# EXHIBIT C

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JUSTIN GUY, individually and on behalf
of those similarly situated,

                    Plaintiff,

                                    Case No. 20-cv-12734-MAG-EAS
vs                                  HON. MARK A. GOLDSMITH

ABSOPURE WATER COMPANY, L.L.C., a
domestic limited liability company,

                    Defendant.
_____/


                    ZOOM DEPOSITION OF JUSTIN GUY

          Taken on the 15th of July, 2021, at 10:10 a.m.

JUSTIN GUY
July 15, 2021

---

**Page 2**

APPEARANCES:

For Plaintiff:  MORGAN & MORGAN, P.A.

     BY:  MICHAEL N. HANNA (P81463)

     2000 Town Center, Suite 1900

     Southfield, Michigan  48075

     (248)251-1399

     mhanna@forthepeople.com

For Defendant:  CUMMINGS, McCLOREY, DAVIS & ACHO, P.L.C.

     BY:  RONALD G. ACHO (P23913)

     17436 College Parkway

     Livonia, Michigan  48152

     (734)261-2400

     racho@cmda-law.com

For Defendant:  JONI HYSKA (P82288)

     Plastipak Packaging, Inc.

     41605 Ann Arbor Road, E

     Plymouth, Michigan  48170

ALSO PRESENT:  Patrick Byrne

     Mari Yokhana

REPORTED BY:  Wendy L. DeMatio, CSR 3851

---

**Page 4**

INDEX OF EXHIBITS (CONTINUED)

| EXHIBIT: | PAGE: |
|---|---|
| Exhibit 17 (check-out/check-in time record) | 5 |
| Exhibit 18 (commission sheets) | 5 |
| Exhibit 19 (Plf's resp. to 1st req. admiss.) | 5 |
| Exhibit 20 (complaint) | 5 |
| Exhibit 21 (consent to join collec. action) | 5 |
| Exhibit 22 (2nd re-ntc. of dep.) | 5 |
| Exhibit 23 (supp. initial disclosures) | 273 |

---

**Page 3**

TABLE OF CONTENTS

WITNESS:  JUSTIN GUY

| | PAGE |
|---|---|
| Examination by Mr. Acho | 6 |
| Examination by Mr. Hanna | 234 |
| Re-examination by Mr. Acho | 248 |
| Re-examination by Mr. Hanna | 272 |

INDEX OF EXHIBITS

| EXHIBIT: | PAGE: |
|---|---|
| Exhibit 1 (employment application) | 5 |
| Exhibit 2 (position description) | 5 |
| Exhibit 3 (cert./compliance driver license) | 5 |
| Exhibit 4 (DOT reg mobile phone policy) | 5 |
| Exhibit 5 (serv. specialist hiring agreement) | 5 |
| Exhibit 6 (serv. specialist bonus plan) | 5 |
| Exhibit 7 (licensing policy) | 5 |
| Exhibit 8 (ntc., background reports) | 5 |
| Exhibit 9 (verifica. consent agreement/acknowl.) | 5 |
| Exhibit 10 (associate handbook) | 5 |
| Exhibit 11 (driver handbook) | 5 |
| Exhibit 12 (call offline policy) | 5 |
| Exhibit 13 (acceptable attendance policy) | 5 |
| Exhibit 14 (termination letter) | 5 |
| Exhibit 15 (Suburban Truck Driving record) | 5 |
| Exhibit 16 (pay records) | 5 |

---

**Page 5**

1        July 15, 2021 - 10:10 a.m.

2        (Exhibits 1-22 were marked prior to

3   deposition at Attorney Acho's office.)

4        COURT REPORTER:  Hello, my name is Wendy

5   DeMatio.  I am your reporter today.  Since this is a Zoom

6   Deposition where the reporter and witness are not in the

7   same location, I would like to confirm with each attorney

8   that I, as the notary, may swear in the witness remotely.

9   Mr. Hanna, do you agree with that?

10        MR. HANNA:  Yes, ma'am.

11        COURT REPORTER:  And, Mr. Acho, do you agree

12   with that?

13        MR. ACHO:  Yes.

14        (Off the record at 10:10 a.m.)

15        (Back on the record at 10:11 a.m.)

16        COURT REPORTER:  Mr. Guy,, could you raise your

17   right hand, please.  Do you solemnly swear or affirm that

18   the testimony you are about to give is the truth, the

19   whole truth, and nothing but the truth?

20        MR. GUY:  Yes.

21        COURT REPORTER:  Thank you.

22        JUSTIN GUY

23   At 10:11 a.m., having been first duly sworn by the

24   Notary Public, was examined and testified as follows:

25        EXAMINATION

---

JUSTIN GUY
July 15, 2021

Page 6

1  BY MR. ACHO:
2  Q   Let this be known that this is the deposition of Justin
3      Guy, pursuant to the Federal Rules of Civil Procedure,
4      and pursuant to notice and agreement of the parties.  Let
5      us begin.  Mr. Guy, could you please state your name,
6      please?
7  A   Justin Guy.
8  Q   And where do you live?
9  A   Canton, Michigan.
10 Q   Where are you now?  Are you in your lawyer's offices?
11 A   I'm in Southfield, Michigan.
12 Q   I didn't ask that question.  Where are you in terms of
13     your lawyer's offices?
14 A   Alone.
15 Q   Mr. Guy, do you live in that room where you are?
16 A   No.  I'm here on Facetime — I mean, Zoom.
17 Q   But where are you?
18 A   In a room.
19 Q   What's the address?
20 A   I don't know.
21 Q   How did you get there?
22 A   I drove to Southfield, Michigan.  He said —
23            MR. HANNA:  He's — just for the record, he's
24     in a non-dispute lawyer's office.  He doesn't have a
25     working laptop.  He came to our office to take the

Page 7

1      deposition.
2            MR. ACHO:  Mike, Mike, I appreciate that, but
3      this deposition deals with credibility.  I want to get
4      honest answers from this witness.
5            MR. HANNA:  Oh, he was being honest, he is in
6      Southfield.  I'm just trying to short circuit it, but you
7      can go ahead with your line of questioning, because I
8      don't think this is relevant, but go ahead.
9  Q   (BY MR. ACHO):  Mr. Guy, why wouldn't you tell me you were
10     at your lawyer's offices?
11            MR. HANNA:  Objection, form.  Mr. Guy properly
12     answered you.  Your question was not clear.  You asked
13     him were he was at.  He told you where he was at.  Please
14     don't insinuate that he wasn't being truthful.
15            MR. ACHO:  Well —
16            MR. HANNA:  I'm not going to allow that to
17     happen.
18 Q   (BY MR. ACHO):  Mr. Guy, are you an honest person, sir?
19 A   Yes.
20            MR. HANNA:  Objection, form, harassment.
21     Mr. Acho, if this line of questioning continues, we're
22     going to call the court right now.
23 Q   (BY MR. ACHO):  Sir, are you an honest person?
24            MR. HANNA:  Objection, form, harassment.
25 Q   (BY MR. ACHO):  Please answer the question.

Page 8

1  A   Yes, I am.
2  Q   Okay.  Do you ever lie?
3  A   No.
4  Q   Okay.  So you've never lied?
5  A   No.
6            MR. HANNA:  Objection, form.
7  Q   (BY MR. ACHO):  Okay.  Next, how much money do you allege
8      you are owed?
9            MR. HANNA:  Objection, form.  You can answer if
10     you know.
11            THE WITNESS:  I don't know.
12 Q   (BY MR. ACHO):  You started this lawsuit a year ago, and
13     you don't know how much you're owed; is that correct?
14            MR. HANNA:  Objection, form.  You can answer.
15            THE WITNESS:  What was the question?
16 Q   (BY MR. ACHO):  Court reporter, just before you read it
17     back, let me mention something to Mr. Guy.  Mr. Guy, have
18     you ever been deposed before?
19 A   What does that mean?
20 Q   I'm sorry, I can't hear you.
21 A   What does that mean?
22 Q   Have you ever gone through something like this before,
23     where you were asked questions under oath?
24 A   No.
25 Q   Okay.  This is your deposition, where I'm going to ask

Page 9

1      you questions and you are to answer the questions
2      truthfully and to the best of your ability.  Your
3      attorney has a right to object, but once his objection is
4      finished, you have to answer the question.  The only time
5      that won't happen is if he directs you not to answer.
6      That's very rare.  So how it will go is this.  I'll ask
7      you a question, you are to answer it.  If your attorney
8      objects, wait until his objection is finished, then
9      answer that question.  Do you understand that?
10 A   Yes, I do.
11 Q   Okay.  If at any time you're confused or you don't
12     understand something, just tell me and I'll be happy to
13     work with you.  Okay?
14 A   Okay.
15     This is not a trial by ordeal, this is not a trick
16     session.  This is a matter of getting answers to
17     questions.  Okay?
18 A   Okay.
19 Q   Okay.  Now, if you need a break at any time, not in the
20     middle of a question, but if at any time you need to go
21     to the bathroom or whatever, just tell me and we'll break
22     and give you time.  And, madam court reporter, make sure,
23     please, keep track of times that we are off the record,
24     because I want to stay within the seven-hour limit.
25            Okay, would you read the last question back to

JUSTIN GUY
July 15, 2021

**Page 10**

1   the witness, please, madam court reporter.
2           COURT REPORTER:  One moment.  The last question
3   was:  You started this lawsuit a year ago, and you don't
4   know how much you're owed; is that correct?
5           MR. HANNA:  Objection, form.  You can answer.
6           THE WITNESS:  No.
7  Q  (BY MR. ACHO):  Why not?
8           MR. HANNA:  Objection, form.  You're asking him
9   why he doesn't know something?
10 Q  (BY MR. ACHO):  Please answer the question.
11          MR. HANNA:  Objection, form.
12          THE WITNESS:  Right.  So am I supposed to
13  answer?
14          MR. ACHO:  Yes, sir.
15          MR. HANNA:  It doesn't make sense, but if you
16  can —
17          THE WITNESS:  I never clocked out of work, so I
18  can't keep track of how much I'm owed.
19 Q  (BY MR. ACHO):  So you have no idea whatsoever whether
20  you're owed five hundred dollars, five thousand,
21  ten thousand, maybe less?  You don't know, do you?
22 A  It would be —
23 Q  You have no idea?  Pardon me?
24          MR. ACHO:  Objection, form.  Mr. Guy, when
25  Mr. Acho finishes asking you a question, just give me a

**Page 11**

1   second to object and then we'll give you a chance to
2   respond.  So objection, form, to that last one.  Mr. Guy,
3   you may answer.
4           THE WITNESS:  Okay.  Which question did you say
5   last?
6  Q  (BY MR. ACHO):  Well, I'm trying to figure out how did you
7   file a lawsuit without knowing what money you think
8   you're entitled to —
9           MR. HANNA:  Objection —
10 Q  (BY MR. ACHO):  — if you have no idea?  That's what you
11  told us, you have no idea, correct?
12          MR. HANNA:  Objection, form.  Is it your
13  understanding, Mr. Acho, that you're required to have the
14  exact amount ascertained in the complaint in an FLSA
15  case?  You're asking a lay witness a question that is
16  nonsensical in a attempt to harass him.  And it doesn't
17  make any sense, you know it doesn't make any sense,
18  you're trying to get under his skin.  Your tactics are
19  well documented in this deposition and others, and I will
20  not hesitate to call the court on you.
21          MR. ACHO:  Mr. Hanna, Mr. Hanna, Mr. Hanna?
22          MR. HANNA:  Yes, sir.  Yes, sir.  How can I
23  help you?
24          MR. ACHO:  You have not allowed the witness to
25  answer virtually any question without an objection, and

**Page 12**

1   I'm asking him a simple question.
2           MR. HANNA:  What question are you — you're
3   asking him if he's lying, if he's a liar, if he lies on
4   the record, and you're asking him why he doesn't know
5   something?  He said he doesn't know.  If he doesn't know
6   the answer, then you move on.  You're trying to harass
7   him is transparent.
8           MR. ACHO:  Mr. Hanna —
9           MR. HANNA:  Yes, Mr. Acho?
10          MR. ACHO:  Let me court — quote to you the
11  court rule of Federal Rules of Civil Procedure 30(c)(2):
12  That an objection must be stated concisely, in a
13  non-argumentative manner, in a non-suggestive manner.
14          I would submit to you that what you are doing
15  is wrong.  I'm going to continue the deposition as best I
16  can.  I have a right to inquire why a witness doesn't
17  know something.  He can give me whatever answer he wants
18  to give.
19 Q  (BY MR. ACHO):  So please give me your answer, Mr. Guy.
20  Why don't you know how much money you say Absopure owes
21  you?
22          MR. HANNA:  Objection, form.  I will just note
23  for the record that my objection is because these
24  questions are harassing and inappropriate.  It's like
25  asking somebody why did you beat your wife.  You're —

**Page 13**

1   he's already said he doesn't know.  That's why these
2   questions are harassing, subject to which you can answer,
3   Mr. Guy.
4           THE WITNESS:  Next question.
5           MR. HANNA:  No, you can answer, Mr. Guy.  He
6   has a right to get your answer.  Ask — if you don't
7   know — if you know why you don't know, I guess you can
8   answer, which doesn't make sense, but you can answer.
9  Q  (BY MR. ACHO):  Mr. Guy?
10 A  Yes.
11 Q  What's the answer?
12 A  I said because I never clocked out, so I never clocked
13  out of work.
14 Q  But that wasn't what I asked you.
15 A  You asked the question, I answered it.
16 Q  Okay.  We'll get back to it this later.  I heard you were
17  a hard worker; is that true?
18 A  Yes, it is.
19 Q  I heard you were a good salesman; is that true?
20 A  Never sold anything.  I delivered goods for Absopure.
21 Q  It is your sworn testimony that you never sold any
22  products, all you did was deliver products and nothing
23  more?  Is that your sworn testimony?
24 A  That's correct.
25 Q  Okay.  And you were described as being intelligent.

JUSTIN GUY
July 15, 2021

Page 14

1  Would you agree with that?
2  A  Yes.
3  Q  Okay.  Is your memory, in your estimation, poor, fair, or
4     good?
5        MR. HANNA:  Objection, form, vague.  You can
6     answer.
7        THE WITNESS:  I got a good memory.
8  Q  (BY MR. ACHO):  Okay.  You say that you're owed money by
9     Absopure.  When did you first come to that conclusion?
10       MR. HANNA:  Objection, form.
11       THE WITNESS:  When I first started working
12    there.  After training, I was working over 10 hours a day
13    and I never received overtime pay.
14 Q  (BY MR. ACHO):  Okay.  Also, Mr. Guy, you're very soft
15    spoken.  It would help me, I'm a little bit hard of
16    hearing, if you could speak up a bit, please.
17 A  I can talk louder for you.
18 Q  Thank you very much.  It will help the court reporter,
19    too, I think.
20 A  Okay.
21 Q  So you started working at Absopure when?
22 A  Back in September 2018.
23 Q  Okay.  Now, so you knew from the very first week that you
24    were not getting paid overtime, correct, you knew that?
25    From the first week you knew that?

Page 15

1        MR. HANNA:  Objection, form.  You can answer.
2        THE WITNESS:  I wasn't aware.
3  Q  (BY MR. ACHO):  Well, you said I knew I wasn't being paid
4     properly since I first started working at Absopure right
5     after my training.  Isn't that what you said?
6        MR. HANNA:  Objection, form.
7        THE WITNESS:  Yes.
8  Q  (BY MR. ACHO):  So you knew in September 2018 that you
9     were not getting overtime pay, correct?
10 A  Who — yes.
11 Q  Okay.  Now, when you realized — I'm sorry.  Before you
12    came to Absopure, were you a driver of other places?
13 A  For like Amazon, like little transit trucks.  Not like no
14    big, big trucks, no.
15 Q  I said did you drive.
16 A  Yes, yes.
17 Q  Okay.  And were you paid hourly?
18 A  No.
19 Q  They paid you salary?
20 A  Yes.
21 Q  So you never got overtime with the other companies?
22 A  I never said that.
23 Q  Well, did you get overtime at the other companies before
24    you came to Absopure?
25 A  Yes, I did.

Page 16

1  Q  COURT REPORTER:  I'm sorry, I'm sorry.
2        (Off the record at 10:20 a.m.)
3        (Back on the record at 10:48 a.m.)
4  Q  (BY MR. ACHO):  Okay.  Mr. Guy, you have known since
5     September 2018 that you were being paid unfairly by
6     Absopure; isn't that correct?
7  A  Yes.
8  Q  Did you complain to the United States Department of
9     Labor, Wage and Hour Division at any time?  You have to
10    answer yes or no.
11       MR. HANNA:  Objection, form.  For the record,
12    he does not — that's a false instruction.  He is not
13    required by law to answer yes or no.  You can answer,
14    Mr. Guy.
15       THE WITNESS:  Can you repeat that question?
16 Q  (BY MR. ACHO):  Could you, court reporter?  Here, I'll
17    make it quicker.  Please don't object again, Mr. Hanna,
18    because I'm just repeating the question.  Did you ever
19    complain to the United States Department of Labor and/or
20    the Wage and Hour Division about this, yes or no?
21       MR. HANNA:  Objection, form.  You can answer.
22       THE WITNESS:  I complained —
23 Q  (BY MR. ACHO):  What?
24 A  I complained to the people that paid me.
25 Q  Okay.  Sir, could you please answer my question.  Did you

Page 17

1     complain to the United States Department of Labor and/or
2     the Wage and Hour Division about you not being paid
3     properly, yes or no?
4  A  No.  I don't know who that is.
5  Q  Did you contact the United States Department of Civil
6     Rights?
7        MR. HANNA:  Objection, form.  You can answer.
8        THE WITNESS:  I don't know who that is.
9  Q  (BY MR. ACHO):  Did you contact the United States
10    Department of Transportation?
11 A  I don't know who that is.
12 Q  So you didn't contact any federal agency about you being
13    paid unfairly since September of 2018, correct?
14 A  I contacted my attorney for that.
15 Q  Sir, please, I'm asking you a specific question.  Wendy,
16    could you please read back the question?  And I would
17    like to get the question there and the answer.
18       COURT REPORTER:  One moment.  So you didn't
19    contact any federal agency about you being paid unfairly
20    since September of 2018, correct?
21       THE WITNESS:  I don't know who that is.
22 Q  (BY MR. ACHO):  Well, is the answer, yes, I did or, no, I
23    didn't?
24 A  My answer is I don't know who that is.
25 Q  So you didn't contact them, right?

JUSTIN GUY
July 15, 2021

Page 18

1  A   I don't know who that is to contact.
2  Q   So you didn't contact then, correct?
3  A   I do not know who that is.
4  Q   If you don't know who it is, then you didn't contact then
5      and complain, correct?
6  A   I do not know who you're talking about.
7  Q   Did you contact the Michigan Department of Labor to
8      complain about you not being paid overtime?
9  A   I do not know who that is to complain to, so how am I
10     supposed to complain?
11 Q   Did you complain to the Michigan Department of Civil
12     Rights?
13 A   I complained to Absopure.  They did nothing about it.
14 Q   Did you complain to the department of civil rights, yes
15     or no?
16 A   I don't know who that is.
17 Q   Did you contact the Michigan Department of Transportation
18     to complain, yes or no?
19 A   I don't know who —
20 Q   You don't know what?
21 A   I don't know who you're talking about.
22 Q   Okay.  So you never contacted them?
23 A   This was my first like real trucking job.  I don't know
24     who to contact for that, I don't know who that is you
25     keep asking me.  Ask —

Page 19

1  Q   Mr. Guy, all you have to say is, no, I didn't.  The
2      answer is — the questions are really simple, so please
3      try to listen to the question and answer it.  Okay,
4      please?  I'm not trying to give you a hard time, I just
5      want to get answers to my questions.  So you did not —
6      so you didn't contact anyone from the State of Michigan,
7      correct, to complain, right?
8              MR. EPANA:  Objection to form.  You can answer.
9              THE WITNESS:  I don't know.
10 Q   (BY MR. ACHO):  Pardon me?
11 A   I don't, sir.  I can't complain to somebody I don't know
12     who it is.
13 Q   Okay.  So you didn't contact a U.S. Congressman, a U.S.
14     Senator, a State Senator, a State Representative to
15     complain about your not getting paid overtime, correct?
16             MR. EPANA:  Objection —
17             THE WITNESS:  They're not the people that paid
18     me.
19 Q   (BY MR. ACHO):  Pardon me?
20 A   Them are not the people that paid me.  I complained to
21     Absopure.  That's who I worked for, that's who I
22     complained to.
23 Q   Okay.  So you complained from your very first paycheck,
24     didn't you, back in September of 2018, correct?
25 A   That's correct.

Page 20

1  Q   Did you contact human resources at the plant, yes or no?
2  A   The human resources —
3  Q   And complained?
4  A   Are you talking about at Absopure?
5  Q   Yes.
6  A   Yes, I did.
7  Q   Yes or no?
8  A   Yes, I did.
9  Q   To complain about not getting paid overtime?
10 A   Yeah.  I complained about everything that them guys was
11     doing is more — is I complained.
12 Q   Would that have been in September or October of 2018?
13 A   I was complaining to them when I first started working.
14 Q   What did you complain about?  Tell me everything.
15 A   I was working long —
16             MR. EPANA:  Objection, relevance.  You can
17     answer.
18             THE WITNESS:  I was working long hours and
19     never clocked out a day of my life.
20 Q   (BY MR. ACHO):  My question, Mr. Guy, is very simple.
21 A   I gave you an answer.
22 Q   Tell me everything that you complained about to human
23     resources, and when was that.
24 A   I was complaining to human resources that I was working
25     10 — over 10 hours per day when I first started working,

Page 21

1      and I didn't like that, because they was only giving me a
2      certain amount of money and it wasn't enough.
3  Q   Who did you speak to?
4  A   Oh, I think the guy was named like Pat, or something like
5      that.
6  Q   And that would have been — that would have been around
7      September or October of 2018?
8  A   Yes.  Back in September, yeah.
9  Q   Of 2018.  Now, did you complain about anything else other
10     than not getting paid overtime?
11             MR. EPANA:  Objection.  What's the relevance of
12     that, Mr. Acho?  This is an overtime lawsuit.
13 Q   (BY MR. ACHO):  Please answer the question.
14             MR. EPANA:  Yeah, I just want to note for the
15     record, to the extent we run overtime, Mr. Acho is just
16     going off on tangents that have nothing to do with anything.
17     For example, he's asking Mr. Guy if he complained to the
18     department of civil rights, which has nothing to do with
19     wage and hour cases.  In fact, most of the questions Mr.
20     Acho has asked have nothing to do with this case.
21     Now, Mr. Guy indicated that he complained about
22     not getting paid for overtime, which has everything to do
23     with this case, and he's asking him on and on and on to
24     go on about other unrelated complaints.
25             You're entitled to ask this, I'm not asking him

JUSTIN GUY
July 15, 2021

**Page 22**

1    not to answer, but I just want this noted for the record,

2    because we're going to object if you request any

3    additional time, because you're wasting your time right

4    now conducting your deposition on irrelevant topics. You

5    may answer, Mr. Guy.

6  Q  (BY MR. ACHO): Go ahead, sir.

7  A  What was your last question?

8  Q  So the record is clear, we're wasting a lot of time

9    because of the objections, speaking objections and other

10    things, and then the witness then forgets the question.

11    You said you complained --

12        MR. HANNA: For the record, for the record,

13    that is an inaccurate statement. I don't care what

14    you're saying. You can't make a statement like that

15    against me on the record and not expect me to respond.

16    The statement Mr. Acho made is verifiably false, and I am

17    noting my position on the record so we don't waste time,

18    and Mr. Acho intends to go after the time, because once

19    the time is up, we're out. This is a very simple

20    plaintiff's deposition in an FLSA case. If we could keep

21    it to that, we can get done in time, but you can

22    continue.

23  Q  (BY MR. ACHO): Mr. Guy, you said you complained about

24    everything. What did you complain about other than

25    overtime?

**Page 23**

1        MR. HANNA: Objection, form. You can answer.

2        THE WITNESS: Working too long of a -- I mean,

3    too many hours. That's too long for not to be paid for.

4  Q  (BY MR. ACHO): So was it the hours were too long or that

5    you weren't getting paid for them?

6  A  Both.

7  Q  Which is it?

8  A  Both.

9  Q  Okay. And you didn't want to work that many -- you

10    didn't want to work that many hours? Pardon me?

11  A  Can I finish my response? You asked me a question. I'm

12    going to answer it.

13  Q  I'm sorry, I didn't hear it. Go ahead.

14  A  Let me finish. All right.

15  Q  Mr. Guy, I'm waiting. I'm sorry, go ahead.

16  A  I was telling you, but you was speaking over me. So go

17    with your next question, I already answered the last one.

18  Q  So you did finish your answer?

19  A  Yeah.

20  Q  Okay.

21  A  Well, I was trying to, but you was talking over me.

22  Q  Is there more you want to say, sir?

23  A  No. Next question.

24  Q  Okay, okay. When -- after September or October 2018,

25    when was the next time you complained to human resources,

**Page 24**

1    if ever?

2  A  I was going over there once every other month really,

3    like trying to.

4  Q  And who did you speak to?

5  A  It was a guy named Pat and a lady named something. I

6    don't remember her name, but she was a little, short

7    lady. I'm sure you know who I'm taking about.

8  Q  And what did you complain about?

9  A  I just told you. I worked too much not to get paid.

10  Q  Well, let me ask you this. When you first went, what did

11    that person say to you?

12  A  It's -- it's just how Absopure works. That's how they

13    pay each other. You get paid on what you do.

14  Q  That's what you were told, nothing else?

15  A  I mean, it was three years ago. I don't remember exactly

16    word-for-word how it went, but that was a part of it.

17    Like this is how we constructed the business, this is

18    what you're going to be paid. You're either going to

19    work here or you're not. I had kids, I had to do what I

20    had to do, I worked there.

21  Q  Well, let me understand something. Is it your sworn

22    testimony that at the time that you got hired, you didn't

23    know how you were going to get paid, you didn't know?

24        MR. HANNA: Objection, form.

25        THE WITNESS: What was that?

**Page 25**

1  Q  (BY MR. ACHO): When you got hired in, are you telling the

2    court I didn't know how I was going to get paid? Is that

3    what you're saying?

4        MR. HANNA: Object to form. Yeah, that's

5    misrepresents the testimony. You can answer.

6  Q  (BY MR. ACHO): Go ahead. Answer it, please.

7  A  I never said that.

8  Q  Well, is that true? Is that an accurate statement?

9  A  No, it's not.

10  Q  So you knew before you started working at Absopure in

11    September of 2018 how you were going to be paid, which

12    did not include overtime? You knew that when you got

13    hired in, correct?

14        MR. HANNA: Objection, form.

15        THE WITNESS: No, it's not.

16  Q  (BY MR. ACHO): Well, either you knew how you were going

17    to be paid or you didn't. Which is it?

18  A  I knew I was going to be paid $120 a day for salary pay,

19    nothing about overtime. I thought overtime comes with

20    any job you work.

21  Q  Who told you that?

22  A  I mean, I thought it was common sense. I had a job

23    before this. This wasn't my first job.

24  Q  Did anyone at -- I'm sorry, go ahead.

25  A  Go ahead, you can go to the next question. Did anybody

JUSTIN GUY
July 15, 2021

**Page 26**

1  at Absopure what?

2 Q  Did anyone at Absopure at the time of your hire or

3  anytime after while you were there said you were going to

4  get overtime, anyone?

5 A  I don't know.  That's —

6 Q  Can you explain that to me?  Can you explain what you

7  mean by "I don't know"?  Either someone told you you get

8  overtime or you weren't told that.  Which is it?

9 A  You're not — when you get hired at a job, you're not

10  working for overtime.  Overtime is a privilege.

11 Q  That's not my question, though.  That's not my question.

12  Sir, it will help me to get through the deposition if you

13  listen carefully, please, please, to my question and

14  answer it, so I'm going to ask it again.  At the time of

15  your hire or at anytime that you worked at Absopure were

16  you told you were going to get paid overtime?

17 A  Overtime comes with working.  It's the law.

18 Q  Mr. Guy, I'm going to ask you the question again.  It's

19  real simple, it's not complicated.  Were you ever told

20  either at the time of your hire or during work for

21  Absopure that you would be paid overtime?  Did anyone

22  ever tell you that?

23 A  I don't remember.  It was three years ago.

24 Q  But you told us you had a good memory.

25 A  Up to a certain extent.

**Page 27**

1  MR. HANNA:  Objection, form.

2 Q  (BY MR. ACHO):  Well, isn't it — is it significant to

3  know how you're going to get paid before you start a job,

4  isn't it?

5 A  Not when you got kids and about to get kicked out your

6  mother's house, no, it's not.

7 Q  I'm sorry, are you married?

8 A  No, I am not.

9 Q  But you have children?

10 A  Yes, I do.

11 Q  How many?

12 A  Two.

13 Q  Okay.  How old are they?

14 A  Two and four.

15 Q  And you were kicked out of your mother's house; is that

16  what you're saying?

17 A  I was going to if I didn't go to work, so I had no choice

18  but to work for them.

19 Q  Okay, okay.  Well, but you could have worked somewhere

20  else where they paid overtime, couldn't you?

21  MR. HANNA:  Objection, form.

22  THE WITNESS:  I thought all jobs paid that.

23 Q  (BY MR. ACHO):  That's not my question.  You knew Absopure

24  didn't pay overtime, you were told that, but yet —

25 A  I was not.

**Page 28**

1 Q  — you continued working for 18 months, right?

2 A  Who told me I wasn't getting overtime?  I was told

3  never — nothing about that.

4 Q  You were — so — well, but when you first complained to

5  human resources, they told you you don't get overtime,

6  that they don't pay it.  They told you that, didn't they?

7 A  No.  What — what person told me that?

8 Q  Whoever you met with.  You said, this is how we pay.

9  They never said you'd get overtime.  Pardon me?

10 A  Only thing they told me was $120 a day, plus commission

11  is my salary pay.

12 Q  Yeah.  Nothing about overtime, right?  Nothing, true?

13 A  No.

14 Q  It's not true they brought up overtime?

15 A  I mean, honestly, they didn't.  That's why we're here,

16  right?

17 Q  Well, you talked about it.  You asked — you said I went

18  to be paid overtime.  That's why you went to human

19  resources to complain, right?

20 A  And that's why I'm here now, because they didn't want to

21  do nothing about it.

22 Q  Because they said they don't pay overtime for that job,

23  correct?  That's what they told you?

24 A  They suppose to.  They don't want to, because people work

25  over eight hours every single day there, and that's a lot

**Page 29**

1  of money to give out to every employee.

2 Q  Mr. Guy, I'm talking about you —

3 A  I'm talking about —

4 Q  — and what you were told.  I'm talking about you only.

5 A  I'm not the only one it's happened to.  It's every driver

6  there.

7 Q  Mr. Guy, I'm talking about you and your claim.  Your

8  claim is I didn't get paid overtime for my work, right?

9 A  Yes.

10 Q  But when you went to complain, Absopure says we don't pay

11  overtime.  They told you that in September or October of

12  2018, and they told you each time you asked about it,

13  didn't they?

14 A  No.

15 Q  They didn't?

16  MR. HANNA:  Okay.  I'm just going to note for

17  the record, again, as far as the time goes, Mr. Acho, I

18  know you don't regularly handle FLSA cases, but just so

19  you know, the fact if — even if they told him or didn't

20  tell him, it's completely irrelevant.  It doesn't make it

21  legal or illegal if they told him they're paying proper

22  or not proper.  So I just want to note this for the

23  record, because we're wasting a lot of time again diving

24  into these rabbit holes that are completely irrelevant,

25  but you may continue with your deposition and ask him

**Page 30**

1      about whether they told him or didn't tell him.

2 Q   (BY MR. ACHO): When did you find out that Absopure was

3      not going to pay you overtime?

4 A   When I worked my first week of 50 hours and I didn't get

5      paid over that 40-hour mark.

6 Q   Okay, okay. And did you complain to the supervisor?

7 A   Yeah, I always complained, but I —

8 Q   You always complained? You always complained?

9 A   I was just a little black kid, and they —

10          COURT REPORTER: I'm sorry, I'm sorry, whoa,

11      whoa. I'm getting a lot of overlap. Please ask your

12      question, Mr. Acho.

13 Q   (BY MR. ACHO): Which supervisor did you complain to?

14 A   I complained to all of them. Tony, Alex, Art, and —

15 Q   And what did they tell you when you — what did they tell

16      you when you complained?

17 A   Well, Art, he made it to where he was basically just

18      saying — like he did make it to where I could make some

19      more money. He gave me a personal route, like I had a

20      route that was mine. That's what he did when I started

21      complaining.

22 Q   I didn't ask you — what did he say about the overtime?

23 A   But I complained — are you listening or am I not talking

24      clear? You asked me a question, I answered it. When I

25      was telling him about complaining — when I was

**Page 31**

1      complaining, he offered me a better route to make more

2      money.

3 Q   To make more money. Oh, that's the commissions, right?

4 A   That's what he offered me in order of overtime. He said

5      he would just give me more money to do a better route.

6 Q   And did you make more money on a better route?

7 A   I had to work longer, and I still didn't get paid

8      overtime.

9 Q   Well, but there are days and weeks where you made a lot

10      more money than had you been hourly and got paid

11      overtime. You're not denying that, are you?

12 A   That's not correct.

13 Q   Well, I was told some days, I mean, you got — you knew

14      how much you made every day, didn't you?

15 A   Yes.

16 Q   You knew it. So every day you were aware of what you

17      were getting, which did not include overtime, correct?

18 A   No.

19 Q   No, what?

20 A   No, it didn't include overtime.

21 Q   But you knew it every single day, right?

22          MR. HANNA: Object to form.

23          THE WITNESS: I didn't know I wasn't supposed

24      to be paid — overtime is over eight hours a day, and I

25      was working over eight hours a day.

**Page 32**

1 Q   (BY MR. ACHO): But not every day. Some days you only

2      worked four or five hours. Based upon what people are

3      telling me, you only worked some days four to five hours.

4      You're not denying that, are you?

5 A   That's not correct.

6 Q   Are you denying under oath that there are days you only

7      worked four to five hours? You're denying it?

8          MR. HANNA: Objection.

9          THE WITNESS: I never only worked four to five

10      hours, unless I got injured at work and did ask to go

11      home.

12 Q   (BY MR. ACHO): What about the Detroit Public Schools?

13      Remember when they were not operating that much? You

14      only worked four to five hours is what I was told. Is

15      that not true?

16 A   They must be — who told you that? Because you might

17      want to go back to ask them was that me, because that

18      wasn't me, that's not correct.

19 Q   Okay. And one of the routes that you were given toward

20      the end when you were working, you were making a lot of

21      money, weren't you?

22 A   I don't recall. I don't know.

23 Q   Okay. Sitting here today, you're telling us under oath

24      you don't know what your damages are and you don't know

25      whether you made a lot of money toward the end of your

**Page 33**

1      career with Absopure. That's what you're telling us,

2      right?

3          MR. HANNA: Objection, form.

4 Q   (BY MR. ACHO): Go ahead.

5 A   Repeat your question.

6          MR. ACHO: Go ahead, Wendy, please.

7          COURT REPORTER: One moment. Okay. Sitting

8      here today, you're telling us under oath you don't know

9      what your damages are and you don't know whether you made

10      a lot of money toward the end of your career with

11      Absopure. That's what you're telling us, right?

12          MR. HANNA: Objection, form. You can answer.

13          THE WITNESS: I don't know.

14 Q   (BY MR. ACHO): You don't know what?

15 A   I don't remember.

16 Q   You don't remember what I just asked you?

17 A   I don't remember how much I made at Absopure three years

18      ago.

19 Q   That's not my question.

20 A   That was.

21 Q   My question is, you're saying under oath I don't know

22      what my damages are even today and I don't know whether I

23      made a lot of money at the end my career at Absopure, I

24      don't know. Is that what you're saying?

25          MR. HANNA: Object — objection.

JUSTIN GUY
July 15, 2021

Page 34

```
1            MR. ACHO:  Go ahead.
2            MR. HANNA:  Objection, form.
3            THE WITNESS:  I don't know.
4   Q  (BY MR. ACHO):  You don't know what?
5            MR. HANNA:  All right.  We're going to -- let
6   me put another objection on the record.  First of all,
7   Mr. Acho --
8            MR. ACHO:  Okay, let me move on.  Let me --
9   wait, wait --
10           MR. HANNA:  I am putting an objection --
11           MR. ACHO:  I want to move on.
12           MR. HANNA:  I don't care if you want to move
13  on.  You don't get to badger -- you don't get to badger
14  the witness and say I want to move on, okay.  Your
15  questions are nonsensical.  You're telling him if he
16  made, quote, unquote, "a lot of money."  You don't even
17  define what that means.  He's answered you five times
18  saying I don't know.  It's completely irrelevant for the
19  FLSA.  Mr. Acho, all respect due to you, I understand you
20  don't regularly handle these types of cases.  It's
21  irrelevant, you're wasting the time, and I want this
22  noted for the record, because we're not going to agree to
23  any more time for the deposition.  You may continue your
24  deposition, Mr. Acho.
25           MR. ACHO:  I'll cite you again to Civil
```

Page 35

```
1   Procedure 30(c)(2).
2   Q  (BY MR. ACHO):  Sir, you've been trying to get other
3      drivers to join your case, haven't you?  You've tried,
4      haven't you?
5            MR. HANNA:  Objection, form.  Lack of
6      foundation.
7   Q  (BY MR. ACHO):  Go ahead, answer the question, please.
8   A  What was that?
9   Q  Sir, why do you keep doing this?  I mean, I keep having
10     to repeat questions.  You've tried to get other drivers
11     to join your lawsuit.
12           MR. HANNA:  Objection --
13  Q  (BY MR. ACHO):  You're not denying that, are you?
14           MR. HANNA:  Objection, form.  Lack of
15     foundation, leading.
16  Q  (BY MR. ACHO):  Go ahead.
17  A  All right.  I don't know.
18  Q  You don't know what?
19  A  My answer is I don't know.
20  Q  You don't know whether you contacted other drivers or
21     tried to?  You don't know the answer to that?
22  A  I do not know.
23  Q  Is it because your memory fails?  Why don't you know,
24     please?
25  A  I have good memory, I was just answering the question.  I
```

Page 36

```
1      gave you my answer.  Can you go to the next question?
2   Q  Well, no one has joined your lawsuit, have they, even
3      though you approached some people?
4   A  I don't know.
5   Q  Have you done anything wrong while you were at Absopure?
6   A  Yes.  Worked overtime and not get paid for it.
7   Q  No, what you did wrong, not what Absopure --
8   A  Somebody didn't pay me, that was wrong.
9   Q  Okay.  Did you honor all of your obligations to Absopure?
10  A  I'm not understanding what you're asking.  Can you repeat
11     that in a better way?
12  Q  Yeah.  Did you do everything that you had promised
13     Absopure you would do?
14  A  Yes.  I would -- I would deliver the goods for Absopure.
15  Q  So you never violated anything, correct?  True?
16  A  No.  I didn't violate nothing, no.
17  Q  Okay, let me ask you this.  Didn't Absopure always treat
18     you fairly and well, true?
19           MR. HANNA:  Objection, form.
20           THE WITNESS:  Not all the time.
21  Q  (BY MR. ACHO):  Other than the overtime issue, they
22     treated you well over there, didn't they, your
23     supervisors?
24  A  Not all the time.
25  Q  Well, when didn't they?
```

Page 37

```
1   A  I mean, I can't remember.  It was so long ago, it was
2      three years ago.  You're asking me to remember three
3      years ago?
4   Q  Well, didn't you stop working last year?
5   A  A year and-a-half ago.
6   Q  Well, let me understand something.  You have no
7      recollection right now that you were not treated fairly
8      and well by Absopure.  Right now, you have no
9      recollection, do you?
10  A  Define "recollection" for me.
11  Q  You know, where you remember.  You don't remember
12     anything, correct?  Is that correct?
13  A  I didn't say that, no.
14  Q  Say what?
15  A  No.
16  Q  I don't understand.  No, what?
17  A  No.
18  Q  No, what?  I don't understand what you mean by "no."  No,
19     that you don't remember anything?  You don't remember
20     anything negative right now, correct?
21  A  That's not what you said.  You said --
22  Q  That's what I'm asking you.  Do you remember anything
23     right now where you were not treated well other than
24     overtime?
25  A  It's multiple times I wasn't treated well, but don't
```

JUSTIN GUY
July 15, 2021

Page 38

1    nobody care about it.
2 Q  But you can't remember any right now that you can tell us
3    about, can you?
4        MR. HANNA:  Object, relevance.
5        THE WITNESS:  How long you want me to talk
6    about it?  I mean —
7 Q  (BY MR. ACHO):  Any time?
8 A  Other than not being paid overtime; is that what you're
9    asking?
10 Q  Yes, sir.
11 A  Like working 10 hours a day and not being paid for it?
12 Q  Other than your overtime claim, you have no recall of not
13   being treated fairly and well, correct?
14        MR. HANNA:  Objection —
15        THE WITNESS:  That's not correct.
16 Q  (BY MR. ACHO):  Tell me what — tell me what's not
17   correct.
18 A  I answered your question.  It's not correct.
19 Q  How was it not correct?
20 A  Because that's my answer.
21 Q  But why is it not correct?  Please explain for me,
22   because I don't understand.
23 A  I don't understand what you want me to say more.  Like
24   what are you asking, then?
25 Q  All right.  Okay.  I'm going to move on.

Page 39

1 A  Thank you.
2 Q  Do you need a break at all?  If you do, we'll take a
3    break now, because I —
4 A  I got to get my kids, so I'm on your time.  I don't need
5    no break.
6 Q  Okay.  Did you like working at Absopure?
7 A  Yes, I did.
8 Q  How come?
9 A  It was just I looked at it as a workout.  You know, the
10   heavy — the water is heavy.
11        MR. HANNA:  Just for the record, Mr. Guy, you
12   just said you have to get your kids.  What — is there
13   something going on?  Is there a specific time you have to
14   get them or something?
15        THE WITNESS:  Oh, no, no, no.  I don't have a
16   specific time.  He was just — I was just letting him
17   know I don't need no breaks, I was on his time.
18        MR. HANNA:  Okay.
19 Q  (BY MR. ACHO):  Okay.  Mr. Guy, you didn't answer the
20   question.  Why did you like working at Absopure?
21 A  Because —
22        MR. HANNA:  Objection — objection, relevance.
23   You can answer.
24        THE WITNESS:  Because it was a nice workout,
25   and it was I'm out daily.  I'm not inside stuck in a

Page 40

1    warehouse for 10, 12 hours working my ass off.  I'm
2    outside in the air, you know, moving at my own pace.
3 Q  (BY MR. ACHO):  So you had freedom, right?
4 A  Yes.
5 Q  And you could eat whenever you want, couldn't you?
6 A  No.
7 Q  You couldn't?
8 A  I never took a lunch break.
9 Q  Did you hear my question?  I didn't ask you what you did.
10   I asked you whether you could.  You could eat lunch when
11   you wanted to, couldn't you, yes or no?
12 A  No.
13 Q  Why not?
14 A  I had to deliver.  I didn't have time to eat.
15 Q  You didn't have time to eat?
16 A  No.
17 Q  Is that what you're telling us?  Wait, wait, wait.  Are
18   you testifying under oath I never ate lunch, because I
19   didn't have time to eat?  Is that your sworn testimony?
20 A  That's the truth.
21 Q  So in the year and-a-half you worked at Absopure, you
22   never took a lunch; is that right?
23 A  That's correct.
24 Q  Did anyone tell you you couldn't take lunch?
25 A  I don't know.  Everybody told me I had to get my work

Page 41

1    done, and in between time if I ate, I wouldn't be able to
2    get the work done, so I never ate.  There was too much
3    stuff to do.
4 Q  Mr. Guy, I apologize, but respectfully, you're not
5    answering my questions.  You really are not answering
6    what I'm asking you.
7        Okay, Wendy, we're going to start this as a
8    clean question.  Did anyone at Absopure say you could not
9    take lunchtime, yes or no?
10 A  Did they ever say that?
11 Q  Yes.
12 A  Like they — you said did they ever tell me I can or I
13   can't?
14 Q  Mr. Guy, honestly, this is becoming very frustrating for
15   me.  I'm asking real simple questions.
16        MR. HANNA:  Mr. Acho, we're in a Zoom
17   deposition and he can't hear you.  He just — he said,
18   did you say they told him you can or cannot.  That's all
19   he asked you.
20        MR. ACHO:  Okay.  You know what, maybe you
21   should put the phone up to your ear.  Maybe that will
22   help you.
23        MR. HANNA:  I'll object to — I'm not going to
24   require the deponent to put the phone up to his ear for
25   seven hours because there's computer issues.  We can hear

JUSTIN GUY
July 15, 2021

**Page 42**

```
 1   him just fine.  Mr. Guy, he said -- Mr. Guy, he said --
 2              MR. ACHO:  No, no, I'll do it.  I'll do it.
 3              MR. HANNA:  Well, you can't do it clearly, so
 4   I'll do it.
 5              MR. ACHO:  No, no, please, I will ask --
 6              MR. HANNA:  Go ahead, ask your question.
 7 Q (BY MR. ACHO):  Mr. Guy, you have testified under oath
 8   that you did not take a lunch break for a year and-a-half
 9   while you were at Absopure.  Did anyone at Absopure ever
10   tell you that you could not take a lunch break?
11 A Nobody ever told me that I could.
12 Q So because no one said you could, you assumed that you
13   could not.  Is that the assumption you made?
14 A If I was out there 10 hours without a lunch break, what
15   am I going to do with a lunch break?  I'm going to be out
16   there almost 11 hours.
17 Q Well, first of all, when you're driving a truck, you
18   could pack your own lunch, couldn't you?
19 A Yes, if I can afford -- if you can afford it, yes.
20 Q Pardon me?
21 A If you can afford it, yes.
22 Q What do you mean by that?
23 A I --
24              MR. HANNA:  Objection --
25              THE WITNESS:  I had to pay bills.  I didn't
```

**Page 43**

```
 1   have enough money to pay for lunch after.  Maybe if I was
 2   getting paid the correct rate, I probably could afford
 3   it, but all my money was tied -- I was paying --
 4 Q (BY MR. ACHO):  So it's your sworn -- so it's your sworn
 5   testimony that you didn't take lunch, your own -- pack
 6   your own lunch, because you didn't have the money; is
 7   that correct?
 8 A You asked me did I -- I never took a lunch, because I
 9   didn't have time to eat at work.  That was why I didn't
10   took a lunch.
11 Q But that's not what I asked you.  We're beyond that.  Now
12   I'm asking you why didn't you just pack your own lunch
13   and have it in the truck?  You could have done that, and
14   you said, no, I didn't have the money.  Isn't that what
15   you told us --
16 A Yes.
17 Q -- just now?  Is that correct?
18 A Yes, that's correct.
19 Q So -- so it's your sworn testimony that you didn't take
20   lunch, because you didn't have the money for the lunch,
21   because you weren't getting paid enough; is that right?
22   Is that right?
23 A No, that's not right.
24 Q Well, what is right?  You brought up the issue you didn't
25   have money.  Didn't you bring it up?
```

**Page 44**

```
 1 A That -- that is a waste of money to eat during work.  Why
 2   would I eat if I'm going to eat when I get off work and I
 3   ate before I got to work?
 4 Q Okay.  So you chose not to take lunch.  You made the
 5   decision that you would eat before you started working
 6   and eat after, it's not because someone told you you
 7   couldn't take a lunch; is that true?
 8              MR. HANNA:  Objection.
 9              THE WITNESS:  No.  I couldn't take a lunch,
10   because I had too much work assigned to me every single
11   day.  I didn't have time to eat, once again.
12 Q (BY MR. ACHO):  Okay, let me ask you this.  Did you
13   complain to human resources about that you never took a
14   lunch, because you didn't have time to eat?  Did you ever
15   make that complaint, yes or no?  Yes or no?
16              MR. HANNA:  Objection to --
17              THE WITNESS:  I don't know why we're talking
18   about my lunch.  I don't get what this has to do with
19   anything.
20 Q (BY MR. ACHO):  So the answer is, no, you did not complain
21   about not having lunch, correct?  You never did?
22 A I didn't complain about being hungry, I didn't care.  I
23   had to do my work.  That work was more important.  They
24   don't care about nothing as long as the water's
25   delivered.  That's all Absopure cares about.
```

**Page 45**

```
 1 Q So you did not complain to anyone at Absopure that you
 2   weren't taking a lunch.  You never did, did you?
 3 A I never had to.
 4 Q You know, it's real simple.  It's a simple question.
 5 A I gave you a simple answer.  I never had to complain.
 6   I'm not hear complaining about food.
 7 Q Wait a minute, let me understand something.  So you're
 8   not complaining that you didn't take lunch?  Is that what
 9   you're testifying under oath, you're not complaining
10   about that?
11 A No, I'm not.  Do I have to?  I didn't know I had to.
12 Q All right, let me ask you something.  When you hired in,
13   you said you have a good memory, tell us about the
14   hiring.  Oh, by the way, before I forget, where do you
15   work now?
16              MR. HANNA:  Objection, relevance.  You can
17   answer.
18              THE WITNESS:  I start working next week for
19   Jack Cooper, a car hauling company.
20 Q (BY MR. ACHO):  Well, you started working -- okay.  Are
21   you being paid hourly with overtime?
22 A This is a --
23              COURT REPORTER:  I'm sorry, what was the
24   answer?
25 Q (BY MR. ACHO):  Pardon me?
```

JUSTIN GUY
July 15, 2021

Page 46

1    MR. HANNA: Objection, form, relevance, to this
2  whole line of questioning, so I don't keep interrupting.
3  You can answer, Mr. Guy.
4    THE WITNESS: I start working next week.
5  Q  (BY MR. ACHO): That's not what I asked you. You already
6    said that. I said how are they paying you?
7  A  I haven't started yet, I don't know. They told me I'm
8    going to be paid a hundred — $1.30 a mile. This is
9    trucking, this is a whole other different ballgame.
10 Q  So you're not getting paid overtime —
11 A  I don't know.
12 Q  — is that right?
13 A  I haven't started working. It's a terrific job, so
14   they're going to pay me overtime, yes.
15 Q  Oh, they are. Okay. Where are they located?
16 A  In Wayne, Michigan.
17 Q  Okay. Now, by the way, you quit Absopure, didn't you?
18 A  No, I did not.
19 Q  You stopped showing — you stopped showing up to work?
20 A  No, I did not.
21 Q  Right?
22 A  No.
23 Q  You did not stop showing up for work?
24 A  No.
25   MR. HANNA: Objection. Just — objection,

Page 47

1  form. You can answer.
2  Q  (BY MR. ACHO): Well, first of all, after Absopure, where
3    did you start working?
4  A  You said after Absopure?
5  Q  Yeah.
6  A  I just got a job, like I start next week. You didn't
7    hear me the last couple questions?
8  Q  Mr. Guy, I'm trying to be as polite and respectful to you
9    as —
10   MR. HANNA: You're not doing a good job, Mr.
11   Acho, at being polite or respectful. Questioning him why
12   he didn't have enough money to buy lunch? That was very
13   disrespectful to question a witness about why he doesn't
14   have money to eat lunch, so I don't think you were being
15   respectful, for the record.
16 Q  (BY MR. ACHO): Mr. Guy, have you worked anywhere since
17   you left Absopure?
18 A  No, I did not.
19 Q  What have you been living on?
20 A  Unemployment from Absopure.
21 Q  And you get that supplement as well?
22 A  I don't know what that means. Can you define that
23   "supplement" word for me?
24 Q  Well, how much are you getting from unemployment?
25   MR. HANNA: Objection, relevance.

Page 48

1  Q  (BY MR. ACHO): Go ahead.
2  A  What was that?
3  Q  How much are you making?
4  A  It's like $600 a week.
5  Q  Is that more than what you were making at Absopure?
6    MR. HANNA: Objection —
7  Q  (BY MR. ACHO): I can't hear you, I'm sorry. Can you
8    speak up a little bit, can you speak up a little bit? Go
9    ahead.
10 A  Yes, without the commission.
11 Q  Well, I'm — yeah, I want to ask you about that. You
12   collected commission besides your day rate, correct?
13 A  Yes.
14 Q  And you want overtime, even though your commission could
15   have made you more money than the overtime. That's true,
16   isn't it?
17 A  No.
18   MR. HANNA: Objection, form.
19 Q  (BY MR. ACHO): What? Say it again?
20 A  No.
21 Q  No, what?
22 A  That's not correct.
23 Q  Well, are you asking for overtime for the weeks where
24   your commission was more than the overtime? Are you
25   asking for that money or no?

Page 49

1    MR. HANNA: Objection.
2    THE WITNESS: That's not relevant to each
3  other. I was supposed to get both, technically.
4  Q  (BY MR. ACHO): I'm not asking you that, sir. Sir, I'm
5    asking you —
6    MR. HANNA: No, no, no, hold on, hold on, hold
7  on. Please — please let the witness finish what he's
8  saying, and don't interrupt him because you don't like
9  his answer. Did you get that, madam court reporter —
10   COURT REPORTER: No.
11   MR. HANNA: — on the record what — the
12   witness' statement?
13   COURT REPORTER: No. There was too —
14   MR. HANNA: Can you repeat your answer,
15   Mr. Guy, before Mr. Acho rudely interrupted you?
16   THE WITNESS: I said, no, that's not correct,
17   because overtime and commissions is supposed to come
18   together, so commission wouldn't overweigh the —
19   overweigh the extra overtime premium. So, no, that's not
20   right.
21 Q  (BY MR. ACHO): So even though there are weeks where you
22   made more money, perhaps a lot more money, than had you
23   been paid overtime, you still want overtime; is that
24   correct?
25   MR. HANNA: Objection, form.

JUSTIN GUY
July 15, 2021

Page 50

1  THE WITNESS:  Can you repeat that question
2  again, because — try it again, you were in and out.
3  Q  (BY MR. ACHO):  Okay.  You are looking for overtime money
4  even for weeks where you made more money by getting
5  commissions than you would have made getting overtime,
6  correct?
7  MR. HANNA:  Objection, form.  You can answer.
8  THE WITNESS:  I'm not sure, I don't know.
9  Q  (BY MR. ACHO):  How come you don't know?
10  MR. HANNA:  Because you're asking him for a
11  legal conclusion as to the categories of damages that a
12  plaintiff is entitled to in a FLSA case.  It's completely
13  inappropriate.
14  MR. ACHO:  Okay, okay.  Mr. Hanna, again,
15  you're not to answer or — which is what you're doing.
16  MR. HANNA:  Because you're badgering the
17  witness, Mr. Acho.
18  MR. ACHO:  I'm sorry —
19  MR. HANNA:  You're badgering —
20  MR. ACHO:  — I'm making — I'm making a
21  record.  I'm making a record.  I have not raised my
22  voice.  I haven't done anything to badger this witness.
23  I do not like you saying that, Michael.  I really don't
24  like you saying that.
25  MR. HANNA:  You've done that.  You were

Page 51

1  questioning him why he can't afford lunch.  How dare you.
2  Please don't go down that route again.
3  MR. ACHO:  Mr. Guy —
4  MR. HANNA:  Your question is inappropriate.
5  It's asking a plaintiff to answer a legal conclusion.
6  You're not asking him about the facts.  So I object, that
7  it calls for a legal conclusion.  You can answer.
8  Q  (BY MR. ACHO):  Mr. Guy, are you asking for money,
9  overtime money, even for weeks where you made more money
10  by getting commissions than getting overtime?  Are you
11  asking the court to give you money for that, yes or no?
12  MR. HANNA:  Objection, calls for legal
13  conclusion.  You can answer.
14  THE WITNESS:  Yes.
15  Q  (BY MR. ACHO):  Okay.  Now, how did you stop working for
16  Absopure?  Did they up and fire you?
17  A  Are you ready?  Can you hear me, are you ready?  Are you
18  done with your question?
19  Q  Yes, sir.
20  A  Okay.  So I guess they got tired of me complaining, so
21  they had me fill out a paper saying they was going to
22  fire me if I didn't get my CDL license within 60 days,
23  and then I signed up for — to get my CDL license, and
24  they told me I'm fired.  So they made me sign a paper
25  saying I was going to get fired if I didn't get a

Page 52

1  license, I went to go get the license, they fired me.
2  Q  Who fired you?
3  A  Absopure.
4  Q  Who at Absopure fired you?
5  A  They terminated me.  Whoever does termination, I don't
6  know.
7  Q  Well, was it your supervisor, was it a manager?
8  A  I answered your question.  You asked me who fired me.
9  Absopure fired me.  That's the company that I worked for.
10  What individual, I don't know.
11  Q  So it is your sworn testimony — it is your sworn
12  testimony you were fired by Absopure by someone that you
13  don't know, because you didn't get your CDL, correct?
14  A  No, that's not what I said.  You're mixing my words up.
15  Listen to me.  Listen clearly, okay?  They had me —
16  okay, okay, you want names?  Alex had me sign the paper
17  saying he was going to fire me if I didn't get my CDL
18  license.  I signed that paper, and I told him that I was
19  going to get a CDL.  I signed up for the schooling, and
20  by the time I got out of that schooling, I was
21  terminated.
22  Q  Now — but that CDL license, you were obligated to get it
23  60 days after you were hired, weren't you —
24  MR. HANNA:  Objection —
25  Q  (BY MR. ACHO):  — yes or no?

Page 53

1  MR. HANNA:  Objection, form.
2  Q  (BY MR. ACHO):  Yes or no?
3  A  No.
4  Q  No?
5  A  Because I worked there after 60 days without having a
6  CDL.
7  Q  That's not my question.  My question, Mr. Guy, is you
8  were required to get your CDL within 60 days, but you
9  didn't do it, did you?
10  MR. HANNA:  Objection, form.  Asked and
11  answered.
12  Q  (BY MR. ACHO):  Go ahead.
13  COURT REPORTER:  I'm sorry, what was the
14  answer?
15  THE WITNESS:  I didn't have time to.
16  Q  (BY MR. ACHO):  That — my question wasn't whether you had
17  the time.  Wasn't that part of the deal, that Absopure
18  would hire you, but only if you got your CDL within 60
19  days?  That was the deal you made with them?
20  MR. HANNA:  Objection to form.
21  Q  (BY MR. ACHO):  What?
22  A  I wasn't aware of the deal.
23  Q  You were not aware; is that your sworn testimony?  Is
24  that your sworn testimony?  Yes?
25  A  I worked there over 60 days without a license.

JUSTIN GUY
July 15, 2021

Page 54

1 Q   That's not my question.  You're testifying I didn't know
2     I was required to do that when I got hired in, I did not
3     know.  That's what you're telling the court; is that
4     right?
5 A   I didn't know.
6         MR. ACHO:  Objection, asked and answered.
7 Q   (BY MR. ACHO):  Okay.  Do you remember the hiring process?
8 A   Yeah.  Actually, I really do, a lot.
9 Q   Okay, good.  Tell me about it.  Go into as much detail as
10    you can.
11 A   I originally --
12        MR. ACHO:  Objection -- objection, form,
13    relevance.  I -- I would really like it if you would ask
14    him questions about this case and not irrelevant stuff,
15    but it's your deposition.  You can answer.
16 Q   (BY MR. ACHO):  Go ahead.
17 A   I originally wasn't called into Absopure to be a truck
18    driver.  I originally applied for a water technician, and
19    when I got there, they told me that I didn't have the
20    experience in that, and that did I want to drive their
21    trucks.  That's how I originally started.
22 Q   Continue, please.
23 A   And Art, the guy that hired me in, that gave me the offer
24    of driving the truck when I didn't have a CDL or obtained
25    a CDL at the time, that I could drive his truck, and then

Page 55

1     he told me as long as I drive the truck, he said never
2     clock out.  As long as you never clock out, I'd be good.
3 Q   Go ahead, continue.  What else?
4 A   That was the hiring process.  Then he gave me like 20, 25
5     pieces of paper.  He said don't worry about reading it,
6     just sign it off and you're hired.  That's how I started.
7 Q   What else do you remember?
8 A   That how I was started.  You asked me how the hiring
9     process went, that's how I started.  Then the next day --
10 Q   That's all you remember?  You didn't remember anything
11    else?
12 A   That's --
13        MR. ACHO:  Objection.
14        THE WITNESS:  I signed --
15        MR. ACHO:  I'm sorry.  Objection, form.  You
16    can continue with this line of irrelevant answers.
17 Q   (BY MR. ACHO):  Go ahead, answer it.
18 A   He just gave me a stack of papers, told me to sign it, I
19    signed it, came back the next day, started working.
20 Q   Do you know what your title was?
21 A   A delivery driver for Absopure.
22 Q   That's what your title was?
23        MR. ACHO:  Objection, asked and answered.
24        THE WITNESS:  That's what my job application
25    said when I signed up, yes.

Page 56

1 Q   (BY MR. ACHO):  Do you know what "sales" means?
2         MR. HANNA:  Objection.  Form, vague.
3         THE WITNESS:  No, I'm not aware.  I didn't
4     handle that type of stuff.
5 Q   (BY MR. ACHO):  So you were not aware of what constitutes
6     sales; is that correct?
7 A   What was that?
8         MR. HANNA:  Objection --
9 Q   (BY MR. ACHO):  You don't know what "sales" refers to,
10    correct?
11 A   No.
12        MR. HANNA:  Objection.  Form, vague.
13 Q   (BY MR. ACHO):  I didn't -- I think you said no, but,
14    Wendy, I don't know if you heard him, I don't know.  Can
15    you answer that question?
16 A   No, I was a delivery -- delivery driver.
17 Q   That wasn't my question.
18 A   What was your question?
19 Q   Do you know what "sales" consists of, yes or no?
20        MR. HANNA:  Objection, form.
21        MR. ACHO:  Wendy, we're really breaking up, I'm
22    sorry.  I cannot --
23        MR. HANNA:  Mr. Guy -- Mr. Guy, if you can,
24    after Mr. Acho asks a question, just give me one second
25    before you answer to see if I need to object, just so we

Page 57

1     can make Wendy's job a little easier, so we're not
2     talking over each other.
3         THE WITNESS:  All right.  My fault.
4         MR. ACHO:  And please speak up, I can't hear
5     you.
6         MR. HANNA:  I can hear him just fine, Mr. Acho.
7     My computer --
8         MR. ACHO:  Well -- well, he's next door to you
9     or right by you.
10        MR. HANNA:  No.  For the record -- for the
11    record, I'm hearing him through the telephone.  He's
12    across the building in the Southfield Town Center.  So
13    it's not because I can hear him in real life.  I can hear
14    you very well, too.
15        MR. ACHO:  Well, Wendy -- Wendy, could you hear
16    his answer?
17        COURT REPORTER:  I could not hear due to
18    overlapping.
19        MR. ACHO:  I truly think it's the connection as
20    well, Wendy.  I'm not going to lie to you.
21 Q   (BY MR. ACHO):  Mr. Guy, do you know what "sales" consists
22    of, yes or no?
23 A   No.
24        MR. HANNA:  Objection, form.  Mr. Guy, you got
25    to give me a second.  Objection, form.  Go ahead, answer,

JUSTIN GUY
July 15, 2021

Page 58

1  Mr. Guy.
2          THE WITNESS:  No.
3  Q  (BY MR. ACHO):  Okay.  So the job that you had at Absopure
4     was merely driving a truck, correct?  Is that right?
5          MR. HANNA:  Objection, form.
6          THE WITNESS:  I delivered for Absopure.
7          MR. ACHO:  Wendy, read the question back,
8     please.
9          COURT REPORTER:  One moment.  So the job you
10    had at Absopure was merely driving a truck, correct?  Is
11    that right?
12         THE WITNESS:  No.
13 Q  (BY MR. ACHO):  What else did it consist of?
14 A  I loaded the truck, I unloaded the truck, and I delivered
15    the goods that was in the truck.
16 Q  Did it have a sales component to it, your job, yes or no?
17 A  No.
18 Q  Weren't you supposed to sell as much product as you
19    could?  Wasn't that part of your job, sir?
20 A  No.
21         MR. HANNA:  Objection, form.  You can --
22 Q  (BY MR. ACHO):  So no one at Absopure, none of your
23    supervisors or anyone else at Absopure, ever told you
24    that you needed to be actively involved in sales; is that
25    correct?  No one told you that?

Page 59

1  A  Yeah, nobody told me that, no.  I was just a truck
2     driver, because I delivered.
3  Q  Okay.  Now, have you ever been a delivery driver before?
4  A  Yeah.
5  Q  Where?
6  A  Amazon.
7  Q  Who else?
8          MR. HANNA:  Objection, relevance.  You can
9     answer.
10         THE WITNESS:  For delivery, that's about it,
11    Amazon.
12 Q  (BY MR. ACHO):  At Amazon, were you involved in sales at
13    all?
14 A  No, just dropping off the packages, delivering the goods
15    just like Absopure.
16 Q  So Absopure was just like Amazon, as far as you recall;
17    is that correct?
18 A  No.  That's two different companies, two different
19    meanings, two different job titles.
20 Q  No, no, but aside from that, the actual functions were
21    the same.  You just dropped product off, right, true?
22 A  I'm not -- I'm not sure.
23 Q  Okay.  Now, it's your testimony that it wasn't until you
24    were fired that you knew that you were to get a CDL?
25    It's the first time you heard of that, correct?

Page 60

1          MR. HANNA:  Objection, form.
2          THE WITNESS:  No.
3          MR. HANNA:  Misstates prior testimony.  You can
4     answer.
5  Q  (BY MR. ACHO):  Go ahead.
6  A  No.
7  Q  No, what?  Why isn't that --
8  A  I said no.
9  Q  When did you -- when did you first find out that you were
10    required to have a CDL to keep your job?  When did you
11    first find out?
12         MR. HANNA:  Objection, form.
13         THE WITNESS:  I'm not sure.
14 Q  (BY MR. ACHO):  Give us your best estimate, because you do
15    have a good memory.
16 A  I got a good memory, but I worked there for almost two
17    years with no CDL, so I'm not sure what you're talking
18    about.
19 Q  Well, let's think about it.  You said at the time of your
20    hire, no one mentioned anything about a CDL to you.
21    That's what you testified, correct?
22 A  I said that when I got hired in, he gave me a whole bunch
23    of papers and I signed them.  I didn't read them, so I
24    don't know what those papers said or what I was supposed
25    to have.

Page 61

1  Q  I'm not asking you about papers right now.  We'll get to
2     that in a minute.  I'm asking you did you testify today,
3     this morning, within the last 30 minutes, that no one
4     told you you had to have a CDL?  That's what you said,
5     right?
6          MR. HANNA:  Objection, form.
7  Q  (BY MR. ACHO):  Go ahead.
8  A  I'm not sure.
9  Q  You're not sure of what?
10 A  I'm not sure that -- what you're talking about.
11 Q  You said no one told you you had to have a CDL.  That's
12    what you said.
13         MR. HANNA:  Are you sure about that Mr. -- hold
14    on, hold on, hold on, hold on.  Are you sure about that,
15    Mr. Acho, you're quoting what he said?  Because you're
16    representing on the record that that's exactly what he
17    said; is that correct?
18         MR. ACHO:  Okay.  Okay, counsel, I would cite
19    you to 30(c)(2) again.
20         MR. HANNA:  Okay.  So I'm asking you -- I'm
21    asking you a question, Mr. Acho, because you're -- it
22    seems to me you're misrepresenting prior testimony in an
23    attempt to badger the witness.  So I'm asking you, can
24    you advise -- for the record, are you sure about that, is
25    that a direct quote?  Because you keep badgering him

JUSTIN GUY
July 15, 2021

**Page 62**

1  about it.

2  　　　　MR. ACHO:  Mr. Hanna, Mr. Hanna, please stop

3  using the word "badgering."  Please stop interrupting.

4  　　　　MR. HANNA:  If you'd stop badgering the

5  witness, I hope I never have to use the word "badgering."

6  It would be great if you didn't badger him, that's the

7  problem.

8  Q  (BY MR. ACHO):  Mr. Guy, didn't you testify earlier that

9  no one told you you had to get a CDL?  Isn't that what

10  you told us?

11  　　　　MR. HANNA:  Objection, form.

12  　　　　THE WITNESS:  No.  I told you I — I told you I

13  never had a CDL.

14  Q  (BY MR. ACHO):  I understand that, but you did — were you

15  told you had to get a CDL, yes or no?

16  　　　　MR. HANNA:  Objection, form.  You can answer.

17  　　　　THE WITNESS:  I don't — I don't recall.

18  Q  (BY MR. ACHO):  You don't recall what?

19  　　　　MR. HANNA:  He answered your question.  You

20  asked him a question.  He says, I don't recall.  What do

21  you mean, you don't recall what?

22  Q  (BY MR. ACHO):  Go ahead, please answer the question.

23  　　　　MR. HANNA:  Again, you're badgering — you're

24  badgering the witness.  You can continue.  We're going to

25  put all this to the court.

**Page 63**

1  Q  (BY MR. ACHO):  What is it that you do not recall,

2  Mr. Guy, as to whether anyone told you at Absopure that

3  you needed a CDL?

4  A  I went to get a CDL.  I don't know what you're asking.

5  Q  That's not my —

6  A  Aren't you going to —

7  Q  My question is not — that's not my question.  Did anyone

8  at Absopure say you needed a CDL, and if so, when was

9  that and who told you that?

10  A  I'm not sure, I don't remember.

11  Q  What do you mean?  Can you explain what you mean, you

12  can't remember?

13  　　　　MR. HANNA:  Objection, form.

14  　　　　THE WITNESS:  So can you — as my answer, can I

15  write "I don't know," or are you just not trying to go to

16  the next question, because I answered it about 10

17  different times.

18  　　　　MR. HANNA:  Thank you.  Further evidence of

19  badgering the witness.  Mr. Acho, I need to go to the

20  bathroom, whenever you have a clean break here.

21  　　　　MR. ACHO:  Let's do this.  Why don't we take a

22  ten-minute break.  Would that be good for everybody, 10

23  minutes?

24  　　　　MR. HANNA:  Plenty for me.

25  　　　　MR. ACHO:  Is that okay for you, Mr. Guy?

**Page 64**

1  　　　　THE WITNESS:  Yeah, that's perfect.

2  　　　　MR. HANNA:  Is that okay for you, Miss court

3  reporter?

4  　　　　MR. ACHO:  Okay, okay, we'll come back in 10

5  minutes.

6  　　　　THE WITNESS:  Okay.

7  　　　　(Off the record at 11:50 a.m.)

8  　　　　(Back on the record at 12:04 p.m.)

9  Q  (BY MR. ACHO):  Okay.  Let's go to your — do you have the

10  exhibits in front of you, Mr. Guy?

11  A  No, I do not.

12  　　　　MR. ACHO:  Okay.  Mr. Hanna, you didn't give

13  your client the exhibits?  Because I'm going to go

14  through all the exhibits.

15  　　　　MR. HANNA:  Yeah, I thought you wanted him to

16  screen share, but if you want, I can have it printed

17  right now.

18  　　　　MR. ACHO:  Why don't you.  I think it will be

19  easier.

20  　　　　MR. HANNA:  Sure.

21  　　　　MR. ACHO:  I can begin, you know, with the

22  screen shot, but please, if you would.  Thank you.

23  　　　　MR. HANNA:  Yeah, that's no problem.

24  　　　　MR. ACHO:  Thank you.  We're going to introduce

25  Defendant's Exhibit No. 1.  That's your application for

**Page 65**

1  employment.  Do you remember filling out the —

2  　　　　MR. HANNA:  Can we — Mr. Acho, can you hold on

3  one second?

4  　　　　(Off the record at 12:05 p.m.)

5  　　　　(Back on the record at 12:06 p.m.)

6  　　　　MR. HANNA:  Mr. Acho, while we're printing, is

7  there anything you want to go over with him —

8  　　　　THE WITNESS:  Yeah, I can start.

9  　　　　MR. HANNA:  Okay.

10  Q  (BY MR. ACHO):  The application for employment is

11  Defendant's Exhibit No. 1, and you answered all of the

12  questions.  And you graduated from high school with a

13  diploma, correct?  Correct?

14  A  I mean, I didn't even know you was asking me a question.

15  What's your question?

16  Q  Did you graduate from high school with a diploma?

17  A  Oh.  Yes.

18  Q  Okay.  And did you do anything else?  Did you go to any

19  other classes, community college or anything after that?

20  A  No.

21  Q  Okay.  Now, Exhibit No. 2 is the position that you

22  applied for, correct?

23  　　　　MR. HANNA:  Mr. Acho, can we — Mr. Acho, can

24  we go off the record for two minutes, and I'm going to go

25  deliver it to him in the other room.

JUSTIN GUY
July 15, 2021

Page 66

1    MR. ACHO: Well, let's go five minutes. That
2  way you don't have to rush.
3        (Off the record at 12:06 p.m.)
4        (Back on the record at 12:16 p.m.)
5  Q  (BY MR. ACHO): Okay. I'm going to ask you about Exhibit
6     No. 2. Okay. That's the Absopure Water Company position
7     description. Do you see that?
8  A  Yeah. I see Exhibit 2, yeah.
9  Q  You've seen -- you've seen it before, haven't you?
10 A  No, I never saw this.
11 Q  It's part of your file.
12 A  Oh, have I saw it recently or before I started working at
13    Absopure?
14 Q  Are you testifying you've never seen this document before
15    today?
16        MR. HANNA: Objection, form.
17        THE WITNESS: I saw it. I just ain't never --
18    this ain't -- this is not describing my job title.
19 Q  (BY MR. ACHO): Let me ask you, do you know Patrick Byrne?
20 A  Yeah. I saw him before, yeah. I know who he is, yeah.
21 Q  Yeah. I mean, he's in this video, the Zoom meeting. Do
22    you see him?
23 A  Yeah. I see him down there, yeah.
24 Q  He's a boss over at Absopure, isn't he?
25 A  I don't know if he's a boss, but he's somebody that works

Page 67

1     in the office.
2  Q  Well, isn't he above your supervisor?
3  A  Not that I know of, no.
4  Q  Did you ever deal with him?
5  A  Just probably about towards the end of my -- when I was
6     asking him about how I was being paid, and he was just
7     I'll get back to you, and never got back with me.
8  Q  So what did you say to Mr. Byrne?
9  A  I wasn't being paid fairly, and he was telling me he was
10    going to bring up all my documents and get back with me,
11    and never got back with me.
12 Q  So what did he say to you? Tell me again.
13 A  He would bring up all my -- I guess all the stuff that I
14    was delivering and stuff, he would bring all that stuff
15    up, but I never got back with him, because he never got
16    back with me.
17 Q  So he never answered you as to whether you were entitled
18    to overtime, did he?
19 A  I never said I asked him about overtime.
20 Q  You did or didn't?
21 A  I said I used to go to him to complain about what I was
22    being paid, and he never got back with me. That's my
23    answer.
24 Q  Okay. Now, how did you come to believe that Absopure was
25    required to pay you overtime? How did you come to

Page 68

1     believe that?
2  A  That's the law, that's my right.
3  Q  So that is your belief that it's the law?
4  A  It's the law. I mean, it's not what I believe, it's the
5     law. I mean, I believe nobody -- everybody don't follow
6     the law, but --
7  Q  So everybody who works, based upon what you believe, has
8     to be paid overtime after 40 hours. That is your belief,
9     correct?
10 A  That's not my belief, that's a well-known fact.
11 Q  Okay. And it's because of that fact or belief that you
12    filed this lawsuit, correct, based on that?
13 A  I'm not sure what you're trying to say.
14 Q  Okay. Well, I'm trying to figure out why you filed this
15    lawsuit. That's my area. You say that you were supposed
16    to get overtime, and I said why, and you said, well,
17    that's the law. So that's what you believe, is that
18    everybody who works, if they work overtime, they're
19    supposed to get paid overtime. That's your belief,
20    correct?
21        MR. HANNA: Objection, form. You can answer.
22        THE WITNESS: That is the law. That's not my
23    belief, that's not what I think, that's not -- it's just
24    how it works. When you work over 40 hours, that's what
25    your supposed to be paid, time and-a-half.

Page 69

1  Q  (BY MR. ACHO): Everybody?
2  A  Everybody that works over 40 hours.
3  Q  Okay. Now, had you been to any other attorney before you
4     went to Mr. Hanna?
5        MR. HANNA: Objection.
6  Q  (BY MR. ACHO): You've been to a couple of others, weren't
7     you?
8        MR. HANNA: Objection, form. I'm going to
9     instruct you not to answer that question. It's asking
10    for attorney-client privilege communication.
11        MR. ACHO: No, not if he hasn't retained them,
12    Mr. Hanna. Then they're not his attorneys.
13        MR. HANNA: That's actually not correct,
14    Mr. Acho. Even if you're talking to a potential client
15    and you don't sign them up, that's still privileged. So
16    I'm going to instruct you not to answer that question.
17        MR. ACHO: Well, we'll disagree, but I'll move
18    on.
19 Q  (BY MR. ACHO): Okay. Look at "position description."
20    Weren't you hired as a sales and service specialist
21    trainee, yes or no?
22 A  No.
23 Q  What was your job title, then?
24 A  If you refer back to Exhibit 1, it says a driver
25    application employment.

JUSTIN GUY
July 15, 2021

Page 70

1  Q   I'm not referring to Exhibit 1.  I'm referring to Exhibit
2      2.
3  A   But I didn't fill this out.  I filled out Exhibit 1,
4      that's my application.
5  Q   Okay.  Mr. Guy, forgive me, I'm trying to make it as
6      clear as I can.  My question deals with what was your job
7      title when you were hired at Absopure?
8  A   A delivery driver for Absopure.  That's what my
9      application says.
10 Q   That's not my question, what the application said.
11 A   Okay.
12 Q   What was your title?
13 A   My title --
14 Q   Or are you saying you don't know?
15 A   It's a delivery driver.  That's what my title was, that's
16     what I did at Absopure.
17 Q   Who told you your title was delivery driver?  Who told
18     you that?
19 A   This paper right here (indicating).
20 Q   Mr. Guy --
21 A   You asked me.  I'm telling you.
22 Q   Mr. Guy --
23 A   I didn't make it up.
24 Q   Mr. Guy --
25 A   Yes?

Page 71

1  Q   -- I'm not asking you what you filled out.  I'm asking
2      you who told you your title at Absopure, who told you?
3  A   Art told me that I was being hired for a delivery driver
4      for his company of Absopure.  That's what he told me,
5      Art.  Art, the guy that's boss of the guy that's on this
6      picture.  He is his boss.
7  Q   And -- but he didn't tell you what the title was, did he?
8  A   Yeah.  He told me I was driving a truck for Absopure.
9      That's what I did, that's my title.
10 Q   Mr. Guy, were you told what the title was, yes or no?
11 A   I told you no.
12 Q   Okay.  Were you told what the job description was, yes or
13     no?
14 A   I was a driver.
15 Q   Were you told what the description was?
16 A   Yes.  Driving the truck for Absopure.
17 Q   Okay.  I'm going to show you Defendant's Exhibit No. 2.
18     The company, Absopure, is saying you were a sales and
19     service specialist trainee.  Would you look at this,
20     please?
21 A   Yeah, I'm looking at it.  Exhibit 2, right?
22 Q   Yeah.  You've seen this before, haven't you?  You have
23     seen this?
24         MR. HANNA:  Objection, form.
25 Q   (BY MR. ACHO):  Go ahead.

Page 72

1  A   This is not my job title.
2  Q   Pardon me?
3  A   This is not my job title.
4  Q   Mr. Guy, is that the question I asked you?  Sir, please,
5      you're not being fair to me.  Would you please answer my
6      question?
7          MR. HANNA:  Objection, form.  I -- this is the
8      type of badgering that I'm talking about.  You're not
9      being fair to me?  Mr. Acho, he's been very fair to you.
10     He's answered your question 15 times.  You don't like the
11     answer and you're badgering him, and then you're
12     manipulating him and insinuating that he's not being fair
13     to you.  Please don't do that.  He's answered the
14     question, the record is very clear.  We're going to look
15     at this deposition transcript, we're going to see you
16     asking it seven times and him answering it seven times.
17     Please stop badgering the witness, it's inappropriate.
18         MR. ACHO:  Wendy, could you please read the
19     question back to the witness and retype it, please?
20     Okay.
21         MR. HANNA:  Objection, asked and answered.
22         COURT REPORTER:  One moment.  The last question
23     was:  You've seen this before, haven't you?  You have
24     seen this?
25         THE WITNESS:  What are you asking, when have I

Page 73

1      seen it, or prior to now, or prior to yesterday?  Like I
2      don't know what you're saying.
3  Q   (BY MR. ACHO):  At any time.  At any time.
4  A   I don't know.
5  Q   Okay.  Are you denying that part of your job was to
6      acquire new customers via referrals and potential
7      prospecting, which is item three under primary duties and
8      responsibilities?  Are you denying that?
9  A   Yes, I'm denying that.  I didn't do that.
10 Q   Okay.  Are you denying that you were to interface with
11     the general public daily and promote the sale of Absopure
12     products, item five?  Are you denying that was part of
13     your primary duties and responsibilities?
14 A   No.  That was for whoever was the sales service
15     specialist, not mine.  I didn't do that.
16 Q   So you didn't do that either, okay.  And other duties
17     assigned as needed, item number nine, you're denying that
18     you did that either, correct?
19         MR. HANNA:  Objection, vague.  Are you asking
20     him if a part of his duties was other duties?
21         MR. ACHO:  Yes.
22         MR. HANNA:  It doesn't make sense.
23 Q   (BY MR. ACHO):   Yeah.  I'd like him to answer the
24     question.  Can you?
25         MR. HANNA:  Objection.  Form, vague, ambiguous.

JUSTIN GUY
July 15, 2021

Page 74

1   The sentence -- the question does not make sense.  You
2   can answer if you understand it.
3         THE WITNESS:  I don't understand, because my
4   only duty was to deliver for Absopure, and that's the
5   only thing I did.
6 Q  (BY MR. ACHO):  Okay.  So none of the supervisors ever
7   told you try to sell as much product as you can?
8 A  No, I didn't sell no type of products.  Every product was
9   sold, I just delivered them.
10 Q  Okay.  It is your testimony that you never sold product,
11   you just dropped product off and never attempted to sell
12   anything more; is that correct?  Is that your testimony?
13 A  Yeah.  I never had to sell any, it was already sold.
14 Q  Okay.  I move for -- okay, I move admission of No. 2.
15   Let's go to Exhibit No. 3.
16         MR. HANNA:  I'll object to admission of No. 2,
17   it's not authenticated, but we can move on.
18 Q  (BY MR. ACHO):  Well, wait a minute.  Mr. Guy, didn't you
19   tell us you've seen that document?  You said you do, you
20   just don't remember when.  Isn't that what you told us?
21 A  No.  I asked you a question, are you asking me when or
22   where?
23 Q  Oh.  You said you don't recall.  That's what you told us.
24   Hm?
25 A  Like Absopure never showed me this paper, no.

Page 75

1 Q  Oh.  So today is the first time you've seen it?
2         MR. HANNA:  Objection, form.  You can answer.
3         THE WITNESS:  I'm not sure.  I don't remember a
4   piece of paper from three straight years, you know?
5 Q  (BY MR. ACHO):  Okay.  Let's go to Exhibit No. 3.  Do you
6   remember seeing Exhibit 3, Bates stamped 44,
7   certification and compliance with driver license
8   requirements?  Did you see this?
9 A  No, I don't remember this paper.
10 Q  Do you remember ever seeing this paper?
11 A  No.  It looks like -- it just like got my driver's
12   license on there and my name.
13 Q  Well, isn't that your signature?
14 A  This has got my name on it, and -- I mean, when you get
15   handed 25 pieces of paper, who's going to read 25 pieces
16   of paper?  If they tell you you're hired, sign these
17   papers, what you gonna do?  Just sign them, and that's
18   what I did.
19 Q  Did you see and sign this paper on September 24, 2018,
20   yes or no?
21 A  I'm not -- yeah, I signed it, it's right there.
22 Q  Now, go to the third paragraph, driver requirements.
23   Doesn't it say and refer to the Federal Motor Carrier
24   Safety Regulations, correct?
25 A  I see what you're talking about.

Page 76

1 Q  You do see it?
2 A  Yeah.  I see it in paragraph three, yes.
3 Q  Okay.  And you were obligated to follow the Federal Motor
4   Carrier Safety Regulations as a driver for Absopure,
5   correct?
6         MR. HANNA:  Objection, assumes facts not in
7   evidence.  You can answer.
8         THE WITNESS:  I mean, I never read this, so I'm
9   not sure.
10 Q  (BY MR. ACHO):  Well, forgetting about whether you read it
11   or not, as a driver for Absopure, weren't you required to
12   follow the Federal Motor Carrier Safety Regulations?
13         MR. HANNA:  Objection, assumes facts not in
14   evidence.  You can answer.
15         THE WITNESS:  I was never trained to know what
16   that was, so I'm not -- I still don't know what that is.
17         MR. ACHO:  Okay.  I move for Exhibit No. 3.
18         MR. HANNA:  I object to the admission of same.
19   You can move on.
20         MR. ACHO:  Let's go to Exhibit 4.  Exhibit 4 is
21   Absopure Bates stamp 14.  And by the way, let me just put
22   something on the record.  The application is Exhibit 1,
23   which is -- and Exhibit 2 is Bates 95.  Okay.
24 Q  (BY MR. ACHO):  So let's go to now -- and again, start a
25   new question, Wendy, please.  I have handed you or you

Page 77

1   have in front of you Absopure 14, Defendant's Exhibit 4.
2   Is this the DOT regulated hand-held mobile telephone
3   policy?
4         MR. HANNA:  Objection, form, vague.  You can
5   answer.
6         THE WITNESS:  That was a question?  What you
7   saying?
8         MR. ACHO:  Wendy, please read it back.
9         COURT REPORTER:  One moment.  I have handed you
10   or you have in front of you Absopure 14, Defendant's
11   Exhibit 4.  Is this the DOT regulated hand-held mobile
12   telephone policy?
13         THE WITNESS:  I mean, that's what it says on
14   top of the paper.  I'm not sure.
15 Q  (BY MR. ACHO):  Well, you signed it, didn't you?
16 A  I signed --
17 Q  Did you sign this, Mr. Guy?
18         MR. HANNA:  Mr. Acho, I object to form.  His
19   signature is not on this document.
20         MR. ACHO:  I don't care, I'm going to ask him
21   the question.
22 Q  (BY MR. ACHO):  Mr. Guy, isn't that your signature on
23   September 24, 2018?
24         MR. HANNA:  Objection, form.  Assumes facts not
25   in evidence.

JUSTIN GUY
July 15, 2021

Page 78

1    THE WITNESS:  It's got my name printed on
2    there.  It's not a signature for the --
3 Q  (BY MR. ACHO):  Okay.  Who printed your name on it?
4 A  Probably I did.  I mean, it's my name.
5 Q  Doesn't that look like your handwriting or your printing,
6    doesn't it?
7 A  Yeah, it looks like it.  I'm sure it is.
8 Q  Okay.  Now, look at the first line.  It talks about the
9    Federal Motor Carrier Safety Administration.  Isn't that
10   what it says?
11 A  I mean, that's what it say at the top of this paper, yes.
12 Q  Okay.  So you were under the Federal Motor Carrier Safety
13   Administration in your duties at Absopure, weren't you?
14   MR. HANNA:  Object to form.
15   THE WITNESS:  I'm not sure.
16 Q  (BY MR. ACHO):  Pardon me?
17 A  You asked me a question.  I said I'm not sure.
18 Q  Okay.  Now, go to the third paragraph.  Can you read the
19   first nine words in that third paragraph?  Out loud,
20   please.
21 A  I don't know, because are you talking about under the
22   numbers?  Are numbers counted as a --
23 Q  Okay, I apologize.  I wasn't --
24 A  Is this what you're asking me?  Because --
25 Q  Look at -- look at after number two.  There is several

Page 79

1    words there about DOT.  Could you read that out loud,
2    please?
3 A  It say:  As a DOT regulated driver for Absopure Water
4    Company, you will be required to complement [sic] with
5    the new rules.
6 Q  Okay.  Let me ask you, so you knew that you were a DOT
7    regulated driver for Absopure Water Company, correct?
8    You knew that?
9    MR. HANNA:  Objection, form.  Assumes facts not
10   in evidence.  You can answer.
11   THE WITNESS:  No, I didn't know.  This was my
12   first real trucking job, so I don't know how none of this
13   stuff works.
14 Q  (BY MR. ACHO):  And so you didn't read this document that
15   you printed your name, correct?
16 A  Not the other 25 papers that I signed, either.  No, I did
17   not.
18 Q  You had the opportunity to read them if you so chose,
19   correct?
20 A  I didn't have time to.
21 Q  Well, you were given a copy before you went home, weren't
22   you?
23 A  No.
24 Q  You were given a copy?  Pardon me?
25 A  No.  They say -- they said it's not important, just sign

Page 80

1    it.  They're saving it for the people across the street
2    to keep in their records.
3 Q  Okay.  Is it your testimony you were given no documents
4    at all; is that your testimony?
5    MR. HANNA:  Objection, form.  Misstates his
6    testimony.
7    THE WITNESS:  No, I wasn't given these papers
8    once I signed them.  No, I did not receive none.
9    MR. ACHO:  Okay.  I move for Exhibit No. 4.
10   Let's go to Exhibit No. 5.
11   MR. HANNA:  For the record, I object to moving
12   it into evidence, but we can move on.
13 Q  (BY MR. ACHO):  Okay.  Defendant's Exhibit 5, Absopure
14   Bates 13, can you read the caption for me out loud?
15 A  Absopure Water Company.
16 Q  What's below it, the caption?  What's it say?
17 A  Service special [sic] hiring agreement.
18 Q  Okay.  Now, as a service specialist, this document was
19   handed to you, correct?
20 A  That's not what my application said when I signed in.
21 Q  My question, Mr. Guy, respectfully, is this is a document
22   that was handed to you at the time of your hiring,
23   correct?
24 A  Yeah, I signed this paper once I got hired.
25 Q  Okay.  And it refers to service specialist, correct?

Page 81

1 A  But that's not what I did.  I wasn't a service
2    specialist.
3 Q  It also refers to sales in paragraph three?  Doesn't it
4    refer to sales?
5 A  It says something about that in there, but that's not
6    what I did.  I didn't sell anything.
7 Q  Well, but you agreed to accept responsibility for
8    improper sales.  You accepted that responsibility, didn't
9    you, when you signed Exhibit 5?
10 A  No.  I was forced to sign this paper in order to stay
11   active as an employee there.  I went to work for them,
12   they told me to sign these papers.  If I didn't sign
13   them, I wouldn't have a job.
14 Q  Okay.  So let me understand something.  Is it your
15   testimony that no matter what document was given to you,
16   that you were going to sign it regardless?
17 A  Yeah, because I had to take the job.
18 Q  Okay.
19 A  That's just like me saying -- if they told me if I didn't
20   sign it, I wasn't going to be there and have a job, I
21   would have signed it.  If they say it's not important,
22   why wouldn't I sign it?
23 Q  Pardon me?  They said it wasn't important?
24 A  Art.  I'm sorry, I don't mean to say "they."  This was a
25   specific guy.  Art told me these papers aren't important,

**Page 82**

1    just sign them and come to work tomorrow. That's what —

2 Q    Did he say — wait a minute. Did he say they're not

3      important?

4 A    Yeah, that's exactly what he said —

5 Q    Okay.

6 A    — when I asked.

7      MR. ACHO: Okay. So we move for admission of

8      Exhibit 5.

9      MR. HANNA: I object to the admission of same.

10 Q    (BY MR. ACHO): Okay. Let's go to Exhibit 6. This is

11      Exhibit 6, Absopure Bates stamp 45. Can you read that

12      top portion, those first two lines out loud?

13 A    I know I'm here to answer questions. I didn't think I

14      was here to read.

15 Q    Would you mind reading it for me?

16 A    No. Can you read it to me?

17 Q    Okay. It reads: To Absopure associates. That's what

18      you were, correct, an associate?

19 A    No. I was a truck driver.

20 Q    Pardon me?

21 A    I was a delivery driver.

22 Q    Weren't you considered an associate of the company?

23 A    I don't —

24      MR. HANNA: Objection, form.

25 Q    (BY MR. ACHO): Pardon me? I'm sorry, I didn't hear you.

**Page 83**

1      Say it again.

2 A    I was looked at as an Absopure delivery driver. I don't

3      know where "associate" came from. I don't know — it's

4      never even — nobody called me an associate, so, no, I

5      wasn't looked at as that.

6 Q    And the subject is service specialist, notice, bonus

7      plan. Were you on the bonus plan when you got hired?

8 A    No. Never received a bonus, nothing. So that's for all

9      the service specialists, that's why I never received one.

10 Q    Well, besides your daily rate, didn't you have an

11      opportunity to get a bonus by way of commission?

12 A    I never received a bonus, so no.

13 Q    Well, weren't the commissions considered a bonus over

14      your daily rate?

15 A    No. That commission was what I was being paid for what I

16      did at work, plus the daily rate.

17 Q    Okay. Please help me, because I'm having difficulty

18      understanding this. How were you paid?

19 A    $120 a day, plus commission.

20 Q    What was the commission based on?

21 A    Everything that I delivered for the day.

22 Q    So did you have an opportunity to make some significant

23      money by way of commission which is over and above your

24      daily rate? Did you have that opportunity?

25 A    I'm not sure what your referring to.

**Page 84**

1      MR. HANNA: Objection, form. You can answer.

2      THE WITNESS: I'm not sure what you're

3      referring to.

4 Q    (BY MR. ACHO): Okay. When you applied for the job, did

5      they describe how you would get paid?

6 A    Yeah. Drive the truck, deliver the water and get $120 a

7      day, plus commission off of what I drop off.

8 Q    Well, what did they say about the commission?

9 A    The commissions, you had to like, I think, deliver — it

10      was a certain amount of water. I don't know, something

11      like that. But whatever — you know, I mean, the water

12      you delivered, you just get a commission for it, you

13      know.

14 Q    So the more you sold, the more money you made, correct?

15      MR. HANNA: Objection.

16      THE WITNESS: No. I never sold anything.

17 Q    (BY MR. ACHO): Pardon me?

18 A    I never sold anything.

19 Q    So when you delivered product, other than, hi, how are

20      you, you never said anything else to the people, correct?

21      Is that a fair statement?

22 A    Yeah, I asked them how they doing, how their day going.

23      But other than that, that's all you said to them,

24      correct?

25      MR. HANNA: Objection. Form, vague.

**Page 85**

1 Q    (BY MR. ACHO): Go ahead.

2 A    I'm not sure what I said three years ago to an individual

3      person for thirty times a day. I did thirty deliveries a

4      day. I don't know exactly what I said to each person.

5      No, I do not know.

6 Q    I apologize. I'm not asking you what you said to each

7      person. I'm saying other than a greeting, a hello, how

8      are you, something like that, that's all you said to

9      them? You didn't try to sell them anything, correct?

10 A    I didn't have to, everything was sold. Why would I — I

11      don't have to sell anything. Absopure sold the water, I

12      delivered it for them.

13 Q    Okay. So your efforts had nothing to do with your

14      commission, none at all, correct?

15 A    No. That's — oh, I'm sorry.

16      MR. HANNA: Objection, form. Misstates prior

17      testimony. You can answer.

18 Q    (BY MR. ACHO): Go ahead.

19 A    All I did was deliver the water. That's all I did.

20 Q    But that's not my question.

21 A    What's your question?

22      MR. ACHO: Wendy, please read the question back

23      and retype it again, please.

24      COURT REPORTER: One moment. So your efforts

25      had nothing to do with your commission, none at all,

Page 86

```
1   correct?
2           THE WITNESS:  I don't understand the question.
3   I'm not sure, I don't know.
4  Q  (BY MR. ACHO):  So you really couldn't affect your
5   commissions at all, because all you did was take product
6   and drop it off, right?
7  A  I don't understand what you're saying.
8  Q  Well, okay.  Let's do this, let's back up.  Tell me,
9   after you were trained and you started, what was your
10  typical day?  What did you do?  When did you start, what
11  did you do?
12 A  I'd come in around 6:00 or 7:00 in the morning.  Figure
13  out which truck I'm going to drive for the day.  Get my
14  little hand-held device, you know, then and I'd figure
15  out like all the different coffees, paper towels, hot
16  chocolate, plates, napkins, cups, all that stuff, get all
17  that stuff gathered up.  Then make sure my truck was
18  loaded, make sure everything is correct for everything
19  I'm going out for the day with.
20 Q  Okay.  Then what did you -- what did you do?
21 A  Then I'd go get like water machines, water coolers like
22  for the day, and then after all that stuff is wracked up
23  and everything is on any truck, I drop back to the other
24  side of the building and get checked out and start my
25  day.
```

Page 87

```
1  Q  And then what did you do?
2  A  Drive my route, deliver the water.
3  Q  What did you do?  I mean, did you -- you drove to a
4   place, and they already had an order, and you just
5   deliver the order?
6  A  I just dropped off everything that I was suppose to drop
7   off.
8  Q  And you didn't do anything else?
9  A  No.  I'd pick up empty bottles, I mean, and switch out
10  their water containers if they had a bad water machine.
11 Q  But you didn't try to sell them anything?
12 A  No, I didn't.  They already had paid for it, it was
13  bought.  I just delivered it and took the empties.
14 Q  All right.  And the commissions were one percent based
15  upon calculating that sale.  Isn't that right, one
16  percent?
17         MR. HANNA:  Objection.  Assuming facts not in
18  evidence.  You can answer.
19 Q  (BY MR. ACHO):  Go ahead.
20 A  I'm not sure.
21 Q  So you worked there for 18 months, and you're telling the
22  court that you don't know what your bonus commission was
23  based on; is that right?  You didn't know what it was; is
24  that right?
25 A  Yeah, that's right.  I don't know what I was being paid
```

Page 88

```
1   for commission, no.  I didn't know.  I just took whatever
2   they gave at the end of the week, because I had no
3   choice.
4  Q  Well, when you brought the truck back, didn't you find
5   out, when you came back, how much you were going to get
6   paid that day for that day?
7  A  But you asked me a percent.  I didn't know the percent.
8   I know what I got paid at the end of the day.
9  Q  Okay.  Well, what was it based on?  You don't know?
10 A  All the products that I delivered for the day.
11 Q  No, but you don't know what it was based on.  You don't
12  know what the percentage commission was, do you?
13 A  Whatever -- whatever you did for the day, you got paid
14  for it.
15 Q  So --
16 A  If you worked for ten hours, for eight hours, it don't
17  matter, you got paid so much.  They don't care about
18  hours worked.  They just want their water delivered.
19 Q  Okay.  But if you worked a year and-a-half, and you work
20  typically five days a week?
21 A  Or six.
22 Q  Six?  Okay, six days a week.  Then you would have worked,
23  just ballpark, 300 days a year, and -- for one year, then
24  150 for half a year.  So you worked, just ballpark, no
25  one is holding you to this, you worked about 450 days for
```

Page 89

```
1   Absopure, correct?
2  A  I mean, I don't know.
3  Q  Ballpark, estimate?
4          MR. HANNA:  Objection.
5          THE WITNESS:  I'm not sure, I don't know.
6  Q  (BY MR. ACHO):  Okay.  Now, on those 450 days, you were
7   told how much you made that day, you knew it, right?
8  A  Each day?
9  Q  Say it again, please?
10 A  You're saying like each day I was told how much I was
11  being paid for?
12 Q  Yeah.
13 A  Yeah, I got told every day how much I was being paid.
14 Q  So you would know every single day the day rate plus any
15  commission, true?
16 A  Every day I would know the -- no, they don't split it up,
17  they just tell me the full price.  They never wrote
18  nothing down to me, that's why I didn't know how much I
19  got.
20 Q  Well, hold on a second.  Take a day, let's say yesterday
21  you delivered, okay, and they told you how much money you
22  made that day, wouldn't they?
23 A  Yeah.  They would tell me, yeah.
24 Q  Okay.  So if it was $200, you would know that you got a
25  commission of $80, because your day rate was $120, right?
```

JUSTIN GUY
July 15, 2021

Page 90

1  A   I'm not sure, because that's not $120, plus commission.
2      Commission is $200.  A day rate plus $200 be $320, if I'm
3      not mistaken, so I —
4  Q   Well, you could — you could easily figure out what your
5      commission was if you wanted to know?
6  A   But did you hear what you said?  If I made $200 yesterday
7      from commission, I would only have an $80 commission.
8      That's not —
9  Q   I didn't — I'm sorry, I'm sorry, Mr. Guy.  If I said
10     that, I misspoke.
11 A   No, you said it the right way, and that's —
12 Q   Let me — let me try it this way.  If you came in at the
13     end of the day on a Wednesday and you said you're going
14     to get $200 for the day, you understand, correct?
15 A   I hear you.
16 Q   How much would your commission have been?
17 A   Whatever that number is they tell me, like $200, that
18     means I'm supposed to get $200 commission, but that
19     wasn't the case, so you don't have it, you know what I'm
20     saying?
21 Q   Sir, you're confusing me.  I apologize.
22 A   No, I'm answering you.
23 Q   You were guaranteed $120, correct?
24 A   Correct.
25 Q   Anything above that would be your commission, correct?

Page 91

1  A   No.  They told me I was going to get $120 a day, plus
2      commission.  When I came in, they're telling me how much
3      commission I made for the day and then subtract 120.
4  Q   Okay, but you would know — you would know what the
5      commission was based upon what they told you less the
6      120, correct, you would know it?
7  A   Yeah, but it wasn't no percent.  You asked me what was
8      the percent I was being paid commission.
9  Q   Well, how do you know it was right every single day for
10     450 days?  So you're telling me you didn't know?
11 A   I did, but I had to do what I had to do.  I ain't had no
12     choice.
13 Q   Well, I — well, here's the thing.  You said you
14     complained about not getting overtime; is that right?
15 A   Yeah.
16 Q   But you didn't complain saying, hey, I don't know what my
17     percentage is on commission.  You never complained, did
18     you?
19 A   Never said that.  I said I complained about a lot of
20     stuff.
21 Q   But I asked you what you complained about, and you only
22     said the overtime, that's all you said.
23 A   I said a lot of stuff.
24 Q   Well, tell me what the other stuff is, then.
25     MR. HANNA:  Objection, relevance.  Mr. Acho,

Page 92

1      can we please move on?  This is about the overtime.  Even
2      if he complained about everything else, Mr. Acho, it
3      doesn't matter, because we're not — we're not — he's
4      not suing Absopure for that other stuff, so why are we
5      wasting everybody's time?
6          MR. ACHO:  Please, sir, as you know,
7      depositions deal with credibility and reliability.
8      That's what I'm asking about.
9  Q   (BY MR. ACHO):  So, Mr. Guy, you never complained —
10         MR. HANNA:  None of this is into evidence,
11     though.
12 Q   (BY MR. ACHO):  Excuse me, please.  You didn't know what
13     your commission percentage was, nor did you ever complain
14     about it, did you?
15 A   Never said that.
16 Q   Did you?
17 A   I complained about a lot of stuff, but I never said I
18     never complained about it.
19 Q   Did you?
20 A   I'm not sure.  I complained about a lot of stuff.
21 Q   Tell me what you complained about, then, other than the
22     overtime.
23 A   Well —
24         MR. HANNA:  Objection, relevance.  You can
25     answer if you remember.

Page 93

1          THE WITNESS:  I'm not sure, I don't remember.
2      It was a lot of stuff, though, but that was another part
3      of it as well, though.
4  Q   (BY MR. ACHO):  So right now you can't remember anything
5      other than overtime, right, is that correct?
6          MR. HANNA:  Objection, relevance.
7  Q   (BY MR. ACHO):  Pardon me?
8  A   I said that's what we're here for.
9  Q   Okay.  Let's go back to Exhibit 6.  I would like you to
10     read the first full paragraph out loud.  I would like you
11     to read it out loud.
12 A   The following plan offers reasons why a service
13     specialist can be more —
14         COURT REPORTER:  I can't — I can't hear him.
15     I can't hear him.
16         THE WITNESS:  What about it?
17 Q   (BY MR. ACHO):  Okay.  Wendy, I'm going to read it:  The
18     following plan offers reasons why the service specialist
19     can be more self-directed and entrepreneurial.  Your
20     compensation can be further enhanced based upon your own
21     efforts and initiatives.  If you have further questions,
22     please consult with your leadership group or with human
23     resource management.  Did you hear that, sir?
24 A   Yeah, I heard you say that.
25 Q   Did you read it, did you read this document?

JUSTIN GUY
July 15, 2021

Page 94

1 A   Not when I first worked, no.
2 Q   Have you ever seen this document since the day it was
3     handed to you?
4 A   Yeah.  I saw this document, yeah.
5           MR. HANNA:  Objection —
6 Q   (BY MR. ACHO):  When — when did you see it?
7           MR. HANNA:  Mr. Acho, please let me finish my
8     objection.  Objection, form, vague and ambiguous as to
9     the time line of him reviewing these documents.
10 Q  (BY MR. ACHO):  When did you see this document?
11 A  I mean, I don't know.  I just — this is — this ain't
12    got nothing to do with — asking about a service
13    specialist.  I never — I was never a service specialist,
14    so —
15 Q  Okay.  Now, I'm going to read under "please review the
16    following":  A one-percent bonus on the calculated net
17    sales will be paid on designated products.  Bonus
18    payments are subject to the following, and there's a
19    list.  So you got a one-percent bonus, didn't you?
20          MR. HANNA:  Objection, form.  Hold on, hold on.
21    Object, form.  Assumes facts not in evidence.  You can
22    answer.
23          THE WITNESS:  I never received no type of bonus
24    while I was working there, sir.
25 Q  (BY MR. ACHO):  And you don't consider the commission a

Page 95

1     bonus?
2 A   That's not a bonus.  I was hired to do $120 a day, plus
3     commission, not a bonus.
4 Q   Well, what do you call it, then?  What do you call the
5     commission, then?
6           MR. HANNA:  Mr. Acho, he's — just to make
7     things simpler, he's admitted that he's received
8     commissions.  He's not denying that he's received
9     commissions.
10 Q  (BY MR. ACHO):  What do you call it, Mr. Guy, if it's not
11    a bonus over and above your hourly -- I'm sorry, your
12    daily rate?  What do you call it?
13 A  Are you aware that this paper right here is a bonus check
14    that drivers are getting every three months and not every
15    week you get paid?  That's not a commission.  This is a
16    bonus for performance of delivering the water for
17    Absopure, that's what this is about, so I don't know what
18    you're talking about.
19 Q  Well, in your job — I move for the admission of six.
20          MR. HANNA:  Sir, please, for the record, I
21    object to admission.  It's not been authenticated.
22 Q  (BY MR. ACHO):  In your job, weren't you self-directed?
23    In other words, had you told us you ran your own show?
24    You were on the road, no one watched you, you did
25    whatever you had to do, right?

Page 96

1           MR. HANNA:  Objection, form.  Assumes facts not
2     in evidence and misstates prior testimony.
3 Q   (BY MR. ACHO):  Correct?
4 A   What was that?  Yeah, I ran my own show.  Yeah, did what
5     I had to do for Absopure.  I delivered everything they
6     wanted me to.
7 Q   Okay.  You ran your own show, like you said, right?
8           MR. HANNA:  Objection, form, vague and
9     ambiguous as to what do you mean, but you can answer it.
10 Q  (BY MR. ACHO):  Go ahead, go ahead.
11 A  What you mean, I ran my own show?  I drove my own truck.
12 Q  Isn't that what you — isn't that what you — didn't you
13    just tell us that?  Isn't that what you just told us?
14 A  I said I moved on my own time.  That's not running the
15    show.  Running the show is the boss.
16 Q  So you were on your own time.  So if you wanted to have
17    lunch, you could have lunch, because you're on your own
18    time, right?
19 A  No, because Absopure had deliveries, to be certain places
20    by certain times, and I stayed on schedule.
21 Q  Okay.  Let's go to Exhibit 7.
22 A  I have no time for that.
23 Q  Okay.  Let's go to Exhibit 7.  This is Defendant's
24    Exhibit 7, Absopure Bates stamp 46.  This a licensing
25    policy that you not — that you signed by printing your

Page 97

1     name.  That is your name, Justin Guy, there on September
2     24, 2018, correct?
3 A   Yeah, that's my name.
4 Q   Doesn't this document say a route sales trainee?
5 A   No.  It says delivery driver or a route trainee.  It also
6     say --
7 Q   Or?  Where — wait, wait, wait.  Wait, wait.  Where do
8     you see the "or"?
9 A   Where do you see "and"?  It say two different lines.
10    That's two different paragraphs, two different job
11    titles.
12 Q  Oh, so you read it as you're one or the other.  Is that
13    what you're telling us?
14 A  I'm the one that says delivery driver, like my
15    application says.  That's who I am.
16 Q  Okay.  It says here:  I understand as a condition of
17    employment I must possess a chauffeur's license.  Do you
18    read that?
19 A  Yeah, I'm reading it.  Keep continuing.
20 Q  No, let's stop right there.  Do you understand what that
21    means?
22 A  Yeah, I heard you.
23 Q  What does it mean?  What does it mean, please?
24 A  I understand the conditions just like they say.
25 Q  What does it mean to you?

JUSTIN GUY
July 15, 2021

Page 98

1  A   It don't mean nothing, because I didn't have my license
2      after 60 days and I continued working, so it don't mean
3      nothing.  Didn't nobody follow this, Absopure don't care
4      about this.  I worked there for longer than 60 days
5      without a CDL.
6  Q   But as a condition of employment -- do you know what
7      "condition of employment" means?
8  A   Yeah.
9  Q   What does that mean?
10 A   Exactly what it says, a condition of employment.  In
11     order to -- in order to keep working here, you need to
12     have a CDL and be licensed.  That's what this paper's
13     saying.
14 Q   Okay.  So you knew at the time of your hire that you were
15     required to get it within 60 days?
16 A   I never read this paper, I just signed everything they
17     gave me.  That's --
18 Q   I'll read the next sentence for you:  I will then be
19     required to obtain a CDL Group B license within 60 days
20     from the date of hire to continue employment with
21     Absopure Company.  Did I read that correctly?
22 A   You -- I heard you correctly and I read the exact same
23     thing you just said.
24 Q   Okay.  And you signed this?
25 A   It looks like I put my name there.  I didn't read it

Page 99

1      before this, but I definitely signed this paper.
2  Q   Well, I'm trying to understand something.  While you were
3      at Absopure, you never got your CDL Group B license, did
4      you?
5  A   No.
6  Q   Yes or no?  Okay.  And they didn't fire you for 18
7      months.  They allowed you to keep working for 18 months
8      without you getting your CDL Group B license, true?
9  A   True.
10 Q   Wasn't that nice of them?
11         MR. HANNA:  Object to form.
12 Q   (BY MR. ACHO):  Wasn't it nice of Absopure to let you stay
13     on even though you didn't get it, true?
14 A   That's true.
15 Q   Okay.  I move for Exhibit 7.
16         MR. HANNA:  I object.  It hasn't been properly
17     authenticated under the federal rules.
18         MR. ACHO:  Let's go off the record.
19         (Off the record at 1:04 p.m.)
20         (Proceedings in recess at 1:05 p.m.)
21         (Back on the record at 1:48 p.m.)
22 Q   (BY MR. HANNA):  Mr. Guy, do you think --
23 A   Yes.
24 Q   -- you can ignore a paper you signed because you didn't
25     read it?

Page 100

1          MR. HANNA:  Objection, form.
2          THE WITNESS:  What was your question?
3  Q   (BY MR. ACHO):  Do you think that you can ignore a paper
4      that you signed because you didn't read it?
5          MR. HANNA:  Objection.  Form, relevance.
6          THE WITNESS:  I'm not sure what you're asking.
7  Q   (BY MR. ACHO):  Well, I presented all these documents to
8      you; do you recall that?
9  A   Yes.
10 Q   And you kept saying I didn't read it.  I signed it, I
11     didn't read it.  I didn't read it.  I didn't read it.  Do
12     you think that because you didn't read it, that you're
13     not bound at all?
14         MR. HANNA:  Objection.  Form, relevance.
15 Q   (BY MR. ACHO):  Sir?
16 A   I was told these papers wasn't important when they was
17     handed to me from Art, so he told me just sign it, I
18     didn't have to read it, so I didn't.  Why would I read
19     something he told me is not important?
20 Q   I didn't ask you that question.  Please, I'm going to ask
21     it for the third or fourth time, because you're not
22     answering it.  Here is the question.  Do you think that
23     you can ignore a paper that you signed because you didn't
24     read it?
25         MR. HANNA:  Objection --

Page 101

1          THE WITNESS:  It's not important.
2          MR. HANNA:  -- form.  You can answer.
3      Relevance.
4          THE WITNESS:  It wasn't important, that's what
5      I was told from the supervisor, the boss guy that hired
6      me that told me to sign it.  He didn't tell me to read
7      over it and sign everything, so, I mean, it's not
8      important, just sign it and I'm hired.
9  Q   (BY MR. ACHO):  Well, let me understand something.  Have
10     you ever bought a car?
11 A   Plenty of times.
12 Q   How many, would you guess?
13         MR. HANNA:  Objection, relevance.
14         THE WITNESS:  Six.
15 Q   (BY MR. ACHO):  Okay.  Did you sign papers for those cars?
16 A   Yeah.  I didn't read nothing above them dotted lines.
17 Q   But you were still obligated under whatever you signed,
18     right?
19 A   No.  If I wanted the car, I signed the paper and I
20     received the car, that was it.  Just like I signed these
21     papers and I received the job and that was it.  I never
22     read it.
23 Q   But you were bound by whatever you signed for the cars,
24     weren't you?
25         MR. HANNA:  Objection, form.  You're --

JUSTIN GUY
July 15, 2021

**Page 102**

1 Q   (BY MR. ACHO):  Go ahead.

2        MR. HANNA:  You're reading a document and

3   signing a contract.  I mean, this is — you're attempting

4   to go confuse a lay witness with these nonsensical

5   questions concerning whether he understands it or not.

6   It's irrelevant.  Mr. Acho —

7        MR. ACHO:  Sir, Sir —

8        MR. HANNA:  — the documents say what they say,

9   the documents speak for themselves.  Nobody says they

10   don't say that.  They say what they say.

11        MR. ACHO:  I'm going to cite to Civil

12   Procedure 30(c)(2), because you're not stating objections

13   in a concise and non-argumentative manner and a

14   non-suggestive manner.

15        MR. HANNA:  Because you are harassing the

16   witness.

17        MR. ACHO:  Would you —

18        MR. HANNA:  You've been doing it all day.

19 Q   (BY MR. ACHO):  Would you please answer my question.  You

20   were still bound by those agreements you signed when you

21   got the cars, didn't you?

22        MR. HANNA:  Objection, form.

23        THE WITNESS:  I'm not sure if I didn't read it.

24 Q   (BY MR. ACHO):  Okay.

25        MR. HANNA:  Objection to form.

**Page 103**

1 Q   (BY MR. ACHO):  Did you ever borrow money for cars or

2   anything else?

3        MR. HANNA:  Objection.  Form, relevance.  You

4   can answer.

5        THE WITNESS:  I'm not sure what you're leading

6   to.  I don't know.

7 Q   (BY MR. ACHO):  You don't know whether you signed to

8   borrow money at all on cars or anything else?

9        MR. HANNA:  Object, relevance —

10        THE WITNESS:  I mean, when you're signing the

11   title, you're not borrowing no money when I have a title,

12   a green title.  I mean, you paid for the car, so I don't

13   know what you're saying.

14 Q   (BY MR. ACHO):  Did you ever buy cars on an installment

15   plan, monthly payments?

16        MR. HANNA:  Objection.  Form, relevance.

17 Q   (BY MR. ACHO):  That's a yes are or no.

18 A   No.  Not me, no.

19 Q   Okay.  Now, let me understand something.  You are certain

20   that all these papers that we started going over were all

21   presented to you by Art.  You're absolutely certain of

22   that fact; is that right?

23        MR. HANNA:  Objection, form.  Assumes facts not

24   in evidence.  He never said that, Mr. Acho.  Please don't

25   put — don't lie on the record and put words in his

**Page 104**

1   mouth.  He never testified that he is certain that Art

2   gave him each and every one of those documents.  That's

3   inappropriate.

4        MR. ACHO:  Mr. Hanna, please don't call me a

5   liar again.

6        MR. HANNA:  Then don't lie on the record again,

7   Mr. Acho.  I've had enough of this harassment and all

8   this nonsense you're doing.  Ask him questions about his

9   FLSA case and move on.

10        MR. ACHO:  Please, sir —

11        MR. HANNA:  You're lying about what he

12   purportedly previously said to try to manipulate him and

13   get him to change his answer.  The record is transparent.

14   Just like you want him — to ask the court reporter to

15   put on the record that you asked us how long we wanted

16   for lunch while we were off the record.  That was

17   completely irrelevant, but you want to try to buttress

18   all the harassment you've had on the client by making it

19   seem like you're being civil, when you're not.

20        MR. ACHO:  Mr. Hanna —

21        MR. HANNA:  Yes, sir.

22        MR. ACHO:  I'm 75 — I'm 75 —

23        MR. HANNA:  I don't really care how old you

24   are, it doesn't matter to me.  Act like an adult and

25   don't harass my witness.

**Page 105**

1        MR. ACHO:  Mr. Hanna —

2        MR. HANNA:  Yes, sir.

3        MR. ACHO:  — I'm 75 years old.

4        MR. HANNA:  It doesn't matter.

5        MR. ACHO:  And I've had — please don't

6   interrupt me.

7        MR. HANNA:  You've lost every single motion in

8   this — in this case.  You've lost everything in this

9   case, because it's a frivolous defense and you don't

10   handle FLSA litigation.  That's why you're asking all

11   this nonsense and harassing my client, and I've had

12   enough of it.

13        MR. ACHO:  Please, stop interrupting me.  I am

14   75 years old.

15        MR. HANNA:  Ask him questions about his FLSA

16   case.

17        MR. ACHO:  Mr. Hanna —

18        MR. HANNA:  Yes, sir.

19        MR. ACHO:  — please, stop.  Let me finish.

20   I'm not only 75 years old, I had open-heart surgery 11

21   years ago.

22        MR. HANNA:  Do whatever you have to do to lower

23   the stress a little.  I don't know what to tell you.

24        MR. ACHO:  You know what, I'll save my

25   arguments to the court.

JUSTIN GUY
July 15, 2021

Page 106

1  MR. HANNA:  Yeah, we will.  He will definitely
2  be doing that.
3  Q  (BY MR. ACHO):  Sir, did you testify under oath that these
4  documents that we have identified, which is Exhibits 2
5  through 6, were presented to you for signature by Art,
6  yes or no?  Did you say that?
7  A  I don't remember.
8  Q  You don't remember —
9  A  You're asking me about stuff before lunch, I don't
10  remember that.
11  Q  You don't remember what you said as to who gave you the
12  documents?  You don't remember what you said?
13  MR. HANNA:  Objection.  And I just want to note
14  that, for the record, he just asked one thing, and then
15  he said he doesn't remember, he changed the question and
16  asked him something else to insinuate that he is lying.
17  I just want to note that for the record.  You can answer.
18  Q  (BY MR. ACHO):  Please answer the question.
19  A  I don't know.
20  Q  You don't know what you testified to about that?
21  A  I don't know the answer, or is it something that we're
22  going to debate about?
23  Q  You had a hand-held device, didn't you?
24  A  Yeah, a hand-held — yeah, I had a device.
25  Q  And when you came in, weren't you checked in?

Page 107

1  A  You're not asking me a question.
2  MR. HANNA:  Yeah, objection.  Form, vague.
3  Q  (BY MR. ACHO):  I did — I did ask you.  When you came in,
4  weren't you checked in?
5  MR. HANNA:  Objection, vague.
6  Q  (BY MR. ACHO):  Please answer the question.
7  A  Are you asking me where I checked in, when I checked in,
8  how I checked in?  What are you saying?
9  MR. HANNA:  Right.
10  Q  (BY MR. ACHO):  Oh.  How and when?
11  A  That's not —
12  Q  Go ahead, please answer.
13  A  I pulled the truck in, they — I drop off all the coolers
14  that I brought back for the day.  That takes about 10
15  minutes, 15 minutes.  Then I'll go wait in line about 20
16  minutes or so to get the truck checked in, to take all
17  the empties off.  Sometimes it could be about 30 minutes,
18  depending how many trucks was in line.  So than after I
19  check the truck in and take all the bottles off the
20  truck, then I go walk around to the other building, turn
21  in my hand-held, and that's when they tell me what I
22  delivered that day and how much my commission was.
23  Q  Okay.  So you were given a check-in slip which you signed
24  when you came in, correct?
25  A  No, I didn't say that.

Page 108

1  Q  I'm asking you.
2  A  I said, no, I didn't say that.
3  Q  Weren't you given a check-in slip with the time on it
4  when you came in, yes or no?
5  A  No.  No, I did not say that.
6  Q  So it didn't happen?
7  A  I never was handed a check-out list.  I don't know what
8  you're saying.
9  Q  I didn't say check-out, I said check-in.  When you came
10  back —
11  A  I never was handed a check-in list with a certain time
12  that I was back at work.  I never was handed that, no.
13  Q  Not a check-in list, a check-in slip that showed —
14  A  I never.
15  Q  — when you came back?
16  A  No, I never had nothing telling me what time I came back,
17  no.  They don't keep track as far as what you — how long
18  you were out.  They just keep track of what's your
19  delivery.  They don't care about how long you're out on
20  the road, they don't care about it.  They just want that
21  water delivered.
22  Q  Okay.  That check-in slip doesn't show the time; is that
23  what you're saying?
24  A  No, it does not.
25  Q  It does or — okay.  Let's go to Exhibit 8, Absopure

Page 109

1  number 47.  You signed this document as well, didn't you?
2  MR. HANNA:  Objection, form.  You can answer.
3  Q  (BY MR. ACHO):  Is that correct?
4  A  Yeah, it's got my name on it.
5  Q  Well, not your name.  That's your signature, because you
6  signed with printing, don't you?
7  A  Yeah, that's my name.
8  MR. HANNA:  Objection, form.  You can answer.
9  Q  (BY MR. ACHO):  Not your name, isn't that your
10  handwriting?
11  MR. HANNA:  Objection, form.  That's a
12  different question.
13  Q  (BY MR. ACHO):  Answer, please.
14  A  Yes, that's my handwriting.
15  Q  Okay.  And looking at the third line, it references the
16  Federal Motor Character — try it again — Federal Motor
17  Carrier Safety Administration, doesn't it, right?
18  A  What was the question?  You're not asking a question.
19  Q  It says — what I read is what it says, correct, the
20  third line?
21  MR. HANNA:  Objection, form.
22  THE WITNESS:  It says what it says, but I don't
23  get what you're asking.  You're not asking a question.
24  MR. ACHO:  I move — I move for its admission.
25  Now, let's go to —

JUSTIN GUY
July 15, 2021

Page 110

1    MR. HANNA: Hold on, hold on.
2    MR. ACHO: Let's go to Exhibit No. 9.
3    MR. HANNA: Hold on. For the record, I object
4  to the admission of document — of that last exhibit. It
5  was not authenticated in accordance with federal rules, but
6  we can move on with the dep.
7  Q  (BY MR. ACHO): Well, you received that document, didn't
8     you? You signed it —
9    MR. HANNA: Objection, form.
10 Q  (BY MR. ACHO): — right?
11   MR. HANNA: Objection. Form, leading.
12 Q  (BY MR. ACHO): Please answer.
13 A  What's your question, because I'm not hearing you. I
14    ain't hearing no question.
15 Q  The question is you received this form and you signed it,
16    correct?
17 A  I signed it. I never read it, that's not correct.
18   MR. HANNA: Objection —
19 Q  (BY MR. ACHO): That's not what I asked you, sir. You
20    received it, it was given to you to sign, correct?
21   MR. HANNA: Objection, form. Mr. Acho, we were
22  — you were talking about Exhibit 8. You said move on to
23  Exhibit 9. Which one are you even referring to right
24  now, just for the record?
25   MR. ACHO: No. 8, No. 8.

Page 111

1    MR. HANNA: Okay. So you're asking him if he
2  signed Exhibit No. 8?
3    MR. ACHO: Yes.
4    THE WITNESS: I was forced to. I didn't —
5  like it wasn't something — he told me to sign it, it
6  wasn't important. Why would you read something if it's
7  not important?
8  Q  (BY MR. ACHO): Do you sign everything that people give
9     you, Mr. Guy?
10   MR. HANNA: Objection, form.
11   THE WITNESS: If they tell me to.
12 Q  (BY MR. ACHO): So if I told you to sign something giving
13    me money, you would sign it? Would you?
14 A  I wouldn't know, I don't know.
15 Q  Well, what goes through your mind, in your thought
16    process, as to whether you should sign a document or not?
17    What goes through your mind, please?
18 A  It's a company that's hiring me. Whatever they tell me
19    to sign, I'm going to sign. Just like if they told me to
20    crash the car and that's their car, I'm going to crash
21    it. That's what they told me to do.
22 Q  So you would do anything at all?
23 A  To keep my employment, yes, I will.
24 Q  Okay. Oh, by the way, who gave you Exhibit No. 8?
25 A  It was just I didn't — never was handed a single

Page 112

1  individual paper. I had a stack of 25 — 20, 30 papers,
2  and I just signed everything.
3  Q  Who gave them to you?
4  A  My interview was with Art when I applied at Absopure.
5  Q  Who gave you the papers to sign? Who?
6  A  Art.
7  Q  Okay. Now, let's go to Exhibit No. 9. I've already
8     referenced this. This is called verification consent
9     agreement and acknowledgment. Now, sir, I'm going to
10    direct you — by the way, you received this document, did
11    you not, to sign?
12   MR. HANNA: Objection, form. You can answer.
13   THE WITNESS: I sign it. I didn't review it,
14    no, I did not.
15 Q  (BY MR. ACHO): No. I mean, you received it before you
16    signed it?
17 A  I signed this paper when they gave me 30 pieces of paper.
18    You keep asking me the same question. Each paper that
19    got my name on it, it's going to be the same answer.
20    They handed it to me, told me it's not important, I
21    signed it. They didn't say read through all these papers
22    and bring them back the next day. Now, that's the
23    professional way if you want me to know what's going on.
24    They told me to sign these papers, it's not important.
25    If it's not important, why would I read it and waste my

Page 113

1  time?
2  Q  Well, let me understand something. You weren't given
3     something with just your name at the bottom. It wasn't
4     like some paper covering Exhibit No. 9 and they said just
5     go ahead and sign. They didn't do that. They gave you
6     this piece of paper, it was right there, that you could
7     look at if you so chose before you signed it. You had
8     that right. Didn't you have that legal right to look at
9     it?
10 A  No, I didn't. I don't know nothing about rights. I'm
11    not a lawyer or an attorney, so I don't know.
12 Q  Okay. Is it your testimony that you had no right to read
13    these papers?
14   MR. HANNA: Objection, form. See, this is
15    just — I want to put this for the record. This is the
16    type of manipulation that is going on, and it's harassing
17    and it's inappropriate. He said he doesn't know his
18    rights. Mr. Acho comes back and says, oh, so you're
19    testifying you don't have a right. Like that's
20    inappropriate, Mr. Acho. You're misstating what he's
21    saying and claiming that's what he said, and you know
22    what you're doing. Please, stop it.
23 Q  (BY MR. ACHO): Mr. Guy, do you believe that you had the
24    freedom and free will to read this document before you
25    signed it, yes or no?

JUSTIN GUY
July 15, 2021

**Page 114**

1  MR. HANNA:  Objection —
2  THE WITNESS:  I didn't —
3  MR. HANNA:  Mr. Guy —
4  COURT REPORTER:  I'm sorry, I'm sorry, what was
5  the answer, Mr. Guy?  I didn't hear it.
6  THE WITNESS:  I was told it's not important,
7  just sign the paper.  That's — I mean, if it's not
8  important, why would I read all this — like look it here
9  (indicating), this is just one paper.  Why would I read
10  all this?  And there's 30 other papers, come on now.
11 Q  (BY MR. ACHO):  I'm not asking you that question, Mr. Guy.
12  Please, please, I beg you, please listen to my question.
13  Do you believe that you had the free will to sign or not
14  sign these documents, including Exhibit 9?
15 A  No, I didn't have the free will because I needed the job,
16  so I did what he told me to do in order to start working.
17 Q  Well, your free will, was it not, to choose to say I
18  would like to read these before I sign it.  I will sign
19  them if they're okay, but I need a little bit of time to
20  read it.  You could have said that, but you didn't, did
21  you?
22 A  I didn't know that was my right to.  It's a job
23  interview.  I didn't — I don't know them, they don't
24  know me.  I'm doing whatever they tell me to do to
25  continue working at this place, because they can just let

**Page 115**

1  me go quicker than they can call me in.
2 Q  Well, didn't you apply and work at other companies before
3  Absopure?
4 A  Yes.
5 Q  And didn't you go through an initiation at those
6  companies like you did at Absopure?
7 A  No.
8 Q  You didn't have to sign any documents?
9 A  No.
10 Q  So each of your previous employers that you've identified
11  never asked you to sign anything?
12 A  I don't know what you're referring to.  You asked me did
13  I sign — did I get a stack of 30 papers like Absopure
14  gave me in my previous jobs and, no, I did not.
15 Q  No, I'm not talking about 30 papers.  You worked at
16  Amazon and you also worked at Target, was it?
17 A  Yeah.  I worked at Target, yeah.
18 Q  And where else did you work?  And where else did you
19  work?
20 A  Curtis.  That's a construction company.
21 Q  Okay.  Anywhere else?
22 A  That's about it that I remember.
23 Q  Okay.  At each of those companies, did they have you sign
24  papers, yes or no?
25 A  Not that I can remember, no.

**Page 116**

1 Q  Is it your testimony that you have no recollection of
2  ever signing any papers for any other prior employer; is
3  that your testimony?
4 A  I don't know what you're asking.  You're asking me
5  something about different companies that I'm not here
6  for, so I don't know what that got to do with anything.
7 Q  Please answer my question, sir.
8  MR. HANNA:  Objection, relevance.  I mean,
9  honestly, all of these irrelevant inquiries are just so
10  harassing, a waste of everyone's time, but you can
11  answer.
12  THE WITNESS:  I don't know.
13 Q  (BY MR. ACHO):  Okay.  I'm going to read the last
14  paragraph, and read along with me to see if I read it
15  correctly.  Now, this is something you signed as well,
16  correct?  That's your signature?
17 A  I'm reading along with you, come on.
18 Q  Is that your signature?
19 A  I see my name there, yeah.
20 Q  Not your name.  Is that your signature, yes or no?
21 A  That's what it says, don't it?
22 Q  The last paragraph — the last paragraph says:  I
23  acknowledge that I have received a copy of the associate
24  handbook.  It is my responsibility to read the associate
25  handbook.  Do you see that?

**Page 117**

1 A  Keep going.  I see it.
2 Q  Did you read it; is that correct?
3 A  Yeah, I read it and I heard you loud and clearly.
4 Q  Okay.  So they gave you the associate handbook, didn't
5  they?
6 A  What?
7 Q  The company did give you an associate handbook, didn't
8  they, yes or no?
9 A  I don't —
10 Q  And you took it home, didn't you?
11  MR. HANNA:  Mr. Acho, please don't talk over
12  the witness.  He's trying to say something.  Did you want
13  to saying something, Mr. — did you want to answer that
14  last question, Mr. Guy?
15  THE WITNESS:  I had a handbook.
16 Q  (BY MR. ACHO):  The question is you took it home, didn't
17  you?
18 A  I had a handbook.  You asked me did I receive a handbook.
19  I received one.
20 Q  Okay.  And you took it home, correct?
21 A  I don't know what — I don't know what I did with it.  It
22  wasn't important to me, so it probably was in my car or
23  something, I don't know.  Like I'm supposed to remember
24  what I did three years ago on a Monday?
25 Q  Was it your responsibility to read the associate

JUSTIN GUY
July 15, 2021

**Page 118**

1  handbook?

2      MR. HANNA:  Objection, form.  Assumes facts not

3  in evidence.  You can answer.

4      THE WITNESS:  That's what this paper says, but

5  I never read this, so I wouldn't know then.  Now, I'm

6  aware that's what it's saying, so I guess that's what the

7  paper says, so that's what they were supposed to tell us,

8  but nobody told me that.

9      MR. HANNA:  For the record, the paper does not

10  say that.  It just says you received it.  It doesn't say

11  you were required to read as a condition of employment.

12      MR. ACHO:  Okay, okay.  Mr. Hanna, I'm going to

13  cite you to the Federal Rules of Civil Procedure.  What

14  you've done is something seriously wrong throughout this

15  deposition.  I have read this.  That the person, the

16  associate, has a responsibility to read that handbook, so

17  please don't do that anymore.

18      MR. HANNA:  Where do you see that, sir?

19      MR. ACHO:  It's in the sentence I read.

20      MR. HANNA:  I acknowledge that I have received

21  a copy of the associate handbook, and it's my — oh, you

22  know what, you're right.  I withdraw my last statement.

23  I was incorrect about that.  It does say that, my

24  mistake.

25  Q  (BY MR. ACHO):  So, Mr. Guy —

**Page 119**

1      MR. HANNA:  And just for the record, I'm

2  willing to admit my mistakes, and that was a mistake on

3  my hands.

4  Q  (BY MR. ACHO):  Mr. Guy, so you didn't bother to read the

5  handbook even though it was your responsibility to read

6  it; is that right?

7  A  Yeah, I never read it.

8  Q  Even though it was your responsibility to read it, right?

9  A  I have a lot of responsibilities.  Reading a handbook,

10  I'm not going to get nowhere in doing that.

11  Q  Well, the handbook says how you get paid.  So you didn't

12  even know how you were getting paid, did you, because you

13  didn't read the handbook, right?

14  A  I just did my job like they asked me to do.

15      MR. ACHO:  Okay.  Wendy, please read the

16  question back, and I want it separate, so we have the

17  question and answer.  Please listen to the question,

18  Mr. Guy.

19      COURT REPORTER:  One moment.  Well, the

20  handbook says how you get paid.  So you didn't even know

21  how you were getting paid, because you didn't read the

22  handbook, right?

23      MR. HANNA:  Objection, form.

24      THE WITNESS:  Never read the handbook.

25  Q  (BY MR. ACHO):  So you didn't know how you were getting

**Page 120**

1  paid —

2      MR. HANNA:  Objection —

3  Q  (BY MR. ACHO):  — because you didn't read the handbook,

4  right?

5      MR. HANNA:  Objection, form.  Misstates prior

6  testimony.

7  Q  (BY MR. ACHO):  Go ahead.

8      MR. HANNA:  Mr. Acho, he's testified already

9  hours ago.  He knows how he got paid.  He told you how he

10  got paid.  He said he got paid a day rate, plus

11  commission.

12      MR. ACHO:  You're violating — you're violating

13  the Federal Rules of Civil Procedure once again.

14      MR. HANNA:  I am not violating the civil rules

15  — Federal Rules of Civil Procedure.  I'm trying to get

16  us moving forward.  You're asking him — you're badgering

17  the witness.  He's already answered this so many times.

18  You know, we can — before we go to the court on this

19  stuff, you can go back and look and you will see on

20  numerous occasions, in writing, he's answered this

21  question.  He's told you how he got paid.  He said day

22  rate, plus commission.  I don't understand what —

23  anyways, you can continue.  I placed my objection on the

24  record.

25  Q  (BY MR. ACHO):  Go ahead, please answer the question.  You

**Page 121**

1  didn't bother to read the handbook which sets out how you

2  get paid, and there's no reference to you getting paid

3  overtime, so you didn't even know that, did you?  You

4  didn't even know it?

5      MR. HANNA:  Objection, form.

6  Q  (BY MR. ACHO):  Go ahead, answer.

7      MR. HANNA:  You can answer if you understand

8  his question.

9      THE WITNESS:  I was told how I was being paid.

10  I was told how to do my job.  I was told what I was going

11  to be doing.  What do I need a handbook for?  I'll wait.

12      MR. ACHO:  I move for admission of No. 9.

13      MR. HANNA:  For the record, plaintiff objects

14  to the admission of Exhibit No. 9.

15  Q  (BY MR. ACHO):  Okay.  Let's go to Exhibit 10.  Have you

16  ever seen this document before?

17  A  This looks like the handbook.

18  Q  It's Exhibit 10, Abscpure Bates 177.  What is it, sir?

19      What's it called?

20  A  What was that?

21  Q  What is this document called?

22  A  A handbook.

23  Q  Is that what it says?  Is that what it says, "handbook"?

24      What's the caption?

25  A  Oh.  The caption says it's an associate handbook.

JUSTIN GUY
July 15, 2021

Page 122

1 Q   Ah.  Remember when I asked you whether you were an
2     associate, and you said whatever you said.  You didn't
3     say you were an associate, did you?
4 A   Because I'm not one.
5 Q   You're not one?  Okay.  So what you're saying is —
6               MR. HANNA:  For the record — if I can,
7     Mr. Acho, please, slow down.
8               MR. ACHO:  I didn't finish my question.
9               MR. HANNA:  Well, you —
10              MR. ACHO:  Please wait until I'm done with the
11    question.
12              MR. HANNA:  Would you let me object, though?
13              MR. ACHO:  No, because I haven't finished my
14    question.
15              MR. HANNA:  Your last question, Mr. Acho.  Pay
16    attention to me when I'm talking.  The last question, you
17    didn't wait.  Please slow down.
18              I object to form to the last two questions.
19    Mr. Guy, please just hold off a minute after Mr. Acho
20    asks a question.
21              THE WITNESS:  Okay.
22              MR. HANNA:  Just so I have a chance, because
23    more than anything, poor Wendy is trying to write all
24    this down, and when we're talking over each other, she's
25    writing down every word, it makes it very difficult for

Page 123

1     her.
2               THE WITNESS:  Okay.
3 Q   (BY MR. ACHO):  You said you weren't an associate, yet you
4     got an associate handbook from Absopure; is that correct?
5               MR. HANNA:  Objection, form.  Misstates prior
6     testimony.  You can answer.
7               THE WITNESS:  That's what the handbook says.
8     My application says I was a driver.  This don't say
9     driver handbook, so why would I read something if it's
10    not for drivers?
11 Q  (BY MR. ACHO):  My question is, you were given an
12    associate handbook and, by your own testimony, you were
13    not an associate; is that correct?
14              MR. HANNA:  Objection, form.  You can answer.
15              THE WITNESS:  That's correct.  I'm a delivery
16    driver.
17 Q  (BY MR. ACHO):  Okay.  You're not an associate; is that
18    right?
19              MR. HANNA:  Objection —
20              THE WITNESS:  I never heard that word until
21    today.  I was never called an associate by none of my
22    employees or my bosses, nor the boss.
23 Q  (BY MR. ACHO):  Before today, you never heard you being
24    referred to as an associate; that's your —
25 A  No.

Page 124

1 Q   — testimony?
2 A   That's correct.
3 Q   That's your testimony?
4 A   Yes.
5 Q   Okay.  Is it your testimony that the associate handbook,
6     Exhibit 10, did not apply to you; is that your testimony?
7 A   Can't apply to something if you didn't read it.
8 Q   My question is, are you saying the associate —
9     associate handbook did not apply to you?
10 A  I wouldn't know, because this doesn't say "Absopure
11    Driver Handbook," it says "associate."  I never was
12    called an associate, I never knew about the word
13    "associate," I was never an associate, so how am I
14    supposed to know anything about it?
15 Q  So this handbook didn't apply to you, then, did it?
16 A  I'm not sure, I don't know.  I never read it.
17 Q  Sitting here — you're sitting here today some three
18    years after starting at Absopure, and you tell us you
19    don't know whether the handbook applied to you or not,
20    you don't know; is that correct?
21              MR. HANNA:  Objection, form.  You can answer.
22              THE WITNESS:  It doesn't say "Absopure driver."
23    I was a driver, not an associate.  Anymore questions on
24    this "associate" word?
25              MR. ACHO:  Sir, you didn't answer my question.

Page 125

1     Wendy, please, I hate to do it, retype the question and
2     read it for the witness.  Please, please, I beg you,
3     Mr. Guy, answer the question.
4               MR. HANNA:  At this point, I object to form.
5     Mr. Acho, he's answering to the best of his ability.
6     Mr. Guy is — worked as a manual laborer.  You're clearly
7     asking him questions he's — just I think the record is
8     clear as to what I'm saying.  He's answering to the best
9     of your ability.
10              COURT REPORTER:  One moment.  Sitting here —
11    you're sitting here today some three years after starting
12    at Absopure, and you tell us you don't know whether the
13    handbook applied to you or not, you don't know; is that
14    correct?
15              MR. HANNA:  Objection, form.  You can answer.
16              THE WITNESS:  That's what I — that's correct,
17    because I'm not an associate, I was a delivery driver.
18    And I never read this book, so I don't know what this
19    whole book's referring to or who is it about.  Nothing in
20    here to tell me how to deliver the water, how to drive
21    the truck, or what to do while I'm out there, so I
22    wouldn't know.
23 Q  (BY MR. ACHO):  How do you know what you just said is true
24    if you never read this handbook?  How do you know —
25 A  Because it doesn't say "driver," so why would I read

JUSTIN GUY
July 15, 2021

Page 126

1    something that has nothing to do with me?  It says
2    "associate."
3  Q  Who do you know it doesn't say "driver" if you never read
4    it?
5  A  That's common sense.
6  Q  So you're telling the court your common sense tells you
7    that there's no reference to people doing what you did at
8    Absopure; is that correct?
9            MR. HANNA:  Objection.  Objection, form.
10           MR. ACHO:  Go ahead.  Go ahead.
11           MR. HANNA:  Please don't say "go ahead" while
12   I'm in the middle of an objection, Mr. Acho.  So
13   objection, form, badgering the witness, misstates prior
14   testimony.  You can answer, Mr. Guy.
15           THE WITNESS:  This book is not going to tell me
16   how to drive a truck or drop off water, so why would I
17   read it?
18           MR. ACHO:  Okay —
19           THE WITNESS:  The book —
20           MR. ACHO:  I'm going to —
21           MR. HANNA:  For the record, Mr. Acho is
22   interrupting Mr. Guy in completing his response.
23           MR. ACHO:  There was no response.  There's no
24   question.
25           MR. HANNA:  He was in the middle of — okay.

Page 127

1  Q  (BY MR. ACHO):  What question is before you, Mr. Guy?  Is
2    there a question before you that you want to answer?
3    Maybe I missed something.  What is it?  Go ahead, go
4    ahead, continue.  Tell me what —
5            MR. HANNA:  There's no — there's no need to be
6    so confrontational, Mr. Acho.  He was answering — he was
7    completing his answer to your last question.  I don't
8    even remember what it is at this point.  I don't know if
9    he does, but —
10           THE WITNESS:  Me, either.
11 Q  (BY MR. ACHO):  So I didn't cut you off, did I?
12 A  What's your next question?
13           MR. HANNA:  Mr. Guy, were you in the — were
14   you in the middle of saying something, Mr. Guy?
15           THE WITNESS:  I was saying something, but
16   forgot what I was saying, because I don't even — I'll
17   just go on to your next question at this point.
18           MR. HANNA:  Did he cut you off in the middle of
19   talking?
20           THE WITNESS:  Yeah, he did.
21 Q  (BY MR. ACHO):  Oh, you're — excuse me, excuse me.  What
22   did I cut you off from?  What was the last question that
23   I cut you off from?
24           MR. HANNA:  I don't think he can remember it
25   after all this back and forth, Mr. Acho.  I mean, it's —

Page 128

1    the record is going to show he was in the middle of
2    saying something and you then said — and you cut him
3    off.  The record will show it.  I've asked you on
4    numerous occasions to slow down and stop trying to
5    manipulate his testimony in this matter.
6  Q  (BY MR. ACHO):  Mr. Guy, you're an intelligent man.  Is
7    any of your testimony that you've given so far today been
8    inaccurate because it's been manipulated —
9  A  No.
10 Q  — yes or no?  Okay.  Now, I'm going to refer you to page
11   7, which is Bates stamp 184.  Look at item number four.
12   I'm going to read it out loud, and you tell me if I'm
13   reading it correctly:  Daily wage exempt.  An associate
14   in the daily wage exempt classification will be paid a
15   fixed daily wage.  Were you paid a fixed daily wage, yes
16   or no?
17 A  Which one are you reading?  I don't know what you're —
18   I'm trying to find what line you at.
19 Q  Okay.  The fourth paragraph.  It's under "associate
20   employee — employment classification," number four,
21   "daily wage exempt."  Do you see that?
22 A  Yeah.
23 Q  I'm going to read the first sentence:  An associate in
24   the daily wage exempt classification will be paid a fixed
25   daily wage.  That's how you were paid, correct, a fixed

Page 129

1    daily wage, true?
2  A  No.
3  Q  You were not paid a fixed daily wage?
4  A  No.
5  Q  What were you paid, then?
6  A  I was paid commission.  I was paid $120, plus commission.
7  Q  Okay.  Well, let's read the rest of the paragraph:  These
8    positions are exempt from the overtime pay requirements
9    pursuant to federal regulations, FLSA.  Now, this
10   statement, it tells you you don't get overtime, doesn't
11   it?
12 A  No, because I wasn't a daily wage exempt.  That's only
13   for daily wage exemptors.  That wasn't me.
14 Q  Let's go to the next one:  The daily wage will be
15   compensation for completion of the job and duties
16   assigned regardless of hours necessary to complete work.
17   Certain daily wage exempt associates and specific job
18   classifications may be paid a daily wage, plus commission
19   based upon performance.  That's what you were being paid,
20   correct?  A day rate, plus commission based on
21   performance, correct?
22           MR. HANNA:  Objection.  Form, compound.
23 Q  (BY MR. ACHO):  Isn't that correct?
24 A  $120 a day, plus commission?
25 Q  Yes, that's what it says here, daily fixed rate, plus

JUSTIN GUY
July 15, 2021

Page 130

1  commission based on performance, correct?

2 A  I didn't have a daily fixed rate.  My daily rate was the

3  same.

4 Q  Well, isn't that what "fixed" means, the same?  Isn't

5  that what that means?

6 A  It sounds like something that should be fixed.  I don't

7  know, I wouldn't know.

8 Q  So you don't know what "daily fixed rate" means?  You

9  don't know what that means?

10 A  No.  Can you define it for me?

11 Q  Did you ever ask anyone at Absopure what —

12 A  I never — I never looked inside of this, sir.  It wasn't

13  even — it wasn't important to me.  I just know I was

14  getting paid a hundred days — $100 a day — $120 a day,

15  plus commission.  Nobody told me that I was exempt

16  daily — I still don't know — I was never told I was

17  that, sir.

18 Q  Well, let me ask you something.  Had you read this, would

19  you have still continued working at Absopure?

20 A  I don't know, because it's — it's not the case.

21 Q  But — so you put yourself in a position of not knowing,

22  didn't you, by not reading this, correct?

23 A  I wasn't told that I had to read this in order to work

24  here, sir.  Why would I read this?

25 Q  Well, you signed something that said you were going to

Page 131

1  read it, didn't you?  Didn't you sign something, sir,

2  that said you would read the handbook, yes or no?

3  MR. HANNA:  Objection, form, relevance.  You

4  can answer.

5  THE WITNESS:  I didn't know what I signed.  I

6  was forced to sign all them papers in order to be

7  employed at Absopure.

8 Q  (BY MR. ACHO):  Do you want me to read it to you again?

9  That statement, Exhibit No. 9, do you want me to read it

10  again to you?

11 A  Do you want to hear my answer again, because it's not

12  going to change.

13 Q  But it was your responsibility to read the associate

14  handbook and you didn't do it, did you?

15  MR. HANNA:  Again, for the record, counsel for

16  defendant is badgering the witness, as evidenced by his

17  last response.  I mean, you got his testimony on the

18  record.

19 Q  (BY MR. ACHO):  Go ahead, sir, answer it.  You knew you

20  were supposed to — you knew you were supposed to read it

21  and you chose not to you.  You chose not to.

22 A  Nobody forced me — nobody forced me to do anything,

23  so — they forced me to deliver water, that's what they

24  forced me to do.  That's the only thing I had to do, that

25  was my job.

Page 132

1 Q  But they forced you to read the handbook?

2 A  No, no.

3 Q  They had a requirement, that was a requirement of your

4  job, to read the handbook?

5 A  What supervisor told you you made me read the handbook

6  or forced all of the employees to read the handbook?

7  Because me or no other employees that's still employed

8  ever read this.

9 Q  It's a company policy.  Every employee gets an associate

10  handbook and they have to read it, it's their

11  responsibility.  Do you realize that or no?

12 A  No, I don't realize none of that, because they're not

13  enforcing this inside the workplace.

14 Q  Okay.  Let's go to page 11, same exhibit.  Page 11, Bates

15  stamp 188.  I'm going to read out loud.  Tell me if I'm

16  right:  Daily wage exempt.  An associate in the daily

17  wage exempt classification will be paid a fixed daily

18  wage.  These positions are exempt from overtime pay

19  requirements pursuant to federal regulations, FLSA.  The

20  daily wage will be compensation for completion of the job

21  and duties assigned regardless of hours necessary to

22  complete work.  Certain daily wage exempt associates and

23  specific job classifications may be paid a daily wage,

24  plus commission based on performance.  Daily wage exempt

25  associates do not receive any overtime compensation for

Page 133

1  hours worked over 40 hours per workweek.  Did I read that

2  correctly?

3 A  I don't know.

4 Q  Well, you read it with me, didn't you?

5 A  I'm trying to find where you was reading, and I couldn't

6  find you.

7 Q  Let's move on.  Next time, sir, if you don't see it,

8  please tell me.

9  MR. ACHO:  Okay.  I move for admission of

10  Defendant's Exhibit 10.

11  MR. HANNA:  Okay.  And for the record, I object

12  to its admission, number one.  Number two, that's the

13  type of harassment that we're referring to, because he

14  did indicate that he doesn't know where you're at, and

15  then you scold him for not knowing.  Number three, this

16  whole statement on this document, that's not a real

17  thing.  That's not like a real — there's no such thing

18  as a daily wage exemption under the FLSA.  Whoever

19  attorney put that together for them, that's not a real

20  law.  There's no daily wage exemption under the FLSA, but

21  we can move on.

22  MR. ACHO:  Okay, okay.  Counsel —

23  MR. HANNA:  Yes, sir.

24  MR. ACHO:  I cite you to Civil Procedure

25  30(c)(2).  This is what you're continuing to do.  Let's

JUSTIN GUY
July 15, 2021

Page 134

1  go to Defendant's Exhibit 11.
2      MR. HANNA:  I disagree with that, but, okay,
3  let's continue.
4  Q  (BY MR. ACHO):  Do you have it?
5  A  Yeah, I'm on it, I'm on it.
6  Q  What's it say on it?
7  A  Driver's handbook.  Now, that's for me.
8  Q  The other was not for you?  You're saying the other was
9  not for you, but this was, right?
10  A  Yep.  Can you hear me?  Do you see this one, driver
11  handbook?  That one (indicating), what's that say?
12  Associate handbook.
13  Q  Okay.  Did you read this document?
14  A  No.
15  Q  So you didn't read the other one, the associate handbook,
16  because you say you're not an associate, but the driver
17  handbook you admit applied to you, but you didn't read
18  that either, did you?
19  A  If you're not going to tell me how to drive a truck, why
20  would I read it?
21  Q  Would did the company give it to you, do you think?
22  A  Why didn't they force me to read it?
23  Q  My question is simply this.  Why did Absopure, in your
24  mind, give you the driver handbook if they didn't expect
25  you to read it?  What was the purpose in giving it to

Page 135

1  you, then?
2  A  Just — just like what you're doing now, to say they gave
3  it to me.
4  Q  So what reason, though?
5  A  I wouldn't know, just to say you got it.  I mean, if I'm
6  working 10, 12 hours all day, I've got to sleep 10 hours,
7  right?  I don't got no other time to read.
8  Q  How about Sunday?
9  A  I got kids, they take all my days up.  And why would I
10  take an off day to read something for work?  If they
11  ain't going to make time for me at work to read it, then
12  I'm not going to read it.
13  Q  So your testimony is the reason you didn't read the
14  driver handbook is because you weren't getting paid to
15  read it; is that your testimony?
16  A  That's not what I said.
17  Q  It sounded that way.  So why is the reason you didn't
18  read it?
19  A  If I'm — if you — if I'm working 10, 12 hours, what do
20  I look like going off of work to read something for work?
21  This book is not going to get me nowhere in life.  It's
22  not going to help me drive the truck, deliver the water,
23  nor be a better person while I'm out there, so why would
24  I read it?
25  Q  You didn't — there are very few days you worked those

Page 136

1  kind of hours.  There are days you didn't work eight
2  hours a day.  You're not denying that under oath, are
3  you?  Because I've got all kinds of people who are going
4  to say you worked less than eight hours multiple days.
5  Are you denying it?
6  A  Yes, I was not asked, because I never clocked out.
7      MR. HANNA:  Objection —
8  Q  (BY MR. ACHO):  Sir, are you denying under oath that you
9  had a number of days where you didn't work eight hours a
10  day?  Are you denying it under oath?
11      MR. HANNA:  Objection, form.  You can answer.
12      THE WITNESS:  I don't know what you're trying
13  to say, because I'm telling you that I did work over
14  eight hours.  I don't know what you're trying to say.
15  Q  (BY MR. ACHO):  What I'm trying to say is, no, you did
16  not.  You worked less than eight hours a day a number of
17  days.  Are you denying that?
18      MR. HANNA:  Are you testifying, Mr. Acho?  Are
19  you asking or testifying?
20  Q  (BY MR. ACHO):  Please answer my question.
21      MR. HANNA:  Is that a question?  Because you're
22  telling him what happened.  That's testimony.
23      THE WITNESS:  Right.
24  Q  (BY MR. ACHO):  Please answer my question.
25      MR. HANNA:  I mean, I can conduct your

Page 137

1  deposition if you'd like, but ask questions, don't
2  testify.
3  Q  (BY MR. ACHO):  Will you answer my question, please,
4  Mr. Guy?
5  A  I'm not sure what you're talking about.
6  Q  Are you denying the fact that you worked less than eight
7  hours on a number of days?  Are you denying that fact?
8  A  I don't remember what you're saying, because what you're
9  saying has nothing to do with what I'm talking about.
10  You asked me about a handbook, now you're asking me how
11  many hours I worked three years ago.
12  Q  Yes, I am.  Yes, I am.  I'm asking you that.  I would
13  like you, please, to answer it.
14  A  So what you want me to answer, because you just —
15      MR. ACHO:  Wendy, please, read it again and
16  type it again for the witness.
17      COURT REPORTER:  One moment.
18      MR. HANNA:  Objection, form.
19      COURT REPORTER:  One moment.
20      MR. HANNA:  Compound.
21      COURT REPORTER:  One moment.  Are you denying
22  the fact that you worked less than eight hours on a
23  number of days?  Are you denying that fact?
24      MR. HANNA:  Objection, form.  Misstates prior
25  testimony.  You can answer.

JUSTIN GUY
July 15, 2021

Page 138

1    THE WITNESS:  I'm not answering that.  Repeat
2    the question one more time.  I'm not denying that fact?
3         MR. HANNA:  If you don't understand what he's
4    saying, you can ask him to rephrase it, too, Mr. Guy.
5         THE WITNESS:  Yeah, like can you put it in a
6    different way, because I don't know what you're trying to
7    say.
8         MR. HANNA:  Mr. Acho and I both want to get
9    your correct testimony, so, please, don't ever feel
10   like — if you ever don't understand the question, ask
11   Mr. Acho to rephrase it, and he's going to be more than
12   happy to do that.
13 Q (BY MR. ACHO):  That's correct.  You don't understand my
14   question, sir?
15 A Can you repeat — put it in a different way?
16 Q Sure.  You didn't work eight hours every day.  You worked
17   less some days, didn't you?
18 A No.
19 Q So you never worked less than eight hours a day is your
20   testimony?
21 A I don't remember every single day that I worked, but I'll
22   tell you I worked over eight hours.
23 Q Every single day; is that what you're telling us?
24 A I'm sure, yes, that's about correct, because 6:00 to
25   6:00 is what?  6:00 in the morning to 6:00 p.m., how long

Page 139

1    is that?
2  Q Well, that's not what I'm asking you.  I know what it is.
3    I'm saying that there are people that are going to
4    testify there are days you didn't work eight hours a day.
5    Are you saying that they're mistaken?
6         MR. HANNA:  Objection —
7         THE WITNESS:  If they going to testify and say
8    what they going to say, well, let them say it, because —
9    okay, if I didn't come to work, of course I didn't work,
10   but when I came to work, I worked longer than eight
11   hours.  And when I was working over eight hours, I was
12   never compensated for it, that's correct.
13 Q (BY MR. ACHO):  Sir, that's not what I — you're getting
14   away from my question.  If people said there were days
15   that you showed up at work, but you didn't work eight
16   hours, are they mistaken?
17 A Got to be, because who's going to tell me I didn't work
18   eight hours?
19 Q Okay, all right.
20        MR. HANNA:  Wendy, did you get my objection to
21   that last one, ma'am?
22        COURT REPORTER:  No.
23        MR. HANNA:  It was just an objection to form.
24        COURT REPORTER:  Thank you.
25 Q (BY MR. ACHO):  Okay.  Let's go to Exhibit 11.  This is

Page 140

1    the driver handbook that you chose not to read, and I'm
2    going to refer you to page 3, which —
3  A Can you hear me?
4         COURT REPORTER:  Yes, we can hear you.
5         THE WITNESS:  Okay.  The phone broke up.  I
6    can't hear nothing, I can't hear nothing.
7         MR. HANNA:  I don't think he said anything,
8    sir.  I think he's looking at a document.
9         THE WITNESS:  Oh, okay.  I think he froze up.
10        MR. HANNA:  Yeah, Mr. — maybe Mr. Acho froze,
11   actually.
12        COURT REPORTER:  He just fell off.
13        (Mr. Acho left conference at 2:42 p.m.)
14        MR. HANNA:  Mr. Guy, did you need water or
15   anything?
16        THE WITNESS:  No, no, no, that's okay.  Are we
17   taking a break?
18        MR. HANNA:  I'm not sure.  I think Mr. Acho —
19   it seems like he lost connection would be my obvious
20   guess.
21        THE WITNESS:  Can I run to the bathroom, then,
22   real quick?
23        MR. HANNA:  I think we can safely go off the
24   record to go to the bathroom.  Mr. Bryne, you don't mind
25   about that, right?  (No verbal response.)  Okay, go

Page 141

1    ahead.  Can we go off the record until Mr. Acho comes
2    back, Wendy.
3         COURT REPORTER:  That might be — someone was
4    trying to call me.  I'm wondering if that was him.  So,
5    yes, I'm going to make a note that we're going off the
6    record at 2:43 p.m.
7         MR. HANNA:  Okay.  Thank you.
8         (Off the record at 2:43 p.m.)
9         (Back on the record at 2:48 p.m.)
10 Q (BY MR. ACHO):  Mr. Guy, weren't you referred at times as
11   a commission route driver salesperson, weren't you?
12 A No.
13        MR. HANNA:  Object to form.
14        THE WITNESS:  No.
15 Q (BY MR. ACHO):  Okay.  Just so I'm clear, there's an
16   objection by counsel for the plaintiff as to that
17   question, and the denial by Justin Guy that at times he
18   was referred as a commission route driver salesperson; is
19   that correct?
20        MR. HANNA:  Yeah, that's correct, because
21   you're not — you're not being clear as to whether he's
22   — you're saying he's referred in writing or orally or
23   what.  So I object to form, because your form is
24   completely ambiguous.
25        MR. ACHO:  I would —

JUSTIN GUY
July 15, 2021

Page 142

1       MR. HANNA:  If you're —

2       MR. ACHO:  I would like the record to reflect

3   that this is contrary to the admissions under oath made

4   by Mr. Guy, with the assistance of his counsel, which is

5   answer number five in the — in the plaintiff's response

6   to defendant's first request for admissions.  Okay, we'll

7   move on now.

8       MR. HANNA:  You can't move on — you can't cut

9   me off and not let my position on the record and say

10  we're going to move on.  That's not how it works, Mr.

11  Acho.  You've been doing this for a long time and you

12  should know that.

13      So for the record, since we want to have a

14  statement on the record by Mr. Acho, I will respond in

15  kind.  His question was vague and ambiguous, which is why

16  I objected.  It was — he keeps talking about what

17  they're referring to orally, and then he throws in his

18  question in an attempt to confuse the witness.  It's

19  disputed — well, the documents speak for themselves, but

20  his testimony does as well.  So we'll leave it at that.

21 Q  (BY MR. ACHO):  Okay.  We're going to go back to 11 in a

22  minute, but, Mr. Guy, you didn't just drop off products

23  to customers.  You would try to see whether they would

24  buy more products from you, you would ask them about

25  other products, didn't you?

Page 143

1 A  No.

2       MR. HANNA:  I object to —

3 Q  (BY MR. ACHO):  Well, in your admissions under oath that

4   we just received, you say:  Plaintiff also admits he

5   asked defendant customers if they needed additional

6   products when he delivered ordered products.  So

7   either — okay, let me just leave it at that.  This is

8   contrary to your admission under oath.

9       MR. HANNA:  Object, form.  Mr. Acho, would you

10  like to show him your admission — his admissions that

11  you're referring to and —

12      MR. ACHO:  I'll present it to the court.  I'll

13  present it to the court.

14      MR. HANNA:  So we'll object to form, vague and

15  ambiguous.  And, you know, again, Mr. Acho, this isn't a

16  gotcha litigation, where you're trying to have a gotcha

17  moment against a manual laborer with a high school

18  education, so I don't understand why you're trying to

19  confuse him.  If you want to show him something you ask

20  him, you can ask him, but that's not really how it works.

21      MR. ACHO:  Sir, I think referring to him as a

22  manual laborer is, truthfully, not —

23      MR. HANNA:  What do you call truck drivers?

24  What do you call truck drivers?  What do you call people

25  who are delivery drivers?

Page 144

1       MR. ACHO:  People, workers.

2       MR. HANNA:  Right, right.

3       MR. ACHO:  Okay, let's move on.

4       MR. HANNA:  When you're trying to throw in

5   legal terms to confuse a lay witness, it's inappropriate,

6   Mr. Acho.  And you know what you're doing, so stop it.

7       MR. ACHO:  Page number 3, Bates stamp 100 —

8       MR. HANNA:  What document are you on?

9       MR. ACHO:  — can you please — No. 11.

10 Q  (BY MR. ACHO):  You have No. 11 in front of you, don't

11  you?  Don't you have No. 11 in front of you, sir?

12      MR. HANNA:  No, I didn't, but I do now.

13 Q  (BY MR. ACHO):  Mr. Guy, do you have it in front of you?

14 A  Yes.

15 Q  Can you go to page 3?

16 A  Yep.

17 Q  Okay.  Now, section two, hours of service policy, you see

18  that?

19 A  Yeah, I see it.

20 Q  And you operated for Absopure under the department of

21  transportation regulations, correct?  You don't deny

22  that —

23 A  I'm not sure.

24 Q  — do you?

25 A  I'm not sure.

Page 145

1       MR. HANNA:  Objection —

2 Q  (BY MR. ACHO):  You're not sure whether you —

3       MR. HANNA:  Mr. Acho, please, let me get my

4   objection in.  Please let me get my objection on the

5   record, for God's sake, Mr. Acho.  Object to form, asking

6   a lay witness for a legal conclusion.  You can answer if

7   you know.

8       THE WITNESS:  I don't.

9 Q  (BY MR. ACHO):  So you never heard anything — you heard

10  nothing about "department of regulation" in the year

11  and-a-half you were at Absopure, correct?

12 A  It was my first trucking job, so I wouldn't know.

13 Q  I thought you delivered for Amazon?

14 A  That's not — that wasn't a truck.  It's a transit.

15 Q  Well, when you say you — your first trucking job, it

16  wasn't your first trucking job, was it?  Has it?

17 A  Do you know the definition of "trucking"?

18      MR. HANNA:  Right.  Object —

19      THE WITNESS:  You need to describe the truck.

20  That was my — this is my first trucking job, yes, that's

21  correct.

22      MR. HANNA:  I think the plaintiff very

23  eloquently made my point.  So objection, form, vague.

24 Q  (BY MR. ACHO):  Well, I'm trying to understand something.

25  You had a trucking job for Absopure and didn't know —

JUSTIN GUY
July 15, 2021

Page 146

1  not know at all whether they were under the department of
2  transportation.  Is that correct --
3        MR. HANNA:  Objection.
4  Q  (BY MR. ACHO):  -- you didn't know?
5        MR. HANNA:  Objection, form.  Misstates a lot
6  of things.  Let's just keep it under objection, form.
7  Q  (BY MR. ACHO):  Please answer.
8  A  Oh.  I originally didn't go to Absopure to drive a truck,
9     sir.  I was going for a water technician.  They gave me
10    this truck.  They gave me all these papers to sign and
11    just threw me in the truck.  I didn't know nothing about
12    it.  I just did what they told me to do.
13 Q  Please answer my question, not what you're saying.  Here
14    is my question.  You worked for 18 months at Absopure in
15    a trucking job and are telling the court you had no idea
16    that the department of transportation had anything to do
17    with the trucking; is that correct?
18       MR. HANNA:  Objection, form.  Misstates prior
19    testimony, and using vague and ambiguous words like
20    "trucking," which, you know --
21 Q  (BY MR. ACHO):  Please answer it.  Please answer it.
22 A  I don't know what -- that word you just said, I don't
23    know what that is.
24 Q  Department of transportation?
25 A  Department of truck -- transportation or regulation,

Page 147

1  whatever that is, I still don't know what that is.  And I
2  start a new trucking job next week, so what's your point?
3  Q  Okay.  Let's go to page 4, which is 101 Bates, same
4     Exhibit 11.  Go to "what are you exempt from," towards
5     the bottom, okay.  Do you see it?
6  A  Yeah, I see it.  I know what you're talking about.
7  Q  Okay.  We're going to go to the second paragraph
8     beginning with "although."
9  A  You should start with the first, because I drove over 11
10    hours.
11 Q  Sir, please, don't keep doing that.  It's disrespectful.
12    I'm asking you --
13 A  This is stuff that I did.
14 Q  Sir, sir, please --
15 A  You're skipping over stuff that I see.
16 Q  Sir, your lawyer can ask you questions when I'm done.
17    I'm going to refer you to the second paragraph.  Reading
18    that out loud -- read it out loud beginning with
19    "although," please, out loud.
20 A  It says:  Certain hours of service rules apply --
21 Q  Sir, don't -- sir, sir, please don't do that.  You're
22    being disrespectful, you're not following procedure.
23       MR. HANNA:  I don't agree with that
24    characterization.  If anyone's being disrespectful, sir,
25    it's you, and --

Page 148

1        MR. ACHO:  Okay.  You know what, please stop
2  that.
3  Q  (BY MR. ACHO):  All right, sir.  I'm going to read --
4        MR. HANNA:  Then don't badger the witness.  I
5  don't appreciate that, that's my client.  Don't badger
6  the witness.
7        MR. ACHO:  For the record, I'm directing the
8  witness to read two sentences in the second paragraph.
9        MR. HANNA:  What do you mean, what are you
10 referring to?  First of all, what are you referring to
11 when you say "second paragraph," sir, because this isn't
12 in a paragraph format.  So what words begin in that
13 second paragraph?
14 Q  (BY MR. ACHO):  I'm going to read it out loud.  I don't
15    want to get into this debate anymore.  Although drivers
16    are not required to maintain a detained -- a detailed log
17    of their duty status, they are required to record their
18    on-duty time.  Do you see that?  Do you see that,
19    Mr. Guy?
20 A  Yeah.  I also see that drivers are not --
21 Q  Sir, wait, wait --
22 A  -- to drive more than 11 hours, and --
23 Q  Wait, wait, wait.  Did you -- did I read --
24    Read that part.
25 Q  Sir, did I read it correctly?

Page 149

1  A  I see that under I'm not allowed to drive over 11 hours.
2  Q  Okay, okay.  Sir, did you record your on-duty time
3     according to the driver handbook?  Did you, yes or no?
4  A  I clocked in, yes.  I never clocked out, because I was
5     forced not to.  So I didn't keep track of clocking out,
6     just clocked in.
7  Q  Hold on.  Sir, you didn't read this driver handbook,
8     correct?
9  A  I wish I would have, because I wasn't suppose to drive
10    over 11 hours, and I did that.  So you all broke a lot of
11    laws and rules.
12 Q  Sir --
13 A  This is you all handbook, this is you all rules.  Why did
14    you let me drive over 11 hours?
15 Q  Mr. Guy, why do you keep doing this?  That's not the
16    question I'm asking you.  Your lawyer can ask you
17    questions.  Please, don't keep doing this, because we
18    won't finish in seven hours.
19       So you didn't record your on-duty time, did
20    you?
21       MR. HANNA:  Well, for the record, after seven
22    hours, this deposition is over.  We have multiple
23    instances recorded where you're asking irrelevant -- and
24    just so you know, Mr. Acho, what you're asking right now
25    is also irrelevant, because he's a -- it's referring to a

JUSTIN GUY
July 15, 2021

Page 150

1 completely different position, I don't think you're
2 reading this document correctly, but you can continue
3 with your irrelevant inquiry.
4     MR. ACHO: Counsel, you're repeatedly violating
5 the federal rules.
6     MR. HANNA: I am not. I don't -- there's no
7 such --
8 Q (BY MR. ACHO): Mr. Guy, Mr. Guy, pursuant to page 13 --
9 A My computer's on 19 percent.
10 Q Pardon me?
11 A My computer's on 19 percent.
12     MR. HANNA: Your computer's on 19 percent?
13     THE WITNESS: Yeah.
14     MR. HANNA: I'm going to have -- we can
15 continue the deposition. Mari is about to go to your
16 office and make sure it's plugged in, so you're good.
17     THE WITNESS: Okay, all right.
18 Q (BY MR. ACHO): All right. Go to page 13, please.
19 A Oh, so we're just going to skip over 11 hours can't be
20 driven, or are we -- I don't have a 13. Oh, my fault,
21 I'm sorry.
22 Q Okay. Go to the first paragraph.
23 A There's still people driving over 11 hours, just to say,
24 just to let you know, but that's what the papers say,
25 though.

Page 151

1 Q I have a question for you, sir.
2 A Okay. What is it?
3 Q Doesn't the first paragraph indicate that you will be
4 qualified under the Federal Motor Carrier Safety
5 Regulations and company policies? Isn't that what this
6 says?
7 A No. This says "driver's qualifications." I don't see
8 where you're saying that at.
9 Q It's the last sentence of that paragraph.
10 A Drivers will be qualified -- I mean, that's what it says,
11 but --
12     MR. ACHO: Okay, good. I move for the
13 admission into evidence of Exhibit No. 11.
14     MR. HANNA: I object to its admission, it
15 hasn't been authenticated.
16 Q (BY MR. ACHO): So let's go to Exhibit 12. This was
17 something you signed, again, dealing with call offline
18 policy. You saw that, that's your signature, correct?
19     MR. HANNA: Objection, assumes facts not in
20 evidence. You can answer.
21     THE WITNESS: What we on? We on a new page,
22 you said?
23 Q (BY MR. ACHO): Page 12 -- no, Exhibit 12. You got it?
24 A Uh-huh.
25 Q You signed this, correct? That's your signature?

Page 152

1 A Yeah. That's my name right there, yeah.
2     MR. ACHO: I move for its admission. Exhibit
3 No. 13 --
4     MR. HANNA: Just for the record -- if I can,
5 Mr. Acho, real briefly, I object to the admission of
6 Exhibit 12. It has not been properly authenticated in
7 accordance with federal rules. We can move on.
8 Q (BY MR. ACHO): Exhibit 13, you signed that one, too,
9 didn't you? You received and you signed it, correct?
10 A Yeah, that's the tardy -- what's that? That's the tardy
11 issue, that's the tardy paper.
12     MR. ACHO: Okay. I move for its admission. I
13 move for its admission. Let's go to No. 14.
14     MR. HANNA: If I can, Mr. Acho, please. I
15 object. This document has not been properly
16 authenticated in accordance with federal rules. You can
17 move on.
18 Q (BY MR. ACHO): Let's go to No. 14. You received this
19 letter regarding termination; is that correct?
20 A I wasn't -- yeah, I had this letter.
21 Q Now, let me ask you --
22 A I didn't voluntarily -- I didn't voluntarily get
23 terminated. I would never do that.
24 Q Well, you're making more on unemployment now than you
25 were working at Absopure; isn't that what you told us?

Page 153

1     MR. HANNA: Objection, form.
2 Q (BY MR. ACHO): Correct?
3     MR. HANNA: How would he know how much he would
4 make on unemployment if he's still employed, to make that
5 decision ahead of time?
6 Q (BY MR. ACHO): Isn't that true, sir?
7     MR. HANNA: Objection, form.
8 Q (BY MR. ACHO): I would like you to answer the question.
9 A Actually, that wasn't the case.
10 Q What wasn't the case?
11 A I was terminated, because they told me to go get my CDL
12 license, and I went to go get it, they fired me, so
13 I didn't voluntarily quit.
14 Q Okay. I want to go over this letter with you. The
15 company has a no-call, no-show policy, don't they, yes or
16 no?
17     MR. HANNA: Objection. Form, relevance.
18     THE WITNESS: I never did -- I never did
19 no-call, no-show.
20 Q (BY MR. ACHO): Did you hear my question, Mr. Guy?
21 A Yeah, I heard your question.
22 Q Answer it, please.
23 A I said I heard your question.
24 Q I want you to answer the question.
25 A I said -- what did you -- what did you say, do they got a

JUSTIN GUY
July 15, 2021

Page 154

1    no-call, no-show policy.  And I said I'm sure they do.
2  Q  You weren't positive about that, you weren't sure?
3  A  I mean, every job that you work at, if you did a no-call,
4     no-show, you're fired.  Ain't that common sense?
5  Q  Okay.  Now, where were you on February 3, 2020?
6  A  I don't know, that was so far.  I don't even know when
7     that is.
8  Q  Okay.  Where were you on January 30, 2020?
9  A  How am I supposed to know off the top of my head wherever
10    I'm at?
11 Q  Where were you on January 31, 2020?
12 A  I don't know what you're asking.  I don't know if I — I
13    don't remember a date, where I was at on a specific date.
14 Q  Where were you on February 3, 2020?
15 A  That was a year and-a-half ago.  I do not know.
16       MR. HANNA:  Just — just for the record, I
17    object to this entire line of inquiry.  To the extent we
18    need to file motions for additional time, the reason
19    we're taking so much time is because Mr. Acho is asking
20    all this completely nonsensical and irrelevant inquiry.
21    This is not a wrongful termination lawsuit.  His
22    termination is completely irrelevant and, you know, I'm
23    not going to object to him asking, you can go ahead and
24    ask, but to the extent we need more time, I'm going to
25    object to it, because we're wasting time asking about

Page 155

1     irrelevant topics.  You can continue.
2        MR. ACHO:  We are probing the credibility and
3     reliability of this witness.
4        MR. HANNA:  Okay.
5  Q  (BY MR. ACHO):  Mr. Guy, you read this letter, and it says
6     you were fired for no-call, no-show.  There's nothing
7     here at all about you not getting the CDL license, is
8     there?
9  A  They hid that paper from you guys, or from you, because
10    you ain't give it to me.
11 Q  Okay.  What did they hide, did you say?
12 A  The paper said they was going to fire me if I didn't get
13    a CDL.
14 Q  Do you have that letter?  Do you have it?
15 A  I've never had it in my possession, I don't know.  Ask
16    Alex what he did with it.
17 Q  Well, hold on.  Are you saying Alex gave you a letter to
18    read and then took it back; is that what you're saying?
19 A  He gave me a piece of paper to sign that he says it's not
20    important, I signed it before, so I never looked at it,
21    and then somebody else tells me what the paper was about
22    that was wondering the same thing as me, like why did I
23    just sign a paper?  So we came to a conclusion on what it
24    was about, then that's when I went to go get my CDL.
25    That's when I was fired.

Page 156

1  Q  Well, hold on, wait.  I'm trying to understand how this
2     worked.  Here there days at the end of January 2020 and
3     early February 2020 where you did not show up for work?
4  A  No.  I started trucking school.
5        MR. HANNA:  Objection, form.  You can answer.
6  Q  (BY MR. ACHO):  Answer, please.
7  A  I started trucking school the end of that — around that
8     time period, because they had me sign a paper saying they
9     was going to fire me if I didn't get a CDL license.  So I
10    went to get my CDL license, they still fired me.  How did
11    that work?  I don't know.  Why they hiding that paper?
12    It makes sense, because if you had me sign a paper saying
13    I need to get my CDL license, I go get it, you still fire
14    me, I would hide that paper, too.
15 Q  So you started that truck driving training school at the
16    end of January; is that what you're telling us?
17 A  It was — I don't know the exact date I started, but it
18    was around January, February.
19 Q  Well, no, no, I'm asking you very specifically, because
20    you're saying you didn't show up for work because you
21    started your driver training course; is that what you're
22    testifying?
23 A  That's what I started, yes.  I started trucking school.
24 Q  And that's why you didn't show up for work at the end of
25    January?

Page 157

1  A  That's not correct.  Like you said, when the job — if
2     you work there for a certain amount of time, you get a
3     personal leave, and since I needed a CDL, I thought that
4     I was going to take my leave to get the CDL so I wouldn't
5     get fired, and they still fired me.  They just didn't
6     want me.  I'm young, black, and selling a lot of —
7     delivering a lot of water for them.  It was like what can
8     I personally do — if they tell me to get something, I go
9     get it, I still get fired.  So if I didn't get it, I'm
10    still going to get fired, so what's the point, what are
11    you getting to?
12 Q  What did you mean —
13 A  I got it, I got fired.  If I didn't get it, I was going
14    to get fired.
15 Q  Okay.  Let me understand something.  What does you being
16    young or black have anything to do with anything?
17 A  That's how I felt.  If you was in my position, you would
18    feel the same way.  You know what — you know what's
19    going on in this time in the world and how people treat
20    people like me, and look what we're going through now.
21    You're asking me about why I got terminated.  It's
22    because I went to get a CDL, but I signed the paper
23    saying I was going to get a CDL.  Since I got the CDL,
24    you fired me.  That don't make sense.  And that's how I
25    look at it, because what would you look at it in your

JUSTIN GUY
July 15, 2021

**Page 158**

1  eyes if you were in my position?  You get told to get a
2  CDL, you get the CDL, you still get fired.  What else can
3  I look at it as?  And I'm doing everything Absopure asked
4  me to do.
5  Q  Well, you had a condition of employment that you would
6     get your CDL in 60 days, right?
7           MR. HANNA:  Objection, form.  Misstates -- hold
8     on, hold on.  Objection, form.  Misstates prior
9     testimony.  You can answer.
10 Q  (BY MR. ACHO):  Go ahead.
11 A  I don't know what you're trying to ask, but it's not
12    making sense, because after them 60 days, back in
13    September 2018, when December came, whatever them 60 days
14    is, I should have been released.  If that wasn't the
15    case, you shouldn't be worried about nothing else at that
16    point.  And since I continued in 60 days, then a year
17    and-a-half later, now all of a sudden I need to go get my
18    CDL or I'm going to be fired, I got get it and I still
19    get fired, what else would you look at it as?
20 Q  Well --
21 A  There's nothing -- there's nothing else to look at it as.
22    I did what you want me to do, I got what you want me to
23    got, and I still got fired.  How does that work?
24 Q  Well, we'll come back to that.  There's nothing in
25    Exhibit 14 that has anything to do with your not getting

**Page 159**

1  a CDL; is that true?
2  A  That's why Absopure is lying.  It's common sense.  Like
3     you see I got my CDL, you see the paper that's so-called
4     -- I signed in the beginning.  They didn't show you when
5     I signed it back in January 2020.  Why?  Because they
6     fired me.  So why would they show you that --
7           MR. ACHO:  I move for --
8           THE WITNESS:  -- since I signed it the second
9     time --
10          MR. ACHO:  I move for --
11          THE WITNESS:  -- in order to get the license?
12    I got the license, I still got fired.  You're not making
13    sense.  They had no reason to fire me, because I was in
14    trucking school.
15          MR. ACHO:  Tell me when you're finished, sir.
16          THE WITNESS:  Oh, no, I'm done.  I'm just
17    letting you know what happened.  And I know you still
18    have your own story, but I didn't get fired because I
19    didn't come to work.  I got fired because I did what they
20    told me to do, I went to go get the license, and I still
21    have the license.
22 Q  (BY MR. ACHO):  Do you have anything in writing to prove
23    that, yes or no?
24 A  Yes.
25 Q  What?

**Page 160**

1  A  That I have the license?
2  Q  No.  Do you have anything in writing to prove that's why
3     you were terminated by Absopure, yes or no?
4  A  That is the reason why --
5           MR. HANNA:  Objection, relevance.
6  Q  (BY MR. ACHO):  What?  Say what?  I --
7  A  That's the real reason, that's the real reason.  You see
8     what their reason was.
9  Q  Did you hear my question, Mr. Guy?
10 A  Didn't you hear I was a good employee?  Ain't that what
11    they told you?
12 Q  Mr. Guy, we're not talking about whether you're a good
13    employee.  We're talking about something else.  Here's
14    the question.  Do you have any written documentation to
15    say that the company terminated you because you didn't
16    have a CDL, yes or no?
17 A  That's the last paper that I signed -- oh, I'm sorry, go
18    ahead.
19          MR. HANNA:  Objection, form.  You can continue,
20    sir.
21          THE WITNESS:  That's the last paper that I
22    signed before I was fired, so that's their reason.  They
23    had to put it in a type of formal way in order not to
24    make them look bad on their behalf.
25 Q  (BY MR. ACHO):  You didn't give me any letter that you

**Page 161**

1  signed that says you were terminated because you didn't
2  have a CDL.  Do you have such a document?
3  A  You showed me a document if I didn't get a CDL in 60
4     days, I'd be fired.  They re-gave me that document in
5     August -- in that 2020 range, whenever January was.  I
6     signed it.  Therefore, I signed up to start a CDL class,
7     and they just fire me.  They said, you know, it was what
8     it was.  So basically that was my -- basically it was
9     time to go.
10          MR. ACHO:  Okay.  We moved for the admission of
11    14.  Now we're going to go to 15.
12          MR. HANNA:  For the record, I object to the
13    admission of 14, it was not authenticated in accordance
14    with the federal rules.  We can move on, though.
15 Q  (BY MR. ACHO):  You testified just a few minutes ago that
16    you started your training on the days where you missed
17    work on January 30th --
18 A  I never -- I never told you the day I started.
19 Q  -- 3rd, but that's not true, is it, Mr. Guy?  That's not
20    true at all, is it?
21 A  I never told you a certain date.
22          MR. HANNA:  Objection --
23 Q  (BY MR. ACHO):  Yeah.  You said, I started and that's why
24    I missed those days of work.  That's what you said.
25          MR. HANNA:  Wendy, did you get my objection,

JUSTIN GUY
July 15, 2021

**Page 162**

1  ma'am?
2          COURT REPORTER:  All I got was the word
3  "objection."
4          MR. HANNA:  Objection, form.  You can answer.
5  You can answer if you understand the question, Mr. Guy.
6          THE WITNESS:  Okay.  No, I never told you
7  nothing about no — no certain dates.  I told you I
8  started in like the end of January.
9  Q  (BY MR. ACHO):  Well, let's look at Exhibit 15 that you
10  produced for us, or your attorney did.  You went to take
11  a look at it?
12  A  Yeah, I'm looking at it.  I got it in my hands.
13  Q  When is the course start date from Suburban Truck Driving
14  for you?
15  A  That says February 4th, 2020.
16  Q  Okay.  So that was after your termination by Absopure,
17  wasn't it, yes or no?
18  A  No.
19  Q  Well, take a look at Exhibit 14.  That's what it says,
20  February 4th, 2020.
21  A  So I started the same day I got fired, see.  So I went to
22  school and they fired me, that's basically what you're
23  telling me.  Since I went to school, they fired me.
24  Q  Okay, let me understand.  I'm going to move for admission
25  of this document.

**Page 163**

1          When you got your CDL — by the way, why didn't
2  you get your CDL for 18 months?  Can you explain that to
3  me?
4          MR. HANNA:  Objection —
5          THE WITNESS:  I didn't need it.  I'm sorry,
6  Michael.
7          MR. HANNA:  Objection, form.  You can answer,
8  Mr. Guy.
9          THE WITNESS:  Nobody forced me to get it.  I
10  was delivering more water than the people with the CDLs.
11  They loved me there, they didn't care.  Why would they
12  need me to get a CDL if I'm delivering more water than
13  people with a CDL?
14  Q  (BY MR. ACHO):  Did you try to get your CDL in those 18
15  months?
16  A  I tried.  I couldn't get it, because I never went to
17  school for that.  I didn't have time to go to school for
18  it.  So I went to school for it, and when I went to
19  school, they fired me.
20  Q  Well, hold on.  Let's take it a step at a time.  You
21  tried to get your CDL and you kept failing; isn't that
22  true?
23  A  After — I didn't try like — you said I tried — wait,
24  repeat that question.
25  Q  All right.  After you got hired by Absopure, did you try

**Page 164**

1  to get your CDL, yes or no?
2          MR. HANNA:  Objection.  Form, vague.
3          THE WITNESS:  I didn't have a CDL.
4  Q  (BY MR. ACHO):  Mr. Guy, you know my question, sir.
5  Please, don't do that.  Did you try to get the CDL while
6  you were at Absopure, yes or no?
7          MR. HANNA:  Mr. Acho, I would ask you not to do
8  those — do that, what you just did.  Don't insinuate
9  that he knows something and he's not answering.  The way
10  you're asking your questions is — let's just say it's
11  not the best questioning I've ever heard.  I'll allow you
12  to continue, of course, but please don't insinuate that
13  he's intentionally not answering your questions properly.
14  I think he's doing the best he can given the poor
15  questions you're asking.
16  Q  (BY MR. ACHO):  Please answer the question.
17          MR. HANNA:  If you understand it.
18          THE WITNESS:  I tried.  I couldn't get it.
19  Q  (BY MR. ACHO):  How many times did you try to get your CDL
20  while you were at Absopure?
21  A  I don't know.  It's been a year and-a-half.  It's — I
22  don't know.  I tried to — I got tired of trying and I
23  went to school.
24  Q  Okay.  Mr. Guy, please listen to my question.  Please
25  tell the court how many times you tried to get your CDL

**Page 165**

1  while you were —
2  A  Multiple, I can't count.  It was a long time ago.
3  Multiple times.
4  Q  Were you talking four, six, eight, ten?
5  A  Multiple, multiple.  Just — more than once, how about
6  that?  More than once.
7  Q  No, no, I need something more than that.  Give me a —
8  you said you have a good memory, so —
9  A  Yeah, I do.
10  Q  — how many times?
11          MR. HANNA:  Objection, form.
12          THE WITNESS:  An estimate or —
13  Q  (BY MR. ACHO):  Yes, an estimate's good.
14          MR. HANNA:  Objection, form.  For the record —
15          MR. ACHO:  Go ahead.
16          MR. HANNA:  For the record, it's very vague as
17  to what Mr. Acho is asking, to be honest, I mean, but
18  I'll let him — you know, you can continue.
19          MR. ACHO:  Go ahead.
20          MR. HANNA:  You're asking him how many times he
21  signed up for the course?
22          MR. ACHO:  No.
23          THE WITNESS:  Actually, I took offense to what
24  he was saying.  What he's asking, it don't make sense.
25  Multiple times.

JUSTIN GUY
July 15, 2021

Page 166

1      MR. HANNA:  Is that what you're asking, how
2  many times he took the test, too?
3 Q  (BY MR. ACHO):  Yes.  How many times?
4 A  It's embarrassing.  I don't know, multiple.  Like that's
5  not something I want it remember myself.  Like, shit, I
6  can't pass the fucking test — I mean, I can't pass the
7  test.  That's not something I want to remember.  Like
8  that's actually embarrassing.
9      MR. HANNA:  All right.  Let's take a —
10      MR. ACHO:  I'm not —
11      MR. HANNA:  Let's go off the record.  I think
12  that things are getting a little heated with Mr. Guy.
13  I — can we go off the record for a couple minutes?
14      MR. ACHO:  Of course, of course.
15      (Off the record at 3:20 p.m.)
16      (Back on the record at 3:22 p.m.)
17 Q  (BY MR. ACHO):  Okay.  Mr. Guy, if I apologize — I'm
18  sorry.  If I embarrassed you by asking you that question,
19  I'm not going to ask you it again or refer to it again,
20  okay?  And I do apologize.  I'm not hear to make you feel
21  bad, all right?  Do you accept my apology?
22 A  Yeah.
23      MR. ACHO:  Okay.  So we move for Exhibit 15
24  into evidence.
25      MR. HANNA:  No objection.

Page 167

1 Q  (BY MR. ACHO):  Now that you've thought more about it, how
2  many people did you try to get to join your lawsuit?
3      MR. HANNA:  Objection, form.  Asked and
4  answered.  That's assuming facts not in evidence.
5 Q  (BY MR. ACHO):  Go ahead and answer.
6 A  I don't know.
7 Q  Give us your best estimate under oath, your best
8  estimate.
9      MR. HANNA:  What are you referring to by saying
10  he tried to get them to join?  What does that even —
11      MR. ACHO:  Please, counsel — okay.
12      THE WITNESS:  I didn't ask nobody to join.
13  What does he — I don't know what you're trying to say.
14 Q  (BY MR. ACHO):  Have you talked to any of the Absopure
15  drivers or former drivers about your case?
16 A  No.
17 Q  And you're the only one in this case; am I right?
18      MR. HANNA:  Objection, form.  Asks for a legal
19  conclusion of a lay witness.
20 Q  (BY MR. ACHO):  Go ahead.
21 A  I'm not understanding your question.  I mean —
22 Q  Well, I'm kind of puzzled by something.  The company
23  wanted you to sell as much product as you could; isn't
24  that right?
25      MR. HANNA:  Objection, form.  I mean, I just

Page 168

1  want to — I want to mark that, for the record, the fact
2  that this is — this line of inquiry has been asked and
3  answered multiple times, and then Mr. Acho —
4      MR. ACHO:  It's foundational.
5      MR. HANNA:  — comes back and intentionally
6  misrepresents the prior testimony to make it seem like
7  Mr. Guy, who is already attempting to — you know, is
8  embarrassed about his intelligence and make him seem like
9  he testified to something that he never did.  And
10  Mr. Acho knows very well that he didn't testify to that,
11  and the record is clear in that regard.
12      MR. ACHO:  I want the record to reflect that I
13  have tried to maintain my composure, I believe I have,
14  with the various insults by plaintiff's counsel.  I have
15  never questioned the plaintiff's intelligence.  I am
16  probing credibility and reliability, and that's it.
17 Q  (BY MR. ACHO):  Now, Mr. Guy, how many people did you
18  discuss, either while you were at Absopure or after,
19  about this overtime issue?  How many people?
20      MR. HANNA:  Objection, form.  I'm going to
21  instruct him not to answer that, to the extent you're
22  asking a question that goes into attorney-client
23  privilege.
24      MR. ACHO:  Not about your attorney, no, no.
25      MR. HANNA:  So you're him — are you asking him

Page 169

1  if he's discussed it with any other employees of
2  Absopure?
3      MR. ACHO:  Yeah, yes.  Employees or
4  ex-employees.
5      MR. HANNA:  Mr. Guy, have you talked about this
6  lawsuit with any —
7      MR. ACHO:  Wait, wait.  How — wait, please.
8  You know what you're doing, Mr. Hanna.  Again, it's a
9  violation of the Federal Rules of Civil Procedure.
10      MR. HANNA:  What are you talking about?
11      MR. ACHO:  Please allow me — please allow me
12  to ask the questions.
13      MR. HANNA:  Okay.  Ask appropriate questions,
14  then, so I don't have to ask it for you.
15 Q  (BY MR. ACHO):  Mr. Guy, have you discussed the issues
16  involving with overtime at Absopure with any current or
17  former Absopure employees?
18      MR. HANNA:  That's exactly what I said, Mr.
19  Acho.
20 Q  (BY MR. ACHO):  Yes or no?
21 A  Did I — repeat that one more time.
22      MR. ACHO:  Wendy, please read it to him.
23      COURT REPORTER:  One moment.  Mr. Guy, have you
24  discussed the issues involving with overtime at Absopure
25  with any current or former Absopure employees?

JUSTIN GUY
July 15, 2021

**Page 170**

```
1              THE WITNESS:  I'm not sure.
2              MR. HANNA:  Objection, form, vague.  You can
3     answer.  I think he said I'm not sure.
4              THE WITNESS:  I'm not sure.  He talked about a
5     lot of stuff that Absopure does that nobody agreed to.
6  Q  (BY MR. ACHO):  Why aren't you sure?
7              MR. HANNA:  Object to form.
8  Q  (BY MR. ACHO):  Did you discuss overtime?
9  A  You asked that question, I gave you an answer.
10 Q  You said that, I don't know.  Why don't you know?
11             MR. HANNA:  He didn't say —
12             THE WITNESS:  I never said I don't know.  I
13    said I'm not sure.  We talked about a lot of different
14    things.
15 Q  (BY MR. ACHO):  Why — okay.  Please explain why are you
16    not sure whether you —
17 A  We complained with — like within employees.  Everybody
18    talked about the same stuff every day.  There's nothing
19    we can do, because guess what?  Nothing is going to
20    happen, so what would they help?
21 Q  Well, either you talked with the other workers or you
22    didn't.  Which is it?
23 A  I said — I thought you was asking me a time and the
24    people, like how many or who I talked to.
25 Q  No, no, I'm not asking that.  Did you talk to other
```

**Page 171**

```
1     workers at Absopure about not getting paid overtime, yes
2     or no, and what did they say to you?
3              MR. HANNA:  Objection, form.  You can answer.
4              THE WITNESS:  Call an attorney, and they would
5     back me up.
6  Q  (BY MR. ACHO):  Call an attorney?  Huh.  And by the way,
7     did you protest your termination?
8  A  I don't know what that means.  Explain it.
9              MR. HANNA:  Objection.  Form, vague.
10 Q  (BY MR. ACHO):  Did you call the company and complain that
11    you were terminated?
12 A  Why would I do that?
13 Q  Because you said it wasn't right.  You never did, did
14    you?
15 A  What could I do to make somebody rehire me after they
16    fire you?  A termination means you can never come back to
17    a workplace, ever.  I don't know where you work at or who
18    you work for, but if you get terminated, you can't come
19    back.  Why would you call and complain?
20 Q  Did you ask, yes or no?
21 A  Who was I supposed to ask?
22 Q  Well, you could ask human resources, right?  Right?
23 A  Honestly, when you have — when I worked, I bust my — I
24    bust my butt for people.  So when I work for you and I do
25    what you tell me to do, and yet then I go do what you
```

**Page 172**

```
1     didn't ask me to do for a whole year and-a-half and you
2     fire me, I don't really care what happens to that company
3     no more.  Like I would never drop another blood, sweat
4     and tear to bust my butt for them again.  Like I was
5     still like — it's like why would I do that?  I'm doing
6     what you asked me to do, and you still fire me.  You've
7     been looking for a way — you've been trying to find a
8     way to fire me.  So I do what you ask me to do, and you
9     still fire me.  It don't make sense.
10 Q  Well —
11 A  So why would I call to be like, oh, thank you, I got the
12    CDL, so can I get my job back?  No.  I'm going to move on
13    with my life.
14 Q  But you really didn't move on with your life, because you
15    got your CDL on March 9, 2020, and you stayed unemployed
16    for almost a year and-a-half; is that right?
17 A  Do you know there's a pandemic right now and ain't nobody
18    trying to hire nobody?  Do you know that?
19 Q  Excuse me, say that again.
20 A  Do you know it's the middle of the pandemic still and
21    nobody was trying to hire anybody; do you know that?
22    Like we went through a whole phase of a depression or
23    whatever it's called.  Like nobody has a job right now.
24 Q  I heard that there are thousands and thousands of truck
25    driver jobs that are going unfulfilled for months.  Are
```

**Page 173**

```
1     you saying you never heard that?
2  A  No, I'm not saying I never heard that.  I'm telling you
3     last year, wasn't nobody working last year.  This is a
4     new year that everything is starting opening back up.
5  Q  Wait, we're in July.  Things were opening up — things
6     started opening up in January.  And so —
7  A  That's news to me.
8              MR. HANNA:  Objection, relevance.  This is not
9     a wrongful termination lawsuit.  We're wasting everyone's
10    time.  None of this matters for the FLSA claim.
11             MR. ACHO:  It goes to credibility.
12             MR. HANNA:  Credibility of what?
13 Q  (BY MR. ACHO):  Have you applied for jobs in January?  Did
14    you?
15 A  You said did I apply for jobs?  I'm not working for
16    nobody — I'm not working for anybody that pays less than
17    Absopure.  So if it's not what Absopure is paying, me
18    personally, I'm not downgrading myself.  So I'm not —
19    now, you, you have to quit being a lawyer and go work at
20    McDonald's.  That's just like basically what you're
21    telling me to do, just go get a job so you're now
22    working.
23 Q  (BY MR. ACHO):  So basically you have not applied for any
24    jobs unless it paid more than Absopure; is that —
25 A  I applied for jobs.  Jobs never called me back, because
```

JUSTIN GUY
July 15, 2021

Page 174

```
1    they wasn't hiring.  I got a job now, I start next week.
2    I already went through the drug test, drug chain.  I'm
3    not a lazy person that you're trying to make me seem.  I
4    work hard for everything that I do.  I start work next
5    week.  I'm sorry that I wasn't working the last year
6    and-a-half in the middle of a pandemic.
7  Q  Sir, let me ask you this.
8         MR. HANNA:  I just want to note the harassment
9    and completely irrelevant line of inquiry and a waste of
10   time, for the record.
11 Q  (BY MR. ACHO):  Mr. Guy, what do you remember about the
12   products you delivered?
13 A  I got commission off everything that I delivered or
14   everything that I donated, that Absopure donated.
15 Q  What kind of products were they?
16 A  Water, five-gallon waters, bottled waters, small bottles
17   of water.  Coffee, Absopure coffee, Starbucks coffee, Tim
18   Horton's coffee, K cups, napkins, straws, cups, lids,
19   tops.  I mean, paper towels.  Delivered everything you
20   can think of.
21 Q  Did you deliver Mountain Valley spring water?
22 A  I delivered that, too.
23 Q  Do you know where that came from?
24 A  The company.
25 Q  Didn't it come from Arkansas?
```

Page 175

```
1         MR. HANNA:  Objection, form.
2  Q  (BY MR. ACHO):  Go ahead.
3  A  I'm not sure.
4  Q  How about Maxwell House coffee, did you deliver that?
5  A  I delivered everything that Absopure had to be delivered.
6  Q  I'm asking --
7  A  You can ask Absopure what everything that they have in
8    stock to deliver, but it was so long, I can't remember
9    every single little thing.
10 Q  Okay.  Well, I want to see what you do remember, please.
11   Did you deliver Maxwell House coffee?
12 A  Coffee, I delivered coffee.
13 Q  Maxwell House, did you know it came from Florida and
14   Texas?
15        MR. HANNA:  Object to form.
16 Q  (BY MR. ACHO):  Did you?
17        MR. HANNA:  Object to form.
18 Q  (BY MR. ACHO):  Did you?  Sir --
19        MR. HANNA:  Objection --
20 Q  (BY MR. ACHO):  -- can you answer the question?
21 A  I know that it came out of Absopure's storage room and I
22   delivered it.  That's all I know.
23 Q  You don't know where it emanated from, do you?
24        MR. HANNA:  Objection, form.
25        THE WITNESS:  I know where Absopure coffee
```

Page 176

```
1    originated from.  It's in Highland Park, because I --
2  Q  (BY MR. ACHO):  Did I ask you -- did I ask you about
3    Absopure coffee?
4  A  You asked me about coffee, and I remember Absopure
5    coffee, so I'm telling you what I remember.
6  Q  Please, sir.  Did I -- please, I don't want you to fight
7    with me.  Don't be --
8  A  I'm not fighting.  I'm just telling you what I remember
9    about Absopure coffee.
10 Q  I'm not asking you what you remember.  I'm asking you
11   specific questions.
12        MR. HANNA:  You're being --
13 Q  (BY MR. ACHO):  Do you know where Folgers --
14        MR. HANNA:  Mr. Acho --
15 Q  (BY MR. ACHO):  You delivered Folgers coffee, correct?
16        MR. HANNA:  Mr. Acho, you're being combative
17   with the witness.  He answered your question, you don't
18   like the answer and you're accusing him of being
19   combative.  That's manipulative, please don't do that.
20 Q  (BY MR. ACHO):  Did you deliver Folgers coffee?
21 A  Yes, I delivered that.
22 Q  Did you know it came from Louisiana?
23 A  It came from Absopure's warehouse.  That's where I got it
24   from.  I didn't go to Louisiana to deliver that, so I
25   don't -- how was I supposed to know it came from
```

Page 177

```
1    Louisiana?  Absopure bought it for me to drop off.
2  Q  Okay.  You never ever delivered Green Mountain coffee
3    products?
4  A  What was it?
5  Q  Green Mountain.
6  A  Green Mountain.  You say Green Mountain coffee?
7  Q  Yeah.
8  A  I don't know.  I just grabbed something -- I was working
9    with so many coffees, if it ain't a big brand, I don't
10   know what it is, like Swiss Miss and Tim Horton's and
11   stuff like that, but all that coffee I did, I delivered
12   all that.
13 Q  Did you know -- do you know that it came from Vermont,
14   did you?
15 A  It came from Absopure.  I received it from Absopure.
16 Q  Where would you think you'd get it from?
17 A  The coffee warehouse inside of Absopure.  They had a
18   whole warehouse section to get all the coffee for the
19   day.
20 Q  How about Starbucks products, did you deliver them?
21 A  Yeah, I delivered that.
22 Q  Do you know they come through Absopure from Georgia and
23   Washington?  Did you know that?
24 A  I don't deal with that type of stuff.  I just deliver it.
25   I'm not a sales rep or a salesperson that sets deliveries
```

JUSTIN GUY
July 15, 2021

Page 178

1   and none of that, so I wouldn't know.  I just take it and
2   deliver it.
3 Q  Did you deliver powdered creamers that came from
4   Louisiana and New York, too, correct?
5         MR. HANNA:  Objection, form.
6         THE WITNESS:  I delivered —
7         MR. HANNA:  Objection, form.  Assumes facts not
8   in evidence.  You can answer.
9 Q  (BY MR. ACHO):  Go ahead.
10 A  I delivered whatever Absopure had me deliver.  None of
11   that stuff, I don't know what you're talking about.
12 Q  Okay.  And —
13 A  I didn't pay attention to that.
14 Q  And sugar —
15         MR. HANNA:  Mr. Acho, please don't cut him off
16   while he's testifying.
17 Q  (BY MR. ACHO):  And sugars and creamers, you delivered
18   those, too, right?
19 A  Yes, I delivered creamers and sugar.
20 Q  Yeah.  Did you know that the sugars came from Louisiana
21   and New York, and the creamers came from California?  Did
22   you know that?
23 A  How am I supposed to know that?  That's not what I got —
24   I got it from Absopure.
25         MR. ACHO:  Okay.  What I would like to do is

Page 179

1   take a ten-minute break and then, Wendy, please do some
2   calculations for time.  In fact, just a five-minute break
3   is enough, just five minutes.
4         THE WITNESS:  All right.  There's all these
5   breaks.
6         (Off the record at 3:38 p.m.)
7         (Back on the record at 3:47 p.m.)
8 Q  (BY MR. ACHO):  Okay.  Mr. Guy —
9 A  Yes.
10 Q  — isn't it true that Absopure allowed you to study for
11   the license exam during working hours, yes or no?
12         MR. HANNA:  Objection, relevance.  You can
13   answer.
14         THE WITNESS:  No.
15 Q  (BY MR. ACHO):  And didn't Absopure on multiple occasions
16   give you time off to take the license exam; isn't that
17   true?
18         MR. HANNA:  Objection, relevance.
19         THE WITNESS:  Take time off?
20 Q  (BY MR. ACHO):  Pardon me?
21 A  No.  Take time off?  No.
22 Q  Now, when you were hired in, do you remember what you
23   were told by whoever brought you in what your job would
24   be?
25 A  Can you repeat that?

Page 180

1 Q  Yeah.  When you hired in, what were you told you were
2   going to do?
3 A  My interview — I got called into the Absopure office
4   originally was to be a water assistant.  They gave me
5   this whole trucking job — once I got there, they told me
6   I wasn't good enough for their water assistant, because I
7   had no — I had no experience in that.
8 Q  That's not what I'm asking you.  What were you told, when
9   you were hired in, in terms of what you were going to be
10   doing?
11 A  Oh, oh, oh.  Oh, they told me I was going to drive their
12   truck, deliver the goods.
13 Q  But didn't they tell you more than that?  What kind of
14   truck, what kind of products, where you were going to go?
15   What did they tell you?
16 A  I don't remember all that.
17 Q  You don't know that you were told you could have to
18   potentially drive out of state?
19 A  Oh, no, no.  I never was told I would drive out of state.
20   I can't — I can't even drive out of state.
21 Q  Why?
22 A  I don't have the CDL.  I had a permanent route, so I
23   can't drive out-of-state, my route got to be done.
24 Q  Well, hold on a second.  Is it your testimony that you
25   must have a CDL to cross state lines; is that your

Page 181

1   testimony?
2         MR. HANNA:  Objection, form.  You can answer.
3         THE WITNESS:  You asked me could I drive across
4   state lines.  I personally couldn't.
5 Q  (BY MR. ACHO):  Why?
6 A  Because I had a route.
7 Q  But suppose they put you on a route that crossed
8   Michigan.  You could have done that, you didn't need a
9   CDL for that with your truck, right?  You didn't need a
10   CDL?
11 A  I would not know.
12         MR. HANNA:  Objection.
13 Q  (BY MR. ACHO):  What?
14         MR. HANNA:  Objection, form.
15 Q  (BY MR. ACHO):  Say what, Mr. Guy?  Say what?
16         MR. HANNA:  What was the question?
17         THE WITNESS:  Because I didn't have to do that.
18   I drove Detroit every single day for from, the Absopure
19   station.  That —
20 Q  (BY MR. ACHO):  I know what you did.  I'm saying you could
21   have crossed state lines if they told you to.
22 A  No, I could not.
23 Q  Why?
24 A  Because I couldn't.  That was not my job.  My job was to
25   deliver it to route 16 or route 17.  That's why I came to

JUSTIN GUY
July 15, 2021

Page 182

1   work, that's what I got paid to do, that's what I was
2   going to continue doing.
3 Q   But they could have put you on a different route if they
4   chose to?
5 A   No, they could not.  I had a permanent route.  That route
6   had to be done every single day.
7 Q   Wait.  Are you -- are you saying Absopure could not have
8   changed your route?  Is that what you're saying?
9 A   No.  We had a permanent route.  Because if I got a
10   permanent route, who's going to do my route if I go do
11   that?  That don't even make sense.  I couldn't do that.
12 Q   Okay.
13 A   Routes have to be delivered to on time.
14 Q   Sir, you're not answering my question.  Is it your
15   testimony that Absopure could not have changed your
16   route, they couldn't?
17        MR. HANNA:  He's answering your question.  You
18   just don't like his answer.
19        THE WITNESS:  That's not what I said, no, about
20   ten times.  I'll say it again, it won't hurt, no.
21 Q   (BY MR. ACHO):  Okay.  And what do you base that on, that
22   they didn't have that right?  What do you base it on?  Is
23   there something in policy or handbook that said Absopure
24   cannot change your route?  Is there anything?
25 A   No.

Page 183

1 Q   So Absopure could change your route, and they have
2   changed your route more than once, haven't they?
3 A   No, they never could change a route.  I had to pick
4   routes that I did, so I didn't have to go out of state
5   and I was never asked, because --
6 Q   Sir, that's not my question.  Absopure had the right to
7   change your route if they chose, correct?
8 A   No, Absopure didn't, because you keep asking me the same
9   thing.  I betcha they tell you the same thing.  They
10   couldn't do that, because the stuff that I did only I
11   could do.
12 Q   You're saying --
13 A   Nobody else could do my route.  I'm the only one who did
14   my route at Absopure.  Didn't nobody help me, didn't
15   nobody ask to help me.  That's what I did, that's what I
16   only was going to do.  That's what I only could do.
17 Q   Well, wait a minute.  People did that route before you
18   and people did that route after you, didn't they?  Right?
19 A   I don't know, I wasn't there.  If I'm not working there,
20   and I'm not now, so I don't know what they doing now.
21 Q   So you don't know that other people couldn't do your
22   route.  In fact --
23 A   For 18 months, I --
24 Q   -- other people did your route when you were on vacation?
25   When you were on vacation other people did your route,

Page 184

1   correct?
2 A   No.
3        MR. HANNA:  Objection.
4        THE WITNESS:  I did it when I came back.
5 Q   (BY MR. ACHO):  Wait, wait, wait, wait.  When you were on
6   vacation, did you do your route?
7 A   I did when I came back, not until I got back.  That's how
8   they worked at Absopure.
9 Q   That's not my -- that's not my question.
10 A   You asked me a question.  Man, listen.  Hello, listen.
11   If you asked me a question and I answered it, how are you
12   going to tell me that's not my answer?  I'm not
13   understanding what you're referring to.
14 Q   You're not -- you're not answering my question, sir.
15   Please.  Other people did your route when you didn't come
16   in; isn't that true?
17 A   No.
18        MR. HANNA:  Objection, form.  The problem is
19   you're asking him nonsensical questions.  How would he
20   know what other people did if he's not at work?  How
21   would he know what other people did before his
22   employment, after his employment, when he's not there?
23        MR. ACHO:  I'm saying he's on vacation.
24        MR. HANNA:  You're intentionally asking him a
25   question that don't make sense, and then you're

Page 185

1   frustrated when he's not giving you an answer.  I
2   couldn't give you an answer, because I don't even know
3   what you're trying to say.  It doesn't make sense.
4 Q   (BY MR. ACHO):  Okay.  Mr. Guy, did you have vacation time
5   at Absopure?
6        MR. HANNA:  Objection, form.
7        THE WITNESS:  Yeah.
8 Q   (BY MR. ACHO):  You took vacation; is that right?
9 A   They didn't really allow me to take vacation time.  They
10   needed me to do my route.
11 Q   Are you testifying under oath you never took vacation
12   time, just like --
13 A   I take vacation.  Do somebody do my route?  For the
14   fifth, sixth, seventh time, no.  I did my route when I
15   came back from my off day.  Did nobody else do my route
16   when I was there.
17 Q   And -- okay.  Let me -- I'm going to do this.  I'm going
18   to introduce -- I'm going to introduce Exhibits 16, 17
19   and 18.  I want you to take a look at these, Mr. Guy.
20 A   Okay.
21        MR. HANNA:  You want him to look at all three
22   exhibits?
23        MR. ACHO:  Just real quick.
24        THE WITNESS:  So what's on first?
25 Q   (BY MR. ACHO):  Well, do you know what 16 is?

JUSTIN GUY
July 15, 2021

Page 186

1  A    Yeah.  It looks like pay sheets or something.
2  Q    Paystubs?
3  A    Yeah, paystubs.
4  Q    You had these, right?  You received these, didn't you?
5         MR. ACHO:  Objection, form.
6         THE WITNESS:  Yes.
7  Q    (BY MR. ACHO):  Yes?  Yes?
8  A    Yeah.
9         MR. ACHO:  Okay.  I move for their admission
10        into evidence.
11        MR. HANNA:  Objection, form.  You haven't
12        authenticated these records to move into evidence, but
13        you can go on.
14 Q    (BY MR. ACHO):  Well, these are all records that are
15       undisputed by you, Mr. Hanna, and 17 and 18.  Did you
16       look at 17 and 18, sir, before today?
17        MR. HANNA:  I disagree with your
18        characterization, but we can go on.
19 Q    (BY MR. ACHO):  Did you read -- did you look at 17 and 18
20       that was sent to your attorney?
21 A    Yeah, I see these.
22        MR. HANNA:  Objection to form.  Are you asking
23        him -- it's just not clear if you're asking him if he
24        looked at them while he was employed or if he's looked at
25        them --

Page 187

1         MR. ACHO:  At any time.
2         MR. HANNA:  -- since you produced them -- since
3  you produced them in the course of discovery, because
4  there's a big substantive difference.
5         MR. ACHO:  Okay.  There's really no difference.
6         MR. HANNA:  There really is.  You might not
7  understand, but there is a difference.
8         MR. ACHO:   Sir, sir, please don't argue with
9  me.
10        MR. HANNA:  You're arguing with me, because I
11 was putting my objection on the record and then you're
12 arguing.  Then when I respond to put my position on the
13 record, you're telling me not to argue.  I wasn't
14 arguing, I was putting my position.
15        MR. ACHO:  Under Civil Procedure 30(c)(2), an
16 objection must be stated concisely in a non-argumentative
17 manner and a non-suggestive manner.  Mr. Guy, did you see
18 these documents at any time?
19        MR. HANNA:  Objection, form.
20 Q    (BY MR. ACHO):  Did you look at them?  Did you look at
21       them?
22 A    Which one are you talking about?  You're talking about
23       three different documents.
24 Q    Yeah, all three.
25 A    Some of these documents are not accurate, so I don't know

Page 188

1  what you want me to say.
2  Q    Oh, okay.  All right.  Well, let's go through it.  See, I
3       want to find out why you don't know what your damages
4       are, okay, because you say you don't know what they are,
5       correct?
6         MR. HANNA:  Objection, form.  Misstates prior
7  testimony.
8  Q    (BY MR. ACHO):  Isn't that what you said, you didn't know
9       what your damages are?
10 A    Do you know how many things are included in that number
11       that you're asking me?  No, I don't know that number off
12       the top of my head.
13 Q    All right.  Let me ask you this.  In your subpoena for
14       your deposition, I asked you to bring any documents.  Do
15       you have any documents that you haven't produced before?
16 A    No.
17        MR. HANNA:  Objection, form.
18 Q    (BY MR. ACHO):  Okay.  Now, let's go over these 16, 17 and
19       18.  You say they're inaccurate.  Could you please look
20       at 16 and tell me what is inaccurate, if anything, about
21       16?
22 A    About 16?
23 Q    Yeah.
24 A    Well, one, I'll start with -- I'm sorry.
25        MR. HANNA:  For the record, Mr. Acho, I think

Page 189

1  we've already advised you, I don't think we're disputing
2  16.
3         MR. ACHO:  Let him answer.
4         MR. HANNA:  Okay.
5         MR. ACHO:  Let him answer, please.  This is
6  exactly what I cautioned you about.  Sir --
7         MR. HANNA:  I'm making it easier for you.  Mr.
8  Acho, I'm making it easier for you.  I'm letting you know
9  we're agreeing with your documents.
10        MR. ACHO:  Sir --
11        MR. HANNA:  Those are the company documents,
12 and I'm telling you I agree with them.  Don't insinuate,
13 I'm trying to make this go forward.
14        MR. ACHO:  Sir, we're dealing with credibility
15 and reliability.
16 Q    (BY MR. ACHO):  Is there anything about 16 that you say is
17       inaccurate, Mr. Guy?  If it is, point it out to me,
18       please.
19        MR. HANNA:  Objection, form.
20 Q    (BY MR. ACHO):  Go ahead.  Go ahead, Mr. Guy.
21 A    I wouldn't be able to say, because I didn't get paid this
22       week from Absopure, so I don't know if this is correct or
23       not.  These are from two years ago, sir.  I'm not
24       supposed to know what I got paid every week, every single
25       week two years ago, so I don't know.

Page 190

1 Q  Well, look, here's what I'm trying to figure out. You
2    knew every single day what you were getting paid, didn't
3    you?
4 A  17 is not accurate.
5 Q  Well, sir, did I ask you about 17 right now?  I asked you
6    a question.
7 A  You said 16, 17 and 18, that's what you asked me.  You
8    asked me to look at all three of these papers at once, so
9    I don't know which specifical one you're talking about.
10      MR. ACHO:  Wendy, could you please read the
11   last question to Mr. Guy?
12      COURT REPORTER:  One moment.  Well, look,
13   here's what I'm trying to figure out.  You knew every
14   single day what you were getting paid, didn't you?
15      THE WITNESS:  Yes, I knew that I was getting
16   paid at the end of every day.
17 Q  (BY MR. ACHO):  Okay.
18 A  Even though that wasn't the question you asked before
19   that, but okay.
20 Q  I understand.  No, I know, we're going to get back to it.
21   And even though you knew what you were getting paid,
22   there is nothing you did about it; is that correct?
23 A  Other than complain, that's something.  Complaining is
24   good enough.
25 Q  Let's go to -- oh, by the way, you know -- you've heard

Page 191

1    of the department of labor, haven't you?  You have heard
2    of it?
3 A  No.  What's that?
4 Q  Well, also have you ever heard of the department of
5    transportation?  Have you ever heard of that?
6       MR. HANNA:  Objection, asked and answered about
7    five times.
8 Q  (BY MR. ACHO):  You don't know what the department of
9    transportation is?
10      MR. HANNA:  Objection, asked and answered.
11 Q  (BY MR. ACHO):  Well, aren't those trucks -- don't they
12   have some DOT markings on them, some of those trucks?
13 A  I never learned nothing about that.
14 Q  No, no.  I didn't ask you whether -- no, I'm not asking
15   whether you learned about it.  Did you ever see those
16   letters on trucks at Absopure, yes or no?
17 A  I don't know.  I don't know what you're referring to, I
18   don't even know.
19 Q  Wait, wait, wait, wait, wait.  Wait, wait, wait.  Are you
20   saying you are denying ever seeing DOT letters on any
21   Absopure truck?  Is that what you're saying under oath?
22      MR. HANNA:  For the record, for the record,
23   under oath, I object again to counsel for defendant's
24   attempt to manipulate the testimony, because Mr. Guy said
25   one thing, Mr. Acho says another thing and he's saying,

Page 192

1    wait, wait, wait, is that what you're saying, when that's
2    not.  And you know what, this is a written record, thank
3    God for that, because we know what he said and we also
4    know what Mr. Acho asks him after, and it's a completely
5    different question.  So I want to mark that for the
6    record and, you know, Mr. Acho's attempt to badger the
7    witness in an effort to change his testimony.
8       MR. ACHO:  Wendy, can you please read the
9    question back to the witness?
10      COURT REPORTER:  One moment.  The last question
11   was:  Wait, wait, wait.  Are you saying you are denying
12   ever seeing DOT letters on any Absopure truck?  Is that
13   what you are saying under oath?
14      MR. HANNA:  And same objection I previously
15   placed.
16      THE WITNESS:  I don't hear nothing.
17 Q  (BY MR. ACHO):  Pardon me?
18 A  All right, now I can hear.  Did you say something?
19 Q  No.  I was waiting for you to answer my question.
20 A  Oh.  I said I don't know, I never said no.  I said I
21   don't remember seeing that, no.
22 Q  So you went into work 450 days at Absopure and have no
23   recollection of ever seeing a DOT number on any Absopure
24   truck.  That's your testimony?
25 A  I didn't even get paid to search the trucks for whatever

Page 193

1    you're talking about.
2 Q  I didn't ask about searching.
3 A  That's basically what you're asking me, that I searched
4    the truck and looked for something that doesn't apply to
5    me.
6 Q  Let me ask you something.  You said you have a good
7    memory, right?
8 A  Yeah, I got a real good memory.
9 Q  Okay.  Then how come you don't remember --
10      MR. HANNA:  Can you stop badgering him with did
11   you -- just say you got a good memory.  Do you know how
12   well you did exactly this thing three years ago?  For
13   one, that's a ridiculous question.  You're almost --
14   you're attempting to insinuate that he's not intelligent
15   or has a bad memory by asking him something that nobody
16   would remember, and that's harassment and that's what we
17   keep talking about here.  Please, stop harassing and ask
18   him appropriate questions.
19      MR. ACHO:  Counsel --
20      MR. HANNA:  Yes, sir.
21      THE WITNESS:  I'll repeat to you again Federal
22   Rules of Civil Procedure 30(c)(2) you continue to
23   violate.
24      MR. HANNA:  I disagree.
25 Q  (BY MR. ACHO):  The reason I'm asking you this, Mr. Guy,

JUSTIN GUY
July 15, 2021

Page 194

1 is because I have asked you something simple about what's
2 on a truck and you say you don't have any recollection,
3 yet you and your lawyer produced a document yesterday
4 called supplemental initial disclosures.  Do you remember
5 working on that with your lawyer?
6 A    Yes.
7 Q    Now, how do you remember all of these percentages that
8 you have in this document?  I am going to go over each
9 and every one.  How do you recollect those and can't
10 recollect conversations that you had with your supervisor
11 about your duties?  Can you explain that to me?
12        MR. HANNA:  Objection, form.
13        THE WITNESS:  Explain the question again in a
14 different way, because that don't make sense.
15        MR. ACHO:  Okay.  Wendy, try to read it to him
16 again and see —
17        THE WITNESS:  No, I want you — I want you to
18 reword it a different way.  That's what I want.  I don't
19 need her to read it, because I've already answered the
20 other two.  Use different words.
21        MR. ACHO:  I would like her to read it, because
22 I don't have any different words right now.  Wendy, can
23 you read it?
24        MR. HANNA:  For the record, the witness
25 expressly indicated he does not understand the question

Page 195

1 and counsel for defendant is refusing to rephrase it.
2 Q    (BY MR. ACHO):  Okay.  You know what, Mr. Guy, I'll try it
3 again.  How do you remember these percentages that you
4 and your lawyer just put together and we received
5 yesterday, and yet you can't remember things where you
6 viewed 450 days?  Can you explain how you have such good
7 recollection about something that helps you against
8 something that hurts you?  Can you explain that?
9        MR. HANNA:  Objection, form, as to the faulty
10 characterization of remembering estimates versus
11 remembering exact things, which is not one in the same,
12 but you can answer.
13        THE WITNESS:  I got calendars written down my
14 times for certain days, so how wouldn't I remember that?
15 Q    (BY MR. ACHO):  Oh, you have calendars with times on it;
16 is that correct?
17 A    No, I'm saying like — didn't you all say I was — they
18 tell me everything, how much I get paid, right?
19 Q    No, sir.  Mr. Guy, listen to my question.  Didn't you
20 just testify that you have calendars with times on it,
21 yes or no?
22 A    No, you just asked me did I — how would I know
23 something, and I said off of the calendar, who would know
24 how long you worked per day?  You work six days a week on
25 a calendar day basis.  How wouldn't I know what time I

Page 196

1 got off every day?  I did the work, why wouldn't I know?
2 Q    Because the days are all different, aren't they?
3 A    Yeah, that's why it was an estimate, percentage.
4 Q    But these are just guesses on your part, that's all they
5 are.  They're not based upon anything that's documented,
6 is it?
7        MR. HANNA:  Objection, form.  Mr. Acho, you
8 should know that there's established case law that allows
9 for estimates of hours worked in an off-the-clock case.
10 You should know that.
11        MR. ACHO:  Counsel, I repeat 30(c)(2), you keep
12 violating it.  Would you please stop doing it.
13        MR. HANNA:  I'm not violating it, sir.  I'm
14 trying to help you, because you, I mean, respectfully,
15 you're going into tangents that, respectfully, don't make
16 any sense, and I'm just trying to move the process
17 forward.
18        MR. ACHO:  Mr. Hanna, I don't want your
19 assistance.  Mr. Guy, these are just guesses, guesses,
20 speculation —
21        MR. HANNA:  Objection —
22 Q    (BY MR. ACHO):  — in terms of time and percentage, aren't
23 they?
24        MR. HANNA:  Objection to form.
25        THE WITNESS:  No.  They are estimates, it's not

Page 197

1 a guess.
2 Q    (BY MR. ACHO):  But not based on anything other than your
3 recollection, right?
4 A    No, no.
5 Q    Okay.  Let's go through this.  Let's look at —
6        MR. HANNA:  Do you want me to print him a copy
7 if you want to go over it, sir?  Because you didn't tell
8 us what part of the exhibit.
9        MR. ACHO:  Yes, and it's going to be Exhibit
10 No. —
11        MR. HANNA:  23.
12        MR. ACHO:  — 23, and we're going to move for
13 its admission, Wendy.  Okay?
14        THE WITNESS:  Oh, wait, are we off these
15 exhibits?  We're not on 16 no more?
16        MR. ACHO:  No, we're going to go back to them.
17        THE WITNESS:  So which one to pull out?
18        MR. HANNA:  Mr. Guy, he's asking for a document
19 that wasn't part of the initial exhibit list, so —
20        MR. ACHO:  Okay.  Instead of wasting time, I'll
21 move on with 17, 18 while it's being printed.
22 Q    (BY MR. ACHO):  What's inaccurate about 17?
23        MR. HANNA:  It's already printed, Mr. Acho.
24        THE WITNESS:  Who is this for?
25 Q    (BY MR. ACHO):  You don't know?

Page 198

1  A   Like who's — this don't have nobody's name on it. This
2      don't say this is for me. I don't know — I don't
3      understand what this is saying. What is this saying?
4      Can you read the line to me?
5  Q   Okay. So I'm just asking you, you don't know whether
6      this is accurate or inaccurate, do you, because you don't
7      know anything about it, true?
8  A   I know it's inaccurate, because it says "clock out" and
9      "clock in." That don't even make sense.
10 Q   It doesn't make sense?
11         MR. HANNA:  For the record, it doesn't say
12      "clock out" and "clock in."
13         THE WITNESS:  Oh, it says "check out," yeah.
14 Q   (BY MR. ACHO):  Well, clock out and clock in, you can't be
15      doing this. Okay. So, Mr. Guy, you don't know what this
16      means, right, check out or check in?
17 A   I don't understand.
18 Q   You have no idea? Okay. I for its administration
19      anyway.
20         MR. HANNA:  Well, I vehemently object. I —
21         MR. ACHO:  Okay.
22         MR. HANNA:  Are you —
23         MR. ACHO:  It's what we produced —
24         MR. HANNA:  I mean, are you going to let me
25      object, Mr. Acho? Am I allowed to object? So I object

Page 199

1      to the admission of this document. First of all, there
2      is — let me just leave it at that. I object to its
3      admission.
4         Mr. Acho, I do have that document printed, if
5      you want me to walk over to — would you like me to go?
6         MR. ACHO:  Yeah, go ahead.
7         MR. HANNA:  Okay. Give me one second.
8         (Off the record at 4:12:03 p.m.)
9         (Back on the record at 4:12:39 p.m.)
10 Q   (BY MR. ACHO):  Mr. Guy, you've been handed what's been
11      marked as Defendant's — I'm sorry, yeah, Exhibit 23.
12      Have you seen this document before?
13 A   Is that this one (indicating)?
14 Q   Yeah.
15 A   Yes.
16 Q   Did you help prepare this or did someone else prepare it?
17 A   No. Yeah, I helped prepare this.
18 Q   Okay. Where did the information come from?
19 A   It was, really, what I did. It wasn't like information
20      that it came from, it's what I did at Abscpure.
21 Q   This is based purely on your recollection, purely
22      recollection and speculation, correct?
23         MR. HANNA:  Objection, form. You can answer.
24         THE WITNESS:  I don't know, you used so many
25      big words for me, bro — I mean, sir.

Page 200

1  Q   (BY MR. ACHO):  Okay, I apologize. I'll change the
2      question. You prepared this with your attorney without
3      any documentation backing it up; is that true?
4  A   I'm not sure what you're using at that time.
5  Q   Well, where did you come up with the percentages other
6      than your head?
7  A   That's — I mean, we work over eight hours, that's how
8      long it's supposed to be. I was working over 10, 11, 12
9      hours.
10 Q   Other than coming from your head, where did these numbers
11      come from?
12 A   I did it for real, so it was like — I mean, you know
13      what I'm saying? I don't know what you're trying to ask.
14 Q   Well, I asked you a bunch of questions early on, and you
15      said, sir, it's been a year and-a-half, how can you
16      expect me to remember that. Remember you said that to me
17      multiple times, yes or no?
18 A   Do I remember, do I remember that?
19 Q   Okay. So now I'm going to ask — yeah, you did, so I'm
20      going to ask you this. How is it all of a sudden, even
21      though it's been a year and-a-half and up to three years
22      you now can remember this? Can you explain it, or no?
23      Or you can't explain it?
24         MR. HANNA:  Objection —
25         THE WITNESS:  Do you know how it feels — huh?

Page 201

1      Maybe you don't know how it feels to work 10 hours in a
2      day and not get paid for it, but when that happens
3      numerous times for a year straight, but you have no
4      choice but to do what you gotta do in order to feed your
5      kids, you would do it, too, so how would I forget
6      something like that? That shit — I mean, I'm sorry,
7      that stuff like that is like embarrassing for me, but I
8      don't have no choice, in order to do it, but do it.
9  Q   (BY MR. ACHO):  Okay. All right. Let's go through this.
10      Go to the last paragraph of the first page. Go to the
11      last few words. Okay. Can you read that sentence?
12 A   "Estimates that," is that where you're talking about?
13 Q   Here, I'll help you. Plaintiff estimates that on
14      average, he stopped working 45 percent of the time at
15      approximately 4:00 p.m. How did you come up with
16      45 percent at 4:00 p.m.? How do you know it wasn't
17      30 percent or 60 percent or 65 percent? How do you know
18      it was 45 percent, based on what?
19 A   Schools closed at 4:00, so I made it back by 4:00 if I
20      was doing school that day. So most of the time they
21      would run out at 4:00, and if I'm at school at 4:00, what
22      time would I get back to the station? 5:00, right,
23      because it takes about 30, 40 minutes to get out to
24      Canton from Detroit. So if my last stop is around 4:00,
25      it's going to be between 4:00, 5:00 and 6:00.

JUSTIN GUY
July 15, 2021

Page 202

1 Q    But there are days you came in earlier than 4:00, but I
2      don't see that in here at all.  Are there days in here,
3      in what you prepared, where you came before 4:00, yes or
4      no?
5 A    What's your question?
6            MR. ACHO:  Wendy, please.
7            COURT REPORTER:  One moment.  But there are
8      days you came in earlier than 4:00, but I don't see that
9      in here at all.  Are there days in here, in what you
10     prepared, where you came before 4:00, yes or no?
11           THE WITNESS:  I'm not sure, no.
12 Q    (BY MR. ACHO):  Well, are you not sure or is it no?  Which
13     is the answer?
14 A    If you're including Saturday, then I'm in there before
15     4:00, so I don't know what you're asking, and that is the
16     answer.  I don't know your -- you want me to answer your
17     answer with two different answers, three different
18     answers?  You're asking the same thing.
19 Q    Yeah, go ahead, answer any way you --
20 A    I told you.  If you're not talking about Saturday, then
21     yeah.  If you're talking about Saturday, then I came in
22     before 4:00.  If you're not talking about Saturday, then
23     no.
24 Q    Okay.  So then the next statement:  30 percent of the
25     time at approximately 5:00.  How do you know it was

Page 203

1      30 percent --
2 A    Because I was --
3 Q    -- and not 35?
4 A    That's what I did.  My last delivery is normally around
5      4:00.  So, once again, how long do it take to get from
6      Detroit to Plymouth to the station?  I just want to know,
7      for the record.
8 Q    No, I'm trying to figure out what did you base the 30
9      percent on?  Did you have anything to work with to say it
10     was 30 percent as opposed to smaller than 30?  Do you
11     have anything, yes or no?
12           MR. HANNA:  Objection, form.  You can answer.
13           THE WITNESS:  I'm not sure what you're asking.
14 Q    (BY MR. ACHO):  Do you have any document, any records,
15     anything at all to support this statement, yes or no?
16           MR. HANNA:  Objection, form.
17           THE WITNESS:  Do you know I never clocked out?
18     Like if I clocked out, like every other job allows you to
19     do that follows the laws, then I would know for a fact
20     which times I got out, but you can't even show me the
21     times that I clocked out, so I'm going off of what I
22     know, because I did that.  That's what I did every single
23     day for two years straight.  How can I remember what time
24     I got off?  It's common sense.
25 Q    It's just your recollection, isn't it, yes or no, not

Page 204

1      documentation?
2 A    What's a regulation -- what's a recollection?
3 Q    What you remember, what you believe to be true.
4 A    No.
5 Q    Right?
6 A    I had kids in daycare, so I had to be there by 6:00.  So
7      I know exactly what time I was getting off every single
8      day, because that's where I had to be.
9 Q    Okay.  Then --
10 A    If I didn't get there by 6:00, I had to make ways around
11     it for somebody else to pick my kids up, so how wouldn't
12     I remember that kind of stuff?
13 Q    All right.  Now you state 15 percent at 6:00 p.m.  That's
14     just a guess on your part, isn't?
15 A    No, that's true.  I had breakdowns.  You should ask the
16     company that you're representing for all my breakdown
17     days in, days that I came in at that time, because they
18     should have it marked, shouldn't they?
19 Q    And 10 percent at 7:00 p.m.; is that right?
20 A    That's correct.
21 Q    Now, let's go to the next statement:  Plaintiff did not
22     take uninterrupted lunch breaks of 20 minutes or more
23     throughout the duration of his employment with defendant.
24     We already went over that, right?  Correct?
25 A    Yeah, I think we did.

Page 205

1 Q    Okay.  Moreover, when plaintiff worked on Saturdays,
2      which occurred on approximately one-half the weekends
3      throughout his employment, he generally stopped working
4      30 percent of the time at approximately noon, 40 percent
5      at 1:00, and 15 percent of the time at 2:00 p.m., and
6      15 percent at 3:00 p.m.  So it's all within a very short
7      time period, right?
8 A    For Saturday, yeah.
9            MR. ACHO:  Okay.  I move for admission into
10     evidence.
11 Q    (BY MR. ACHO):  Now, I want to ask you about Exhibit
12     No. 18.  Aren't these the dollars you made?  You looked
13     at 18, and you said you don't think it's accurate?
14 A    No, I said I wouldn't know if it's accurate, because it's
15     not something that I did today or last week.
16 Q    Okay.  So you have nothing to challenge 16, 17, or 18 of
17     defendant's exhibits; is that right?
18           MR. HANNA:  Objection --
19           THE WITNESS:  I don't know nothing about 17.
20           MR. ACHO:  Okay.  I move for its admission,
21     Exhibit 18.
22           MR. HANNA:  And again, we object to the
23     admission of Exhibit 17, because it has not been
24     authenticated.
25           THE WITNESS:  18 and 16 has my name on it, 17

JUSTIN GUY
July 15, 2021

Page 206

1    does not, so that's not for me.  I don't know where that
2    came from, I don't even know where you got it.
3  Q   (BY MR. ACHO):  Did you read it, did you look at it?
4  A   I'm looking at it now.  I see numbers and letters.  What
5    is it to read on there?
6  Q   Okay.
7  A   Can you show me how to read it?  Can you read off out
8    loud for me?
9  Q   Sir, let me ask you something.  Did you ever drive one or
10   more of Absopure's motor vehicles that were registered
11   with a department of transportation number?
12         MR. HANNA:  Objection —
13         THE WITNESS:  I don't know what — you keep
14   talking about department of transportation.  I don't know
15   what that is.
16 Q   (BY MR. ACHO):  Did you understand that because you didn't
17   obtain a commercial driver's license Group B, you were
18   limited in types of motor vehicles you could drive?
19         MR. HANNA:  Objection, form.  Calls for legal
20   conclusion.  You can answer if you know.
21         THE WITNESS:  I'm not sure.
22 Q   (BY MR. ACHO):  You're not sure?  Well, why did the
23   company want the CDL if you're not sure why?  Can you
24   explain that?
25 A   I don't know, why did they keep me?  Why did they keep me

Page 207

1    if I didn't get it within 60 days?  That's what you
2    should be asking them, not me.
3         MR. ACHO:  Okay.  Wendy, would you —
4         THE WITNESS:  They should fire me after 60 days
5    if I didn't have my CDL.  That's — so I don't know.
6         MR. ACHO:  Wendy, could you read the question
7    back to the witness?  Please, listen to this question.
8    That's the one I would like you to answer, so we can wrap
9    up.
10        THE WITNESS:  Okay.
11        COURT REPORTER:  One moment.  You are not sure?
12   Well, why did the company want the CDL if you're not sure
13   why?  Can you explain that?
14        THE WITNESS:  See, does that make sense to you?
15        MR. HANNA:  It doesn't to me, so I object to
16   form, because, you know, he's asking about you
17   speculating on the mental impression of a third-party
18   corporate entity, so I object to that question.
19 Q   (BY MR. ACHO):  Go ahead, Mr. Guy, please answer it.
20 A   Can you put it in your words, because what she just said,
21   I didn't understand what she was saying, so can you —
22 Q   I'd be happy to, I'd be happy to.  In fact, let's do
23   this.  No, let's continue.  Is it your testimony that
24   when you hired in, Art or no one else at Absopure ever
25   tell you why they wanted you to get a CDL?  You knew they

Page 208

1    wanted you to, but what was the reason?  They never told
2    you?
3         MR. HANNA:  Objection, form.  See, this is what
4    I'm talking about.  That assumes facts not in evidence.
5    You know they wanted you to get a CDL?
6         MR. ACHO:  He admitted it, he admitted it
7    already, Mr. Hanna.  Please —
8         MR. HANNA:  He admitted that he received —
9         MR. ACHO:  — let's move forward.
10        MR. HANNA:  Well, he admitted that he received
11   the documents.  So you got to be careful, you're a
12   lawyer, Mr. Acho.  You're asking questions in a way —
13   either you're doing it intentionally, you're trying to
14   manipulate the testimony, or you're not being careful,
15   because you're not saying the same thing.
16 Q   (BY MR. ACHO):  Please answer my question, Mr. Guy.
17 A   You see how he — I answered all your questions.  I don't
18   know — I don't know how to answer it, because I'm not
19   understanding what you're asking.
20 Q   Yes.  I'm asking you, are you denying that Art or someone
21   else at Absopure told you you needed a CDL?  Are you
22   denying they told you that at the time of your hire?
23 A   I didn't understand that.
24 Q   I'm asking you now.  They did tell you at the time of
25   your hire you needed to get a CDL, correct?

Page 209

1  A   So you are going to hire somebody to be a lawyer without
2    a lawyer license; is that what you're talking to me?  To
3    get it in 60 days, that's what you're asking me.  That's
4    basically what you're asking me.  That's exactly what
5    you're asking me.  Like you're going to hire somebody and
6    tell them, oh, you got 60 days, just get the license and
7    we going to still pay you, and if you don't get it, I'll
8    fire you.  That's basically what you're saying.
9  Q   Mr. Guy, you didn't answer my question.
10 A   I'm answering the best way that I can, because you're
11   not — you're confusing me asking me — I told you —
12 Q   Okay.
13 A   — what I thought, and you're still trying to like ask me
14   the question previous before, and I answered it, but now
15   I'm not understanding the way you worded it this time.
16   Like I got a job to drive with a CDL, and I didn't have a
17   CDL.  I don't see what you're asking.
18 Q   Okay.
19 A   I had a —
20 Q   Okay.  We'll — we'll —
21 A   I didn't have a CDL in my possession.
22 Q   We'll break this down.  When you were hired, did you
23   speak with someone at Absopure about your job?
24 A   I originally didn't go to Absopure for a trucking job.
25   That's probably what you're not understanding.  Like I —

JUSTIN GUY
July 15, 2021

Page 210

1 Q  That's not what I'm asking. Wait, stop. I'm not asking
2     that. My question is real simple. When you were hired,
3     which involved driving a truck, what were you told and by
4     whom at the time of your hire? What were you told and by
5     whom?
6 A  I was told that I was hired. I'm not understanding what
7     you're saying. If I got hired to drive a CDL truck and I
8     drove the track, I'm hired for that. I don't understand
9     your point. That's why I was hired, I drove their truck
10    for them. That's all I did.
11 Q  Sir, what were you told at the time of your hire?
12 A  Sign these papers, it's not important, see you tomorrow.
13    That's exactly how it went. I signed papers, I came the
14    next day, I drove the truck, I waited and they said
15    whatever, I drove it. Whenever your little 60-day mark
16    you're trying to talk about, I didn't do it, I didn't get
17    it within 60 days. I didn't -- they didn't fire me.
18    They waited a year and-a-half to fire me. I don't
19    understand what you're asking.
20 Q  What I'm asking you is --
21 A  I don't know --
22 Q  -- when did you find out that you needed a CDL? Wasn't
23    it the time of your hire?
24 A  They told me that I can drive the truck for them. I
25    didn't have a CDL when I got hired. So if my job was to

Page 211

1     have a CDL to drive that truck, I should have never got
2     hired.
3          MR. ACEO: Wendy, please ask the question
4     again. It's real simple. Please do it for me, Wendy.
5          MR. HANNA: Wendy, do you know when the
6     seven-hour mark is up? Because it's already 4:30, and
7     this whole line of questioning has been asked five times,
8     but that's okay.
9          COURT REPORTER: One moment. When did you find
10    out that you needed a CDL? Wasn't it the time of your
11    hire?
12         THE WITNESS: No, I got hired without no CDL.
13 Q  (BY MR. ACEO): When were you told you needed it?
14 A  I don't recall.
15 Q  Give me your best estimate.
16         MR. HANNA: Objection, form. Assumes facts not
17    in evidence.
18 Q  (BY MR. ACEO): Please answer the question.
19 A  I'm not sure. I don't know, I don't remember.
20 Q  Well, you remember your hours and percentages, and you
21    can't remember when you were told, even approximately,
22    whether you needed a CDL?
23 A  I remember what I did at work. I don't remember what
24    somebody told me from that job. That don't even make
25    sense. Like physically doing work and mentally listening

Page 212

1     to somebody that they said three years ago, you don't
2     remember what somebody told you three years ago. Come
3     on, now.
4 Q  Well, were you told about the CDL and why it was
5     necessary? You were, weren't you?
6 A  No, I was never told it was necessary, because if that
7     was necessary, I would have never got behind the wheel of
8     that truck until I had that license.
9 Q  Wait a minute. I thought you told us at some point, you
10    don't remember when, you were told that you needed a CDL
11    Group B license. You were told that, you don't remember
12    when, right?
13         MR. HANNA: Objection, form. Misstates prior
14    testimony.
15         THE WITNESS: You showed me a paper that said
16    that I would get a CDL B license within 60 days of that
17    hire date, right? So why are you still asking me about a
18    date if I signed a paper that I didn't read? Obviously,
19    that would be the date if -- I wouldn't know, because I
20    didn't read the paper. They told me about it after,
21    what's the name, and then it's like how am I supposed to
22    just automatically like, oh, well, they told me September
23    two thousand and blah, blah, blah. That's like you want
24    a specific date and time. That don't make sense.
25 Q  (BY MR. ACEO): Well, sir, do you know why Absopure wanted

Page 213

1     you to get that type of license?
2 A  Once again, no. I never had one. How can I know
3     something if I never had it?
4 Q  So you sit here today, after three years and having hired
5     a lawyer and filed a lawsuit, you have no idea of why the
6     company wanted you to get a CDL Group B license; is that
7     correct?
8 A  That's correct, because I didn't have it, I still worked
9     there, and when I went to get it, I got fired. So
10    obviously it don't make sense what you're saying. I got
11    fired for going to get it, so what is your point? I went
12    to go get it, I got fired. I didn't get it, I stayed
13    working. I wasn't supposed to work unless I had the
14    license, so I don't even -- it don't make sense.
15 Q  Sir, are you alleging that you could not legally drive
16    for Absopure outside the state of Michigan? Are you
17    alleging that?
18 A  Repeat your question.
19 Q  Yeah. Are you --
20 A  I don't know what you -- can you define that word?
21 Q  Okay. All right. I'll break it down.
22 A  I don't have a college degree, sorry, man. Don't feel --
23    I'm not trying to be funny. I don't have a college
24    degree, I don't know certain stuff.
25 Q  No, that's okay. I -- is it your testimony that by law,

JUSTIN GUY
July 15, 2021

**Page 214**

1  your opinion is you couldn't drive outside of the state
2  of Michigan?  Is that your opinion, your belief?
3 A  What's — so can you not use testimony and not use the
4  other stuff?  So can you just be clear upfront what
5  you're talking about, because I don't know what you're
6  trying to say.  If you're trying to trick me, I don't
7  know.  I mean, I can't answer a question I don't know the
8  answer to because you're not telling me what clearly you
9  want to be answered.
10         MR. HANNA:  Mr. Acho, Mr. Acho, the law is the
11  law.  Like you're asking him for a legal conclusion.  Can
12  we move on?
13 Q  (BY MR. ACHO):  Well, no, because you answered an
14  admission, admission number twenty.  I'm going to read it
15  to you, and I am going to read your answer.  This is you.
16 A  What number is that?
17 Q  It's the admissions.
18 A  Okay.
19 Q  Do you have them?
20 A  Uh —
21 Q  I'm going to read it to you.
22 A  Yeah.
23         MR. HANNA:  Well, can you hold on a second?
24  I'm going to pull up what you're referring to.  And I
25  think it's mis — yeah, it's Exhibit 19, Mr. Guy.

**Page 215**

1         THE WITNESS:  Yeah, 19.  Which number are you
2  reading again?
3         MR. ACHO:  Number twenty.
4         THE WITNESS:  Okay.  Go ahead.
5 Q  (BY MR. ACHO):  Here is the question that I asked you,
6  which you deny.  The question is:  Admit that as a
7  condition of employment by defendant, plaintiff was to
8  drive any physical destination as assigned or directed by
9  defendant.  Do you see that question?
10 A  Yeah.  Do you see the answer?
11 Q  Well, that's what I want to ask you about.  What do you
12  base it on that it was illegal for you to go outside of
13  Michigan?  What knowledge do you have, or proof or
14  anything, that said you couldn't drive outside Michigan?
15  What do you got?
16         MR. HANNA:  Objection, calls for a legal
17  conclusion from a lay witness.
18 Q  (BY MR. ACHO):  Please go ahead and answer it.  This is
19  your answer, this is your answer.
20 A  I didn't — I didn't have a CDL.  I can't — I couldn't
21  do that.
22 Q  Okay.  So —
23 A  And I had a route, so I wouldn't have to do that.
24 Q  Oh, wait, wait, wait.  So I understand your testimony,
25  the reason why you didn't think you could legally drive

**Page 216**

1  outside the state of Michigan is because you didn't have
2  that CDL Class B.  That is what you believe, correct?
3         MR. HANNA:  Objection —
4 Q  (BY MR. ACHO):  Is that right?
5 A  That's not what I said.  That's not my answer.
6 Q  Well, you say you couldn't legally drive.  Based on what?
7 A  Could I?
8 Q  Yeah.  It's your answer, that's your answer.
9 A  No, I'm asking you, could I drive out of state with no
10  CDL with a big Absopure truck?
11 Q  Absolutely.  Yeah, absolutely you can.  Why not?
12 A  Wouldn't you —
13 Q  How could I?
14 Q  What knowledge do you have that you couldn't have taken
15  that truck and driven to Toledo?  What prevented you from
16  going to Toledo if that's where Absopure wanted you?
17  Tell me.
18 A  If I was able to do that and I worked for them for almost
19  two years, why didn't I do that, then?  Because I wasn't
20  able to.
21 Q  No, sir.  That's your opinion.  No one told you at
22  Absopure that you couldn't drive to Ohio.  No one told
23  you, did they?
24 A  Nobody told me that I had to, either, so I couldn't.  If
25  I got a route to do, I can't go do somebody else's route

**Page 217**

1  if their route was in Toledo, so I can't do that.  No, I
2  can't.
3 Q  Sir, sir, I'm dealing with your answer to twenty.  You
4  said you couldn't legally drive outside of the state of
5  Michigan.  You have no facts to support that, do you?  Do
6  you?
7 A  How come I can't?  Can I legally —
8 Q  Yeah, tell me factually how legally you couldn't go
9  outside of Michigan.  What facts do you have?
10 A  My facts is the route that I did, I wouldn't ever be able
11  to have to go out there, and if I had to or if I was able
12  to, somebody would have talked to me about that or told
13  me that I had to or I could or if I wanted to, because I
14  was like one of the best employees there, so why would
15  they ask me to go to Ohio if I couldn't go?
16 Q  Sir, you don't know whether this answer is true or not,
17  do you?  You don't know whether legally —
18         MR. HANNA:  Objection —
19 Q  (BY MR. ACHO):  Whether legally you could drive outside of
20  Michigan, you really don't know the answer to that even
21  though you denied it, correct?
22         MR. HANNA:  Objection to form.
23         COURT REPORTER:  What was that again, please,
24  by Mr. Guy?
25         THE WITNESS:  What was that?

Page 218

```
1              COURT REPORTER: What was your last comment? I
2    couldn't hear.
3              THE WITNESS: I couldn't drive out of state.
4  Q  (BY MR. ACHO): Who told you that? Who told you that?
5  A  Who told me I could? Nobody told me that.
6  Q  No, I'm not asking you who told you you could. I'm
7    telling you, who told you you could not? What do you
8    base that on, that you could not?
9              MR. HANNA: Are you trying to trick the lay
10   witness as to what the law is or is not, Mr. Acho? This
11   is highly inappropriate and it's also irrelevant. The
12   law is the law. Is it your understanding, Mr. Acho, that
13   you can drive across state lines in a commercial vehicle
14   without a CDL license? Is that your understanding,
15   Mr. Acho?
16             MR. ACHO: Okay. Mr. Hanna, please, you're
17   violating 30(c)(2) again.
18             MR. HANNA: I'm not -- Mr. Acho, when you go
19   out of bounds and ask inappropriate questions and badger
20   the witness and harass him about his knowledge of legal
21   doctrine and what the law is and, quite frankly, it
22   appears you're misstating the law, that's inappropriate.
23 Q  (BY MR. ACHO): Answer it, Mr. Guy.
24 A  I gave you my answer, man. I don't know how many times
25   you want me to answer it. My answer is actually right
```

Page 219

```
1    there, it says deny.
2  Q  Because it's illegal, right? Is that true?
3  A  If it wasn't -- if it wasn't illegal, why didn't they
4    send me? I just want to know.
5  Q  Let's go to 22. You don't really know all the other
6    drivers and where they drove, did you? You had no
7    personal knowledge, you didn't drive with them. You have
8    no personal knowledge what other drivers did or didn't
9    do; isn't at that right?
10 A  No.
11             MR. HANNA: Objection, form.
12 Q  (BY MR. ACHO): No, what?
13 A  I knew a lot of stuff. Actually, all the workers talked
14   every time that we clock in the next day, so whatever was
15   going on the day before, we talk about it. If they went
16   to Ohio, they told me they went to Ohio. If people went
17   to Indiana, they said they went to Indiana. Anybody that
18   went to Illinois, they told me they went to Illinois and
19   how it was. So I don't see where I don't have personal
20   knowledge.
21 Q  That's not personal. That's what somebody told you,
22   right?
23 A  If they -- if that's what they're doing, that's their
24   job, that's what I know. That's what they're doing every
25   day, this is what I do every day. So it's like you're
```

Page 220

```
1    not making sense.
2  Q  Well, I'm sorry. I apologize if I'm not making sense.
3    Let me understand something. Why did you file this
4    lawsuit as a class action as opposed to just for you?
5  A  Because I'm not the only one that's being treated
6    unfairly. Everybody is working their butts off for that
7    company. Nobody get paid overtime. That's like it's a
8    problem for when other jobs are -- that truck drives
9    offer bonus commission, that don't make sense, the bonus
10   of having overtime premium and still work whatever they
11   get paid every single day. So I'm not the only trucker
12   that thought that, so I just wanted to make it a class
13   action.
14 Q  But you don't know how much those people make, do you?
15 A  I know that we all do the same job, everybody work a lot
16   of hours and don't get paid overtime. That's what I do
17   know, so that's why we're here. That was your question,
18   that's my answer.
19 Q  Well, what about the commissions they made? You don't
20   know how much commissions those other drivers got, do
21   you?
22 A  Commission doesn't require -- doesn't have nothing to do
23   with overtime premium. I still don't understand why
24   you're still bringing up commission.
25 Q  Well, commission is how much money you put in your pocket
```

Page 221

```
1    at the end of the day, and based upon the numbers that
2    I've seen, you made a lot of money some weeks way more
3    than if you got overtime. You're not denying that, are
4    you? True?
5  A  If -- I would have made more money if I would have got
6    paid my overtime and commission.
7  Q  I didn't ask you that. Please. I'm going to ask it
8    again. Listen to what I'm asking you, please. There are
9    weeks where you made a lot more money with the commission
10   than you would have had you been paid the flat rate, plus
11   overtime; isn't that true? You're not denying it, are
12   you?
13             MR. HANNA: Objection, relevance.
14             THE WITNESS: I am denying that.
15 Q  (BY MR. ACHO): You're saying that some of the weeks you
16   didn't make more than what you would have made with
17   overtime instead of commission?
18 A  How would I know if I never got overtime? And if I was
19   getting overtime, I would be getting overtime and
20   commission. So of course I would have made more, so
21   yeah.
22 Q  Did you make -- did you a make a deal with the company
23   that you were going to get commission and overtime? Did
24   you make that deal with the company?
25 A  I didn't make a deal with nobody. I just started working
```

JUSTIN GUY
July 15, 2021

Page 222

1  for them, driving a truck for them.
2  Q  But you agreed --
3  A  You don't make deals -- you can't make deals with an
4     employee, it don't work that way. You either going to do
5     what they say, do what they do and we work it out later,
6     or just do whatever you want to do. But me, I did what
7     they told me to do, and since they didn't do the -- they
8     didn't follow the law correctly, I did what I had to do
9     at the end of it.
10 Q  Okay. So here is what I'm understanding. You want the
11    benefit of the deal that the company made, but you want
12    some sweetener, you want some overtime on top of the flat
13    rate and the commission. You want a sweetener, you want
14    overtime, too; is that right?
15 A  That's not what I'm saying.
16 Q  That's what you're doing. You want the sweetener, you
17    want the commission and the overtime, don't you?
18       MR. EPANA: Objection, form. That's your
19    characterization of the sweetener concerning the law.
20       THE WITNESS: Right.
21 Q  (BY MR. ACHO): Go ahead, sir, answer the question.
22    Answer the question.
23 A  I don't understand what you're saying. Absopure can do
24    what they want, how they want, pay employees how they
25    want to, no matter the law. That's basically what you're

Page 223

1  saying.
2       MR. ACHO: Okay. Wendy, sorry to make you do
3     this. This witness is not answering my question, so
4     please ask the question again to the witness. And we'll
5     keep doing this --
6       MR. EPANA: For the record, we're not going to
7     keep doing this much longer. Wendy, before you do that,
8     can you provide us a time on the record, because once
9     it's seven minutes -- seven hours, we're out. It's
10    already 4:45.
11       COURT REPORTER: You want to know -- can we go
12    off the record, please?
13       MR. EPANA: Sure.
14       MR. ACHO: Well, let's do this. Let's go off
15    the record for about 10 minutes. That way, I'll go over
16    my notes. If I get the answers directly and promptly,
17    then we can wrap this thing up.
18       MR. EPANA: You've gotten them five times, you
19    just don't like them.
20       MR. ACHO: Please, don't keep doing that.
21    Let's take a break for 10 minutes.
22       MR. EPANA: I'm not sure -- I'm not doing
23    anything, but, okay, let's take a break. We can go off
24    the record.
25       (Off the record at 4:46 p.m.)

Page 224

1       (Back on the record at 4:55 p.m.)
2  Q  (BY MR. ACHO): Mr. Guy, you wanted a sweetener beyond
3     your flat rate and your commissions. That's what you
4     wanted with this lawsuit, right?
5       MR. EPANA: Objection, form. As --
6       MR. ACHO: Go ahead.
7       MR. EPANA: -- to counsel's reference of
8     following the Fair Labor Standards Act in requiring --
9     requesting overtime time pay as a, quote, unquote,
10    "sweetener."
11       MR. ACHO: I repeat Civil Procedure 30(c)(2).
12    Go ahead, Mr. Guy.
13       MR. EPANA: I disagree with that, but you can
14    answer, Mr. Guy.
15 Q  (BY MR. ACHO): Go ahead.
16 A  That's not correct.
17 Q  Well, you didn't tell the company, hey, just pay me my
18    flat rate and overtime. You didn't ask the company for
19    that, did you?
20       MR. EPANA: Objection, form.
21 Q  (BY MR. ACHO): Did you ask them, yes or no?
22       MR. EPANA: Objection, form.
23 Q  (BY MR. ACHO): Please answer.
24 A  What's your question again? Did I ask them --
25 Q  Sir, see what I mean? I ask you a simple question, you

Page 225

1  delay, you get an objection, get another delay. This is
2  what's causing the difficulty.
3       MR. EPANA: What's causing the difficulty is
4     you ask bad questions. You're overly combative and
5     you've wasted half of your deposition asking about
6     nonsensical topics. That's the problem.
7  Q  (BY MR. ACHO): Mr. Guy, you didn't ask that you get paid
8     the daily rate, plus overtime, did you?
9       MR. EPANA: Object, form. Misstates prior
10    testimony.
11 Q  (BY MR. ACHO): Go ahead.
12 A  I asked for everything that I was paid for. I complained
13    about everything that I've been complaining about now,
14    and still you're asking me the same question.
15 Q  Answer the question, please.
16       MR. EPANA: Asked and answered. You can answer
17    again.
18       THE WITNESS: Repeat your question a better
19    way, so I can give you another answer that --
20 Q  (BY MR. ACHO): Sir, you know, we've spent five minutes on
21    this, Mr. Guy. Okay. You didn't say to the company,
22    look, pay me the flat rate, but I want to get overtime.
23    Forget the commissions, pay me the overtime. You didn't
24    do that, did you?
25       MR. EPANA: Objection --

JUSTIN GUY
July 15, 2021

Page 226

1       THE WITNESS: Why would —
2       MR. HANNA: — form.
3  Q  (BY MR. ACHO): Pardon me?
4  A  Why would I do that? I want my daily pay and my
5       commission that I was told I was going to get and the
6       extra hours that I worked that I was supposed to be paid
7       for. There's nothing it got to do with you, Absopure.
8       It's the law. You can't hire people and not pay them by
9       law what they are — they're supposed to be paid.
10 Q  Okay. Now, for 18 months you kept working there. Did
11      you talk to any lawyer or anyone about — or government
12      official, anyone, about the law of truck drivers? Did
13      you?
14      MR. HANNA: Objection. I'm going to instruct
15      you not to answer that question. Do not answer it,
16      because it's asking for attorney-client privilege
17      communication as to what you have or may not have spoken
18      to a lawyer about. Do not answer.
19 Q  (BY MR. ACHO): Well, I beg to differ with you, but let me
20      ask you this. When did you first find out it was against
21      the law to not pay overtime to someone in your position?
22      MR. HANNA: Objection, form.
23 Q  (BY MR. ACHO): When did you first find out?
24      MR. HANNA: Objection, form.
25 Q  (BY MR. ACHO): Tell me, when did you find out?

Page 227

1       MR. HANNA: Object, form. Asked and answered.
2  Q  (BY MR. ACHO): You said that three times, Mr. Hanna.
3       Answer the question, please.
4       MR. HANNA: Well, I said "objection," and you
5       kept interrupting me. I didn't get to say objection,
6       form, asked and answered. If you would just hold your
7       horses for a second, let me object, let him answer, we'll
8       — you've already asked this 10 times, but do it for the
9       11th time.
10      THE WITNESS: All right. Repeat your question
11      again.
12 Q  (BY MR. ACHO): No, sir, I don't want to repeat it. When
13      did you first find out — okay, come on. You're playing
14      a game, but I'm going to try to be as nice as I can be.
15      MR. HANNA: I'll play the game. Counsel, I
16      need you to watch your tone —
17      MR. ACHO: Sir —
18      MR. HANNA: — and watch your language on the
19      record. Don't you ever insinuate about playing a game.
20      MR. ACHO: Sir —
21      MR. HANNA: He asked you to repeat a
22      question —
23      MR. ACHO: Sir —
24      MR. HANNA: — and you're refusing on the
25      record, because you're trying to manipulate the

Page 228

1       testimony. Don't do that.
2       MR. ACHO: Please stop yelling —
3       MR. HANNA: I will not stand for that.
4       MR. ACHO: Please stop yelling and screaming.
5       MR. HANNA: Then make — well, I'm yelling and
6       screaming when you're making —
7       MR. ACHO: Listen —
8       MR. HANNA: — bold, inappropriate accusations
9       on the record, so the record is clear.
10      MR. ACHO: For the record, constantly Mr. Hanna
11      has objected all the time, and he yells and screams. I'm
12      getting tired of it.
13 Q  (BY MR. ACHO): Mr. Guy —
14      MR. HANNA: For the record, I have not —
15 Q  (BY MR. ACHO): — when did it come to your attention —
16      when did it come to your attention —
17      MR. HANNA: You don't get to say that, you
18      don't get to say —
19 Q  (BY MR. ACHO): Mr. Guy, when did it come to your
20      attention —
21      MR. HANNA: You don't get to say that and not
22      allow me to put my position on the record. That was an
23      incorrect and false accusation by Mr. Acho, for the
24      record. Okay, you can go ahead and ask your question
25      now.

Page 229

1  Q  (BY MR. ACHO): Mr. Guy, when did you — when did it come
2       to your attention that how you were paid was illegal?
3       When?
4       MR. HANNA: Objection, form. Asked and
5       answered.
6       THE WITNESS: It — it always — all right.
7  Q  (BY MR. ACHO): Are you looking at something on the screen
8       while you're answering me or no?
9  A  No, I was trying to think about what you said, because
10      you said about 20 different things and you all went back
11      and forth, so I don't even remember the question,
12      honestly, but I got slow — I got what — so you said —
13      what was your question again? What — when did I figure
14      out that they was being illegal about how they was paying
15      me?
16 Q  Yes.
17 A  Since the beginning.
18 Q  Okay. You did drive a commercial motor vehicle for
19      Absopure, didn't you?
20      MR. HANNA: Objection —
21      THE WITNESS: I don't know what a commercial
22      motor vehicle is.
23 Q  (BY MR. ACHO): I'm sorry, say that again.
24 A  What is a commercial motor vehicle? Does it need a CDL
25      for that?

JUSTIN GUY
July 15, 2021

Page 230

1  Q   Okay. Let me understand something. You got -- you're
2      sitting here today three years from the time you started
3      for Absopure, and you even took a test, Suburban Truck
4      Driver Training School and you got a certificate, and
5      you're telling the court you don't know what a commercial
6      motor vehicle is; is that correct?
7  A   That CDL that I got is allowed to drive with commercial
8      vehicles. I didn't have one when I worked at Absopure,
9      so I didn't drive a commercial vehicle without a
10     commercial license.
11 Q   Sir --
12 A   I don't --
13 Q   I asked you whether you drove a commercial motor vehicle,
14     and you said you don't know what a commercial motor
15     vehicle is. That's your answer in admission 28. You
16     want to look at it? Take a look at it.
17         MR. HANNA: Objection, form.
18         THE WITNESS: I just told you the same thing on
19     the screen, so what's your point?
20 Q   (BY MR. ACHO): So you do know what a commercial motor
21     vehicle is, even though you denied it in 28 in your
22     admissions --
23         MR. HANNA: Objection, form.
24 Q   (BY MR. ACHO): -- correct?
25         MR. HANNA: Objection, form.

Page 231

1  Q   (BY MR. ACHO): Am I correct?
2  A   You said I need a CDL to drive a commercial motor
3      vehicle. I didn't have a CDL when I was at Absopure, so
4      I didn't drive a commercial motor vehicle. Who --
5  Q   Sir, aren't there different types of CDLs?
6  A   I wouldn't know, I didn't have a CDL until now.
7  Q   You got one now. You got one now.
8  A   Yeah, I do. Now, I do.
9  Q   Did you --
10 A   That's why --
11 Q   -- drive a truck for Absopure?
12 A   I drove Absopure's truck.
13 Q   Okay. Was that a commercial vehicle or a personal
14     vehicle? What was it?
15 A   That was an Absopure truck. That's all I knew.
16 Q   Well, do you know what "commercial" means?
17 A   I mean, commercial is on TV, so what type of commercial?
18 Q   Commercial, like in commerce.
19 A   I know what it is now. I have a commercial license that
20     now I can drive commercial trucks. I didn't have no
21     commercial -- I didn't know what this was then, no. Now
22     I know. I'm aware of what it is now, I did my research.
23     I didn't know then. And I thought you're supposed to
24     have a CDL to drive a commercial driver's truck -- a
25     driver's commercial truck. How did I have no license and

Page 232

1      drive a commercial truck? It don't make sense.
2  Q   Were you fully informed by Absopure of what their pay
3      structure was at the time you started?
4          MR. HANNA: Object to form. I mean, counsel,
5      this is harassment again. How many times have you asked
6      this question?
7  Q   (BY MR. ACHO): We're wrapping up, counsel. Would you
8      answer the question?
9          MR. HANNA: Wrapping up doesn't mean you get to
10     re-ask him everything to hope for another answer.
11 Q   (BY MR. ACHO): Go ahead.
12         MR. HANNA: The record is -- the record's clear
13     in this regard.
14 Q   (BY MR. ACHO): Go ahead, sir.
15         MR. HANNA: You can answer.
16         THE WITNESS: I forgot the question now.
17     You're going to have to repeat it.
18         MR. ACHO: For the record, this has occurred
19     repeatedly because of the constant objections by
20     plaintiff's counsel, which will present at an appropriate
21     time. Wendy, could you read it back, please?
22         MR. HANNA: For the record, that is a false
23     accusation. Mr. Acho is asking inappropriate questions,
24     and he's asking it over and over. And when we present it
25     in the appropriate time, I will just go to the prior

Page 233

1      pages in the transcript and show that you already asked
2      this a hundred times, and that's why my objection to it
3      being asked and answered and placing that on the record
4      is appropriate, but I'm not going to instruct him not to
5      answer it again. He can answer it again if you'd like.
6      You have seven hours, you can use your time as you like.
7          COURT REPORTER: One moment, please. Were you
8      fully informed by Absopure of what their pay structure
9      was at the time you started?
10         THE WITNESS: No, I wasn't fully informed,
11     other than I was getting paid $120 a day, plus commission
12     to drive their vehicle. They didn't tell me I wasn't
13     going to be paid overtime.
14         MR. ACHO: Okay. This is going to be the last
15     -- this is going to be the last question, I hope, unless
16     there are any questions by plaintiff's counsel. Do you
17     think you're going to have questions, sir?
18         MR. HANNA: Absolutely.
19 Q   (BY MR. ACHO): Okay. You admit, don't you, that there
20     were days you didn't work eight hours a day and you were
21     still paid your full daily rate, correct?
22 A   If you're talking about a Saturday?
23 Q   Any day. Any day at all.
24 A   I worked Saturdays, and probably worked about six, four
25     or five hours.

JUSTIN GUY
July 15, 2021

Page 234

1  Q   But even during the week you worked some days less than
2      eight hours and you're still paid your full day rate,
3      correct?
4  A   I'm not sure.  I'm not sure.
5  Q   Well, according to your admission number 38, you believe
6      it to be an accurate statement.  Are you still not sure?
7  A   38 says --
8  Q   Do you believe --
9  A   I'm not a hundred percent --
10 Q   -- to be an accurate statement?
11 A   I'm not a hundred certain that's what that says.
12             MR. ACHO:  All right.  I have no further
13     questions.
14             THE WITNESS:  I'm not sure.
15             MR. HANNA:  And this is --
16             MR. ACHO:  I'm going to reserve my time, almost
17     an hour, in case there are questions by Mr. Hanna.
18             MR. HANNA:  It's not almost an hour at this
19     point, for the record.  I just have a few questions.
20                    EXAMINATION
21 BY MR. HANNA:
22 Q   So, Mr. Guy, if you could take a look at Exhibit 23 for a
23     minute, the estimates that were provided.
24 A   Uh-huh.
25 Q   And are these estimates?

Page 235

1  A   Exhibit 23?
2  Q   Yeah.  Are these --
3  A   Yeah, these are estimates.
4  Q   You're not claiming you know exactly every single day
5      what time you left.  These are estimates for your
6      employment; is that correct?
7  A   Yes, that's correct.  That's just a percentage of mostly
8      per day.
9  Q   And do those estimates appear to be fair and accurate to
10     you?
11 A   What was that?  I didn't hear you, I'm sorry.
12 Q   Do those estimates appear to be fair and accurate to you?
13 A   Yes.
14 Q   Okay.  And I'm sure there are exceptions to these
15     estimates.  For example, were there potentially a day
16     where you got sick or one of your kids got sick and you
17     had to leave early or something to that effect?
18 A   Yeah, my kids got sick often and I had to go pick them up
19     early.
20 Q   Okay.  So are there days where you, you know, potentially
21     might have left early due to an emergency of some kind?
22 A   Yeah, probably, but I'm not sure because, I mean, it was
23     so long ago.  I can't -- I don't know the exact day.
24 Q   Understood.  Just to clarify this, we've had a lot of
25     back and forth, it is your understanding that you cannot

Page 236

1      drive a commercial motor vehicle outside the state of
2      Michigan without a CDL license of some kind?
3             MR. ACHO:  I'm going -- I'm going to object.
4      These questions have all been leading and suggestive, and
5      they're highly improbable.
6  Q   (BY MR. HANNA):  Okay, you can object.  You can answer,
7      Mr. Guy.
8  A   What was the question again?  I'm sorry.
9  Q   Sure.  Is it your understanding that you cannot drive a
10     commercial motor vehicle of a certain weight outside of
11     the state of Michigan without a CDL license?
12 A   Yes, that's correct.
13 Q   Can you look -- can you take a look at Exhibit 17 for a
14     minute, sir?
15 A   17?  Oh, here's 17 right here.
16 Q   Is it in your hand, sir?
17 A   Yeah, yeah, I got it in my hands.
18 Q   Okay.  Have you ever seen this document during your
19     employment with Absopure?
20 A   No.  Never saw this thing in my life.
21 Q   Do you even know what these times are suggesting?
22 A   No.  And it doesn't have my name on it, either.
23 Q   Is there any employee ID or any demarcation that
24     signifies this is for you?
25 A   No, there is not.

Page 237

1  Q   Okay.  It doesn't even say "clock in" or "clock out" time
2      on this document, does it?
3  A   No, it does not.  It says "check out" and "check in."
4  Q   Do you know what that means, check out, check in, UTC?
5  A   No.
6  Q   Okay.  Let's take a look at the time for a minute.  If
7      you look at the column -- there appears to be dates on
8      the "max of date."  I'm not sure what that means, but the
9      next column is "min of time."  Assuming this is minutes
10     of time, the first one is 11:46 a.m. in Army time, the
11     second is one is 12:04, the third one is 11:30, and when
12     you go down, I represent that, you know, the document
13     speaks for itself, but most of these times appear to be
14     around noon, 1:00 p.m. -- yeah, most of them are around
15     noon or 1:00 p.m.  Did you -- did you regularly start
16     working around noon and 1:00 p.m. while working for
17     Absopure?
18 A   No, did I not.  I started at 6:00 in the morning,
19     sometimes 7:00.
20 Q   Okay.
21 A   Every once in a while I come in at 5:30.
22 Q   Okay.  Bear with me one moment, sir.  I'm just trying to
23     wrap this up.  All right.  Did you -- how many times did
24     you sign up for a CDL-related course?
25 A   Just once.

JUSTIN GUY
July 15, 2021

**Page 238**

1  Q  And was that around January, February-ish 2020?
2  A  2020, yes.
3  Q  Okay.  Do you recall the exact day you began your
4     schooling for that course?
5  A  I don't remember the exact date, but I know it is the end
6     of January when I started going to the school and
7     learning, and when I was going to start and stuff like
8     that.  I know it was the end —
9  Q  Sure.  Are you estimating?
10 A  Yeah, estimating like in between — at the end of
11    January, the beginning of February 2020, that's an
12    estimate, yes.
13 Q  Okay.  Let's take a look at your requests for admissions,
14    sir.
15 A  Which — is that Exhibit 20 or —
16 Q  No, sir.  It's Exhibit 19.
17 A  Oh, 19?
18 Q  Yes, sir.
19 A  Okay.
20 Q  Take a look — have you reviewed these documents — have
21    you reviewed this document previously?
22 A  Yes.
23 Q  Are all your answers on there fair and accurate?
24 A  Yes.
25 Q  I'm trying to recall the one that Mr. Acho asked you on

**Page 239**

1     in there, bear with me one moment.  So let's — can you
2     read request for admission number four, sir, and the
3     answer.  And when you're done reading it, let me know
4     when you're done.
5  A  Okay.
6  Q  Have you finished reading it, Mr. Guy?
7  A  Yeah, I read it.
8  Q  So did you ask the customers whether — you know, when
9     you're making the deliveries, did you ask them, hey, do
10    you need any more water, do you need additional products
11    or something to that effect?
12 A  Like if — so say like — so if I go to my house and
13    they're not in, I'm not going to talk to somebody.  They
14    going to have empty bottles on the porch or empty
15    bottles — wherever the delivery is at, I do those.
16    Deliver — whatever empties, and give them full ones.
17 Q  So did you ever ask them if you need additional bottles?
18 A  I mean, if, say, like — I mean, not like — no.  Like
19    if — if they got empties, how many empties they got,
20    that's how many — that's how many I just redo.  Like how
21    many empties is how many I give them.
22 Q  Okay, I understand.  So if you looked at them and they
23    seen like they had empties, you'd ask them, hey, do you
24    want more; is that right?
25 A  I mean, if they needed — like if they asked for like can

**Page 240**

1     you give me more, then I would just give them more.
2  Q  Okay.  And do you consider that to be selling?
3  A  No.  The product was sold to the person already.  I never
4     had to sell anything.  I just delivered for Absopure.
5  Q  Understood.  So there was a lot of talk about the
6     documents, and it appears you were handed some documents
7     when you were first employed.  Were you ever asked to
8     review the documents before signing them?
9  A  No.  They just told me it wasn't important, just sign it
10    and come in tomorrow.  That's how it all started.
11 Q  Okay.  Mr. Acho asked you previously about working under
12    eight hours, and I believe you said you never worked
13    under eight hours.  But just to be clear, was there
14    ever — when you say "never," sometimes it insinuates
15    "never" means "zero."  Was there ever a day, for example,
16    that maybe your kid got sick or something to that effect
17    and you had to leave early?
18 A  Yeah, my kids get sick, you have to leave early, but —
19 Q  So is it a more fair and accurate statement to say you
20    usually didn't work more than eight hours, but there
21    might have been exceptions if your sick got — if your
22    kids got sick or an emergency happened?  Is that a more
23    fair and accurate statement?
24 A  Yeah, as long — yeah, as long as I stayed at work the
25    full day, I worked over eight hours, but if my kids was

**Page 241**

1     sick or, you know, something was wrong, I called up.  I
2     couldn't — I wasn't going to go work then.  Like if I
3     was at work, I'm working more than eight hours, unless
4     somebody was injured or something.
5  Q  That's fair.  There was talks about — and I believe
6     Mr. Acho referred to it as "running your own show."
7     Let's go into that, as far as the discretion you had as a
8     delivery driver.  Did you pick who you were going to
9     deliver to?
10 A  No.
11 Q  Did you pick your route?
12 A  No.
13 Q  Did you pick how you could go to your route or which
14    delivery you'd make first?
15 A  No.  Everything was told — I was told how to do, what to
16    do, when to do it.
17 Q  Did you pick which items to deliver to who?
18 A  No.
19 Q  Did you get a paper from Absopure at the beginning of
20    your shift advising you of your route?
21 A  Yes.
22 Q  Did it have specific times of — or at least ranges of
23    times to deliver to this person, that person, et cetera?
24 A  Not no times, just you made your stops.  So you just do
25    it how you do it, if you can do it.  Or if you don't do

JUSTIN GUY
July 15, 2021

**Page 242**

1 it, you going to do it tomorrow, so —
2 Q Okay, that's fair. Did you have to do your daily stops
3 in a specific order?
4 A Yeah, it was an order, a numerical order, like 30 stops.
5 Q And I believe you produced the one document that you had
6 in that regard, and if I recall correctly, did those
7 documents indicate go to — you know, go deliver XYZ
8 here, then go to deliver ABC there? Was that the format
9 that it was presented to you?
10 A Yes.
11 Q Okay. So did you have any discretion as to your duties
12 as a delivery driver?
13 A I don't understand what you're saying.
14 Q Sure. Did you — were you able to kind of do your own
15 thing or run your own show when you're delivering these
16 products, or did they tell you exactly what to deliver,
17 and to who and when?
18 A They told me what to deliver, who, when, and sometimes
19 they would call and be like, what's your ETA for a
20 certain spot, like how fast can you get there, or their
21 business is about to close, can you stop what you're
22 doing and go to this business and drop some water off
23 here, because they're about to close.
24 Q Understood. Can you take a look at Exhibit 2 for a
25 second, sir?

**Page 243**

1 A Exhibit 2?
2 Q Yes, sir. Let me know when you have it in front of you.
3 A Okay, I got it.
4 Q And during your — during your employment, I'm not
5 talking about during the litigation or when counsel for
6 defendant produced documents and you looked at them, you
7 know, during your employment while you were working for
8 Absopure, did you ever see that document?
9 A I have never seen this paper a day in my life but here,
10 until yesterday, today. I don't even remember seeing —
11 shown the paper saying I had this. I don't even ever —
12 like I'm not even a sales service specialist. I'm a
13 delivery driver. I don't even know why this is in front
14 of me right now still.
15 Q Well, they've given you a bunch of documents that
16 conflict. Some call you one position, some call you the
17 other position. So, I mean, do you have any knowledge or
18 recollection as to whether this is a standard packet that
19 they provided to all employees regardless of their
20 position?
21 A I wouldn't know, because —
22 Q That's fair.
23 A For Exhibit 1, it clearly states that I'm a driver —
24 it's a driver's application. It don't say nothing about
25 sales associate, it don't say nothing about a service

**Page 244**

1 specialist, nothing.
2 Q As to the documents that have your signature on them that
3 we've looked at today, do you recognize these documents
4 prior to you reviewing them for litigation? Meaning do
5 you recognize those documents contemporaneous with your
6 employment?
7 A No, I just signed them and handed it back to him. I
8 never read a piece of paper.
9 Q Well, that's my question to you. You said — the
10 testimony is very clear that when you were hired, you
11 indicate that they provided you with a bunch of
12 documents, I believe you estimated them to be 30, and you
13 signed them all, right?
14 A Right.
15 Q Do you know what those documents are? Do you know if
16 these are those documents or not, one way or another?
17 A I mean, I don't know, because these are — these are not
18 the official copies, so I wouldn't know. I don't know.
19 Q So do you — do you know if those are fair and accurate
20 representations of those documents that you purportedly
21 signed?
22 A No.
23 Q As far as lunch breaks, did you ever eat stuff while
24 you're driving, like on the go?
25 A No.

**Page 245**

1 Q Did you drink like smoothies or something?
2 A No. I just drank the water that they provided me. They
3 just gave me free water at the end — beginning of the
4 day to keep me hydrated.
5 Q Did you ever receive training to sell anything, or any
6 sales training?
7 A No, I never received sales training. I wasn't even a
8 sales representative. I'm pretty sure you'd have to
9 train for that.
10 Q Did you ever refer anybody as a referral?
11 A No.
12 Q Did you ever prospect anybody?
13 A What does — what does that mean?
14 Q Did you ever ask somebody, hey, why don't you start using
15 Absopure products. I work for Absopure, they're a great
16 company. Anything to that effect?
17 A No.
18 Q Okay. Did you ever go to sales meetings?
19 A No.
20 Q Were you ever given a sales quota? And what I mean by
21 "quota," sir, is did you ever — say, if you — if you
22 don't sell this much, you're going to get disciplined or
23 anything to that effect?
24 A No.
25 Q Did you ever get disciplined for not selling a certain

JUSTIN GUY
July 15, 2021

Page 246

1  amount of products?
2  A  No.
3  Q  Did they ever tell you you need to up your sales or
4     anything to that effect?
5  A  No.
6  Q  Is there any sales training, procedures, or conversations
7     you had concerning the amount that you're required or
8     requested to sell throughout the duration of your
9     employment with Absopure?
10 A  No.
11 Q  Is there a single referral that you ever made for
12    Absopure to sell to anybody asking them, hey, come join
13    Absopure?
14 A  No.
15 Q  Were you ever asked to go door to door to door and ask
16    them if they need water services or use Absopure
17    products?
18 A  No, I did not.
19        MR. HANNA:  Okay.  Counsel, if we could go off
20    the record for two minutes, I just want to review my
21    documents, but I might be all set.  Actually, hold on,
22    let's go back on for a minute.  I think there's another
23    document.
24 Q  (BY MR. HANNA):  Did you ever complete DVIRs?  Well, did
25    you ever complete daily vehicle inspection reports

Page 247

1     throughout the duration of your employment with Absopure?
2  A  No.  I didn't get trained how to do that, either.
3  Q  So a DVIR, just so you know, under federal regulations,
4     it's a daily vehicle inspection report.  It's like a 30-
5     or 40-point inspection of things you have to inspect for
6     your vehicle.  Were you ever asked or did you ever
7     conduct those types of inspections for any
8     vehicle throughout the duration of your employment with
9     Absopure?
10 A  Never.  Maybe I just wasn't trained right or something, I
11    don't know.  Nobody ever told me this.
12 Q  How many Saturdays do you believe you worked, on average?
13 A  I worked every other Saturday or every Saturday.  It was
14    not — probably about two, three — two to four times a
15    month, because I was working every other Saturday and
16    sometimes they have you work every Saturday.  It really
17    depends on whose route would be higher that I'd have to
18    help.
19 Q  You kept mentioning an individual by the name of Art.  Do
20    you know who Art — what his last name is?
21 A  No, I don't know.  That's what I was calling him.  I
22    think his name is like Archary or Art.  I don't know what
23    his name is, but something with Art.  That's what I
24    always called him.
25        MR. HANNA:  Understood.  Wendy, if we could go

Page 248

1     back off the record for two minutes.  I just — I need to
2     make a quick phone call.  Otherwise, I might be done.
3        COURT REPORTER:  Okay.  We are off the record
4     at 5:27 p.m.
5        (Off the record at 5:27 p.m.)
6        (Back on the record at 5:33 p.m.)
7        MR. HANNA:  Okay.  I have no further questions.
8     Thank you.
9                RE-EXAMINATION
10 BY MR. ACHO:
11 Q  Mr. Guy, I want to follow up on the questions that you
12    were asked.  You and your lawyer led you to say that you
13    couldn't cross the state lines because of weight limits,
14    is that correct, words to that effect?
15        MR. HANNA:  Objection, form.  Objection, form,
16    for multiple reasons.
17 Q  (BY MR. ACHO):  Go ahead, sir.
18 A  I don't understand the question.
19 Q  Well, do you remember the question your lawyer asked you?
20 A  He asked me a lot of questions.  Which one?
21 Q  The one about crossing state lines.  Do you remember that
22    one?
23 A  Which number is that on here, because he asked me
24    questions about a certain number.  He gave me a number, I
25    read it, and I answered it.

Page 249

1  Q  No, there's no document.  There's no document about
2     crossing state lines.  You said you couldn't do it
3     because of weight limits, words that effect, am I
4     correct, or what was your answer?  Tell me what your
5     answer was.
6        MR. HANNA:  Objection, form.  Misstates prior
7     testimony.
8        MR. ACHO:  Well, I went to hear what he said,
9     that way I won't misstate it.
10 Q  (BY MR. ACHO):  Tell me what you told him.
11        MR. HANNA:  Same objection.  You're asking me
12    to talk?
13        MR. ACHO:  Mr. Guy.
14        THE WITNESS:  What — what was that?
15 Q  (BY MR. ACHO):  Mr. Guy, what's wrong?  I asked you
16    something simple.
17 A  You didn't ask me anything specific.  You just said
18    something about the weight limit and driving out of
19    state.
20 Q  Well, wait a minute.  Your lawyer asked you about
21    crossing state lines.  Do you remember what you said?
22 A  I don't even know which question you're talking about.
23 Q  It was the first area of questioning that he asked you
24    about.  You said something to the effect of you couldn't
25    cross state lines because of certain weight limits.  Do

JUSTIN GUY
July 15, 2021

Page 250

```
 1   you remember that?
 2          MR. HANNA:  Objection, form.
 3          THE WITNESS:  Is that on paper somewhere, or I
 4   don't know which --
 5          MR. ACHO:  No, no.
 6          THE WITNESS:  I don't know which -- which
 7   exhibit should I be looking at?  I'm confused.
 8          MR. ACHO:  There's no --
 9          MR. HANNA:  He clearly doesn't remember -- he
10   doesn't remember or know what you're talking about.  Just
11   ask him the underlying question, ask him what you want to
12   ask him, instead of being --
13          MR. ACHO:  I did, I did.
14 Q     (BY MR. ACHO):  You said that you couldn't cross state
15   lines because there was a weight limit, okay, there was a
16   certain weight limit.  Do you remember that or no?
17   That's words you used.
18          MR. HANNA:  Objection to form.
19          THE WITNESS:  I didn't have no -- nothing to do
20   with state lines, because I had routes that didn't go out
21   of the state, so I don't see what you're getting with
22   this.
23 Q     (BY MR. ACHO):  But your lawyer asked you about that, and
24   he said isn't it true there is certain weight limits.
25 A     Didn't I answer it with a yes or no answer?
```

Page 251

```
 1 Q     Sir, didn't you say, yeah, I -- you can't cross state
 2   lines because of certain weight limits and you didn't
 3   have a CDL for that, correct?  Isn't that what you told
 4   him?
 5          MR. HANNA:  Objection, form.
 6 Q     (BY MR. ACHO):  Isn't that what you told him?
 7 A     I remember answering him with yes or no questions --
 8   answers, so I don't know what you're talking about.
 9 Q     Okay.  So here, not 20 minutes ago, 15 minutes ago, you
10   testified under oath about this area, and now you're
11   saying you have no recollection.  That's what you're
12   telling us, right?
13          MR. HANNA:  Objection to form.  You're not
14   being fair with the witness, sir.
15          MR. ACHO:  You want to help?  Listen --
16          MR. HANNA:  You've been asking questions for
17   eight hours today --
18          MR. ACHO:  No, no --
19          MR. HANNA:  -- and you're misstating the
20   question, and then you're like holding him to task.  It's
21   something that you couldn't do yourself.  It's not fair.
22          MR. ACHO:  It's 20 minutes ago.  Tell him what
23   you asked him, that first area of questions.  Go ahead,
24   help him.
25          MR. HANNA:  Go ahead and help him?  No, I'm not
```

Page 252

```
 1   here to help my client.  He's here to testify, so you can
 2   go ahead and conduct your deposition.  I'm not going to
 3   help you, either.
 4 Q     (BY MR. ACHO):  Sir, your vehicle was under the weight
 5   limit and you could have crossed state lines legally,
 6   couldn't you?
 7          MR. HANNA:  Objection, form.
 8          THE WITNESS:  No.
 9 Q     (BY MR. ACHO):  No, what?
10 A     I couldn't cross state lines.  I had a route within
11   Detroit, Michigan.  I don't know why you keep asking me
12   that.
13 Q     No, I didn't ask you about what route you had.
14 A     You asked me a question.
15 Q     I'm talking about legally.  No --
16 A     I gave you an answer.
17 Q     No, no --
18 A     I can't go across state lines.
19 Q     No, wait, please.  We're talking about weight limits.
20   Your truck legally can cross state lines, couldn't it?
21          MR. HANNA:  Objection to form.
22 Q     (BY MR. ACHO):  Or tell me you don't know.  No, you don't
23   know?
24 A     I don't know.
25          MR. HANNA:  Objection to form.
```

Page 253

```
 1 Q     (BY MR. ACHO):  No, what?
 2 A     My answer is no.  Can you ask the next question?
 3 Q     No, I don't understand your question.  Is it, no, it
 4   couldn't --
 5 A     The answer is no.
 6 Q     Is it no, it couldn't go across state lines because of
 7   weight limits?  Is that your answer, what "no" meant?
 8 A     My answer was, no, I don't have to go across state
 9   lines, because my personal route --
10 Q     I didn't ask you -- I didn't ask you that.  I'm following
11   up with what your lawyer asked.  Legally --
12          MR. HANNA:  You're asking for something
13   completely different.
14 Q     (BY MR. ACHO):  Legally --
15          THE WITNESS:  Exactly, that's exactly what he's
16   doing.
17 Q     (BY MR. ACHO):  Legally could you have crossed state lines
18   with that truck, legally?
19 A     No.
20 Q     Why?  Why?  Why?
21          MR. HANNA:  Objection to form.
22 Q     (BY MR. ACHO):  Yes, why?
23 A     That's not my job.  I didn't get hired to drive across
24   state lines, so why would I drive across state lines?
25   You're not making sense.
```

JUSTIN GUY
July 15, 2021

Page 254

1 Q Okay. All right, sir. I apologize if I'm not making
2   sense. What I'm trying to figure out, too, is something
3   else. Exhibit 15 clearly says that you got involved with
4   the training for the CDL on February 4th, 2020. Are you
5   denying under oath that that's accurate, as opposed to
6   your recollection?
7 A What's your question?
8   MR. ACHO: Wendy --
9   THE WITNESS: Stop using big words. I don't
10  know which part -- I only got a high school -- all I got
11  is a high school diploma. I ain't gone to college. You
12  got to use small words for me for like the twentieth
13  time, okay?
14  MR. ACHO: Wendy --
15  MR. HANNA: This is part of my -- this is part
16  of my ongoing objection in that regard.
17 Q (BY MR. ACHO): Sir, let me understand something. You
18  gave your lawyer an opinion of when you started your
19  truck driver training; is that correct?
20 A I gave him an estimate when I first went into the school.
21 Q Which was the end of January, you said, right?
22 A Yes, that was --
23 Q Or early February, right? Or early February, correct?
24 A No. I said in between, yeah, but the dates --
25 Q Yeah, but look at --

Page 255

1 A On 15, it says the day was the 4th, which means I was in
2   the school prior the end of January to sign up for
3   school. You can't just go to school and start school the
4   same day.
5 Q This doesn't say that. It says February 4th, that's what
6   it says.
7   MR. HANNA: Mr. Acho --
8   THE WITNESS: You signed up for college and
9   went to college the same day you signed up, or did you
10  have to get approved and accepted first?
11 Q (BY MR. ACHO): Okay. Mr. Guy, we're going to move on.
12 A No, no, no. You should stay here, because I like what
13  you're trying to get to.
14  MR. HANNA: No, Mr. Guy, you don't get to ask
15  him questions.
16  THE WITNESS: All right. My fault, sorry.
17  MR. ACHO: Let's go to -- let's go to admission
18  number four.
19  MR. HANNA: That's -- for the record, Mr. Guy,
20  that's Exhibit No. 17, I believe.
21  THE WITNESS: Oh, 17?
22  MR. ACHO: How about 19?
23  MR. HANNA: No, I'm sorry --
24  THE WITNESS: Exhibit 19.
25  MR. HANNA: Gotcha.

Page 256

1   THE WITNESS: 19? Okay.
2 Q (BY MR. ACHO): Okay. Mr. Guy, let me ask you this. When
3   your lawyer was asking you questions, he was asking about
4   your trips to people's homes, right?
5 A He was asking me about my employment at Absopure.
6   MR. HANNA: Objection to form.
7 Q (BY MR. ACHO): No, sir. No, no. We're dealing with this
8   issue. He was asking you about the customers, when you
9   went to their home in terms of selling them, and you
10  would describe taking in bottles and getting return
11  bottles, correct?
12  MR. HANNA: Objection, form. Misstates prior
13  testimony. See, you're partial truth and adding the word
14  "sell" to try to confuse the witness at 4:50 after a
15  10-hour deposition. The record is very clear in what
16  you're doing. We all know what you're doing.
17  THE WITNESS: I delivered the products that --
18  Absopure had already had people that was buying. I
19  didn't sell anything. I just delivered the water.
20 Q (BY MR. ACHO): Mr. Guy, you went -- you would have 30
21  stops a day?
22 A Yeah.
23  MR. HANNA: Objection --
24  THE WITNESS: Yeah, more. Plus more.
25 Q (BY MR. ACHO): More? More than 30? Just tell me.

Page 257

1 A Plus more, depending on the day.
2 Q Okay. How many of them were residential and how many
3   were non-residential?
4   MR. HANNA: Objection, form.
5   THE WITNESS: Man, I don't really know off the
6   top of my head.
7 Q (BY MR. ACHO): I mean, you did this for a year
8   and-a-half. You would know, because you even know
9   percentages. So how many percentage were residential and
10  how many were not?
11  MR. HANNA: Objection, form.
12  THE WITNESS: 50/50.
13 Q (BY MR. ACHO): 50/50, okay. Now, on the non-residential,
14  you had stores, you had schools, you had businesses that
15  you sold to, right? That you delivered to?
16 A No, no.
17 Q What do you mean?
18 A I didn't sell water to no stores, I didn't sell no water
19  to no businesses, I didn't sell no water to nobody.
20  Absopure --
21 Q I'm not just talking about water. You had all these
22  other products you sold?
23 A That's not so.
24 Q Did you have a whole list? Wait.
25 A I gave them what them what they -- Absopure told me to

JUSTIN GUY
July 15, 2021

Page 258

1  give them.  I didn't sell anything.
2 Q  Well, sir —
3 A  I delivered.
4 Q  When you went to these stores, you would tell them about
5     new products, wouldn't you?  You'd have to —
6 A  No.
7 Q  — otherwise, how could they order it?  How could they
8     order it?
9 A  Ask Absopure, the people that put everything through the
10    — they the ones who did all that stuff.  I don't have —
11    all I did — I got paid to deliver Absopure's goods.
12    That's all I did.
13 Q  Do you remember the second question I asked you, that you
14    were described as a good salesman?  Do you remember that
15    question?
16         MR. HANNA:  Objection.
17 Q (BY MR. ACHO):  Do you?
18 A  No, you asked if I was a good employee.  You didn't say
19    nothing about —
20 Q  No, sir.
21 A  — salesman, because I'm not a salesman.
22 Q  No, no, no, no.
23         MR. HANNA:  Well, Mr. Acho —
24         MR. ACHO:  When we get the transcript —
25         MR. HANNA:  Mr. Acho —

Page 259

1         MR. ACHO:  — it will say this.
2         MR. HANNA:  Is this a game?
3         MR. ACHO:  You agree —
4         MR. HANNA:  — of talking over —
5         COURT REPORTER:  Excuse me, excuse me, excuse
6     me.  There is so much overlapping, I cannot understand,
7     sorry.
8         MR. HANNA:  Yeah, Mr. Acho, please don't cut
9     him off when he's in the middle of his testimony and say
10    no, no, no, no, no, because you don't like it.  That's
11    inappropriate.
12         THE WITNESS:  Right.  Ask the question and I'll
13    tell you.
14 Q (BY MR. ACHO):  Mr. Guy, didn't you agree that you were a
15    good salesman?
16         MR. HANNA:  Objection, form.
17 Q (BY MR. ACHO):  Do you agree with me?
18         MR. HANNA:  Objection, form.
19         MR. ACHO:  Okay, you never said that.  All
20    right.  We'll go by what the record shows.
21         MR. HANNA:  Mr. —
22 Q (BY MR. ACHO):  Let me ask you this.
23         MR. HANNA:  Mr. Acho, please let me state my
24    objection for the record.  Objection, form.  Misstates
25    prior testimony.  Thank you.

Page 260

1 Q (BY MR. ACHO):  So my understanding is you never asked
2     customers if they needed additional products?  You never
3     asked them that?
4         MR. HANNA:  Objection, form.
5 Q (BY MR. ACHO):  Go ahead.  Answer it, please.
6         MR. HANNA:  Misstates prior testimony again.
7 Q (BY MR. ACHO):  Please, go ahead.
8 A  If anybody wanted extra anything, they would ask me for
9     it.  If they didn't ask me for it, I gave them whatever
10    they had empty.
11 Q  So you never asked defendant's customers if they needed
12    additional products?  You never did, did you?
13         MR. HANNA:  Objection, form.  Misstating his
14    testimony.
15 Q (BY MR. ACHO):  Go ahead.  Is that correct?
16 A  I was at a delivery to deliver product.  Why would I ask
17    them if they need extras?
18 Q  Well, that's what you said in your admission number four.
19    So now you're changing your testimony, aren't you?
20         MR. HANNA:  You're trying to harass him and
21    confuse him.  He already answered it.
22         MR. ACHO:  You know what?  We'll move on, we'll
23    move on.  We'll —
24         MR. HANNA:  Well, now you have to redirect him,
25    because you're trying to do that.

Page 261

1         MR. ACHO:  Well, I got admission number four,
2     so we'll just deal with that at another time.  You want
3     to ask him more, we'll keep on going.
4 Q (BY MR. ACHO):  Sir, on the documents you were given to
5     sign, no one told you you are not permitted to read them,
6     did they?  No one said you're not permitted to read them,
7     correct?
8 A  They told me it was not important, so why would I read
9     something that's not important?
10 Q  Okay.  I want you to listen to my question and answer my
11    question, not what you want to say.  There was no one at
12    Absopure that told you you could not read the documents,
13    correct?
14         MR. HANNA:  Objection, form.  Asked and
15    answered many, many, many times.
16         THE WITNESS:  I was going to give him the same
17    answer again, because I don't understand.  I just told
18    you an answer.  My answer is not good enough for you or
19    something, because I said it?
20 Q (BY MR. ACHO):  It's not accurate.  You're not answering
21    my question.  Did anyone at Absopure say you cannot
22    sign — you cannot read these documents?  Did anyone say
23    that to you, yes or no?
24 A  They told me I didn't have to read it, so basically yes.
25 Q  They didn't direct you to say you cannot read it?

Page 262

1 A They told me I didn't have to. Why would I read
2 something they told me I didn't have to?
3 Q Okay — oh, if they said you don't have to, then you had
4 free will, you could either read it and sign it or not
5 read it and sign it; isn't that true? You had free will,
6 correct? Correct?
7 A No, no.
8 Q You didn't have free will?
9 A No, I did not.
10 Q No one stopped you from reading it, did they?
11 A Nobody forced me to read it either, did they?
12 Q No, no, we're not talking about forcing you to read.
13 We're talking about they didn't force you not to read it,
14 did they?
15 MR. HANNA: Objection, form. You can answer.
16 THE WITNESS: I just answered your question.
17 You want me to answer it again?
18 Q (BY MR. ACHO): Did anyone force you not to read it, yes
19 or no?
20 A They told me I didn't have to read it. So if you're
21 telling me — you trying to hear me say they told me not
22 to tell me not to read it, you're not making sense. They
23 told me it's not important, just sign the paper. That's
24 what I'm — that's my answer, it's not going to change.
25 It's not important, sign the paper, come to work

Page 263

1 tomorrow, that's what I was told. That's what got me in
2 this position right now.
3 Q What do you mean, it got you in the position you're in
4 now? Can you explain that to me?
5 A Working and not getting paid for it.
6 Q Well, how did they put you in that position when you
7 chose not to read the associate handbook and you chose
8 not to read the driver's manual? You chose not to read
9 them, didn't you?
10 A I didn't get hired if I read the stuff. If they would
11 have told me read this and come get hired, then that's
12 different. They don't do that. They just hired me —
13 threw stuff at me, I signed the stuff, I gave back
14 whatever they gave me, I walked out, I had a job. That's
15 better than anything. I don't know what you're asking.
16 Q But Absopure didn't put you in that position, you put
17 yourself in that position?
18 A To work for a dirty company, yes, I did. They cut me a
19 deal.
20 Q Did you say a dirty company?
21 A Yeah, that's a dirty company. I don't like — they don't
22 even make sense.
23 Q But didn't you tell us that you liked working there?
24 Didn't you tell us that under oath?
25 A What — "dirty" and "liking," that's even not comparable.

Page 264

1 Q So —
2 A My house is dirty, but I like being at home. What's your
3 point?
4 Q So you think a dirty company can be a nice place to work?
5 Is that what —
6 MR. HANNA: Objection. Mr. Acho, who cares?
7 Relevance, who cares?
8 MR. ACHO: Credibility.
9 MR. HANNA: Who cares if you like to work
10 there, why does it matter?
11 MR. ACHO: Credibility.
12 MR. HANNA: Credibility of what? Okay.
13 Q (BY MR. ACHO): So you're telling us that it can be nice
14 to work at a dirty company. That's what you're telling
15 us, correct?
16 A I don't understand what you're saying. It can be nice to
17 work at a dirty company?
18 Q Yeah, that's what you're telling us. You said it was a
19 nice company, but it was dirty. That's what you are
20 telling us, unless you —
21 A If you're delivering goods for a certain person, and it's
22 dusty, got green stuff in the water, pencils, papers, and
23 I'm returning it because people are complaining to me
24 about green stuff in the water, water machines got black
25 stuff all in it, mold, that's some dirty shit — I mean,

Page 265

1 that's some dirty stuff. Excuse my language. That's
2 some dirty stuff. That don't mean I'm about to quit my
3 job because they're selling dirty water, dirty equipment,
4 bottles that are being recycled that they're not telling
5 people about. Yes, that's dirty, but would I still work
6 there? Yes.
7 Q So when you talk about "dirty," you're not talking about
8 underhanded, you're talking about some of the products
9 are not wholesome, right? That's what you're saying,
10 right?
11 A Well, what — you using big words again, you got to
12 explain it. I tried telling you once. I don't know how
13 many times I got to tell you I don't know big words.
14 Q Okay. Well, let me ask you this. If a customer had a
15 complaint about any product, did you take care of it?
16 A Yeah. I gave them a fresh one.
17 Q Okay.
18 A That's my job. That's why I said it's a dirty company,
19 but I like what I do.
20 Q Okay, wait a minute. Let's take this a step at a time,
21 because you brought up something new.
22 MR. HANNA: Do we really need to? Is it
23 relevant, Mr. Acho? Really, is it relevant?
24 MR. ACHO: Unless he strikes what he said.
25 Unless he strikes it, I'm going to ask about it, because

**Page 266**

```
1    he brought it up.
2             MR. HANNA:  You don't have to yell.  I mean,
3    I'm just -- I'm just talking to you, because you're the
4    lawyer and you should know what's relevant or not and
5    what's wasting everyone's time.
6             MR. ACHO:  Well, I'm very, very disturbed about
7    what he's saying.
8    Q   (BY MR. ACHO):  Did you report --
9             MR. HANNA:  Even if you're disturbed, who
10   cares?  It's not -- this isn't a lawsuit about that, who
11   cares?  We're not suing for dirty products.
12   Q   (BY MR. ACHO):  Okay.  Did you report any returns to the
13   company and why the products were being returned?
14   A   You said, did I report it?
15   Q   Yeah.
16   A   I mean, I took it back and told them, yeah, but write it
17   down, no, I don't get paid for that.  I get paid to
18   deliver water, I don't get paid to complain about what
19   somebody else got at my job.  I fixed what their problem
20   was, they should be happy.  I gave them the dirty water
21   back, and they should be happy.
22   Q   Well, what my point is the company, Absopure, was
23   concerned and they wanted to rectify any issues that were
24   presented to you, correct?  They wanted to rectify them?
25   A   You're using big words again.  That's not correct.  I
```

**Page 267**

```
1    don't know what you're saying.
2    Q   "Rectify" means take care of.
3             MR. HANNA:  Objection.
4             THE WITNESS:  I still don't know.
5    Q   (BY MR. ACHO):  So Absopure wanted to take care of the
6    problems of any customer, true?
7    A   Yeah, they would take care of the problem, just give them
8    another water that's not dirty, but it shouldn't be like
9    that in the first place.
10   Q   Well, didn't they look into it, or you don't know?
11   A   They didn't look into it, they don't care.
12   Q   How do you know?  How do you know that?
13   A   Because I worked there --
14            MR. HANNA:  Mr. Acho, why are you badgering --
15   Q   (BY MR. ACHO):  How do you even know, though?
16            MR. HANNA:  -- how he knows that the product is
17   dirty?  Who cares, it's irrelevant.
18            MR. ACHO:  It goes to credibility.
19            MR. HANNA:  We're not -- no, it doesn't.  We're
20   not suing about dirty products, this is not that.  This
21   is an overtime lawsuit.  It's 6:00 p.m., what are we
22   doing?
23   Q   (BY MR. ACHO):  You don't know what the company did or
24   didn't do when you brought these issues to their
25   attention, correct?
```

**Page 268**

```
1    A   What you mean?
2    Q   Well, you satisfied the customer, you brought back
3    product that was defective.  You don't know what the
4    company did after that, do you?
5    A   Yeah, I do.  I worked there for two years.  I don't know
6    what you're speaking, but everybody talks, so --
7    Q   What did the company do to take care of those
8    deficiencies, if you know?
9    A   They paid a couple million dollars to get a new water
10   machine inside the warehouse, and the same stuff still
11   started to happen, if you really need to know.
12   Q   Okay.  Let me ask you this.
13   A   And they started firing the temp agencies, because they
14   paid for those new machines.
15            MR. HANNA:  I'm going to -- we're getting to
16   the point where I'm going to call this, because you're
17   going beyond the line of redirect.
18            MR. ACHO:  Well, --
19            MR. HANNA:  You're -- you're -- you're after
20   redirect, so you're supposed to limit your questions,
21   sir, to what I directed him on.
22            MR. ACHO:  I did.  He opened up the door, I
23   didn't.
24            MR. HANNA:  But, sir, you're the lawyer.  You
25   know this doesn't matter.  Who cares what he thinks about
```

**Page 269**

```
1    this?  It has nothing to do with this lawsuit, it doesn't
2    matter.
3    Q   (BY MR. ACHO):  Let me ask you this, sir.  You brought up
4    that you were never trained to sell anything; is that
5    true?  No one ever talked to you at all about how to sell
6    product; is that your testimony?
7    A   I never was taught, I never went to sales training
8    meetings, I never even been approached as a sales
9    representative for Absopure.  My driver -- my application
10   from Absopure says "driver."
11   Q   I know.
12   A   I'm a driver.
13   Q   I know, I know, but --
14   A   So --
15   Q   But they have new products come out all the time, don't
16   they?
17   A   No.
18   Q   They don't have new products come out?
19   A   Everything -- I never dealt with nothing brand-new from
20   when I first started working there.  Everything I did, I
21   did the same thing before.  There was nothing new.
22   Q   Okay.  So your sworn testimony is for 18 months while you
23   were at Absopure, they had no new products that guys like
24   you were told to sell.  That's your sworn testimony,
25   correct?
```

JUSTIN GUY
July 15, 2021

Page 270

1  A    You asked me did I sell anything new while I was working
2       there.  When I was working at Absopure, there ain't
3       nothing come out brand-new.  Everything that they had
4       when I started working was the same thing I delivered
5       when I got fired.
6  Q    That's okay.  The last thing is, you don't know anything
7       about the daily vehicle inspection reports, correct?  You
8       know nothing about that?
9  A    I never did that.  I wasn't — I wasn't trained properly.
10      Nobody trained me to do that.
11 Q    Okay.  I didn't ask you that.  You don't know whether
12      they were done by the company, do you?  You don't know
13      anything about it?
14 A    They wasn't, they wasn't, because I see — I saw other
15      people doing it every morning, but I didn't do it because
16      I wasn't trained on that.
17 Q    I mean, so you saw the vehicles inspected?  You saw it?
18 A    Yeah, people — I saw people climbing in and walking
19      around, but I ain't — I ain't ever did that.  I was
20      never told to, I had to do that.
21 Q    I didn't ask you whether you did, but other people did?
22 A    You asked me did the company do it, and I said no.  Is
23      that helpful?  The company didn't do it.
24 Q    No, no.  Who did it, then?  If the company didn't do it,
25      who did it?

Page 271

1             MR. HANNA:  All right, wait.  You know, madam
2       court reporter, do you know what time we're on?  I think
3       it's time to go at this point.  Are we at seven hours
4       yet?
5  Q    (BY MR. ACHO):  Okay, last question.  You don't know who
6       did those inspections, do you?
7             MR. HANNA:  Objection, form.
8             THE WITNESS:  The drivers.
9             MR. ACHO:  Okay.  I have no further questions.
10            MR. HANNA:  I have two follow-up.  Mr. Guy —
11            MR. ACHO:  Well, I may have some more, then,
12      too.  Don't hold me, because —
13            MR. HANNA:  Well, with your time limit —
14            THE WITNESS:  No, no.  No, you're not, not if
15      it's your questions.
16            MR. HANNA:  Well, you can take it to the court,
17      and I can him show the record.  I can show him how you
18      spent hours asking about termination, as if this is a
19      termination suit.  Asking him if he complained to the
20      department of civil rights on a wage and hour case?  It
21      doesn't even make sense.  So we can go into all that and
22      you can see if the court will give you more time.  Let me
23      ask my two questions.
24                        RE-EXAMINATION
25

Page 272

1  BY MR. HANNA:
2  Q    First question, very simple.  If you could take a look at
3       Exhibit 19, number four, and read the answer, Mr. Guy,
4       and let me know what you're done reading it.
5             COURT REPORTER:  For the — do you want him to
6       read it to himself or out loud?
7             MR. HANNA:  You can read it to yourself.  Just
8       for the record, I have asked Mr. Guy to read Exhibit 19,
9       number four, the question and the answer.  Please, read
10      it to yourself, sir, and let us know when you're done.
11            THE WITNESS:  Okay, I read it.
12 Q    (BY MR. HANNA):  All right.  Is that answer true and
13      accurate?
14 A    Yes.
15 Q    Is there anything wrong with that answer?
16 A    No.
17 Q    Okay, last question.  The DVIR inspections, other people,
18      do you know if anyone else at Absopure did a DVIR?
19 A    I just — not really.  I just saw them like — people
20      would just like early in the morning just look at their
21      trucks and check their oil, that was it.  Like I —
22 Q    So you saw people early in the morning check their trucks
23      and, I'm sorry, you said check their truck and the oil;
24      is that correct?
25 A    Yeah.  Like people was climbing on top and looking at oil

Page 273

1       and stuff like that.
2  Q    Okay.  Do you know what they were doing?
3  A    No.  They were just checking their truck and stuff.
4  Q    Okay.  So just to be fair -- to be accurate, you don't
5       know if they were doing a DVIR inspection, but what you
6       have testified is you recall them going around the truck
7       and checking the oil; is that correct?
8  A    Yeah, yeah, yeah.
9             MR. HANNA:  Okay.  I don't --
10            THE WITNESS:  I ain't know nothing about a
11      DVIR.
12 Q    (BY MR. HANNA):  I'm sorry?
13 A    Yeah, I said yeah, because I ain't know about a DVIR.
14      Like I never got trained to do that.
15 Q    And that was my next question.  Did you ever get trained
16      as to what a DVIR even is?
17 A    No.
18            MR. HANNA:  Okay.  I have no further questions.
19            MR. ACHO:  We're done, we're done.
20            (Proceedings concluded at 6:03 p.m.)
21            (Exhibit 23 marked for identification.)
22
23
24
25

JUSTIN GUY
July 15, 2021

Page 274

CERTIFICATE OF NOTARY PUBLIC

1
2
3  DEPONENT:  JUSTIN GUY           ( STATE OF MICHIGAN )
   RECORDED:  July 15, 2021       (          SS        )
4                                 (COUNTY OF OGEMAW    )
5          Being a notary public duly commissioned and
   qualified in and for the State of Michigan at Large, I
6  do hereby certify that pursuant to notice there came
   before me remotely the deponent herein, who was by me
7  first duly sworn to testify to the truth and nothing but
   the truth touching and concerning the matters in
8  controversy in this cause.
9          Being thereupon carefully examined under
   oath, said examination was recorded stenographically,
10 and was later reduced to transcription under my
   supervision; said transcription being a true record of
11 the testimony given by the witness.
12         I further certify that I am neither attorney
   or counsel for, nor related to or employed by any of
13 the parties to the action in which this deposition was
   taken; and, further, that I am not a relative or
14 employee of any attorney or counsel employed by the
   parties hereto, or financially interested in the
15 action.
16         IN WITNESS WHEREOF, I have hereunto
   subscribed my signature on July 27, 2021.
17
18
19
   NOTARY PUBLIC
20 OGEMAW COUNTY, MICHIGAN
   MY COMMISSION EXPIRES:
21 December 25, 2026          Wendy L. DeMatio, CSR-3851
22
23
24
25