UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JUSTIN GUY, individually and on behalf
of those similarly situated,

    Plaintiff,                    Case No. 20-12734

v.                              Hon. Mark A. Goldsmith

ABSOPURE WATER COMPANY

    Defendant.

_____/

**<u>OPINION & ORDER (1) DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Dkt. 55) AND (2) GRANTING IN PART AND DENYING IN PART PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT (Dkt. 56)</u>**

Two motions are before the Court: Defendant Absopure Water Company's motion for summary judgment (Dkt. 55), and Plaintiff Justin Guy's cross-motion for summary judgment (Dkt. 56). For the following reasons, the Court denies Absopure's motion for summary judgment and grants in part and denies in part Guy's cross-motion for summary judgment.[1]

**I. BACKGROUND**

Guy is a former employee of Absopure, where he worked as a driver transporting products within the state of Michigan. Some of those products, including products from coffee brands such as Starbucks, Maxwell House, Folger's, and Green Mountain, as well as water products from

---

[1] Because oral argument will not aid the Court's decisional process, the motions will be decided based on the parties' briefing. See E.D. Mich. LR 7.1(f)(2); Fed. R. Civ. P. 78(b). In addition to Absopure's motion for summary judgment, the briefing includes Guy's response (Dkt. 59) and Absopure's reply (Dkt. 62). In addition to Guy's motion for summary judgment, the briefing includes Absopure's response (Dkt. 61) and Guy's reply (Dkt. 63). The briefing also includes Absopure's notice of supplemental authority (Dkt. 65) and Guy's response to that supplemental authority (Dkt. 67).

Mountain Valley, originated outside of the state of Michigan. Guy delivered Folger's, Maxwell House, and Starbucks coffees, Mountain Valley water products, and other products that originated out-of-state for Absopure during his employment. Guy and Absopure have stipulated to treating products from Mountain Valley as representative of goods that drivers delivered that originated outside of Michigan. A third-party carrier, JB Hunt, transported the Mountain Valley products across state lines from Arkansas to a warehouse in Michigan. Guy was paid a daily rate of $120.00 plus commission for products sold and was not paid overtime for hours worked in excess of 40 per week. He brought suit claiming that Absopure violated the Fair Labor Standards Act (FLSA) by not paying him overtime for hours worked in excess of 40 per week. Absopure argues that he falls under the Motor Carrier Act (MCA) exemption to the FLSA and is not owed overtime wages.

## II. ANALYSIS[2]

Absopure requests that the Court grant summary judgment in full and dismiss Guy's case with prejudice. Absopure Mot. at PageID.836. Specifically, Absopure seeks a decision that: (i) the MCA exemption applied to Guy's work activities, and (ii) Guy cannot establish that he

---

[2] In assessing whether either party is entitled to summary judgment on any claim, the Court applies the traditional summary judgment standard as articulated in Scott v. Harris, 550 U.S. 372, 380 (2007). The movant is entitled to summary judgment if that party shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). If the movant makes an initial showing that there is an absence of evidence to support the nonmoving party's case, the nonmovant can survive summary judgment only by coming forward with evidence showing there is a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324–325 (1986).

Because the employer has the burden of establishing that an employee meets each element of a claimed exemption to the FLSA, a plaintiff who moves for summary judgment is entitled to summary judgment "unless the defendant can come forward with evidence at least creating a genuine issue of material fact as to whether [the plaintiff] meets each and every element of the exemption." Martin v. Indiana Michigan Power Co., 381 F.3d 574, 578 (6th Cir. 2004). Where the defendant "fails to proffer such evidence, not only must its motion for summary judgment be denied, but summary judgment for [the plaintiff] must be granted." Id.

sustained any economic damages. Id. at PageID.843. Absopure's motion is denied because Absopure has not conclusively demonstrated that the MCA exemption applied or that Guy is unable to establish damages.

Guy, on the other hand, moves for summary judgment and seeks a decision that: (i) he was not exempt under the MCA; (ii) he is entitled to liquidated damages; and (iii) his claims are subject to a three-year statute of limitations because Absopure willfully violated the FLSA. Guy Mot. at PageID.1249–1250. Summary judgment is denied as to the first and third points because questions of fact remain as to the applicability of the MCA exemption and whether any violation of the FLSA was willful. As to the second point, the Court finds that any good faith defense to the imposition of liquidated damages fails as a matter of law.

**A. The Motor Carrier Exemption to the FLSA**

The FLSA requires employers to pay their employees at least 1.5 times their regular rate of pay for work in excess of 40 hours per week. 29 U.S.C. § 207(a). This requirement, however, does not apply to "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of Title 49[.]" 29 U.S.C. § 213(b)(1). Title 49 U.S.C. § 31502 is the Motor Carrier Act.

"The MCA . . . gives the Secretary of Transportation the authority to regulate the hours of an employee (1) who works for a private motor carrier that provides transportation in interstate commerce and (2) whose work activities affect the safety of operation of that motor carrier." Vaughn v. Watkins Motor Lines, Inc., 291 F.3d 900, 904 (6th Cir. 2002) (punctuation modified). The parties agree that the Secretary has the power to establish qualifications and maximum hours for truck drivers only if they are engaged in interstate commerce for purposes of the MCA.

Absopure Mot. at PageID.859; Guy Mot. at PageID.1268. See Baird v. Wagoner Transp. Co., 425 F.2d 407, 410 (6th Cir. 1970); see also 29 C.F.R. § 782.2(a).

While Absopure argues that the MCA exemption should be broadly construed, Absopure Mot. at PageID.858, and Guy argues that it should be narrowly construed, Guy Mot. at PageID.1266, FLSA exemptions—including the MCA exemption—are subject simply to "fair readings." Encino Motorcars, LLC v. Navarro, 138 S. Ct. 1134, 1142 (2018); Sec. of Labor v. Timberline S., LLC, 925 F.3d 838, 850 (6th Cir. 2019).

**1. The Interstate Commerce Prong of the MCA Exemption**

The parties agree that Absopure is a private motor carrier and that Guy was engaged in work that affects the safety and operation of motor vehicles on public highways. They disagree about whether Guy was engaged in interstate commerce. It is undisputed that Guy drove only within the state of Michigan, but drivers whose intrastate transportation is "part of a continuous movement in interstate commerce" are also subject to the MCA exemption. Baird, 425 F.2d at 410 (punctuation modified). Whether there was a "practical continuity of movement in interstate commerce" depends on the "essential character of the movement." Mazzarella v. Fast Rig Support, LLC, 823 F.3d 786, 791 (3d Cir. 2016) (punctuation modified); Packard v. Pittsburgh Transp. Co., 418 F.3d 246, 255 (3d Cir. 2005); see also Musarra v. Digital Dish, Inc., 454 F. Supp. 2d 692, 705–706 (S.D. Ohio 2006).

**a. Interstate Factor Analysis**

Much of the parties' briefing is devoted to arguments about the test that should be used to determine whether Guy was transporting goods in a practical continuity of interstate movement. While the parties propose different tests, both tests focus primarily on whether "the shipper" of the

4

goods has a "fixed and persisting intent" that the out-of-state goods continue in interstate commerce after passing through a warehouse. See Baird, 425 F.2d at 410.

Guy argues that the appropriate test for determining the shipper's intent is set forth in industry guidelines issued by the Interstate Commerce Commission (ICC) in 1957 (Ex Parte No. MC-48), which are also referenced in the 2016 Department of Labor (DOL) Field Operations Handbook § 24d02(a) (Dkt. 59-18).[3] Guy Resp. at PageID.2945. However, multiple circuit courts have determined that MC-48 no longer provides the operative test. See California Trucking Ass'n v. I.C.C., 900 F.2d 208, 213 (9th Cir. 1990); Central Freight Lines v. I.C.C., 899 F.2d 413, 421 (5th Cir. 1990); Roberts v. Levine, 921 F.2d 804, 811–812 (8th Cir. 1990); Mena v. McArthur Dairy, LLC, 352 F. App'x 303, 306 n.2 (11th Cir. 2009).

Absopure argues that this Court should look to guidelines issued by the ICC in 1992 (the MC-207 factors). MC-207 states that "the shipper's" intent "is ascertained from all the facts and circumstances surrounding the transportation." MC-207, 57 Fed. Reg. at 19812 (Dkt. 55-25). While the memorandum does not expressly define the role of "the shipper," it states that the following factors can indicate interstate intent: (i) the shipper bases its determination of volume to be shipped on projections of customer demand that have some basis in fact; (ii) no processing or substantial modification takes places at the warehouse; (iii) while in the warehouse, the merchandise is subject to the shipper's control and direction; (iv) modern systems allow tracking and documentation of most or all shipments coming into and departing from the warehouse; (v)

---

[3] MC-48 provides that there is no interstate intent where (i) "at the time of shipment there is no specific order being filled for a specific quantity of a given product to be moved through to a specific destination" beyond the warehouse; (ii) the warehouse "is a distribution point or local marketing facility from which specific amounts of the product are sold or allocated," and (iii) "transportation in the furtherance of this distribution within the single State is specifically arranged only after sale or allocation from storage." Baird, 425 F.2d at 410–411.

the shipper ultimately bears the costs of transportation; (vi) the warehouse is owned by the shipper; and (vii) shipments move through the warehouse pursuant to a storage-in-transit provision.[4] Id. "[N]o particular factor is, in and of itself, determinative." Musarra, 454 F. Supp. 2d at 711.

Recent lower court decisions tend to utilize the MC-207 factors. See Smith v. Coastal Produce Dist., Inc., No. 19-13095, 2021 WL 1026910, at *4 (E.D. Mich. Mar. 17, 2021) (slip copy); Finn v. Dean Transp., Inc., 53 F. Supp. 3d 1043, 1054–1055 (M.D. Tenn. 2014); Musarra, 454 F. Supp. 2d at 711. But the relevance of some of these MC-207 factors to the Secretary's authority to regulate certain employees is not particularly clear, and MC-207 does not explain how courts should weigh the various criteria. See Collins v. Heritage Wine Cellars, Ltd., 589 F.3d 895, 899 (7th Cir. 2009) (describing difficulties with applying the MC-207 factors and electing to rely on four of the listed criteria which "ma[d]e sense" for purposes of the interstate inquiry).

Other courts have articulated factors to be considered that do not precisely track either MC-48 or MC-207 and look to the intent and conduct of the "employer," not the "shipper," in conducting the analysis. See, e.g., Mazzarella, 823 F.3d at 791 (considering (i) "whether and to what extent a product pauses in a warehouse or other location during transport before reaching its final destination," (ii) "whether the product is altered in any way during its transport," (iii) "the employer's intent concerning the delivery of the product at the time the transportation commences," and (iv) "whether the employer's business involves an integrated system of interstate shipments") (punctuation modified).

---

[4] "A storage-in-transit provision is usually contained in a shipment's bill of lading or the shipper's tariff and the effect of such a provision is to designate goods as remaining 'in transit' while they are warehoused, so that further transportation of the goods is a continuation of their shipment to the warehouse." Roberts, 921 F.2d at 814 n.3.

The Sixth Circuit has not given definitive guidance on what approach should be taken. Over a half-century ago, Baird utilized the MC-48 factors, now jettisoned by many courts. 425 F.2d at 410–412. A more recent Sixth Circuit decision utilized some of the MC-207 factors without formally adopting them in their entirety as the test to be applied. See Timberline, 925 F.3d at 851.

To avoid straitjacketing an analysis that should be flexible enough to properly evaluate the nuances of various transportation transactions, the ultimate inquiry should remain focused on the "essential character of the transaction." Mazzarella, 823 F.3d at 791 (punctuation modified). In keeping with Timberline, Mazzarella, and Collins, the Court concludes that all the factors articulated in the caselaw discussed above potentially bear on the outcome of whether the MCA exemption applies. However, as explained below, factual disputes as to some of those factors preclude awarding summary judgment.

**b. Factual Disputes Regarding Interstate Commerce**

Summary judgment for either party is not appropriate because there are factual disputes regarding multiple factors relevant to the interstate inquiry. Specifically, factual questions remain as to (i) which actor's interstate intent is relevant; (ii) whether Absopure placed orders with Mountain Valley based on projections of customer demand; and (iii) whether Absopure utilized modern tracking systems that "allow[ed] tracking and documentation of most, if not all, of the shipments coming in and going out of the warehouse or distribution center." MC-207, 57 Fed. Reg. at 19813.

**i. Interstate Intent**

The parties agree that "the shipper's" intent is important to the interstate commerce analysis, but they disagree about whether Absopure or Mountain Valley is "the shipper." See

7

Absopure Mot. at PageID.859–861; Guy Mot. at PageID.1268–1269. Outstanding factual disputes about which entity had primary control and direction over the interstate transportation of Mountain Valley products prevent resolution of this question on summary judgment.

Absopure argues that the employer is "the shipper" where the employer orders out-of-state goods and arranges with a third-party to transport those goods across state lines. Absopure Mot. at PageID.860–861 (citing Smith, 2021 WL 1026910, at *7 (holding that defendant employers, rather than out-of-state suppliers, were "the shippers" where employers "were the . . . entities that procured the produce from out-of-state suppliers and arranged for its shipment to Michigan")).

Guy, on the other hand, argues that the in-state employer is "the importer," that the out-of-state supplier is the "shipper," and that the employer/importer may be considered as the shipper only where that entity produces goods in one state and then ships those goods to its own distribution point in another state. Guy Resp. at PageID.2942. Guy cites a Department of Labor Field Operations Handbook for the distinction between shipper and importer:

> The term "fixed and persisting transportation intent" as used by the DOT [Department of Transportation] refers to the intent of the shipper of the commodities into the state, who may or may not also be the importer . . . .
>
> (b) In some situations, the shipper is also the importer, as would be the case where a manufacturer, such as a bakery, produces goods in one state and moves them through his distribution point in another state to his customers in that state. The employer, as the shipper, knows at the time of the shipment what he intends to do with the goods after they reach his out-of-state distribution point . . .

U.S. Dep't of Labor, Field Operations Handbook § 24d02(a)–(b) (Rev. 690, May 23, 2016).

However, § 24d02(b) does not indicate that the scenario it recounts—one in which a manufacturer produces goods in one state and then ships those goods to its own distribution point in another state—is the only possible circumstance in which one entity could be both the shipper and the importer.

Guy also argues that past precedent indicates that an employer is not the shipper where the employer is not also the corporate entity that produced the out-of-state goods. See Baird, 425 F.2d at 409–412 (where Standard Oil of Indiana shipped petroleum products into Michigan and defendant employer then delivered those petroleum products within the state of Michigan, assessing the MC-48 factors as applied to Standard Oil); Musarra, 454 F. Supp. 2d at 695–696, 711–719 (where parent company DISH Network shipped goods via freight from facilities in Illinois to defendant Digital Dish's distribution center in Ohio and those goods were then distributed within Ohio, and where DISH Network maintained title to goods until they were delivered to customers, using the MC-207 factors to assess the interstate intent of DISH Network); Horn v. Dig. Cable & Commc'ns, Inc., No. 1:06 CV 325, 2008 WL 7137186, at *1, *4–*6 (N.D. Ohio June 12, 2008) (where Georgia-based Cox Communications delivered equipment to Ohio, and Ohio-based defendants then transported that equipment to customers, using the MC-207 factors to assess the interstate intent of Cox Communications). None of these cases, however, explicitly defined the role of the shipper.[5]

---

[5] Guy also cites Smith v. Werner Enter., Inc., No. 14-0107-WS-B, 2015 WL 4429046 (S.D. Ala. July 20, 2015) and Tang v. Wing Keung Enter., Inc., No. 14 CV 390 (JBW)(LB), 2016 WL 6110454 (E.D.N.Y. July 11, 2016), report and recommendation adopted, 210 F. Supp. 3d 376 (E.D.N.Y. 2016) as support for his proposition that interstate intent cannot be based on the defendant employer where the defendant employer did not also produce the relevant goods out-of-state. In Smith, however, the court stated that "[t]he defendant . . . has not even identified the shipper or shippers of the various shipments of scrap paper, much less offered any evidence that the fixed and persisting intent of the shipper . . . at the moment of shipment was that the scrap paper would remain in interstate commerce . . . ." 2015 WL 4429046, at *4. The court, therefore, did not consider and reject an argument that the defendant itself was the shipper. In Tang, the defendants relied on a conclusory statement that either the seller or the defendant ultimately intended the goods at issue to be shipped out of state, and the court found this insufficient because "defendants fail[ed] to specifically focus on the shipper's intent at the time the goods were shipped" and because "[t]his conclusory statement [wa]s not supported by record evidence of the shipper's intent." 2016 WL 6110454, at *11. As a result, the court did not consider and reject a developed argument that the defendant was the shipper.

In keeping with the overall aim of assessing the "essential nature of the transaction," this Court finds it most appropriate to identify as the shipper the entity that functionally plays the most significant role in directing and controlling the transportation of goods. See Collins, 589 F.3d at 896, 898 (referring to the employer, an importer and distributor of wine, as "the shipper," and assessing the employer's intent where the employer purchased wine from out-of-state, and "control[led] the wine and direct[ed] its movements on the entire journey from the state . . . of origin . . . to the [in-state] retail stores"). The factfinder should consider all appropriate factors, including which entity arranged for and paid for that transportation. See id. at 896 (explaining that the employer controlled and directed the goods when it hired independent contractors to ship wine from out-of-state to in-state warehouses).

Both parties have produced evidence as to whether Absopure controlled and directed the shipment of Mountain Valley products across state lines. In support of its argument that it purchased out-of-state goods and then arranged for their transportation into Michigan with JB Hunt, for example, Absopure points to invoices from Mountain Valley. See Absopure Mot. at PageID.861 (citing Mountain Valley Invoices (Dkt. 55-19)). And these invoices do support the uncontested proposition that Absopure ultimately paid the cost of interstate transportation, although it is somewhat less clear from the face of the documents how they support the proposition that Absopure is the entity that actually arranged for the transportation with JB Hunt. Guy, on the other hand, points to evidence including (i) testimony from Absopure's corporate representative indicating a belief that Mountain Valley arranges the transportation and (ii) the fact that JB Hunt's annual report refers to Mountain Valley as a "related party" and describes a contractual service agreement with Mountain Valley. Guy Resp. at PageID.2932, 2935 (citing Absopure 30(b)6 Dep.

10

at 187:18–25, 189–190 (Dkt. 59-2)); id. at PageID.2932 (citing JB Hunt Annual Report at 21 (Dkt. 59-15)).

Because it is not clear whether Absopure or Mountain Valley arranged the interstate transportation with JB Hunt, the Court cannot determine at present which entity is "the shipper" for purposes of the interstate intent analysis.[6] The factfinder will be best situated to address which entity controlled and directed shipment of the goods across state lines, and, if relevant, whether Absopure intended at the time of shipment that the goods would continue in interstate commerce after reaching its warehouse.[7]

### ii. Shipments Based on Customer Demand

Based on the evidence produced by both parties, a material dispute also remains as to whether Absopure placed orders with Mountain Valley based on projections of customer demand that had a basis in fact, rather than to replenish general inventory. See Watkins v. Ameripride Servs., 375 F.3d 821, 826–827 (9th Cir. 2004).

Absopure asserts that it based the volume of goods ordered on projections of customer demand, and that customers at times pre-ordered products as well. Absopure Mot. at PageID.862–863; Absopure Resp. at PageID.4127–4128 (citing Absopure 30(b)(6) Dep. at 178–179 (Dkt. 55-5)); see also 3/21/22 Byrne Aff. ¶ 24 (Dkt. 55-22). Guy, however, argues that Absopure did not

---

[6] Guy argues that Absopure has already admitted it is "the shipper." Guy Resp. at PageID.2934–2935 (citing Absopure 30(b)(6) Dep. at 175:11–16; 187:18–25; 189–91). Absopure contests this. Absopure Reply at PageID.4414. Absopure's corporate representative said that "[Mountain Valley] ship[s] Mountain Valley-branded water products," and answered in the affirmative when asked questions like "And it's your position that Mountain Valley did . . . ship these items from their Hot Springs facility to Absopure's Plymouth, Michigan facility; correct?" Absopure 30(b)(6) Dep. at 175:11–16; 187:18–25. These statements may reflect a colloquial use of the word "ship," and not necessarily a legal acknowledgement that Mountain Valley is "the shipper" for purposes of the interstate intent analysis. This will be for the factfinder to resolve.

[7] Absopure concedes that Mountain Valley does not have the requisite intent. Absopure Resp. at PageID.4126–4127.

11

rely on projections of customer demands and instead placed orders with Mountain Valley to replenish stock levels. Guy Resp. at PageID.2947. See Absopure 30(b)6 Dep. at 165:8–15, 179:22–24, 182:11–19, 188:1–17; Second Supp. Answer to RFP No. 33 at 28–29 (Dkt. 59-13); Absopure's Third Supp. Resp. to Disc. Req. at 3 (Dkt. 59-5), Answer to RFP No. 47 at 40–41 (Dkt. 59-13). The factfinder must resolve this issue.

### iii. Modern Systems Enabling Tracking of Incoming and Outgoing Shipments

A material question of fact remains as to whether Absopure utilized "modern systems" to track most or all of the shipments entering and leaving its warehouse. See MC-207, 57 Fed. Reg. at 19813.

Absopure argues that it did have such a tracking system, because its drivers used handheld computer devices to record all sales and transactions. Absopure Mot. at PageID.862 (citing Absopure 30(b)6 Dep. at 71, 164–165, 196). Additionally, Absopure asserts that it monitored depletion of stock and was able to document how many days items are typically stored in the warehouse before they are sold. Id. at PageID.863 (citing Inventory Turn Report (Dkt. 55-21)).

Guy argues that Absopure did not use modern tracking systems. Guy Resp. at PageID.2947. Guy points to Absopure's statement that "[t]here are no documents that exist which identify when a specific load of product received by Absopure is delivered to a customer." Id. at PageID.2947–2948 (citing Def. 3rd Supp. Resp. at 3). Guy also argues that the Inventory Turn Report cited above was created for the purposes of litigation by cross-referencing the number of items received with the number of items sold and delivered, rather than by tracking incoming and outgoing shipments. Id. at PageID.2948. Thus, the evidence is mixed as to the tracking system.

Given the outstanding questions about the shipper's intent, orders based on customer demand, and tracking systems, summary judgment as to the applicability of the MCA exemption is not appropriate.[8]

**2. The Small Vehicle Exception to the MCA Exemption**

The motor vehicles used by the employee must weigh at least 10,001 pounds for the MCA exemption to apply. 49 C.F.R. § 390.5. The SAFETEA-LU Technical Corrections Act of 2008 (TCA) creates an exception to the MCA exemption "by providing that regardless of an employee's otherwise exempt status under the Motor Carrier Act, 'covered employees' [are] nonetheless . . . entitled to the overtime protections of the FLSA." Alberts v. L & K Constr., Ltd., No. 1:15 CV 251, 2015 WL 12600978, at *2 (N.D. Ohio Oct. 13, 2015). "[T]he TCA define[s] a 'covered employee' as including a driver whose work in whole or in part affects the safe operation of motor vehicles weighing 10,000 pounds or less." Id. (punctuation modified).

Guy argues that this small vehicle exception to the MCA exemption is a de minimis exception and asserts that drivers who operate small vehicles for 1% or more of their routes satisfy the threshold. Guy Resp. at PageID.2937 (citing Oddo v. Bimbo Bakeries U.S.A., Inc., 391 F. Supp. 3d 466, 474 (E.D. Pa. 2019) (holding that plaintiffs satisfied the de minimis threshold to collect overtime under the small vehicle exception because they drove small vehicles for 1% or more of their trips)). Absopure, on the other hand, argues that Guy (and prior courts) have misinterpreted the text of the TCA.

The text of that law defines a covered employee as follows:

---

[8] Absopure filed a notice regarding the Supreme Court's decision in Southwest Airlines Co. v. Saxon, 142 S. Ct. 1783 (2022) (Dkt. 65). Given that the Court was addressing an entirely different issue from the issue raised here—namely, whether workers "engaged in interstate commerce" were exempt under the Federal Arbitration Act—that case has no relevance to ours.

13

> (c) COVERED EMPLOYEE DEFINED.—In this section, the term "covered employee" means an individual—
> (1) who is employed by a motor carrier or motor private carrier . . .
> (2) whose work, in whole or in part, is defined—
>     (A) as that of a driver, driver's helper, loader, or mechanic; and
>     (B) as affecting the safety of operation of motor vehicles weighing 10,000 pounds or less in transportation on public highways in interstate or foreign commerce, except vehicles—
>         (i) designed or used to transport more than 8 passengers (including the driver) for compensation;
>         (ii) designed or used to transport more than 15 passengers (including the driver) and not used to transport passengers for compensation; or
>         (iii) used in transporting material found by the Secretary of Transportation to be hazardous under section 5103 of title 49, United States Code, and transported in a quantity requiring placarding under regulations prescribed by the Secretary under section 5103 of title 49, United States Code; and
> (3) who performs duties on motor vehicles weighing 10,000 pounds or less.

SAFETEA–LU TECHNICAL CORRECTIONS ACT OF 2008 § 306(c), PL 110–244, June 6, 2008, 122 Stat 1572. Absopure argues that the statute should be interpreted to require an employee to "drive a vehicle 10,000 pounds or less in whole to meet the TCA exception to the MCA exemption" on the grounds that the language "in whole or in part" modifies only TCA § 306(c)(2), not TCA § 306(c)(3), which contains the weight limitation. Absopure Resp. at PageID.4136–4138 (emphasis in original).

As Guy points out in his reply, see Guy Reply at Page ID.4452, Absopure acknowledges that the "in whole or in part" modifier applies to § 306(c)(2), and § 306(c)(2)(B) also includes the weight limitation. Guy is correct that courts have applied a de minimis standard. Byers v. Care Transport Inc., No. 13-CV-15174, 2015 WL 5608287, at *8 (E.D. Mich. Sept. 24, 2015). However, it is not clear that a 1% threshold applies within the Sixth Circuit. See id. at *7 (explaining that the Sixth Circuit has not yet interpreted the "in whole or in part" language of the

14

small vehicle exception); id. at *8 n.11 (stating that though many courts use the de minimis standard, "virtually none actually define what de minimis work on small vehicles would be").

Guy "estimate[s] that [he] drove . . . vehicles which weighed less than 10,001 lbs. approximately two times per month." Guy Decl. ¶¶ 6–8 (Dkt. 56-15). In his briefing, Guy asserts that this equates to 9% of his routes. Guy Mot. at PageID.1264, 1277. However, the contention that he drove small vehicles for 9% of his routes is not a statement made in his declaration or at a deposition. It is simply argumentation in his lawyer's brief—argumentation that is not fully explained or substantiated.

Absopure, on the other hand, has produced evidence that the vehicles Guy "regularly and routinely drove" weighed more than 10,001 pounds. 3/21/22 Byrne Aff. at ¶ 3. Absopure admits, though, that it "does not maintain . . . documents that identify which vehicle is/was assigned to each Driver on any specific workday," so it is unclear how Absopure could provide its own estimate regarding precisely how often Guy drove small vehicles. Guy Mot. at PageID.1262–1263; Absopure Resp. at PageID.4128 (admitting this fact).

The issue of whether a plaintiff's work with small vehicles was more than de minimis and when such work occurred often does not lend itself to resolution on summary judgment. See, e.g., Byers, 2015 WL 5608287, at *8 (declining to grant summary judgment on these issues); Mayan v. Rydbom Exp., Inc., No. 07-2658, 2009 WL 3152136, at *9 (E.D. Pa. Sept. 30, 2009) (same). Because neither side has demonstrated an absence of disputed fact on this issue, the Court declines to grant summary judgment for either party as to the small vehicle exception on the present record.

**B. Economic Damages**

Absopure argues that Guy has not sustained any economic damages because he earned more money (through the $120.00/day + commission formula) than he would have if he had been

15

paid an hourly rate plus overtime. Absopure Resp. at PageID.4145 (citing 3/21/22 Byrne Aff. at ¶¶ 4–23)). However, as Guy points out, commissions must be included when calculating an employee's "regular rate" of pay. Guy Resp. at PageID.2951 (citing 29 C.F.R. § 778.117).

Absopure also argues that Guy does not know how much money he is owed. Absopure Resp. at PageID.4145 (citing Guy Dep. at 50–51 (Dkt. 61-4) (responding "I'm not sure, I don't know," and then, "Yes" when asked whether he was seeking overtime even for weeks when he made more money by getting commissions than he would by getting overtime); id. at 8 (responding, when asked, "how much money do you allege you are owed?", with "I don't know.")).

In response, Guy correctly points out that the employer is required to maintain timekeeping records under the FLSA, and that where the employer has failed to do so, the employee can put forth a damage estimate that the employer has the burden to negate. Guy Resp. at PageID.2950 (citing Herman v. Palo Grp. Foster Home, Inc., 183 F.3d 468, 472 (6th Cir. 1999) (explaining that where an employer has kept insufficient records, "an employee has [met] his burden if he proves that he has . . . performed work for which he was improperly compensated and . . . produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference") (punctuation modified); Moran v. Al Basit LLC, 788 F.3d 201, 205 (6th Cir. 2015) ("[W]e do not require employees to recall their schedules with perfect accuracy in order to survive a motion for summary judgment.")).

Guy argues that Absopure does not have documentation of Guy's precise hours worked. See Absopure 30(b)(6) Dep. at 70–71 (deponent explaining Absopure does not track when drivers arrive at the facility at the beginning of the day or when they leave at the end of the day); id. at 75–76 (indicating that Absopure does not have records about when Guy clocked out each day)).

16

Guy asserts that he has provided a damages estimate based on the available records and his estimate of hours worked and that the damages estimate is proper. See Pl. 2d Supp. Initial Disclosures (Dkt. 59-16) (estimating that he is owed $16,001.12 in unpaid wages and liquidated damages).

Because Guy has presented sufficient evidence that he has sustained damages, summary judgment is denied on this point.

**C. Liquidated Damages**

Guy argues that Absopure is liable for liquidated damages. Guy Mot. at PageID.1279. An employer who violates the FLSA is liable for the amount of unpaid wages, plus an additional equal amount in liquidated damages, unless the employer demonstrates that it acted in good faith and had reasonable grounds to believe it was not violating the FLSA, in which case a district court has discretion not to award liquidated damages. Elwell v. Univ. Hosp. Home Care Servs., 276 F.3d 832, 840 (6th Cir. 2002). "Th[e] burden on the employer is substantial[.]" Id.; see also Visner v. Michigan Steel Indus., Inc., No. 14-cv-12786, 2015 WL 4488524, at *4–*5 (E.D. Mich. July 23, 2015) ("Even negligent, as opposed to willful mis-classification of an employee is enough to prevent the application of the good faith exception.") (punctuation modified).

Where a defendant "enters nothing in the record showing that it took the affirmative steps necessary to ascertain the FLSA's requirements, [the plaintiff] is entitled to summary judgment on the failure of [the defendant's] good faith defense" to the imposition of liquidated damages. Hardesty v. Kroger Co., No. 1:16-cv-298, 2020 WL 7053358, at *9 (S.D. Ohio Dec. 1, 2020) (slip copy); see also Visner, 2015 WL 4488524, at *4–*5 (granting summary judgment on the issue of liquidated damages where "[d]efendants . . . failed to point to any evidence rebutting the pertinent deposition testimony indicating that no research or investigation was conducted").

17

Guy argues that Absopure did not take steps to ensure compliance with the FLSA—for example, Absopure never consulted with an attorney, never requested a DOL opinion letter, and did not rely on any DOL decisions in reaching the conclusion that Guy was exempt. See, e.g., Absopure 30(b)6 Dep. at 226:9–13 (corporate representative had "no knowledge of" any steps "taken to see if this classification was in compliance with the FLSA"); id. at 224:23–225:2 (corporate representative had no knowledge of whether an attorney was ever consulted prior to this litigation regarding the classification of Absopure's truck drivers as exempt employees); Second Supp. Answer to ROA No. 5 at 3 (Dkt. 56-17) (admitting that Absopure did not consult with the Department of Labor).

Guy argues that Absopure cannot identify who made the decision to classify drivers as exempt, asserts that this is because drivers were classified as exempt as a matter of course, and points out that drivers were classified as "daily wage exempt" rather than "MCA exempt." See Absopure 30(b)(6) Dep. at 141:16–19 (confirming that drivers were classified as "daily wage exempt"); Def. Handbook at PageID.2229 (Dkt. 56-16) ("An associate in the Daily Wage Exempt classification will be paid a fixed daily wage. These positions are exempt from overtime pay requirements . . . ."); Absopure 30(b)(6) Dep. at 223:21–24 (corporate representative stating that he did not know who made the decision to classify the drivers as exempt).

Absopure does not meaningfully respond to this argument. Instead, Absopure asserts simply that "the DOT has exerted its authority over Absopure, and . . . Absopure has submitted to the DOT's authority." Absopure Resp. at PageID.4145–4146. Absopure does not explain how it decided to classify its drivers as exempt or what steps it took to ensure compliance with the requirements of the FLSA. Id. Given that Absopure does not argue it took affirmative steps to investigate and comply with its obligations under the FLSA, the Court finds that its good faith

defense fails as a matter of law. Should Guy establish an FLSA violation, liquidated damages will be awardable.

## D. Statute of Limitations

Guy argues that he is entitled to a three-year statute of limitations period (rather than a two-year period) because Absopure's alleged FLSA violation was willful. Guy Mot. at PageID.1249–1250, 1279–1280. See 29 U.S.C. § 255(a). A violation is willful where the "employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by" the FLSA. McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133 (1988); see also Herman, 183 F.3d at 473–474 (holding that violation was willful where employer had notice of FLSA requirements because of prior DOL investigations and still failed to comply).

Guy argues that the fact Absopure did not take affirmative steps to ensure its classification of drivers complied with the FLSA constitutes reckless disregard. Guy Mot. at PageID.1280. But the standard for the good faith defense to the imposition of liquidated damages is different than that applied to determine willfulness. Abadeer v. Tyson Foods, Inc., 975 F. Supp. 2d 890, 908 (M.D. Tenn. 2013) (explaining that a determination that an employer did not act in good faith does not necessarily mean that any violation was "willful").

The present record does not establish that Absopure had actual notice of what was required to comply with the FLSA and failed to comply regardless. As a result, Guy's motion for summary judgment is denied on this point.

### III. CONCLUSION

For the foregoing reasons, the Court denies Absopure's motion for summary judgment (Dkt. 55), and grants in part and denies in part Guy's cross-motion for summary judgment (Dkt. 56). Guy's cross-motion is denied as to (i) the applicability of the MCA exemption and the small

19

vehicle exception and (ii) the applicability of a three-year statute of limitations. Guy's cross-motion is granted as to liquidated damages for any FLSA violation.

     SO ORDERED.

Dated: February 8, 2023                           s/Mark A. Goldsmith
     Detroit, Michigan                       MARK A. GOLDSMITH
                                                 United States District Judge