# EXHIBIT A

00774725-1

PATRICK BYRNE
June 14, 2023

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

JUSTIN GUY, individually on behalf

of himself and others similarly situated,

    Plaintiff,

vs.                         Case No. 20-cv-12734

                              Hon. Mark A. Goldsmith

ABSOPURE WATER COMPANY, LLC, a

Domestic Limited Liability Company,

    Defendant.

_____

    The Remote Deposition of PATRICK BYRNE,

    Commencing at 10:04 a.m.,

    Wednesday, June 14, 2023,

    Before Helen F. Benhart, CSR-2614,

    Appearing remotely from Wayne County, Michigan.

PATRICK BYRNE
June 14, 2023

```
 1   REMOTE APPEARANCES:
 2
 3   MICHAEL N. HANNA
 4   Morgan & Morgan, P.A.
 5   2000 Town Center
 6   Suite 1900
 7   Southfield, Michigan  48075
 8   (313) 251-1399
 9   mhanna@forthepeople.com
10        Appearing on behalf of the Plaintiff.
11
12   MICHAEL O. CUMMINGS
13   Cummings, McClorey, Davis & Acho, P.L.C.
14   1185 Avenue of the Americas
15   3rd Floor
16   New York, New York 10036
17   (212) 547-8810
18   mcummings@cmda-law.com
19        Appearing on behalf of the Defendant.
20
21   ALSO PRESENT:
22   JONI HYSKA
23
24
25
```

| | | |
|---|---|---|
| 1 | A. | Typically the documents were sent to me for review by |
| 2 | | someone from CDMA, and without -- I mean, I don't |
| 3 | | recall the attorney's name on every document that I've |
| 4 | | looked at. |
| 5 | Q. | And you've signed off on each and every one of those, |
| 6 | | correct? |
| 7 | A. | Yes. |
| 8 | Q. | Okay. And did you ever make any changes to the |
| 9 | | content that they contained? |
| 10 | A. | Yeah. There were certainly revisions based upon my |
| 11 | | review, yes. |
| 12 | Q. | Okay. And do you swear to the accuracy of and |
| 13 | | truthfulness of everything you signed in this matter |
| 14 | | under oath under penalty of perjury? |
| 15 | A. | Yes. |
| 16 | Q. | Okay. All right. You are designated as the corporate |
| 17 | | representative for -- as the individual with the most |
| 18 | | knowledge regarding the documents produced in this |
| 19 | | lawsuit, correct? |
| 20 | A. | Yes. |
| 21 | Q. | Okay. I want to go over some of that. Before we get |
| 22 | | into that, it's my understanding from your counsel |
| 23 | | that your company was hacked by Kronos during the |
| 24 | | Kronos hack, I guess it would be in late 2021 to 2022, |
| 25 | | is that correct? |

1  A. I know we were hacked. I don't know the details of
2     it.
3  Q. Okay. Do you know what -- well, the reason this is
4     relevant for what we're talking about is because your
5     counsel represented that we may be missing some
6     documents as a result of this hack, so my question to
7     you is what documents are you aware of that we are
8     missing as a result of this hack?
9  A. The only that I'm aware of are the -- some of the
10    documents related to the commission calculation for
11    the specialists prior to mid 2019.
12 Q. Prior to mid 2019? Are you sure about that?
13 A. I'm pretty sure.
14 Q. I believe I'm fairly certain -- I litigated several of
15    the Kronos class action lawsuits. I'm fairly certain
16    the Kronos hack was not -- you believe it was mid
17    2019?
18 A. Yes.
19 Q. Let me take a look at something real quickly.
20          MR. CUMMINGS: For the record, I'll state,
21    Michael, when reviewing our documents, we realized we
22    have commission statements that we have not produced
23    from mid -- later than mid 2019. We produced them for
24    some of the opt-in plaintiff's. We did not produce
25    them for all but just slipped through the cracks.

| | |
|---|---|
| 1 | These are only the commission slips or commission |
| 2 | statements from sometime in 2019 forward. We're |
| 3 | working to Bates stamp those and produce them |
| 4 | immediately. If you need to bring Mr. Byrne back, |
| 5 | talk about those, we will make him available. |
| 6 | MR. HANNA: That's fine, but we might need |
| 7 | to take that to the court as well because the deadline |
| 8 | has passed. That's fine. We can deal with that |
| 9 | accordingly. Bear with me one moment I'm just trying |
| 10 | to see the Kronos. |
| 11 | BY MR. HANNA: |
| 12 | Q. Yeah. I don't -- I'm almost a million percent |
| 13 | positive that the Kronos hack happened in December-ish |
| 14 | 2021 and early 2022, so are you certain, Patrick, that |
| 15 | what you believe the records you're missing are from |
| 16 | sometime near mid 2019 and not late '21, 2022? Are |
| 17 | you sure of that or are you speculating? |
| 18 | A. No, I'm not speculating. |
| 19 | Q. You're sure that whatever issue you guys had was |
| 20 | something related to something that happened in mid |
| 21 | 2019? |
| 22 | A. No. You're conflating two things. |
| 23 | Q. Okay. Tell me -- explain to me what I'm conflating. |
| 24 | A. Again, I can't comment on the specifics of the hack, |
| 25 | but it was -- the issue was the retrievability of the |

| | | |
|---|---|---|
| 1 | | files and to whom the files had been originally sent |
| 2 | | during which periods of time and so the files that |
| 3 | | were sent after mid 2019 were not from the same person |
| 4 | | and they were not affected by -- the recovery of those |
| 5 | | files were not affected by the hack, but the files |
| 6 | | prior to 2019 were a different individual, and that |
| 7 | | mailbox was irrecoverable because of this hack. |
| 8 | Q. | I'm not sure what you're -- who is this individual |
| 9 | | that you're -- what does this individual -- it appears |
| 10 | | you're talking about two individuals.  One of them was |
| 11 | | hacked, one of them was not, is that right?  Who are |
| 12 | | these individuals that you're referring to? |
| 13 | A. | I only know the effect of it.  I don't know the |
| 14 | | details of the hack. |
| 15 | Q. | You just said something to the effect of there was two |
| 16 | | individuals, and one of them you couldn't recover and |
| 17 | | the other one you could, right? |
| 18 | A. | That's correct. |
| 19 | Q. | So who are these individuals?  Are they people at |
| 20 | | Absopure? |
| 21 | A. | Yes. |
| 22 | Q. | Okay.  So two of your Absopure -- who are they, do you |
| 23 | | know? |
| 24 | A. | The one whose data we could not recover was Erika |
| 25 | | Wilder. |

PATRICK BYRNE
June 14, 2023

| | | |
|---|---|---|
| 1 | Q. | So Erika Wilder, and what is her position? |
| 2 | A. | She was the director of HR. |
| 3 | Q. | And you're talking about what -- what is it that got |
| 4 | | hacked? Her e-mail account? |
| 5 | A. | Yes. The e-mail server, and apparently the backup to |
| 6 | | the e-mail server was compromised. |
| 7 | Q. | And her e-mail server contained all of the Absopure |
| 8 | | employees' pay and time records, commission reports or |
| 9 | | something? |
| 10 | A. | The commission reports, yes. That's who they were |
| 11 | | sent to. |
| 12 | Q. | So who -- where were they sent from? Don't you have |
| 13 | | it from wherever it was sent from? If her e-mail was |
| 14 | | hacked or whatever is on it, somebody must have sent |
| 15 | | it to her. Did you check to see where it was sent |
| 16 | | from to see if it was there? |
| 17 | A. | They were former employees, and we weren't able to |
| 18 | | track that down. |
| 19 | Q. | Why? Did you delete their e-mail accounts? |
| 20 | A. | The e-mail accounts are removed from the server a |
| 21 | | little while after they leave, yes. |
| 22 | Q. | Okay. So where -- how do the commission reports |
| 23 | | originate from? They're based on what exactly? |
| 24 | A. | We run a report out of our system. |
| 25 | Q. | That's not answering my question. Where is this -- |

| | | |
|---|---|---|
| 1 | | how is -- you got a driver working.  He finishes his |
| 2 | | work.  From that point on how do you get to this |
| 3 | | commission report?  Is he inputting the data in the |
| 4 | | handheld device? |
| 5 | A. | Yes. |
| 6 | Q. | Okay.  And then what goes on from there? |
| 7 | A. | The data is uploaded to our back end system. |
| 8 | Q. | So where is that?  Where is the back end system? |
| 9 | | Forget that the fact that it was transferred from one |
| 10 | | e-mail account to the other.  Why haven't you looked |
| 11 | | at the actual back end system to see if these records |
| 12 | | exist there? |
| 13 | A. | They the raw commission data does exist there. |
| 14 | Q. | So you do have all this data? |
| 15 | A. | We have the underlying commission -- the data that the |
| 16 | | commission was existed on originally still exists, |
| 17 | | yes. |
| 18 | Q. | So what are you missing, like just the pay stubs? |
| 19 | A. | We're missing final -- we're missing the final |
| 20 | | commission report that was sent to HR and then |
| 21 | | conveyed to payroll to pay the individuals the |
| 22 | | commission and various bonuses that were owed. |
| 23 | Q. | So did you lose those contemporaneously or after |
| 24 | | those -- after these compensations were paid out? |
| 25 | | MR. CUMMINGS:  Objection, vague. |

```
 1              THE WITNESS:  Well, I mean, all of the
 2       documents that we weren't able to recover would have
 3       been for prior periods of time where everyone was
 4       already paid.
 5   BY MR. HANNA:
 6   Q.  So from what you're telling me, what you believe
 7       happened is the raw commission data exists based on
 8       this data you create these commission reports.  All of
 9       the opt-in plaintiffs were paid out based on these
10       commission reports.  However, sometime after they were
11       paid out is when this hack occurred and you don't have
12       these reports any longer.  Is that fair?
13   A.  Yes.
14   Q.  Okay.  But as it stands -- when you pay these
15       employees out, do you give them like a portion of the
16       pay stub?  Do you send it to them, do you e-mail it to
17       them so they know what they're getting paid?
18   A.  Yes.
19   Q.  So how do you give it to them?  Do you e-mail it to
20       them or mail it to them?
21   A.  My understanding is that it is physically mailed to
22       them.
23   Q.  And do you keep a backup copy of that somewhere?
24   A.  Well, that's what's missing.
25   Q.  Okay.  And so when did you lose this data?  I
```

| | | |
|---|---|---|
| 1 | | understand it affects a period of time in mid 2019. |
| 2 | | When did you lose it, though, or when was it hacked or |
| 3 | | what have you? |
| 4 | A. | I don't remember the date of this hack.  It was back a |
| 5 | | couple years ago. |
| 6 | Q. | So was it in 2019? |
| 7 | A. | No. |
| 8 | Q. | It was 2020? |
| 9 | A. | I'm not sure.  It was more recent than that, but it |
| 10 | | wasn't -- again, the two dates are not really -- they |
| 11 | | don't coincide.  They're two different things. |
| 12 | Q. | What are you referring to that the two dates don't |
| 13 | | coincide? |
| 14 | A. | The hack occurred later, much more recently than the |
| 15 | | cutoff point for the data being irrecoverable, are two |
| 16 | | different dates. |
| 17 | Q. | And so did it occur -- you said it -- it happened in |
| 18 | | 2019.  You said it didn't -- it wasn't hacked in 2019. |
| 19 | | You said it wasn't hacked in 2020.  Do you believe it |
| 20 | | was hacked in 2021? |
| 21 | A. | I'm not certain. |
| 22 | Q. | Was it hacked before or after I deposed you? |
| 23 | A. | I'm not certain.  I'm not certain. |
| 24 | Q. | Was it hacked this year, 2023? |
| 25 | A. | No. |

| | | |
|---|---|---|
| 1 | Q. | Was it hacked last year, 2022? |
| 2 | A. | It could have been early 2022. I don't recall. |
| 3 | Q. | It seems like you're confused as to whether it |
| 4 | | happened in 2021 or '22, is that fair? |
| 5 | A. | I don't know the exact time it happened. |
| 6 | Q. | Okay. Now, how long of a period -- you said this |
| 7 | | affects something in mid 2019. How long of a period |
| 8 | | does it affect? |
| 9 | A. | I only know that it affects from October of '17 |
| 10 | | through that date in 2019. I didn't investigate |
| 11 | | prior. |
| 12 | Q. | So -- well, that's fine. I don't care about prior. |
| 13 | | What day in 2019 does it stop affecting? |
| 14 | A. | I don't remember. |
| 15 | | MR. HANNA: Mr. Cummings, can you provide |
| 16 | | us with that date? |
| 17 | | MR. CUMMINGS: We'll see. If we can |
| 18 | | identify it, we will. |
| 19 | BY MR. HANNA: | |
| 20 | Q. | So essentially you have not produced any of what you |
| 21 | | refer to as the commission reports from the beginning |
| 22 | | of the relevant time period in 2017 until sometime in |
| 23 | | mid 2019, is that correct, Mr. Byrne? |
| 24 | A. | Well, we do have Mr. Guy's, but we did not provide |
| 25 | | them. |

| | | |
|---|---|---|
| 1 | | value's always one. |
| 2 | Q. | That's what I thought. And then there's obviously -- |
| 3 | | so, for example, for Wednesday, March 23rd, you -- or |
| 4 | | not you, but the system wrote absence, but through |
| 5 | | Sunday, 3/20, it wrote nothing, I'm assuming that's |
| 6 | | because this gentleman was not scheduled to work on |
| 7 | | 3/20 but was scheduled on 3/23 and was absent, is that |
| 8 | | correct? |
| 9 | A. | I'm not certain of the mechanics. I'd be speculating. |
| 10 | Q. | Okay. And then in, what does that mean? |
| 11 | A. | In is the recorded punch time. |
| 12 | Q. | And that's when the individual punched in? |
| 13 | A. | Usually that is correct, yes. |
| 14 | Q. | What does usually that's correct mean? |
| 15 | A. | If -- unless they failed to punch. |
| 16 | Q. | And if they failed to punch, how does that -- what |
| 17 | | happens? |
| 18 | A. | The manager confers with the specialist to determine |
| 19 | | what they approximate their start times were for the |
| 20 | | missing punches. |
| 21 | Q. | So your testimony is because it says 7:00 a.m. on all |
| 22 | | these days for Mr. Householder -- for the record, for |
| 23 | | example, from March 7th until March 21, your testimony |
| 24 | | is one of the supervisors actually spoke to |
| 25 | | Mr. Householder and he said he came in at 7:00 a.m. |

PATRICK BYRNE
June 14, 2023

| | |
|---|---|
| 1 | all these days? |
| 2 | MR. CUMMINGS: Objection, mischaracterizes. |
| 3 | **THE WITNESS: I couldn't say for certain.** |
| 4 | BY MR. HANNA: |
| 5 | Q. Okay. I've represented thousands of clients in wage |
| 6 | and hour cases. Whenever you see time records that |
| 7 | show an exact time, those don't look like -- that's |
| 8 | not what -- you know, most people it would look like |
| 9 | this, 8:41, 7:15, 7:13. That looks like it was |
| 10 | somebody who actually is clocking in, but whenever you |
| 11 | see time records that, you know, somebody works nine |
| 12 | to five, they'll say 9:00 a.m. every day, 5:00 p.m. |
| 13 | every day on the dot. Not 4:59, not 5:01. Those look |
| 14 | like somebody had just put it in there. They're not |
| 15 | actual time in time records. Do you have any |
| 16 | indication to know whether this is actually when he |
| 17 | clocked in at 7:00 a.m. on the dot week after week as |
| 18 | indicated up here? |
| 19 | A. **No, I don't.** |
| 20 | Q. Okay. Let's go back for a second. For this gentleman |
| 21 | it says the date range that you or whoever selected is |
| 22 | 3/7/2022 to 4/22/22 why was that the limited date |
| 23 | range selected? |
| 24 | A. **Again, I'm not certain why his date range is that.** |
| 25 | **I'm not sure.** |

|    |       |                                                                 |
|----|-------|-----------------------------------------------------------------|
| 1  |       | Mountain Valley Spring Company's distribution                   |
| 2  |       | agreement. HOD Distribution Rights is the name of the           |
| 3  |       | document. It begins on Bates ABS 3739 to 3750.                  |
| 4  | BY MR. HANNA: |                                                         |
| 5  | Q.    | Mr. Byrne, do you recognize this document?                      |
| 6  | A.    | Yes.                                                            |
| 7  | Q.    | Okay. And were you at all involved in the procurement           |
| 8  |       | or negotiation or anything related to this agreement?           |
| 9  | A.    | No.                                                             |
| 10 | Q.    | No? Okay. This agreement states each purchase order             |
| 11 |       | shall be delivered in the manner and the location               |
| 12 |       | designated by the company, which is Mountain Valley,            |
| 13 |       | in its standard ordering procedures as provided to              |
| 14 |       | distributor, which is Absopure, concurrently with this          |
| 15 |       | agreement. Do you see that?                                     |
| 16 | A.    | Yes.                                                            |
| 17 | Q.    | Where is that document?                                         |
| 18 | A.    | Where is what document?                                         |
| 19 | Q.    | The standard ordering procedures?                               |
| 20 | A.    | If it's not contained in here, I have not seen that.            |
| 21 | Q.    | And is this agreement still currently in effect?                |
| 22 | A.    | Yes.                                                            |
| 23 | Q.    | All right. Let's take a look at the handheld -- the             |
| 24 |       | document that's called handheld check-in, check-out             |
| 25 |       | times.                                                          |

1          MR. HANNA: For the record we're reviewing
2  ABS Bates 3751 through 4195. The witness is being
3  shown ABS 3751.
4  BY MR. HANNA:
5  Q. Mr. Byrne, do you see the document I'm referring to,
6     3751?
7  A. Yes.
8  Q. So what is this document?
9  A. This is a -- this is, again, a data extract from our
10    back end system showing the time stamps from the
11    inventory check-out and inventory check-in on the
12    handheld in the vehicle for each day.
13 Q. Okay. And do we have this for each day that every
14    opt-in worked through the duration of their
15    employment?
16 A. I believe so.
17 Q. Let's go over these. So let's take a look at the
18    first line item -- or the first two line items on
19    Bates 3751, for the record. So tour, what does tour
20    mean?
21 A. Tour is -- we saw it on the prior sheet. Tour,
22    shipment. It's that unique designation for a given
23    day, for a given route on a given day.
24 Q. Okay. Check out/in, what does that mean?
25 A. That shows which -- whether the time stamp is from the

| | | |
|---|---|---|
| 1 | | check out of inventory or the check in of inventory. |
| 2 | Q. | When does a check out of inventory occur? |
| 3 | A. | The check out of inventory -- I mean, it occurs |
| 4 | | immediately before the S3 departs. |
| 5 | Q. | I'm sorry. Say that again. |
| 6 | A. | It occurs immediately before the S3 heads off on the |
| 7 | | route for the day 3. |
| 8 | | MR. HANNA: Can you give me one second? I |
| 9 | | have a crying infant in the back. I don't know if you |
| 10 | | guys can hear that. |
| 11 | | (Off the record at 11:22 a.m.) |
| 12 | | (Back on the record at 11:22 a.m.) |
| 13 | | MR. HANNA: Let's go back on the record. |
| 14 | BY MR. HANNA: | |
| 15 | Q. | I apologize if I already asked you this last question, |
| 16 | | but back to Bates 3751, check in/out time, so my |
| 17 | | question is when do they check out? |
| 18 | A. | So they check out immediately before they leave the |
| 19 | | premise to begin their route for the day. |
| 20 | Q. | Okay. That's what I had figured. So explain to me |
| 21 | | what happens before they're checking out from the |
| 22 | | minute that they arrive to the facility. |
| 23 | A. | Okay. Well, I mean, there's some -- there's a |
| 24 | | pretty -- there's some variability based upon the |
| 25 | | different requirements for the different days, so my |

| | | |
|---|---|---|
| 1 | Q. | So roughly all 30 of them? |
| 2 | A. | Yes. |
| 3 | Q. | And they're all starting to work at around the same |
| 4 | | time, right? |
| 5 | A. | No. |
| 6 | Q. | No? |
| 7 | A. | No. |
| 8 | Q. | You got somebody starting at seven, you got somebody |
| 9 | | starting at eight, you got somebody who's starting at |
| 10 | | ten, you've go something who's starting at noon, is |
| 11 | | that how it works? |
| 12 | A. | There's a spread to when they start. |
| 13 | Q. | Is it like two shifts start times or what -- |
| 14 | A. | No. |
| 15 | Q. | Just sporadic all throughout the day? |
| 16 | A. | It not throughout the day, but in the morning it -- |
| 17 | | typically it would be -- everyone would leave |
| 18 | | typically between six and 9:00 a.m. |
| 19 | Q. | Okay. Got it. Are they told, hey, come in at six, |
| 20 | | come in at seven, come in at eight or not really? |
| 21 | A. | They are -- the veterans -- I mean, the guidance is |
| 22 | | subjective, right? It depends on how much guidance a |
| 23 | | person needs, so to my knowledge, they aren't given -- |
| 24 | | individuals are not given a specific start time, no. |
| 25 | Q. | Okay. Very good. And this clock in -- I'm sorry, |

| | | |
|---|---|---|
| 1 | | check in.  When does that happen?  Immediately when |
| 2 | | they get back to the warehouse? |
| 3 | A. | No.  Well, no.  It would occur -- it occurs when that |
| 4 | | same inventory verification of what is being returned |
| 5 | | is done so right before they walk up to the front |
| 6 | | office at the end of the day. |
| 7 | Q. | So let me just confirm.  So you told me that they come |
| 8 | | back from the route and drive to the back of the |
| 9 | | warehouse.  Is that when the check-in is done? |
| 10 | A. | It's done after they arrive at the warehouse and they |
| 11 | | pull back there and there is a checker available to |
| 12 | | check them in, and when that is completed, that's when |
| 13 | | the -- when the verification -- you know, that's when |
| 14 | | the clock in is time stamped. |
| 15 | Q. | Got it.  So you told me before they come back from |
| 16 | | route and they drive to the back of the warehouse. |
| 17 | | They're checked in by the warehouse staff, the count |
| 18 | | will back that is unsold or returned.  That's when |
| 19 | | they're -- the check-in is when they're checked in by |
| 20 | | the warehouse staff, right? |
| 21 | A. | Yes. |
| 22 | Q. | Got it.  Understood.  So on average -- and do they |
| 23 | | also complete a DVIR at the end of the day? |
| 24 | A. | That I'm not sure of.  I know they do a pretrip.  I |
| 25 | | guess I'm not sure if they do a post trip.  I mean, |

1     certainly if there were a major issue with the truck
2     they would report it, but I don't know if they do a
3     complete formal walk-around or not. I don't know.
4 Q. Aren't they required by law -- to the extent you're
5     regulated by the DOT, aren't they required by law to
6     complete a DVIR inspection and report?
7 A. So I know they do a -- I'm just saying I know for a
8     fact that they do a pretrip. I don't know for a fact
9     whether they do a formal post trip or not. They may.
10     I'm not sure. I don't want to over step my knowledge.
11 Q. Fair enough. So going back to our story, so they
12     arrive at work and they go in the office. What's the
13     first -- how long does it take from the time they
14     arrive at work to the time they go in the office?
15 A. Ten seconds, 15 seconds.
16 Q. You believe less than one minute?
17 A. Yeah.
18 Q. And then from -- once they go in the office, they go
19     to grab their mailbox, right?
20 A. Correct.
21 Q. Is there a line to do that? Are they all coming in at
22     once?
23 A. No.
24 Q. How long does it take for them to go to their mailbox?
25     How long does it take for them to go to their mailbox