# EXHIBIT 6

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**JUSTIN GUY**, individually on behalf
of himself and others similarly situated,

      Plaintiff,

v.

**ABSOPURE WATER COMPANY, LLC,**
a domestic limited liability company,

      Defendant.

_____/

Case No.: 20-CV-12734

Hon. Mark A. Goldsmith

**PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF**
**RELEVANT FACTS**

      Plaintiff, Justin Guy, on behalf of himself and those similarly-situated Opt-in

Plaintiffs, hereby Responds to Defendant's "Statement of Relevant Facts".

**Defendant's Interrogatory Nos. 1 and 3.**

      1.     Identify the job titles or positions You held as part of Your employment
with Absopure during the Relevant Time Period, including the dates You held such
job titles or positions.

      3. Identify the date(s) You received a commercial driver's license ("CDL"), if
any, and the dates that any such CDLs expired, if any have.

      **Defendant's Statement No. 1**: The Plaintiffs in this case have been employed
by Defendant in only one or both of two positions: Sales and Service Specialist
("Sales Specialist") and "Sales and Service Specialist Trainee" ("Sales Specialist
Trainee," and, together with Sale Specialists, "Specialists").

      **Plaintiff's Response to Defendant's Statement No. 1**:  Defendant employs

a singular Truck Driver position in Michigan, though its document production refers to its drivers interchangeably as either "Route and Sales Delivery Drivers" or "Sales and Service Specialists," and interchangeably refers to the Drivers "in training" as "Sales and Service Specialist Trainees," or "Entry Level Route Delivery" Drivers. For example, Defendant claims that Plaintiff's official job title was "Sales and Service Specialist Trainee," but acknowledges that its internal documentation refers to him as a "driver" and "delivery driver", and that the job postings indicate they are for a "Delivery Driver" position. 30(b)(6) Dep. 114:14-115:3. Defendant testified that the advertisements identify its Driver position as "Delivery Driver" because they "want (applicants) to understand that [ ] the sales position involves route delivery." *Id.* at 122:25-123:5. Substantively, these job postings are for the same position that Defendant now refers to as "Sales Service Specialists Trainees and Sales Service Specialists." *See* Defendant's Second Supp. Answer to Request for Production ("RFP") No. 8.[1] Plaintiffs understood their job title to be that of a "Delivery Driver", which is consistent with their "Driver's Application for Employment." Plaintiff's Dep. 55:20-25. Ultimately, job titles are irrelevant, and the relevant consideration is

---

[1] *See also* 30(b)(6) Dep. 117:16-22; 117:23:118:2 ("Q. Okay. So, you take out ads asking for 'route delivery driver' but for purposes of this litigation, you're referring to the employees hired under this ad as 'sales and service associates', correct? A. "sales and service specialists, yes."); 118:6-119:7 ("Entry-level route delivery" job postings are also referred to as "Sales service specialists."); 119:4-7 ("Affirming that "all of the individuals in these job postings are" also referred to as "sales and service specialists.").

whether the putative class members are/were subject to similar policy and practice that led to the FLSA violation. *See, e.g., Bernardez v. Firstsource Sols. USA, LLC*, 2019 WL 4345986, at *6 (W.D. Ky. Sept. 12, 2019).

**Defendant's Statement No. 2:** All Specialists begin their employment with Defendant as Sales Specialist Trainees. Once a Sales Specialist Trainee has a) obtained their commercial driver's license ("CDL"), and b) has been assigned a regular route, he or she then becomes a Sales Specialist. Not all Sales Specialist Trainees stay employed by Defendant long enough to become Sales Specialists.

**Response to Defendant's Statement No. 2:** *See* Response to Defendant's Statement No. 1. Plaintiff, Justin Guy, for example, worked for Defendant for more than one year, yet Defendant's documentation still referred to him as a "trainee" even though he was employed "long enough."

**Defendant's Statement No. 3:** Below is a list of the positions held by Plaintiffs beginning October 8, 2017 and the dates those positions where held and information regarding each Plaintiff's CDL. Further, attached as Exhibit A is a list of the bates number ranges with Plaintiffs' driving records that provide CDL information. *See* Chart and Defendant's Ex. A at Defendant's Statement of Relevant Facts.

**Response to Defendant's Statement No 3:** With respect to position title, *see* Response to Defendant's Statement No. 1. With respect to dates of employment and dates of obtaining a CDL License, the Opt-in Plaintiffs interviewed thus far do not dispute the dates of employment or CDL license status provided.

**Defendant's Interrogatory Nos. 2, 7 and 8**

2. Identify and describe the job duties and activities for each position You held as part of Your employment with Absopure during the Relevant Time Period.

2

7. Identify each day that You were employed by Absopure during the Relevant Time Period that you performed job duties prior to clocking in by placing Your employee badge next to the time clock and getting a signal from it at the Absopure facility out of which you worked and describe all such job duties that you performed, the amount of time it took you to perform those duties, and the circumstances that led You to performing those job duties prior to clocking in.

8. Describe the job duties You performed while employed by Absopure during the Relevant Time Period a) prior to checking out your truck by confirming the inventory on the truck with the hand-held device before making deliveries , and b) after checking in Your truck on the hand-held device after making deliveries and returning to Absopure's facility, including describing the amount of time it took You to perform each set of such job duties, and including, if applicable, describing the typical job duties you performed and amount of time it took and identifying any substantially greater or lesser number of duties and longer or shorter times it took and the circumstances of and number of occurrences of such longer or shorter times.

**Defendant's Statement No. 4:** All Specialists have the same job responsibilities and engage in the same job activities. The manner and degree in which each Specialist carries out these responsibilities and activities can vary depending on the experience and dedication of the Specialist.

**Plaintiff's Response to Defendant's Statement No. 4:** Plaintiff agrees that the Opt-in Plaintiffs have the same job responsibilities and engage in the same job activities.

**Defendant's Statement No. 5**. Both Defendant's Plymouth and Grand Rapids locations have a time clock near the entrance doors used by the Specialists, who pass by this clock on their way to their other job activities. The purpose of the time clock is to confirm each Specialist's attendance on the job for that day. Specialists confirm their attendance by placing their employee identification badges next to the clock, which electronically registers the time that this occurs.

**Plaintiff's Response to Defendant's Statement No. 5:** Defendant employs "the same timekeeping method at Absopure during the relevant time period from

3

2017 to" present. 30(b)(6) Dep. 70:4-7; 72:3-5 (Q: "And this is the same method of timekeeping used for all of the truck drivers in Michigan; correct?" A: "Yes."). Specifically, Defendant does not track any of its Truck Drivers' hours worked through a timekeeping system. *Id.* at 70:13-17. Defendant does not track the Truck Drivers' clock-in time for when they arrive at Defendant's facility in the beginning of the workday. *Id.* at 71:6-9. Likewise, Defendant also does not track the Truck Drivers' clock-out time at the end of their workday. *Id.* at 71:16-19. Some of the Opt-in Plaintiffs interviewed thus far dispute the time clocks for purposes of clocking-in for attendance because they were advised by their supervisors that it was not necessary to "clock-in" by swiping their badge.

**Defendant's Statement No. 6:** The majority of Specialists, the majority of time, clock in in immediately upon entering the facility.

**Plaintiff's Response to Defendant's Statement No. 6:** Plaintiff's counsel is conferring with the Opt-in Plaintiffs to see if they "clocked-in" to Defendant's purported attendance system "immediately upon entering the facility." Some of the Opt-in Plaintiffs interviewed thus far advise that they did immediately "clock-in" for attendance purposes by swiping their badge, while others advise that they did not, seeing as how this they were not required to "clock-in" for purposes of timekeeping.

**Defendant's Statement No. 7:** After entering the building, and usually immediately after clocking in, the Specialist walks over to the place where the handheld devices are kept in charging stations and takes the one that he or she will use for the day.

4

**Plaintiff's Response to Defendant's Statement No. 7:**  Plaintiff's counsel is conferring with the Opt-in Plaintiffs concerning this statement.   Most Opt-in Plaintiffs interviewed thus far advise that they do not take the handheld from the charging station immediately after "clocking-in" for purposes of attendance.  Rather, most Opt-in Plaintiffs advise that they complete other duties before getting the handheld device, which includes going to their mailbox to obtain and review their route or manifest for the day.

**Plaintiff's Statement No. 8.** The handheld devices are used to keep track of the inventory of items on a Specialist's vehicle and to record sales or rentals of items.

**Plaintiff's Response to Defendant's Statement No. 8:**  The handheld devise is utilized to track the routes and the items delivered by Defendant's Truck Drivers.

**Defendant's Statement No. 9:** After obtaining the hand-held device, the Specialist checks his or her mailbox for paperwork, some of which might be related to his route for that day.

**Plaintiff's Response to Defendant's Statement No. 9:**  See Response to Defendant's Statement No. 7.

**Defendant's Statement No. 10:** After obtaining the handheld and checking his mailbox, the Specialist will walk to the warehouse to get the vehicle he will use for the day. The warehouse at the Plymouth facility is behind the front office while the warehouse at the Grand Rapids facility is right outside the front office door. The vehicle in the warehouse will have been loaded the night before by warehouse personnel with an inventory of items that had been specified by the Specialist at the end of the previous working day.

**Plaintiff's Response to Defendant's Statement No. 10:**  Plaintiff's counsel is conferring with the Opt-in Plaintiffs concerning this statement.   The Opt-in

5

Plaintiffs advise that it took anywhere from two minutes to twenty minutes from the time they left the office to the time they arrived at the warehouse. This is partly due to Opt-in Plaintiff going to the cooler warehouse first. Once they reached their vehicle, some of the Opt-in Plaintiffs completed a DVIR inspection. It would take the Opt-in Plaintiffs that completed a DVIR inspection 10 – 45 minutes to complete. The Opt-in Plaintiffs advise that the vehicles would at times be pre-loaded with water, which was not always the case. Additionally, the Opt-in Plaintiffs advise that in addition to the water, they would load the water coolers and accessories. This took the Opt-in Plaintiffs anywhere between 5 minutes to one hour to obtain and load the coolers.

**Defendant's Statement No. 11**: The items on the vehicles loaded by the warehouse staff will include products to be sold, or potentially sold, to customers that day on the Specialists' routes. Any equipment, such as water coolers or coffee makers, will be loaded by the Specialists.

**Plaintiff's Response to Defendant's Statement No. 11:** Plaintiff objects to this statement as it seeks information irrelevant to the claims and defenses in this matter. *See* Response to Statement No. 10.

**Defendant's Statement No. 12**: Of the products loaded onto vehicles, the large majority have not been pre-ordered, but are what the Specialists' estimate customers will order on the routes. For example, of the 156,503 orders created between January 1, and April 30, 2023, 17,886 of them were pre-orders, or about 11.4% orders, and the remainder were created on the routes, about 88.6%.

**Plaintiff's Response to Defendant's Statement No. 12:** Plaintiff objects to this statement as it seeks information irrelevant to the claims and defenses in this

matter. Plaintiffs lack knowledge regarding the numbers of pre-orders vs. "Orders created on the routes," and Defendant has failed to produce any documents in discovery concerning Defendant's contention in this regard. Most of the Opt-ins Plaintiffs interviewed thus far indicate that over 90% of the items that they delivered were pre-ordered. None of the Opt-ins Plaintiffs interviewed thus far concede to "asking" Defendant's customers if they wanted additional products.

**Defendant's Statement No. 13:** At the Plymouth facility, from the warehouse, the Specialist will then drive the vehicle to the street outside of the main office and park along the curb.

**Plaintiff's Response to Defendant's Statement No. 13:** Plaintiff objects to this statement because it is not relevant to this matter, or otherwise proportional to the needs of this case. It is also not clear what time period Defendant is referring to here. The Opt-in Plaintiffs interviewed thus far do not dispute this contention.

**Defendant's Statement No. 14:** After parking the vehicle in front at Plymouth, the Specialist will then go back into the office to obtain coffee items, either coffee bags or K-cups, and place them on the vehicle, if those items are part of the planned inventory for his route.

**Plaintiff's Response to Defendant's Statement No. 14:** Plaintiff's counsel is conferring with the Opt-in Plaintiffs concerning this statement. The Opt-in Plaintiffs interviewed thus far do not dispute this statement, and some of these Opt-in Plaintiffs indicate that they also had to wait to get cleared to leave, obtain gas card and/or handheld device at this time, and estimate that this took roughly ten minutes to complete.

**Defendant's Statement No. 15:**   The Specialist will then go get a manager and the Specialist and manager will perform a pre-trip safety inspection of the vehicle at front in Plymouth or in or by the warehouse at Grand Rapids.

**Plaintiff's Response to Defendant's Statement No. 15:** : Plaintiff's counsel is conferring with the Opt-in Plaintiffs concerning this statement. Some of the Opt-in Plaintiffs interviewed thus far deny that a manager ever came out for a pre-trip safety inspection. Rather, these Opt-in Plaintiffs advise that they did the pre-trip safety inspection themselves, and the managers would check off on it.

**Defendant's Statement No. 16:** After the safety inspection, the Specialist and manager will count together the inventory items on the vehicle. As this count is conducted, the Specialist will enter the number of each type of product and equipment into the handheld device.

**Plaintiff's Response to Defendant's Statement No. 16:** Plaintiff's counsel is conferring with the Opt-in Plaintiffs concerning this statement. Some of the Opt-in Plaintiffs interviewed thus far indicate that the managers did not count the inventory with them. Rather, the managers would simply sign off on the Drivers' handheld device. This process could take up to 30 minutes depending on if there is a line to speak with the manager.

**Defendant's Statement No. 17:**   Once the count is completed and the Specialist and manager agree on the inventory numbers, the Specialists will "check out" the vehicle using the handheld device. The time for the "check out" is recorded by the handheld device.

**Plaintiff's Response to Defendant's Statement No. 17:** Plaintiff's counsel is conferring with the Opt-in Plaintiffs concerning this statement. The Opt-in

Plaintiffs are not aware whether the time for the "check-out" was recorded by the handheld device.

**Defendant's Statement No. 18:**   The series of job-related activities from entering the building to checking out the vehicle typically takes between 10 and 20 minutes for the Plymouth facility and a few minutes less for Grand Rapids facility because the office and warehouse are closer to each. The variation in times mostly depend on the experience of the driver. The actual times may be longer due to non-work activities such as using the restroom.

**Plaintiff's Response to Defendant's Statement No. 18:** Plaintiff's counsel is conferring with the Opt-in Plaintiffs concerning this statement.   The Opt-in Plaintiffs interviewed thus far indicated that this process took anywhere from 30 to 90 minutes.

**Defendant's Statement No. 19:**   After checking out the vehicle, the Specialist will then drive to the customers on his assigned route.

**Plaintiff's Response to Defendant's Statement No. 19:** Plaintiff's counsel is conferring with the Opt-in Plaintiffs concerning this statement. The Opt-in Plaintiffs do not dispute this contention, except that some of the Opt-in Plaintiffs advise that they fueled their vehicles immediately after leaving the facility, which could take approximately ten to fifteen minutes.

**Defendant's Statement No. 20:**   Sales Specialists have the same route assigned to them every day. Sales Specialist Trainees have different routes, depending on need, such taking over part of a Sales Specialist's route who is on vacation.

**Plaintiff's Response to Defendant's Statement No. 20:** With respect to the

Opt-in Plaintiffs interviewed thus far, the "trainees", such as Plaintiff, also had

assigned routes.  At times, however, the trainees would also fill in for other drivers

who may be out on leave or vacation.  The only trainee that was interviewed thus far

who indicated that he did not have an assigned route was George Woldt, which is

likely due to the fact that he was only employed for approximately 1.5 months.

**Defendant's Statement No. 21:**  Defendant provides each Specialist with an
"optimized" route listing that orders customer stops to minimize driving mileage.
Specialists are not required to follow this order and typically do not. Defendant does
impose time limits or other requirements on how Specialists chose to drive their
routes.

**Plaintiff's Response to Defendant's Statement No. 21:** Plaintiff's counsel

is conferring with the Opt-in Plaintiffs concerning this statement. The Opt-in

Plaintiffs interviewed thus far do not dispute the first two sentences in this statement,

but do dispute that Defendant imposed time limits.

**Defendant's Statement No. 22:**  Specialists are free to take breaks at
any time while driving on their routes. Defendant does not set a maximum time for
the routes to be completed. Most specialists take a lunch break and many take both
a breakfast and lunch break as well as other breaks.

**Plaintiff's Response to Defendant's Statement No. 22:** Plaintiff's counsel

is conferring with the Opt-in Plaintiffs concerning this statement.  The Opt-in

Plaintiffs interviewed thus far predominantly advise that they did not take a lunch

break. A few of the Opt-in Plaintiffs interviewed thus far indicated that they took a

lunch break sometimes, and one said very rarely. The individuals that took a break

10

indicated that they took 10–15 minutes to eat. The Only Opt-in Plaintiff interviewed

thus far who indicated that they "sometimes" took a 20–30 minute lunch break is

Keith Brown, and even then some of these lunch breaks would be completed while

driving. In fact, the vast majority of Opt-in Plaintiffs interviewed thus far indicate

that they ate lunch while driving. None of the Opt-in Plaintiffs interviewed thus far

advised that they took a breakfast break, or any other break for that matter.

**Defendant's Statement No. 23:** Sales of products and sales and rentals of equipment occur at each customer stop. These sales occur in a number of different manners.

**Plaintiff's Response to Defendant's Statement No. 23:** Plaintiff objects to

this statement as it seeks information not relevant to the claims and defenses in this

matter. Plaintiffs delivered goods to Absopure's customers.

**Defendant's Statement No. 24:** For a residential customer buying 5-gallon water bottles, the customer will typically leave out a number of empty bottles, with the expectation that the Specialist will replace that same number with full bottles. Sometimes customers will leave notes or speak with the Specialist to state the number of bottles to order or equipment to rent or purchase. After the Specialist has left the full bottles or equipment, he will then record this number with the handheld device. Usually, the handheld device will then print out two copies of an invoice, one left for the customer and the other kept by the Specialist. Some customers who pay electronically will not receive a printed invoice.

**Plaintiff's Response to Defendant's Statement No. 24:** Plaintiff's counsel

is conferring with the Opt-in Plaintiffs concerning this statement. Some of the Opt-

in Plaintiffs interviewed thus far dispute the contention that customers will leave

notes or speak with them to state the number of bottles to order or equipment to rent

or purchase.

**Defendant's Statement No. 25:**   For customers who order coffee products, which are typically businesses, the Specialist will go in and speak with an employee of the business who will tell the Specialist the kind and number of products and, if applicable, equipment being ordered. After delivering these, the Specialist will likewise record the amounts with the handheld device, two invoices will be printed, and the time recorded.

**Plaintiff's Response to Defendant's Statement No. 25:** Plaintiff's counsel is conferring with the Opt-in Plaintiffs concerning this statement.   The Opt-in Plaintiffs interviewed thus far do not dispute this statement.

**Defendant's Statement No. 26:**   Customers pay for products a number of different ways. Many pay by credit card at the end of the month that is kept on file. Others pay by ACH direct debit. Some mail in a check. Some give a check or cash directly to the Specialist when the products are delivered.

**Plaintiff's Response to Defendant's Statement No. 26:**  Plaintiff's counsel is conferring with the Opt-in Plaintiffs concerning this statement. The Opt-in Plaintiffs interviewed thus far do not dispute this statement.

**Defendant's Statement No. 27:**  At customer locations, Specialists have opportunities to increase the revenue from products ordered by customers. These activities are recommended and encouraged by Defendant, but not required. Increasing revenue from sales on the route increases the Specialist's commissions. These activities include a) persuading the customer to purchase additional items, especially higher margin products that earn higher commissions (upselling) b) suggesting/recommending additional or more frequent delivery dates, c) going to nearby homes and businesses to solicit new customers, and d) asking existing customers for referrals, e) working diligently to complete all of the customer stops on the route each day, and f) providing consistent good service that results in spontaneous referrals to new customers by current customers.

**Plaintiff's Response to Defendant's Statement No. 27:** Plaintiff objects to this statement of fact because it is irrelevant to the claims and defenses in this matter.

**Defendant's Statement No. 28:** After stopping by their last customer, Specialists will return to the facility, driving into the warehouse.

**Plaintiff's Response to Defendant's Statement No. 28:** Plaintiff's counsel is conferring with the Opt-in Plaintiffs concerning this statement. The Opt-in Plaintiffs interviewed thus far do not dispute this contention, except that one Opt-in Plaintiff advises that he had to go to the office first because his handheld device had issues.

**Defendant's Statement No. 29:** Upon arriving at the warehouse, the Specialist will meet with a warehouse employee in Plymouth, or the manager in Grand Rapids, and count with that person the number of empty bottles on the vehicle and make an inventory of the unsold products. That inventory count is entered into the handheld device. When the count is complete the vehicle is then checked in using the handheld device. The handheld device records the time of this check in.

**Plaintiff's Response to Defendant's Statement No. 29:** Plaintiff's counsel is conferring with the Opt-in Plaintiffs concerning this statement. With respect to the Opt-in Plaintiffs interviewed thus far, a few dispute that they counted the empty bottles with a warehouse employee, and one of the Opt-in Plaintiffs disputes that he went over the outstanding inventory with a warehouse employee. Most of the Opt-in Plaintiffs do not know when the handheld device is checked in. After the handheld device is checked at the time of check in, the Opt-in Plaintiffs would either park their truck and/or return to the office.

13

**Defendant's Statement No. 30:** Specialists typically sell about eighty percent of the inventory they leave the facility with at the beginning of their routes and thus have about twenty percent of that inventory remaining on their vehicles when they return.

**Plaintiff's Response to Defendant's Statement No. 30:** Plaintiff objects to

this statement of fact because it is irrelevant to the claims and defenses in this matter.

**Defendant's Statement No. 31:** After checking in their vehicles, the Specialists walk to the front office of the facility. Upon arriving, they first turn in any cash or checks they have received from customers. They then turn in copies of the invoices printed by the handheld devices.

**Plaintiff's Response to Defendant's Statement No. 31:** Plaintiff's counsel

is conferring with the Opt-in Plaintiffs concerning this statement. The Opt-in

Plaintiffs interview thus far do not dispute this contention. This process took ten to

fifteen.

**Defendant's Statement No. 32:** After turning in cash, checks and invoices, the Specialists then synchronize their handheld devices by pressing a button on the devices, which causes all the data of handheld devices to be wirelessly uploaded into Defendant's system. The Specialists then return the handheld devices to their charging stations.

**Plaintiff's Response to Defendant's Statement No. 32:** Plaintiff's counsel

is conferring with the Opt-in Plaintiffs concerning this statement. Roughly half of

the Opt-in Plaintiffs interviewed thus far advised that they did not synchronize their

handheld devise themselves. Rather, their managers synchronized the handheld

device.

**Defendant's Statement No. 33:** After turning in the handheld devices, the Specialists meet with a manager to review what happened on the route. This review will include the Specialists informing the manager of any customer vacations or closures. During this review, the Specialists fill out a "load sheet," which is used to tell the warehouse personnel what products and equipment to load onto the Specialists' vehicles for the following working day. By filling out the load sheets, the Specialists are estimating the amount of product they are likely to sell the next time they go on their routes, with additional amounts added to take advantage of opportunities for increased sales. Once the load sheet is filled out, the Specialists' job responsibilities are complete for the day.

**Plaintiff's Response to Defendant's Statement No. 33:** Plaintiff's counsel is conferring with the Opt-in Plaintiffs concerning this statement. The vast majority of the Opt-in Plaintiffs agree with the gist of Defendant's Statement No. 33, except that all of the Opt-in Plaintiffs interviewed thus far dispute that they discussing anything related to "selling" goods. This process took anywhere between 5 to 90 minutes.

**Defendant's Statement No. 34:** During the review with the managers after completing their routes for the day, many Specialists ask the manager for an estimate of the amount of commissions they earned for that day, which the manager can look up on the system.

**Plaintiff's Response to Defendant's Statement No. 34:** Plaintiff objects to this statement because it is irrelevant to the claims and defenses in this matter.

**Defendant's Statement No. 35:** The amount of time for work-related activities from checking in the vehicle in warehouse to completing the load sheets while meeting with the manager is typically 20-30 minutes in Plymouth and a few minutes shorter in Grand Rapids, with more experienced Specialists taking less time than the inexperienced. The actual times may be longer due to non-work activities such as using the restroom.

**Plaintiff's Response to Defendant's Statement No. 35:** Plaintiff's counsel is conferring with the Opt-in Plaintiffs concerning this statement.  Every Opt-in Plaintiff interviewed thus far disputes this statement. Rather, the Opt-in Plaintiffs advised that this process took anywhere between 30 to 120 minutes.

**Defendant's Interrogatory Nos. 4, 5 and 6**

4.    Identify each specific calendar week You claim to have worked more than 40 hours during that week while employed by Absopure during the Relevant Time Period.

5.    For each week identified in response to Interrogatory No. 4, describe the facts upon which You base that allegation, including the total number of hours You claim to have worked during that week, the total number of overtime hours You are claiming for that week, how You determined those hours, and identify any documents, communications or other evidence You claim support Your allegations concerning the hours You worked.

6.    For each week identified in response to Interrogatory No. 4, identify the total amount of overtime wages (or other wages, compensation or monies) that You claim to be owed and the reason You claim You were not properly paid and describe all calculation You used to come to the amount of overtime You claim to be owed.

**Defendant's Statement No. 36:** Defendant has produced lists of the clock-in times for each Plaintiff.  Attached as Exhibit B is a list of the bates ranges for those lists. For those times when a Specialist did not clock in immediately upon arrival, a manager typically filled in a rough estimate for when the Specialist arrived.

**Plaintiff's Response to Defendant's Statement No. 36:**  Plaintiff's counsel is conferring with the Opt-in Plaintiffs concerning this statement.  As far as they

know, most of the Opt-in Plaintiffs interviewed thus far do not dispute the "clock-in" times provided as the range of accurate times that they clocked-in. They cannot, however, attest to when they "clocked-in" for purposes of attendance on every workday. Additionally, there was no incentive to "clock-in" immediately upon arriving to work because these "clock-in" records are/were not intended to serve as time records, but merely intended to serve as attendance records. This burden lies with the Defendant to maintain accurate time records, and Defendant admittedly failed to maintain same.

**Defendant's Statement No. 37:** Defendant has provided a list of the handheld device check-out and check-in times for each Plaintiff on a document bearing bates stamp numbers ABS -003751-004195.

**Plaintiff's Response to Defendant's Statement No. 37**: Plaintiff objects to this statement. These records have not been authenticated, and there is no way to know what is missing. The Opt-in Plaintiffs cannot attest to the accuracy of this data.

**Defendant's Interrogatory No. 18**

18.  If You claim that You are or were not exempt from the overtime provisions of the FLSA pursuant to section 13(b)(1) of the FLSA (29 U.S.C. § 213(b)(1)) as being an employee with respect to whom the Secretary of Transportation has power to establish qualifications, describe with specificity all of the bases for such claim including all of the facts, documents, and communications on which You are relying.

**Defendant's Statement No. 18:** Defendant's facts with respect to this interrogatory are contained in its answers to Opt-In Plaintiffs' Interrogatories No.

3 and any supplements.

**Plaintiff's Response to Defendant's Statement No. 18:** Plaintiffs are not exempt from the overtime provisions of the FLSA pursuant to section 13(b)(1) of the FLSA. The supporting facts and evidence are set forth in Plaintiff's dispositive motion briefings, discovery responses, and certification briefings.

**Defendant's Interrogatory No. 19**

19.   Identify each day that You drove a vehicle for Absopure during the Relevant Time Period that weighed than 10,000 pounds or less and each day that you drove a vehicle that weighed 10,001 pounds or more.

**Defendant's Statement No. 19:**   Produced concurrently with these Statements is a list of the vehicles, the weights of those vehicles, and the route numbers that each Plaintiff drove during the relevant time frame bearing bates number range ABS 003581- 003738.

**Plaintiff's Response to Defendant's Statement No. 19:**   Plaintiff's counsel is conferring with the Opt-in Plaintiffs concerning this statement.  Plaintiffs cannot confirm the accuracy of this statement.

**Defendant's Interrogatory No. 20:**

20.   If You denied any of Absopure's Requests For Admission served concurrently with these interrogatories, then, with respect to each such denial, describe Your reasons for denial. For example, if You deny either Absopure's Request Nos. 5 or 6 regarding how your compensation was calculated, describe any inaccuracy, omission, or mischaracterization You claim is in the Request and what You claim is an accurate, complete, and properly characterized description.

**Defendant's Statement No. 20:**   The Court ordered that no response is needed for requests for admission.

18

**Defendant's Interrogatory No. 21**

21.  While You were employed by Absopure, did You ever complain about any alleged violations of the FLSA to any supervisor or manager or of any other failure to pay You what You believed You were owed? If so, describe Your complaint, to whom You made it, and Absopure's response.

**Defendant's Statement No. 39:**  Defendant has reviewed the personnel files for Plaintiffs and has not found records of complaints by Plaintiffs.

**Plaintiff's Response to Defendant's Statement No. 39:**  Plaintiff objects to this interrogatory because it not relevant to this matter.

**Defendant's Interrogatory Nos. 22 and 23**

22.  Other than the other Plaintiffs in this action, identify all individuals whom You believe support Your claims that You are entitled to overtime compensation.

23.  For each individual listed in response to Interrogatory No. 17, describe Your understanding of the knowledge each person has that supports Your claims in this case.

**Defendant's Statement No. 40:**  No individuals support Plaintiffs' claims.

**Plaintiff's Response to Defendant's Statement No. 40:**  The Opt-in Plaintiffs support Plaintiff's claims.

**Defendant's Interrogatory No. 24**

24.  Identify each personal computer, mobile phone, or other electronic device (other than the hand-held device) capable of sending or receiving e-mails, text messages, data, or documents that You owned or used while You were employed by Absopure during the Relevant Time Period, , and identify the make and model of the devices, the operating systems, software and applications used by the devices, and the carriers

or providers that facilitated data communication services for the devices, and please identify whose possession each computer, device, etc., currently resides.

**Defendant's Statement No. 24:**  The Court Ordered that Plaintiffs do not need to respond to this interrogatory.

Dated:  June 9, 2023

Respectfully submitted,

/s/ *Michael N. Hanna*
Michael N. Hanna (P81462)
MORGAN & MORGAN, P.A.
2000 Town Center, Suite 1900
Southfield, MI 48075
(313) 739-1950
mhanna@forthepeople.com

*Attorneys for Plaintiff*

20