# EXHIBIT 3

TERRY PEMBERTON
July 03, 2023

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION


JUSTIN GUY, individually and

on behalf of those similarly

situated,

        Plaintiff,

  vs.                      Case No. 20-cv-12734-MAG-EAS

                            Hon. Mark A. Goldsmith

ABSOPURE WATER COMPANY, LLC,

a domestic limited liability

company,

        Defendant.

_____


    The Remote Deposition of TERRY PEMBERTON,

    Commencing at 2:01 p.m.,

    Monday, July 3, 2023,

    Before Helen F. Benhart, CSR-2614,

    Appearing remotely from Wayne County, Michigan.

TERRY PEMBERTON
July 03, 2023

### Page 2

```
 1  REMOTE APPEARANCES:
 2
 3  ANDREW R. FRISCH
 4  Morgan & Morgan, P.A.
 5  8151 Peters Road
 6  Suite 4000
 7  Plantation, Florida  33324
 8  (954) 967-5377
 9  afrisch@forthepeople.com
10      Appearing on behalf of the Plaintiff.
11
12  MICHAEL O. CUMMINGS
13  Cummings, McClorey, Davis & Acho, P.L.C.
14  1185 Avenue of the Americas
15  Third Floor
16  New York, New York 10036
17  (212) 547-8810
18  mcummings@cmda-law.com
19      Appearing on behalf of the Defendant.
20
21
22
23
24
25
```

### Page 3

```
 1              TABLE OF CONTENTS
 2
 3  WITNESS                                    PAGE
 4  TERRY PEMBERTON
 5
 6  EXAMINATION
 7  BY MR. CUMMINGS:                              4
 8  EXAMINATION
 9  BY MR. FRISCH:                               32
10  RE-EXAMINATION
11  BY MR. CUMMINGS:                             33
12
13               EXHIBITS
14
15  EXHIBIT                                    PAGE
16  (Exhibit retained by Mr. Cummings.)
17
18  DEPOSITION EXHIBIT 1                         29
19
20
21
22
23
24
25
```

### Page 4

```
 1  Remote Proceedings
 2  Monday, July 3, 2023
 3  2:01 p.m.
 4          THE REPORTER:  The attorneys participating
 5  in this deposition acknowledge that I am not
 6  physically present in the deposition room.  They
 7  further acknowledge that in lieu of an oath
 8  administered in person, the witness will verbally
 9  declare his testimony in this matter is under penalty
10  of perjury.  The parties and their counsel consent to
11  this arrangement and waive any objections to this
12  manner of reporting.  Please indicate your agreement
13  by stating your name and your agreement on the record.
14          MR. FRISCH:  Andrew Frisch for the
15  plaintiff and I agree.
16          MR. CUMMINGS:  Michael Cummings for
17  Defendant.  Yes, I agree.
18          TERRY PEMBERTON,
19  Was thereupon called as a witness herein, and after
20  having been first duly sworn to testify to the truth,
21  the whole truth and nothing but the truth, was
22  examined and testified as follows:
23              EXAMINATION
24  BY MR. CUMMINGS:
25  Q.  Good afternoon, Mr. Pemberton.  You're having your
```

### Page 5

```
 1      deposition taken which is part of a litigation court
 2      procedure.  It's very similar to testifying in court.
 3      There's a court reporter taking down what you say and
 4      will produce a transcript of that.  First of all, have
 5      you ever had your deposition taken before?
 6  A.  I have not, no.
 7  Q.  Okay.  So as I said, it's very much like court
 8      testimony.  You're sworn in.  You are under oath and
 9      you would be like you would in court subject --
10      potentially subject to penalties for perjury if you
11      knowingly made a false statement.  Do you understand
12      that?
13  A.  Yes.
14  Q.  Okay.  Good.  And so some basic ground rules.  Please
15      continue as you're doing to say -- make verbal answers
16      such as yes rather than nodding your head or something
17      so that the court reporter can take down clearly what
18      you say.  Do you understand that?
19  A.  Yes, I do.
20  Q.  Okay.  And, also, as you've been doing, please wait
21      for me to complete my question even if the answer
22      seems quite obvious, again, so the court reporter can
23      take it down and your attorney could have the
24      opportunity to object if necessary.  You understand
25      that as well?
```

TERRY PEMBERTON
July 03, 2023

Page 6

1  A. Yes, I do.
2  Q. Where are you currently?
3  A. I'm in my home.
4  Q. Okay. Other than the computer you're taking this on,
5     do you have any computing or communication devices
6     with you?
7  A. No, no.
8  Q. Okay. And as I'm asking you questions, I would ask
9     you not guess at the answer. If you don't know, feel
10    free to say so. However, if you can give an
11    approximation, please do so, about this time or about
12    this long or whatever it may be. Do you understand
13    that as well?
14 A. Yes, I do.
15 Q. Is there anything going on with you that might prevent
16    you from giving full and complete answers, maybe on
17    medication or some other distraction that would
18    interfere with your answering questions?
19 A. No.
20 Q. Now, what is your understanding of the case and why
21    you are participating?
22 A. My understanding is that it has -- I believe it has
23    something to do with overtime payments at Absopure.
24    Other than that, I can't give a clear answer.
25 Q. Do you recall the dates that you worked for Absopure?

Page 7

1  A. Yes. It was late February to late June I believe.
2  Q. Of what year?
3  A. Of 2022.
4  Q. Okay. What was your position with Absopure when you
5     worked there?
6  A. I was a driver.
7  Q. Okay. Could you please state your current address?
8  A.                            Michigan.
9  Q. Were you living at that location at the time you
10    worked for Absopure?
11 A. Yes.
12 Q. And what were your responsibilities as a driver for
13    Absopure?
14 A. I would deliver product. That was -- I would -- like
15    throughout the day? Do you want like a --
16 Q. Yeah. We'll go through more, just a general
17    description would be fine now and we'll go through bit
18    by bit.
19 A. Just in general it was driving and delivering the
20    product to customers.
21 Q. Okay. Did you -- other than a general description of
22    driver, did you have a specific title when you worked
23    there?
24 A. Not that I'm aware of, unless it was driver. That's
25    the only one I remember.

Page 8

1  Q. Okay. So it would be good at the moment to -- have
2     you heard of the term specialist in reference to some
3     of the drivers?
4  A. Not that I recall, no.
5  Q. Or had you heard the term trainee with respect to
6     drivers?
7  A. I think I did hear trainee once or twice.
8  Q. Did you have any sense of what that referred to?
9  A. Just someone who's in training.
10 Q. Okay. Were you a trainee or in training while -- at
11    any time while you were working with Absopure?
12 A. If it refers to that, then -- if it refers to someone
13    in training, then, yes, I was in training at some
14    point.
15 Q. Okay. During the time that you worked for Absopure,
16    did you have a commercial driver's license?
17 A. Yes, I did.
18 Q. What type of license was it?
19 A. I had a Class A.
20 Q. So I would like if we could step through your
21    day-to-day job activities starting the very first
22    thing when you arrived for a working day. What was
23    the first thing that you did?
24 A. I would clock in.
25 Q. And what do you mean by clocking in?

Page 9

1  A. Right near the door, right when you walked into the
2     second set of doors, there was a thing that you scan
3     your ID up against right near the wall and that was
4     the clock in thing.
5  Q. Okay. Did you do that every day when you began the
6     workday?
7  A. Every day that I began my workday at the yard, yes.
8  Q. Okay. Just to confirm, you worked at Absopure's
9     Plymouth facility, correct?
10 A. Yes.
11 Q. Okay. And then what did you do after you swiped your
12    card after the clock in?
13 A. I would check my load sheet and my route for the day
14    as well as grab my -- my handheld device. I can't
15    remember what it's called, but my handheld device and
16    checked through and make sure everything's correct and
17    lined up with my paperwork.
18 Q. What was your load sheet?
19 A. It was -- it was just like a sheet that showed which
20    bay had which product and along that line. I'm trying
21    to word it. It was a sheet that showed on my -- on
22    the truck where the product was on each thing or where
23    it should be.
24 Q. And did you fill out the load sheet?
25 A. Yes.

TERRY PEMBERTON
July 03, 2023

Page 10

1  Q.  And when did you fill out the load sheet?
2  A.  The day before, whenever -- either the day before or
3      the Friday before if it's in the case of Mondays.
4  Q.  Okay. And you referred to a handheld device. What
5      was that?
6  A.  I'm not quite sure how to describe it. It's like a
7      little -- like a handheld thing bigger than a phone
8      with a keypad. A big bulky thing.
9  Q.  What kind of things did you do with the handheld?
10 A.  So I would compare it to what is on my load sheet and
11     make sure that the amount of each product like, for
12     example, distilled water, matched up with what was in
13     my handheld.
14 Q.  Okay. And when did you do that comparison?
15 A.  Just right before -- as soon as I get in, check the
16     loads and then check the handheld and then right after
17     that. Right after I looked at the handheld I would
18     compare the two.
19 Q.  What did you do after making that comparison?
20 A.  I would go start my truck, and if I had any coolers or
21     anything like that for the day, I would go grab those
22     and load them in the truck, then count and make sure
23     everything in the load sheet was also on the truck as
24     well.
25 Q.  How often did you grab coolers to take with you?

Page 11

1  A.  Generalizing, I'd say at least two times a week for me
2      personally for my route.
3  Q.  And typically how many coolers would that be?
4  A.  I'll generalize and say like two, two each time.
5  Q.  Was there a maximum number that you would take?
6  A.  If I remember correctly, the max I ever took was like
7      six in one day, if that.
8  Q.  Okay. As I recall, you just stated that you would
9      compare what was on the -- you went back to your truck
10     and compared what was on the load sheet with what was
11     on the truck, is that correct?
12 A.  Yes.
13 Q.  Then what did you do after that?
14 A.  After that, assuming there were no mistakes with the
15     things -- with things not being loaded or similar
16     issues, I'd drive up to the front, and a manager is
17     supposed to come and check and make sure that it all
18     lines up with the paperwork, the truck and the
19     handheld.
20 Q.  And when you were back at -- first getting your truck
21     and it did not match up between the handheld and what
22     was on the truck, what would happen then?
23 A.  We would have to drive into the warehouse and get the
24     attention of a forklift driver to make sure to bring
25     the stuff that wasn't there or if it was a smaller

Page 12

1      item like a -- like water containers, like a 12-pack
2      water, smaller things like that, then we would have to
3      go into the warehouse and get it.
4  Q.  About how often did this occur where there wasn't a
5      match-up?
6  A.  I can't really recall. It was inconsistent.
7  Q.  And you said you then drove up to the front. Where
8      did you drive up to?
9  A.  Right in front of the office building. Yeah, right in
10     front of the main door, the same door that I went
11     into, walk in at.
12 Q.  And on your route did you have any coffee products
13     that you took with you?
14 A.  My route I usually did not.
15 Q.  Okay. And at any time in the morning in this process
16     did you ever do any kind of safety inspection on your
17     truck?
18 A.  Yeah. Right before I start the truck you do a
19     walk-around, check the engine and all that.
20 Q.  Okay. And about how long did that safety inspection
21     take you?
22 A.  It would take me about five minutes, if that.
23 Q.  And after you had met with the manager by the front
24     office and confirmed the inventory on the truck, what
25     happens then?

Page 13

1  A.  Then I'd be given the okay to go and I'd -- I'd
2      usually go like right after that.
3  Q.  Okay. When did you ever do anything that was called
4      checking out or checkout?
5  A.  When the -- when I would talk to the manager, they
6      would check me out. They do it all in one. They walk
7      around. They make sure it all matches, then they
8      check me out on the thing, on the handheld.
9  Q.  By check me out on the thing, they would do something
10     on the handheld?
11 A.  Yeah. They would have to insert some passwords and
12     stuff to make sure I was good to go.
13 Q.  After that was done, what happened next?
14 A.  That's when I would be done checking out and done for
15     my pretrip stuff basically and then I'd be on my way
16     to my stops.
17 Q.  Okay. Do you have a sense for how long generally it
18     took from the time that you clocked in until the time
19     you were able to check out the truck?
20 A.  Probably -- an estimate, I'll say around max 30
21     minutes, minimum 15, 20.
22 Q.  Okay. Did you ever --
23 A.  Assuming there was no errors on the load sheet or
24     stuff wasn't loaded, you know, a situation like that.
25 Q.  If there was some kind of error, how long might you --

TERRY PEMBERTON
July 03, 2023

Page 14

1  it take you then or did it take you then?
2  A.  It depends on how many forklift drivers there are and
3      how many other trucks had similar issues.  Yeah, it
4      all depends on that.  I'd say the most I've waited was
5      like 30 minutes in there would be about the maximum,
6      minimum like five minutes, so it's a bit of a spread.
7  Q.  Okay.  And you mentioned you weren't quite sure how
8      often that happened.  Did it happen more than once a
9      week?
10 A.  It has happened more than once a week, but I have also
11     gone more than two weeks without it happening.  It was
12     rather inconsistent.
13 Q.  I see.  The route that you drove, did it have a name
14     and a number?
15 A.  I assume it did.  I wouldn't know what it was, though.
16 Q.  Either one, you don't recall a name or a number for
17     the route?
18 A.  No.  I just called it up north route.
19 Q.  I see.  And by up north route, where did you go on
20     your route?
21 A.  Furthest north I'd go is like Cheboygan, Petoskey, and
22     usually my first stop, the most southern stop, would
23     be Beaverton or Gladwin and anywhere between that
24     would be Gaylord, Alpena, stuff like that.
25 Q.  Was yours an overnight route?

Page 15

1  A.  Yes, it was.
2  Q.  So please give me a brief description of how things,
3      you know, went in your route including how long it
4      took you.
5  A.  For my route, depending upon which one it was --
6          MR. FRISCH:  I'm going to object.  It calls
7      for a narrative and it's a compound question, but you
8      can answer if you understand.
9          THE WITNESS:  So depending on which route
10     it was, it could take -- it would usually take just
11     around 12 hours because that's -- I'd usually start
12     around six and end around six as well.
13 BY MR. CUMMINGS:
14 Q.  I see.  How long did -- you said depending on the
15     route.  Did you drive a number of different routes up
16     north?
17 A.  I drove -- I would usually have -- they were usually
18     rather similar, but there was three distinct routes.
19 Q.  How often did you drive each of these three different
20     routes?
21 A.  Every week.
22 Q.  So you drove three times?  You made three routes every
23     week?
24 A.  Yes.
25 Q.  Okay.  And what were the -- maybe for each route

Page 16

1  maybe -- how did you refer to each route?
2  A.  Mondays it was Saint Helen and Houghton Lake and back.
3      Wednesday -- Tuesday, Wednesday Gaylord and Alpena,
4      Thursday, Friday Petoskey and Cheboygan.
5  Q.  You said the Monday route.  Was that an overnight
6      route?
7  A.  Monday night was not overnight.
8  Q.  So how long did it take you from the time you left on
9      your route to the time you got back to the facility?
10 A.  On Monday?
11 Q.  Yes, Monday.
12 A.  Monday I'd usually leave around six or -- I'd leave
13     the facility around 6:30 and then I'd probably get
14     back about four or five, around that time.
15 Q.  I see.  Okay.  And for the Tuesday, Wednesday route,
16     how long did it typically take you to get to your
17     first stop?
18 A.  No less than around three hours.
19 Q.  I see.  After you got to your first stop, how long
20     after that would it take you to complete the route for
21     the day or complete what you would be driving for that
22     day?
23 A.  Around eight hours from the first stop to when -- the
24     stop at the hotel, about eight hours.
25 Q.  Were you able to make all the stops for that route on

Page 17

1  your -- on the first day, on the Tuesday?
2  A.  Very inconsistently.  It depends on how many stops
3      they would have and where the stops would be so
4      it's -- I can't give like a clear answer on that.
5      It's very imprecise.
6  Q.  Be fair to say that sometimes you could complete all
7      the stops on the Tuesday and sometimes you would have
8      to -- other times you would have to complete the stops
9      on Wednesday, correct?
10 A.  I would say more often than not I would have to
11     complete the rest of them on Wednesday.
12 Q.  Okay.  And how long did it take you from the time you
13     left your hotel to the time you completed your stops
14     when you had to do so on Wednesday?
15 A.  So from when I left the hotel to like finish the stop
16     before I head back to --
17 Q.  Yeah, before you head back.
18 A.  Two, three hours.
19 Q.  Okay.  And how much time would it take you then after
20     the last stop on a Wednesday to head back?
21 A.  Two and a half or three hours.
22 Q.  I see.  How about -- I'll see if I'm getting it right.
23     Is it correct you had a Friday, Saturday route?  Did I
24     hear that correctly?
25 A.  Thursday, Friday.

TERRY PEMBERTON
July 03, 2023

Page 18

1  Q.  Thursday, Friday, excuse me. So for the Thursday,
2      Friday route, how long did it take you to reach your
3      first stop?
4  A.  Maximum four hours. Depends on which way they
5      dispatched me, which direction they did.
6  Q.  Was it further away than the Tuesday, Wednesday?
7  A.  Usually, yes.
8  Q.  Okay. And for the Thursday, Friday route, were you
9      able to complete all of the stops on the first day?
10 A.  No, almost never.
11 Q.  Okay. And from the -- I guess from time -- to make it
12     simpler, from the time you left the Plymouth facility,
13     the time you made it to your hotel, how long would
14     that typically be for the -- this third route?
15 A.  It would usually be around 11 or 12 hours.
16 Q.  And how much time on the following day from the time
17     you left your hotel to the time you made it back to
18     Plymouth, how much would that be?
19 A.  Six or seven hours.
20 Q.  Okay.
21 A.  Minimum.
22 Q.  For this third route, how many stops did you make
23     total both days?
24 A.  I do not recall.
25 Q.  Do you have any recollection for the second route, the

Page 19

1      Tuesday, Wednesday route, how many stops you made?
2  A.  No, I can't remember that for those routes.
3  Q.  Okay. Now, getting back for all the routes, when
4      you -- what occurred when you made it back to
5      Plymouth?
6  A.  I would -- I'd go in. I'd hand in any checks or cash
7      into the -- I don't know what position -- I assume a
8      clerk as well as all the -- sorry. I'm trying to
9      recall the words. As well as all -- like all the
10     receipt like papers that I had printed out from all
11     the drop-offs. They'd check through. They'd check in
12     my handheld device and then I'd be -- I'd fill out my
13     load sheet for the next day and then I'd take the
14     truck back to the back and get all the empties
15     unloaded, fill up my gas while I'm there and then park
16     my truck and then head up to the front and clock out
17     and be done for the day.
18 Q.  So is it correct then you would hand in the paperwork
19     from the route and hand in your handheld prior to
20     taking the truck to the back of the facility?
21 A.  I would, yes.
22 Q.  At any time -- when you came back from your routes,
23     did you meet with warehouse facilities to confirm the
24     inventory you still had on your truck or the empties
25     you still had on your truck when you got back?

Page 20

1  A.  Yes. Yeah. When I would go back to get the empty
2      racks unloaded, they would also scan in with my
3      handheld.
4  Q.  I see. So was this -- would this occur before you
5      handed in your paperwork?
6  A.  Yeah. Yeah. I'm sorry. I think I mixed those two
7      up. I would go to the warehouse first and then the
8      paperwork and stuff would be brought up to the front.
9  Q.  Oh, I see.
10 A.  Sorry. It's been a while.
11 Q.  Understood. Now, getting back, after you hand in your
12     paperwork -- you hand in your paperwork. You handed
13     back the handheld, and what did you do after that
14     again?
15 A.  After the handheld would be put back, I would fill out
16     my load sheet for the following day.
17 Q.  Okay. At any time did you meet with a manager after
18     getting back?
19 A.  So they -- yes. They'd print out the load sheet for
20     me and tell me my route for the next day.
21 Q.  I see. And getting to them when you drove your truck
22     to the back and met with the warehouse personnel, did
23     you do anything with the handheld at that time?
24 A.  Yeah. They would -- I'm not sure exactly what they
25     did. I believe they just checked it in and confirmed

Page 21

1      the numbers like as they were pulling it off.
2  Q.  Okay. And when you confirmed the numbers, is that
3      something that was done with the handheld?
4  A.  Yes.
5  Q.  Okay. And you mentioned the word check in. Did any
6      of the process you do with the handheld, was that ever
7      called checking in?
8  A.  I believe so, yeah. Or checking out. I can't recall
9      which --
10 Q.  Okay. Now, you mentioned that -- earlier that you had
11     driven back to the back after you had turned in your
12     load sheet. Is that still correct or were you mixing
13     up your sequence?
14 A.  Yeah. I mixed up. The office would be after I got --
15     sorry. I'd go to the office after fueling up and
16     getting checked out in the warehouse and then parking
17     my truck and then I do the office stuff.
18 Q.  Fueling your truck, when did you do that along the
19     sequence?
20 A.  On my way to the warehouse. You have to pass by the
21     gas pump while you're going to the warehouse.
22 Q.  Okay. Was your truck a diesel truck?
23 A.  Yes, mine was.
24 Q.  And so you did the fueling before you met with the
25     warehouse personnel to confirm the inventory on the

TERRY PEMBERTON
July 03, 2023

Page 22

1    truck, is that correct?
2  A. Yes.
3  Q. So returning back to the load sheet then, is there
4     anything you did after handing in the load sheet?
5  A. I think after that I'd just clock out.
6  Q. How did you hand in your load sheet?
7  A. I'd give it to -- I don't know what they'd be referred
8     to, one of the office employees. I'd hand it to them
9     and that was it.
10 Q. Okay. Was your -- do you happen to know whether or
11    not your load sheet was scanned in with a scanner
12    at --
13 A. I don't recall.
14 Q. Okay. I'm going to put up a document and I'll
15    probably send it around as an exhibit. Please give me
16    a second here. I'll put it on the screen in a minute
17    so just be patient. And I'm going to ask you whether
18    or not you've seen it, but give me a minute and I'll
19    put it up on the screen.
20           MR. CUMMINGS: I will state for the record
21    this is a series of documents, the whole document.
22    This is only one page of it, but the whole document
23    has been produced in the case and bears the Bates
24    numbers 5489 to 5530.
25 BY MR. CUMMINGS:

Page 23

1  Q. Mr. Pemberton, do you recognize this document?
2  A. Yes.
3  Q. And what is it?
4  A. This is the load sheet.
5  Q. Okay. And so that is your name on it?
6  A. Yes.
7  Q. Okay. And the handwriting that's on the document, is
8     that something that you would have filled out?
9  A. Yes. It's usually something that I fill out.
10 Q. Okay. And just a couple of things. It says route
11    11007 northeast. Does that number sound familiar?
12 A. It doesn't ring any bells.
13 Q. Okay. And also gives a truck number that's
14    handwritten in. It says 422. Does that ring any
15    bells? Do you recall that at all?
16 A. Yes. That was my usual truck.
17 Q. Okay. I notice that a truck number that appears to be
18    1111 was crossed out. Did you ever drive a truck with
19    the number 1111?
20 A. No.
21 Q. Okay. And I'm going to scroll through some pages
22    here. Now, may I ask, do you recall at the time who
23    were -- who was the manager or the managers that you
24    worked with in the -- when you returned your truck for
25    day?

Page 24

1  A. Joe and Mike.
2  Q. Do you know recall Joe's name or Mike's name?
3  A. I don't remember their last names, no.
4  Q. The page before this actually is an e-mail. I'll blow
5     it up a little bit so you can see it. I see there's a
6     name. It's an e-mail from a none@absopure to a
7     Michael McWhinnie. Do you recall if that was the name
8     of the manager?
9  A. Yes.
10 Q. And are you aware of any -- have you ever seen an
11    e-mail like this from an address called
12    none@absopure.com?
13 A. Not that I recall, no.
14 Q. Okay. However, truck -- is it correct, though, that
15    truck 422 was your truck?
16 A. For the -- yeah. That was my usual truck.
17 Q. And just to confirm, the date on this e-mail,
18    April 11, 2022, that was during your employment period
19    with Absopure, correct?
20 A. Yes.
21 Q. Okay. And do you recall -- can you recall typical
22    times or range of times that you normally completed
23    your load sheet for the day?
24 A. That I complete my load sheet?
25 Q. Yeah. On the days you returned, I know some days you

Page 25

1     didn't return, but on the days you returned, is there
2     a typical time or typical times that you can recall?
3  A. For the overnight shifts, yes. It was around three or
4     4:00. For the Monday shift it was around 6:00 I
5     think.
6  Q. Three or 4:00 you said for the Monday shift?
7  A. No, for the overnight shifts, the Wednesday and
8     Friday.
9  Q. I see. I understand. Okay. So I'm going to scroll
10    to this. It looks -- according to this, Monday,
11    April 11. April 11 was in fact a Monday and so that
12    on Monday if this is accurate, then that was your
13    single day route, correct?
14 A. Yes.
15 Q. I'm going to scroll down. There's another e-mail.
16    This says Wednesday again with Michael McWhinnie and
17    truck 422. I'm going to go down to that load sheet.
18    I can make it bigger or smaller as you prefer or
19    scroll through it. Do you recognize this document I'm
20    showing now, which, for the record, is Bates number
21    5492?
22 A. Yeah, it looks like a load sheet as well.
23 Q. I notice that this is for -- it looks like it's for a
24    different day of the week than the other load sheet,
25    but it gives the same route 11007 northeast. Do you

TERRY PEMBERTON
July 03, 2023

Page 26

1  recall if all the different routes that you drove, the
2  three different routes, did they have a common name or
3  number that you recall?
4  A.  I don't recall, no.
5  Q.  Okay. And scroll through -- there's several, maybe 20
6      of them total here. The next one coming down is
7      dated -- now I want -- according to this e-mail --
8      I'll scroll back up. It says -- the e-mail in front
9      of it says Wednesday, April 13th, but the load sheet
10     that's next to it, and I'm not making any
11     associations, says -- has a date on it for April 14th.
12     In general the load sheet -- my question is in general
13     for the load sheets that you filled out, would the
14     date on the load sheet reflect the following date that
15     you'd be going on your route or the same --
16 A.  I believe that's what it is, yes.
17 Q.  And were there significant different -- what
18     products typically let's say that you took typically
19     on your Monday route?
20 A.  Monday would usually be distilled spring and Primo
21     would be the main ones.
22 Q.  And these are water products?
23 A.  Yeah, the five-gallon water bottles.
24 Q.  And I'm going to go back up to the first load sheet
25     that we talked about, which, for the record again, is

Page 27

1  5490, and this reflects the type of products that you
2  would take on your Monday route?
3  A.  Yes. And the last two were not always there.
4  Q.  Okay. The last two meaning -- it says Abso premium
5      16.9 ounce, 24 count and glass bottles were not always
6      there, is that correct?
7  A.  Yes, correct.
8  Q.  Going down to the next load sheet, for the record this
9      is Bates numbers 5492, are these the type of products
10     that -- shown on this log that you typically took with
11     you on your Tuesday, Wednesday routes?
12 A.  Similar to the last one, only the first -- those first
13     four, the Absopure distilled, five gallon, Absopure
14     spring five gallon, Primo drinking five gallon and the
15     Absopure drink five gallon are the only ones that were
16     consistently there.
17 Q.  The other ones were sometimes?
18 A.  Yes.
19 Q.  And going down to the next load sheet here, and
20     I'll -- for the record it is Bates number 5494, again,
21     it has a list of products. Is this list of products
22     typical for your Thursday, Friday -- your third route
23     of the week?
24 A.  Similar to the last -- similar to the last ones,
25     distilled and the two drinking waters are usually

Page 28

1  there. There's usually also the five gallon spring on
2  that route as well.
3  Q.  It's something often taken that was not on this
4      particular load sheet. Is that what you're saying?
5  A.  Yes.
6  Q.  And I noticed none of these particular load sheets
7      listed any coffee products that I can see, is that
8      correct?
9  A.  Correct.
10 Q.  Did you ever take any coffee products on your route?
11 A.  On this route, I don't recall ever having done that on
12     this route.
13 Q.  The Thursday -- this is the Thursday, Friday route,
14     correct?
15 A.  On any of the up north routes, the overnights.
16 Q.  Did you ever run other routes than the up north
17     routes?
18 A.  A few times, yes.
19 Q.  And what were those routes?
20 A.  I don't recall. I can't remember the cities that they
21     were in.
22 Q.  And did you drive different trucks when you were on
23     those routes?
24 A.  Not specifically if I was on those routes.
25 Q.  Do you have any recollection of how often you ran the

Page 29

1  other routes other than the up north routes?
2  A.  Not very often. I can't put a number to it. It was
3      not very frequent.
4  Q.  Okay. Very good. We'll stop sharing this document.
5             When you were working for Absopure, how
6      were you paid? Excuse me. I'm going to rephrase the
7      question. Forgive me. How was your pay calculated
8      when worked for Absopure?
9  A.  I believe it was like a flat rate per day and then we
10     earned some -- we earned an amount for every bottle we
11     delivered.
12 Q.  Okay. And what was that amount that you earned for
13     every bottle that you delivered?
14 A.  I do not recall.
15 Q.  Okay. And you do have -- now, do you recall what your
16     flat rate was for the day?
17 A.  I do not recall, no.
18 Q.  Okay. Give me a minute. I'm going to put another
19     document --
20         MR. CUMMINGS: By the way, court reporter,
21     that last document that I just put up, could you enter
22     that as Exhibit 1. I will e-mail it to you when we're
23     done here.
24         REMOTELY INTRODUCED:
25         DEPOSITION EXHIBIT 1

TERRY PEMBERTON
July 03, 2023

### Page 30

```
 1        2:40 p.m.
 2  BY MR. CUMMINGS:
 3  Q.  Give me a minute and I will get to another document.
 4      Can you see this document on the screen?
 5  A.  Kind of, yeah.
 6  Q.  Okay.  It's kind of a long, wide document.  I'll blow
 7      it up and we'll show the left half of it at the moment
 8      if that's okay.  Now, for the record here, I am -- the
 9      document -- this is one page of a document bearing
10      Bates numbers 4936 through 4945.  This particular
11      sheet, I will scroll down here, it bears the Bates
12      number 4936.  And can you see the words and numbers on
13      this portion of the document?
14  A.  Yes.
15  Q.  Okay.  I'm going to scroll over to the right so we get
16      the whole thing here since it's blown up.  I'll scroll
17      it back down.  Have you seen this document before?
18  A.  I don't recall.
19  Q.  Okay.  Have you ever heard of a document or piece of
20      paper called a commission sheet?
21  A.  Not that I recall, no, not by that name.
22  Q.  Did you ever receive any kind of document showing how
23      much money that you made in addition to your flat rate
24      for the day?
25  A.  I don't remember.  I apologize.
```

### Page 31

```
 1  Q.  Okay.  That's fine.  That's actually -- I'm very glad
 2      you say if you can remember or not.  It's much better
 3      than trying to guess or speculate.  Okay.  We can stop
 4      sharing that document at the moment.
 5          Getting back to -- forgive me if I've
 6      already asked this, but my own notes aren't clear.
 7      When you arrived back at the facility after any of
 8      your routes during the week, from the time that you
 9      went back you confirmed you met -- stop me if I'm
10      putting words in your mouth, but from the time you
11      met -- brought the car back, you met with warehouse
12      personnel and confirmed on the handheld the inventory
13      and empties you had on your truck, from that point
14      until the time you left for the day, you filled out
15      your load sheet and left for the day, how long did
16      that process typically take you?
17  A.  Around 30 minutes.
18  Q.  Did it sometimes take longer?
19  A.  It did sometimes take longer, yes.
20  Q.  Were there any factors that would make it take longer?
21  A.  Yes.  If warehouse personnel were unavailable or if
22      they were just taking longer.
23  Q.  By taking longer, I'm talking from the time that you
24      met with the warehouse personnel and confirmed on the
25      handheld the inventory.  From that point forward, was
```

### Page 32

```
 1      there anything from that point forward that would make
 2      your time longer until you finally left for the day?
 3  A.  Then no.  If it's after that, then no.  Nothing would
 4      really make it longer.
 5  Q.  And do you recall if you received any kind of
 6      compensation that was called a bonus?
 7  A.  I don't recall.
 8  Q.  Okay.  And do you recall if you received any
 9      compensation for installing or removing water coolers?
10  A.  I don't believe I ever got a bonus for that, no.
11  Q.  Okay.  Really that's all the questions I have.
12          MR. FRISCH:  Okay.  I just have a few
13      follow-up questions.
14              EXAMINATION
15  BY MR. FRISCH:
16  Q.  Mr. Pemberton, did you ever drive a van when you were
17      doing your deliveries?
18  A.  I did a few times, yes.
19  Q.  Okay.  And that would have been a van weighing less
20      than 10,000 pounds?
21  A.  I believe so, yeah.  That's a Sprinter van I believe,
22      yeah.
23  Q.  When you did drive such a vehicle, did you drive it
24      for the entire day as you were doing your route or if
25      it was an overnight route I guess two days?
```

### Page 33

```
 1  A.  I believe so, yeah.
 2  Q.  You said earlier when defense counsel asked you
 3      about -- a question about what you understood the case
 4      to be about, you said it was about overtime
 5      compensation, right?
 6  A.  Yeah.
 7  Q.  And this -- is it your understanding that you were
 8      never paid overtime during the period of time you were
 9      employed by Absopure despite the fact you worked over
10      40 hours a week?
11  A.  That is my understanding, yes.
12          MR. CUMMINGS:  Objection.
13  BY MR. FRISCH:
14  Q.  Is that what -- so you believe that you have unpaid
15      overtime compensation you're seeking in this case?
16  A.  Could you repeat the question.
17  Q.  Is it your understanding that you're seeking unpaid
18      overtime compensation in this case?
19  A.  Yes.
20  Q.  I have nothing further.
21          MR. CUMMINGS:  I just have a couple
22      questions based on that.
23              RE-EXAMINATION
24  BY MR. CUMMINGS:
25  Q.  Did you ever drive a Sprinter van on your overnight
```

TERRY PEMBERTON
July 03, 2023

Page 34

1 routes?
2 A. On the overnight route, no.
3 Q. Did you ever drive a Sprinter van on your Monday
4    route?
5 A. On my -- no. My normal Monday route, no.
6 Q. Under what circumstances would -- did you drive the
7    Sprinter van?
8 A. In the cases where I was doing someone else's route,
9    when they would have me do another employee's route.
10 Q. I see. Would that -- doing that route be in place of
11    doing one of your normal up north routes?
12 A. Yes.
13 Q. Did you ever use that van on a weekend day, like on a
14    Saturday?
15 A. I don't think so, no.
16    MR. CUMMINGS: Okay. I'm done with the
17    questions.
18    MR. FRISCH: I have no further follow-up.
19    He'll read and also the one this morning, we didn't
20    talk about whether he would read or waive, both of
21    them would like to read their depositions.
22    MR. CUMMINGS: No objection.
23    MR. FRISCH: You can send us the transcript
24    and then we'll get it to them.
25    (Deposition concluded at 2:48 p.m.)

Page 35

1 Signature of the witness was requested.

Page 36

1 JUSTIN GUY, individually and
2 on behalf of those similarly
3 situated,
4            Plaintiff,
5 vs.           Case No. 20-cv-12734-MAG-EAS
6               Hon. Mark A. Goldsmith
7 ABSOPURE WATER COMPANY, LLC,
8 a domestic limited liability
9 company,
10           Defendant.
11 _____/
12        VERIFICATION OF DEPONENT
13
14        I, having read the foregoing examination
15 under oath consisting of my testimony at the
16 aforementioned time and place, subject to the changes
17 in the attached errata sheet, do hereby attest to the
18 correctness and truthfulness of the transcript.
19
20
21
22
23        _____
24              TERRY PEMBERTON
25        Dated:

Page 37

1              ERRATA SHEET
2 PAGE LINE READS              PAGE LINE SHOULD READ

Page 38

```
 1                CERTIFICATE OF NOTARY
 2   STATE OF MICHIGAN )
 3                    ) SS
 4   COUNTY OF WAYNE  )
 5
 6            I, HELEN F. BENHART, certify that this
 7   deposition was taken remotely before me on the date
 8   hereinbefore set forth; that the foregoing questions
 9   and answers were recorded by me stenographically and
10   reduced to computer transcription; that this is a
11   true, full and correct transcript of my stenographic
12   notes so taken; and that I am not related to, nor of
13   counsel to, either party nor interested in the event
14   of this cause.
15
16
17
18
19
20
21            _____
22            HELEN F. BENHART, CSR-2614
23            Notary Public,
24            Wayne County, Michigan.
25   My Commission expires: 7/7/2027
```