# EXHIBIT 6



# Worker Classification Knowledge Survey

# Volume I—Technical Report

DOLQ129633231
Final

11/16/2016

*Prepared for:*
***Jonathan Simonetta***
*U.S. Department of Labor*
*200 Constitution Avenue*
*Washington, DC 20210*

*Submitted by:*
*Kelly Daley*
*Jacob Klerman*
*Mehera Baugher*
*Lauren Dunton*
*Utsav Kattel*
*Andrew Burkey*

**Abt Associates**

*This report was prepared with funding from the U.S. Department of Labor, Chief Evaluation Office. The views expressed are those of the authors and should not attribute to the Federal Government or the Department of Labor.*

# Abstract

Under contract from the U.S. Department of Labor, Abt Associates conducted a survey of 8,503 workers on issues related to employee classification; i.e., whether those who by law are employees are being treated as self-employed (and vice versa). In addition, the study conducted 17 semi-structured interviews with employers and employer representatives. The survey suggests that workers have an imperfect understanding of the implications of employment status. In particular, many self-employed individuals believe that they are covered by the minimum wage, overtime rules, family and medical leave regulations, and occupational health and safety regulations. Interviews with employers and their representatives suggest that employers think carefully about whether to treat workers as employees. Salient considerations include lower total compensation costs for self-employed workers and the potential compliance cost of misclassifying a worker.

# Acknowledgements

This report is a collaboration of the Chief Evaluation Office (CEO) and Wage and Hour Division (WHD) of the United States Department of Labor and Abt Associates. This effort has received the strong support of the CEO—including Demetra Nightingale and Jonathan Simonetta, as well as Deputy Assistant Secretary for Policy Raj Nayak. Members of the Solicitor's Office who provided valuable insight and feedback include Jonathan Kronheim and Kerry O'Brien. Jennifer Marion, formerly of WHD, also provided comments. The survey and this report would not be a reality without their vision and day-to-day input.

At Abt Associates, Glen Schneider served as Project Quality Advisor, providing insights throughout the project and careful review of this final report. Members of our Technical Working Group—William C. Dunkelberg, Ross Eisenbrey, Connie Klipsch, Alison Morantz, Catherine Ruckelshaus, and Abel Valenzuela Jr.—provided valuable feedback throughout the project. Cindy Taylor provided valuable management guidance. Krista Olson and Nomoya Hall provided solid research assistance. Lori Metz provided programming support. Jan Nicholson formatted the document.

The survey was fielded by Abt SRBI, a subsidiary of Abt Associates, under the leadership of Kelly Daley. Julie Pacer served as Acting Survey Manager. Courtney Kennedy and Stas Kolenikov led the sample design and weighting effort. Marci Schalk also contributed.

# Table of Contents

Executive Summary ........................................................................................................... 1

1.     Introduction ............................................................................................................. 4

2.     Worker Classification Knowledge Survey—Methodology ................................ 5
    2.1   Methodological Approach ......................................................................... 5
        2.1.1   Target Population ......................................................................... 5
        2.1.2   Data Collection ........................................................................... 5
        2.1.3   Weighting Protocol ..................................................................... 5
    2.2   Characteristics of the Sample ................................................................... 5
    2.3   Terms and Definitions .............................................................................. 8
        2.3.1   Examining "Employee" Definition with Two Survey Questions ............ 9
        2.3.2   Further Refinement of "Employee" ........................................... 11
        2.3.3   Final Definition of "Employees" ............................................... 12
        2.3.4   Stratifying Variables .................................................................. 13

3.     Worker Knowledge of Employment Rights and Benefits ................................ 15
    3.1   Knowledge of Minimum Wage ............................................................... 17
        3.1.1   Minimum Wage Coverage on Main Job ...................................... 17
        3.1.2   Reasons for Lack of Minimum Wage Coverage .......................... 22
        3.1.3   Minimum Wage Coverage Change .............................................. 23
    3.2   Knowledge of Overtime Pay ................................................................... 24
        3.2.1   Overtime Coverage on Main Job ................................................ 25
        3.2.2   Reasons for Lack of Overtime Coverage ..................................... 29
        3.2.3   Overtime Coverage Change ........................................................ 29
    3.3   Knowledge of Unemployment Insurance ............................................... 31
        3.3.1   Unemployment Insurance Coverage on Main Job ........................ 31
        3.3.2   Reasons for Lack of Unemployment Insurance Coverage ............ 35
        3.3.3   Unemployment Insurance Coverage Change ................................ 36
    3.4   Knowledge of Workers' Compensation Coverage ................................... 37
        3.4.1   Workers' Compensation Coverage on Main Job .......................... 38
        3.4.2   Workers' Compensation Coverage—Subgroup Analysis .............. 39
        3.4.3   Reasons for Lack of Workers' Compensation Coverage ............... 41
        3.4.4   Workers' Compensation Coverage Change .................................. 42
    3.5   Knowledge of OSHA Safety Protections ................................................ 44
        3.5.1   OSHA Protections on Main Job .................................................. 44
        3.5.2   OSHA Safety Standards Coverage—Subgroup Analysis .............. 46
        3.5.3   Reasons for Lack of OSHA Safety Standards Coverage ............... 48
        3.5.4   OSHA Safety Standard Change ................................................... 49
    3.6   Knowledge of FMLA Benefits ............................................................... 50
        3.6.1   FMLA Coverage on Main Job ................................................... 51
        3.6.2   FMLA Eligibility—Subgroup Analysis ...................................... 53
        3.6.3   Reasons for Lack of FMLA Eligibility ....................................... 54
        3.6.4   FMLA Coverage Change ............................................................ 55
    3.7   Knowledge of Social Security/Medicare Contributions .......................... 56
        3.7.1   Social Security/Medicare Deductions and Contributions on Main Job ....... 57

       3.7.2   Change in Social Security/Medicare Contribution................................................. 61

**4.    Employers' and Employer Representatives' Feedback on Worker Classification ................ 63**

    4.1    Methodology .................................................................................................................... 63

        4.1.1   Pre-Recruitment Activities........................................................................... 63

        4.1.2   Recruitment .................................................................................................. 64

        4.1.3   Field Methods and Analysis......................................................................... 65

    4.2    Findings ............................................................................................................................ 66

        4.2.1   Factors Resulting in a Shift Away from Permanent Employees ............................ 66

        4.2.2   Factors Employers Consider When Hiring (Employee vs. Contractor)................. 68

        4.2.3   Perceived Advantages and Disadvantages of Hiring Contractors........................ 70

        4.2.4   Workers' Preferences ................................................................................... 71

        4.2.5   The Future of Hiring Employees and Contractors ....................................... 71

        4.2.6   Enforcement Experiences............................................................................. 72

    4.3    Discussion ........................................................................................................................ 73

        4.3.1   Summary Thoughts ...................................................................................... 73

        4.3.2   Recommendations for Future Research ....................................................... 74

**References**.................................................................................................................................... **75**

**Appendix A: Economic Realities Test Survey Pilot** ............................................................... **77**

    A.1    Survey Question Development ........................................................................................ 78

    A.2    Survey Administration ..................................................................................................... 81

    A.3    Coding Algorithm and Outcomes ................................................................................... 82

        A.3.1   Algorithm Description ................................................................................. 82

        A.3.2   Base Algorithm Outcomes ........................................................................... 89

        A.4.3   Discussion .................................................................................................... 94

**Appendix B: Worker Classification Survey** ........................................................................... **95**

**Appendix C: Interview Guides** ................................................................................................ **149**

    C.1    Employer Qualitative Interview Protocol ..................................................................... 149

    C.2    Employer Representative Qualitative Interview Protocol............................................... 150

## List of Exhibits

Exhibit 2.1: Demographic Information on Worker Classification Knowledge Survey Respondents ........... 6

Exhibit 2.2: Labor Force Characteristics of Worker Classification Knowledge Survey Respondents ......... 7

Exhibit 2.3: Self-Reported Employment Status Variables ................................................................... 9

Exhibit 2.4: Tax Forms Received ..................................................................................................... 11

Exhibit 2.5: Self-Reported Status among Dual Reporters (N=1,718) ................................................. 12

Exhibit 2.6: Definition of Workers Used in Analysis ......................................................................... 12

Exhibit 2.7: Stratifying Variables ................................................................................................... 14

Exhibit 3.1: Minimum Wage Coverage on Main Job—All Workers .................................................... 18

Exhibit 3.2: Minimum Wage Coverage—Clearly Identified Employees (CIEs) ..................................... 19

Exhibit 3.3: Minimum Wage Coverage on Main Job—Not Clearly Identified Employees (NCIEs) ......... 19

Exhibit 3.4: Minimum Wage Coverage by Work Characteristic—All Workers ...................................... 20

Exhibit 3.5: Minimum Wage Coverage by Education and English Language—All Workers ................... 21

Exhibit 3.6: Minimum Wage Coverage by Demographic Categories—All Workers ............................... 22

Exhibit 3.7: Minimum Wage: Reason Not Covered—Clearly Identified Employees (CIEs) and Not Clearly Identified Employees (NCIEs) ......................................................................................... 23

Exhibit 3.8: Minimum Wage Coverage Change—Clearly Identified Employees (CIEs) and Not Clearly Identified Employees (NCIEs) ......................................................................................... 23

Exhibit 3.9: Minimum Wage Coverage Change by Work Characteristic—All Workers .......................... 24

Exhibit 3.10: Minimum Wage Coverage Change—Workers of Undetermined Self-Reported Status ....... 24

Exhibit 3.11: Overtime Coverage—All Workers ............................................................................... 25

Exhibit 3.12: Overtime Coverage—Clearly Identified Employees (CIEs) ............................................. 26

Exhibit 3.13: Overtime Coverage—Not Clearly Identified Employees (NCIEs) .................................... 26

Exhibit 3.14: Overtime Coverage by Work Characteristic—All Workers .............................................. 27

Exhibit 3.15: Overtime Coverage by Education and English—All Workers .......................................... 28

Exhibit 3.16: Overtime Coverage by Demographic Characteristic—All Workers .................................. 28

Exhibit 3.17: Overtime: Reason Not Covered—Clearly Identified Employees (CIEs) and Not Clearly Identified Employees (NCIEs) ......................................................................................... 29

Exhibit 3.18: Overtime Coverage Change—Clearly Identified Employees (CIEs) and Not Clearly Identified Employees (NCIEs) ......................................................................................... 30

Exhibit 3.19: Overtime Coverage Change by Work Characteristic—All Workers .................................. 30

Exhibit 3.20: Overtime Coverage Change—Workers of Undetermined Self-Reported Status ................ 31

Exhibit 3.21: Unemployment Insurance Coverage—All Workers ....................................................... 32

Exhibit 3.22: Unemployment Insurance Coverage—Clearly Identified Employees (CIEs) ..................... 32

Exhibit 3.23: Unemployment Insurance Coverage—Not Clearly Identified Employees (NCIEs)............33

Exhibit 3.24: Unemployment Insurance Coverage by Work Characteristic—All Workers ......................34

Exhibit 3.25: Unemployment Insurance Coverage by Education and English—All Workers .................34

Exhibit 3.26: Unemployment Insurance Coverage by Demographic Categories—All Workers...............35

Exhibit 3.27: Unemployment Insurance: Reason Not Covered—Clearly Identified Employees and Not Clearly Identified Employees...........................................................................................................36

Exhibit 3.28: Unemployment Insurance Coverage Change .........................................................................36

Exhibit 3.29: Unemployment Insurance Coverage Change by Work Characteristic—All Workers..........37

Exhibit 3.30: Unemployment Insurance Coverage Change—Workers of Undetermined Self-Reported Status.......................................................................................................................................................37

Exhibit 3.31: Workers' Compensation Coverage—All Workers ..................................................................38

Exhibit 3.32: Workers' Compensation Coverage—Clearly Identified Employees (CIEs)........................39

Exhibit 3.33: Workers' Compensation Coverage—Not Clearly Identified Employees (NCIEs)...............39

Exhibit 3.34: Workers' Compensation Coverage by Work Characteristic—All Workers .........................40

Exhibit 3.35: Workers' Compensation Coverage by Education and English—All Workers .....................40

Exhibit 3.36: Workers' Compensation Coverage by Demographic Characteristic—All Workers.............41

Exhibit 3.37: Workers' Compensation: Reason Not Covered—Clearly Identified Employees and Not Clearly Identified Employees..................................................................................................................42

Exhibit 3.38: Workers' Compensation Coverage Change—Clearly Identified Employees and Not Clearly Identified Employees..................................................................................................................42

Exhibit 3.39: Workers' Compensation Coverage Change by Work Characteristic—All Workers ............43

Exhibit 3.40: Workers' Compensation Coverage Change—Workers of Undetermined Self-Reported Status.......................................................................................................................................................43

Exhibit 3.41: OSHA Safety Standards Coverage—All Workers..................................................................44

Exhibit 3.42: OSHA Safety Standards Coverage—Clearly Identified Employees.....................................45

Exhibit 3.43: OSHA Safety Standards Coverage—Not Clearly Identified Employees..............................45

Exhibit 3.44: OSHA Safety Standards Coverage by Work Characteristic—All Workers..........................46

Exhibit 3.45: OSHA Safety Standards Coverage by Education and English—All Workers......................47

Exhibit 3.46: OSHA Safety Standards Coverage by Demographic Categories—All Workers .................48

Exhibit 3.47: OSHA Safety Standards: Reason Not Covered—Clearly Identified Employees and Not Clearly Identified Employees..................................................................................................................49

Exhibit 3.48: OSHA Safety Standards Coverage Change—All Workers.....................................................49

Exhibit 3.49: OSHA Safety Standards Coverage Change by Work Characteristic—All Workers ............50

Exhibit 3.50: OSHA Safety Standards Coverage Change—Workers of Undetermined Self-Reported Status.......................................................................................................................................................50

Exhibit 3.51: FMLA Eligibility—All Workers ............................................................................... 51

Exhibit 3.52: FMLA Eligibility—Clearly Identified Employees (CIEs) ...................................... 52

Exhibit 3.53: FMLA Eligibility—Not Clearly Identified Employees (NCIEs) ............................ 52

Exhibit 3.54: FMLA Coverage by Work Characteristic—All Workers ....................................... 53

Exhibit 3.55: FMLA Coverage by Education and English—All Workers .................................... 53

Exhibit 3.56: FMLA Eligibility by Demographic Characteristics—All Workers ....................... 54

Exhibit 3.57: FMLA: Reason Not Eligible—Clearly Identified Employees (CIEs) and Not Clearly Identified Employees (NCIEs) ........................................................................................... 55

Exhibit 3.58: FMLA Eligibility Change—All Workers ............................................................... 55

Exhibit 3.59: FMLA Eligibility Change by Work Characteristic—All Workers ....................... 56

Exhibit 3.60: FMLA Eligibility Change—Workers of Undetermined Worker Status ............... 56

Exhibit 3.61: Social Security/Medicare Deduction and Contribution—All Workers ................. 57

Exhibit 3.62: Social Security/Medicare Deduction and Contribution—Clearly Identified Employees .. 58

Exhibit 3.63: Social Security/Medicare Deduction and Contribution—Not Clearly Identified Employees ................................................................................................................................... 58

Exhibit 3.64: Social Security/Medicare Contribution by Work Characteristic—All Workers ................. 59

Exhibit 3.65: Social Security/Medicare Contribution by Education and English—All Workers ............. 60

Exhibit 3.66: Social Security/Medicare Contribution by Demographic Categories—All Workers .......... 61

Exhibit 3.67: Change in Social Security/Medicare Contribution by Worker Type ....................... 62

Exhibit 3.68: Change in Social Security/Medicare Contribution—Workers of Undetermined Self-Reported Status ......................................................................................................................... 62

Exhibit 4.1: Completed Interview Totals .................................................................................... 65

Exhibit 4.2: Steps for Analysis .................................................................................................. 65

Exhibit A.1: ERT Employment Status Variables and Mapping to ERT Factors: Questions Related to Permanence Factor ...................................................................................................... 79

Exhibit A.2: ERT Employment Status Variables and Mapping to ERT Factors: Questions Related to Other Factors ................................................................................................................... 80

Exhibit A.3: Employee and Non-Employee Responses for ERT Employment Status Algorithm ............. 84

Exhibit A.4: ERT Concept—Permanence Factor Responses ...................................................... 89

Exhibit A.5: ERT Concept—Behavioral Control Factor ........................................................... 90

Exhibit A.6: ERT Concept—Financial Control Factor .............................................................. 92

Exhibit A.7: ERT Concept—Employment Relationship Factor ................................................. 93

Exhibit A.8: ERT Determination Outcomes .............................................................................. 94

# Executive Summary

Worker misclassification is the practice, intended or unintended, of assigning the status of independent contractor to a worker who is in fact an employee according to the current legal standard. This type of misclassification potentially keeps the worker from receiving the statutory protections offered to employees (e.g., minimum wage, overtime), and also often prevents the worker from accessing employer-provided benefits. Worker misclassification also affects competition between compliant and noncompliant employers, and it impacts the funding and administration of federal and state government programs.

Workers may not understand that the categorization of independent contractor status makes certain rights and benefits unavailable to them. This concern has been highlighted in two Government Accountability Office (GAO) reports (2007, 2009) and through the activities of the Vice President's Middle-Class Task Force (Office of the Vice President of the United States 2010). Together, these efforts led to additional funding for initiatives related to misclassification (Office of Management and Budget (OMB) 2010a, 2010b), in addition to an interdepartmental Misclassification Initiative (U.S. Department of Labor, Wage and Hour Division n.d.) and the research described in this report.

To better document workers' understanding of issues related to job classification, Abt Associates, under contract to the DOL, designed a survey to collect information on workers' knowledge about their self-perceived current job classification and the rights and benefits associated with that classification. Abt SRBI, a subsidiary of Abt Associates, administered the survey to 8,503 individuals. In addition, Abt SRBI conducted semi-structured interviews with 17 employers and employer representatives.

## ES.1   Worker Understanding of the Consequences of Classification Status

Survey responses suggested a mixed understanding of employee rights and benefits and how they would change with a different classification. From a survey, it is not possible to conclusively identify workers who should be treated as employees vs. non-employees.

However, to gauge the correctness of employee responses to questions about knowledge of coverage of rights and benefits, we need a proxy for current classification (i.e., employee or self-employed).  For that purpose, the appropriate concept is perceived classification, even if that perception is inconsistent with the way the worker should, by law, be viewed. As to why the appropriate concept is perceived classification, note that since the questions asked about coverage on the current job, the best we can hope for in terms of understanding is correct answers given perceived status. Even if a worker by law is an employee, if the worker perceives herself to be self-employed, it is not reasonable to expect the worker to give correct answers for an employee.

Given this need to impute classification, here, we use the following two groupings: (i) a clearly identified employee (CIE), who is defined as a worker who does not report being self-employed and who received only a W-2 on his or her main job; and (ii) not clearly identified employees (NCIE), including all workers who do not meet that condition. We note that this grouping implies that some employees are likely included in the not clearly identified employee group. That possibility should be kept in mind in interpreting the results that follow. Most workers are currently treated as employees (88 percent by self-report; 58 percent using our clearly identified employee proxy, which is based on a combination of self-report and receipt of tax documentation).

Most CIE's appear to understand the benefits and rights available to employees. The survey considered minimum wage protections, overtime pay, unemployment insurance, workers' compensation, OSHA safety standards, family and medical leave, and Social Security. Under current laws, policies, and regulations, most employees would be covered by each of these rights and benefits (there are exceptions). With some variation across specific benefits and rights, overall knowledge appears quite good. The situation is more subtle for non-employees. Workers who are genuinely self-employed are not eligible for most of the benefits and rights we asked about in the survey, (minimum wage, overtime, unemployment, workers' compensation), and non-employees pay higher amounts into Social Security. OSHA standards exclude some worksites and types of workers, including some public employees and self-employed workers; for the purposes of these analyses, we assume that NCIEs are not covered as well.

Appropriately, NCIEs (i.e., the group who are not conclusively employees) are less likely than their counterparts (CIEs) to report that they are covered by these benefits and rights. However, a substantial fraction of these NCIEs nonetheless report that they are in fact covered by these rights and benefits. For example, 64 percent of NCIEs report they are covered by minimum wage and 80 percent say they are covered by the Family Medical Leave Act. Some (probably a substantial) portion of this apparent misunderstanding may not be a misunderstanding at all:  the NCIEs used undoubtedly include—and probably many—true employees in the NCIE group. Regardless of their correct status under the law, certainly many of them are self-reported employees. We argued above that for these purposes self-reported status is the appropriate concept. However, even with this caveat, the implied level of misunderstanding about workplace rights and benefits seems high. Given the reported level of misunderstanding, it seems plausible that many workers choosing self-employment status do so while not understanding that that choice forfeits these rights and benefits.

This interpretation is reinforced by worker responses to an important hypothetical question. The survey asked employees whether their coverage would change if they switched to non-employee status. Conversely, the survey asked non-employees whether their coverage would change if they switched to employee status. While in most cases coverage would in fact change with the hypothetical switch, many responses did not demonstrate that understanding. Less than half of all workers reported that their benefits would change under a different worker classification. Notably, only a third said their minimum wage protections would change. Some of this misunderstanding may be due to the generic challenge of answering hypothetical survey questions, but some of it appears to be true misunderstanding; i.e., it appears that many workers do not understand the implications of a change in classification (i.e., employee to non-employee or non-employee to employee).

## ES.2   Employer Insights

The project also included qualitative interviews with 17 employers and their representatives. Recruiting interviewees was considerably more challenging than had originally been envisioned. In retrospect, it became clear that there were few clear incentives to participate, particularly if potential respondents were disinclined to disclose their own practices around the issue of worker classification. While this feedback may have been guarded at times and may not be fully representative of a broader population (a general concern with qualitative research), we nonetheless feel that these respondents' insights are a valuable complement to the survey results.

Employers and employer representatives described a wide range of considerations in making hiring decisions. The direct costs per hour—wages plus benefits for employees vs. single payment to a

temporary employment agency or a self-employed individual—create an incentive not to hire employees for some employers. Employers report that these cost-related differences were exacerbated—directly and indirectly—by the Affordable Care Act's health insurance mandate. Directly, the mandate could increase benefit costs for employees, costs that are not borne directly for non-employees. Indirectly, the Affordable Care Act's health insurance requirements apply only to firms with 50 or more employees. Small to medium-sized businesses may move more tasks to the self-employed or to temporary employment agencies to stay below the cap and avoid those requirements. Likewise, this could provide an additional inducement to firms to misclassify employees as independent contractors in an attempt to stay under the cap.

In addition, employees were perceived to do better work and to be more easily supervised. For some tasks the additional cost of having employees was perceived as worthwhile; for others, not. In particular, there appears to be an implicit longer-term commitment to employees, such that firms are reluctant to let the number of employees vary over time. Instead, short-term tasks and fluctuations in demand are perceived as appropriate not for employees but instead for the self-employed, contractors, and workers from temporary employment agencies.

## ES.3   Discussion

Worker classification is a complicated and subtle area of the labor market. Inasmuch as workers have a choice between being an employee and being self-employed (and many may not have a choice), it seems plausible that that choice will be affected by the perceived benefits and rights afforded by these two statuses. The survey results suggest that workers have far from complete understanding of the loss of rights and benefits when they switch from employee to self-employed status. Consider a worker choosing between employment and self-employment, an improved understanding of the rights and benefits that are not afforded to the self-employed could lead workers to demand higher payments before accepting the self-employed position. This would raise the relative cost of self-employment to firms, causing them to switch some positons back to employment (from self-employment). Continued efforts on the part of the Department of Labor to inform workers of their lack of benefits and rights as non-employees seem worthy of serious consideration.

# 1.    Introduction

Worker misclassification is the practice, intended or unintended, of assigning the status of independent contractor to a worker who is in fact an employee according to the proper legal standard. This type of misclassification keeps the worker from receiving the statutory protections offered to employees (e.g., minimum wage, overtime), and also often prevents the worker from accessing employer-provided benefits. Worker misclassification also affects competition between compliant and noncompliant employers, and it impacts the funding and administration of federal and state government programs.

Workers may not understand that the categorization of independent contractor status makes certain rights and benefits unavailable to them. This concern has been highlighted in two Government Accountability Office (GAO) reports (2007, 2009) and through the activities of the Vice President's Middle-Class Task Force (Office of the Vice President of the United States 2010). Together, these efforts led to additional funding for initiatives related to misclassification (Office of Management and Budget (OMB) 2010a, 2010b), in addition to an interdepartmental Misclassification Initiative (U.S. Department of Labor (DOL),Wage and Hour Division (WHD)) and the research described in this report.

To better document workers' understanding of issues related to job classification, Abt Associates, under contract to the DOL, designed a survey to collect information on workers' knowledge about their self-perceived current job classification and the rights and benefits associated with that classification. Abt SRBI, a subsidiary of Abt Associates, administered the survey to 8,503 individuals. In addition, Abt SRBI conducted semi-structured interviews with 17 employers and employer representatives. This report presents the results of these two data collection efforts.

The next chapter describes the survey and survey methodology. The third chapter describes the results of the worker survey with an emphasis on workers' understanding related to the implications of their classification status. The fourth chapter describes our approach to, and results of, the semi-structured interviews with employers and employer representatives.

The document also includes several appendices. Appendix A (Detailed Worker Classification Questions) describes the development, coding, and analysis of the survey questions developed to mirror the Economic Realities Test, as well as some of the limitations of the resulting data. Appendix B (Worker Classification Knowledge Survey) contains the worker survey questionnaire. Appendix C contains the employer and employer representative interview guide. A companion volume—*Worker Classification Knowledge Survey Volume II - Methodology Report* (Daley et al. 2016)—describes the survey methods in more detail.

## 2. Worker Classification Knowledge Survey—Methodology

This chapter proceeds in three main sections. The first section provides an overview of the methodological approach. The second section describes the demographic and labor force characteristics of the sample, including respondents' reported job classification. We conclude by defining the derived variables and the terminology we use in the main analyses of worker understanding of classification status reported in Chapter 3.

### 2.1 Methodological Approach

This section provides an overview of the Worker Classification Knowledge Survey's methods: target population, data collection, and weighting protocol. A separate volume, *The Worker Classification Knowledge Survey Volume II - Methodology Report*, provides more detail on methods used in the sample design, fieldwork, and weighting.

#### 2.1.1 Target Population

The target population for the Worker Classification Knowledge Survey was persons age 18 and over who had worked for pay or profit within the 30 days prior to the interview. These individuals resided in one of the 50 states or the District of Columbia and had a landline or cellular telephone. Households reporting no workers over the age of 18 in the last 30 days screened out as ineligible for the interview.

#### 2.1.2 Data Collection

Abt SRBI conducted telephone interviews in both English and Spanish from August 26, 2014, to March 9, 2015; 2,554 on a landline frame and 5,949 on a cell phone, for a total of 8,503 interviews. The recruitment protocol featured a maximum of 10 call attempts to landline numbers, and a maximum of eight call attempts to cell phone numbers. The average length of a completed interview was 18 minutes in the landline sample and 17 minutes in the cell phone sample.

#### 2.1.3 Weighting Protocol

Unless otherwise noted, all analyses are weighted. Weighting is needed to account for the complex design (as well as other factors) and to support inference to the target population. In addition to a base weight reflecting the probability of selection, weights include: (1) a sampling frame integration weight; (2) a nonresponse adjustment for people who are included on the household roster but do not complete the interview; and (3) a post-stratification adjustment to independent population controls by age, gender, education, race, Hispanic ethnicity, region, and employment status.

### 2.2 Characteristics of the Sample

This section describes the demographic and labor force characteristics of the respondents, including a profile of respondents' self-reported employment classification.

Exhibit 2.1 summarizes the demographic characteristics of the Worker Classification Knowledge Survey sample. We note that the weighting procedure aligns the distributions of gender, age, education, race/ethnicity, region, and phone service with national control totals on workers from the Current

Population Survey (CPS), defined as adults who worked for pay or profit in the past seven days (not shown).[1]

Consistent with the universe of American workers, slightly less than half of the sample is female. About 1 in 10 have not graduated from high school, a quarter have graduated from high school but have not attended college, slightly less than a third have attended some college, and slightly more than a third are college graduates (including those with a graduate degree).

Fifteen percent are Hispanic, about a third are nonwhite non-Hispanic, and about half are married.

**Exhibit 2.1: Demographic Information on Worker Classification Knowledge Survey Respondents**

| Demographics | Percentage |
|---|---|
| Gender | |
| Male | 53.2% |
| Female | 46.8% |
| Education | |
| Less than high school graduate | 10.0% |
| High school graduate | 24.1% |
| Some college | 29.4% |
| College graduate | 22.6% |
| Graduate school | 12.6% |
| Undetermined/refused | 1.3% |
| Race *(multiple responses allowed)* | |
| White | 67.9% |
| Black or African American | 10.4% |
| Other | 9.4% |
| Asian | 5.3% |
| Undetermined/refused | 4.8% |
| American Indian/Alaska Native | 1.0% |
| Multiple races reported | 1.0% |
| Native Hawaiian/Pacific Islander | 0.3% |
| Hispanic | 15.2% |
| Marital status | |
| Married | 50.7% |
| Living with a partner | 8.6% |
| Separated | 2.8% |
| Divorced | 9.4% |
| Widowed | 2.3% |
| Never married | 22.5% |
| Undetermined /refused | 3.7% |

Unweighted n=8,503.

---

[1]   All of the population control totals, with the exception of telephone service, came from an analysis of the March 2014 CPS Annual Social and Economic Supplement (ASEC), filtered on adults 18 years and older residing in the United States who had worked for pay in the past week. See *The Worker Classification Knowledge Survey Volume II - Methodology Report* for more details of the weighting and post-stratification procedures.

The analyses in this report focus on the worker's "main job," which is defined as the one at which the respondent usually works the most hours. Respondents were instructed to answer all questions with reference to this job. Instructions for selection of "main job" for respondents with more than one job were as follows:

- For respondents who have more than one job and work an equal number of hours at each job, the main job is the job at which they have worked for the longest period of time.

- If the respondent reported having worked at all the jobs for an equal amount of time, the respondent was asked to randomly pick a job and then refer to that job when responding to subsequent questions.

- For any respondent who later chose a "main job" randomly, the Computer-Assisted Telephone Interviewing (CATI) system provided periodic prompts to remind the respondent about his or her selection.

Exhibit 2.2 tabulates the characteristics of respondents' main job, which is the reference point for all subsequent classification questions. The vast majority (88.5 percent) of workers had only one main job; 9 percent of the workers reported having two jobs.

As a point of comparison, we provide selected estimates from the Current Population Survey. In 2014, the CPS estimated that union membership was 11.1 percent, versus 10.6 percent in our sample. The CPS percentage of part-time workers was 18.6 percent, versus 22.3 percent in the Worker Classification Knowledge Survey. Our sample aligns closely to CPS estimates for employed persons in Construction— the Bureau of Labor Statistics (BLS) estimate from June 2015, 6.8 percent, is identical to our estimate. Similarly, for Manufacturing the BLS estimate was 10.5 percent, and ours was 9.0 percent. However, the Worker Classification Knowledge Survey sample reports fewer workers in Wholesale and Retail Trade than does the CPS: the CPS has 14.1 percent, versus our survey's 10.4 percent. Also, our sample reports fewer workers in Education and Health Services than does the CPS: the BLS estimate from June 2015 was 22.8 percent, versus our 19.3 percent.[2]

**Exhibit 2.2: Labor Force Characteristics of Worker Classification Knowledge Survey Respondents**

| Respondent's job characteristics | Percentage |
|---|---|
| Number of jobs held | |
| One job | 88.5% |
| More than one job (number unspecified) | 0.1% |
| Two jobs | 9.0% |
| Three or more jobs | 2.3% |
| Undetermined/refused | 0.1% |
| Worked for a temporary or staffing agency | 8.5% |
| Member of a labor union | 10.6% |

---

[2]   http://www.bls.gov/cps/cpsaat14.htm Accessed 4/25/2016.

| Respondent's job characteristics | Percentage |
|---|---|
| **Industry (top five)** | |
| Education and Health Services | 19.3% |
| Wholesale and Retail Trade | 10.4% |
| Manufacturing | 9.0% |
| Construction | 6.8% |
| Professional and Technical Services (Legal, Accounting, Consulting, Scientific Research, Advertising, Veterinary, Design) | 6.6% |
| **Occupation (top five)** | |
| Management Occupations | 10.2% |
| Office and Administrative Support Occupations | 10.1% |
| Sales and Related Occupations | 8.6% |
| Construction and Extraction Occupations | 6.2% |
| Business and Financial Operations Occupations | 6.0% |
| **Worker status** | |
| Full-time workers | 77.6% |
| Part-time workers | 22.3% |
| Undetermined /refused | 0.1% |
| **Total number of persons who work for firm on the main job** | |
| 1 | 5.5% |
| 2–49 | 33.8% |
| 50–249 | 18.6% |
| 250–499 | 6.5% |
| 500-999 | 15.3% |
| 1,000–4,999 | 7.8% |
| 5,000–19,999 | 4.9% |
| 20,000–99,999 | 3.8% |
| 100,000 or more | 1.3% |
| Undetermined/refused | 2.4% |

Unweighted n=8,503.

## 2.3   Terms and Definitions

Throughout this document, we discuss issues related to the classification of a worker as an employee versus as an independent contractor. Specifically, the primary research goals of this survey are to determine (1) what workers know about their current employment classification status and (2) how well they understand the implications associated with that status. In this context, we broadly refer to the entire sample of respondents who answered our survey as "workers" regardless of how they self-classified. These subsequent discussions of employees and independent contractors are intended as overall

summaries. For rhetorical clarity, these discussions omit what—for the purposes of this report—may be unimportant details or caveats. Therefore, no statement in this document should be taken as stating official interpretation of the Fair Labor Standards Act (FLSA); nor should any statement in this document be taken as stating official DOL policy. Those desiring information on statute and regulation should consult the appropriate legal documents. Links to further information about worker classification can be found on DOL's website: http://www.dol.gov/whd/workers/misclassification/; http://www.dol.gov/whd/flsa/.

### 2.3.1   Examining "Employee" Definition with Two Survey Questions

We identify employees based on answers to two survey questions. The first of the employee self-report questions has the variable name QEMPLOYER; it is adapted from the Current Population Survey question IO1INTI.[3] The question wording is:

> At your main job, are you employed by government, by a private company, a nonprofit organization, or were you self-employed?
>
> 1.  Government
> 2.  Private-for-profit company
> 3.  Nonprofit organization including tax exempt and charitable organizations
> 4.  Self-employed [INTERVIEWER NOTE: INCLUDES INDEPENDENT CONTRACTOR, INDEPENDENT CONSULTANT, FREELANCE WORKER, OR "OWN MY OWN BUSINESS"]
> 5.  OTHER (VOL)
> 8.  DON'T KNOW (VOL)
> 9.  REFUSED (VOL)

Exhibit 2.3 displays the distribution of survey responses to the QEMPLOYER question. A majority of workers reported working for a private for-profit company (62 percent). One in ten (10 percent) reported they were self-employed, which is similar to the BLS estimate of 10.4 percent self-employed workers in June 2015.[4]

**Exhibit 2.3: Self-Reported Employment Status Variables**

| Variable | Percentage |
|---|---|
| **Employment status** QEMPLOYER (sample: all workers) | |
| Government | 17.60% |
| Private, for-profit company | 61.60% |
| Nonprofit organization | 8.30% |
| Self-employed | 10.00% |
| Other | 1.10% |
| Don't know | 1.30% |
| Refused | 0.50% |

---

[3]   For a complete comparison of the two survey questions, please see Appendix B.

[4]   http://www.bls.gov/news.release/empsit.t09.htm, Accessed 4/21/16.

The second of the employee self-report questions is a multi-part question about income tax documentation and the annual tax form respondents received on their main job. The variable name is QDOCUMENT; the question wording, including the table that the question incorporates, is as follows.

Now I am going to ask you about the tax forms you get (or will get) at your main job.

[Did/Will] you receive a…?

| _a. W-2 | 1. YES<br>2. NO<br>8. DK (VOL)<br>9. REF (VOL) |
|---|---|
| _b. W-4 | 1. YES<br>2. NO<br>8. DK (VOL)<br>9. REF (VOL) |
| _c. 1099-MISC [IWER CONFIRM: This is only for your JOB, and not for other income earned, such as interest on a bank account.]<br><br>[IF NEC: A 1099-MISC form is typically is given to an independent contractor as a record of the income received from a particular business. Other versions of the 1099 can be used to report different types of income, such as interest and dividends.] | 1. YES<br>2. NO<br>8. DK (VOL)<br>9. REF (VOL) |
| _d. W-9 | 1. YES<br>2. NO<br>8. DK (VOL)<br>9. REF (VOL) |
| _e. Schedule K-1<br><br>[IF NEC: The Schedule K-1 is a tax document issued for an investment in partnership interests. The purpose of the Schedule K-1 is to report your share of the partnership's income, deductions and credits.] | 1. YES<br>2. NO<br>8. DK (VOL)<br>9. REF (VOL) |
| f. Any other tax forms (SPECIFY) | 1. YES<br>2. NO<br>8. DK (VOL)<br>9. REF (VOL) |

Exhibit 2.4 displays the responses to these tax form questions in the QDOCUMENT series displayed above. Nearly 90 percent of workers reported that they received a W-2 on their main job.

**Exhibit 2.4: Tax Forms Received**

| Tax forms received QDOCUMENT (Sample: all workers) | W-2 | W-4 | 1099-MISC | W-9 | K-1 | Any other tax forms |
|---|---|---|---|---|---|---|
| Yes | 88.1% | 56.1% | 24.6% | 14.0% | 4.4% | 2.0% |
| No | 9.7% | 23.1% | 66.7% | 54.7% | 82.7% | 95.3% |
| I don't know what that form is | 0.7% | 15.0% | 6.0% | 23.5% | 8.9% | n/a |
| I don't know if I got that form | 1.1% | 5.4% | 2.3% | 7.4% | 3.7% | 2.4% |
| Refused | 0.3% | 0.4% | 0.3% | 0.4% | 0.3% | 0.3% |

Unweighted n=8,503.

### 2.3.2 Further Refinement of "Employee"

Nearly one quarter (23 percent; n=1,571) of all respondents reported that they received both a W-2 and a 1099-MISC (we refer to these respondents as "dual reporters"; results not shown in Exhibit 2.4). We expected that workers who reported this way would have had more than one job, since receiving both forms on the same job is rare, though not impossible, and is considered a "red flag" at the IRS (Collabrus 2008). However, among these dual reporters, just 11 percent reported being paid by more than one job.

Despite our extensive efforts to prompt respondents to specify a main job as the reference for all survey questions, some workers may have been thinking of the broader "work" that they did rather than the particular job specified when answering this question. This could account for dual reporting. For example, an accountant in a firm may do side jobs for independent clients. To explore other possible reasons for dual reporting, we examined the responses to two survey questions that addressed whether a respondent had ever changed from one classification to another on their main job (e.g., if a consultant was hired on as a full-time employee or vice versa). The question wording is:

"On your main job have you always been an employee?" (QCHANGE_EE)

"On your main job, were you treated as an employee prior to becoming self-employed" (QCHANGE_NE)

Most dual reporters (n=1,571, 91 percent) identified as employees when asked: "At your main job, are you an employee?" (see Exhibit 2.5). The vast majority of these dual reporter, self-identified employees (n=1,524, or 97 percent) reported that they had always been an employee on their main job when asked "Have you always been an employee on your main job?" The small number of remaining dual reporters (n=147; 9 percent; i.e., about 0.3 percent of the total sample) who self-identified as self-employed, 43 percent said that they had been treated as an employee prior to becoming self-employed on their main job, and 57 percent said that they had not been treated as an employee before becoming self-employed on their main job. It remains unclear why so many of these workers reported that they had received both forms on the same job. Therefore, we include only those workers who reported that they received only a W-2, and not a 1099-MISC as well, in the group we define as "Clearly Identified Employees" (CIEs), described below.

**Exhibit 2.5: Self-Reported Status among Dual Reporters (N=1,718)**

| Status | Percent |
|---|---|
| Dual reporters reporting as Employees (n=1,571) | |
|    Always treated as an employee | 97% |
|    Treated as self-employed prior to becoming employee | 3% |
| Dual reporters reporting as Self-Employed (n=147) | |
|    Always treated as self-employed | 57% |
|    Treated as employee prior to becoming self-employed | 43% |

Source: Worker Classification Knowledge Survey QCHANGE_NE, QCHANGE_EE, "At your [QMAIN] job, are you an employee?" (QEMPLOYEE).

### 2.3.3    Final Definition of "Employees"

For the purposes of these analyses, we combine the two questions presented in 2.3.1 as well as our findings on dual reporters discussed in 2.3.2 to define "Clearly Identified Employees" (CIEs) who jointly meet these two conditions:

   A) Workers employed by government, a private for-profit company, or a nonprofit organization, including tax exempt and charitable organizations. That is, QEMPLOYER =1, 2, or 3); **AND**

   B) Workers who received only a **W-2** for their main job and did **not** receive a 1099-MISC on their main job. (Note: these respondents may have received other tax forms.)

Not clearly identified employees (NCIEs) are those workers whose survey responses do not jointly meet these two conditions. They include workers who provided any response to QEMPLOYER who received both a W-2 and a 1099-MISC. We note that the survey was administered only to workers, and that no attempt was made to contact respondents' firms to confirm the accuracy of respondents' self-reported worker status.

Exhibit 2.6 shows the distribution of workers in each of these categories. In the analyses that follow, we describe results for all workers, and compare responses among these two definitions of workers (i.e., CIE and NCIEs) as appropriate.

**Exhibit 2.6: Definition of Workers Used in Analysis**

| | N | Percentage |
|---|---|---|
| Clearly Identified Employees (CIEs) | 4,943 | 58.1% |
| Not Clearly Identified Employees (NCIEs) | 3,560 | 41.9% |
| Total | 8,503 | 100.0% |

It is important to note that the distribution reported in Exhibit 2.6 above is based solely upon self-reported worker classification and therefore does not match national estimates for the *self-employed* persons from the CPS.

### 2.3.4   Stratifying Variables

Since we are concerned with worker knowledge about rights and benefits associated with the main job, our analyses focused on a number of stratifying variables. These variables fall into three main categories: work characteristics, education-related characteristics, and demographic variables. These variables are intended to help inform outreach and education campaigns devoted to improving worker knowledge.

Exhibit 2.7 provides the name and description of each stratifying variable used in this analysis.

Worker Classification Knowledge Survey—Methodology

**Exhibit 2.7: Stratifying Variables**

| Variable | Description |
|---|---|
| Sector | This term refers to the variable QEMPLOYER (see Exhibit 2.3): Government; Private, for-profit; Nonprofit. |
| Work type | This term refers to a classification of blue collar versus white collar industries. The industries included within each category are displayed. |
| Blue collar | <ul><li>Installation, Maintenance, and Repair Occupations</li><li>Protective Service Occupations</li><li>Farming, Fishing, and Forestry Occupations</li><li>Construction and Extraction Occupations</li><li>Office and Administrative Support Occupations</li><li>Construction and Extraction Occupations</li><li>Production Occupations</li><li>Transportation and Material Moving Occupations</li><li>Healthcare Support Occupations</li><li>Community and Social Service Occupations</li><li>Food Preparation and Serving Related Occupations</li><li>Building and Grounds Cleaning and Maintenance Occupations</li><li>Personal Care and Service Occupations</li><li>Military Specific Occupations</li></ul> |
| White collar | <ul><li>Legal Occupations</li><li>Sales and Related Occupations</li><li>Business and Financial Operations Occupations</li><li>Computer and Mathematical Occupations</li><li>Life, Physical, and Social Science Occupations</li><li>Management Occupations</li><li>Architecture and Engineering Occupations</li><li>Education, Training, and Library Occupations</li><li>Arts, Design, Entertainment, Sports, and Media Occupations</li><li>Healthcare Practitioners and Technical Occupations</li></ul> |
| Job tenure | Total number of years on the job. The variable is recoded from the year in which the respondent began the main job into the following categories: less than 1 year; 1 year to <5 years; 5 years or more. |
| Union membership | Self-reported membership in a labor union. |
| Education level | Self-reported highest level of educational attainment. |
| English | Self-reported English as native language. |
| Gender | Self-reported gender. |
| Race | This question is from the CPS, self-rated race. Respondents could select more than one race. |
| Hispanic origin | Self-reported Hispanic origin. |

## 3.  Worker Knowledge of Employment Rights and Benefits

As discussed above, the primary research goals of this survey are to determine (1) what workers know about their current employment classification status and (2) how well they understand the implications associated with that status.   Specifically, the survey considered seven employment-related rights and benefits: 1) Minimum Wage; 2) Overtime; 3) Unemployment Insurance; 4) Workers' Compensation; 5) OSHA Safety Standards; 6) Family and Medical Leave (FMLA); 7) Social Security/Medicare.

For each of these rights/benefits, we inquired about three aspects of knowledge, listed here with further explanation below:

1. Does the respondent report that his or her main job is **covered** or protected by each of the rights/benefits? (Coverage)

2. If the main job is not covered, *why not*?[5] (Why not)

3. Would workers' coverage *change* under a different job classification—e.g., if an employee became a non-employee, or if a non-employee became an employee? (Change)

In the survey, all respondents were asked whether their main job was covered. If the main job was not covered, we asked whether the worker knew why not; for those that knew, in an open-ended follow-up question we asked them to explain the reason why the job was not covered. In real time, interviewers coded these open-ended responses against a list of valid reasons why a worker might not have coverage, including those related to eligibility, job classification, and pay (salaried, or commissioned worker, or paid in some other way). If the answer given was not on this prepared list, the response was listed as "other" and later back-coded, either to an existing category, or to a new classification if more than 5 percent had answered in that way. Statistical tests were not performed for the "why not" series, because of the small sample sizes and the open-ended, single-response nature of these questions; any statistical tests performed could have resulted in a misleading conclusion.

To gauge knowledge about each right or benefit as related to respondent employment status, the survey asked whether each type of coverage would change under a different job classification. The respondent base for these questions included only those respondents who had responded "yes" or "no" to the relevant coverage question.[6] The question wording was tailored for respondents according to a series of self-reported job classification questions to form a composite self-reported "flag". (For a detailed description of this self-report concept see Volume II, Final Methodology Report.) Specifically, respondents who self-identified as an employee were asked, "Would this coverage change if you became self-employed?" Conversely, respondents who self-identified as self-employed were asked: "Would this coverage change if you became an employee?" However, for some workers, we were not able to determine a self-reported status. These workers were asked "Under what conditions would your coverage change?" For these analyses, we assume that coverage would change for both types of workers.

---

[5]  The exception is Social Security contributions and deductions. The survey did not contain a question about why a worker did not contribute or have deductions.

[6]  That is, respondents who refused the Coverage question or responded with "don't know" were excluded from the analysis.

Gauging worker knowledge first requires establishing the "right answer" against which to compare their responses. However, for at least two reasons, precisely imputing a "right answer" is not always possible for every worker.

First, a variety of exemptions and exceptions apply to *employee* eligibility and coverage for each of these rights and benefits. Confirming the entirety of possible exceptions requires information beyond what the survey collected. Here we apply plausible general rules, but there are undoubtedly specific exceptions that these will not cover.

Second, the determination of a "right answer" is also made more complex by the parameters used to form the two job classification categories. Following Department of Labor guidance, the analysis that follows groups all workers into one of two categories: Clearly Identified Employees (CIEs) and Not Clearly Identified Employees (NCIEs). Consistent with the label, the definition of CIEs is strict. Specifically, a CIE must jointly meet these two conditions:

A) Workers employed by government, a private for-profit company, or a nonprofit organization, including tax exempt and charitable organizations. That is, QEMPLOYER =1, 2, or 3); **AND**

B) Workers who received only a **W-2** for their main job and did **not** receive a 1099-MISC on their main job.

The result of this strict definition is that anyone who might not be an employee is classified as an NCIE. The analysis in Chapter 2 found that two-thirds of the NCIEs self-identify as an employee and most of them report either (i) receiving both a W-2 and a 1099-MISC; or (ii) receiving neither a W-2 nor a 1099-MISC. For the purposes of understanding worker knowledge questions with respect to coverage on the current job, the relevant concept is self-perceived status—even if that classification is wrong; and these results suggest that many of these NCIEs are self-perceived employees. They are not CIEs only because they do not report only receiving a W-2 (i.e., some report receiving a W-2 and a 1099-MISC, some reporting receiving only a 1099-MISC, and some report receiving neither).

The likelihood that many of the NCIEs are actually employees should be kept in mind when interpreting the results. In particular, that likelihood implies that *we would expect many of the NCIEs to answer that they do have the rights and benefits that apply only to employees.*

With those caveats in mind, we proceed as follows:

- With the exception of the OSHA-regulated job safety protections, we assume that *non-employees* are *not covered* by each of the employment-related rights and benefits about which we inquired.

- Among employees who answer "no" to coverage, we use the answer to the "why not" follow-up question to determine whether the worker's response was correct, by comparing the answer against the assumptions we derive for employees versus non-employees under the Fair Labor Standards Act.

The balance of the chapter considers each of the seven workers' rights/benefits in turn—for the worker's "main job." For each of the rights/benefits, we provide a brief description of the federal regulation related to the employment right under discussion, and how we map those regulations to the data available in the survey. We then tabulate respondents' knowledge by comparing responses to the "right" answer, given the appropriate regulation—to the extent possible given the data available in the survey. We then consider

how knowledge varies by job characteristics, education, and demographic profiles among all workers. We discuss results for all Clearly Identified Employees (CIEs; workers whose main job was for the government or for nonprofit or for-profit organizations, and who reported receiving a W-2 and not a 1099-MISC for income tax reporting purposes) versus NCIEs, as appropriate.

The only time that we discuss differential response by worker characteristics is when a statistical test rejects the hypothesis of no difference. Specifically, we used a Rao-Scott Chi-Square test. This test incorporates a design effect adjustment. In our analyses, we exclude cases in which the respondent refused to answer. For analyses of demographic subgroups, we also excluded "don't know" responses.

## 3.1   Knowledge of Minimum Wage

The Fair Labor Standards Act requires that most employees be paid at least the federal minimum wage for all hours worked (DOL Fact Sheet #17A). Many states and some counties and cities have higher minimum wages. Employees are entitled to the higher of the federal, state, or local minimum wage (although there are exemptions and exceptions). Non-employees are not covered by minimum wage. For the purposes of these analyses, we assume that, in general, employees are covered by minimum wage protections and non-employees are not. In the sections that follow, we discuss reasons workers gave for the absence of minimum wage coverage on their main job, and we discuss whether they provide reasons that align with valid exemptions and exceptions.

### 3.1.1   Minimum Wage Coverage on Main Job

Nearly three-quarters of all workers (73 percent) reported that their main job is covered by minimum wage requirements. Another 12 percent reported not being covered, and 16 percent did not know whether their job was protected by minimum wage requirements (see Exhibit 3.1, section A).

Among those who are not covered by the minimum wage, a sizeable majority (69 percent) reported that they knew why they are not covered (see Exhibit 3.1, section B). The most common explanations were that they were self-employed and therefore were not eligible for minimum wage protections (42 percent), or that they described themselves as "salaried" or "exempt," which we interpret as qualifying for the "white collar" exemption that generally applies to salaried workers whose duties qualify them as executive, administrative, or professional workers (41 percent)[7] (see Exhibit 3.1, section C).

A small number subsequently said that they did not know why they were not covered (6 percent), despite having previously responded that they *did* know the reason why their main job was not covered by minimum wage.

---

[7]   Section 13(a)(1) of the FLSA exempts from the Act's minimum wage and overtime pay protections "any employee employed in a bona fide executive, administrative, or professional capacity." The exemption is premised on the belief that these kinds of workers typically earn salaries well above the minimum wage and enjoy other privileges, including above-average fringe benefits, greater job security, and better opportunities for advancement, setting them apart from workers entitled to overtime pay. To be considered exempt under this provision, employees must meet certain minimum requirements related to their primary job duties, and, in most instances, must be paid on a salary basis at not less than the minimum amounts specified in the regulations.

**Worker Knowledge of Employment Rights and Benefits**

**Exhibit 3.1: Minimum Wage Coverage on Main Job—All Workers**



Source: Worker Classification Knowledge Survey, QCOVER_MW_A, QCOVER_WHY_MW, QREASON_MW.

Exhibits 3.2 and 3.3 provide a graphic overview of this series of questions for CIEs and NCIEs, respectively. Nearly two-thirds of respondents reported that their job was covered by minimum wage (73 percent). Of those who reported that their job was not covered, 69 percent knew the reason why. Nearly equal proportions reported that they were not covered because they were not an employee or self-employed (42 percent) or because they were a salaried or exempt employee (41 percent).

**Worker Knowledge of Employment Rights and Benefits**

**Exhibit 3.2: Minimum Wage Coverage—Clearly Identified Employees (CIEs)**



**Exhibit 3.3: Minimum Wage Coverage on Main Job—Not Clearly Identified Employees (NCIEs)**



Nearly all CIEs should be covered by the minimum wage. Indeed, 78 percent so report, as shown in Exhibit 3.2, Section A. Workers who are not employees should not be covered by the minimum wage. Among the group of NCIEs, 65 percent report that they are covered. The difference between the two groups is statistically significant (p <.001). NCIEs are more likely to know why they are not covered (75 percent versus 60 percent of CIEs; p < .01).

### 3.1.2    Minimum Wage Coverage—Subgroup Analysis

First we present minimum wage coverage reporting by work characteristics. At the bivariate level, we find small but statistically significant differences in minimum wage coverage with respect to work characteristics. Because we expect that government agencies will be more likely than the private sector to comply with regulations and to inform workers of their rights, we would expect that government workers would be more likely to report being covered by the minimum wage, compared with for-profit and

nonprofit employees. Given that blue collar workers generally will not qualify for the administrative, executive, or professional portions of the "white collar" exemption, we would expect that they would report minimum wage coverage more frequently than white collar workers, and we would expect union members to report coverage more often than non-union employees. The relationship between job tenure and minimum wage coverage is more complicated to predict. Generally, we might expect that having more years on the job would be associated with better knowledge of one's own coverage, assuming that more-experienced, longer-tenured workers are more attuned to legalities and rights. We might also expect that more years on the job would be associated with a greater likelihood of promotion and, perhaps, movement to an exempt "executive" or supervisory position. To the extent that *employees* with longer tenure are more likely to be exempt, they would then be more likely to report that they are not covered. Respondents with a job tenure of between one and five years reported being covered by minimum wage most frequently (75 percent), a greater proportion than those with over five years' tenure. Interestingly, the highest proportion of respondents reporting not being covered by minimum wage were those with tenure of five years or more (13 percent).

**Exhibit 3.4: Minimum Wage Coverage by Work Characteristic—All Workers**

| | | Covered | Not covered | Don't know |
|---|---|---|---|---|
| **SECTOR** Unweighted *n* = 7,395; *p* = .0077 | Government | 74% | 10% | 17% |
| | Private, for-profit | 78% | 7% | 15% |
| | Nonprofit | 73% | 10% | 17% |
| **WORK TYPE** Unweighted *n* = 8,388; *p* = 0.0859 | Blue collar | 74% | 11% | 16% |
| | White collar | 71% | 13% | 16% |
| **UNION** Unweighted *n* = 8,273; *p* = .07 | Member of labor union | 76% | 10% | 14% |
| | Not member of labor union | 72% | 12% | 16% |
| **JOB TENURE** Unweighted *n* = 8,448; *p* < .001 | Less than 1 year | 71% | 7% | 21% |
| | 1 year to < 5 years | 75% | 9% | 16% |
| | 5 years or more | 71% | 13% | 16% |

Source: Worker Classification Knowledge Survey QCover_MW_A, QEmployer, QOccupation, QUnion, Jobtenure.

At the highest level of education, higher percentages of workers report that they are *not covered by* minimum wage, which we would expect, given that these workers are more likely to be exempt (see Exhibit 3.5.). A closer examination of this variable reveals a curious pattern in which both CIEs and NCIEs with college degrees or higher report that they do not know whether their main job is covered by minimum wage (not shown). Workers with higher levels of education may have been exempt as executive, administrative, or professional employees their entire working lives, and, since they are exempt, may simply be unaware of minimum wage parameters. We found significant differences between native and non-native English speakers. A higher percentage of native speakers reported being covered by minimum wage than non-native speakers (74 percent versus 66 percent), and more non-native speakers reported that they did not know whether they were covered than native speakers (23 percent versus 15 percent).

**Worker Knowledge of Employment Rights and Benefits**

**Exhibit 3.5: Minimum Wage Coverage by Education and English Language—All Workers**

| | | Covered | Not covered | Don't know |
|---|---|---|---|---|
| **EDUCATION** Unweighted $n$ = 8,404; $p < .001$ | Less than high school | 67% | 14% | 19% |
| | High school graduate | 76% | 9% | 14% |
| | Some college | 77% | 8% | 15% |
| | Associate's degree | 76% | 10% | 14% |
| | Bachelor's degree | 71% | 12% | 17% |
| | Graduate degree | 64% | 17% | 18% |
| **ENGLISH** Unweighted $n$ = 8,352; $p < .001$ | Non-native English speaker | 66% | 11% | 23% |
| | Native English speaker | 74% | 12% | 15% |

Source: Worker Classification Knowledge Survey: QCover_MW_A , QEducation_recode, Eng_native.

For all workers, there are significant differences in reporting coverage of minimum wage across demographic categories (Exhibit 3.6): men are more likely to report that they are not covered than women (13 percent versus 10 percent); and more women report not knowing whether their job is covered (17 percent versus 15 percent). Hispanics are less likely to report that they are covered and more likely to say that they do not know, compared with non-Hispanic workers. Whites are more likely to report that they are not covered compared with African Americans, and less likely to say they do not know about their coverage. Respondents in the Other and Multiple race categories reported the lowest levels of coverage (69 percent and 70 percent). In terms of age, respondents 65 and over reported lower levels of coverage than all categories of younger workers (59 percent versus 70-76 percent).   It seems likely that these demographic differences are, at least in part, related to differences by demographic group in occupation; i.e., that demographic differences would be less stark within (or correcting for) occupation. We do not explore that conjecture here.

**Exhibit 3.6: Minimum Wage Coverage by Demographic Categories—All Workers**

| | | Covered | Not covered | Don't know |
|---|---|---|---|---|
| **GENDER**<br>Unweighted $n$ = 8,483; $p < .001$ | Male | 72% | 13% | 15% |
| | Female | 73% | 10% | 17% |
| **HISPANIC**<br>Unweighted $n$ = 8,255; $p < .001$ | Hispanic | 67% | 12% | 21% |
| | Not Hispanic | 74% | 11% | 15% |
| **RACE**<br>Unweighted $n$ = 8,113; $p < .001$ | Native Hawaiian/Pacific Islander | 74% | 17% | 9% |
| | White | 74% | 12% | 14% |
| | Black/African American | 73% | 9% | 18% |
| | American Indian/Alaska Native | 71% | 9% | 20% |
| | Multiple race | 70% | 14% | 16% |
| | Other race | 69% | 10% | 21% |
| | Asian | 72% | 5% | 23% |
| **AGE**<br>Unweighted $n$ = 8,070; $p < .001$ | 18–34 years | 76% | 8% | 16% |
| | 35–49 years | 73% | 11% | 17% |
| | 50–64 years | 72% | 15% | 14% |
| | 65 and over | 59% | 25% | 16% |

Source: Worker Classification Knowledge Survey QCover_MW_A, QGender, QHispanic, QRace_recode, QAge_recode.

### 3.1.3   Reasons for Lack of Minimum Wage Coverage

As shown in Exhibit 3.1, only 12 percent of workers said that they lack minimum wage coverage on their main job. Among these, 69 percent report that they know why they are not covered. In this section we discuss the reasons workers gave for why they lacked coverage, and align their responses to our assumptions about correct and incorrect answers.

Exhibit 3.7 displays workers' reasons for lack of minimum wage coverage, by type of worker. The columns for each worker type display the percentage of workers who reported each reason and whether this reason is a correct explanation for lack of coverage. A check (√) indicates that under the FLSA, this is a valid reason for lack of minimum wage protections. An "ex" (X) indicates an incorrect reason. A question mark (?) indicates that more information about the worker's job situation would be required to determine whether the answer provided was correct in this case. A majority of CIEs (77 percent) who said they were not covered answered correctly, based upon our assumption that those respondents who reported being "salaried//exempt" qualify for the white collar exemption. Over one-third (38 percent) of NCIEs gave answers that did not align with a correct "non-employee" response, while only 2 percent of CIEs were incorrect about the reasons for not having minimum wage protection. *In interpreting this incorrect response rate for NCIEs (and similar ones later in this chapter), it is crucial to consider that many of the NCIEs are self-reported employees, for whom—at least given their self-perceived classification—this would be a correct response.*

**Worker Knowledge of Employment Rights and Benefits**

**Exhibit 3.7: Minimum Wage: Reason Not Covered—Clearly Identified Employees (CIEs) and Not Clearly Identified Employees (NCIEs)**

| Reasons main job not covered by minimum wage | All respondents (unweighted *n* = 602) Percent | Clearly Identified Employees (CIEs) (unweighted *n* = 179) | | Not Clearly Identified Employees (NCIEs) (unweighted *n* = 423) | |
|---|---|---|---|---|---|
| | | Percent | Correct? | Percent | Correct? |
| Not an employee/self-employed | 42% | 1% | ✓ | 58% | ✓ |
| Salaried/exempt employee | 41% | 77% | ✓ | 27% | X |
| Other | 10% | 12% | ? | 9% | X |
| Don't know | 6% | 9% | n/a | 5% | n/a |
| Eligibility (have not worked enough hours) | 2% | 1% | X | 2% | X |
| Eligibility (have not worked at the organization long enough) | 0% | 1% | X | 0% | X |

Source: Worker Classification Knowledge Survey QREASON_MW.

Note: n/a = not applicable, X = incorrect, ✓ = correct, ? = requires further information not available in survey.

### 3.1.4    Minimum Wage Coverage Change

To further gauge respondents' knowledge about this issue, the survey asked whether the respondents' minimum wage coverage would change under a different job classification. The respondent base for this question included only those respondents who responded "yes" or "no" to the question about minimum wage coverage (unweighted n=6,591). For most, but not all, workers, minimum wage coverage would change with a change to a different (perceived) job classification (exceptions include exempt workers—either in their current job or the job they would shift to). With that crucial caveat, we note that only about a third (34 percent) of workers reported this way, as shown in Exhibit 3.8. Among CIEs, more than 42 percent said that they did not know whether their coverage would change if they became self-employed, compared to 36 percent of the NCIEs.

**Exhibit 3.8: Minimum Wage Coverage Change—Clearly Identified Employees (CIEs) and Not Clearly Identified Employees (NCIEs)**

| All workers (unweighted *n* = 6,591) | | | Clearly Identified Employees (CIEs) (unweighted *n* = 4,091) | | | Not Clearly Identified Employees (NCIEs) (unweighted *n* = 2,500 ) | | | Significance CIEs vs. NCIEs |
|---|---|---|---|---|---|---|---|---|---|
| Yes | No | DK | Yes | No | DK | Yes | No | DK | *p*-value |
| 34% | 26.% | 40.% | 33% | 24% | 42% | 36% | 28% | 36% | *<.001* |

Source: Worker Classification Knowledge Survey QCover_MW_B.

Sample: Self-identified worker status identified who reported "yes" or "no" to QCover_MW_A.

Exhibit 3.9 shows the distribution of responses to the question about change in minimum wage coverage for all workers by work characteristic. Workers in private for-profit organizations more frequently report that their coverage would change than workers in other sectors. Nearly half of nonprofit workers did not know whether their minimum wage coverage would change if their work classification status changed. Blue collar workers were more likely than white collar workers to report that their coverage would change

**Worker Knowledge of Employment Rights and Benefits**

(37 percent versus 31 percent). In terms of job tenure, workers with tenure of five years or more reported that their coverage would change more frequently than workers with tenure under five years.

**Exhibit 3.9: Minimum Wage Coverage Change by Work Characteristic—All Workers**

| | | Yes, would change | No, would not change | Don't know |
|---|---|---|---|---|
| **SECTOR**<br>Unweighted *n* = 5,970; *p* = .0127 | Government | 33% | 26% | 41% |
| | Private, for-profit | 35% | 24% | 42% |
| | Nonprofit | 28% | 24% | 48% |
| **WORK TYPE**<br>Unweighted *n* = 6,526; *p* < .001 | Blue collar | 37% | 25% | 38% |
| | White collar | 31% | 27% | 43% |
| **UNION**<br>Unweighted *n* = 6,450; *p* = .9644 | Member of labor union | 35% | 26% | 40% |
| | Not member of labor union | 34% | 26% | 40% |
| **JOB TENURE**<br>Unweighted *n* = 6,566; *p* = .004 | Less than 1 year | 24% | 48% | 27% |
| | 1 year to < 5 years | 33% | 24% | 43% |
| | 5 years or more | 35% | 27% | 38% |

Source: Worker Classification Knowledge Survey QCover_MW_B, QEmployer, QOccupation, QUnion, Jobtenure.

Workers of undetermined status were asked under what conditions their minimum wage coverage would change. Nearly three-quarters of these workers could not correctly identify an answer (46 percent did not know; 23 percent said "none"). The result is not surprising, given that these respondents gave conflicting answers to the survey questions used to determine employment status. Conversely, only 12 percent provided a correct answer to this question, that is, because their worker classification had changed (see Exhibit 3.10).

**Exhibit 3.10: Minimum Wage Coverage Change—Workers of Undetermined Self-Reported Status**

| Under what conditions would your minimum wage coverage change? | Percent<br>(unweighted *n* = 553) |
|---|---|
| Don't know | 46% |
| None | 23% |
| Other | 17% |
| If your worker status changed (unspecified) | 6% |
| If you became an employee | 4% |
| If you became self-employed | 2% |

Source: Worker Classification Knowledge Survey QCover_MW_C.

Sample: Self-identified worker status "undetermined" who reported "yes" or "no" to QCover_MW_A.

## 3.2    Knowledge of Overtime Pay

Federal and state overtime pay laws exist to spread employment among greater numbers of workers by requiring additional pay when workers work many hours, incentivizing the hiring of additional employees, and ensuring that workers are not forced to work long hours without premium compensation.

Under federal law, overtime is generally defined as work over 40 hours in a week, although state definitions may vary slightly (for example, some states provide premium pay for work beyond a certain number of hours per day). Workers who are classified as non-employees are ineligible for overtime pay. Additionally, some salaried employees are also ineligible for overtime.[8] In this section we describe worker knowledge of coverage of eligibility for overtime as employees and as non-employees.

### 3.2.1    Overtime Coverage on Main Job

Just over half of all workers (53 percent) report that their main job is covered by overtime, and only 7 percent do not know whether they are eligible for overtime on their main job (see Exhibit 3.11). Among those who are not eligible for overtime, most (83 percent) know why they are not covered; among these, two-thirds said they were salaried/exempt employees and therefore presumably eligible for the "white collar exemption."

**Exhibit 3.11: Overtime Coverage—All Workers**



Source: Worker Classification Knowledge Survey, QCOVER_OT_A, QCOVER_WHY_OT, QREASON_OT.

Exhibits 3.12 and 3.13 provide a graphic overview of this series of questions for CIEs and NCIEs, respectively. Among CIEs, 58 percent reported that their job was covered by overtime pay. Of those who reported that their job was not covered (36 percent), the majority (87 percent) knew the reason why: that they were salaried/exempt (82 percent). Among CIEs, nearly half reported that they were covered by overtime (47 percent), and of those not covered, 79 percent reported that they knew why. Nearly half (49 percent) reported that they were not covered because they were salaried/exempt.

---

8    Since the fielding of this survey, the DOL Wage and Hour Division has released a new Final Rule on Overtime: Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees under the Fair Labor Standards Act  (https://www.dol.gov/whd/overtime/final2016/)

**Worker Knowledge of Employment Rights and Benefits**

**Exhibit 3.12: Overtime Coverage—Clearly Identified Employees (CIEs)**



Source: Worker Classification Knowledge Survey, QCOVER_OT_A, QCOVER_WHY_OT, QREASON_OT.

**Exhibit 3.13: Overtime Coverage—Not Clearly Identified Employees (NCIEs)**



Source: Worker Classification Knowledge Survey, QCOVER_OT_A, QCOVER_WHY_OT, QREASON_OT.

### 3.2.2   Overtime Coverage – Subgroup Analysis

In this section we discuss difference in knowledge about overtime coverage for all workers. First, given that blue collar workers are unlikely to qualify for the "white collar" exemption, we would also expect that they would report overtime more frequently than white collar employees, and we would expect union members to report coverage more often than non-union.

As with minimum wage, the influence of job tenure is more complicated to predict at the bivariate level. Generally, we might expect that having worked more years on a given job would be associated with better

knowledge, assuming that more-experienced, longer-tenured workers are more attuned to the legalities and their rights. We might also expect more years on the job to be associated with the likelihood of promotion and, perhaps, movement from an hourly to an exempt position. To the extent that *employees* with longer tenure are more likely to be exempt, they would then be more likely to report that they are not covered.

Government and nonprofit workers are less likely to report being covered for overtime pay than private, for-profit workers (see Exhibit 3.14). And blue collar workers are considerably more likely (66 percent) to report being covered for overtime pay compared to white collar workers (39 percent). The same relationship is true for union members versus non-union members (71 percent of union members reported overtime pay, versus 51 percent of non-union workers). Workers with mid-level job tenure (one year to less than five years) reported the highest level of overtime coverage.

**Exhibit 3.14: Overtime Coverage by Work Characteristic—All Workers**

| | | Covered | Not covered | Don't know |
|---|---|---|---|---|
| **SECTOR**<br>Unweighted *n* = 7,395; *p* < .001 | Government | 50% | 45% | 5% |
| | Private, for-profit | 60% | 33% | 7% |
| | Nonprofit | 48% | 43% | 8% |
| **WORK TYPE**<br>Unweighted *n* = 8,386; *p* < .001 | Blue collar | 66% | 27% | 7% |
| | White collar | 39% | 55% | 6% |
| **UNION**<br>Unweighted *n* = 8,272; *p* < .001 | Member of labor union | 71% | 26% | 3% |
| | Not member of labor union | 51% | 42% | 7% |
| **JOB TENURE**<br>Unweighted *n* = 8,446; *p* < .001 | Less than 1 year | 42% | 53% | 6% |
| | 1 year to < 5 years | 56% | 35% | 8% |
| | 5 years or more | 51% | 44% | 5% |

Source: Worker Classification Knowledge Survey, QCOVER_OT_A, QEmployer, QOccupation, QUnion, Jobtenure.

Beyond high school graduation, education is inversely associated with reporting overtime coverage (see Exhibit 3.15). This is consistent with our expectation that workers with higher levels of education are more likely to have exempt positions. Workers whose highest level of education is a bachelor's degree or higher are significantly more likely to report they are not covered by overtime, compared to workers with an associate's degree or lower. Those with less than a high school education have the highest percentage of "don't know" responses. Twice as many non-native speakers of English as native speakers reported that they did not know whether they were covered by overtime (12 percent versus 6 percent).

**Exhibit 3.15: Overtime Coverage by Education and English—All Workers**

| | | Covered | Not covered | Don't know |
|---|---|---|---|---|
| **EDUCATION** Unweighted $n$ = 8,401; $p < .001$ | Less than high school | 61% | 28% | 11% |
| | High school graduate | 67% | 26% | 7% |
| | Some college | 61% | 32% | 7% |
| | Associate's degree | 62% | 33% | 5% |
| | Bachelor's degree | 41% | 53% | 5% |
| | Graduate degree | 24% | 70% | 6% |
| **ENGLISH** Unweighted $n$ = 8,351; $p < .001$ | Non-native English speaker | 51% | 37% | 12% |
| | Native English speaker | 54% | 41% | 6% |

Source: Worker Classification Knowledge Survey, QCover_OT_A, QEducation_recode, Eng_native.

Differences in reporting of overtime coverage occur between Hispanics and non-Hispanics, with 11 percent fewer Hispanics reporting they are not covered by overtime pay (see Exhibit 3.16.). Hispanics are more likely to report not knowing whether their main job is covered or not. Similarly, more African Americans receive coverage for overtime pay compared with white workers. Younger workers also report overtime coverage at higher rates than older workers (e.g., 59 percent of 18- to 34-year-old workers versus 39 percent of workers 65 and older).

**Exhibit 3.16: Overtime Coverage by Demographic Characteristic—All Workers**

| | | Covered | Not covered | Don't know |
|---|---|---|---|---|
| **GENDER** Unweighted $n$ = 8,481; $p$ = .3562 | Male | 54% | 40% | 6% |
| | Female | 53% | 40% | 7% |
| **HISPANIC** Unweighted $n$ = 8,254; $p < .001$ | Hispanic | 58% | 31% | 11% |
| | Not Hispanic | 53% | 42% | 6% |
| **RACE** Unweighted $n$ = 8,113; $p < .001$ | Black/African American | 66% | 27% | 6% |
| | American Indian/Alaska Native | 63% | 30% | 7% |
| | Native Hawaiian/Pacific Islander | 63% | 24% | 13% |
| | Multiple race | 60% | 33% | 7% |
| | Other race | 60% | 30% | 10% |
| | White | 51% | 43% | 6% |
| | Asian | 45% | 45% | 10% |
| **AGE** Unweighted $n$ = 8,069; $p < .001$ | 18–34 years | 59% | 33% | 8% |
| | 35–49 years | 52% | 42% | 7% |
| | 50–64 years | 51% | 44% | 5% |
| | 65 and over | 39% | 54% | 8% |

Source: Worker Classification Knowledge Survey QCover_ OT_B, QGender, QHispanic, QRace_recode, QAge_recode.

### 3.2.3    Reasons for Lack of Overtime Coverage

As shown in Exhibit 3.11, 40 percent of all workers said that their job was not covered by overtime. Among these, 83 percent report that they know why they are not covered. In this section we discuss the reasons workers gave for why they lacked coverage, and align their responses to our assumptions about correct and incorrect answers. Exhibit 3.17 displays workers' reasons for lack of overtime coverage by type of worker. The columns for worker type show the percentage of respondents who reported each reason. Additionally, we indicate whether that particular reason could be a correct explanation for lack of coverage under the FLSA. A check (√) indicates that under our assumptions, this is a valid reason for lack of overtime coverage. An X (x) indicates an invalid reason. A question mark (?) indicates that more information would be required to determine whether the answer provided was valid or invalid.

CIEs who reported they are not covered by overtime seem to have a solid understanding of their rights to receive overtime pay, according to our assumptions. The majority of CIEs (82 percent) said they were exempt, and 8 percent said that they had not worked enough hours. Nearly half of NCIEs (49 percent) also reported that they were not covered because they were salaried/exempt, and 27 percent reported they were not covered because they were not an employee, or were self-employed.

**Exhibit 3.17: Overtime: Reason Not Covered—Clearly Identified Employees (CIEs) and Not Clearly Identified Employees (NCIEs)**

| Reason main job not covered by overtime | All respondents (unweighted *n* = 2,778) p | Clearly Identified Employees (CIEs) (unweighted *n* = 1,545) | | Not Clearly Identified Employees (NCIEs) (unweighted *n* = 1,233) | |
|---|---|---|---|---|---|
| | Percent | Percent | Correct? | Percent | Correct? |
| Salaried/exempt employee | 67% | 82% | ✓ | 49% | ? |
| Eligibility (have not worked enough hours) | 9% | 8% | ✓ | 10% | X |
| Other | 9% | 7% | ? | 12% | ? |
| Don't know | 2% | 2% | n/a | 2% | n/a |
| Not an employee/self-employed | 12% | 1% | ✓ | 27% | ✓ |
| Eligibility (have not worked at the organization long enough) | 0.1% | 0% | X | 0% | X |

Source: Worker Classification Knowledge Survey, QReason_OT.

Note: n/a = not applicable, X = incorrect, ✓ = correct, ? = requires further information not available in survey.

### 3.2.4    Overtime Coverage Change

To further gauge knowledge about overtime pay as related to the respondent's employment status, the survey asked whether overtime coverage would change under a different job classification. The respondent base for this question included only those respondents who had reported "yes" or "no" to the question about overtime coverage (unweighted n=7,299). For most, but not all, workers, overtime pay coverage would change with a change to a different (perceived) job classification (exceptions include those eligible for the "white collar exemption"—either in their current job or the job they would shift to). With that crucial caveat, we note that only 40 percent of workers reported that their coverage would change if they changed their worker classification (see Exhibit 3.18).

With that crucial caveat, we note that only 40 percent of workers reported that their coverage would change if they changed their worker classification (see Exhibit 3.18).

**Exhibit 3.18: Overtime Coverage Change—Clearly Identified Employees (CIEs) and Not Clearly Identified Employees (NCIEs)**

| All workers (unweighted $n$ = 7,299) | | | Clearly Identified Employees (CIEs) (unweighted $n$ = 4,500) | | | Not s (NCIEs) (unweighted $n$ = 2,799) | | | Significance CIEs vs. NCIEs |
|---|---|---|---|---|---|---|---|---|---|
| Yes | No | DK | Yes | No | DK | Yes | No | DK | *p*-value |
| 39% | 34% | 26% | 40% | 33% | 28% | 39% | 37% | 24% | *<.001* |

Source: Worker Classification Knowledge Survey, QCover_OT_B.

Sample: Self-identified worker status who answered "yes" or "no" to QCover_OT_A.

Exhibit 3.19 shows the distribution of responses to the question about overtime coverage for the full sample by work characteristic. Workers in government and private for-profit organizations reported that their coverage would change slightly more frequently than did workers in the nonprofit sector. Blue collar workers were more likely than white collar workers to report that their overtime coverage would change (44 percent versus 35 percent). Union members were also more likely to report that their coverage would change. In terms of job tenure, those with the shortest tenure (less than one year) most frequently reported that their coverage would change (56 percent) compared to those with longer tenure (39-40 percent).

**Exhibit 3.19: Overtime Coverage Change by Work Characteristic—All Workers**

| | | Yes, would change | No, would not change | Don't know |
|---|---|---|---|---|
| SECTOR Unweighted $n$ = 6,589; $p$ = .0024 | Government | 40% | 36% | 25% |
| | Private, for-profit | 40% | 32% | 28% |
| | Nonprofit | 33% | 37% | 30% |
| WORK TYPE Unweighted $n$ = 7,222; $p$ < .001 | Blue collar | 44% | 30% | 27% |
| | White collar | 35% | 39% | 26% |
| UNION Unweighted $n$ = 7,139; $p$ < .001 | Member of labor union | 47% | 29% | 24% |
| | Not member of labor union | 39% | 35% | 26% |
| JOB TENURE Unweighted $n$ = 7,272; $p$ = .0071 | Less than 1 year | 56% | 35% | 9% |
| | 1 year to < 5 years | 39% | 33% | 28% |
| | 5 years or more | 40% | 35% | 25% |

Source: Worker Classification Knowledge Survey, QCover_OT_B, QEmployer, QOccupation, QUnion, Jobtenure.

Forty percent of workers who answered the employment status classification questions inconsistently also said they did not know under what conditions their overtime coverage would change (see Exhibit 3.20). Nearly a third said there were no conditions that would change their coverage, and 40 percent did not know what conditions would change their coverage. Recall that these respondents are those who gave conflicting answers to the self-reported employment status variables; therefore, this result is not surprising for this group. Only 11 percent of these workers correctly reported that their overtime coverage would change under a different worker classification.

**Exhibit 3.20: Overtime Coverage Change—Workers of Undetermined Self-Reported Status**

| Under what conditions would your overtime coverage change? | Percent (unweighted *n* = 650) |
|---|---|
| Don't know | 40% |
| None | 30% |
| Other | 18% |
| If your worker status changed (unspecified) | 5% |
| If you became an employee | 4% |
| If you became self-employed | 2% |

Source: Worker Classification Knowledge Survey QCover_OT_C.

Sample: Self-identified worker status "undetermined" who reported "yes" or "no" to QCover_OT_A.

## 3.3   Knowledge of Unemployment Insurance

Unemployment insurance provides for the payment of benefits to eligible unemployed workers and for the collection of employer contributions from liable employers. It is designed to provide living expenses to eligible workers while they seek new employment. Independent contractors and other non-employees do not receive this benefit between jobs. Employers who hire independent contractors have a competitive advantage over those who hire employees, because they avoid the cost of unemployment insurance premiums for these workers. Workers who have been misclassified may not know that by being hired as an independent contractor, they forfeited this protection. In this section, we present questions on workers' knowledge related to unemployment insurance coverage.

### 3.3.1   Unemployment Insurance Coverage on Main Job

Exhibit 3.21 summarizes responses to the unemployment insurance question series for the full sample of respondents. The majority of workers (65 percent) report that their main job is covered by unemployment insurance. Nearly 18 percent reported that they *did not know* whether this was the case, and just over 17 percent reported that their job was *not* covered by unemployment insurance. Those workers reporting that their job was not covered were asked whether they knew why not, and just over half (51 percent) reported that they did not know why. For those who reported that they *did* know the reason why their job lacked unemployment insurance coverage, Section C of Exhibit 3.21 displays the reasons given. Over half (57 percent) said that they were not covered because they were not an employee or were self-employed, 18 percent gave an "Other" response, 10 percent said they had not worked enough hours at the job to be covered, and 8 percent said that their job was exempt from this coverage. Despite having previously reported that they knew why they were not covered, a small percentage (6 percent) could not give a reason why they lacked unemployment insurance coverage.

**Exhibit 3.21: Unemployment Insurance Coverage—All Workers**



Source: Worker Classification Knowledge Survey, QCOVER_UI_A, QCOVER_WHY_UI, QREASON_UI.

Exhibit 3.22 and 3.23 provides a graphic overview of this series of questions for CIEs and NCIEs, respectively. Fewer NCIEs reported being covered by unemployment insurance than CIEs (54 percent versus 73 percent). Of CIEs, two-thirds of those not covered did not know the reason why. Of NCIEs who reported they were not covered, more than half (56 percent) reported that they knew the reason why.

**Exhibit 3.22: Unemployment Insurance Coverage—Clearly Identified Employees (CIEs)**



Source: Worker Classification Knowledge Survey, QCOVER_UI_A, QCOVER_WHY_OT, QREASON_OT.

**Exhibit 3.23: Unemployment Insurance Coverage—Not Clearly Identified Employees (NCIEs)**



Source: Worker Classification Knowledge Survey, QCOVER_UI_A, QCOVER_WHY_OT, QREASON_OT.

### 3.3.2   Unemployment Coverage—Subgroup Analysis

In this section we discuss differences in knowledge about unemployment insurance coverage for all workers, by work characteristics. We would expect those in the government sector to be more likely to report being covered by unemployment insurance, compared to the for-profit and nonprofit employees. Additionally, we might also expect that those with longer job tenure would have better knowledge of employment-related rights and would be more likely to report that they are covered.

Union membership shows the most striking difference among the categories of workers, with 80 percent of union members reporting that they are covered by unemployment insurance on their main job compared to only 63 percent among non-union workers (see Exhibit 3.24). In terms of job tenure, those with five years or more were considerably more likely to report that their job was covered by unemployment insurance than those with shorter tenure (71 percent versus 58 percent). Workers in the private sector were more likely than those in the government and nonprofit sectors to report that they were covered (71 percent versus 67-69 percent). White collar workers were more likely than blue collar workers to report that they were covered by unemployment insurance (68 percent versus 62 percent), and also less likely to report that they did not know whether they were covered (16 percent versus 20 percent).

**Exhibit 3.24: Unemployment Insurance Coverage by Work Characteristic—All Workers**

| | | Covered | Not covered | Don't know |
|---|---|---|---|---|
| **SECTOR** Unweighted $n$ = 7,392; $p$ = .0032 | Government | 67% | 14% | 19% |
| | Private, for-profit | 71% | 10% | 19% |
| | Nonprofit | 69% | 14% | 16% |
| **WORK TYPE** Unweighted $n$ = 8,384; $p < .001$ | Blue collar | 62% | 18% | 20% |
| | White collar | 68% | 16% | 16% |
| **UNION** Unweighted $n$ = 8,273; $p < .001$ | Member of labor union | 80% | 9% | 11% |
| | Not member of labor union | 63% | 18% | 18% |
| **JOB TENURE** Unweighted $n$ = 8,444; $p < .001$ | Less than 1 year | 55% | 18% | 27% |
| | 1 year to < 5 years | 58% | 18% | 24% |
| | 5 years or more | 71% | 16% | 12% |

Source: Worker Classification Knowledge Survey QCover_UI_A, QEmployer, QOccupation, QUnion, Jobtenure.

We would expect that workers with higher levels of education would have better knowledge about unemployment insurance. We would not expect to see a drop-off in reporting coverage among more-highly-educated workers, as unemployment insurance applies to white collar positions. However, there is a similar pattern of response across education levels to what we saw with minimum wage and overtime: slightly fewer highly educated workers report that they are covered (see Exhibit 3.25). Specifically, differences in coverage were highly significant across education levels, with respondents with less than a high school education reporting the lowest coverage (51 percent) and those with an associate's degree reporting the highest (71 percent). Native English speakers were 20 percentage points higher in their reports of coverage than non-native speakers of English (68 percent versus 48 percent).

**Exhibit 3.25: Unemployment Insurance Coverage by Education and English—All Workers**

| | | Covered | Not covered | Don't know |
|---|---|---|---|---|
| **EDUCATION** Unweighted $n$ = 8,402; $p < .001$ | Less than high school | 51% | 25% | 24% |
| | High school graduate | 65% | 16% | 19% |
| | Some college | 64% | 17% | 19% |
| | Associate's degree | 71% | 14% | 15% |
| | Bachelor's degree | 67% | 16% | 17% |
| | Graduate degree | 67% | 18% | 14% |
| **ENGLISH** Unweighted $n$ = 8,352; $p < .001$ | Non-native English speaker | 48% | 24% | 28% |
| | Native English speaker | 68% | 16% | 16% |

Source: Worker Classification Knowledge Survey QCover_UI_A, QEducation_recode, Eng_native.

Significant differences appear for all demographic categories (see Exhibit 3.26). Males report higher coverage for unemployment insurance than females (67 percent versus 63 percent). Significantly more non-Hispanics report coverage than Hispanics (68 percent versus 50 percent), and whites report higher

coverage (68 percent) than any other race (40-66 percent). Among age groups, 50- to 64-year-olds and 35- to 49-year-olds report the highest level of coverage (73 percent and 71 percent, respectively), while those in the youngest and oldest age groups report much lower levels of coverage (54 percent of 18- to 34-year-olds and 56 percent of those 65 and older).

**Exhibit 3.26: Unemployment Insurance Coverage by Demographic Categories—All Workers**

| | | Covered | Not covered | Don't know |
|---|---|---|---|---|
| **GENDER**<br>Unweighted *n* = 8,479; *p* < .001 | Male | 67% | 18% | 15% |
| | Female | 63% | 16% | 20% |
| **HISPANIC**<br>Unweighted *n* = 8,255; *p* < .001 | Hispanic | 50% | 24% | 26% |
| | Not Hispanic | 68% | 16% | 16% |
| **RACE**<br>Unweighted *n* = 8,114; *p* < .001 | White | 68% | 17% | 15% |
| | Black/African American | 66% | 14% | 20% |
| | American Indian/Alaska Native | 61% | 15% | 25% |
| | Multiple race | 59% | 15% | 25% |
| | Asian | 58% | 14% | 28% |
| | Other race | 50% | 26% | 25% |
| | Native Hawaiian/Pacific Islander | 40% | 22% | 38% |
| **AGE**<br>Unweighted *n* = 8,070; *p* < .001 | 18–34 years | 54% | 18% | 28% |
| | 35–49 years | 71% | 15% | 14% |
| | 50–64 years | 73% | 17% | 10% |
| | 65 and over | 56% | 31% | 13% |

Source: Worker Classification Knowledge Survey QCover_UI_A, QGender, QHispanic, QRace_recode, QAge_recode.

### 3.3.3 Reasons for Lack of Unemployment Insurance Coverage

As show in Exhibit 3.21 above, 17 percent of workers said that their job was not covered by unemployment insurance. Among these, 36 percent reported that they knew why they were not covered. In this section we discuss the reasons workers gave for why they lacked coverage, and align their responses to our assumptions about correct and incorrect answers. Exhibit 3.27 displays these respondents' perceived reasons for lack of unemployment insurance coverage, for all respondents, CIEs and NCIEs. The columns for worker type show the percentage of respondents who reported each reason. Additionally, we indicate whether that particular reason could be a correct explanation for lack of coverage under the FLSA. A check (√) indicates that under our assumptions, this is a valid reason for lack of unemployment insurance coverage. An X (x) indicates an invalid reason. A question mark (?) indicates that more information would be required to determine whether the answer provided was valid or invalid.

Only 37 percent of CIEs correctly identified a reason for not having unemployment insurance. In contrast, 68 percent of NCIEs identified the correct reason for lacking unemployment insurance coverage.

**Exhibit 3.27: Unemployment Insurance: Reason Not Covered—Clearly Identified Employees and Not Clearly Identified Employees**

| Reason main job not covered by unemployment insurance | All respondents (unweighted *n* = 670) | Clearly Identified Employees (unweighted *n* = 129) | | Not Clearly Identified Employees (unweighted *n* = 541) | |
|---|---|---|---|---|---|
| | Percent | Percent | Correct? | Percent | Correct? |
| Not an employee/self-employed | 57% | 14% | ✓ | 68% | ✓ |
| Other | 18% | 30% | ? | 15% | ? |
| Eligibility (have not worked enough hours) | 10% | 23% | ✓ | 7% | X |
| Salaried/exempt employee | 8% | 15% | X | 6% | X |
| Don't know | 6% | 15% | n/a | 3% | n/a |
| Eligibility (have not worked at the organization long enough) | 1% | 2% | X | 0% | X |

Source: Worker Classification Knowledge Survey QReason_UI.

Note: n/a = not applicable, X = incorrect, ✓ = correct, ? = requires further information not available in survey.

### 3.3.4   Unemployment Insurance Coverage Change

To further gauge knowledge about unemployment insurance coverage as related to a respondent's employment status, the survey asked whether the respondent's unemployment insurance coverage would change under a different job classification. The respondent base for this question included only those respondents who responded "yes" or "no" to the question about unemployment insurance coverage. For the purposes of these analyses, we assume that if an employee becomes self-employed, or conversely, if a self-employed person becomes an employee, the person's unemployment insurance coverage would change.

Across all workers, about half of respondents reported correctly that their coverage would change if their job classification changed (see Exhibit 3.28). Nearly one-third of all workers (30 percent) did not know whether their unemployment coverage would change under a different status.

**Exhibit 3.28: Unemployment Insurance Coverage Change**

| All workers (unweighted *n* = 6,505) | | | Clearly Identified Employees (unweighted *n* = 4,022) | | | Not Clearly Identified Employees (unweighted *n* = 2,483) | | | Significance (CIEs vs. NCIEs) |
|---|---|---|---|---|---|---|---|---|---|
| Yes | No | Don't know | Yes | No | Don't know | Yes | No | Don't know | *p*-value |
| 49% | 21% | 30% | 50% | 19% | 31% | 47% | 25% | 28% | *<.001* |

Source: Worker Classification Knowledge Survey QCover_UI_B.

Exhibit 3.29 shows the distribution of responses to the question about unemployment insurance coverage for the full sample by work characteristic. There is a significant association between union membership and reporting that access to unemployment insurance coverage would change.

**Exhibit 3.29: Unemployment Insurance Coverage Change by Work Characteristic—All Workers**

| | | Yes, would change | No, would not change | Don't know |
|---|---|---|---|---|
| **SECTOR** Unweighted $n$ = 5,832; $p$ = .0693 | Government | 52% | 20% | 28% |
| | Private, for-profit | 49% | 20% | 32% |
| | Nonprofit | 45% | 21% | 34% |
| **WORK TYPE** Unweighted $n$ = 6,437; $p$ = .0590 | Blue collar | 48% | 23% | 29% |
| | White collar | 49% | 20% | 31% |
| **UNION** Unweighted $n$ = 6,365; $p$ = .0129 | Member of labor union | 54% | 17% | 29% |
| | Not member of labor union | 48% | 22% | 30% |
| **JOB TENURE** Unweighted $n$ = 6,482; $p$ = .0521 | Less than 1 year | 67% | 24% | 10% |
| | 1 year to < 5 years | 47% | 23% | 30% |
| | 5 years or more | 50% | 20% | 30% |

Source: Worker Classification Knowledge Survey, QCover_UI_B, QEmployer, QOccupation, QUnion, Jobtenure.

Over 70 percent of workers with a self-reported status of undetermined did not know under what conditions their unemployment insurance coverage would change (47 percent did not know; 24 percent said "none"; see Exhibit 3.30). Only 15 percent of these workers correctly identified under what conditions their unemployment insurance coverage would change. The respondents to this series of questions provided unclear or conflicting answers to the self-reported classification concept questions, perhaps indicating a more general lack of knowledge.

**Exhibit 3.30: Unemployment Insurance Coverage Change—Workers of Undetermined Self-Reported Status**

| Under what conditions would your unemployment insurance coverage change? | Percent (unweighted $n$ = 587) |
|---|---|
| Don't know | 47% |
| None | 24% |
| Other | 14% |
| If your worker status changed (unspecified) | 7% |
| If you became an employee | 6% |
| If you became self-employed | 2% |

Source: Worker Classification Knowledge Survey QCover_UI_C Sample; self-identified worker status "undetermined" who reported "yes" or "no" to QCover_UI_A.

## 3.4    Knowledge of Workers' Compensation Coverage

Workers who are independent contractors or other non-employees have no workers' compensation coverage if injured on the job. In some industries, where workplace injuries are more likely or potentially more dangerous (e.g., construction), using contract workers instead of employees affords firms a tremendous cost advantage by avoiding associated insurance and liability for injuries. Yet many workers

may not know how their coverage and protections are associated with working as an employee. In this section, we present data on worker knowledge related to workers' compensation.

### 3.4.1 Workers' Compensation Coverage on Main Job

Three-quarters of workers (75 percent) reported that their main job is covered by workers' compensation. Twelve percent reported that they are not covered, and among these, about half knew why they lacked coverage (see Exhibit 3.31). The majority of workers who could offer a reason why they lacked workers' compensation cited being not an employee/being self-employed. The percentage of CIEs reporting workers' compensation is even higher, 84 percent, in keeping with our assumption that employees have this coverage (Exhibit 3.32). Among the few CIEs that do lack coverage, fewer than 40 percent could explain why. Exhibit 3.33 provides a graphic overview of this series of questions for NCIEs. As shown, one fifth (21 percent) of these workers reported that they were not covered by workers' compensation.

**Exhibit 3.31: Workers' Compensation Coverage—All Workers**



**Worker Knowledge of Employment Rights and Benefits**

**Exhibit 3.32: Workers' Compensation Coverage—Clearly Identified Employees (CIEs)**



**Exhibit 3.33: Workers' Compensation Coverage—Not Clearly Identified Employees (NCIEs)**



### 3.4.2   Workers' Compensation Coverage—Subgroup Analysis

Responses to coverage questions are associated with worker characteristics, as show in Exhibit 3.34. A large percentage of union workers report being covered by workers' compensation (91 percent). This number is even higher among CIEs (not shown). Among all workers, being on the job longer is associated with reporting being covered by workers' compensation insurance (80 percent of those with five or more years, versus 70 percent with one to five years).

**Exhibit 3.34: Workers' Compensation Coverage by Work Characteristic—All Workers**

| | | Covered | Not covered | Don't know |
|---|---|---|---|---|
| SECTOR<br>Unweighted $n$ = 7,392; $p < .001$ | Government | 81% | 9% | 10% |
| | Private, for-profit | 80% | 6% | 14% |
| | Nonprofit | 82% | 8% | 10% |
| WORK TYP<br>Unweighted $n$ = 8,382; $p < .001$ | Blue collar | 73% | 13% | 14% |
| | White collar | 78% | 11% | 11% |
| UNION<br>Unweighted $n$ = 8,271; $p < .001$ | Member of labor union | 91% | 4% | 6% |
| | Not member of labor union | 74% | 13% | 13% |
| JOB TENURE<br>Unweighted $n$ = 8,442; $p < .001$ | Less than 1 year | 72% | 13% | 16% |
| | 1 year to < 5 years | 70% | 12% | 18% |
| | 5 years or more | 80% | 12% | 8% |

Source: Worker Classification Knowledge Survey: QCover_WC_A, QEmployer, QOccupation, QUnion, Jobtenure.

Workers with less than high school education are more likely to report that they are not covered by workers' compensation or that they do not know whether they are covered, compared to those with high school education or higher (see Exhibit 3.35). Looking at those with some college or above, differences in the perception of workers' compensation coverage are small. In terms of language, native English speakers more frequently report that they are covered by workers' compensation than non-native English speakers (79 percent versus 54 percent, respectively).

**Exhibit 3.35: Workers' Compensation Coverage by Education and English—All Workers**

| | | Covered | Not covered | Don't know |
|---|---|---|---|---|
| EDUCATION<br>Unweighted $n$ = 8,400; $p = .001$ | Less than high school | 60% | 20% | 21% |
| | High school graduate | 76% | 10% | 14% |
| | Some college | 76% | 11% | 12% |
| | Associate's degree | 81% | 10% | 9% |
| | Bachelor's degree | 78% | 12% | 9% |
| | Graduate degree | 76% | 11% | 12% |
| ENGLISH<br>Unweighted $n$ = 8,350; $p < .001$ | Non-native English speaker | 54% | 17% | 28% |
| | Native English speaker | 79% | 11% | 10% |

Source: Worker Classification Knowledge Survey, QCover_WC_A, QEducation_recode, Eng_native.

Reporting of workers' compensation coverage across demographic groupings follows a similar pattern to those observed with respect to minimum wage, overtime, and unemployment insurance (see Exhibit 3.36). Nearly 80 percent of non-Hispanics report that they are covered by workers' compensation, versus 59 percent of Hispanics. Similarly, Hispanics are more likely to report that they do not know whether their job is covered by workers' compensation (23 percent Hispanics versus 11 percent non-Hispanics).

**Exhibit 3.36: Workers' Compensation Coverage by Demographic Characteristic—All Workers**

| | | Covered | Not covered | Don't know |
|---|---|---|---|---|
| **GENDER** Unweighted *n* = 8,477; *p* < .0192 | Male | 75% | 13% | 12% |
| | Female | 75% | 11% | 14% |
| **HISPANIC** Unweighted *n* = 8,254; *p* < .001 | Hispanic | 59% | 17% | 23% |
| | Not Hispanic | 79% | 11% | 11% |
| **RACE** Unweighted *n* = 8,111; *p* < .001 | White | 79% | 12% | 9% |
| | Multiple race | 76% | 8% | 16% |
| | American Indian/Alaska Native | 75% | 10% | 15% |
| | Black/African American | 75% | 10% | 16% |
| | Asian | 69% | 7% | 24% |
| | Native Hawaiian/Pacific Islander | 64% | 12% | 24% |
| | Other race | 59% | 17% | 24% |
| **AGE** Unweighted *n* = 8,059; *p* < .001 | 18–34 years | 68% | 12% | 20% |
| | 35–49 years | 79% | 10% | 11% |
| | 50–64 years | 81% | 12% | 7% |
| | 65 and over | 70% | 21% | 9% |

Source: Worker Classification Knowledge Survey, QCover_WC_A, QGender, QHispanic, QRace_recode, QAge_recode.

### 3.4.3 Reasons for Lack of Workers' Compensation Coverage

As shown in Exhibit 3.31 above, only 12 percent of workers said that their job was not covered by workers' compensation. Among these, 47 percent said that they know why they are not covered. This section discusses the reasons workers gave for why they lacked coverage, and aligns their responses to our assumptions about correct and incorrect answers.

Exhibit 3.37 displays these data for all respondents, CIEs and NCIEs. The columns for worker type show the percentage of respondents who reported each reason. Additionally, we indicate whether that particular reason could be a correct explanation for lack of coverage under the FLSA. A check (√) indicates that under our assumptions, this is a valid reason for lack of workers' compensation coverage. An X (x) indicates an invalid reason. A question mark (?) indicates that more information would be required to determine whether the answer provided was valid or invalid.

Only 13 percent of CIEs identified a valid reason among the response categories. Among NCIEs, approximately two-thirds (65 percent) identified the correct reason for lacking workers' compensation coverage.

**Exhibit 3.37: Workers' Compensation: Reason Not Covered—Clearly Identified Employees and Not Clearly Identified Employees**

| Reasons main job not covered by workers' compensation | All respondents (unweighted *n* = 490) Percent | Clearly Identified Employees (unweighted *n* = 54) | | Not Clearly Identified Employees (unweighted *n* = 436) | |
|---|---|---|---|---|---|
| | | Percent | Correct? | Percent | Correct? |
| Not an employee/self-employed | 72% | 13% | ✓ | 65% | ✓ |
| Other | 14% | 23% | ? | 15% | ? |
| Salaried/exempt employee | 7% | 23% | X | 9% | X |
| Don't know | 4% | 24% | X | 6% | X |
| Eligibility (have not worked enough hours) | 3% | 15% | X | 4% | X |
| Eligibility (have not worked at the organization long enough) | 1% | 2% | X | 1% | X |

Source: Worker Classification Knowledge Survey, QReason_WC.

Note: n/a = not applicable, X = incorrect, ✓ = correct, ? = requires further information not available in survey.

### 3.4.4    Workers' Compensation Coverage Change

To further gauge respondents' knowledge about this issue, the survey asked whether respondents' workers' compensation coverage would change under a different job classification. The respondent base for this question included only those respondents who responded "yes" or "no" to the question about workers' compensation coverage. For the purposes of these analyses, we assume that if an employee becomes self-employed, or conversely, if a self-employed person becomes an employee, the person's workers' compensation coverage would change.

Just over half of workers in each category correctly reported that their workers' compensation coverage would change under a new job classification, as shown in Exhibit 3.38.

**Exhibit 3.38: Workers' Compensation Coverage Change—Clearly Identified Employees and Not Clearly Identified Employees**

| All Workers (Unweighted *n* = 6,942) | | | Clearly Identified Employees (unweighted *n* = 4,315) | | | Not Clearly Identified Employees (unweighted *n* = 2,627) | | | Significance (CIEs vs. NCIEs) |
|---|---|---|---|---|---|---|---|---|---|
| Yes | No | Don't know | Yes | No | Don't know | Yes | No | Don't know | *p*-value |
| 53% | 20% | 27% | 54% | 18% | 28% | 51% | 24% | 25% | *<.001* |

Source: Worker Classification Knowledge Survey QCover_WC_B.

Exhibit 3.39 shows the distribution of responses to the question about workers' compensation coverage for the full sample by work characteristic. There are significant associations between reporting change in workers' compensation coverage and all four work characteristics (Exhibit 3.39). Government workers are more likely to correctly report that their coverage would change, along with white collar workers and union members. With respect to job tenure, the sample size of workers with less than one year of

experience on the job was quite small (n=14), and therefore this difference should be interpreted cautiously.

**Exhibit 3.39: Workers' Compensation Coverage Change by Work Characteristic—All Workers**

| | | Yes, would change | No, would not change | Don't know |
|---|---|---|---|---|
| **SECTOR** Unweighted *n* = 6,268; *p* = .0013 | Government | 57% | 18% | 25% |
| | Private, for-profit | 53% | 18% | 28% |
| | Nonprofit | 49% | 16% | 34% |
| **WORK TYPE** Unweighted *n* = 6,871; *p* < .001 | Blue collar | 51% | 22% | 27% |
| | White collar | 55% | 17% | 27% |
| **UNION** Unweighted *n* = 6,799; *p* = .0015 | Member of labor union | 59% | 17% | 24% |
| | Not member of labor union | 53% | 20% | 27% |
| **JOB TENURE** Unweighted *n* = 6,916; *p* = .026 | Less than 1 year | 76% | 13% | 11% |
| | 1 year to < 5 years | 52% | 20% | 29% |
| | 5 years or more | 54% | 20% | 26% |

Source: Worker Classification Knowledge Survey, QCover_WC_B, QEmployer, QOccupation, QUnion, Jobtenure.

Workers of undetermined status were asked under what conditions their workers' compensation coverage would change. The majority (71 percent) either answered that they did not know (50 percent) or answered incorrectly (21 percent). The result is not surprising, given that we were not able to determine a self-identified classification (EMPFLAG) for these respondents. Conversely, only 12 percent provided a correct answer to this question, that is, because their worker classification had changed (see Exhibit 3.40).

**Exhibit 3.40: Workers' Compensation Coverage Change—Workers of Undetermined Self-Reported Status**

| Under what conditions would your workers' compensation coverage change? | Percent (unweighted *n* = 600) |
|---|---|
| Don't know | 50% |
| None | 21% |
| Other | 16% |
| If your worker status changed (unspecified) | 6% |
| If you became an employee | 5% |
| If you became self-employed | 1% |

Source: Worker Classification Knowledge Survey QCover_WC_C.
Sample: Self-identified worker status "undetermined" who reported "yes" or "no" to QCover_WC_A.

**Worker Knowledge of Employment Rights and Benefits**

## 3.5    Knowledge of OSHA Safety Protections

Occupational Safety and Health Administration (OSHA) regulations seek to provide a safe and hazard-free work environment. OSHA standards limit the amount of hazardous chemicals workers can be exposed to, require the use of certain safe practices and equipment, and require employers to monitor hazards and keep records of workplace injuries and illnesses. OSHA standards exclude some worksites and types of workers, including some public employees and self-employed workers. Workers at state and local government agencies are not covered by Federal OSHA, but have Occupational Safety and Health Act protections if they work in one of the states or territories that have an OSHA-approved state program. For the purposes of these analyses, we assume that NCIEs are not covered.

### 3.5.1    OSHA Protections on Main Job

Three-quarters of all workers report that their job is covered by OSHA safety standards (see Exhibit 3.41). Among the 10 percent who report their job is not covered, just over half (51 percent) believe they know *why* OSHA standards do not apply to their job, and among these, most report that they are not covered because they are not employees.

**Exhibit 3.41: OSHA Safety Standards Coverage—All Workers**



Source: Worker Classification Knowledge Survey, QCOVER_OS_A, QCOVER_WHY_OS, QREASON_OS.

Just 6 percent of CIEs report that they are not covered by OSHA standards, and less than half of these believe they know why not (39 percent), as shown in Exhibit 3.42.

### Worker Knowledge of Employment Rights and Benefits

**Exhibit 3.42: OSHA Safety Standards Coverage—Clearly Identified Employees**



Source: Worker Classification Knowledge Survey, QCOVER_OS_A, QCOVER_WHY_OS, QREASON_OS.

NCIEs report that they are not covered by OSHA safety standards more than twice as often as CIEs (i.e., 15 percent, in Exhibit 3.43 vs. 6 percent in Exhibit 3.42). Just over half say they know why they are not covered, and among these, most say it is because they are not employees.

**Exhibit 3.43: OSHA Safety Standards Coverage—Not Clearly Identified Employees**



Source: Worker Classification Knowledge Survey, QCOVER_OS_A, QCOVER_WHY_OS, QREASON_OS.

### 3.5.2    OSHA Safety Standards Coverage—Subgroup Analysis

We would expect that unionized workers would have more accurate knowledge of their coverage related to OSHA safety standards. Research in the early 1990s showed that OSHA enforcement was improved in industries when unions were present (Weil 1991a, 1991b). We would also expect that workers with longer job tenure would have better knowledge, owing to more experience and opportunities for exposure to safety-related incidents and education on the job.

Only these two worker characteristic factors—union membership and job tenure—are significantly associated with knowledge of OSHA safety standards coverage (see Exhibit 3.44). Workers with longer tenure (five or more years) are more likely to report that they are protected by OSHA safety standards on their main job compared to those with less tenure. While there is a significant difference, we caution that there are small sample sizes among those with less than one year on the job. Non-union members are less likely to report that they are covered (73 percent versus 87 percent of union members) and more likely to report that they don't know whether they are covered (16 percent versus 10 percent of union members).

**Exhibit 3.44: OSHA Safety Standards Coverage by Work Characteristic—All Workers**

| | | Covered | Not covered | Don't know |
|---|---|---|---|---|
| **SECTOR**<br>Unweighted $n$ = 7,390; $p$ = .4646 | Government | 79% | 7% | 14% |
| | Private, for-profit | 78% | 6% | 16% |
| | Nonprofit | 80% | 5% | 14% |
| **WORK TYPE**<br>Unweighted $n$ = 8,382; $p$ = .1871 | Blue collar | 74% | 10% | 16% |
| | White collar | 75% | 10% | 15% |
| **UNION**<br>Unweighted $n$ = 8,270; $p < .001$ | Member of labor union | 87% | 3% | 10% |
| | Not member of labor union | 73% | 11% | 16% |
| **JOB TENURE**<br>Unweighted $n$ = 8,442; $p < .001$ | Less than 1 year | 68% | 19% | 13% |
| | 1 year to < 5 years | 71% | 9% | 20% |
| | 5 years or more | 78% | 10% | 12% |

Source: Worker Classification Knowledge Survey, QCover_OS_A, QEmployer, QOccupation, QUnion, Jobtenure.

The relationship among education, being a native speaker of English, and OSHA safety standards coverage follows a similar pattern as for the previously discussed benefits, and, as with unemployment insurance and workers' compensation, there are different implications. We would expect that workers with higher education would report being covered, yet they report slightly lower levels of coverage when compared to workers with less education (see Exhibit 3.45). More native English speakers report they are covered than non-native English speakers (78 percent vs. 55 percent).

**Worker Knowledge of Employment Rights and Benefits**

**Exhibit 3.45: OSHA Safety Standards Coverage by Education and English—All Workers**

| | | Covered | Not covered | Don't know |
|---|---|---|---|---|
| **EDUCATION** Unweighted $n$ = 8,400; $p < .001$ | Less than high school | 61% | 16% | 23% |
| | High school graduate | 75% | 8% | 17% |
| | Some college | 76% | 9% | 15% |
| | Associate's degree | 82% | 8% | 10% |
| | Bachelor's degree | 76% | 9% | 15% |
| | Graduate degree | 74% | 11% | 14% |
| **ENGLISH** Unweighted $n$ = 8,400; $p < .001$ | Non-native English speaker | 55% | 13% | 32% |
| | Native English speaker | 78% | 9% | 13% |

Source: Worker Classification Knowledge Survey, QCover_OS_A, QEducation_recode, Eng_native.

When findings from the OSHA subgroup analyses are compared with findings from subgroup analyses for other benefits, demographic differences in reporting coverage on OSHA follow similar patterns (see Exhibit 3.46). Most notably, Hispanics are less likely to report coverage (63 percent versus 77 percent among non-Hispanics). Men are slightly more likely to report that they are covered by OSHA safety standards than women. Whites are more likely to report being covered than other racial groups. Black/African Americans are more likely to report that they do not know whether or not they are covered by OSHA standards.

**Exhibit 3.46: OSHA Safety Standards Coverage by Demographic Categories—All Workers**

| | | Covered | Not covered | Don't know |
|---|---|---|---|---|
| **GENDER**<br>Unweighted *n* = 8,477; *p* < .0053 | Male | 76% | 10% | 14% |
| | Female | 73% | 9% | 17% |
| **HISPANIC**<br>Unweighted *n* = 8,253; *p* < .001 | Hispanic | 63% | 13% | 25% |
| | Not Hispanic | 77% | 9% | 14% |
| **RACE**<br>Unweighted *n* = 8,110; *p* < .001 | Multiple race | 82% | 9% | 10% |
| | White | 77% | 10% | 13% |
| | Black/African American | 74% | 9% | 17% |
| | Asian | 69% | 7% | 24% |
| | Native Hawaiian/Pacific Islander | 68% | 4% | 29% |
| | American Indian/Alaska Native | 67% | 4% | 29% |
| | Other race | 63% | 12% | 25% |
| **AGE**<br>Unweighted *n* = 8,068; *p* < .001 | 18–34 years | 71% | 7% | 22% |
| | 35–49 years | 77% | 10% | 13% |
| | 50–64 years | 79% | 10% | 11% |
| | 65 and over | 68% | 18% | 13% |

Source: Worker Classification Knowledge Survey, QCover_OS_A, QGender, QHispanic, QRace_recode, QAge_recode.

### 3.5.3   Reasons for Lack of OSHA Safety Standards Coverage

As shown in Exhibit 3.41 above, only 10 percent of all workers said that their job was not covered by OSHA safety standards. Few workers said that they were not covered, just 23 CIEs. Among the NCIEs, most said they were not covered, most said it was because they were self-employed; this is a correct answer for non-employees. Among the 13 percent who supplied an "other" answer, while the numbers are low, there are common two main patterns of responses. About half of these respondents gave responses (perhaps mistakenly) explaining that because of the type of work they did, OSHA safety standards did not apply. For example: "I don't work in an unsafe environment,"  "I'm not in manufacturing," "We're not doing physical work," "It's an office job." The other half of these respondents described working for federal, military or public employers. Public employees are covered only in OSHA State Plan States/Territories. Also, OSHA does not cover military personnel and federal civilian employees engaging in uniquely military operations.

**Exhibit 3.47: OSHA Safety Standards: Reason Not Covered—Clearly Identified Employees and Not Clearly Identified Employees**

| Reasons main job not covered by OSHA safety standards | All respondents (unweighted n = 243) Percent | Clearly Identified Employees (unweighted n = 23) | | Not Clearly Identified Employees (unweighted n = 230) | |
|---|---|---|---|---|---|
| | | Percent | Correct? | Percent | Correct? |
| Not an employee/self-employed | 66% | 4% | ✓ | 73% | ✓ |
| Other | 13% | 16% | ? | 13% | ? |
| Salaried/exempt employee | 9% | 26% | X | 7% | X |
| Don't know | 9% | 45% | X | 5% | X |
| Eligibility (have not worked enough hours) | 3% | 5% | X | 3% | X |
| Eligibility (have not worked at the organization long enough) | 1% | 5% | X | 0% | X |

Source: Worker Classification Knowledge Survey QReason_OS.

Note: n/a = not applicable, X = incorrect, ✓ = correct, ? = requires further information not available in survey.

### 3.5.4   OSHA Safety Standard Change

To further gauge respondents' knowledge, the survey asked whether respondents' OSHA safety standards coverage would change under a different job classification. The respondent base for this question included only those respondents who reported "yes" or "no" to the question about OSHA safety standard protections (but not those who refused to respond or responded that they did not know). As shown in Exhibit 3.48, among CIEs, 35 percent said that they did not know whether their coverage would change if they became self-employed, compared to 36 percent of the NCIEs. Fewer NCIEs did not know the answer to the coverage question (25 percent, versus 30 percent of CIEs).

**Exhibit 3.48: OSHA Safety Standards Coverage Change—All Workers**

| All workers (unweighted n = 6,672) | | | Clearly Identified Employees (unweighted n = 4,159) | | | Not clearly identified employees (unweighted n = 2,513) | | | Significance CIEs vs. NCIEs | |
|---|---|---|---|---|---|---|---|---|---|---|
| Yes | No | DK | Yes | No | DK | Yes | No | DK | p-value | significance |
| 35% | 36% | 28% | 35% | 35% | 30% | 36% | 39% | 25% | <.001 | *** |

Source: Worker Classification Knowledge Survey QCover_OS_B.

Exhibit 3.49 shows the distribution of responses to the question about OSHA safety standards for the full sample by work characteristics. Government-sector workers were more likely to report that their OSHA coverage would change than private or nonprofit sector workers (40 percent versus 35 percent and 32 percent). Labor union members were also more likely to report that their coverage would change than non-union members (42 percent versus 34 percent).

**Exhibit 3.49: OSHA Safety Standards Coverage Change by Work Characteristic—All Workers**

| | | Yes, would change | No, would not change | Don't know |
|---|---|---|---|---|
| **SECTOR**<br>Unweighted $n$ = 6,036; $p$ = .0031 | Government | 40% | 32% | 28% |
| | Private, for-profit | 35% | 35% | 29% |
| | Nonprofit | 32% | 33% | 35% |
| **WORK TYPE**<br>Unweighted $n$ = 6,599; $p$ = .0725 | Blue collar | 36% | 37% | 27% |
| | White collar | 35% | 35% | 30% |
| **UNION**<br>Unweighted $n$ = 6,537; $p$ < .001 | Member of labor union | 42% | 31% | 27% |
| | Not member of labor union | 34% | 37% | 29% |
| **JOB TENURE**<br>Unweighted $n$ = 6,647; $p$ = .0687 | Less than 1 year | 31% | 56% | 13% |
| | 1 year to < 5 years | 34% | 37% | 30% |
| | 5 years or more | 37% | 36% | 28% |

Source: Worker Classification Knowledge Survey QCover_OS_B, QEmployer, QOccupation, QUnion, Jobtenure.

Workers of undetermined status were asked under what conditions their OSHA safety standards coverage would change. Half did not know what conditions would change their OSHA coverage (Exhibit 3.50). The result is not surprising, given that we were not able to determine a self-identified classification (EMPFLAG) for these respondents. Just under a third (28 percent) said that no conditions would change their OSHA safety standards coverage.

**Exhibit 3.50: OSHA Safety Standards Coverage Change—Workers of Undetermined Self-Reported Status**

| Under what conditions would your OSHA safety standards coverage change? | Percent (unweighted $n$ = 550) |
|---|---|
| Don't know | 50% |
| None | 28% |
| Other | 13% |
| If your worker status changed (unspecified) | 4% |
| If you became an employee | 3% |
| If you became self-employed | 1% |

Source: Worker Classification Knowledge Survey QCover_OS_C.

Sample: Self-identified worker status "undetermined" who reported "yes" or "no" to QCover_OS_A.

## 3.6    Knowledge of FMLA Benefits

The Family and Medical Leave Act of 1993 (FMLA) guarantees up to 12 work weeks of unpaid, job-protected leave to qualifying employees for specified family and medical leave reasons. It is a protection afforded to most, but not all, employees. To be covered by the FMLA, an employer must employ or have employed at least 50 employees in 20 or more workweeks in the current or preceding calendar year. Not all employees at covered employers are eligible for FMLA leave. Public agencies and public and private

elementary and secondary schools are covered by the FMLA regardless of the number of employees employed. Otherwise, to be eligible for FMLA leave, an employee must: (i) work at a worksite where 50 employees or more employees are employed by the employer within 75 miles of that worksite; (ii) have 12 months of tenure with this firm; and (iii) have worked 1,250 hours in the past year (about 24 hours per week). Therefore, we can assume that, compared to NCIEs, clearly identified employees are more likely to be eligible for FMLA leave. However, CIEs also must meet the conditions applicable for their firm to be covered by the FMLA, and meet the eligibility conditions for themselves. In this section, we describe the responses to these and related eligibility questions as "FMLA Eligibility."

### 3.6.1 FMLA Coverage on Main Job

Most workers (81 percent) report that they are eligible for FMLA leave at their main job (see Exhibit 3.51). This is a large difference in reporting of eligibility compared to when employees were asked about eligibility conditions for the FMLA in the 2012 FMLA survey. In that survey, respondents answered separate questions about the three conditions for their eligibility, and only 59 percent of employees reported meeting all three of these conditions (Klerman et al. 2012). This difference may be attributable to the difference in the questions, but it is notable that so many more workers from the Worker Classification Knowledge Survey *think* that they are eligible.

Just 8 percent of all workers said that they did not know whether they were eligible for FMLA leave and 11 percent reported that they were not eligible for FMLA leave.

Among reported ineligible workers, half reported that they knew why they lacked FMLA eligibility. More than a third (35 percent) of those who knew why they were not eligible explained that they were self-employed and therefore were not eligible for FMLA leave. Approximately another third (28 percent) supplied another reason why they were not eligible for FMLA.

**Exhibit 3.51: FMLA Eligibility—All Workers**



Source: Worker Classification Knowledge Survey, QCOVER_SK_A, QCOVER_WHY_SK, QREASON_SK.

### Worker Knowledge of Employment Rights and Benefits

Exhibits 3.52 and 3.53 display the responses for eligibility for CIEs and NCIEs, respectively. Slightly more CIEs report FMLA eligibility than NCIEs, and among those not eligible, about half report knowing why they are not eligible; this holds for both CIEs and NCIEs.

**Exhibit 3.52: FMLA Eligibility—Clearly Identified Employees (CIEs)**



Source: Worker Classification Knowledge Survey, QCOVER_SK_A, QCOVER_WHY_SK, QREASON_SK.

**Exhibit 3.53: FMLA Eligibility—Not Clearly Identified Employees (NCIEs)**



Source: Worker Classification Knowledge Survey, QCOVER_SK_A, QCOVER_WHY_SK, QREASON_SK.

### 3.6.2    FMLA Eligibility—Subgroup Analysis

Workers in government report more frequently that they are guaranteed their job upon returning from family or medical leave, as do union members and workers with five or more years of tenure on their main job (Exhibit 3.54).

**Exhibit 3.54: FMLA Coverage by Work Characteristic—All Workers**

| | | Eligible | Not eligible | Don't know |
|---|---|---|---|---|
| **SECTOR**<br>Unweighted *n* = 7,391; *p* < .001 | Government | 87% | 7% | 6% |
| | Private, for-profit | 80% | 11% | 9% |
| | Nonprofit | 82% | 10% | 8% |
| **WORK TYPE**<br>Unweighted *n* = 8,360; *p* = .0049 | Blue collar | 80% | 12% | 9% |
| | White collar | 83% | 10% | 7% |
| **UNION**<br>Unweighted *n* = 8,271; *p* < .001 | Member of labor union | 88% | 7% | 5% |
| | Not member of labor union | 80% | 12% | 8% |
| **JOB TENURE**<br>Unweighted *n* = 8,440; *p* < .001 | Less than 1 year | 72% | 18% | 10% |
| | 1 year to < 5 years | 75% | 15% | 10% |
| | 5 years or more | 86% | 8% | 6% |

Source: Worker Classification Knowledge Survey QCover_SK_A, QEmployer, QOccupation, QUnion, Jobtenure.

When we compare CIEs and NCIEs by work characteristics, on FMLA eligibility, there are few significant differences (not reported).

More workers with higher levels of education report being eligible for FMLA leave (Exhibit 3.55), which is in contrast to the pattern of responses for the other benefits discussed in previous sections. Eligibility among native English speakers is higher than among non-native speakers, consistent with the pattern for other rights and benefits.

**Exhibit 3.55: FMLA Coverage by Education and English—All Workers**

| | | Eligible | Not eligible | Don't know |
|---|---|---|---|---|
| **EDUCATION**<br>Unweighted *n* = 8,399; *p* = .0011 | Less than high school | 74% | 15% | 11% |
| | High school graduate | 82% | 10% | 8% |
| | Some college | 80% | 12% | 8% |
| | Associate's degree | 79% | 13% | 8% |
| | Bachelor's degree | 83% | 10% | 7% |
| | Graduate degree | 84% | 10% | 7% |
| **ENGLISH**<br>Unweighted *n* = 8,399; *p* = .002 | Non-native English speaker | 76% | 13% | 11% |
| | Native English speaker | 82% | 11% | 7% |

Source: Worker Classification Knowledge Survey, QCover_SK_A, QEducation_recode, Eng_native.

Hispanic ethnicity and race are associated with FMLA eligibility for all workers, as shown in Exhibit 3.56. Hispanics are significantly less likely to report being eligible. Sample sizes among some race categories are quite small, so these results should be interpreted cautiously.

**Worker Knowledge of Employment Rights and Benefits**

**Exhibit 3.56: FMLA Eligibility by Demographic Characteristics—All Workers**

| | | Eligible | Not eligible | Don't know |
|---|---|---|---|---|
| **GENDER**<br>Unweighted $n$ = 8,475; $p$ < .3611 | Male | 82% | 11% | 8% |
| | Female | 80% | 12% | 8% |
| **HISPANIC**<br>Unweighted $n$ = 8,253; $p$ < .001 | Hispanic | 75% | 14% | 11% |
| | Not Hispanic | 82% | 10% | 7% |
| **RACE**<br>Unweighted $n$ = 8,111; $p$ < .001 | Multiple race | 83% | 12% | 5% |
| | White | 83% | 10% | 7% |
| | Asian | 82% | 8% | 11% |
| | Black/African American | 77% | 15% | 8% |
| | Other race | 75% | 14% | 11% |
| | American Indian/Alaska Native | 71% | 19% | 10% |
| | Native Hawaiian/Pacific Islander | 67% | 22% | 11% |
| **AGE**<br>Unweighted $n$ = 8,068; $p$ = .0909 | 18–34 years | 80% | 12% | 9% |
| | 35–49 years | 82% | 11% | 7% |
| | 50–64 years | 83% | 11% | 6% |
| | 65 and over | 80% | 12% | 8% |

Source: Worker Classification Knowledge Survey QCover_SK_A, QGender, QHispanic, QRace_recode, QAge_recode.

### 3.6.3   Reasons for Lack of FMLA Eligibility

As shown in Exhibit 3.51, only 11 percent of workers said that they are not eligible for FMLA leave on their main job. Among these, 52 percent know why they are not covered. In this section we discuss the reasons workers gave for why they lacked FMLA eligibility, and align their responses to our assumptions about correct and incorrect answers.

Exhibit 3.57 displays workers' reasons for perceived lack of FMLA coverage for all respondents, CIEs, and NCIEs. The columns for worker type show the percentage of respondents who reported each reason. Additionally, we indicate whether that particular reason could be a correct explanation for lack of coverage under the FLSA.

Comparing CIEs and NCIEs, approximately half of both groups provided a correct answer why their job is not covered by the FMLA (45 percent of CIEs and 53 percent of NCIEs).

**Exhibit 3.57: FMLA: Reason Not Eligible—Clearly Identified Employees (CIEs) and Not Clearly Identified Employees (NCIEs)**

| Reason main job not eligible for FMLA leave | All workers (unweighted n=395) | Clearly Identified Employees (unweighted _n_ = 173) | | Not Clearly Identified Employees (unweighted _n_ = 222) | |
|---|---|---|---|---|---|
| | Percent | Percent | Correct? | Percent | Correct? |
| Not an employee/self-employed | 35% | 13% | ✓ | 53% | ✓ |
| Other | 28% | 40% | ? | 18% | ? |
| Eligibility (have not worked enough hours) | 21% | 25% | ✓ | 17% | X |
| Salaried/exempt employee | 7% | 7% | X | 7% | X |
| Eligibility (have not worked at the organization long enough) | 5% | 7% | ✓ | 3% | X |
| Don't know | 4% | 7% | n/a | 2% | n/a |

Source: Worker Classification Knowledge Survey QReason_SK.

Note: n/a = not applicable, X = incorrect √ = correct, ? = Requires further information not available in survey.

Comparing CIEs and NCIES, approximately half of both groups provided a correct answer why they are not eligible for FMLA leave (45 percent of CIEs and 53 percent of NCIEs).

### 3.6.4   FMLA Coverage Change

To further gauge respondents' knowledge about FMLA eligibility as related to respondent employment status, the survey asked whether these benefits would change under a different job classification. The respondent base for this question included only those respondents who responded "yes" or "no" to the question about FMLA eligibility. For these analyses, we assume that FMLA coverage would change for both types of workers, but less than half of all workers (46 percent) reported this way (Exhibit 3.58). A similar percentage of CIEs and NCIEs said that their eligibility would change (47 percent and 43 percent, respectively). Less than a quarter of all workers (23 percent) said that they did not know whether their eligibility would change.

**Exhibit 3.58: FMLA Eligibility Change—All Workers**

| All workers (unweighted _n_ = 7,155) | | | Clearly Identified Employees (unweighted _n_ = 4,372) | | | Not Clearly Identified Employees (unweighted _n_ = 2,783) | | | Significance CIEs vs. NCIEs | |
|---|---|---|---|---|---|---|---|---|---|---|
| Yes | No | DK | Yes | No | DK | Yes | No | DK | _p_-value | significance |
| 46% | 32% | 23% | 47% | 29% | 24% | 43% | 35% | 22% | _<.001_ | *** |

Source: Worker Classification Knowledge Survey QCover_SK_B.

Exhibit 3.59 shows the distribution of responses to the question about FMLA eligibility for the full sample by work characteristics. Government workers are significantly more likely to report that their eligibility would change, compared to workers in other sectors. Union members are more likely to report that eligibility would change compared to non-union members, and white collar workers are also more likely to correctly report a change versus blue collar workers. There is a significant association between

job tenure and reporting FMLA eligibility – workers with less tenure more frequently reported being eligible.

**Exhibit 3.59: FMLA Eligibility Change by Work Characteristic—All Workers**

| | | Yes, would change | No, would not change | Don't know |
|---|---|---|---|---|
| **SECTOR** Unweighted *n* = 6,456; *p* < .001 | Government | 53% | 24% | 23% |
| | Private, for-profit | 45% | 32% | 24% |
| | Nonprofit | 47% | 25% | 28% |
| **WORK TYPE** Unweighted *n* = 7,078; *p* < .001 | Blue collar | 43% | 34% | 23% |
| | White collar | 49% | 28% | 23% |
| **UNION** Unweighted *n* = 7,002; *p* < .001 | Member of labor union | 55% | 24% | 21% |
| | Not member of labor union | 44% | 33% | 23% |
| **JOB TENURE** Unweighted *n* = 7,127; *p* = .0015 | Less than 1 year | 53% | 38% | 9% |
| | 1 year to < 5 years | 43% | 33% | 24% |
| | 5 years or more | 48% | 30% | 22% |

Source: Worker Classification Knowledge Survey QCover_SK_B, QEmployer, QOccupation, QUnion, Jobtenure.

Workers of undetermined status were asked under what conditions their FMLA eligibility would change. Of these, 64 percent could not correctly identify an answer (34 percent did not know; 30 percent said "none"; Exhibit 3.60). The result is not surprising, given that we were not able to determine a worker self-identified classification (EMPFLAG) for these respondents.

**Exhibit 3.60: FMLA Eligibility Change—Workers of Undetermined Worker Status**

| Under what conditions would your FMLA eligibility change? | Percent (unweighted *n* = 670) |
|---|---|
| Don't know | 34% |
| None | 30% |
| Other | 25% |
| If your worker status changed (unspecified) | 6% |
| If you became an employee | 4% |
| If you became self-employed | 1% |

Source: Worker Classification Knowledge Survey QCover_SK_C.

Sample: Self-identified worker status "undetermined" who reported "yes" or "no" to QCover_SK_A.

## 3.7    Knowledge of Social Security/Medicare Contributions

Social Security and Medicare are important benefits related to employment that have implications for both employees and non-employees. Employees contribute 8 percent of their earnings to this disability or retirement benefit, and their employers match the contribution. Self-employed persons must pay the combined amount (i.e., 16 percent). In this section, we present data on worker knowledge related to Social Security/Medicare contributions. Because non-employees pay Social Security tax directly, they

should answer "no" to the question about whether Social Security is deducted from their pay. They should also report that their contribution would decrease if they became an employee. For employees, the correct answer is that their contribution would increase if they became self-employed.

### 3.7.1    Social Security/Medicare Deductions and Contributions on Main Job

The survey asked all respondents whether they had Social Security/Medicare deducted from their pay and/or whether they contributed to Social Security/Medicare. The vast majority (95 percent) reported that they did, as shown in Exhibit 3.61. Only 4 percent of respondents reported that they neither contribute to Social Security/Medicare nor have Social Security/Medicare deduced from their pay, and 2 percent said "don't know."

**Exhibit 3.61: Social Security/Medicare Deduction and Contribution—All Workers**



Source: Worker Classification Knowledge Survey, QCOVER_SS_A.

Exhibits 3.62 and 3.63 display the graphic overview of the Social Security/Medicare contribution and deduction question for CIEs and NCIEs, respectively. The vast majority of workers in both categories reported that they contribute to or have a Social Security/Medicare deduction. NCIEs were more likely than CIEs to report that they did not contribute to Social Security/Medicare (6 percent versus 2 percent).

**Worker Knowledge of Employment Rights and Benefits**

**Exhibit 3.62: Social Security/Medicare Deduction and Contribution—Clearly Identified Employees**



Source: Worker Classification Knowledge Survey, QCOVER_SS_A.

**Exhibit 3.63: Social Security/Medicare Deduction and Contribution—Not Clearly Identified Employees**

 Source: Worker Classification Knowledge Survey, QCOVER_SS_A.



### 3.7.2    Social Security/Medicare Contribution—Subgroup Analysis

In terms of work characteristics, there were significant differences by sector and work type (Exhibit 3.64). A higher proportion of government workers reported that they did not contribute to Social Security than workers in the private and nonprofit sectors. Most government workers at all levels pay into and are covered by Social Security, although this has not always been true. Federal employees did not pay Social Security taxes before 1984, and those who remain under the old retirement system still do not.

White collar workers were more likely to report that they contribute to Social Security than blue collar workers.

**Exhibit 3.64: Social Security/Medicare Contribution by Work Characteristic—All Workers**

| | | Contribute | Do not contribute | Don't know |
|---|---|---|---|---|
| **SECTOR** Unweighted *n* = 7,393; *p* < .001 | Government | 92% | 6% | 2% |
| | Private, for-profit | 96% | 3% | 1% |
| | Nonprofit | 96% | 3% | 1% |
| **WORK TYPE** Unweighted *n* = 8,385; *p* < .001 | Blue collar | 91% | 7% | 2% |
| | White collar | 95% | 4% | 2% |
| **UNION** Unweighted *n* = 8,268; *p* = .0264 | Member of labor union | 92% | 7% | 1% |
| | Not member of labor union | 93% | 5% | 2% |
| **JOB TENURE** Unweighted *n* = 8,444; *p* = n/a | Less than 1 year | 87% | 13% | 0% |
| | 1 year to < 5 years | 90% | 7% | 3% |
| | 5 years or more | 95% | 4% | 1% |

Source: Worker Classification Knowledge Survey: QCover_SS_A, QEmployer, QOccupation, QUnion, Jobtenure.

Significant differences were found across education level and being a native speaker of English for the full sample of workers (Exhibit 3.65). Workers with less than a high school education were significantly less likely to report that they contribute to Social Security than workers of all other education levels (84 percent versus an average of 94 percent). Native English speakers were also more likely to report contributing than non-native English speakers (94 percent versus 87 percent).

Looking at the same variables broken down by CIEs and NCIEs, we find similar patterns (not shown). Some significant differences appear between CIEs and NCIEs with higher levels of education (bachelor's degree, graduate degree). Differences between NCIEs and CIEs in both the non-native English speaker and native speaker categories were highly significant, with CIEs considerably more likely to report contributing to Social Security than NCIEs.

**Exhibit 3.65: Social Security/Medicare Contribution by Education and English—All Workers**

| | | Contribute | Do not contribute | Don't know |
|---|---|---|---|---|
| **EDUCATION** Unweighted *n* = 8,400; *p* < .001 | Less than high school | 84% | 12% | 4% |
| | High school graduate | 93% | 5% | 2% |
| | Some college | 93% | 5% | 2% |
| | Associate's degree | 94% | 4% | 2% |
| | Bachelor's degree | 95% | 4% | 1% |
| | Graduate degree | 94% | 5% | 1% |
| **ENGLISH** Unweighted *n* = 8,346; *p* < .001 | Non-native English speaker | 87% | 10% | 4% |
| | Native English speaker | 94% | 5% | 2% |

Source: Worker Classification Knowledge Survey: QCover_SS_A, QEducation_recode, Eng_native.

There are significant differences in Social Security/Medicare contributions by Hispanic ethnicity, race, and age (Exhibit 3.66). Hispanics are significantly less likely to contribute than non-Hispanics (94 percent vs. 86 percent). Workers of "Other race" are less likely to contribute than any other race category. Across age, the youngest age group (18–34 years) are the least likely to report contributing to Social Security/Medicare of any age group, and most likely to report that they do not know whether they contribute (4 percent).

Comparing knowledge of Social Security contributions by demographic categories and worker type, there are significant differences between CIEs and NCIEs in the categories of non-Hispanics and whites (not shown). Non-Hispanic NCIEs are much less likely than CIEs to report that they contribute (89 percent, versus 97 percent). Among whites, 89 percent of NCIEs reported contributing to Social Security, compared to 97 percent of CIEs. Across the board, NCIEs are less likely to report that they contribute to Social Security than CIEs.

**Exhibit 3.66: Social Security/Medicare Contribution by Demographic Categories—All Workers**

| | | Contribute | Do not contribute | Don't know |
|---|---|---|---|---|
| **GENDER** Unweighted $n$ = 8,479; $p$ < .352 | Male | 93% | 6% | 2% |
| | Female | 93% | 5% | 2% |
| **HISPANIC** Unweighted $n$ = 8,252; $p$ < .001 | Hispanic | 86% | 10% | 3% |
| | Not Hispanic | 94% | 5% | 2% |
| **RACE** Unweighted $n$ = 8,109; $p$ < .001 | White | 94% | 5% | 2% |
| | Asian | 93% | 3% | 4% |
| | Native Hawaiian/Pacific Islander | 93% | 5% | 1% |
| | Black/African American | 92% | 6% | 2% |
| | Multiple race | 91% | 6% | 4% |
| | American Indian/Alaska Native | 91% | 6% | 3% |
| | Other race | 86% | 11% | 4% |
| **AGE** Unweighted $n$ = 8,071; $p$ < .001 | 18–34 years | 89% | 7% | 4% |
| | 35–49 years | 94% | 5% | 1% |
| | 50–64 years | 95% | 5% | 1% |
| | 65 and over | 91% | 7% | 2% |

Source: Worker Classification Knowledge Survey QCover_SS_A, Qgender, QHispanic, QRace_recode, QAge_recode.

### 3.7.3   Change in Social Security/Medicare Contribution

To further gauge respondents' knowledge about this issue, the survey asked how a worker's contribution to Social Security/Medicare would change under a different job classification. The respondent base for this question included only those respondents who responded "yes" or "no" to the question about whether they contributed to Social Security/Medicare.

Just under one half of CIEs (44 percent) did not know how their contribution would change if they became self-employed. Just over a quarter (26 percent) of NCIEs reported that there would be no change in their contribution to Social Security if they became an employee, and nearly half (45 percent) reported that they did not know whether their coverage would change (Exhibit 3.67).

**Exhibit 3.67: Change in Social Security/Medicare Contribution by Worker Type**

| | All respondents (unweighted *n* = 7,582) | Clearly Identified Employees (unweighted *n* = 4,704) | Not Clearly Identified Employees (unweighted *n* = 2,878) | Significance (CIEs vs. NCIEs)  *p*-value |
|---|---|---|---|---|
| My share would go up | 20% | 22% | 16% | |
| My share would go down | 12% | 12% | 13% | <.001 |
| No change | 23% | 22% | 26% | |
| Don't know | 45% | 44% | 45% | |

Source: Worker Classification Knowledge Survey QCover_SS_C.

As described above, we could not determine self-reported employment status from the survey questions for all respondents. We refer to these respondents as workers of undetermined self-reported status. For these workers, we asked questions that were worded slightly differently (i.e., we asked them to explain under what conditions their benefits or coverage would change).

Workers of undetermined status were asked under what conditions their Social Security/Medicare contributions would change. Over half (51.6 percent) reported that they did not know under what conditions their Social Security/ Medicare contribution would change, while 20 percent said that their contribution would not change ("none") (Exhibit 3.68).

**Exhibit 3.68: Change in Social Security/Medicare Contribution—Workers of Undetermined Self-Reported Status**

| | Social Security/Medicare contribution (unweighted *n* = 717) |
|---|---|
| Don't know | 51.6% |
| None | 20.0% |
| Other | 16.1% |
| If your worker status changed (unspecified) | 5.6% |
| If you became an employee | 4.4% |
| Refused | 1.3% |
| If you became self-employed | 0.9% |

Source: Worker Classification Knowledge Survey: QCover_SS_D.

## 4. Employers' and Employer Representatives' Feedback on Worker Classification

The Worker Classification Knowledge Survey discussed in previous chapters collects information on the perspectives of workers with respect to their employment status. To establish a broader context for the interpretation of this empirical feedback, the Worker Classification Knowledge study also included a small qualitative field work component, consisting of 17 in-depth interviews with employers and employer representatives. The perspectives of these employers and employer representatives are particularly important in that they make deliberate and proactive choices about how to structure employment relations. The applicable design of employment and their perception of the likelihood of misclassification being detected are likely to affect those choices (Elmer 2011; Associated Press 2011). Conducted with semi-structured protocols, these interviews sought to elicit descriptions of hiring and staffing decisions and the factors that affect the classification of workers. The strength of these open-ended interviews is that they allow the respondents to elaborate on the array of factors that may influence their decisions. These open-ended interviews provide important contextual information that may be unique to their individual firms or industries.

However, the use of in-depth interviews for this type of research also has its limitations. First, our sample size is quite small, and the respondents were not selected using probability methods. Second, the interview format does not always allow questions to be asked the same way in every interview. While this tends to generate feedback that is more spontaneous, conversational, and respondent-focused, it does limit the extent to which generalizations can be drawn across the interviews. Nonetheless, these more descriptive insights can complement the findings from the worker survey and help to produce more-informed hypotheses about the mechanisms and processes that might underlie hiring practices.

Before turning to the methods and results of our qualitative field work we make one crucial interpretative note. Our goal in this chapter is to describe the perspectives of employers and employer representatives as reported to us in these interviews. We report responses thematically but we do not discuss the accuracy of their statements or the plausibility of their interpretations.

### 4.1   Methodology

This section describes the recruitment, data collection, and analysis methods used in this exploratory research.

#### 4.1.1   Pre-Recruitment Activities

In preparation for this qualitative field work, Abt staff conducted in-person interviews with DOL staff who are most familiar with the array of policies and practices associated with worker classification and misclassification. Interviewees included labor and employment experts from the Solicitor's Office, the Wage and Hour Division, and the OSHA. These background interviews were particularly valuable in that they served the following purposes:

1. *Identify and review DOL's specific areas of interest*. The interviews suggested particular interest in understanding how firms make decisions about employment relations and whether to deem a person an "employee." In particular, DOL staff were interested in whether firms fully understood the implications of their choice as to whether to classify workers as employees vs. self-employed.

2. *Target the recruitment of employers*. Specifically, we asked DOL staff to identify industries and occupations with perceived high prevalence of misclassification. In response, DOL listed the following sectors including: Construction, Technology, Janitorial/Cleaning Services, Home Health Care, Child Care, Transportation, Telecommunications, Beauty/Personal Care, Landscaping, Consulting, and Food Service.

3. *Establish a more informed context for the interviews*. Specifically, we were interested in DOL representatives' perspective on factors that might shape the tone and focus of responses from employers and employer representatives during the interviews.

### 4.1.2   Recruitment

The contract called for conducting between 16 and 20 interviews across a combination of employers and employer representatives. Based on the guidance and input from DOL, we targeted high-level human resource managers or other company representatives who are operationally engaged in a way that could shed light on internal practices and decisions. Across most industries noted above, our emphasis was on mid-sized to large companies. In some industries, such as Beauty/Personal Care, these size parameters did not apply.

In recruiting employer representatives, we sought subject matter experts who could speak knowledgably about the broader dimensions of employment classification and hiring decisions. To this end, we targeted individuals who work in employment law, human resource consultancies, and industry or trade associations. In recruiting both employers and employer representatives, our aim was to achieve some degree of sectoral and geographic mix to capture variation in the operational and regulatory environments they represent.

The recruitment process began by compiling prospects from a list of employers/employer representatives who had provided public comments to the OMB Paperwork Reduction Act submission 1235-0028 and attended listening sessions about the proposed national study on worker classification. This list of employers/employer representatives was supplemented using member lists of multiple trade associations.

In practice, recruitment of interviewees was considerably more challenging than we had expected. In the initial plan, we had expected to request participation from six to eight organizations for every one interview we completed, with up to three follow-up calls before replacing an organization. In the first round of recruitment, we attempted without success to reach 20 organizations, intending to conduct three interviews. In response we took several steps to intensify the recruiting. We began by sending a larger number of recruitment letters (over 100) via priority mail. We pursued more organizations. We increased the number of outreach attempts by adding letters, up to three emails where email addresses were available, and up to three additional phone calls. By the end of the field period, we had sent letters and made phone calls to two hundred organizations to complete 17 interviews.

Exhibit 4.1 summarizes the distribution and schedule of the interviews. For confidentiality reasons, we cannot provide any additional details on the interviewees.

### Employers' and Employer Representatives' Feedback on Worker Classification

**Exhibit 4.1: Completed Interview Totals**

| Employer | Employer representative |
|---|---|
| June 4, 2014—Beauty /Personal Care | June 5, 2014—Landscaping |
| June 27, 2014—Child Care | June 20, 2014—HR Consulting |
| July 8, 2014—Transportation | July 1, 2015—Legal/Consulting |
| August 28, 2014—Manufacturing | July 7, 2015—Transportation |
| September 1, 2014—Manufacturing | August 24, 2015—Legal/Consulting |
| September 10, 2014—Technology | August 25, 2015—Legal/Consulting |
| October 21, 2014—Manufacturing | September 16, 2015—Technology |
| June 10, 2015—Construction | . |
| August 25, 2015—Hospitality | . |
| August 26, 2015—Construction | . |
| August 27, 2015—Construction | . |
| September 10, 2015—Technology | . |

#### 4.1.3    Field Methods and Analysis

Pairs of trained interviewers conducted each interview. Two of the 17 interviews were conducted in person; the other 15 took place over the phone. Each interviewer used a protocol to guide respondents through the conversation. (The complete protocol is contained in Appendix C.) The interviews ranged from 20 minutes to two hours. We promised respondents that their answers would remain private and that their responses would not be associated with their name or with their organization's name. For the protection of privacy, no interviews were audio-recorded.

The analysis of interview data was interpretive, looking at similarities and differences among the different participants and groups represented, and accounting for the context within which the respondents answered: their position within their organization, the industry, and whether the respondent was a representative or an employer. Analysis proceeded using the NVivo qualitative research program. Exhibit 4.2 summarizes the steps of the analysis.

**Exhibit 4.2: Steps for Analysis**

- Completed a search for any *personally* identifying information, and removed before coding.
- Two analysts, who did not conduct interviews, independently read and reviewed the text of the interviews.
- Developed an initial coding scheme including major and minor themes and subthemes evident in the data.
- Reviewed the codebook to reconcile any discrepancies.
- Formatted files as required for use with the software, coded according to the revised coding scheme. (Added sample characteristics to notes files; include industry, respondent type, and state.)
- Developed the attributes table (NVivo's term for the group characteristics) for each interview file, so that the notes could be analyzed according to attribute characteristics (e.g., industry, company size, employee base, state, position in the company).
- Applied the codes to the text of each interview.
- Reviewed coding as a team to check for inter-coder agreement. The coding team included interviewers and analysts.

Employers' and Employer Representatives' Feedback on Worker Classification

## 4.2 Findings

We present the results according to the main topics of the interview guide.

- Factors resulting in a shift away from permanent employees

- Factors employers consider when hiring

- Perceived advantages and disadvantages of hiring contractors

- The future of hiring employees and contractors

- Enforcement experiences

### 4.2.1 Factors Resulting in a Shift Away from Permanent Employees

Recent literature has noted that alternative work arrangements—e.g., flexibility in number of hours worked, scheduling, or place of work, as part of what is sometimes called the "gig economy"—are becoming more common (Dokko et al. 2015). We asked interviewees to comment on the potential shift away from permanent employees and traditional work arrangements, and to discuss how this issue affects their company or industry.

***No perceived shift.*** First, not all of our interviewees agreed that there had been a shift *away* from permanent employees. The interviewees in Beauty/Personal Services, Landscaping, and Transportation (Shipping) were most notable in their response that "it's always been this way"; i.e., that workers in their industry have always been contractors, not employees. Landscaping, our respondent reported, is seasonal (particularly in cooler climates), so "by definition" the workers are temporary. (See note in opening section of this chapter about our deliberate choice not to discuss the legal accuracy of respondent statements.)

Our interviewee in the Beauty/Personal Services sector explained that the industry has a long history of being structured around "booth/station" rentals (independent contractors who are business owners renting stations within established beauty salons). This interviewee purposively chose to structure her business differently. Her primary business is a hair salon, and her stylists are employees because she wants to prevent turnover and to be able to maintain a staff that fits with the culture of her business. She explained that under a booth rental structure, stylists exercise almost total independence, which is not necessarily in the owner's best interest, either for maintaining a consistent culture and style for the business or for maintaining a steady stream of customers. Nonetheless, under the booth rental business model, as long as the stylists pay rent they can do "anything they want." In her experience, our interviewee explained, contracted stylists might not bring in very many clients. While our respondent was moving toward having employee hair stylists, she maintains contracted, *non-employee* nail and skin technicians and massage therapists. These positions, she explained, are related but ancillary to her main business.  Again, we note that workers under the "booth/station" rental model may be employees from a legal perspective, but that was not the interviewee's view.

***Reasons for shift***. Interviewees who described a shift away from hiring permanent employees and toward short-term contract labor noted several underlying reasons. These include: the economic recession of the late 2000s; compositional changes in some industries in the labor force and the career pathways within them; changing costs of employment; and technological advancement. Each is discussed below.

## Employers' and Employer Representatives' Feedback on Worker Classification

- **Recession**. After the recession, employers became hesitant about re-hiring until they had more confidence that they could make a long-term investment. Some learned to operate differently during the recession, such that they no longer required employees once the economic recovery began. Some employers changed the focus of their work—for example, dropping a product line or specializing in a different market—which subsequently led to hiring contract workers until the employers felt more confident that their new endeavors were financially viable. A respondent in the construction industry said there had been many changes in subcontracting during the economic recession. He said that custom cabinetry and welding companies had lost a lot of unskilled labor. If demand picked up, they would use contracted labor (non-employees, sometimes self-employed individuals) to replace them. For larger firms, unskilled laborers were considered employees, and if these larger firms were not in niche markets these workers survived the recession. For smaller firms that had to let go of a lot of workers, the owner of the firm usually took on the work of the laid-off laborers or contracted out if necessary.

- **Labor force.**  Two employer respondents discussed the changing labor force in their industries as the key driver toward using contract labor. Our hotel hospitality interviewee, an executive at a large hotel chain, discussed how changes in labor force expectations eventually led to use of more contract workers. She said that the position of head of housekeeping at a large hotel was once a position that one could aspire to by starting as a maid and working up to a management position. In her opinion, not only are there fewer young people today who aspire to a position such as head of housekeeping: she believes that that career pathway no longer exists, because of the "efficiency models" introduced in housekeeping. She explained that many hotels have adopted quotas for the number and type of rooms cleaned per shift, and performance standards and pay increases are tied to meeting or exceeding the quotas. Maid service in hotels was never a desirable job, according to our respondent, but she believes the efficiency models made these jobs even less desirable and led to higher turnover and more frequent "no-shows."  In response to this turnover, our respondent explained that from a business perspective, it became cheaper and easier (i.e., more efficient) to contract out for a service that can provide a steady stream of workers.

  Similarly, a manufacturing industry respondent explained that when he began his job over 30 years ago as a factory manager, it was common for line workers to be promoted to jobs with more responsibility, higher pay (or salary), and better benefits. He explained that these workers took pride in having achieved those positions. However, in the last 10 years, he has found that the quality and skills of workers seeking entry-level jobs has caused promotions to become "fewer and further between." The hourly factory workers did not stay on the job long enough or simply "weren't promotable." He explained that, in his experience, entry-level manufacturing jobs were increasingly filled with workers who had lower levels of education, lower English-language proficiency, and fewer aspirations. The turnover and lack of promotable labor, combined with the increased costs of employing workers, has led to increased use of contract labor: "If they're not gonna stay, or they aren't that good, why not contract out?" (See note in opening section of this chapter about our deliberate choice not to discuss  the correctness of respondent explanations.)

- **Cost of employment.** Respondents explained that the cost of employment has increased tremendously, especially with respect to benefits, specifically health benefits (recall that interviews were conducted between June 2014 and September 2015). Several respondents stated that the Affordable Care Act (ACA) was going to be very expensive for some small employers. Some respondents explained that the costs of workers' compensation insurance premiums, and other human

resources-related expenses, have risen, especially in industries that employ greater numbers of salaried and highly compensated workers, such as technology. Smaller businesses cannot afford the full package of benefits such as the 401K. They report that the costs of benefits, combined with the indirect costs of employing salaried workers, have pushed firms to use staffing or temporary agencies.

- **Technological advancement.** Respondents noted that technological advancement has changed their need for employees. For example, the owner of a small construction business explained that computer-aided drafting has made his industry more efficient. There are firms that specialize in this area and can be hired on a "one-off" contract basis rather than keeping a person in house. In a firm where much of the design and drafting occurs sporadically or even seasonally, this respondent stated that it is more efficient to contract out the service to another business than to keep someone on staff. This employer said that it was more about shifting to a new service business than shifting to temporary workers.

  A consultant in information technology (IT) for higher education explained that technological change may inadvertently lead to misclassification. This representative interviewee explained that firms/schools hire contractors for the development of branded or company-specific software.  Once installed, the software may require updating, or employees may need training. The firm or school may keep contractors on after the initial development, and when they move into updating and training roles, the lines between contractor and employee may become less clear. Similarly, the employer may invest in more-efficient hardware that requires software upgrades, so the company will use a contractor to keep up with these changes. The technology is not considered a core function, but the need to keep its systems up to date and operating properly requires keeping contractors perpetually on site. Over time, these contractors may behave more like employees than contractors.

  The representative we spoke to within the technology-driven field of graphic design explained that technological change may have facilitated more independent contracting or the use of more freelancers. Previously, graphic artists required substantial computer hardware with large fixed costs, leading to them working as employees for firms that provided the hardware. However, more recently software and hardware costs have dropped sharply, allowing artists to load and use software on their own laptops. As a result, graphic artists no longer need to be attached to a firm to do their work.

- **Other industry changes.** A manufacturing representative explained that, due both to outsourcing abroad and to changing demand for certain goods ("greening"—environmentally safe products, like paper), some types of manufacturing have undergone major changes. Coupled with the economic downturn, these types of changes affect the demand for labor. Respondents described the demand for labor as in constant flux and very unpredictable, resulting in greater reliance of contract labor. In IT, the graphic artist respondent explained that changes in the structure of advertising companies have affected how some graphic artists work. He explained that advertising contracts with companies have changed, as companies are more frequently hiring advertisers for individual campaigns as opposed to entire product lines. This makes their work more varied, less predictable, and shorter-term, all conditions that are less conducive to long-term employees.

### 4.2.2   Factors Employers Consider When Hiring (Employee vs. Contractor)

We asked interviewees to describe what factors employers consider when choosing to hire workers as employees vs. outsourcing to independent contractors, and who makes policies or decisions about which factors should be considered. No one was able to speak to exactly who makes decisions within a firm, but

several did discuss the factors that are considered. Many of these factors mirror the factors that respondents described as related to a shift away from permanent employees. Respondents cited the cost of employment, nature/length of the work, and risk exposure as the three most relevant considerations.

- **Cost of employment.** While many respondents mentioned the role of cost in hiring decisions, not all respondents did. For example, a consultant in the construction industry explained that in general contracting, "it's all about the money." Businesses use contractors because they are less expensive than employees. A manufacturer who had recently started his own business explained: "I'm my only employee. At first I thought I'd just use the temp pool until the work got steady. As things picked up I thought of bringing on a couple of the better guys to help make and fill orders, but I learned real quick that there's no way I could pay the workers' comp premiums and pay myself too." Another respondent took an opposing position, saying that it is a common misconception that businesses use contractors to cut costs.

- **Nature (and length) of the work.** The most pervasive theme was that the "nature of the work" itself drives staffing decisions. This was especially noted by respondents in the construction industry. Several spoke about the seasonality of the industry and the drastic change in available work between seasons. For construction employers, it does not make sense to hire extra employees for a short-term job or season, only to have to lay them off when there is less demand. Another construction industry respondent mentioned two sub-fields in construction, residential and non-residential, and said that each type has unique staffing needs. A respondent in the landscaping industry echoed these respondents, saying that staffing decisions are driven by the need to meet the demand for (or lack of) labor.

Many respondents described using non-employees for temporary surges in work (e.g., "quick turn-around" emergency jobs or repairs). While some of these jobs could be done by workers in permanent positions, "firms hire based on the economy." A construction employer explained that he hires both employees and workers who may be independent contractors (or employees of another construction firm): he chooses based on the specific project. He may use the same contractors for similar work across projects: "we've always used contractors for that [type of job]." He explained that the decision to use the same contractor repeatedly is based on his experience having worked with that contractor in the past. According to this construction employer, construction firms do not view repeated contractors as potential employees because they never know whether or not they will have that type of work. When they do have it, they know that they can rely on the quality of work of a selective group of contractors.

A respondent in IT, contracting for higher education, also spoke about hiring differences between short- and long-term projects. He said that IT contractors are brought in more frequently for short-term projects (e.g., roll-outs of new software) or during a busy period (e.g., the start of a new school year), while the university will maintain a core team of regular IT employees to handle day-to-day computing needs. He also noted that smaller institutions, like community colleges, may not have the budget to support full-time IT employees, so contractors are used to cover all IT functions. Another respondent, in the technology/creative industry, said that the use of contractors is often dependent on the type of work. For short-term projects, businesses may seek out contractors, while for longer-term or "pitch-based" projects, they may prefer full-time employees.

- **Risk.** Several respondents mentioned "risk" as among the factors they consider when hiring an employee. Risk takes different forms, not only financial risk. This manufacturing employer explained

that it is not only the investment in the new employee but the investment in current employees that is at stake. Bringing on a new employee may disrupt the work environment by leading to turnover or lost productivity more broadly. Respondents explained that, given that it is hard to "get rid" of employees, these risks favor contractors.

In contrast, some employers in construction and manufacturing noted that risk considerations favor hiring *employees*. For example, contractors may not follow proper safety practices, risking both the contractor and employees on the job site. Similarly, one of the construction respondents explained how risk is related to a particular job; that is, if there is a high-exposure job for an important customer, he uses full-time employees to ensure the quality of the job. If the job has lower exposure, he may bring in contractors. A representative in landscaping related risk to litigation and regulatory enforcement. This interviewee explained that while many companies legitimately use contractors, the laws are complex, and state and local regulators resort to oversimplifying, and then companies face costs of litigation.

- **Work environment.** Interviewees also described the "work environment" as an important factor to consider when hiring employees versus contractors. Two construction industry respondents explained that the business owner's relationship with workers can be a driver of hiring decisions when hiring for long-term work. According to one of the respondents, when someone is hired as an employee, the relationship between the owner and the worker becomes more personal. "Employees of small businesses tend to become like family members to the business owners, making it difficult for the owners to lay off the employees when business is slow." Business owners can be hesitant to bring on permanent employees, preferring instead contractors that can be hired and let go as needed. Using contractors offers flexibility without having to commit and without facing the difficulty of laying off an employee with whom the owner has developed a personal relationship.

### 4.2.3  Perceived Advantages and Disadvantages of Hiring Contractors

Respondents reported several distinct advantages to hiring contractors instead of employees, most of which parallel the hiring factors discussed above. First, there can be a significant cost savings for the firm. Contractors do not need to be compensated at a different rate for any overtime work, which respondents in the manufacturing, landscaping, and construction industries cited as an advantage of the contractor status. Second, there is typically less investment in contractors, due to the temporary nature of their position. Less time is spent recruiting and interviewing; there is less on-the-job training; and associated administrative costs for payroll and other human resources-related administrative areas are lower. Third, respondents explained that less management is (usually) needed because contractors act independently. (This response appears to be consistent with the legal principal that true non-employees require less supervision.) Employers in technology and a representative in higher education noted this advantage. Fourth, firms also do not have to offer benefits (e.g., health insurance, worker's compensation) to contractors, which results in "less paperwork" surrounding their employment. In addition to lower cost because of workplace benefits like health care and workers' compensation, an HR representative in manufacturing explained that employers also do not have to provide any severance pay, termination benefits, Consolidated Omnibus Budget Reconciliation Act (COBRA) coverage, or other benefits.

Interviewees also described some disadvantages to using contractors instead of employees. Employers in hospitality, manufacturing, and construction explained that since contractors stay with firms for only a short amount of time, significant *staff* turnover can result in an institutional loss of knowledge within the company, often referred to as "brain drain." With increased turnover come increased training costs. Other

respondents said that the quality of contract workers can be lower than that of employees, since they may be less committed to the company's success in the long term. Relatedly, using contractors may result in management challenges—though some respondents noted that contractors tend to require *less* management responsibility. Nevertheless, both of the employers we interviewed in manufacturing noted that contractors have less incentive to follow instructions from managers or supervisors, since the contractor's time working for the firm is limited and there is less opportunity for advancement. Two different employers in the construction industry said their preference is to rely on employees rather than contractors. One respondent said that he typically does not hire contractors unless he has a particular job that requires extra help. He said he prefers to keep the same team of employees and there is not much turnover. The other employer echoed this, saying that his company keeps the same crew year-round, even during the slow season.

### 4.2.4   Workers' Preferences

We asked interviewees to assess what type of job classification workers prefer in their industry; specifically, what types of workers are more amenable to employee versus other types of worker status? The responses varied, but not uniformly by any industry or type of work.

The HR respondent in manufacturing said that 80 percent of the time, workers wants to be employees. They want reliable jobs. This respondent said that she has heard other managers say that in a shrinking economy, most workers will take whatever income they can get, but that did not match her experience talking with workers. As part of her duties at a large, international manufacturing company, this respondent managed the division of the HR department that designed and implemented off-boarding (the administrative and human resources related process of retiring or dismissing) of workers. She explained that through her experience of reviewing hundreds of reports about this process, she did not get the impression that workers were indifferent to their worker status.

In contrast, respondents in the IT and transportation industries stated that many workers prefer the flexibility and independence of working for themselves. An IT graphic artist employer explained that artists want to be able to choose the type of work they do, and being tethered to one employer can feel limiting.

### 4.2.5   The Future of Hiring Employees and Contractors

We asked our respondents to comment on whether the trends they identified would continue into the future. Those who responded to the question seemed to think that current patterns in hiring will continue. A consultant in construction said that he does not expect the industry to change that much; trends in using contractors will continue until the system requires contractors go through the same verification process as employees (E-Verify), because he estimates that many contracted workers, paid in cash, may be undocumented workers. Another construction employer did not anticipate changes in the near future in regard to hiring practices. He said this is primarily due to the slow economy at the time, which made it more efficient for businesses to use contractors rather than employees (presumably because there is not enough work to keep employees working full-time).

The IT consultant said that he expects these patterns in staffing to continue, primarily due to the ever-changing nature of technology. A representative interviewee, an attorney with clients across multiple industries, said simply that he expected the use of independent contractors to continue at its current pace. He did not speak to why or how business owners might decide to shift from using employees to using contractors.

The hospitality employer told us: "I have a feeling there are going to be big changes in the future, but I don't know what." In her view, the company's current model of staffing is unsustainable, as lease or contract labor workers are difficult to retain and not typically interested in promotion up the ladder into management roles. She felt that they needed to "look at a different pool of people."

Asked about staffing in the future, the HR manufacturing consultant noted that the ACA may have an impact on labor arrangements for smaller companies, resulting in employees being laid off in favor of temporary workers. The ACA requires firms with more than 50 employees to provide insurance or pay a fine. Firms that hold their employee count below this cutoff can avoid this cost. One way to do so is to shift some tasks previously done by employees (and even the employees themselves) to a temporary agency. These laid-off employees would then come back to the company via the agency. This allows the company to lower their headcount but keep the same workers. She also said that younger workers tend not to stay at jobs for long, so there is less incentive to keep them as regular employees. She attributed this to the ACA, saying that "kids don't have to work at all [for health benefits] until they're 27."

### 4.2.6   Enforcement Experiences

Among employer respondents, all but two told us they had no experience with enforcement of worker classification. The overall lack of response suggests that these employers had not been audited or investigated for classification issues, or if they had been, they were not willing to disclose that information. The single employer (from the manufacturing industry) who provided a substantive response said that for her company, responding to the Department of Labor (it was unclear if federal or state was intended) was voluntary and complaints were handled through mediation in which the Department of Labor and its regulations were a "point of reference." She described the relationship with her state Department of Labor as a partnership rather than policing. The transportation sector respondent explained that the industry had experienced a surge in enforcement and that the heightened enforcement was an ongoing challenge. This respondent attributed increased enforcement as resulting from the transportation industry's economic resurgence with the expansion of e-commerce and home delivery.

Several interviewees said that they had no experience and were not knowledgeable about enforcement in their particular industry. For example, a consultant in the construction industry said that he had not experienced any problems with enforcement, explaining that his company uses the E-Verify system for employees and those who do not pass are not allowed to continue working for the company. Another construction representative stated that the companies he represents "follow the rules," but did not explicitly say whether any of these companies had been the subject of enforcement action. An attorney in the trucking industry said that his clients have gone through driver-by-firm investigations, but never a class-wide investigation, although he is aware of it happening in the industry. A respondent in IT contracting said that enforcement is not a top issue in his industry, although he believed concern is growing.

An employer in manufacturing explained that enforcement of worker classification issues has been on the forefront of her company's HR policies, mostly because of recent large-scale layoffs. In response to fluctuating work flow, they have hired back previous employees as contractors to fill temporary needs. The HR department monitors how to rotate people in and out of the company or switch their jobs (between employee and contractor) to meet the company's staffing needs and comply with regulations.

Our employer representative interviewees included those who work with clients specifically when they are audited for labor issues. These respondents varied in their willingness to volunteer information about

enforcement experiences. A representative from the landscaping industry, who was willing to discuss the question in general terms, described "surprise visits" from auditors in which businesses were asked to immediately produce extensive documentation. He explained his belief that the landscaping industry had been particularly targeted for investigation on classification of exempt/non-exempt employees. He described enforcement as occurring mostly at the state level and described it as "just brutal." In contrast, regarding federal enforcement, he stated that it "seems like the feds are interested in fixing the problem though, not just enforcing."

## 4.3    Discussion

This research was designed to help better understand employers' perspectives on worker classification and the causes and consequences of using contract labor instead of employees. With extensive recruitment and follow-up efforts, we were able to interview a small group of employers and employer representatives. These interviews provide preliminary insight into opinions and experiences across multiple sectors of the economy.

In interpreting the results, two methodological considerations should be kept in mind. First, while we included employers of varying sizes and experiences with worker classification issues, the sample is small and definitely not representative. In particular, the vast majority of employers or employer representatives approached simply refused to participate. Second and relatedly, more so than in  other qualitative data collection efforts, our respondents were clearly careful in what they said and often appeared to be holding back the full story.

With those crucial methodological caveats, we conclude with some summary thoughts and recommendations for future research with employers and employer representatives.

### 4.3.1    Summary Thoughts

Some common themes that have emerged across the interviews include:

- The respondents did not consistently agree with the conventional wisdom that we are in the midst of a shift away from permanent employees to contract labor. To the extent that there has been movement in this direction, employers and employer representatives described this shift as one in which employers are adapting or reacting to economic or other changes. Employers report that the shift is not being driven by the employers themselves.

- There is no "one size fits all" framework describing how firms decide to hire workers as employees or contractors. Most of our respondents share the view that the cost of employing workers is increasing. However, decisions, including determining the advantages and disadvantages of workers versus contractors, are highly contingent upon the nature of the work, even within firms.

- It is unclear whether jobs that were traditionally held by permanent employees will continue as such or move to contracted labor. Employers and employer representatives have mixed feelings about what direction is the right one for their company, but most agreed that past and future change is tied closely to the economy and the available labor pool.

- Enforcement experiences have varied from very little awareness to full litigation. Some employers and employer representatives believe that regulation and enforcement have increased and will continue increasing.

**Employers' and Employer Representatives' Feedback on Worker Classification**

### 4.3.2   Recommendations for Future Research

We expected eliciting employer perspectives on issues related to employee classification would be challenging. Even so, our experiences for this project far exceeded our expectations. Any future attempt to collect employer perspectives should give careful consideration to field methodology. Candidate methods include the one-on-one interviews we used, focus groups, and an anonymous survey. We discuss each of those possibilities briefly here.

Our one-on-one (almost exclusively) phone interview strategy was one possible approach. We judge it only moderately successful. Although our interview approach did elicit some very candid responses, the recruitment challenges and reticence of several interviewees indicate that this approach was not ideal for this research.

Another possibility would be to conduct focus groups. On one side, focus groups could be well suited for this research, because this format often elicits deeper, more spontaneous responses than one-on-one interviews. In a group, the conversation can elicit spontaneous ideas and opinions that would not necessarily arise in an interview or survey context. However, we ultimately rejected this design because of concerns that participants would be fearful about disclosing information in the presence of other employers.

The recruitment difficulties and reticence in respondent discussions also suggest that employers might be willing to answer questions in a more anonymous setting, such as a brief, self-administered survey. The responses to this preliminary qualitative research have provided several ways that a mix of factual and opinion-based interview questions could be "closed up" to provide useful survey measures of employer experiences and practices. For example, employers identified some common factors they consider when making hiring decisions. These factors could be used as response categories to survey questions about hiring decisions. Respondents could answer whether these were factors they considered in their hiring decisions and to rate their importance.

## References

Braban, Walter. "Question of the week: can an employee receive both a W-2 and a 1099 from the same business?" Collabrus Independent Contractor Compliance Blog. (September 4, 2008.) Retrieved from http://www.collabrus.com/collabrus_blog/2008/09/04/question-of-the-week-can-an-employee-receive-both-a-w-2-and-a-1099-from-the-same-business/. Accessed 3/28/16.

Daley, Kelly, Stas Kolenikov, Marci Schalk, Mehera Baugher, Julie Pacer, Jacob Klerman, and Lauren Dunton. (2016). Worker Classification Knowledge Survey: Volume II - Methodology Report. Cambridge, MA: Abt Associates.

Dokko, J., Mumford, M., and Whitmore, S. 2015. "Workers and the Online Gig Economy." *A Hamilton Project Framing Paper.* Accessed at:
http://www.hamiltonproject.org/assets/files/workers_and_the_online_gig_economy.pdf

Harris, S. 2010. "Statement of Seth D. Harris Deputy Secretary U.S. Department of Labor Before the Committee on Health, Education, Labor, and Pensions U.S. Senate." U.S. Senate. Committee on Health, Education, Labor, and Pensions, U.S. Department of Labor. June 17, 2010. Accessed at:
http://www.dol.gov/_sec/newsletter/2010/20100617-2.htm

Klerman, Jacob, Kelly Daley, and Alyssa Pozniak. 2013. Family and Medical Leave in 2012: Technical Report. Cambridge, MA: Abt Associates. Accessed at: http://www.dol.gov/WHD/fmla/survey/ Office of the Vice President. February 2010. "Annual Report of the White House Task Force on the Middle Class." Accessed at: https://www.whitehouse.gov/sites/default/files/microsites/100226-annual-report-middle-class.pdf

Office of Management and Budget. 2010a. Budget of the U.S. Government Fiscal Year 2011. Retrieved from http://www.gpoaccess.gov/usbudget/fy11/pdf/budget.pdf .

Office of Management and Budget. 2010b. Budget of the U.S. Government Fiscal Year 2012. Retrieved from http://www.whitehouse.gov/files/documents/budget_2012.pdf .

Office of the Vice President of the United States. 2010, February. Annual Report of the White House Task Force on the Middle Class. Retrieved from
http://www.whitehouse.gov/sites/default/files/microsites/100226-annual-report-middle-class.pdf

Ruckelshaus, Catherine K. 2013. "Testimony of Catherine K. Ruckelshaus National Employment Law Project. Hearing Before the United States Congress Senate Committee on Health, Education, Labor & Pensions Subcommittee on Employment and Workplace Safety." Accessed at:
http://edworkforce.house.gov/uploadedfiles/03.20.12_ruckelshaus.pdf

United States Department of Labor. "Administrator's Interpretation No. 2015-1." News release, July 15, 2015. http://www.dol.gov/whd/workers/misclassification/ai-2015_1.htm.

United States Department of Labor. "Compliance Assistance - Wages and the Fair Labor Standards Act (FLSA) Overview." https://www.dol.gov/whd/flsa/

United States Department of Labor. "Misclassification of Employees as Independent Contractors." https://www.dol.gov/whd/workers/misclassification/

United States Department of Labor. "Compliance Assistance - Wages and the Fair Labor Standards Act (FLSA) Overview." https://www.dol.gov/whd/flsa/

United States Government Accountability Office. 2009. "Improved Outreach Could Help Ensure Proper Worker Classification." (testimony of Sigurd R. Nilsen). Accessed at: http://www.gao.gov/assets/120/116524.html

United States Government Accountability Office. 2007. "EMPLOYEE CLASSIFICATION: Improved Coordination, Outreach, and Targeting Could Better Ensure Detection and Prevention." Report to Congressional Requesters. Accessed at: http://www.gao.gov/assets/300/293679.pdf

United States Government Accountability Office. 2007. "Improved Outreach Could Help Ensure Proper Worker Classification." (testimony of Sigurd R. Nilsen). Accessed at: http://www.gao.gov/assets/120/116524.html

# Appendix A: Economic Realities Test Survey Pilot

This appendix describes a pilot battery of survey questions on the Worker Classification Knowledge Survey that we designed to approximate job classification of workers as either employees or independent contractors. As we discuss and conclude below, the survey battery does not appear to clearly determine classification status.

***The Economic Reality Test.*** The context for this effort is the definition of an employee. To determine employee status versus independent contractor status under the Fair Labor Standards Act (FLSA), the Supreme Court and Circuit Courts of Appeals have developed a multi-factor "economic realities" test (ERT). No single fact or factor determines whether an individual is an employee or an independent contractor for purposes of the FLSA. Instead, the Supreme Court has held that the totality of the working relationship is determinative, meaning that all facts relevant to the relationship between the worker and the employer must be considered.

Several factors make the determination of employment status in light of the ERT concept challenging to operationalize in a telephone survey. First, the underlying concepts behind the ERT questions are complex. The classification of workers according to the ERT is usually done by highly trained U.S. Department of Labor (DOL) field staff through a series of questions probing for facts and circumstances. These questions are directed to workers, employers, and third parties with knowledge. Second, even then, decisions made in the field are often disputed, resulting in litigation. Court decisions often turn on the very specific factual situations presented, and the courts have made different decisions in cases with seemingly similar facts.

***A Survey Approximation.*** DOL and Abt acknowledged from the outset that no survey could perfectly classify all workers. Because all facts relevant to the relationship between the worker and employer must be considered, including many that could not be gathered over the phone based solely on the worker's self-report, we did not expect that a survey could perfectly classify all workers. While DOL has cautioned against the application of ERT factors in the form of a checklist or score card, it was expected that a survey and, subsequently, a coding scheme could be developed that would allow most workers to be classified as either a likely employee or a likely non-employee. An approximation could give DOL some insight into any patterns or characteristics among potentially misclassified workers. Even a fairly rough estimation might reveal some strong patterns, such as types of workers, occupations, and job types that might have a stronger tendency toward misclassification. This information could serve as a launching point, narrowing the types of groups for further research and potentially for outreach and education campaigns.

Specifically, Abt worked with DOL staff to:

1.   *Develop survey questions* that would—as much as is possible in a closed-ended survey administered by professional interviewers—classify workers according to the ERT.

2.   *Develop a coding algorithm* based on their responses that would allow us to classify workers as E (employee), nonE (non-employee), or U (undetermined)—where it was our hope that the last group would be small.

In the following sections we describe the development of the survey questions, testing, administration, coding, and analysis of survey responses.

## A.1    Survey Question Development

The underlying theme of the ERT is the workers' economic dependence upon the business for which they render services.

A worker, in business for himself or herself, will not depend on one business to be economically viable, generally speaking. For example, although a plumber may provide ongoing services to one household for a large remodeling job, presumably he or she may also provide those services to other households. The *economic reality* of the worker's relationship with the employer determines whether the worker is economically dependent on the employer (and therefore, an employee) or is in business for himself or herself (and therefore, an independent contractor).

Courts generally apply a number of "economic realities" factors as guides when making the determination, but the factors applied can vary, and no one combination is exclusive. Specifically, the ERT is composed of six factors, as listed below. Guided by experts at the Wage and Hour Division and the Solicitor's Office of DOL, we developed survey questions to measure all facets of the ERT. (See Volume II, Methodological Documentation, for details on question development and testing.) These factors are:

1. PERMANENCE: The permanency of the relationship

2. CONTROL: The degree of control exercised or retained by the employer over the worker

3. INVESTMENT: The relative amount of the worker's investment

4. PROFIT: The worker's opportunity for profit and loss

5. INTEGRAL: The extent to which the work performed is an integral part of the employer's business

6. SKILL: Whether the work performed requires managerial skills and initiative

No single factor can determine whether a worker is self-employed or an employee. Rather, the ERT uses these six factors together to determine whether a worker is truly in business for himself or herself, or is instead economically dependent on an employer[9] (Administrator's Interpretation No. 2015-1 at 2).Therefore, the goal is not to tally which of the six factors are met, but to review and consider whether the combination of responses is sufficient to determine economic dependence on the employer.

Exhibits A.1 and A.2 list *all* the ERT survey questions and their mapping to the ERT factors.

---

[9]    http://www.dol.gov/whd/regs/compliance/whdfs13.pdf

**Exhibit A.1: ERT Employment Status Variables and Mapping to ERT Factors: Questions Related to Permanence Factor**

| Survey question | Content of survey question | ERT factor |
|---|---|---|
| QSELF_NUM | How many different people or companies have paid you in the last 30 days in your [QMAIN] job? | PERMANENCE/ CONTROL |
| QTEMP_1 | Some jobs are temporary. They last only for a set number of weeks or months or until the completion of a project. Is your [QMAIN] job temporary? | PERMANENCE |
| QTEMP_2 | Provided the economy does not change and your job performance is adequate, can you continue to work in your current job as long as you wish? [IF NECESSARY: Please think about your [QMAIN] job.] | PERMANENCE |
| QTEMP_1A | Are you working only until a specific project is completed? | PERMANENCE |
| QTEMP_1B | Were you hired for a fixed period of time? | PERMANENCE |
| QTEMP_1C | Is your [QMAIN] job SEASONAL or YEAR-ROUND? | PERMANENCE |
| QONCALL_1 | Some people are in a pool of workers who are ONLY called to work as needed, although they can be scheduled to work for several days or weeks in a row, for example substitute teachers, information technology workers, and construction workers supplied by a union hiring hall. These people are sometimes referred to as ON-CALL workers. Were you an ON-CALL worker in the last THIRTY DAYS? [IF NECESSARY: Please think about your [QMAIN] job.] | PERMANENCE |
| QONCALL_2 | Some ON-CALL workers have regularly scheduled hours, but IN ADDITION must work when called (for example, doctors, nurses, and managers). Other ON-CALL workers work ONLY when called (for example, substitute teachers, information technology workers). Which type of ON-CALL worker are you? [IF NECESSARY: Please think about your [QMAIN] job.] | PERMANENCE |
| QDAYLABOR | Some people get work by waiting at a place where employers pick up people to work for a day. These people are sometimes called DAY LABORERS. Were you a DAY LABORER in the last THIRTY DAYS? [IF NECESSARY: Please think about your [QMAIN] job.] | PERMANENCE |

Note: These questions were asked before the extended interview. The first question was asked of all respondents.

**Appendix A: Economic Realities Test Survey Pilot**

**Exhibit A.2: ERT Employment Status Variables and Mapping to ERT Factors: Questions Related to Other Factors**

| Survey question | Content of survey question | ERT factor |
|---|---|---|
| **Behavioral Control** | | |
| QBEHAV1 | On your [QMAIN] job, do you report directly to a manager, supervisor, foreman or someone else who regularly oversees or approves HOW you do your work? | CONTROL/SKILL/PROFIT |
| QBEHAV1_A | (On your [QMAIN] job,) Do you determine your own schedule or the hours that you work? | CONTROL/SKILL/PROFIT |
| QBEHAV1_B | Do you need approval for your schedule or hours worked? | CONTROL/SKILL/PROFIT |
| QBEHAV1_C | (On your [QMAIN] job,) Do you need permission to leave your place of work, or can you come and go at will? | CONTROL/SKILL/PROFIT |
| QBEHAV2 | (On your [QMAIN] job,) How often does someone tell you how to perform your usual work activities and duties? | CONTROL/SKILL/PROFIT |
| QBEHAV2_1 | (On your [QMAIN] job,) At any time COULD someone direct HOW you perform your work duties? | CONTROL/SKILL/PROFIT |
| QBEHAV2_A | (On your [QMAIN] job,) Are you required to wear a uniform including any specific type, style, or color of clothing? [IF NECESSARY: A uniform includes clothing associated with a specific employer because of an emblem, logo, or distinctive color, and also may include any specific type and style of clothing that an employer requires its employees to wear at work, such as a tuxedo for a maître d' or a blazer of a distinctive color for a salesperson.] | CONTROL |
| QBEHAV3 | (On your [QMAIN] job,) Are you required to perform your job duties in a specific location? | CONTROL/SKILL/PROFIT |
| QBEHAV3A | Does the nature of your work require that you provide these duties at a specific location? [IF NECESSARY: For example, a theatre actor may work in a specific location because the play shows in a certain theatre, or a home cleaning service works in a specific location because they clean in a client's home.] | CONTROL |
| QBEHAV4 | (On your [QMAIN] job,) Is there a job or procedures manual for the duties you perform that tells you HOW to perform the job? | CONTROL |
| QBEHAV4A | How closely would you say you are required to follow the manual? Are you required to follow it very closely, somewhat closely, not very closely, or not at all? Please give me your best estimate. | CONTROL |
| QBEHAV5_A | Has your [QMAIN] job provided you with any training? | CONTROL/SKILL |
| QBEHAV5_B | Did you need to have any specialized education or training, apprenticeships, or certification to get your [QMAIN] job? | SKILL/CONTROL |
| **Financial Relationship** | | |
| QFINAN1 | On your [QMAIN] job, how much of your own money do you spend each year, on average, on tools, equipment, computers, or other materials you use for your work? | INVESTMENT |

**Appendix A: Economic Realities Test Survey Pilot**

| Survey question | Content of survey question | ERT factor |
|---|---|---|
| QFINAN1A | Are you required to purchase or lease SPECIFIC TOOLS OR EQUIPMENT or do you decide what to buy? | INVESTMENT/SKILL/PROFIT/CONTROL |
| QFINAN1B | Are you required to purchase or lease tools or equipment FROM A SPECIFIC SOURCE or do you decide where to buy them? [IF NECESSARY: Please think about your [QMAIN] job.] | INVESTMENT/SKILL/PROFIT/CONTROL |
| QFINAN3 | On your [QMAIN] job, have you ever invested your own money in the company where you work to support the day-to-day operations? [IF NECESSARY: Examples include purchasing equipment, renting space, or advertising?] | INVESTMENT/SKILL/PROFIT/CONTROL |
| QFINAN4_A QFINAN4_B | At your [QMAIN] job, can you … ? a. hire additional workers? b. change the way the business is run? | PROFIT/SKILL/CONTROL |
| QFINAN5 | In the event that the company where you work loses money, would you continue to earn your wage for the work you perform? | PROFIT |
| Relationship With Employer | | |
| QRELATE1 | Besides your [QMAIN] job, do you perform similar work for others [IF NECESSARY: other companies or businesses]? | SKILL/CONTROL/PERMANANCE |
| QRELATE2 | Are you required to get approval from your [QMAIN] job in order to provide these duties and activities for others? | CONTROL/SKILL |
| QRELATE3 | Do you use your own funds to advertise your services, with a website, flyers, newspapers, business cards or any other way? | INVESTMENT/PROFIT/SKILL |
| QINTEGRAL | Are the duties you perform on your [QMAIN] job a part of the regular services or operations of the company where you work? [IF NECESSARY: Is the work you do the same as the work the company does for its customers?] | INTEGRAL |
| QINTEGRAL2 | You have indicated that you are either NOT an EMPLOYEE or NOT SURE if you are an EMPLOYEE. Are there workers at your [QMAIN] job who are called "employees" and perform the same work duties that you do? [IF NECESSARY: Please provide your best estimate.] | INTEGRAL |

Note: These questions were asked within the detailed classification questions (i.e., inside the green arrow).

Following a discussion of survey administration below, Section 1.3 presents the algorithm that operationalizes the survey questions into the ERT categories.

## A.2    Survey Administration

Over the period from August 26, 2014, to March 9, 2015, Abt SRBI staff completed a national, dual-frame, random-digit dialing (RDD) study involving 8,503 telephone interviews with workers over the age of 18. All respondents received questions about job permanence, while the pilot ERT questions were administered only to respondents who were deemed more likely to be non-employees. Specifically, the

pilot ERT questions were administered to any respondent falling into at least one of the following three groups:

**Group A:** Any respondent who reported that:

1. He or she was an employee, **AND** that he or she:

2. Was paid in cash,

3. Did not receive a pay stub,

4. Had no deductions (no withholding), and

5. Did not receive a W-2, or received both a W-2 and a 1099-MISC.

The manner in which a worker receives his or her pay can be an indicator of whether the firm classifies a worker as an employee or an independent contractor. Being paid in cash, with no pay stub, without deductions, and without tax documentation (W-2), is a fairly strong indication that the worker is not being treated as an employee. A respondent who reports receiving both a W-2 and a 1099-MISC on the same job may have once been an employee and currently be an independent contractor. Or, it is possible that the worker did not know the names of the specific tax forms he or she received, and misreported that he or she did not receive a W-2 or received both a W-2 and 1099-MISC. In either case, ambiguity around the tax forms received, in combination with the first four factors, demonstrates a set of atypical conditions, and therefore respondents in Group A received the ERT question battery.

**Group B:** Any respondent who reported being a non-employee.

This group is fairly straightforward compared to Group A. For any respondent who self-identified as a non-employee, we administered the ERT question battery.

**Group C:** Any respondent who 1) had an undetermined worker status because of reporting conflicting information regarding his or her status as an employee versus non-employee; **and** 2) did not receive a W-2, or received both a W-2 and a 1099-MISC.

As with Group A there was enough ambiguity among these respondents related to self-reported worker status and tax forms that we deemed these cases eligible to receive the ERT question battery.

In total, 3,158 of the 8,503 respondents were asked the ERT battery of pilot questions.

## A.3    Coding Algorithm and Outcomes

The parameters for the ERT coding algorithm were developed in conjunction with DOL, specifically, the Solicitor's office and the Wage and Hour Division. In this section we describe the coding algorithm and the outcomes.

### A.3.1    Algorithm Description

Below we present the details of an algorithm that operationalizes the survey questions into three ERT categories:

1. **ERT_NE.** Through a series of answers to the ERT questions, the respondent appears to be a non-employee.

2. **ERT_EE.** Through a series of answers to the ERT questions, the respondent appears to be an employee.

3. **ERT_DK.** Through a series of answers to the ERT questions that conflict internally or do not provide sufficient information to make a determination, the respondent's worker status could not be determined.

While it may be possible to code some response patterns as "likely an employee" or "likely not an employee," DOL staff deliberately provided conservative guidance. Thus, the algorithm codes response patterns that *clearly* indicate that a respondent is an employee according to the ERT as ERT_EE (i.e., employ*EE*). Similarly, response patterns that, according to the ERT, are clearly *not* those of an employee are coded as ERT_NE (i.e., *Non-E*mployee). However, all other response patterns (i.e., in which there is any ambiguity) are coded as ERT_UNDETERMINED (i.e., *ERT_DK*).

Consistent with this strategy, Exhibit A.3 provides the response patterns that are coded as ERT_NE or ERT_EE. All other response patterns outside these parameters are coded as ERT_DK. The interpretation of the columns is as follows:

- Columns (1) and (2): These two columns use solely the "control" ERT theme questions to determine whether a respondent is an employee. While lack of control is not sufficient to determine that an individual is a non-employee, control is sufficient to determine that an individual is an employee (that is, the ERT wholly encompasses the Common Law Test).[10] Specifically, if a worker answers the questions exactly as provided in column (1) or column (2), that worker is classified as an employee ("ERT_EE"). We note that although many of the rows are identical between the two columns, in some instances two different scenarios under the ERT control theme could classify a worker as an employee (e.g., see QBEHAV4A).

- Column (3): If a worker does not answer the questions exactly as provided in column (1) or column (2), then we examine the person's answers to the other ERT questions (column 3). Values in this column indicate that the respondent is an employee, regardless of what his or her answers were in columns (1) and (2). In order for a respondent to be classified as "ERT_EE", each of his or her responses must match the responses listed in this column; any deviation from this will result in an "ERT_DK" classification.

- Column (4): Values in this column indicate that the respondent is not an employee. That is, for a respondent to be classified as "ERT_NE," each of his or her responses must match the responses listed in this column; any deviation from this will result in an "ERT_DK" classification.

---

[10] Under the "Common Law" test for employment as applied by the courts, a person is an employee if the employer has the right to control and direct the actions of the person that pertain to the job. (See https://www.irs.gov/Businesses/Small-Businesses-&-Self-Employed/Employee-Common-Law-Employee)

**Exhibit A.3: Employee and Non-Employee Responses for ERT Employment Status Algorithm**

| Variable name | Question wording | (1) Employee (Control 1) | (2) Employee (Control 2) | (3) Employee (all factors except Control) | (4) Non-Employee (all factors) |
|---|---|---|---|---|---|
| PERMANENCE Questions asked before the extended interview | | | | | |
| QTEMP_1 | Some jobs are temporary. They last only for a set number of weeks or months or until the completion of a project. Is your [QMAIN] job temporary? | — | — | N | Y |
| QTEMP_2 | Provided the economy does not change and your job performance is adequate, can you continue to work in your current job as long as you wish? [IF NECESSARY: Please think about your [QMAIN] job.] | — | — | Y | [SKIP] |
| QTEMP_1A | Are you working only until a specific project is completed? | — | — | [SKIP] | **EITHER** QTEMP_1A: Y **OR** QTEMP_1A: N **OR** QTEMP_1B: Y |
| QTEMP_1B | Were you hired for a fixed period of time? | — | — | [SKIP] | **EITHER** QTEMP_1A: Y **OR** QTEMP_1A: N QTEMP_1B: Y |
| QTEMP_1C | Is your [QMAIN] job SEASONAL or YEAR-ROUND? | — | — | [SKIP] | ANY RESPONSE |
| QONCALL_1 | Some people are in a pool of workers who are ONLY called to work as needed, although they can be scheduled to work for several days or weeks in a row, for example substitute teachers, information technology workers, and construction workers supplied by a union hiring hall. These people are sometimes referred to as ON-CALL workers. Were you an ON-CALL worker in the last THIRTY DAYS? [IF NECESSARY: Please think about your [QMAIN] job.] | — | — | QONCALL_1=N **OR** QONCALL_1=Y QONCALL_2= Work regular hours but must be available (1) | QONCALL_1: Y QONCALL_2: Only work when called (2) |

| Variable name | Question wording | (1)<br>Employee<br>(Control 1) | (2)<br>Employee<br>(Control 2) | (3)<br>Employee<br>(all factors except Control) | (4)<br>Non-Employee<br>(all factors) |
|---|---|---|---|---|---|
| QONCALL_2 | Some ON-CALL workers have regularly scheduled hours, but IN ADDITION must work when called (for example, doctors, nurses, and managers). Other ON-CALL workers work ONLY when called (for example, substitute teachers, information technology workers). Which type of ON-CALL worker are you? [IF NECESSARY: Please think about your [QMAIN] job.] | — | — | QONCALL_1=N OR QONCALL_1=Y QONCALL_2= Work regular hours but must be available (1) | QONCALL_1: Y QONCALL_2: Only work when called (2) |
| QDAYLABOR | Some people get work by waiting at a place where employers pick up people to work for a day. These people are sometimes called DAY LABORERS. Were you a DAY LABORER in the last THIRTY DAYS? [IF NECESSARY: Please think about your [QMAIN] job.] | — | — | N | Y |
| BEHAVIORAL CONTROL Qs in the extended interview | | | | | |
| QBEHAV1 | On your [QMAIN] job, do you report directly to a manager, supervisor, foreman or someone else who regularly directs and controls HOW you do your work? | Y | Y | ANY RESPONSE | N |
| QBEHAV1_A | (On your [QMAIN] job,) Do you determine your own schedule or the hours that you work? | N | N | ANY RESPONSE | Y |
| QBEHAV1_B | (On your [QMAIN] job,) Do you need approval for your schedule or hours worked? | Y | Y | ANY RESPONSE | N |
| QBEHAV1_C | (On your [QMAIN] job,) Do you need permission to leave your place of work, or can you come and go at will? | NEED PERMISSION | NEED PERMISSION | ANY RESPONSE | COME AND GO AT WILL |
| QBEHAV2 | (On your [QMAIN] job,) How often does someone tell you how to perform your usual work activities and duties? *(1=Multiple times per day; 2=Every day/shift; 3=every week; 4=2-3 times per week; 5=less frequently; 6=never.)* | QBEHAV2=Y (1-5) OR QBEHAV2=Never (6) QBEHAV2_1=Y (1-5) | QBEHAV2=Y (1-5) OR QBEHAV2=Never (6) QBEHAV2_1=Y (1-5) | ANY RESPONSE | [SKIP] |

| Variable name | Question wording | (1)<br>Employee<br>(Control 1) | (2)<br>Employee<br>(Control 2) | (3)<br>Employee<br>(all factors except Control) | (4)<br>Non-Employee<br>(all factors) |
|---|---|---|---|---|---|
| QBEHAV2_1 | (On your [QMAIN] job,) How often COULD someone direct HOW you perform your work duties? *(1=Multiple times per day; 2=Every day/shift; 3=every week; 4=2-3 times per week; 5 less frequently; 6=never.)* | QBEHAV2=Y (1-5) OR QBEHAV2=Never (6) QBEHAV2_1=Y (1-5) | QBEHAV2=Y (1-5) OR QBEHAV2=Never (6) QBEHAV2_1=Y (1-5) | ANY RESPONSE | [SKIP] |
| QBEHAV2_A | (On your [QMAIN] job,) Are you required to wear a uniform including any specific type, style, or color of clothing? [IF NECESSARY: A uniform includes clothing associated with a specific employer because of an emblem, logo, or distinctive color, and also may include any specific type and style of clothing that an employer requires its employees to wear at work, such as a tuxedo for a maître d' or a blazer of a distinctive color for a salesperson.] | ANY RESPONSE | ANY RESPONSE | ANY RESPONSE | N |
| QBEHAV3 | (On your [QMAIN] job,) Are you required to perform your job duties in a specific location? | YES ALL DUTIES (1) | ANY RESPONSE | ANY RESPONSE | NO (3) |
| QBEHAVE3A | Does the nature of your work require that you provide these duties at a specific location? [IF NECESSARY: For example, a theatre actor may work in a specific location because the play shows in a certain theatre, or a home cleaning service works in a specific location because they clean in a client's home.] | Y | Y | ANY RESPONSE | [SKIP] |
| QBEHAV4 | (On your [QMAIN] job,) Is there a job or procedures manual for the duties you perform that tells you HOW to perform the job? | Y | ANY RESPONSE | ANY RESPONSE | N |
| QBEHAV4A | How closely would you say you are required to follow the manual? Are you required to follow it very closely, somewhat closely, not very closely, or not at all? Please give me your best estimate. | EITHER 1. VERY CLOSELY OR 2. SOMEWHAT CLOSELY | ANY RESPONSE | ANY RESPONSE | [SKIP] |
| QBEHAV5_A | Has your [QMAIN] job provided you with any training? | ANY RESPONSE | ANY RESPONSE | ANY RESPONSE | N |
| QBEHAV5_B | Did you need to have any specialized education or training, apprenticeships, or certification to get your [QMAIN] job? | ANY RESPONSE | ANY RESPONSE | ANY RESPONSE | N |

| Variable name | Question wording | (1)<br>Employee<br>(Control 1) | (2)<br>Employee<br>(Control 2) | (3)<br>Employee<br>(all factors except<br>Control) | (4)<br>Non-Employee<br>(all factors) |
|---|---|---|---|---|---|
| FINANCIAL RELATIONSHIP Qs in the extended interview | | | | | |
| QFINAN1 | On your [QMAIN] job, how much of your own money do you spend each year, on average, on tools, equipment, computers, or other materials you use for your work? | — | — | 3. UNDER $1,000<br>OR<br>4. NONE-YOU HAVE NOT SPENT ANY MONEY | EITHER<br>MORE THAN $10,000, OR<br>2. $1,000-$10,000 |
| QFINAN1A | Are you required to purchase or lease SPECIFIC TOOLS OR EQUIPMENT or do you decide what to buy? | — | — | [SKIP] | 2-I DECIDE |
| QFINAN1B | Are you required to purchase or lease these tools or equipment from a specific source or do you decide where to buy them? | — | — | [SKIP] | 2-I DECIDE |
| QFINAN3 | On your [QMAIN] job, have you ever invested your own money in the company where you work to support the day-to-day operations? [IF NECESSARY: Examples include purchasing equipment, renting space, or advertising?] | — | — | N | Y |
| QFINAN4_A<br>QFINAN4_B | At your [QMAIN] job, can you … ?<br>a. hire additional workers?<br>b. change the way the business is run? | — | — | A: N<br>B: N | A: Y<br>B: Y |
| QFINAN5 | In the event that the company where you work loses money, would you continue to earn your wage for the work you perform? | — | — | Y | N |
| QRELATE1 | Besides your main job, do you perform similar paid work for others [IF NECESSARY: other companies or businesses]? | — | — | N | Y |
| QRELATE2 | Are you required to get approval from your [QMAIN] job in order to provide these duties and activities for others? | — | — | [SKIP] | N |
| QRELATE3 | Do you use your own funds to advertise your services, with a website, flyers, newspapers, business cards or any other way? | — | — | N | Y |

| Variable name | Question wording | (1)<br>Employee<br>(Control 1) | (2)<br>Employee<br>(Control 2) | (3)<br>Employee<br>(all factors except Control) | (4)<br>Non-Employee<br>(all factors) |
|---|---|---|---|---|---|
| QINTEGRAL | Are the duties you perform on your [QMAIN] job a part of the regular services or operations of the company where you work? [IF NECESSARY: Is the work you do the same as the work the company does for its customers?] | — | — | EMPFLAG[11]=2,3 and QINTEGRAL=Y (if EMPFLAG=1, QINTEGRAL is SKIPPED) | EMPFLAG=2,3 and QINTEGRAL=N (if EMPFLAG=1, QINTEGRAL is SKIPPED) |
| QINTEGRAL2 | You have indicated that you are either NOT an EMPLOYEE or NOT SURE if you are an EMPLOYEE. Are there workers at your [QMAIN] job who are called "employees" and perform the same work duties that you do? [IF NECESSARY: Please provide your best estimate.] | — | — | EMPFLAG=2,3 and QINTEGRAL2=Y, (if EMPFLAG=1, QINTEGRAL2 is SKIPPED) | EMPFLAG=2,3 and QINTEGRAL2=N (if EMPFLAG=1, QINTEGRAL2 is SKIPPED) |

---

[11]   EMPFLAG is a calculated variable summarizing the respondent's self-reported employment status. A value of EMPFLAG=2 indicates the respondent self-reported as a non-employee, while a value of EMPFLAG=3 indicates the respondent's self-reported status could not be determined.

### A.3.2    Base Algorithm Outcomes

Exhibits A.4 through A.7 show the distribution of responses to the questions used in the ERT concept classification for each of the factors in the ERT question battery.

**Exhibit A.4: ERT Concept—Permanence Factor Responses**

| Variable name | Question wording | Yes | No |
|---|---|---|---|
| QTEMP1 (n=8,503) | Some jobs are temporary. They last only for a set number of weeks or months or until the completion of a project. Is your [+MAINJOB+] job temporary? | 11% | 88% |
| QTEMP2 (n=7,613)[a] | Provided the economy does not change and your job performance is adequate, can you continue to work in your current job as long as you wish? | 95% | 4% |
| QTEMP1A (n=1,277) | Are you working only until a specific project is completed? | 46% | 51% |
| QTEMP1B (n=712) | Were you hired for a fixed period of time? | 31% | 67% |

[a] Only the first question was asked of the full sample of respondents. See Appendix C, the public use codebook, for details on bases for each survey question. The question QTEMP1 asks if the job is temporary. "Temporary" or "temp" jobs often refer to specific work provided through agencies. To ensure that respondents who said "no" were not confusing the temporary nature of their job with work through a temporary agency, we included a confirmatory question in QTEMP2 as a secondary measure of permanence.

**Exhibit A.5: ERT Concept—Behavioral Control Factor**

| Variable name | Question wording | Yes | No | Depends | Multiple times | Every shift | Every week | 2–3x week | Less freq | Never | Yes, all | Yes, some | Very closely | Somewhat | Not very | Not at all |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| QBEHAV1 (n=3,158) | On your [QMAIN] job, do you report directly to a manager, supervisor, foreman or someone else who regularly oversees or approves HOW you do your work? | 68% | 31% | — | | | | | | | | | | | | |
| QBEHAV1_A (n=3,158) | (On your [QMAIN] job,) Do you determine your own schedule or the hours that you work? | 44% | 55% | — | — | — | — | — | — | — | — | — | — | — | — | — |
| QBEHAV1_B (n=3,158) | Do you need approval for your schedule or hours worked? | 39% | 58% | — | — | — | — | — | — | — | — | — | — | — | — | — |
| QBEHAV1_C (n=3,158) | (On your [QMAIN] job,) Do you need permission to leave your place of work, or can you come and go at will? | 47% | 46% | 5% | — | — | — | — | — | — | — | — | — | — | — | — |
| QBEHAV2 (n=2,096) | (On your [QMAIN] job,) How often does someone tell you how to perform your usual work activities and duties? | — | — | — | 7% | 14% | 9% | 10% | 36% | 22% | — | — | — | — | — | — |
| QBEHAV2_1 (n=440) | (On your [QMAIN] job,) At any time COULD someone direct HOW you perform your work duties? | — | — | — | 9% | 15% | 4% | 3% | 22% | 42% | — | — | — | — | — | — |
| QBEHAV2_A (n=3,158) | (On your [QMAIN] job,) Are you required to wear a uniform including any specific type, style, or color of clothing? | 36% | 64% | — | — | — | — | — | — | — | — | — | — | — | — | — |

| Variable name | Question wording | Yes | No | Depends | Multiple times | Every shift | Every week | 2–3x week | Less freq | Never | Yes, all | Yes, some | Very closely | Somewhat | Not very | Not at all |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| QBEHAV3 (n=3,158) | (On your [QMAIN] job,) Are you required to perform your job duties in a specific location? | | 30% | — | — | — | — | — | — | — | 53% | 16% | — | — | — | — |
| QBEHAV3A (n=2,142) | Does the nature of your work require that you provide these duties at a specific location? | 85% | 13% | — | — | — | — | — | — | — | — | — | — | — | — | — |
| QBEHAV4 (n=3,158) | (On your [QMAIN] job,) Is there a job or procedures manual for the duties you perform that tells you HOW to perform the job? | 47% | 52% | — | — | — | — | — | — | — | — | — | — | — | — | — |
| QBEHAV4A (n=1,433) | How closely would you say you are required to follow the manual? Are you required to follow it very closely, somewhat closely, not very closely, or not at all? | — | — | — | — | — | — | — | — | — | — | — | 63% | 29% | 5% | 1% |
| QBEHAV5_A (n=3,158) | Has your [QMAIN] job provided you with any training? | 69% | 30% | — | — | — | — | — | — | — | — | — | — | — | — | — |
| QBEHAV5_B (n=3,158) | Did you need to have any specialized education or training, apprenticeships, or certification to get your [QMAIN] job? | 49% | 50% | — | — | — | — | — | — | — | — | — | — | — | — | — |

**Exhibit A.6: ERT Concept—Financial Control Factor**

| Variable name | Question wording | Yes | No | Depends | More than 10K | Between 1 and 10K | Under 1K | None | Required | I decide | Both/depends |
|---|---|---|---|---|---|---|---|---|---|---|---|
| QFINAN1 (*n*=3,158) | On your [QMAIN] job, how much of your own money do you spend each year, on average, on tools, equipment, computers, or other materials you use for your work? | — | — | — | 6% | 18% | 28% | 45% | — | — | — |
| QFINAN1A (*n*=902) | Are you required to purchase or lease SPECIFIC TOOLS OR EQUIPMENT or do you decide what to buy? | — | — | — | — | — | — | — | 11% | 75% | 8% |
| QFINAN1B (*n*=902) | Are you required to purchase or lease tools or equipment FROM A SPECIFIC SOURCE or do you decide where to buy them? | — | — | — | — | — | — | — | 6% | 85% | 3% |
| QFINAN3 (*n*=3,158) | On your [QMAIN] job, have you ever invested your own money in the company where you work to support the day-to-day operations? | 27% | 72% | — | — | — | — | — | — | — | — |
| QFINAN4_A (*n*=3,158) | At your [QMAIN] job, can you … a. hire additional workers? | 29% | 69% | 2% | — | — | — | — | — | — | — |
| QFINAN4_B (*n*=3,158) | At your [QMAIN] job, can you … b. change the way the business is run? | 25% | 69% | 5% | — | — | — | — | — | — | — |
| QFINAN5 (*n*=3,158) | In the event that the company where you work loses money, would you continue to earn your wage for the work you perform? | 71% | 22% | — | — | — | — | — | — | — | — |

**Exhibit A.7: ERT Concept—Employment Relationship Factor**

| Variable name | Question wording | Yes | No | Other/NA |
|---|---|---|---|---|
| QRELATE1 (n=3,158) | Besides your [QMAIN] job, do you perform similar work for others? | 14% | 85% | — |
| QRELATE2 (n=444) | Are you required to get approval from your [QMAIN] job in order to provide these duties and activities for others? | 30% | 69% | — |
| QRELATE3 (n=3,158) | Do you use your own funds to advertise your services, with a website, flyers, newspapers, business cards, or any other way? | 17% | 83% | — |
| QINTEGRAL (n=3,158) | Are the duties you perform on your [QMAIN] job a part of the regular services or operations of the company where you work? [IF NECESSARY: Is the work you do the same as the work the company does for its customers?] | 77% | 17% | — |
| QINTEGRAL2 (n=3,158) | Are there workers at your [QMAIN] job who are called "employees" and perform the same work duties that you do? | 34% | 60% | 2% |

The combination of these variables resulted in three ERT worker status categories:

1. **ERT_NE**. Based on a series of questions, the respondent might be **a non-employee**.

2. **ERT_EE**. Based on a series of questions, the respondent might be an **employee**.

3. **ERT_DK**. This scenario is reserved for respondents who are undetermined.

Exhibit A.8 shows the distribution of worker categories that result from applying the base coding algorithm. Most notably, this coding algorithm did not identify *any* non-employees (ERT_NE). Only 32.7 percent of workers were identified as likely employees (ERT_EE) and we could not determine the status of 67.2 percent of the workers who answered the ERT question battery.

**Exhibit A.8: ERT Determination Outcomes**

| Status | Percentage |
|---|---|
| Likely non-employee (ERT_NE) | 0.0% |
| Likely employee (ERT_EE) | 32.7% |
| Undetermined (ERT_DK) | 67.2% |

Unweighted n=3,158

### A.4.3   Discussion

Given that the ERT must consider a multitude of factors in evidence when making a worker classification, it is not surprising that many workers would remain undetermined. It was somewhat surprising that no workers were clearly deemed to be a non-employee. After reviewing the distribution of cases across the ERT questions we introduced a complementary alternative to the base algorithm that we hoped would strengthen the overall analytic potential of the survey by yielding better comparisons between the characteristics of workers in all three groups. If such a comparison were to demonstrate discernable and significant differences in the characteristics of workers who are classified as likely employees, likely non-employees, and undetermined, that information could be used to better target the education and outreach campaigns to both workers and employers. However, as noted in the Administrative Interpretation, "These factors are to be considered and weighed against one another in each situation, but there is no mechanical formula for using them to arrive at the correct result. Rather, the factors are simply a tool to assist in understanding individual cases, with the ultimate goal of deciding whether it is economically realistic to view a relationship as one of employment or not." The results also confirmed our initial suspicions that the determination of employment status for the ERT concept would be challenging to operationalize in a telephone survey.

# Appendix B: Worker Classification Survey

## B.1    English Version

### WORKER CLASSIFICATION SURVEY

[PROGRAM REMINDER TO LEAVE VOICEMAIL ON SECOND ATTEMPT]

**QUALIFIED LEVELS:**

**CELL:**

   LEVEL 1: S7_R-AX=1

**LANDLINE:**

   LEVEL 1: SELECT2=1 OR A1=1 OR S6_1=1

## PART I. INTRODUCTION

*RDD (LANDLINE) INTRODUCTION*

**INTRO1**    Hello, my name is [INTERVIEWER] and I'm calling on behalf of [IF CATI1=1: Abt Associates/IF CATI1=2: the Department of Labor].  We are conducting a national survey about American jobs, work benefits, and experiences. First… [SOURCE: NEW]

**S1**    Are you a member of this household and at least 18 years old? [SOURCE: FMLA SURVEY]

   1.   YES        [GO TO S4]

   2.   NO        [GO TO S2]

   8.   DK (VOL)    [GO TO S2]

   9.   REF (VOL)    [GO TO S2]

**S2**    May I speak to a household member who is at least 18 years old? [SOURCE: FMLA SURVEY]

   1.   AVAILABLE      [REPEAT INTRO1]

2.   NOT AVAILABLE [SCHEDULE CALLBACK]

3.   THERE ARE NONE    [GO TO THANK01] [SCREENOUT]

8.   DK (VOL)          [GO TO THANK01] [SOFT REFUSAL]

9.   REF (VOL)         [GO TO THANK01] [SOFT REFUSAL]

[IF NECESSARY: Household members include people who think of this household as their primary place of residence. It includes persons who usually stay in the household but are temporarily away, such as in the military, on business, on vacation, in a hospital, or living at school in a dorm, fraternity, or sorority.]

*CELL PHONE INTRODUCTION*

**INTRO2**     Hello, my name is [INTERVIEWER] and I'm calling on behalf of [IF CATI1=1: Abt Associates/ IF CATI1=2: the Department of Labor].  We are conducting a national survey about American jobs, work benefits, and experiences. First… [SOURCE: NEW]

If you are now driving a car or doing any activity requiring your full attention, I need to call you back later.

1.   AVAILABLE/NOT DRIVING              [GO TO S3]

2.   NOT AVAILABLE/CURRENTLY DRIVING    [SCHEDULE CALLBACK]

8.   DK (VOL)                  [GO TO THANK02] [SOFT REFUSAL]

9.   REF (VOL)                 [GO TO THANK02] [SOFT REFUSAL]

**S3**     Are you at least 18 years old? [SOURCE: FMLA SURVEY]

1.     YES      [GO TO S4]

2.     NO       [GO TO THANK01] [SCREENOUT]

8.     DK (VOL)    [GO TO THANK01]    [SOFT REFUSAL]

9.     REF (VOL)   [GO TO THANK01]    [SOFT REFUSAL]

TIMESTAMP 1

**A.**  **SCREENER & SELECTION**

**S4**  Results from this survey will be used by the U.S. Department of Labor to improve policies and benefits for American workers. Information from the survey will help the Department's efforts to promote fair hiring practices, and access to critical workplace benefits, opportunities and protections. Your answers will remain private and your personal information will not be shared with the U.S. Department of Labor. [SOURCE: NEW]

To determine if [LANDLINE: your household qualifies/ CELL: you qualify] for the survey, I need to get some information about the members of your household who are 18 years old or older.  These questions will take just a minute to complete.

**S5**  How many adults age 18 or over live in your household? _____  [SOURCE: FMLA SURVEY]

[RANGE=1-11, 99 DK/REF=SOFT REFUSAL]

---

IF S5=1 GO TO S7_R.

IF S5>1 GO TO S6.

---

**S6**  Of these, (IF NECESSARY, ADULTS OVER AGE 18) how many worked for pay or profit in the last 30 days? [SOURCE: NEW]

_____

[RANGE=0-11, 99 DK/REF=SOFT REFUSAL. ANSWER CANNOT BE GREATER THAN S5. IF S6=0 GO TO THANK03 - SCREENOUT]

---

IF CELL:

GO TO **S7_R-AX.**

IF LANDLINE:

IF S6=1 GO TO S6_1.

---

**Appendix B: Worker Classification Survey**

| IF S6>1 READ: Can you tell me about the adults in your household? Let's start with you→ GO TO S6_R. |
| --- |

**S6_1**   Are you the person in your household who worked for pay or profit in the last 30 days? [SOURCE: NEW]

1.   YES   [GO TO INFORMEDCONSENT]
2.   NO   [GO TO PROGRAMMING NOTE BELOW]

8.   DK (VOL)   [GO TO THANK03]   [SOFT REFUSAL]

9.   REF (VOL)   [GO TO THANK03]   [SOFT REFUSAL]

LANDLINE ONLY: SET QUALIFIED LEVEL 1 if S6_1=1

| IF S6_1=2 READ: Can you tell me about the adult in your household? Let's start with you→ GO TO S6_R. |
| --- |

[SOURCE: NEW]

| | R | A1 | A2 | A3 (…AX) |
| --- | --- | --- | --- | --- |
| **S6_R-AX** What is [your/the second/third/fourth adult]'s first name or initials? | _ | _ | _ | _ |
| **S7_R-AX** IN THE LAST THIRTY DAYS [have you / has A1-X] worked for pay or profit? Include any job from which (you were/A1-X was) temporarily absent. [PROGRAMMING NOTE: IF CELL, ALWAYS FILL WITH "have you" and "you were"]  [IF NECESSARY: BY THIRTY DAYS, I mean the days beginning on [interview date minus thirty, in day, month, date, year format], and ending [TODAY]] | YES (1)  NO (2)  DK (8)  REF (9) | YES (1)  NO (2)  DK (7)  REF (9) | YES (1)  NO (2)  DK (7)  REF (9) | YES (1)  NO (2)  DK (7)  REF (9) |

IF LANDLINE:

> IF S6_AX = DK/REF FOR 2ND-11TH ADULT, REFER TO BY "second adult/third adult/etc."
>
> CREATE VARIABLE FOR ELIGIBLE.  ELIGIBLE= S7_R-AX=1.
>
> IF S7_R-AX > 1, CODE INELIGIBLE AND LOOP BACK TO S6_AX FOR NEXT ADULT HH MEMBER
>
> IF S7_R-AX = 1 CODE AS ELIGIBLE AND LOOP BACK TO S6_AX FOR NEXT ADULT HH MEMBER
>
> IF S5=1 and S7_R=2,8, or 9, go to THANK03.

IF CELL:

> IF S7_R-AX=1, GO TO INFORMED CONSENT. SET QUALIFIED LEVEL 1.
>
> IF S7_R-AX<>1, GO TO THANK03.

**SHHNUM**   Just to confirm, there [is/are] a total of [FILL ELIGIBLE] adult household member(s) who worked for pay or profit in the last 30 days. Is that correct? [IF NECESSARY: This includes household members who were temporarily absent from a job(s) in the last 30 days.] [SOURCE: NEW]

1. NUMBER OF HH MEMBERS IN MATRIX CORRECT

2. NUMBER OF HH MEMBERS IS INCORRECT     [RETURN TO S5)]

PROGRAMMING NOTE: If ELIGIBLE= 2 (ineligible) and SHHNUM=1, go to THANK03.

**READMSG**   [READ THE FOLLOWING MESSAGE INTO THE ANSWERING MACHINE:]

This is [INTERVIEWER] calling for a study that is being conducted by Abt Associates. We are conducting this study to learn more about American work experiences and benefits and your opinions are important. Your phone number was randomly selected and we want to assure you that your responses to our survey will be kept private. We hope that you will participate in this study, and we will call back within the next day or two. Thank you. [SOURCE: NEW]

RESPONDENT SELECTION:

IF 1 HH MEMBER IS ELIGIBLE, THAT PERSON IS THE RESPONDENT.  GO TO SELECT2.

IF 2 HH MEMBERS ARE ELIGIBLE, INCLUDING THE PERSON ON PHONE, THEN RANDOMLY SELECT ONE AS THE RESPONDENT.  GO TO SELECT2.

IF 2 HH MEMBER ARE ELIGIBLE, **NOT** INCLUDING THE PERSON ON THE PHONE, THEN ASK SELECT1.
IF 3 OR MORE HH MEMBERS ARE ELIGIBLE, THEN ASK SELECT1.

PROGRAMMING NOTE: RANDOMLY INSERT "most recent" OR "next" TO SELECT1.

**SELECT1**      Of the following household members, who had the [most recent/next] birthday?

[LIST ELIGIBLE HH MEMBERS]

1. R

2. A1

3. A2

4. A3 [PROGRAMMER: CONTINUE LISTING AS NECESSARY]

8. DK     [GO TO THANK02] [SOFT REFUSAL]

9. REF    [GO TO THANK02] [SOFT REFUSAL]

PROGRAMMER NOTE: INSERT RESPONDENT BASED ON RESPONDENT SELECTION OR SELECT1. IF S5=1 AND S7_R=1, INSERT "THE PERSON ON THE PHONE". IF SELECT1=DK/REF THEN THANK AND END.

**SELECT2**      INTERVIEWER DO NOT READ: THE RESPONDENT IS [INSERT].  IS R ON THE PHONE NOW OR IS R SOMEONE ELSE?

1.   RESPONDENT IS PERSON ON THE PHONE NOW   [GO TO INFORMED CONSENT]
2.   RESPONDENT IS SOMEONE ELSE              [GO TO HANDOFF1]

**LANDLINE: SET QUALIFIED LEVEL 1 IF SELECT2=1**

**HANDOFF1**     [SELECT2] has been selected as the respondent for this survey. May I please speak to [FILL S6_AX] for the rest of the interview? [SOURCE: FMLA SURVEY]

1. YES/PHONE HANDED OFF        [GO TO INTRO3]

2. NOT AVAILABLE              [SCHEDULE CALLBACK]

3. ALTERNATE NUMBER PROVIDED      [UPDATE NUMBER]

8. DK (VOL)                [GO TO THANK02] [SOFT REFUSAL]

9. REF (VOL)               [GO TO THANK02] [SOFT REFUSAL]

PROGRAMMING NOTE: IF HANDOFF1=3 THEN ASK HANDOFF1A.

**HANDOFF1A**     Is that a landline or cell phone number?

1. LAND        [SCHEDULE CALLBACK]

2. CELL        [SCHEDULE CALLBACK]

**INTRO3**     Hello, my name is [INTERVIEWER] and I'm calling on behalf of Abt Associates.  We are conducting a national study on American work experiences and benefits. Results from this survey will be used by the U.S. Department of Labor to improve policies and benefits for American workers. Information from the survey will help the Department's efforts to promote fair hiring practices, and access to critical workplace benefits, opportunities and protections. Your answers will remain private and your personal information will not be shared with the U.S. Department of Labor. [SOURCE: NEW]

1. CONTINUE TO A1

**A1**     Can you please confirm that in the last THIRTY DAYS you worked for pay or profit? [IF NECESSARY: This includes any job from which you were temporarily absent.] [SOURCE: NEW]

    1.  YES     [GO TO INFORMED CONSENT]

    2.  NO      [GO TO THANK03 - SCREENOUT]

    8.  DK (VOL)     [GO TO S5]

    9.  REF (VOL)     [GO TO S5]

LANDLINE: SET QUALIFIED LEVEL 1 IF A1=1

PROGRAMMING NOTE: IF R ANSWERS DK/REF TO QA1, RE-SCREEN TO CONFIRM WORK STATUS. IF THE SAME R COMES BACK TO QA1 AND ANSWERS DK/REF A SECOND TIME, GO TO THANK03]

TERMINATIONS

**THANK01**     Thank you very much, but we are only interviewing in households with members who are 18 and over. [SOURCE: FMLA SURVEY]

**THANK02**     Thank you very much for the information. These are all the questions I have at this time. [SOURCE: FMLA SURVEY]

**THANK03**     Thank you very much, but we are only interviewing people who have worked in the last THIRTY DAYS.  These are all the questions I have at this time. [SOURCE: NEW]

**INFORMED CONSENT**

[LANDLINE RESPONDENTS:] Your individual answers will remain private and will be combined with responses from about 10,000 people who are also participating in the study.  Study results will be used by the U.S. Department of Labor and researchers to learn what workers know about their employment situation, so your opinions are important.

Your participation is voluntary and all information you provide will be kept private.  We will not provide information that identifies you to anyone outside the study team, except as required by law.  If we should come to any question you don't understand or don't want to answer, I'll try to clarify or we can move on to the next question.  The survey should take about 15 minutes to complete.

[CELL RESPONDENTS:] Your individual answers will remain private and will be combined with responses from about 10,000 people who are also participating in the study.  Study results will be used by the U.S. Department of Labor and researchers to learn what workers know about their employment situation, so your opinions are important.

Your participation is voluntary and all information you provide will be kept private.  We will not provide information that identifies you to anyone outside the study team, except as required by law.  If we should come to any question you don't understand or don't want to answer, I'll try to clarify or we can move on to the next question.  The survey should take about 15 minutes to complete.

In appreciation of your time, we will pay you $10.  So that we can mail you your check, at the end of the survey we will ask for your name and address. Your name and address will not be associated with your survey responses.

**QGENDER  (DO NOT READ)  [IF NECESSARY: I know this may sound awkward, but I have to ask: What is your gender?] ]** [SOURCE: NEW]

1. MALE

2. FEMALE

9. DK

TIMESTAMP 2

**B.    DETERMINE MAIN JOB** (ALL RESPONDENTS GET QJOBS, QMAINJOB, QMAINJOB_2C, QTEMPSTAFF, QMAIN, QMAINJOB_3, QSTATE)

**QMAIN_INTRO**     For the remainder of the interview, we'll be talking about the work you did in the LAST THIRTY DAYS.  [IF R WAS TEMPORARILY AWAY FROM WORK: Since you were temporarily away for the last 30 days, we'll be talking about the work you did BEFORE you were temporarily away.]

**QJOBS**     In the LAST THIRTY DAYS, did you have more than one job [or business], including part-time, evening or weekend work? That is, were you PAID BY more than one job [or business]? [SOURCE: Adapted from American Time Use Survey, Working Without Laws]

1.   YES
2.   NO
8.   DK (VOL)
9.   REF (VOL)

| PROGRAMMING NOTE: IF QJOBS=1 ASK QCONFMJ ELSE GO TO QMAINJOB |
| --- |

**QCONFMJ**     How many jobs paid you in the last thirty days?  [SOURCE: NEW]

_____[RANGE 2-40]
[IF 1 THEN BACK UP AND CHANGE QJOBS TO 2 (NO)]
98. DK (VOL)
99. REF (VOL)

**QCONFMJ_2**     Please list the [INSERT NUMBER FROM QCONFMJ] jobs that paid you in the last 30 days.  You can give me a nickname for each job.  For this question, each job is defined by the clients, customers, or employers who have paid you.  [SOURCE: Adapted from Working Without Laws]

[RECORD VERBATIM]

**QMAINJOB**     How many hours per week do you USUALLY work at your MAIN job?  [IF QJOBS= 1 THEN DISPLAY: By main job we mean the one at which you usually work the most hours.] [IF NECESSARY: For the purposes of this study please consider your job by payment received.] [SOURCE: American Time Use Survey]

____   [Enter number] 0-200 hours [GO TO QMAINJOB_2]
996.   Hours vary week to week
997.   Hours same for all jobs
998.   DK (VOL)

999.    REF (VOL)

PROGRAMMING NOTE: IF QMAINJOB=996-999 ASK QJOBHOURS, ELSE GO TO PROGRAMMING NOTE BEFORE QMAINJOB_2

**QJOBHOURS**   Do you USUALLY work 35 hours or more per week at your MAIN job? [IF NECESSARY: By main job we mean the one at which you usually work the most hours.]  [SOURCE: American Time Use Survey]

1.   YES
2.   NO
8.   DK (VOL)
9.   REF (VOL)

PROGRAMMING NOTE: IF QJOBS=1 AND QMAINJOB=997 THEN SKIP TO QMAINJOB_2A, ELSE ASK QMAINJOB_2.

**QMAINJOB_2**   Throughout the rest of the survey, please consider this your MAIN job, that is, the job where you USUALLY work the most hours. [GO TO QTEMPSTAFF]

**QMAINJOB_2A**   At which job have you worked the longest?  [SOURCE: NEW]

1.   R SELECTS ONE [GO TO QMAINJOB_2A1]
2.   WORKED SAME LENGTH OF TIME AT ALL [GO TO QMAINJOB_2B]

**QMAINJOB_2A1**   Throughout the rest of the survey, please consider this your MAIN job, that is, the job where you have worked the longest. [GO TO QTEMPSTAFF]

**QMAINJOB_2B**   Please select any one of these jobs as your main job.  [GO TO QMAINJOB_2B1]

**QMAINJOB_2B1**   Throughout the rest of the survey, please consider this your MAIN job. [GO TO QTEMPSTAFF]

**QTEMPSTAFF**   At your main job do you work for a temporary or staffing agency? [SOURCE: NEW]

1.   YES
2.   NO
8.   DK (VOL)

9.  REF (VOL)

QMAIN        Please give me a nickname for your main job, that is the employer or client, so I can refer to it throughout the rest of the survey. [SOURCE: Adapted From Working Without Laws (MAIN EMPLOYER)] [IF QTEMPSTAFF=1 THEN DISPLAY: Please refer to your work with the temporary or staffing agency and not your current placement.]

[RECORD VERBATIM]

QMAINJOB_3    In what year did you begin this job? [IF NECESSARY: Please think about your [QMAIN] job.] [SOURCE: NEW]

_____ [RANGE: 1900-2015; 9998-9999]

9998.  DK (VOL)
9999.  REF (VOL)

QSTATE        In what state is your job? [IF NECESSARY: Please think about your [QMAIN] job.] [SOURCE: NEW]

[PROGRAMMING: LIST STATES]

TIMESTAMP 3

**PART II. JOB DESCRIPTION**

**A. EMPLOYER SELF-REPORT** (ALL RESPONDENTS GET QEMPLOYER, QJOBFIND, QREQUIRE)

**\*QEMPLOYER**    At your [QMAIN] job, are you employed by government, by a private company, a nonprofit organization, or are you self-employed? [SOURCE: Adapted from CPS]

1.  Government
2.  Private-for-profit company
3.  Non-profit organization including tax exempt and charitable organizations
4.  Self-employed [IWER NOTE: INCLUDES INDEPENDENT CONTRACTOR, INDEPENDENT CONSULTANT, FREELANCE WORKER, OR "OWN MY OWN BUSINESS"]
5.  OTHER (VOL)
8.  DK (VOL)
9.  REF (VOL)

PROGRAMMING NOTE: IF QEMPLOYER= 2 OR 4 THEN ASK QEMP_2, ELSE GO TO PROGRAMMING NOTE BEFORE QSELF_TITLE_1.  IF QEMPLOYER=2 THEN DISPLAY "private company."

**QEMP_2**    Is this [private company] your family business?  [IF NECESSARY: A family business is one in which you do unpaid work for the family business or farm, and from which you received no payments or profits from that work.] [SOURCE: Adapted from CPS]

1. YES
2. NO
8. DK (VOL)
9. REF (VOL)

PROGRAMMING NOTE: IF QEMPLOYER= 4, 5, 8, OR 9 THEN ASK QSELF_TITLE_1 ELSE GO TO QEMPLOYEE

**\*QSELF_TITLE_1**    In the last 30 days did you work in your [QMAIN] job as an independent contractor, independent consultant, free-lance worker, or something else? [SOURCE: Adapted from CWS, 2005]

1. Independent contractor
2. Independent consultant
3. Free-lance worker
4. Something else (SPECIFY)
8. DK (VOL)
9. REF (VOL)

PROGRAMMING NOTE: IF QSELF_TITLE_1= 4, 8, OR 9 ASK QSELF_TITLE_2 ELSE GO TO QSELF_NUM.

**\*QSELF_TITLE_2**    Do you usually refer to your work at your [QMAIN] job as…? [SOURCE: Adapted from Canadian Self-Employment Survey]

1. Your business?
2. Your (professional) practice?
3. Your self-employment?

4.  Your client?

5.  Your job?

6.  Something else?  (SPECIFY)

8.  DK (VOL)

9.  REF (VOL)

---

PROGRAMMING NOTE: IF QSELF_TITLE_2=1, 2, 3, OR 4 OR IF QSELF_TITLE_1=1, 2, OR 3 THEN ASK QSELF_NUM ELSE GO TO PROGRAMMING NOTE BEFORE QEMPLOYEE.

---

**QSELF_NUM**    How many different people or companies have paid you in the last 30 days in your [QMAIN] job? [SOURCE: NEW]

_____[RANGE 1-99; 998-999; 998=DK, 999=REF]

**\*QCORP_1**    Are you/is your business incorporated? [SOURCE: Adapted from CPS]

1.  YES
2.  NO
8.  DK (VOL)
9.  REF (VOL)

**QCORP_2**    Is your business…? [SOURCE: NEW]

a.  an LLC (IF NECESSARY: limited liability company)?
b.  a partnership?
c.  a franchise?
d.  a sole proprietorship?

1.  YES
2.  NO
8.  DK (VOL)
9.  REF (VOL)

**QCORP_3**    Are you/is your business registered or licensed with the state? [SOURCE: NEW]

1.  YES

2.   NO

8.   DK (VOL)

9.   REF (VOL)

**QCHANGE_NE**     Were you treated as an employee in this job prior to the time you became [INSERT]?  [SOURCE: NEW]
[INSERT "a/an [QSELF_TITLE_1]"; IF QSELF_TITLE_1=DK/REF, INSERT "self-employed"]

1.     YES

2.     NO

8.     DK (VOL)

9.     REF (VOL)

---

PROGRAMMING NOTE: IF QCHANGE_NE=1, ASK QCHANGE_NE2, ELSE GO TO PROGRAMMING NOTE BEFORE QEMPLOYEE.

---

**QCHANGE_NE2**     In what year did you become self-employed in the work you do for your [QMAIN] job? [SOURCE: NEW]

_____   [RANGE: YEAR GIVEN AT QMAINJOB_3-9999]

9997.   IMMEDIATELY (VOL)

9998.   DK (VOL)

9999.   REF (VOL)

---

PROGRAMMING NOTE: ASK QEMPLOYEE
IF QEMPLOYER=1, 2, OR 3,
IF QSELF_TITLE_2=5, 6, 8, OR 9, OR
IF QEMPLOYER=4 (SE) AND QCORP_1=1 (INCORPORATED),
ELSE GO TO PROGRAMMING NOTE BEFORE QCERTAIN_NE.

---

**\*QEMPLOYEE**   At your [QMAIN] job, are you an employee? [SOURCE: NEW]

1.   YES

2.   NO

8.   NOT SURE/DON'T KNOW

9.   REF (VOL)

> PROGRAMMING NOTE: IF QEMPLOYEE=1 GO TO QCHANGE_EE. IF QEMPLOYEE=2, 8, OR 9, GO TO PROGRAMMING NOTE BEFORE QCERTAIN_NE.

**QCHANGE_EE**        While working on this job, have you always been an employee? [SOURCE: NEW]

    1.      YES
    2.      NO
    8.      DK (VOL)
    9.      REF (VOL)

> PROGRAMMING NOTE:
> IF QEMPLOYER=1, 2, OR 3 AND QEMPLOYEE=1, GO TO QCERTAIN_EE.
> IF QEMPLOYER=1, 2, OR 3 AND QEMPLOYEE=2, 8, OR 9, GO TO QCONT_1.
> IF QEMPLOYER=4 AND QEMPLOYEE=1, GO TO QCERTAIN_EE.
> IF QEMPLOYER=4 AND QEMPLOYEE=2, 8, OR 9, ASK QCERTAIN_NE.
> IF QEMPLOYER=4 AND QEMPLOYEE=SKIPPED (AFTER QCHANGE_SE3), ASK QCERTAIN_NE.
> IF QEMPLOYER=5, 8, OR 9, AND QEMPLOYEE=2, 8, OR 9, GO TO QCONT_1.
> IF QEMPLOYER=5, 8, or 9 and QEMPLOYEE=1, GO TO QCERTAIN_EE.
> IF QEMPLOYER=5, 8, OR 9 AND QEMPLOYEE=SKIPPED, ASK QCERTAIN_NE.

**\*QCERTAIN_NE**        How certain are you that you are SELF EMPLOYED on your [QMAIN] job and not an employee of the company or clients for whom you work? [SOURCE: NEW]

    1.      Very certain
    2.      Somewhat certain
    3.      Not too certain
    4.      Not at all certain
    8.      DK (VOL)
    9.      REF (VOL)

> GO TO QCONT_1

**\*QCERTAIN_EE**        How certain are you that you are an EMPLOYEE on your [QMAIN] job and not another type of worker such as an independent contractor, or temporary worker?  [SOURCE: NEW]

    1.      Very certain
    2.      Somewhat certain

3.   Not too certain
4.   Not at all certain
8.   DK (VOL)
9.   REF (VOL)

---

PROGRAMMING NOTE: IF QEMPLOYEE=2, 8, 9, OR SKIPPED (AFTER QCHANGE_NE3), ASK
QCONT_1 ELSE GO TO QJOBFIND

---

**QCONT_1**   Some companies provide employees or their services to other companies or clients
under contract. A few examples of services that can be contracted out include security,
landscaping, or computer programming. Did you work for a company that contracts out
you or your services in the last THIRTY DAYS? [SOURCE: Contingent and Alternative
Employment Arrangements, 2005]

1.   YES
2.   NO
8.   DK (VOL)
9.   REF (VOL)

**QJOBFIND**   Did you use any type of agency to help you obtain your [QMAIN] job? [SOURCE: NEW]

1.   YES
2.   NO
8.   DK (VOL)
9.   REF (VOL)

---

PROGRAMMING NOTE: IF QJOBFIND=1, 8, OR 9 ASK QAGENCY ELSE GO TO QREQUIRE

---

**QAGENCY**   What type of agency helped you obtain your [QMAIN] job? [SELECT ONE RESPONSE.]

1.   Temporary agency
2.   Employee staffing organization
3.   Employment agency
4.   Labor broker
5.   City or county job placement agency
6.   Service referral agency or registry
7.   Client-matching service
8.   Other, specify_____
98.  DK (VOL)
99.  REF (VOL)

> PROGRAMMING NOTE: IF QAGENCY=ANY 1-8 ASK QREFER AND INSERT QAGENCY, ELSE GO TO QREQUIRE

**QREFER**    How did you learn about the [QAGENCY] that helped you obtain this job? [IF NECESSARY: Please think about your [QMAIN] job.] [SOURCE: NEW]

1. Employer sent you there to apply for work
2. Through a personal referral (friend/family)
3. Through an advertisement
4. Some other way (SPECIFY)
8. DK (VOL)
9. REF (VOL)

**QREQUIRE**    To work at your [QMAIN] job, were you REQUIRED to…? [SOURCE: Adapted from WORKERS WITHOUT LAWS]

a. Sign a contract, form or other legal document
b. Create your own business or LLC

1. YES

2. NO

8. DK (VOL)

9. REF (VOL)

> PROGRAMMING NOTE: IF QREQUIRE_A=1 ASK QSIGN_SP ELSE GO TO QIND_INTRO

**QSIGN_SP**    What type(s) of contract, form, or other legal document did you sign? (SELECT ALL THAT APPLY) [SOURCE:  NEW]

a. Tax withholding forms
b. Partnership agreement
c. Franchise agreement
d. Employment contract
e. Independent contractor agreement
f. Something else _____

    1.      YES

    2.      NO

    8.      DK (VOL)

    9.      REF (VOL)

---

PROGRAMMING NOTE: IF ALL QSIGN_SP_A-F=2 THEN CHANGE QREQUIRE_A=2.

---

TIMESTAMP 4

**B. INDUSTRY** (ALL RESPONDENTS)

**QIND_INTRO.**  Now I have some questions about the type of work you do.

**QINDUSTRY**  What kind of business or industry is this? [IF NECESSARY: What do they make or do where you work? For example: hospital, newspaper publishing, mail order house, auto engine manufacturing, bank]? [IF NECESSARY: Please think about your [QMAIN] job.] [SOURCE: CPS, ACS]

[INTERVIEWER:  RECORD VERBATIM AND ALSO APPLY A CODE]

**QINDUSTRY_VERBATIM.**

[RECORD VERBATIM RESPONSE]**QINDUSTRY_CODE.**

1. AGRICULTURE, FORESTRY, FISHING, AND HUNTING
2. MINING, QUARRYING, AND OIL AND GAS EXTRACTION
3. CONSTRUCTION
4. MANUFACTURING
5. WHOLESALE AND RETAIL TRADE
6. UTILITIES (ELECTRIC POWER, GAS, WATER, SEWAGE)
7. TRUCK TRANSPORTATION
8. TAXI AND LIMOUSINE SERVICE
9. COURIERS AND MESSENGERS
10. OTHER TRANSPORTATION
11. INFORMATION (TELECOMMUNICATIONS, INTERNET, PHONE, CABLE, SOFTWARE/MEDIA PUBLISHING)
12. FINANCIAL ACTIVITIES (BANKING, INSURANCE, REAL ESTATE)
13. PROFESSIONAL AND TECHNICAL SERVICES (LEGAL, ACCOUNTING, CONSULTING, SCIENTIFIC RESEARCH, ADVERTISING, VETERINARY, DESIGN)
14. SERVICES TO BUILDINGS AND DWELLINGS (CLEANING, JANITORIAL)

15. LANDSCAPING SERVICES
16. OTHER MANAGEMENT, ADMINISTRATIVE, AND WASTE SERVICES (EMPLOYMENT SERVICES, TRAVEL AGENCIES, SECURITY, BUSINESS SUPPORT)
17. HOME HEALTH CARE SERVICES
18. CHILD DAY CARE SERVICES
19. OTHER EDUCATION AND HEALTH SERVICES
20. ARTS, ENTERTAINMENT, AND RECREATION
21. TRAVELER ACCOMMODATION (HOTEL)
22. RESTAURANTS AND OTHER FOOD SERVICES
23. DRINKING PLACES, ALCOHOLIC BEVERAGES
24. BEAUTY SALONS
25. NAIL SALONS AND OTHER PERSONAL CARE SERVICES
26. DRYCLEANING AND LAUNDRY SERVICES
27. OTHER SERVICES (REPAIR AND MAINTENANCE, RELIGIOUS ORGANIZATIONS, PRIVATE HOUSEHOLDS)
28. PUBLIC ADMINISTRATION (JUSTICE, PUBLIC ORDER, GOVERNMENT SUPPORT, COMMUNITY DEVELOPMENT)
29. OTHER
30. DK
31. REF

TIMESTAMP 5

**C. OCCUPATION** (ALL RESPONDENTS GET QOCCUP, QDUTIES, QFIRMSIZE)

**QOCCUP**      What kind of work do you do, that is, what is your occupation? [IF NECESSARY: For example, home health aide, information technology worker, security guard, janitor, or salesperson.] [IF NECESSARY: What was your job title?] ? [IF NECESSARY: Please think about your [QMAIN] job.] [SOURCE: Adapted from CPS]


[INTERVIEWER:  RECORD VERBATIM AND ALSO APPLY A CODE]

**QOOCUP_VERBATIM.**

[RECORD VERBATIM RESPONSE]

**QOCCUP_CODE.**


1.      MANAGEMENT OCCUPATIONS

2.      BUSINESS AND FINANCIAL OPERATIONS OCCUPATIONS

3.      COMPUTER AND MATHEMATICAL OCCUPATIONS

4.      ARCHITECTURE AND ENGINEERING OCCUPATIONS

5.      LIFE, PHYSICAL, AND SOCIAL SCIENCE OCCUPATIONS

6.      COMMUNITY AND SOCIAL SERVICE OCCUPATIONS

7.      LEGAL OCCUPATIONS

8.      EDUCATION, TRAINING, AND LIBRARY OCCUPATIONS

9.      ARTS, DESIGN, ENTERTAINMENT, SPORTS, AND MEDIA OCCUPATIONS

10.     HEALTHCARE PRACTITIONERS AND TECHNICAL OCCUPATIONS

11.     HEALTHCARE SUPPORT OCCUPATIONS

12.     PROTECTIVE SERVICE OCCUPATIONS

13.     FOOD PREPARATION AND SERVING RELATED OCCUPATIONS

14.     BUILDING AND GROUNDS CLEANING AND MAINTENANCE OCCUPATIONS

15.     PERSONAL CARE AND SERVICE OCCUPATIONS

16.     SALES AND RELATED OCCUPATIONS

17.     OFFICE AND ADMINISTRATIVE SUPPORT OCCUPATIONS

18.     FARMING, FISHING, AND FORESTRY OCCUPATIONS

19.     CONSTRUCTION AND EXTRACTION OCCUPATIONS

20.     INSTALLATION, MAINTENANCE, AND REPAIR OCCUPATIONS

21.     PRODUCTION OCCUPATIONS

22.     TRANSPORTATION AND MATERIAL MOVING OCCUPATIONS

23.     MILITARY SPECIFIC OCCUPATIONS

24.     OTHER

25.     DK

26.     REFUSED

QDUTIES      What are your usual activities or duties at this job? (INTERVIEWER NOTE – DO NOT READ TO RESPONDENT:  for example, keeps account books, work on the internet, files, sells cars, operates printing press, lays brick.)? [IF NECESSARY: Please think about your [QMAIN] job.] [SOURCE: Adapted from CPS]

[RECORD VERBATIM]


QFIRMSIZE    Counting ALL LOCATIONS where your employer/you operate(s), what is the total number of persons who work for your employer/you including yourself?  [Source: Adapted from CPS March Supplement]

_____ [RANGE=1-99,997, 99,998=DK, 99,999=REF]


[IF QFIRMSIZE=99,998 OR 99,999, THEN READ CATEGORIES]

**QFIRMSIZE_CAT.**

**Would you estimate…**
1.   1 Worker
2.   2-4 Workers
3.   5-9
4.   10-19
5.   20-49
6.   50-99
7.   100-249
8.   250-499
9.   500 or more
98. DK (VOL)
99. REF (VOL)


TIMESTAMP 6


**D.  PERMANENCE** (ALL RESPONDENTS GET QTEMP_1, QONCALL_1, QDAYLABOR)


QTEMP_1    Some jobs are temporary.  They last only for a set number of weeks or months or until the completion of a project. Is your [QMAIN] job temporary? [SOURCE: Adapted from Contingent and Alternative Employment Arrangements, 2005]

1.    YES
2.    NO
8.    DK (VOL)
9.    REF (VOL)

PROGRAMMING NOTE: IF QTEMP_1=2, 8, OR 9 THEN ASK QTEMP_2, ELSE GO TO
PROGRAMMING NOTE BEFORE QTEMP_1A

**QTEMP_2**   Provided the economy does not change and your job performance is adequate, can you
continue to work in your current job as long as you wish? [IF NECESSARY: Please think
about your [QMAIN] job.] [SOURCE: Adapted from Contingent and Alternative
Employment Arrangements, 2005]

    1.     YES
    2.     NO
    8.     DK (VOL)
    9.     REF (VOL)

PROGRAMMING NOTE: IF QTEMP_1=1 OR IF QTEMP_2=2, 8, OR 9 THEN ASK QTEMP_1A, ELSE
GO TO QONCALL_1

**QTEMP_1A**   Are you working only until a specific project is completed? [SOURCE: Contingent and
Alternative Employment Arrangements, 2005]

    1.     YES [GO TO QONCALL_1]
    2.     NO
    8.     DK (VOL)
    9.     REF (VOL)

**QTEMP_1B**   Were you hired for a fixed period of time? [SOURCE: Contingent and Alternative
Employment Arrangements, 2005]

    1.     YES [GO TO QONCALL_1]
    2.     NO
    8.     DK (VOL)
    9.     REF (VOL)

**QTEMP_1C**   Is your [QMAIN] job SEASONAL or YEAR-ROUND? [SOURCE: Adapted from Contingent
and Alternative Employment Arrangements, 2005]

    1.     Seasonal
    2.     Year-round
    8.     DK (VOL)

9.      REF (VOL)

**QONCALL_1**      Some people are in a pool of workers who are ONLY called to work as needed, although they can be scheduled to work for several days or weeks in a row, for example substitute teachers, information technology workers, and construction workers supplied by a union hiring hall. These people are sometimes referred to as ON-CALL workers. Were you an ON-CALL worker in the last THIRTY DAYS? [IF NECESSARY: Please think about your [QMAIN] job.] [SOURCE: Adapted from Contingent and Alternative Employment Arrangements, 2005]

1.  YES

2.  NO

8.  DK (VOL)

9.  REF (VOL)

> PROGRAMMING NOTE: IF QONCALL_1=1 THEN ASK QONCALL_2 ELSE GO TO QDAYLABOR

**QONCALL_2**      Some ON-CALL workers have regularly scheduled hours, but IN ADDITION must work when called (for example, doctors, nurses, and managers). Other ON-CALL workers work ONLY when called (for example, substitute teachers, information technology workers). Which type of ON-CALL worker are you? [IF NECESSARY: Please think about your [QMAIN] job.] [SOURCE: Adapted from Contingent and Alternative Employment Arrangements, 2005]

1.  Work regular hours, but must be available

2.  Only work when called

3.  Other (Specify)

8.  DK (VOL)

9.  REF (VOL)

**QDAYLABOR**      Some people get work by waiting at a place where employers pick up people to work for a day. These people are sometimes called DAY LABORERS. Were you a DAY LABORER in the last THIRTY DAYS? [IF NECESSARY: Please think about your [QMAIN] job.] [SOURCE: Contingent and Alternative Employment Arrangements, 2005]

1.  YES
2.  NO
8.  DK (VOL)
9.  REF (VOL)

TIMESTAMP 7

**E. PAY** (ALL RESPONDENTS GET ERNP, QWAGE, QWAGECON, ERNUOT, QPAY_4, QPAYSTUB, QDEADANY, QDOCUMENT)

**ERNP**   Now I have some questions about your earnings.

**ERNUOT**   Do you usually receive overtime pay, tips, or commissions at your [QMAIN] job? [SOURCE: CPS]

1.  YES
2.  NO
8.  DK (VOL)
9.  REF (VOL)

**QWAGE**   In the past 12 months, what was the TOTAL amount you received in wages, salary, commissions, bonuses, or tips on your [QMAIN] job, before taxes or other deductions?

ENTER DOLLAR AMOUNT. DO NOT ENTER CENTS. IF R GIVES CENTS, ROUND TO NEAREST DOLLAR.
[RANGE=1-9,999,999; 8=DK; 9=REF]

**QWAGECON**   INTERVIEWER: CONFIRM AMOUNT

[DISPLAY AMOUNG FROM QWAGE]
1.  Confirmed
2.  Go back and correct the value

PROGRAMMING NOTE: GO TO QPAY4

**\*QPAY_4**     Please tell me how you usually RECEIVE your pay from your [QMAIN] job. [SOURCE: New]

1.   By company/corporate check

2.   By personal check

3.   In cash

4.   ATM/Debit card

5.   Direct deposit

6.   Some other way (SPECIFY)

7.   BY CHECK (NOT SPECIFIED) (VOL) [IWER: PROBE FOR COMPANY/CORPORATE (CODE AS 1) OR PERSONAL (CODE AS 2)]

8.   DK (VOL)

9.   REF (VOL)

**\*QPAYSTUB**   Do you receive or have access to a pay stub or any document listing your pay and any deductions? [SOURCE: Adapted from Working Without Laws]

1.   YES

2.   NO

8.   DK (VOL)

9.   REF (VOL)

**QDEDSPEC**   Please tell me if each of the following items is deducted from your pay: [SOURCE: NEW]

1.   Taxes (federal, state, local)
2.   Social security and Medicare taxes also known as FICA
3.   Health insurance like medical, dental, vision, or disability
4.   Retirement plans like 401k, 403b, or other investment or savings plans
5.   Tools, uniforms, or equipment
6.   Anything else I did not already ask about? (SPECIFY)

1.   YES

    2.  NO

    8.  DK (VOL)

    9.  REF (VOL)

| PROGRAMMING NOTE: IF ALL QDEDSPEC_1-6=2 OR 98 THEN ASK QDEDCONF, ELSE SKIP TO QDOCUMENT |
| --- |

**\*QDEDCONF**  Just to confirm, you told me that at your [QMAIN] job, you have no deductions from your pay (ever).  Is that correct? [SOURCE: NEW]

    1. Yes, correct, no deductions

    2. No   [GO BACK TO QDEDSPEC]

    8. DK (VOL)

    9. REF (VOL)

| **QDOCUMENT.** Now I am going to ask you about the tax forms you get at your [QMAIN] job. |
| --- |
| [IF QMAINJOB_3<2015, DISPLAY " Did"; IF QMAINJOB_3=2015, DISPLAY "Will"] |
| [FOR a, c, e and f, display: [Did/Will] you receive a…?]<br><br>[FOR b and d, display: [Did/Will] you complete a…?] |
| [SOURCE: NEW] |

| | |
| --- | --- |
| a. W-2 | 1. YES |
| | 2. NO |
| | 7. I DON'T KNOW WHAT THAT FORM IS (VOL) |
| | 8.  I DON'T KNOW IF I GOT THAT FORM (VOL) |
| | 9. REF (VOL) |
| b. W-4 | 1. YES |

| | |
|---|---|
| | 2. NO |
| | 7. I DON'T KNOW WHAT THAT FORM IS (VOL) |
| | 8. I DON'T KNOW IF I GOT THAT FORM (VOL) |
| | 9. REF (VOL) |
| c. 1099 [IWER CONFIRM: This is only for your JOB, and not for other income earned, such as interest on a bank account.]<br><br>[IF NEC: A 1099 form is typically is given to an independent contractor as a record of the income received from a particular business. Other versions of the 1099 can be used to report different types of income, such as interest and dividends.] | 1. YES |
| | 2. NO |
| | 7. I DON'T KNOW WHAT THAT FORM IS (VOL) |
| | 8. I DON'T KNOW IF I GOT THAT FORM (VOL) |
| | 9. REF (VOL) |
| d. W-9 | 1. YES |
| | 2. NO |
| | 7. I DON'T KNOW WHAT THAT FORM IS (VOL) |
| | 8. I DON'T KNOW IF I GOT THAT FORM (VOL) |
| | 9. REF (VOL) |
| e. Schedule K-1<br><br>[IF NEC: The Schedule K-1 is a tax document issued for an investment in partnership interests. The purpose of the Schedule K-1 is to report your share of the partnership's income, deductions and credits.] | 1. YES |
| | 2. NO |
| | 7. I DON'T KNOW WHAT THAT FORM IS (VOL) |
| | 8. I DON'T KNOW IF I GOT THAT FORM |

|  | (VOL) |
|  | 9. REF (VOL) |
| f. Any other tax forms (SPECIFY) | 1. YES |
|  | 2. NO |
|  | 7. I DON'T KNOW WHAT THAT FORM IS (VOL) |
|  | 8. I DON'T KNOW IF I GOT THAT FORM (VOL) |
|  | 9. REF (VOL) |

TIMESTAMP 8

---

PROGRAMMING NOTE: GO TO CRITERIA FOR DETAILED CLASSIFICATION QUESTIONS.  GO TO BEHAV_INTRO IF POSSIBLY MISCLASSIFIED, OR KNOW_INTRO IF NOT POSSIBLY MISCLASSIFIED.

---

**CRITERIA FOR DETAILED CLASSIFICATION QUESTIONS (FOR POSSIBLY MISCLASSIFIED WORKERS; AS DEFINED BELOW)**

**[NOTE: THE FONT IS GREEN HERE, IS IN REFERENCE TO THE SURVEY "MAP" ARROW THAT INDICATES THE CONTINGENCY/PATHWAYS INTO THIS SECTION OF QUESTIONS]**

**RESPONDENTS WHO MEET THE FOLLOWING CRITERIA FOR "POSSIBLY MISCLASSIFIED" WILL GET THE DETAILED CLASSIFICATION QUESTIONS:**

A.     A respondent who reports that s/he is an **employee** and who is paid in cash, does not receive a paystub, has no deductions (no withholding), did not receive a W-2, or received BOTH a W-2 and 1099;

        EMPFLAG=1 AND [QPAY_4=3 OR QPAYSTUB>1 OR QDEDCONF=1 OR QDOCUMENT_a>1 OR [QDOCUMENT_a=1 and QDOCUMENT_c=1]]

B.     A respondent who reports being a **non-employee**;

        EMPFLAG=2

C.     A respondent who has an **undetermined** worker status by reporting conflicting information regarding his/her employee vs. non-employee status and did not receive a W-2 or received BOTH a W-2 and 1099.

        EMPFLAG=3 AND [[QDOCUMENT_a>1] OR [QDOCUMENT_a=1 and QDOCUMENT_c=1]]

To determine employee, non-employee, and undetermined, a new variable, EMPFLAG will be created.

| **Table 1.** EMPFLAG and Work Status | |
|---|---|
| EMPFLAG | Represents |
| 1 | EMPLOYEE |
| 2 | NON-EMPLOYEE |
| 3 | UNDETERMINED |

**FOR THE EXHAUSTIVE LIST OF SCENARIOS/COMBINATIONS OF RESPONSES THAT GENERATE EMPFLAG, REFER TO TABLE 2 AT THE END OF THE SURVEY.**

**IF ANY OF CONDITIONS A-C ARE MET, ASK PART III, ELSE SKIP TO PART IV, KNOWLEDGE.**

**PART III. DETAILED CLASSIFICATION QUESTIONS**

BEHAVE_INTRO     Now I have some questions about your usual activities or duties at this, your [QMAIN] job.

**A. BEHAVIORAL CONTROL**

QBEHAV1     On your [QMAIN] job, do you report directly to a manager, supervisor, foreman or someone else who regularly directs and controls HOW you do your work? [SOURCE: Adapted from Economic Realities Test]

1. YES
2. NO
8. DK (VOL)
9. REF (VOL)

QBEHAV1_A     (On your [QMAIN] job,) Do you determine your own schedule or the hours that you work? [SOURCE: Adapted from Economic Realities Test]

1. YES

2. NO
8. DK (VOL)
9. REF (VOL)

**QBEHAV1_B**   (On your [QMAIN] job,) Do you need approval for your schedule or hours worked?  [SOURCE: Adapted from Economic Realities Test]

1. YES
2. NO
8. DK (VOL)
9. REF (VOL)

**QBEHAV1_C**   (On your [QMAIN] job,) Do you need permission to leave your place of work, or can you come and go at will? [SOURCE: Adapted from Economic Realities Test]

1. NEED PERMISSION
2. CAN COME AND GO AT WILL/DO NOT NEED PERMISSION
3. IT DEPENDS
8. DK (VOL)
9. REF (VOL)

PROGRAMMING NOTE: IF QBEHAV1=1, 8 OR 9 ASK QBEHAV2, ELSE GO TO QBEHAV2_A

**QBEHAV2**   (On your [QMAIN] job,) How often does someone tell you how to perform your usual work activities and duties? [SOURCE: NEW]

1. Multiple times per day
2. Every day/shift
3. Every week
4. 2-3 times per week
5. Less frequently
6. Never
8. DK (VOL)
9. REF (VOL)

PROGRAMMING NOTE: IF QBEHAV2=6 ASK QBEHAV2_1, ELSE GO TO QBEHAV2_A

**QBEHAV2_1**   (On your [QMAIN] job,) How often COULD someone direct HOW you perform your work duties? [SOURCE: Adapted from Economics Realities Test]

1.    Multiple times per day
2.   Every day/shift
3.   Every week
4.   2-3 times per week
5.   Less frequently
6.   Never
8.   DK (VOL)
9.   REF (VOL)

**QBEHAV2_A**   (On your [QMAIN] job,) Are you required to wear a uniform including any specific type, style, or color of clothing?  [IF NECESSARY: A uniform includes clothing associated with a specific employer because of an emblem, logo, or distinctive color, and also may include any specific type and style of clothing that an employer requires its employees to wear at work, such as a tuxedo for a maitre d' or a blazer of a distinctive color for a salesperson.] [SOURCE: NEW]

1.   YES
2.   NO
8.   DK (VOL)
9.   REF (VOL)

**QBEHAV3**   (On your [QMAIN] job,) Are you required to perform your job duties in a specific location? [SOURCE: NEW]

1.    Yes, all job duties
2.    Yes, some duties
3.    No, not required to perform in a specific location
8.    DK (VOL)
9.    REF (VOL)

PROGRAMMING NOTE: IF QBEHAV3=1 OR 2 ASK QBEHAV3A, ELSE GO TO QBEHAV4

**QBEHAVE3A**   Does the NATURE OF YOUR WORK require that you provide these duties at a specific location? [IF NECESSARY: For example, a theatre actor may work in a specific location because the play shows in a certain theatre, or a home cleaning service works in a specific location because they clean in a client's home.]

1.   YES
2.   NO
8.   DK (VOL)
9.   REF (VOL)

**QBEHAV4**    Is there a job or procedures manual for the duties you perform that tells you HOW to perform the job? [SOURCE: NEW]

> 1.    YES
> 2.    NO
> 8.  DK (VOL)
> 9.  REF (VOL)

---

PROGRAMMING NOTE: IF QBEHAV4=1 ASK QBEHAV4A, ELSE GO TO QBEHAV5_A

---

**QBEHAV4A**    How closely would you say you are required to follow the manual?  Are you required to follow it very closely, somewhat closely, not very closely, or not at all?  Please give me your best estimate. [SOURCE: NEW]

[INTERVIEWER: PROBE FOR BEST ESTIMATE OF Somewhat closely OR Not very closely IF NECESSARY.]

> 1.    Very closely
> 2.    Somewhat closely
> 3.    Not very closely
> 4.    Do not follow it at all
> 8.  DK (VOL)
> 9.  REF (VOL)

**QBEHAV5_A**    Has your [QMAIN] job provided you with any training? [SOURCE: NEW]

> 1.  YES
> 2.  NO
> 8.  DK (VOL)
> 9.  REF (VOL)

**QBEHAV5_B**    Did you need to have any specialized education or training, apprenticeships, or certification to get your [QMAIN] job? [SOURCE: NEW]

> 1.  YES
> 2.  NO
> 8.  DK (VOL)
> 9.  REF (VOL)

**TIMESTAMP 9**

**B. FINANCIAL RELATIONSHIP**

QFINAN1    On your [QMAIN] job, how much of your own money do you spend each year, on average, on tools, equipment, computers, or other materials you use for your work? [SOURCE: Adapted from ABC test]

       1.    More than $10,000
       2.    Between $1,000 and $10,000
       3.    Under $1,000, or
       4.    None (You have not spent money on materials for your work)
       8.  DK (VOL)
       9.    REF (VOL)

| PROGRAMMING NOTE: IF QFINAN1=1, 2, 8, OR 9 THEN ASK QFINAN1A, ELSE GO TO QFINAN3 |
| --- |

QFINAN1A    Are you required to purchase or lease SPECIFIC TOOLS OR EQUIPMENT or do you decide what to buy? [IF NECESSARY: Please think about your [QMAIN] job.] [SOURCE: NEW]

       1.        Required to buy specific tools or equipment
       2.        I decide what to buy
       3.        Both/Depends
       8.  DK (VOL)
      9.  REF (VOL)

QFINAN1B    Are you required to purchase or lease tools or equipment FROM A SPECIFIC SOURCE or do you decide where to buy them? [IF NECESSARY: Please think about your [QMAIN] job.] [SOURCE: NEW]

       1.    Required to buy from a specific source
       2.    I decide where to buy
       3.    Both/Depends
       8.    DK (VOL)
       9.  REF (VOL)

QFINAN3    On your [QMAIN] job, have you ever invested your own money where you work to support the day-to-day operations? [IF NECESSARY: Examples include purchasing equipment, renting space, or advertising?] [SOURCE: Adapted from Economic Realities Test]

     1.     YES
     2.     NO
     8.     DK (VOL)
     9.     REF (VOL)

**QFINAN4**     At your [QMAIN] job, can you … ? [SOURCE: Adapted from Economic Realities Test]

     a. hire additional workers?
     b. change the way the business is run?

     1.     YES
     2.     NO
     3     IT DEPENDS
     8.     DK (VOL)
     9.     REF (VOL)

**QFINAN5**     [IF QEMPLOYER=1 OR 3 THEN INSERT "organization" ELSE INSERT "company"] In the event that the [INSERT] where you work loses money, would you continue to earn your wage for the work you perform? [SOURCE: Adapted from ABC test]

     1.     YES
     2.     NO
     8.     DK (VOL)
     9.     REF (VOL)

**TIMESTAMP 10**

**C. EMPLOYMENT RELATIONSHIP**

**QRELATE1**     Besides your main job, do you perform similar paid work for others [IF NECESSARY: other companies or businesses]? [SOURCE: Adapted from SS-8 IRS]

     1.     YES
     2.     NO
     8.     DK (VOL)
     9.     REF (VOL)

| PROGRAMMING NOTE: IF QRELAT1=1, ASK QRELAT2, ELSE GO TO QRELAT3 |
| --- |

**QRELATE2**    Are you required to get approval from your [QMAIN] job in order to provide these duties and activities for others? [SOURCE: Adapted from SS-8 IRS]

    1.   YES
    2.   NO
    8.   DK (VOL)
    9.   REF (VOL)

**QRELATE3**    Do you use your own funds to advertise your services, with a website, flyers, newspapers, business cards or any other way? [SOURCE: Adapted from SS-8 IRS]

    1.   YES
    2.   NO
    8.   DK (VOL)
    9.   REF (VOL)

---

PROGRAMMING NOTE: ASK QINTEGRAL AND QINTEGRAL2 ONLY IF EMPFLAG=2 OR 3, ELSE GO TO KNOW_INTRO

---

**QINTEGRAL**    Are the duties you perform on your [QMAIN] job a part of the regular services or operations of the company where you work? [IF NECESSARY: Is the work you do the same as the work the company does for its customers?] [SOURCE: Adapted from ABC Test]

    1.   YES
    2.   NO
    8.   DK (VOL)
    9.   REF (VOL)

**QINTEGRAL2**    You have indicated that you are either NOT an EMPLOYEE or NOT SURE if you are an EMPLOYEE. Are there any workers at your [QMAIN] job who are called "employees" and perform the same work duties that you do?  [IF NECESSARY: Please provide your best estimate.]  [INTERVIEWER: EMPHASIZE "EMPLOYEES"] [SOURCE: Adapted from Economic Realities Test]

    1.   Yes, there are employees performing your same work duties [INTERVIEWER: CONFIRM: These people are "EMPLOYEES"]
    2.   No, there are not employees performing your same work duties
    3.   Other (SPECIFY)
    4.   DOES NOT APPLY TO ME (VOL)

5.    RESPONDENT SAYS S/HE IS AN EMPLOYEE (VOL)

8.    DK (VOL)

9.    REF (VOL)

**TIMESTAMP 11**

**PART IV.    KNOWLEDGE (ALL RESPONDENTS)**

**KNOW_INTRO**    We're interested in finding out how much people know about working for an employer, or being an EMPLOYEE, compared to working for themselves, or being SELF-EMPLOYED. I'm going to ask you a few questions, but if you don't know the answer, that's o.k., you can reply "don't know".

**Appendix B: Worker Classification Survey**

| | **_A.** To your knowledge, is your [QMAIN] job covered by… QCOVER_X? [SOURCE: NEW] | [PROG NOTE: IF EMPFLAG=2, INSERT "an employee"; IF EMPFLAG=1, INSERT "self-employed"; IF EMPFLAG=3 THEN SKIP AND ASK ALL _C INSTEAD OF _B, FOR QCOVER_MW – QCOVER_OS] **_B.** Would your [QCOVER] coverage change if you became [self-employed/an employee]? [INSERT FOR QCOVER: MW. minimum wage OT. overtime pay UI. unemployment insurance WC. workers' compensation OS. OSHA safety standards] | **_C.** Under what conditions would your [QCOVER] coverage change? [INSERT FOR QCOVER: MW. minimum wage OT. overtime pay UI. unemployment insurance WC. workers' compensation OS. OSHA safety standards] [INTERVIEWER: DO NOT READ RESPONSES] |
|---|---|---|---|
| **QCOVER_MW_A-B/C** 1. Minimum Wage Requirements | $\square_1$ YES [GO TO _B] $\square_2$ NO [GO TO _B] $\square_8$ DK [GO TO QCOVER_OT_A] $\square_9$ REF[GO TO QCOVER_OT_A] | $\square_1$ YES [GO TO QCOVER_OT_A] $\square_2$ NO [GO TO _ QCOVER_OT_A] $\square_3$ RESPONDENT SAYS S/HE IS SELF-EMPLOYED OR AN EMPLOYEE (VOL) [SEE PROG NOTE BELOW] $\square_8$ DK [GO TO _ QCOVER_OT_A] $\square_9$ REF [GO TO QCOVER_OT_A] | $\square_1$ IF YOU BECAME AN EMPLOYEE $\square_2$ IF YOU BECAME SELF-EMPLOYED $\square_3$ IF YOUR WORKER STATUS CHANGED (UNSPECIFIED) $\square_4$ OTHER REASON (SPECIFY) $\square_5$ NONE $\square_8$ DK $\square_9$ REF [GO TO QCOVER_OT_A] |
| [PROGRAMMING NOTE: IF QCOVER_MW_B=3 THEN ASK QCOVER_MW_C (ELSE GO TO QCOVER_OT_A).  GOING | | | |

[PROGRAMMING NOTE: IF QCOVER_MW_B=3 THEN ASK QCOVER_MW_C (ELSE GO TO QCOVER_OT_A).  GOING FORWARD ASK _C QUESTIONS INSTEAD OF _B, FOR QCOVER_OT – QCOVER_SK].

[INTERVIEWER: DO NOT READ RESPONSES]

**QCOVER_OT_A-B/C**

2. Overtime pay for hours you work beyond forty hours in one week

□$_1$ YES [GO TO _B]

□$_2$ NO [GO TO _B]

□$_8$ DK [GO TO QCOVER_UI_A]

□$_9$ REF[GO TO QCOVER_UI_A]

□$_1$ YES

□$_2$ NO

□$_3$ RESPONDENT SAYS S/HE IS SELF-EMPLOYED OR AN EMPLOYEE (VOL) [SEE PROG NOTE BELOW]□$_8$ DK

□$_9$ REF

[GO TO QCOVER_UI_A]

□$_1$ IF YOU BECAME AN EMPLOYEE

□$_2$ IF YOU BECAME SELF-EMPLOYED

□$_3$ IF YOUR WORKER STATUS CHANGED (UNSPECIFIED)

□$_4$ OTHER REASON (SPECIFY)

□$_5$ NONE

□$_8$ DK

□$_9$ REF

[GO TO QCOVER_UI_A]

[PROGRAMMING NOTE: IF QCOVER_OT_B=3 THEN ASK QCOVER_OT_C (ELSE GO TO QCOVER_UI_A). GOING FORWARD ASK _C QUESTIONS INSTEAD OF _B, FOR QCOVER_UI – QCOVER_SK].

[INTERVIEWER: DO NOT READ RESPONSES]

**QCOVER_UI_A-B/C**

3. Unemployment Insurance (IF NECESSARY: *A federal program whereby eligible unemployed persons receive cash benefits for a specified period of time. These benefits are paid out of funds derived from employer, employee and government contributions.*)

☐₁ YES [GO TO _B]

☐₂ NO [GO TO _B]

☐₈ DK [GO TO QCOVER_WC_A]

☐₉ REF [GO TO QCOVER_WC_A]

☐₁ YES

☐₂ NO

☐₃ RESPONDENT SAYS S/HE IS SELF-EMPLOYED OR AN EMPLOYEE (VOL) [SEE PROG NOTE BELOW]☐₈ DK

☐₉ REF

[GO TO QCOVER_WC_A]

☐₁ IF YOU BECAME AN EMPLOYEE

☐₂ IF YOU BECAME SELF-EMPLOYED

☐₃ IF YOUR WORKER STATUS CHANGED (UNSPECIFIED)

☐₄ OTHER REASON (SPECIFY)

☐₅ NONE

☐₈ DK

☐₉ REF

[GO TO QCOVER_WC_A]

[PROGRAMMING NOTE: IF QCOVER_UI_B=3 THEN ASK QCOVER_UI_C (ELSE GO TO QCOVER_WC_A). GOING FORWARD ASK _C QUESTIONS INSTEAD OF _B, FOR QCOVER_WC – QCOVER_SK].

[INTERVIEWER: DO NOT READ RESPONSES]

**QCOVER_WC_A-B/C**

4. Workers' Compensation (IF NECESSARY: insurance paid by companies to provide benefits to employees who become ill or injured on the job.)

☐₁ YES [GO TO _B]

☐₂ NO [GO TO _B]

☐₈ DK [GO TO QCOVER_OS_A]

☐₉ REF [GO TO QCOVER_OS_A]

☐₁ YES

☐₂ NO

☐₃ RESPONDENT SAYS S/HE IS SELF-EMPLOYED OR AN EMPLOYEE (VOL) [SEE PROG NOTE BELOW]☐₈ DK

☐₉ REF

[GO TO QCOVER_OS_A]

☐₁ IF YOU BECAME AN EMPLOYEE

☐₂ IF YOU BECAME SELF-EMPLOYED

☐₃ IF YOUR WORKER STATUS CHANGED (UNSPECIFIED)

☐₄ OTHER REASON (SPECIFY)

☐₅ NONE

☐₈ DK

☐₉ REF

[GO TO QCOVER_OS_A]

**Appendix B: Worker Classification Survey**

[PROGRAMMING NOTE: IF QCOVER_WC_B=3 THEN ASK QCOVER_WC_C (ELSE GO TO QCOVER_OS_A).  GOING FORWARD ASK _C QUESTIONS INSTEAD OF _B, FOR QCOVER_OS – QCOVER_SK].

**QCOVER_OS_A-B/C**

[INTERVIEWER: DO NOT READ RESPONSES]

5. OSHA safety standards (IF NECESSARY: OSHA refers to the Occupational Health and Safety Act of 1970. OSHA standards limit the amount of hazardous chemicals workers can be exposed to, require the use of certain safe practices and equipment, and require employers to monitor hazards and keep records of workplace injuries and illnesses.)

☐1 YES [GO TO _B]

☐2 NO [GO TO _B]

☐8 DK [GO TO QCOVER_SK_A]

☐9 REF [GO TO QCOVER_SK_A]

☐1 YES

☐2 NO

☐3 RESPONDENT SAYS S/HE IS SELF-EMPLOYED OR AN EMPLOYEE (VOL) [SEE PROG NOTE BELOW]

☐8 DK

☐9 REF

[GO TO QCOVER_SK_A]

☐1 IF YOU BECAME AN EMPLOYEE

☐2 IF YOU BECAME SELF-EMPLOYED

☐3 IF YOUR WORKER STATUS CHANGED (UNSPECIFIED)

☐4 OTHER REASON (SPECIFY)

☐5 NONE

☐8 DK

☐9 REF

[GO TO QCOVER_SK_A]

[PROGRAMMING NOTE: IF QCOVER_OS_B=3 THEN ASK QCOVER_OS_C (ELSE GO TO QCOVER_SK_A).  ASK _C QUESTIONS INSTEAD OF _B, FOR QCOVER_SK].

**QCOVER_SK_A-B/C**

_A. If you take time off from your [QMAIN] job for family or medical leave, is your job guaranteed when you return? [SOURCE: NEW]

[PROG NOTE: IF EMPFLAG=2, INSERT "an employee"; IF EMPFLAG=1, INSERT "self-employed" ; IF EMPFLAG=3 THEN SKIP TO  QCOVER_SK_C]

_B. Would this change if you became [self-employed/an employee]?

[PROG NOTE: IF QCOVER_SK_A=1 THEN INSERT "would not"; IF QCOVER_SK_A=2 THEN INSERT "would"]

_C. Under what condition would this change? [IF NEC: Is there any condition where your job [would/would not] be guaranteed if you took time off for family or medical leave?]

[INTERVIEWER: DO NOT READ RESPONSES]

☐₁ YES [GO TO _B]

☐₂ NO [GO TO _B]

☐₈ DK [GO TO QCOVER_WHY_XX]

☐₉ REF [GO TO QCOVER_WHY_XX]

☐₁ YES

☐₂ NO

☐₃ RESPONDENT SAYS S/HE IS SELF-EMPLOYED OR AN EMPLOYEE (VOL)

☐₈ DK

☐₉ REF

[GO TO QCOVER_WHY_XX]

☐₁ IF YOU BECAME AN EMPLOYEE

☐₂ IF YOU BECAME SELF-EMPLOYED

☐₃ IF YOUR WORKER STATUS CHANGED (UNSPECIFIED)

☐₄ OTHER REASON (SPECIFY)

☐₅ NONE

☐₈ DK

☐₉ REF

[GO TO QCOVER_WHY_XX]

---

PROGRAMMING NOTE: FOR EACH QCOVER_XX_A=2, ASK QCOVER_WHY_XX. INSERT FOR EACH:

MW. minimum wage

OT. overtime pay

UI. unemployment insurance

WC. workers' compensation

OS. OSHA safety standards

SK. family and medical leave

IF NO QCOVER_XX_A=2 THEN SKIP TO QCOVER_SS_A.


IF QCOVER_WHY_XX=1 THEN ASK QREASON_XX IMMEDIATELY AFTER QCOVER_WHY_XX.  THEN GO BACK TO QCOVER_WHY_XX FOR NEXT COVERAGE.  IF QCOVER_WHY_XX NE 1 THEN ASK QCOVER_WHY_XX FOR NEXT COVERAGE. WHEN DONE, GO TO QCOVER_SS_A.

---

**QCOVER_WHY_XX**        You said your [QMAIN] job is not covered by [INSERT]. Do you know why not? [SOURCE: New]

1.    YES
2.    NO
9.    REF (VOL)

**QREASON_XX**    Why not? [IF NECESSARY: Why is your job not covered by this] [SOURCE: New]

1.    **[INTERVIEWER: DO NOT READ RESPONSES]**HAVE NOT WORKED ENOUGH HOURS
2.    HAVE NOT WORKED AT ORGANIZATION FOR LONG ENOUGH
3.    NOT AN EMPLOYEE/SELF-EMPLOYED
4.    SALARIED/EXEMPT EMPLOYEE
5.    OTHER REASON (SPECIFY)
8.    DK
9.    REF

| | | | |
|---|---|---|---|
| **QCOVER_SS_A-C/D** | [PROG NOTE: IF QDEDSPEC_2=1 THEN SKIP TO _B]<br><br>**_A.** Do you contribute to social security and Medicare tax otherwise known as FICA? [SOURCE: NEW] | **_B.** How much of your gross pay OR what percentage, of your gross pay, do you contribute to FICA? [IF NECESSARY: FICA includes social security and Medicare tax] | [PROG NOTE: IF EMPFLAG=2, INSERT "employed"; IF EMPFLAG=1, INSERT "self-employed"; IF EMPFLAG=3 OR IF ANY QCOVER_XX_B=3 THEN SKIP AND ASK QCOVER_SS_D]<br><br>**_C.** If you became [employed/self-employed] how would your share of the FICA contribution change? | [ONLY ASK IF EMPFLAG=3 OR IF ANY QCOVER_XX_B=3, ELSE GO TO QAGREE. PROG NOTE: IF QCOVER_SS_A=1 THEN INSERT "would not"; IF QCOVER_SS_A=2 THEN INSERT "would"]<br><br>**_D.** Under what condition would this change? [IF NEC: Is there any condition where your FICA contribution [would/would not] change?]<br><br>[INTERVIEWER: DO NOT READ RESPONSES] |

Appendix B: Worker Classification Survey

$_____$

☐₁ YES [GO TO QCOVER_SS_B]

(Range 1-99999, 99998=DK, 99999=REF)

☐₁ IF YOU BECAME AN EMPLOYEE

☐₂ NO [GO TO PROG NOTE BEFORE QCOVER_SS_C]

☐₁ My share would go up

☐₂ IF YOU BECAME SELF-EMPLOYED

☐₂ My share would go down

☐₃ IF YOUR WORKER STATUS CHANGED (UNSPECIFIED)

☐₈ DK [GO TO PROG NOTE BEFORE QAGREE]

OR

☐₃ No change

☐₄ OTHER REASON (SPECIFY)

☐₉ REF [GO TO PROG NOTE QAGREE]

☐₈ DK

☐₉ REF

$_____$%

(Range 1-100, 998=DK, 999=REF)

[GO TO _C]

☐₅ NONE

☐₈ DK

☐₉ REF

---

PROGRAMMING NOTE: IF EMPFLAG=3 THEN SKIP TO QTHINK. IF ANY QCOVER_XX_B=3 THEN SKIP TO QAGREE_2; ELSE ASK QAGREE.  IF EMPFLAG=1 THEN INSERT "an employee", "self-employed". IF EMPFLAG=2 THEN INSERT "self-employed", "an employee".

---

**QAGREE.**   Earlier you indicated that you are [an employee/self-employed].  Do you agree with this classification or do you think that legally, you should be [self-employed/an employee]? [SOURCE: NEW]

1. You agree with this classification
2. You think you should be classified differently
8. DK (VOL)
9. REF (VOL)

[GO TO QDEMO_INTRO]

---

PROGRAMMING NOTE: IF QCOVER_MW_B=3 THEN ASK QAGREE_2.  IF EMPFLAG=1 THEN INSERT "self-employed", "an employee". IF EMPFLAG=2 THEN INSERT "an employee", "self-employed".

---

**QAGREE_2.**   Just to confirm, you have indicated that you are [self-employed/an employee].  Do you agree with this classification or do you think that legally, you should be [an employee/self-employed]? [SOURCE: NEW]

1.  You agree with this classification
2.  You think you should be classified differently
8.  DK (VOL)
9.  REF (VOL)


[GO TO QDEMO_INTRO]

---

PROGRAMMING NOTE: IF EMPFLAG=3 THEN ASK QTHINK, ELSE GO TO QDEMO_INTRO.

---

**QTHINK**.     Based on your responses to earlier questions, we are unable to determine if you are considered an employee or self-employed.  What do you think your legal worker status should be?  Should it be…? [SOURCE: NEW]

1.  Self-employed
2.  Employee
3.  Or, something else (SPECIFY)
8.  DK (VOL)
9.  REF (VOL)


**TIMESTAMP 12**


**PART V.  DEMOGRAPHICS (ALL RESPONDENTS)**


**A. STANDARD DEMOGRAPHICS**


**QDEMO_INTRO**Now we have a few questions to help us better understand your responses.


**QEDUCATION_1**     What is the highest level of school you have completed or the highest degree you have received? [SOURCE: CPS]

1.  LESS THAN 1ST GRADE

2.  1ST, 2ND, 3RD OR 4TH GRADE

3.  5TH OR 6TH GRADE

4.  7TH OR 8TH GRADE

5.  9TH GRADE

6.   10TH GRADE

7.   11TH GRADE

8.   12TH GRADE NO DIPLOMA

9.   HIGH SCHOOL GRAD-DIPLOMA OR EQUIV (GED)

10. SOME COLLEGE BUT NO DEGREE

11. ASSOCIATE DEGREE-OCCUPATIONAL/VOCATIONAL

12. ASSOCIATE DEGREE-ACADEMIC PROGRAM

13. BACHELOR'S DEGREE (EX: BA, AB, BS)

14. MASTER'S DEGREE (EX: MA, MS, Meng, MEd, MSW)

15. PROFESSIONAL SCHOOL DEG (EX: MD, DDS, DVM)

16. DOCTORATE DEGREE (EX: PhD, EdD)

98. DK (VOL)

99. REF (VOL)

**QEDUCATION_2**        Last week, were you enrolled in a high school, college, university, or vocational/technical school? [SOURCE: Adapted from CPS]

[CODE YES IF CURRENTLY ON HOLIDAY OR SEASONAL VACATION, CODE NO FOR SUMMER VACATION]

1.   Yes, high school

2.   Yes, college

3.   Yes, university

4.   Yes, vocational/technical school

5.   Yes, other schooling (SPECIFY)

6.   No, not enrolled

7.   No, for summer vacation

98. DK (VOL)

99. REF (VOL)

If DMARANK=1 ASK EX_LGBT1 ELSE ASK EX_LGBT2.

**EX_LGBT1.**   Do you think of yourself as one, [INSERT1], two, [INSERT2], or three, Bisexual?
INSERT1= [For men/QGENDER=1:] Gay / [For women/QGENDER=2:] Lesbian or gay
INSERT2= [For men/QGENDER=1:] Straight, that is, not gay / [For women/QGENDER=2:] Straight, that is, not lesbian or gay

[IWER: DO NOT READ RESPONSE OPTIONS]

1.        One
2.        Two
3.        Three
4.        Gay/ Lesbian or gay
5.        Straight, that is, not gay/ Straight, that is, not lesbian or gay, or
6.        Bisexual?
7.        SOMETHING ELSE (VOL)
8.        DK (VOL)
9.        REF (VOL)

If DMARANK=2 ASK EX_LGBT2.

**EX_LGBT2.**   Do you think of yourself as [INSERT1], [INSERT2], or Bisexual?
INSERT1= [For men/QGENDER=1:] Gay / [For women/QGENDER=2:] Lesbian or gay
INSERT2= [For men/QGENDER=1:] Straight, that is, not gay / [For women/QGENDER=2:] Straight, that is, not lesbian or gay

[KEEP VALUES CONSISTENT WITH EX_LGBT1 BUT DO NOT DISPLAY 1, 2, 3.]
4.        Gay/ Lesbian or gay
5.        Straight, that is, not gay/ Straight, that is, not lesbian or gay, or
6.        Bisexual?
7.        SOMETHING ELSE (VOL)
8.        DK (VOL)
9.        REF (VOL)

**QMARITAL**   Are you currently... [SOURCE: FMLA SURVEY]

1.   Married,

2.   Living with a partner,

3.   Separated,

4.   Divorced,

5.   Widowed, or

6.   Never married?

8.   DK (VOL)

9.   REF (VOL)

**QAGE**          What is your age? _____ [RANGE: 18-99, REF=99]  [SOURCE: NHIS]

**QINCOME**    What is the total combined income of all members of your FAMILY during the past 12 months? This includes money from jobs, net income from business, farm or rent, pensions, dividends, interest, social security payments and any other money income received by members of your family who are 15 years of age or older.  [SOURCE: CPS]

1. GAVE ANSWER $_____ [MIN RANGE =1, MAX RANGE= 9,999,999]
8. DK (VOL)
9. REF (VOL)

| PROGRAMMING NOTE: ASK QINC_A IF QINCOME=DK OR REF, ELSE GO TO QPASTWEEK |
| --- |

**QINC_A** Was your family income $35,000 or above?
1.   YES
2.   NO  [GO TO QINC_F]
8. DK      [GO TOQPASTWEEK]
9. REF    [GO TOQPASTWEEK]

**QINC_B** Was it $40,000 or above?
1.   YES
2.   NO  [GO TOQPASTWEEK]
8.   DK  [GO TOQPASTWEEK]
9.   REF [GO TOQPASTWEEK]

**QINC_C** Was it $50,000 or above?
1.   YES
2.   NO  [GO TOQPASTWEEK]
8.   DK  [GO TOQPASTWEEK]
9.   REF [GO TOQPASTWEEK]

**QINC_D** Was it $75,000 or above?
1.   YES
2.   NO  [GO TOQPASTWEEK]
8.   DK  [GO TOQPASTWEEK]
9.   REF [GO TOQPASTWEEK]

**QINC_E** Was it $100,000 or above?
1. YES [GO TOQPASTWEEK]
2. NO [GO TOQPASTWEEK]
8. DK [GO TOQPASTWEEK]
9. REF [GO TOQPASTWEEK]

**QINC_F** Was it $30,000 or above?
1. YES [GO TOQPASTWEEK]
2. NO
8. DK [GO TOQPASTWEEK]
9. REF [GO TOQPASTWEEK]

**QINC_G**    Was it $20,000 or above?
1. YES [GO TOQPASTWEEK]
2. NO
8. DK [GO TOQPASTWEEK]
9. REF [GO TOQPASTWEEK]

**QINC_H** Was it $10,000 or above?
1. YES [GO TOQPASTWEEK]
2. NO
8. DK [GO TOQPASTWEEK]
9. REF [GO TOQPASTWEEK]

**QINC_J**    Was it $5,000 or above?
1. YES [GO TOQPASTWEEK]
2. NO [GO TOQPASTWEEK]
8. DK [GO TOQPASTWEEK]
9. REF [GO TOQPASTWEEK]

**QPASTWEEK**    In the PAST WEEK, did you work for pay or profit? [IF NECESSARY: This includes any job from which you were temporarily absent.] [SOURCE: NEW]

1. YES
2. NO
8. DK (VOL)
9. REF (VOL)

**QUNION**    Are you a member of a labor union? [SOURCE: NEW]

1. YES
2. NO

8. DK (VOL)
9. REF (VOL)

**QHISPANIC**    Do you consider yourself to be Hispanic or [Latino/Latina]? [IF NECESSARY: A person of Cuban, Mexican, Puerto Rican, South or Central American, or other Spanish culture or origin, regardless of race.]  [SOURCE: FMLA SURVEY]

1. YES
2. NO
8. DK (VOL)
9. REF (VOL)

**QRACE**    What race do you consider yourself to be? Please select one or more of the following. [SOURCE: FMLA SURVEY]

1.  American Indian or Alaska Native

2.  Asian

3.  Native Hawaiian or Pacific Islander

4.  Black or African American

5.  White

6.  SOME OTHER RACE (VOL) _____

8.  DK (VOL)

9.  REF (VOL)

**TIMESTAMP 13**

**B. ENGLISH PROFICIENCY**

| PROGRAMMING NOTE: FOR QL, INSERT ENGLISH/SPANISH BASED ON SAMPLE VARIABLE |
| --- |

**QL**    Now we have some questions about languages you speak.  Is [English/Spanish] your native language? [SOURCE: NEW IMMIGRANT SURVEY]

  1. YES
  2. NO
  8. DK (VOL)
  9. REF(VOL)

PROGRAMMING NOTE: IF QL=1 GO TO INTRO_T, ELSE CONTINUE

**QL_2**    How well would you say you UNDERSTAND English when someone is speaking to you?
        Would you say you understand English very well, somewhat well, not well or not at all?
        [SOURCE: NEW IMMIGRANT SURVEY]

  1. Very well
  2. Somewhat well
  3. Not well
  4. Not at all
  8. DK (VOL)
  9. REF (VOL)

**QL_3**    How well would you say you SPEAK English? Would you say…? [SOURCE: NEW
        IMMIGRANT SURVEY]

  1. Very well
  2. Somewhat well
  3. Not well
  4. Not at all
  8. DK (VOL)
  9. REF (VOL)

**QL_4**    How well would you say you READ English? Would you say…? [SOURCE: NEW
        IMMIGRANT SURVEY]

  1. Very well
  2. Somewhat well
  3. Not well
  4. Not at all
  8. DK (VOL)
  9. REF (VOL)

**TIMESTAMP 14**

**C. TELEPHONE USAGE**

**INTRO_T**  We're almost done. Now we just have a few quick questions about telephone use in your household. These items will be used for statistical purposes to make sure that all households in the country are represented in this study.

---

PROGRAMMING NOTE: ASK T1 IF LANDLINE SAMPLE

---

**T1**  Now thinking about your telephone use, do you have a working cell phone? [SOURCE: NHIS]

    1.  YES, HAVE CELL PHONE

    2.  NO, DO NOT HAVE CELL PHONE

    9.  DK/REF (VOL)

---

PROGRAMMING NOTE: ASK T2 IF T1=1 OR CELL SAMPLE

---

**T2**  [Including this one,] How many working cell phones do YOU personally have? [SOURCE: NHIS]

    (1-6).  RECORD NUMBER [ENTER 6 IF 6 OR GREATER]

    9.  DK/REF (VOL)

---

PROGRAMMING NOTE: ASK T3 IF S5 > 1 (2+ ADULT HOUSEHOLD)

---

**T3**  Thinking about the other adults in your household, how many working cell phones in total do THEY have? [SOURCE: NHIS] [IF NECESSARY: Do not count your cell phone(s).]

    (0-6).  RECORD NUMBER [ENTER 6 IF 6 OR GREATER]

    9.  DK/REF (VOL)

---

PROGRAMMING NOTE: ASK T4 IF CELL PHONE SAMPLE

---

**T4**     Is a cell phone your ONLY phone, or do you also have a regular landline telephone at home?
[SOURCE: NHIS]

    1.   CELL PHONE IS ONLY PHONE

    2.   HAVE LANDLINE TELEPHONE AT HOME

    9.   DK/REF (VOL)

---

PROGRAMMING NOTE: ASK T5 IF LANDLINE SAMPLE OR T4=2

---

**T5**     [Including this number,] How many different residential phone NUMBERS do you have coming into your household, not including lines dedicated to a fax machine, modem, or used strictly for business purposes? Do not include cellular phones. [SOURCE: NHIS]

    (1-6).   RECORD NUMBER [ENTER 6 IF 6 OR GREATER]

    9.   DK/REF (VOL)

---

PROGRAMMING NOTE: IF LANDLINE SAMPLE: ASK IF T1=1 OR T3=1-6; IF CELL SAMPLE: ASK IF T4=2

---

**T6**     Of all the telephone calls that you [IF S5 > 1 (2+ ADULT HOUSEHOLD): or your family] receive, are: [SOURCE: NHIS]

    1.     All or almost all calls received on cell phones,

    2.     Some received on cell phones and some on regular phones, or

    3.     Very few or none on cell phones?

    9.   DK/REF (VOL)

**QPRESENT**     Were others present while you completed this survey? [IF NECESSARY: Did any other people hear the answers you gave?]

1.  YES
2.  NO
3.  SOMETIMES/OTHERS PRESENT FOR PART OF SURVEY
8.  DK (VOL)
9.  REF (VOL)

**QZIP**  Finally, so that we can group households geographically, may I have your zip code?
[SOURCE: FMLA SURVEY]

RANGE:   00000-99999
999998   DK (VOL)
999999   REF (VOL)

**TIMESTAMP 15**

| PROGRAMMING NOTE: IF CELL SAMPLE ASK QINCENTIVE; IF LANDLINE, GO TO QEND |
| --- |

**QINCENT:** Can I please have your full name and address so I can send you your check?

1       YES     [GO TO QINCENT2]
2       NO      [GO TO QEND]

**QINCENT2.**  ENTER**:**
NAME [ASK FOR SPELLING IF UNSURE]
ADDRESS
CITY/STATE/ZIP
[RE-READ ALL TO CONFIRM]

**QEND**  Thank you very much for your time. If you have any questions or would like further
information about this study, you can call the Worker Classification Study hotline at
(1-866-299-6153) during normal business hours. [SOURCE: FMLA SURVEY]

[FOR INTERVIEWER USE ONLY:]
LANGUAGE OF INTERVIEW:
1.  ENGLISH
2.  SPANISH

## Appendix C: Interview Guides

### C.1    Employer Qualitative Interview Protocol

**Introduction and Informed Consent**

Thank you for agreeing to participate in this research. This project is funded by the U.S. Department of Labor, and under contract with Abt Associates. As we mentioned in the letter we sent you, the purpose of this research is to explore employer knowledge, attitudes, and practices around classifying workers as employees or independent contractors.

Before we begin, I would like to inform you of your rights as a participant in this research.

- Your participation in this research is entirely voluntary. You are free to skip or refuse any question and end the interview at any time. The interview will take no longer than one hour to complete.

- I want to reassure you that we will keep the information you give us private. No one knows that you are taking part in this interview. Your name or the name of your company/organization is not written on this interview. Your name or the name of your company/organization will not appear in the report we write summarizing these interviews.

- The risks involved in participating in this interview are minimal, no more than those you would ordinarily encounter in daily life.

- Your participation will not affect your relationship with the U.S. Department of Labor.

Do you have any questions before you begin?

*[Record questions]*

Can we begin?

Recent research shows a shift away from long-term employees towards other kinds of work arrangements. For example, some companies are using short-term or "term" employees, using temporary work agencies or employee leasing agencies, independent contractors, part-time workers, seasonal workers.

What types of staffing changes have you noticed in the industries you represent? (if necessary: long-term versus short-term/temporary or consultants)

1) *Where* (in what context) do you see these changes taking place?

   a) In which industry?

   b) With firms of different sizes or scopes?

2) What is replacing long-term employment?

   a) For which types of positions?

3) Why do you think there has been a shift? Why isn't this happening at a (faster/broader) pace?

   a) What are the advantages of moving away from long-term employees?

      i) Worker training?

    ii)  Worker supervision?

    iii)  Worker motivation or performance?

    iv)  Work site cooperation/relations with permanent workers?

    v)  Competition from other firms who are moving to using contractors or other labor arrangements?

  b)  Are there any cost disadvantages to using contractors versus employees?

    i)  Are there any quality issues related to using contractors? Control over work product or schedule, deliverables?

  c)  What do WORKERS prefer?

    i)  When?

    ii)  When not?

    iii)  What types of workers are more amenable to employee versus other types of status?

4)  How do firms make the decision to change from hiring full-time workers to other kinds of staff?

  a)  Who in the firm is involved?

  b)  What factors do they consider? Which factors are most important?

5)  Do you expect these changes to continue? Accelerate? Be rolled back?

  a)  Why?

  b)  What factors will influence what happens in the future?

6)  What types of enforcement experiences do companies you represent experience?

7)  I'd like to read you a quote from a website and get your reactions to it: "Now, more than ever, employers must have programs in place to ensure the validity of their classification of workers as independent contractors or as exempt from overtime, and must have a clear strategy for handling government audits and enforcement actions."

  a)  First I'd like to ask your opinions about what is meant by "programs in place." Do you have such programs? How do they work?

  b)  Are they necessary for your firm? If not, why not?

  c)  Where can you go to get help with this?

  d)  Why "now more than ever?"

## C.2    Employer Representative Qualitative Interview Protocol

### Introduction and Informed Consent

Thank you for agreeing to participate in this research. This project is funded by the U.S. Department of Labor, and under contract with Abt Associates. As we mentioned in the letter we sent you, the purpose of this research is to explore employer knowledge, attitudes, and practices around classifying workers as employees or independent contractors.

Before we begin, I would like to inform you of your rights as a participant in this research.

- Your participation in this research is entirely voluntary. You are free to skip or refuse any question and end the interview at any time. The interview will take no longer than one hour to complete.

- I want to reassure you that we will keep the information you give us private. No one knows that you are taking part in this interview. Your name or the name of your company/organization is not written on this interview. Your name or the name of your company/organization will not appear in the report we write summarizing these interviews.

- The risks involved in participating in this interview are minimal, no more than those you would ordinarily encounter in daily life.

- Your participation will not affect your relationship with the U.S. Department of Labor.

Do you have any questions before you begin?

*[Record questions]*

Can we begin?

Recent research shows a shift away from long-term employees towards other kinds of work arrangements. For example, some companies are using short-term or "term" employees, using temporary work agencies or employee leasing agencies, independent contractors, part-time workers, seasonal workers.

What types of staffing changes have you noticed in the industries you represent? (if necessary: long-term versus short-term/temporary or consultants)

1) *Where* (in what context) do you see these changes taking place?

   a) In which industry?

   b) With firms of different sizes or scopes?

2) What is replacing long-term employment?

   a) For which types of positions?

3) Why do you think there has been a shift? Why isn't this happening at a (faster/broader) pace?

   a) What are the advantages of moving away from long-term employees?

      i) Worker training?

      ii) Worker supervision?

      iii) Worker motivation or performance?

      iv) Work site cooperation/relations with permanent workers?

      v) Competition from other firms who are moving to using contractors or other labor arrangements?

   b) Are there any cost disadvantages to using contractors versus employees?

      i) Are there any quality issues related to using contractors? Control over work product or schedule,

deliverables?

    c)  What do WORKERS prefer?

        i)  When?

        ii)  When not?

        iii)  What types of workers are more amenable to employee versus other types of status?

4)  How do firms make the decision to change from hiring full-time workers to other kinds of staff?

    a)  Who in the firm is involved?

    b)  What factors do they consider? Which factors are most important?

5)  Do you expect these changes to continue? Accelerate? Be rolled back?

    a)  Why?

    b)  What factors will influence what happens in the future?

6)  What types of enforcement experiences do companies you represent experience?

7)  I'd like to read you a quote from a website and get your reactions to it: "Now, more than ever, employers must have programs in place to ensure the validity of their classification of workers as independent contractors or as exempt from overtime, and must have a clear strategy for handling government audits and enforcement actions."

    a)  First I'd like to ask your opinions about what is meant by "programs in place." Do you have such programs? How do they work?

    b)  Are they necessary for your firm? If not, why not?

    c)  Where can you go to get help with this?

    d)  Why "now more than ever?"