UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**JUSTIN GUY**, individually on behalf
of himself and others similiarly situated,

    Plaintiff,

v.

**ABSOPURE WATER COMPANY, LLC**,
a domestic limited liability company,

    Defendant.

_____/_____

Case No.:  20-cv-12734

Hon. Mark A. Goldsmith

### PLAINTIFF'S *EMERGENCY* MOTION FOR RECONSIDERATION OF THE COURT'S ORDER DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, Justin Guy, on behalf of himself and the finally certified class of Opt-in Plaintiffs, hereby submits this Motion for Reconsideration concerning Plaintiff's Motion for Summary Judgment. As defense counsel repeatedly acknowledged in the hearing held on November 30, 2023, there are no material issues of fact regarding who is the shipper, and thus the issue is ripe for resolution by this Motion. Specifically, **no reasonable juror could possibly find that Defendant Absopure Water Company was the "shipper" in light of J.B. Hunt's recently secured trial testimony which lays bare Defendant's misrepresentations**; new testimony which was not previously available**.** Thus**,** Plaintiff's Motion for Reconsideration Concerning his Motion for Summary

Judgment as it relates the MCA exemption should be Granted, which will allow this matter to proceed to trial on the limited remaining disputed issues of fact pertaining to damages and whether Defendant's violation of the FLSA was willful.

### I. <u>Background</u>

A Motion for Reconsideration is appropriate on non-final orders where "new facts warrant a different outcome and the new facts could not have been discovered with reasonable diligence before the prior decision." E.D. Mich. L.R. 7.1 (h)(2)(C).

Here, the "new facts" are the trial testimony of J.B. Hunt's corporate representative, and Defendant's acknowledgement that no material disputed issues of fact exist at this time during the November 30, 2023 hearing, with regard to who is the "shipper." The *de bene esse* deposition of J.B. Hunt's corporate representative "could not have been discovered with reasonable diligence before" because Defendant **<u>never</u>** argued that it was the entity that arranged or directed Mountain Valley's shipment of goods through J.B. Hunt before dispositive motions were filed in this matter. Rather, Defendant's corporate representative **<u>bound the corporation</u>** and admitted that Mountain Valley was "the shipper" of its goods:

> Q. Okay. And it's your position that Mountain Valley intended to send this shipment to Absopure's warehouse in Plymouth, Michigan; correct?
> A. Yes.
> Q. Okay. And it's your position that **Mountain Valley did, indeed, ship** these items from their Hot Springs facility to Absopure's Plymouth, Michigan facility; correct?
> A. Yes.

2

> . . .
> Q. Okay. **They** -- **Mountain Valley ships** and delivers those products to Absopure; correct?
> A. I believe it's common carrier. I don't --
> Q. Okay. So, **they arrange for that common carrier to ship it to you**; correct?
> A. I believe so, **yes**.

Defendant's 30(b)(6) Dep. 187:18-25; 189-190 (emphasis added).[1]

It appears that—following the deposition of Defendants' corporate representative--Defendant learned of a then-recent unpublished opinion from the Eastern District of Michigan concerning the MCA exemption, *Smith v. Coastal Produce Distributors*, Inc., 2021 WL 1026910 (E.D. Mich. March 17, 2021), and decided it would attempt to defend this lawsuit by parroting the facts cited in *Smith*, and for the first time falsely claimed that the identical facts set forth in *Smith* existed here. Specifically, Defendant submitted a sham declaration, in which it claimed that it arranged for transportation **with** J.B. Hunt, in direct contradiction to Defendant's prior binding testimony. *See* ECF No. 55, PageID.851 ("54. Absopure purchases Mountain Valley products from Mountain Valley in Arkansas and then **arranges for those products** to be shipped from Arkansas across state lines to Michigan using common carriers."); *see also id.* at PageID.861 (Defendant "**arranges for transportation with a third party carrier (J.B. Hunt) to bring the products across state lines to Michigan**[.]") (emphasis added); *see also* Defendant's

---

[1] Defendant's Corporate Representative transcript is located at ECF No. 56-2.

3

Response to Plaintiff's Motion for Summary Judgment, ECF No. 61, PageID.4141 ("Absopure purchases the products from Mountain Valley in Arkansas **and then arranges for transportation with a third-party carrier (J.B. Hunt) to bring the products across state lines to Michigan**[.]") (emphasis added).

Relying on Defendant's misrepresentations in this regard, the Court denied Plaintiff's motion for summary judgment on the MCA exemption, and reasoned:

> In keeping with the overall aim of assessing the "essential nature of the transaction," this Court finds it most appropriate to identify as the shipper the entity that functionally plays the most significant role in directing and controlling the transportation of goods. . . . **Both parties have produced evidence as to whether Absopure controlled and directed the shipment of Mountain Valley products across state lines**. In support of its argument that it purchased out-of-state goods and then arranged for their transportation into Michigan with JB Hunt, for example, Absopure points to invoices from Mountain Valley. *See* Absopure Mot. at PageID.861 (citing Mountain Valley Invoices (Dkt. 55-19)). And these invoices do support the uncontested proposition that Absopure ultimately paid the cost of interstate transportation, **although it is somewhat less clear from the face of the documents how they support the proposition that Absopure is the entity that actually arranged for the transportation with JB Hunt**. Guy, on the other hand, points to evidence including (i) testimony from Absopure's corporate representative indicating a belief that Mountain Valley arranges the transportation and (ii) the fact that JB Hunt's annual report refers to Mountain Valley as a "related party" and describes a contractual service agreement with Mountain Valley. Guy Resp. at PageID.2932, 2935 (citing Absopure 30(b)6 Dep.at 187:18–25, 189–190 (Dkt. 59-2)); *id*. at PageID.2932 (citing JB Hunt Annual Report at 21 (Dkt. 59-15)). **Because it is not clear whether Absopure or Mountain Valley arranged the interstate transportation <u>with</u> JB Hunt, the Court cannot determine at present which entity is "the shipper" for purposes of the interstate intent analysis.[]** The factfinder will be best situated to address which entity controlled and directed shipment of the goods across state lines, and, if relevant,

4

> whether Absopure intended at the time of shipment that the goods would continue in interstate commerce after reaching its warehouse.[]

ECF No. 70, PageID.4503-04 (emphasis added). Thus, the Court did not Grant Plaintiff's Motion for Summary Judgment because it held that it was "**not clear whether Absopure or Mountain Valley arranged the interstate transportation with JB Hunt**[.]" *Id.* (emphasis added).

### II. J.B. Hunt's Corporate Representative testimony and Dedicated Contract Services Transportation Agreement with Mountain Valley undisputedly confirms that Defendant did not arrange the interstate transportation with J.B. Hunt.

Following J.B. Hunt's corporate representative *de bene esse* deposition, it is now undisputed that **Mountain Valley** "arranged the interstate transportation with J.B. Hunt."

J.B. Hunt's Corporate Representative, Mr. Trevor Rogers, is J.B. Hunt's Operations manager **exclusively dedicated to working with Mountain Valley**. *See* J.B. Hunt 30(b)(6) Dep. 19:20-20:7.[2] J.B. Hunt's corporate representative testified that J.B. Hunt is a dedicated transportation provider for **its customer** Mountain Valley. J.B. Hunt Corp. Rep. Dep. 12:21-25; 26:7-10.  Dedicated contract service solutions are advertised on J.B. Hunt's website under the section for "shippers." *Id.* 67:6-14.

---

[2] J.B. Hunt's corporate representative deposition is located at ECF Nos. 203-1, and 203-2.

J.B. Hunt has a dedicated fleet of approximately 30 truck drivers that work exclusively for Mountain Valley and actually works "**on site**" **at Mountain Valley's warehouse**; not at J.B. Hunt or Absopure's warehouse. 19:12-19; 20:10-12; *Id.* 20:13-14 ("Q. You physically work at Mountain Valley's location? A. Yes."); 20:23-21:1 ("Q. Okay And so you're on-site at Mountain Valley's facility. Are these trucks that you are managing also on-site at Mountain Valley's facility? A. **They pick up from the shipper here**…") (emphasis added).

J.B. Hunt testified that a dedicated account is:

> Typically with dedicated you have managers on-site with that customer. They handle whatever transportation needs, you know, with the size of the customer they -- the customer could have their own transportation office there. They work really closely with J.B. Hunt and make sure things are running efficiently and then J.B. Hunt provides the trucks, trailers, drivers to haul that freight. Typically they're your larger manufacturers, larger customers that have a dedicated fleet not someone that ships one or two loads a week. It is quite a few loads a week.

*Id.* 31:1-16. In other words, Mountain Valley **outsourced its transportation needs** to J.B. Hunt:

> Q. "Do you agree with the statement that Mountain Valley outsourced its transportation needs to J.B. Hunt?
> A. Yes."

*Id.* 73:23-74:1.[3] Conversely, J.B. Hunt also confirmed that **Absopure is not J.B. Hunt's customer and does not have a service contract or agreement with Absopure Water Company**.

> Q. Okay. So let me ask you that. Does J.B. Hunt do business directly with Absopure Water Company?
> A. Not to my knowledge.
> Q. Are you aware of any agreements that exist between J.B. Hunt and defendant Absopure Water Company?
> A. I am not.
> Q. This certificate refers to records that are relied upon in the ordinary course of business. Do you see that?
> A. Yes, I see that.
> Q. So does J.B. Hunt certify that it does not rely upon any records relating to Absopure Water Company in their ordinary course of business?[4]
> (Objection, form).
> A. Correct.
> …
> Q. Does J.B. Hunt receive any records from defendant Absopure Water Company in the ordinary course of its business?
> Mr. Cummings: Objection.
> A. Not that I'm aware of.

*Id.* 84:2-85:1; *See also id.*, 30:14-17; 81:21-23.

J.B. Hunt's relationship with Mountain Valley began as a "private fleet conversion", which means:

> It's just when a customer simply reaches out to J.B. Hunt to convert their fleet from their private drivers, meaning drivers that they employ, and trucks that they own to outsource that to J.B. Hunt.

---

[3] J.B. Hunt also provides Mountain valley with "[a]nything transportation related", which includes setting up a broker to pick up a load that JB Hunt can't handle for whatever reason. *Id.* 45:20-25.

[4] J.B. Hunt's Certificate of no records is located at ECF No. 203-5.

*Id.*, 71:3-10. J.B. Hunt's corporate representative is aware of one driver for J.B. Hunt who was previously directly employed by Mountain Valley as a driver before Mountain Valley conducted its private fleet conversation. *Id.* 73:16-22. J.B. Hunt drivers also drove **Mountain Valley owned** tanker trailers to transport loads purchased in bulk:

> Okay. And are these tanker trailers **the property of Mountain Valley**?
> A. **Yes**. They own those tanker trailers.
> Q. Okay. And then previously a**t one point was J.B. Hunt's drivers driving the tanker trailers to transport the Mountain Valley goods**?
> A. **Correct**. There was, I think, two customers that they actually used tanker trailers for.
> Q. Okay. Got it. And why do you no -- why do you guys no longer use the tanker trailers?
> A. My suspicion is they no longer buy bulk water.

141:11-24 (emphasis added).

J.B. Hunt's truck drivers in this dedicated fleet are assigned to Mountain Valley and not a specific route of Mountain Valley shipment. *Id.* 37:18-25. In other words, the shipment instructions issued to J.B. Hunt by Mountain Valley for its shipments to Absopure are standardized and could be driven by any J.B. Hunt driver dedicated to Mountain Valley. *Id.* 38:1-7 ("Q. Got it. So the driver that is driving this load X today to Absopure Water Company tomorrow or, you know, in a week when they get back, they could be driving a load to California or wherever else Mountain Valley needs transportation of their goods; is that fair? A. That's fair, yes.").

Mountain Valley controls the shipments via standardized shipping instructions that it provides to J.B. Hunt through its "shipment calendar." *Id.* 13:16-20 ("[T]he way it works is they send us a list of loads that they want covered and then we find coverage for those loads with dedicated fleet or through brokerage or, you know, however it needs to get delivered."); 49:18-24.[5] Mountain Valley directs J.B. Hunt through its shipment calendar:

> Q.· Is it correct to say that the shipper, Mountain Valley, tenders freight to J.B. Hunt and **directs** J.B. Hunt to where delivery is expected?
> A.· Yes.

51:5-8 (emphasis added); *see also id.* 51:12-20 (Mountain Valley is "giving us the destination and the time and places the delivery is supposed to happen."); 52:7-13 (Q: "Does Mountain Valley direct J.B. Hunt to where delivery is expected? A. Yes. Q. How does Mountain Valley direct J.B. Hunt to where delivery is expected? A. They give us the address and the city, state, and time to be there."); 55:20-25 (Q. "What is included in the shipment calendar that Mountain Valley provides to J.B. Hunt? A. It provides the address, city, state, pick up time, delivery time, and then some -- you know, sales numbers and stuff like that, like a PO number[.]")

Mountain Valley directs J.B. Hunt in every possible aspect of this straightforward process:

---

[5] When J.B. Hunt cannot cover a shipment for Mountain Valley, J.B. Hunt assists in facilitating the transportation for Mountain Valley with a third-party provider. *Id.* 97:3-20.

9

> Q. And who tells you when to pick up the Mountain Valley goods?
> A. Mountain Valley does.
> Q. And who tells you when to deliver the Mountain Valley goods?
> A. Mountain Valley -- did you say who?
> Q. Yes, sir.
> A. Who, yeah, Mountain Valley does.

*Id.* 53:13-20; *See also id.* 59:5-9 (Mountain Valley advises J.B. Hunt of the weight or quantity of goods to be shipped). Mountain Valley also directs J.B. Hunt during the winter months to watch the weather and make sure "we're planning our routes accordingly to make sure we're not dealing with any frozen product because water freezes obviously, make sure we're not dealing with any of that." *Id.* 53:21-54:11.

Ultimately, J.B. Hunt answered the Court's inquiry concerning "**whether Absopure or Mountain Valley arranged the interstate transportation with JB Hunt**", [ECF No. 70, PageID.4503-04], and indicated that Mountain Valley arranged the interstate transportation **with** J.B. Hunt through Mountain Valley's shipment calendar:

> Q. Who arranges for the transportation of Mountain Valley goods with J.B. Hunt?
> ATTORNEY CUMMINGS: Objection, form.
> A. The shipment calendar is kind of the arranger. It tells -- it tells the date and the time. So once that's handed to us, we have our arrangements, in a sense, and then we plan from there.
> Q. You are referring to Mountain Valley's shipment calendar, correct?
> A. Yes, sir.

*Id.* at 57:18-58:3.

10

The underlying process begins with **Mountain Valley employees** loading the J.B. hunt trucks to ship the Mountain Valley goods. *See id.* 40:24-41:2. With respect to the loading process, J.B. Hunt follows Mountain Valley's specific loading procedures for transportation Mountain Valley's goods:

> Q. Does Mountain Valley have specific loading procedures for its bottled water?
> A. Yeah. Like a -- so in the freight industry, in order to get a load to scale right, you know, you have to put a certain amount of weight on each axle, that sort of thing. That would be their loading procedure that I'm referring to.
> Q. Okay. Is that the same loading procedure for all the Mountain Valley goods that J.B. Hunt transports?
> A. Yes.

*Id.* 49:7-17.

Mountain Valley monitors the load while in transport to see if J.B. hunt timely delivered the loads by simply "just walk[ing] down to our office. **We're on site**. **They come in and ask**." *Id.* 41:14-19; 43:14-17 (emphasis added). Conversely, Absopure communicates with Mountain Valley's customer service—***not*** J.B. Hunt—in the regular course of business:

> Q. "[I]n the regular course of business who – how does the communication get transmitted to J.B. Hunt as it relates to the shipment of Mountain Valley goods to defendant Absopure Water Company?
> A. Like I was saying before, the customer service, you know, they're the ones that gives us the shipment calendar, you know, that I keep referring to.
> Q. And when you say "customer service," are you referring to J.B. Hunt's customer service?
> A. No, no. Mountain Valley.

11

*Id.* 47:7-16; *see also id.* 46:19-23 ("Q. Okay. Does Absopure Water Company ever call J.B. Hunt for these purposes? A. Not directly. Typically they call -- I would say I have never had them call me. They call Mountain Valley for an ETA on their load.")

J.B. Hunt also prepares reports for the shipper Mountain Valley concerning "on-time percentage", "number of miles that we ran that week, our number of loads we delivered that week, that sort of thing." *Id.*, 50:1-11. Conversely J.B. Hunt has never provided these reports to Defendant Absopure. *Id.* 50:12-14.

J.B. Hunt bills Mountain Valley directly through weekly invoices. *Id.*, 78:5-13. In turn, Mountain Valley pays J.B. Hunt for the cost of interstate transportation of its product to Absopure. *Id.* 78:14-18; 153:16-23 (Mountain Valley pays J.B. Hunt's toll charges); 154:7-13 (Mountain Valley pays J.B. Hunt for "detention time" if J.B. Hunt is required to wait additional time to unload its goods at Mountain Valley's customer's facilities.); 159:18-160:6 (J.B. Hunt pays Mountain Valley's fuel charge for mileage).

Ultimately, J.B. Hunt contemplated whether Mountain Valley or J.B. Hunt plays the most significant role in directing and controlling J.B. Hunt Transportation of Mountain Valley goods—**<u>not</u> Defendant Absopure Water Company**:

> Q. Who is the entity that functionally plays the most significant role in directing and controlling J.B. Hunt Transportation of Mountain Valley goods?
> Mr. Cummings: Objection, form.

> Mr. Hanna: You can answer.
> A. Well, I don't know. You know, the significant role is kind of the problem that I am having trouble with, I guess, is -- because I feel like, you know, as J.B. Hunt Transportation, I feel like we play a pretty significant role in delivering those goods as well. But, again, I can say the shipment calendar is all they provide us, and that has those items on there that I was talking about, the city, the state, pickup date, and delivery date. I can't say that they provide a more significant role than we do, I guess, as J.B. Hunt, but...
> Q. What else is there to it other than what's the information provided for the shipments in the shipment calendar?
> A. There is not much as far as you have got to manage your people. You know, that's --
> Q. That's what you're referring to when you say your role in this process?
> A. Yes, sir.

56:12-57:12. Whether Mountain Valley or J.B. Hunt played the most significant role in directing and controlling J.B. Hunt transportation of Mountain Valley goods is of no import: **it is undisputed that Defendant Absopure did not play the most significant role in directing and controlling J.B. Hunt, as admitted by J.B Hunt.**[6]

### A. J.B. Hunt identifies Mountain Valley as the shipper based on well-established transportation industry standard.

While Defendant seeks to discount the fact that J.B. Hunt **literally refers to Mountain Valley as the shipper**, the fact that J.B. Hunt—one of if not the largest

---

[6] Defendant admitted that once Mountain Valley "sells its products [to Absopure], it has no further intent." Defendant's Response to MSJ, ECF No. 61, p. 5 (response to ¶ 24.). Similarly, J.B. Hunt admits that it does not know what happens to the Mountain Valley goods once they are delivered to Absopure. J.B. Hunt Corp. Rep. Dep. 87:17-20.

13

commercial carriers in the United States—refers to Mountain Valley as the shipper **based on industry standard** is at the very least compelling, even if the Court does not find it to be dispositive on its own. *See id.* 25:8-14 ("Q. What does J.B. Hunt refer to Mountain Valley as? A. Most of the time we call them our customer. But **it's industry standard to say "shipper" and "receiver," like you're shipping and receiving. So they're our shipper. You know, we're shipping from Mountain Valley**.") (emphasis added); 44:19-23 (Q. "[W]hy did you refer to Mountain Valley as the "shipper"? A. That's just really an industry standard. "Shipper" and "receiver" is the way we refer to all of our customers."); *Id.* 25:21-26:3 (J.B. Hunt internally refers to Mountain valley as, *inter alia*, "shipper" with its drivers); *Id.* 75:7-12 ("So who is the shipper for the transportation of Mountain Valley goods? (Objection) .. A. Mountain Valley is the shipper.")

**III.   J.B. Hunt's Dedicated Contract Transportation Agreement between J.B. Hunt and Mountain Valley likewise confirms that Mountain Valley was the shipper of its goods that J.B. Hunt transported.**

J.B. Hunt's Dedicated Contract Transportation Agreement between J.B. Hunt and Mountain Valley is attached as ECF No. 203-6. J.B. Hunt's Dedicated Contract Service Transportation Agreement literally refers to Mountain Valley hereinafter as "Shipper." *See id*, p. 1; J.B. Hunt Corp. Rep. 128:11-15 ("Q. … And the drafter of this contract and you as J.B. Hunt's corporate representative consistently refer to Mountain Valley throughout this contract as what? A. Shipper.")

This contract sets forth the terms between J.B. Hunt and Mountain Valley. It begins by indicating that the "Shipper", Mountain Valley, "tender to J.B. Hunt at locations listed" in a corresponding schedule the shipments subject to the terms of the agreement. ECF No. 203-6, p. 1. Significantly, **Mountain Valley is listed on J.B. Hunt's certificate of insurance evidencing coverage for automobile liability insurance**. *See id.*, p. 2 (Section 5 concerning Insurance); *see also* J.B. Hunt Dep. 143:2-9. J.B. Hunt also entered into a "Cargo liability" provision with Mountain Valley. ECF No. 203-6, p. 3 (Paragraph 7).

The agreement provides that custody and possession of the cargo belongs to J.B. Hunt until the goods are delivered. *Id.*, at p. 1. The contract also provides that the terms of the contract are binding if ever in conflict with the terms of any bill of lading. *See* ECF No. 203-6, p. 1. The agreement also may not be assigned, and all transportations are governed by its terms. *Id.*, p. 4. Mountain Valley is the only entity permitted to use J.B. Hunt's dedicated trucks as the shipper. J.B. Hunt Corp. Rep. 158:6-13 ("Q. Okay. So only Mountain Valley's permitted to use the trucks as shippers, correct? MR. CUMMINGS: Objection. THE WITNESS: Since we have a contract with them, the trucks that we've added or the trailers that we've added are for their use, yes.").

Given this newly available testimony, and Defendant's concession that there are no remaining issues of fact regarding which entity is the shipper, the issue is ripe

to be resolved by dispositive motion prior to trial. Indeed, doing so will allow the trial to proceed in the most efficient expeditious manner in line with Fed. R. Civ. Proc. 1's dictates. Thus, Plaintiff's request that the Court reconsider its Order and enter an order holding that Absopure was not the shipper of the Mountain Valley products it received from Mountain Valley.

## **CONCLUSION**

There is no need to further delay the inevitable, or to expend unnecessary jury time and thereby increase the inherent risks of not reaching a verdict. There are no disputed issues of material fact, and no reasonable juror could ever find that Defendant Absopure Water Company was the shipper of Mountain Valley's goods.

Wherefore, Plaintiff respectfully requests the Court Grant Plaintiff's Motion for Reconsideration, and allow this matter to proceed to trial on damages and the issue of whether a willful violation exited only.

Undersigned sought to confer with Defendant's counsel concerning the relief requested herein on December 1, 2023. By the timing of the filing of this Motion, Defendant's counsel did not respond, and Plaintiff therefore assumes that Defendant opposes the relief requested herein.

Dated: December 1, 2023

Respectfully submitted,

/s/ *Michael N. Hanna*
MICHAEL N. HANNA (P81462)
MORGAN & MORGAN, P.A.
2000 Town Center, Suite 1900

16

Southfield, MI 48075
(313) 739-1950
mhanna@forthepeople.com

-and-

*/s/ Andrew R. Frisch*
Andrew R. Frisch
MORGAN & MORGAN, P.A.
8151 Peters Road, Suite 4000
Plantation, FL 33324
(954) WORKERS
afrisch@forthepeople.com

*Attorneys for Plaintiff*

## **LOCAL RULE CERTIFICATION**

I, Michael Hanna, certify that this document complies with Local Rule 5.1(a), including: double-spaced (except for quoted materials and footnotes); at least one-inch margins on the top, sides, and bottom; consecutive page numbering; and type size of all text and footnotes that is no smaller than 10-1/2 characters per inch (for non-proportional fonts) or 14 point (for proportional fonts). I also certify that it is the appropriate length. Local Rule 7.1(d)(3).

*/s/ Michael N. Hanna*
Michael N. Hanna

## **CERTIFICATE OF SERVICE**

The undersigned certifies that on December 1, 2023, the foregoing document was served electronically upon all attorneys of record.

*/s/ Michael N. Hanna, Esq.*
Michael N. Hanna, Esq.

17