UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JUSTIN GUY, individually and on behalf
of those similarly situated,

      Plaintiff,                            Case No. 20-cv-12734

v.                                       HON. MARK A. GOLDSMITH

ABSOPURE WATER COMPANY, LLC,

      Defendant.
_____/

**OPINION & ORDER**
**FOLLOWING JURY TRIAL REGARDING (1) THE MCA EXEMPTION TO THE**
**FLSA AND (2) THE SMALL VEHICLE EXCEPTION TO THE MCA EXEMPTION**

      This is a collective action in which the parties dispute whether Defendant Absopure Water

Company, LLC violated the Fair Labor Standards Act (FLSA), 29 U.S.C. § 207, by not paying

overtime to Plaintiffs—current and former Absopure employees—for hours worked in excess of

40 per week.  Compl. (Dkt. 1).  Absopure maintains that its drivers, including Plaintiffs, are exempt

from the overtime provisions of the FLSA under the Motor Carrier Act (MCA) exemption to the

FLSA.  See Answer at PageID.250 (Dkt. 12).  Plaintiffs contest this, and further argue that even if

the MCA exemption applies, Plaintiffs fall into the "small vehicle exception" to the MCA

exemption—i.e., they drive or drove trucks that weigh less than 10,001 pounds and are owed

overtime pay regardless of whether the MCA exemption applies.

      The Court conducted a 10-day jury trial between December 5, 2023 and December 15,

2023.  The parties have submitted post-trial briefs setting forth conclusions of law that they assert

follow from the jury's factual findings on the MCA exemption.[1]  Specifically, the parties address whether Plaintiffs are subject to the MCA given the jury's factual findings and, assuming the MCA does apply, whether Plaintiffs who drove small vehicles less than twice per month are subject to the small vehicle exception to the MCA.

For the reasons that follow, the Court concludes that (i) Plaintiffs are not subject to the MCA exemption to the FLSA, and (ii) even if the MCA exemption were to apply, Plaintiffs whom the jury found drove small vehicles, but did so less than two times per month, are entitled to overtime under the FLSA because they fall within the small vehicle exception to the MCA exemption.

## I. BACKGROUND

Absopure is a Michigan-based bottled water company, which hires drivers who deliver water and other products to homes and offices.  Answer ¶ 17.  Plaintiffs are current and former employees of Absopure who work or worked as drivers who transport products within the state of Michigan.  Id. ¶ 12.  Some of those products, including products from coffee brands such as Starbucks, Maxwell House, Folger's, and Green Mountain, as well as water products from Mountain Valley Spring Water, originated outside of the state of Michigan.  Id. ¶¶ 37–38. Plaintiffs delivered such products during their employment.  A third-party carrier, under a contractual relationship with Mountain Valley, transported the products across state lines from Mountain Valley's location in Arkansas to Absopure's warehouses in Michigan.  The parties have stipulated to treating products from Mountain Valley as representative of goods that drivers delivered that originated outside of Michigan.  Joint Final Pretrial Order at 21 (Dkt. 247).

---

[1] The parties' briefing includes Plaintiffs' brief on the MCA exemption (Dkt. 250), Absopure's brief on the MCA exemption (Dkt. 249), Absopure's brief on the small vehicle exception (Dkt. 237), and Plaintiffs' brief on the small vehicle exception (Dkt. 241).

Consistent with legal authorities addressing this issue, the parties further agreed that whether the Plaintiffs fall within the scope of the MCA exemption is a legal question for the Court to decide.  Def. Memo. Regarding Jury Role and MCA Exemption (Dkt. 205); Pl. Memo. Regarding Jury Role and MCA Exemption (Dkt. 207); see also Williams v. Cent. Transp. Int'l, Inc., 830 F.3d 773, 775 (8th Cir. 2016) ("The question of how [plaintiff] spent his time working for [defendant] is a question of fact; the ultimate issue of whether his work activities exempted [defendant] from paying FLSA overtime is one of law."); Smith v. Coastal Produce Distribs., Inc., No. 19-13095, 2021 WL 1026910, at *4 (E.D. Mich. Mar. 17, 2021) ("The question of whether the activities of an employee exclude him from FLSA overtime benefits is a question of law for the courts to decide.") (citing Ale v. Tenn. Valley Auth., 269 F.3d 680, 691 (6th Cir. 2001)).

At the conclusion of the trial, the jury made factual findings related to (i) whether each Plaintiff worked over 40 hours in some workweeks, (ii) the amount of overtime pay owed to each Plaintiff assuming the Plaintiffs were legally entitled to that overtime, (iii) the manner and conditions under which Absopure delivered Mountain Valley products to its customers, and (iv) the extent to which Plaintiffs drove small vehicles.  See Verdict Form (Dkt. 230).

## II. ANALYSIS

Armed with the jury's factual findings, the Court sets forth its conclusions of law regarding (i) whether Plaintiffs are exempt from the FLSA's overtime provisions under the MCA and (ii) the extent to which certain Plaintiffs fall within the small vehicle exception to the MCA.

### A. The Motor Carrier Act Exemption to the FLSA

The FLSA requires employers to pay their employees at least 1.5 times their regular rate of pay for work in excess of 40 hours per week.  29 U.S.C. § 207(a).  This requirement, however, does not apply if the MCA exemption to the FLSA applies.  Id. § 213(b)(1).  As the employer, Absopure "bears the burden of proving that it qualifies for [the] claimed [MCA] exemption."

Sec'y of Lab. v. Timberline S., LLC, 925 F.3d 838, 850 (6th Cir. 2019) (punctuation modified). This Court must give "FLSA exemptions a fair, rather than a narrow, reading." Id. (citing Encino Motorcars, LLC v. Navarro, 138 S.Ct. 1134, 1142 (2018)).

The MCA exemption applies to "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service" under the MCA, 49 U.S.C. § 31502. § 213(b)(1). The Secretary of Transportation has such powers over employees whose work activities affect the safety of operation of a "motor carrier" or "motor private carrier," where such carriers transport goods in interstate commerce. § 31502(b); 49 U.S.C. § 13102(14), (15). For purposes of the MCA, interstate commerce is defined as the transport of goods or property "between a place in . . . a State and a place in another State." § 13501(1). As summarized by the Sixth Circuit, the MCA empowers the Secretary of Transportation "to regulate the hours of an employee (1) who works for a private motor carrier that provides transportation in interstate commerce and (2) whose work activities affect the safety of operation of that motor carrier."[2] Timberline, 925 F.3d at 850 (punctuation modified).

The parties agree that Absopure is a motor private carrier and that Plaintiffs engaged in work that affects the safety and operation of motor vehicles on public highways. Joint Final Pretrial Order at 16–17. However, the parties disagree as to whether Plaintiffs engaged in interstate commerce for purposes of the MCA—i.e., whether Plaintiffs' duties involve the transport of goods between a place in a state and a place in another state. See Pl. Br. on MCA at 1–2; Def. Br. on MCA at 1–2.

### 1. The Interstate Commerce Prong of the MCA Exemption and Applicable Test

---

[2] "The MCA uses the term 'motor private carrier' but this term is synonymous with 'private motor carrier.'" Ballou v. DET Distrib. Co., No. 3-03:1055, 2006 WL 2035729, at *9 n.2 (M.D. Tenn. July 17, 2006); see also Musarra v. Digital Dish, Inc., 454 F. Supp. 2d 692, 703 n.22 (S.D. Ohio 2006) ("On occasion, courts refer to 'motor private carriers' as 'private motor carriers.'").

Although the FLSA and MCA both cover employees engaged in "interstate commerce," the term does not have the same meaning for the two statutes. The FLSA has a broader reach than the MCA. "Whereas the FLSA covers employees 'engaged in commerce or in the production of goods for commerce,' 29 U.S.C. §§ 203, 207(a)(1), the MCA only covers employees actually part of a continuous movement in interstate commerce. Whereas the [FLSA] would apply to employees 'in the production of goods for commerce' even though such employees handled or sold such goods prior to or after their actual 'continuous movement' in interstate commerce, the MCA would not." Baird v. Wagoner Transp. Co., 425 F.2d 407, 410 (6th Cir. 1970) (punctuation modified).

Under the MCA, drivers whose routes are entirely intrastate can still be deemed to have engaged in interstate commerce if the intrastate transportation is "part of a continuous movement in interstate commerce." Id. at 410 (punctuation modified). Whether there was a "practical continuity of movement in interstate commerce" depends on the "essential character of the movement." Mazzarella v. Fast Rig Support, LLC, 823 F.3d 786, 791 (3d Cir. 2016) (punctuation modified). In other words, intrastate transportation can be "interstate in character when it forms a part of a practical continuity of movement across state lines from the point of origin to the point of destination." Musarra v. Digital Dish, Inc., 454 F. Supp. 2d 692, 705–706 (S.D. Ohio 2006) (punctuation modified).

Here, the parties stake out opposing positions regarding whether there was a practical continuity of movement across state lines. Absopure contends that the Mountain Valley products—which originated in Arkansas, were transported to and stored in Absopure's Michigan warehouses, and later made their way to Michigan customer locations—were all part of a continuous movement in interstate commerce. Def. Br. on MCA at 6. Plaintiffs contend that the intrastate journeys from the Michigan warehouses to customers' Michigan locations were discrete journeys, not part of a continuous movement in interstate commerce. See Pl. Br. on MCA.

Throughout this litigation, the parties have disputed the appropriate test for determining whether Plaintiffs transported goods in a practical continuity of interstate movement.  Both tests put forth by the parties focus on whether "the shipper" of the goods has a "fixed and persisting intent" that the out-of-state goods continue in interstate commerce after passing through a warehouse.  See Pl. Br. on MCA at 2; Def. Br. on MCA at 3–4.  Plaintiffs have maintained that the appropriate test for determining the shipper's intent is the MC-48 test, set forth in industry guidelines issued by the Interstate Commerce Commission (ICC)[3] in 1957.  See Pl. Br. in Supp. Mot. for Summ. J. at 14–15 (Dkt. 56) (citing 29 C.F.R. § 782.7).[4]  For its part, Absopure has argued that the MC-48 factors are no longer applicable and that the later guidelines issued by the ICC in 1992—referred to as the MC-207 factors—represent the proper test for assessing interstate intent.  See Def. Mot. for Summ. J. at 17 (Dkt. 55) (citing Motor Carrier Interstate Transportation—From Out–of–State Through Warehouses to Points in Same State, 57 Fed. Reg. 19812 (May 8, 1992) (MC-207)).[5]  The Court does not adopt wholesale either test.

---

[3] "In 1966, Congress passed the Department of Transportation Act, transferring to the DOT all functions, powers, and duties of the ICC with regards to the hours and safety provisions of the MCA. Congress later abolished the ICC in 1995 and transferred the ICC's remaining regulatory duties to the DOT and the Surface Transportation Board. Thus, although the DOT now regulates motor carriers and not the ICC, courts still look to the ICC guidelines when interpreting the MCA exemption, as the DOT took over motor carrier regulation from the ICC."  Smith, 2021 WL 1026910, at *4 n.2 (punctuation modified, citations omitted).

[4] MC-48 provides that there is no interstate intent where (i) "at the time of shipment there is no specific order being filled for a specific quantity of a given product to be moved through to a specific destination" beyond the warehouse; (ii) the warehouse "is a distribution point or local marketing facility from which specific amounts of the product are sold or allocated," and (iii) "transportation in the furtherance of this distribution within the single State is specifically arranged only after sale or allocation from storage."  Baird, 425 F.2d at 410–411.

[5] Under MC-207, the following factors indicate interstate intent: (i) the shipper bases its determination of volume to be shipped on projections of customer demand that have some basis in fact; (ii) no processing or substantial modification takes places at the warehouse; (iii) while in the warehouse, the merchandise is subject to the shipper's control and direction; (iv) modern systems allow tracking and documentation of most or all shipments coming into and departing from the warehouse; (v) the shipper ultimately bears the costs of transportation; (vi) the warehouse is owned

As an initial matter, the Court recognizes that the MC-48 and MC-207 tests, and the caselaw that has developed around the application of these tests, characterize the analysis as "determination of a shipper's fixed and persisting intent at the time of shipment." Musarra, 454 F. Supp. 2d at 706 (punctuation modified); Smith, 2021 WL 1026910, at *4 (explaining that the MC-207 factors are "indicative of [the shipper's] interstate intent"). However, it is not clear to the Court how the shipper's intent is probative of the ultimate inquiry of whether "the essential character" of Plaintiffs' intrastate delivery of Mountain Valley products to Absopure's customers was part of a practical continuity of movement across state lines. Indeed, the tests that have been developed and the opinions applying them do not appear to engage in an exploration of subjective intent. Rather they look to objective factors that explore whether the essential character of a given transportation episode amounts to a practical continuity of movement across state lines. A true search for intent would explore the subjective state of mind of managers or operators of a business entity, an undertaking that the test factors do not specifically articulate and that the caselaw does not undertake. To clarify this area of the law, it would probably be best to jettison entirely the intent nomenclature. For present purposes, however, the Court retains the standard formulation of the MCA analysis, which utilizes the language of intent but actually explores whether the character of the transaction demonstrates a practical continuity of movement of Mountain Valley products across state lines.

The threshold question of the test to be applied was previously explained in the Court's summary judgment ruling in this case. See 2/8/23 Op. & Order (Dkt. 70). As explained in that opinion, the Sixth Circuit has not given definitive guidance on what approach should be taken. Over a half-century ago, Baird, 425 F.2d at 410–412, utilized the MC-48 factors, which have been

---

by the shipper; and (vii) shipments move through the warehouse pursuant to a storage-in-transit provision. "[N]o particular factor is, in and of itself, determinative." Musarra, 454 F. Supp. 2d at 711.

jettisoned by many courts—including some Sixth Circuit district courts.  See Smith, 2021 WL
1026910, at *4 (utilizing MC-207 factors); Finn v. Dean Transp., Inc., 53 F. Supp. 3d 1043, 1054–
1055 (M.D. Tenn. 2014) (rejecting the MC-48 factors); Musarra, 454 F. Supp. 2d at 711 (rejecting
MC-48 factors).  Recent lower court decisions tend to utilize the MC-207 factors.  See, e.g., Finn,
53 F. Supp. 3d at 1054; Musarra, 454 F. Supp. 2d at 711.

Still other courts have applied factors that do not precisely track either MC-48 or MC-207.
See, e.g., Mazzarella, 823 F.3d at 791 (considering (i) "whether and to what extent a product pauses
in a warehouse or other location during transport before reaching its final destination," (ii)
"whether the product is altered in any way during its transport," (iii) "the employer's intent
concerning the delivery of the product at the time the transportation commences," and (iv)
"whether the employer's business involves an integrated system of interstate shipments")
(punctuation modified); Collins, 589 F.3d at 899 (describing difficulties with applying the MC-
207 factors and electing to rely on four of the listed criteria which "ma[d]e sense" for purposes of
the interstate inquiry); Deherrera v. Decker Truck Line, Inc., 820 F.3d 1147, 1157 (10th Cir. 2016)
(rejecting sole reliance on MC-48 factors and stating that the proper analysis "focus[es] more
broadly on all the facts and circumstances surrounding the transportation").  And a more recent
Sixth Circuit decision utilized some of the MC-207 factors without formally adopting them in their
entirety as the test to be applied.  See Timberline, 925 F.3d at 851 (citing with approval Collins,
589 F.3d at 897 and Mazzarella, 823 F.3d at 791–793).

Absent controlling Sixth Circuit guidance, this Court adopts a comprehensive analysis
flexible enough to properly evaluate the nuances of a transaction that is viewed by one party as a
unitary interstate undertaking and viewed by the other party as consisting of discrete segments of
interstate and intrastate commerce.  In keeping with Timberline, Mazzarella, and Collins, the Court
concludes that all the factors articulated in the caselaw—including those derived from the MC-48

8

and MC-207 tests—potentially bear on the outcome of whether the MCA exemption applies. Although no particular factor is determinative, Musarra, 454 F. Supp. 2d at 71, the Court's weighing of factors maintains an ultimate focus on assessing the "essential character of the movement." Mazzarella, 823 F.3d at 791 (punctuation modified).

Considering multiple factors and the totality of circumstances can be a difficult undertaking. Collins, 589 F.3d at 900 (noting that judges applying the MCA exemption are often "condemn[ed] . . . to wander forlornly in the untracked wilderness named 'the totality of the circumstances,' a phrase found in many of the cases involving the [MCA] exemption"). But it appears to be the best judicial approach for effectuating the statutory goal of the MCA exemption—to ensure "the overtime provisions of the FLSA and MCA do not overlap or interfere with each other." Masson v. Ecolab, Inc., Case No. 04-4488, 2005 WL 2000133, at *5 (S.D.N.Y. Aug. 17, 2005).

As explained below, the Court finds that the MCA exemption does not apply to Plaintiffs because their intrastate deliveries of Mountain Valley products were not part of a practical continuity of movement in interstate commerce. The Court's weighing of relevant MCA factors reveals that Absopure's intrastate deliveries of product were disconnected from the products' earlier and distinct interstate journey. The transportation of products from Mountain Valley's Arkansas location to Absopure's warehouses in Michigan did not reflect specific customer orders. Indeed, Absopure's orders of products were finalized only upon delivery to Absopure's customers. Further, Mountain Valley's supply of product to Absopure was based largely on Absopure's stock levels, rather than a focused analysis of its customer demand.

The lack of a continuous interstate character is further reflected by the fact that Absopure lacked a method by which it could track the products' interstate movements. While Absopure submits that it maintained rapid product turnover—implying a continuation of the products'

interstate journey—its position is undercut by the jury's finding that it failed to establish the length of time products remained in its warehouses. Similarly unpersuasive is Absopure's asserted control over the products while in its warehouses; the products' indeterminate stay in the warehouses cuts against a finding of "continuous movement." Tellingly, Absopure's product-control began and ended with the intrastate transportation of the products; it exercised little control over the products' interstate transportation. On these facts, the Court also finds that the transportation of Mountain Valley products does not reflect a fixed and persisting intent for the practical continuity of movement of Mountain Valley products across state lines.

All told, the essential character of Absopure's transportation of product from its warehouses to its customers was distinct from the interstate travels of the product and thus intrastate in nature. The Court proceeds to flesh out its overall conclusion by (i) providing a more detailed discussion of the MCA factors identified above, and (ii) addressing Absopure's alternative argument that the MCA applies to Plaintiffs based on the occasional delivery of "firm orders."

### 2. Application of the MCA Factors

Adopting a totality-of-the-circumstances approach, the Court applies the following factors: (i) whether shipments to Absopure's warehouses reflect specific orders for specific quantities of a given product; (ii) whether the intrastate transportation of product is arranged after allocation from storage or sale; (iii) whether and the extent to which shipments are based on projections of customer demand; (iv) whether Absopure's warehouses are a distribution point from which specific amounts of Mountain Valley products are sold or allocated; (v) whether Absopure uses modern tracking and documentation systems of most, if not all, of the shipments coming in and going out of the warehouses or distribution centers; (vi) the average length of time Mountain Valley products remained in Absopure's warehouses before delivery to Absopure's customers; (vii) who bears the cost of transportation; (viii) who owns the warehouses; (ix) whether the

products are modified while stored in Absopure's warehouses and the extent to which Absopure maintains control over those products; and (x) whether the transportation of products reflects inter- or intrastate intent.

### a.  Whether Shipments to Absopure Reflected Specific Orders

The jury answered "no" to the question of whether "[a]t the time Mountain Valley products were shipped to Absopure warehouses, were there specific orders for a specific quantity of a given product to be transported to a specific destination beyond the warehouses." Verdict Form ¶ 4.  The jury's finding supports the conclusion that there was a lack of a practical continuity of interstate movement between the interstate transportation from Mountain Valley to Absopure and the intrastate transportation from Absopure to its customers.  See Watkins v. Ameripride Servs., 375 F.3d 821, 826 (9th Cir. 2004) ("If . . . a company places orders with an out-of-state vendor, with delivery to the company's intrastate warehouse for future delivery to customers yet to be identified, the transportation chain culminating in delivery to the customer is considered intrastate in nature."); Baird, 425 F.2d at 411, 413 (explaining that an oil company's shipment of petroleum products without knowledge of the specific quantity to be shipped to the ultimate customer weighed in favor of finding that the intrastate delivery of that petroleum product was "wholly intrastate in character").  This factor weighs against finding that the entire transportation chain was interstate in character.

### b.  Whether Intrastate Transportation of Products was Arranged After Sale or Allocation from Storage

The jury answered "yes" to the question of whether the "distribution of Mountain Valley products within Michigan was specifically arranged only after sale or allocation from storage." Verdict Form ¶ 6.[6]   The jury also found that Absopure "finalize[d] its sales with its customers

---

[6] See Baird, 425 F.2d at 410–411 (examining whether "transportation [was] specifically arranged only after sale or allocation from storage" under MC-48 test).

only upon delivery of the Mountain Valley products to the customer locations." Id. ¶ 10; see also 12/11/23 Byrne Trial Test. at 14 (Dkt. 243) (stating that the "sale occurs at the customer's location"); 12/12/23 Byrne Trial Test. at 16 (Dkt. 244) (explaining that orders are "estimated" for each customer visit "but the determination of the actual content of each order would be at the time [of delivery to the customer]).[7]

The jury's findings reflect that Absopure arranged for the intrastate transportation of Mountain Valley products only after products were either sold to a customer or allocated for sales that were to be completed following delivery to the customer's location. Essentially, Absopure held products in its warehouses until they were actually sold or allocated to a particular customer—all of which occurred after the products had already reached its warehouses. These facts confirm that Absopure's intrastate delivery of Mountain Valley products represented a break in the interstate chain of transportation of those products. See Baird, 425 F.2d at 412 (explaining that the use of actual orders to determine when products were allocated from storage and intrastate transportation arranged counseled against finding that plaintiff-drivers were engaged in interstate commerce).

### c. Projections of Customer Demand

The jury found that Absopure "base[d] its determination of product volumes to be shipped from Mountain Valley for reasons that included projections of customer demand." Verdict Form ¶ 7. Absopure characterizes this finding as showing that it was engaged in a continuous movement across state lines because its importation of products from Mountain Valley was based on customer demand. Def. Br. on MCA at 7–8.

---

[7] Absopure's account manager Patrick Byrne served as its corporate representative and provided testimony regarding Absopure's operations over the course of three days of trial. See 12/11/23 Byrne Trial Test. at 6.

True, courts have explained that the shipment or import of products according to "projections of customer demand that have some factual basis" is a factor that weighs in favor of finding a continuity of movement across state lines. See Musarra, 454 F. Supp. 2d at 711–714 (finding that distributor's practice of shipping specific types and models of equipment to its subsidiary based on projections of customer demand militated in favor of finding a practical continuity of interstate movement); Collins, 589 F.3d at 899 (finding that a wine distributor's projections of customer demand calculated from customers' purchase histories weighed in favor of finding a practical continuity of interstate movement).

However, the Court is not convinced that such a fact carries much weight in this case. In cases where courts have found that the use of customer projections weighed in favor of finding a continuous interstate journey, such projections were based on detailed assessments of customers' needs, which reflected a practical continuity of interstate transportation from an out-of-state supplier to the eventual customer. See, e.g., Musarra, 454 F. Supp. 2d at 711–7114 (finding that an out-of-state supplier's use of system that tracked "present needs of customers based on the service needs of its customers" and allowed for the shipping of "specific types and models of equipment" to distributor's warehouse based on those customer needs reflected a continuity of movement across state lines); Guyton v. Schwan Food Co., Case No.03-5523, 2004 WL 533942, at *2 (D. Minn. Mar. 16, 2004) (concluding that frozen food distributor's ability to "predict at any time with 95% accuracy, which, and how many of its products, a customer w[ould] purchase" based on data that included "standing orders, historic buying patterns, and predicted sales to targeted residential customers" favored a finding that the distributor engaged in interstate commerce under the MCA).

Here, by contrast, the extent to which Absopure relied on projected customer demand and the accuracy of such projections are not clear. Absopure admitted that projections of customer

demand played only a partial role, and that the replenishment of its warehouse stock was also "driven by a physically-observed safety stock level."  12/12/23 Byrne Trial Test. at 34.  And even considering that Absopure's shipping volume was based in part on customer demand, Absopure provided little detail as to how it calculated its customer projections.  Id. at 35 (stating that Absopure analyzes its inventory by reviewing "future orders [its enterprise resource planning] system generated and . . . what [it] [has] on the [warehouse] floor").  The fact that Absopure maintained an awareness of when its stock is "going to run out," id. at 36, before it received its next Mountain Valley shipment does not reflect that Absopure's intrastate delivery of Mountain Valley products is an extension of a continuous movement across state lines.  No business orders a product without some idea of its customers' demand for that product.

Absopure's limited use of customer projections to determine the volume of product to order from Mountain Valley militates in favor of finding that the products were not transported in a practical continuity of movement across state lines.

### d.  Whether Absopure's Warehouses Were Distribution Points for Mountain Valley Products

The jury determined that Absopure's warehouses were "distribution point[s]" from which specific amounts of products were sold or allocated to customers.  Verdict Form ¶ 5.  Courts have explained that a transaction may lack a practical continuity of interstate movement where an employer's warehouse is a distribution point or local marketing facility for the out-of-state-supplier.  See Baird, 425 F.2d at 412 (explaining that an employer acted as a "local marketing facility" by retaining large inventories of petroleum products and only allocating the products after receiving customer orders and that this fact counseled against finding a continuous movement in interstate commerce).  Plaintiffs argue that this factor weighs in their favor because Absopure's warehouses served as distribution points for Mountain Valley.  Pl. Br. on MCA at 4.  The Court agrees.

14

As explained above, no allocation or sale of Mountain Valley product occurred before the products arrive at Absopure's warehouses.  Verdict Form ¶ 6.  Only after Absopure received projected orders from its customers were the Mountain Valley products transported to Absopure's customers.  And even then, sales of the products were not completed until delivery to Absopure's customers.  Id. ¶ 10.  Such a process—all parts of which took place after the products arrive at Absopure's warehouses—reflects a transaction that is intrastate in character.  Consequently, this factor weighs in Plaintiffs' favor.[8]

### e.  Use of Modern Tracking Methods

Courts assessing whether a transaction is interstate consider whether "[m]odern tracking systems allow tracking and documentation of most, if not all, of the shipments coming and going out of the warehouse or distribution center."  Musarra, 454 F. Supp. 2d at 717 (citing MC-207).  As courts have explained, modern tracking systems "are a common feature of systems designed to deliver interstate goods through a final intrastate leg."  Id. at 718 (concluding that defendant's use of a "complex tracking system" informing defendant when a particular piece of equipment is installed and activated for the customer weighed in favor of finding a continuity of movement across state lines); see, e.g., Bilyou v. Dutchess Beer Distribs., Inc., 300 F.3d 217, 219 (2d Cir.2002) (affirming the district court's application of the MCA exemption where the beverage supplier utilized an "electronic communication system" that was connected to the defendant-distributor's facility and allowed it to monitor the daily amount of products delivered to the defendant's customers).

Here, the jury answered "no" to the question of whether "Absopure use[d] tracking and documentation systems for most or all shipments coming into and departing the Absopure warehouses."  Verdict Form ¶ 8.  Plaintiff submits that the jury's finding weighs against finding

---

[8] Absopure makes no argument regarding this factor.  See Def. Br. on MCA.

that the MCA applies to Plaintiffs.  Pl. Br. on MCA at 5.  Again, the Court agrees with Plaintiffs. The absence of a method to track incoming and outgoing products reflects a disconnect between, on the one hand, the Mountain Valley products' interstate journey from Arkansas to Michigan, and on the other, the intrastate journey from Absopure's warehouses to its Michigan customers. This factor weighs in Plaintiffs' favor.[9]

### f.  Length of Time Mountain Valley Products Were Stored at Absopure's Warehouses

Although not expressly addressed by either the MC-48 or MC-207 tests, courts also find that the length of time products are stored in a warehouse is relevant to determining whether the nature of a transaction is interstate.  See Watkins, 375 F.3d at 826 ("Indefinite storage in a warehouse may transform goods shipped from out-of-state into intrastate deliveries."); Ehrlich v. Rich Prod. Corp., No. 8:16-cv-3532, 2018 WL 2017532, at *7 (M.D. Fla. May 1, 2018), aff'd, 767 F. App'x 845 (11th Cir. 2019) (finding that the "relatively short shelf life" of products and twice-a-week shipments counseled in favor of finding that the MCA exemption applied to plaintiff-drivers).  Here, the jury determined that the parties did not establish "how long on average [] Mountain Valley products stay[ed] at Absopure warehouses until they were delivered to customers."  Verdict Form ¶ 11.

Absopure argues that the jury's finding on this point (or lack thereof) carries "no weight." Def. Br. on MCA at 7.  It cites testimony from Patrick Byrne, who stated that Absopure's inventory turned over inventory every one to two weeks.  Id. at 6 (citing 12/12/23 Byrne Trial Test. at 20–22, 34–39; 12/13/23 Byrne Trial Test. 13–14, 18 (Dkt. 245)).

---

[9] Absopure makes no argument regarding this factor.  See Def. Br. on MCA.

To the extent Absopure invites the Court to disregard the jury's conclusion that the length of time products stay in the warehouse is not established, the Court declines the invitation.  The jury was free to credit or disregard Byrne's testimony regarding the timeframe of product turnover.  While Absopure characterizes the one-to-two-week timeframe as "undisputed," Byrne himself equivocated on this point.  He explained that his knowledge of the average turnover time "assum[ed]" that Absopure followed its "proper[]" product rotation practices.  12/13/23 Byrne Trial Test. at 44.  Based on this evidence, the jury did not unreasonably conclude that the length of time products stayed in Absopure's warehouse was not established.  See In re E. I. Du Pont de Nemours & Co. C-8 Pers. Inj. Litig., 529 F. Supp. 3d 720, 736 (S.D. Ohio 2021) ("[The Sixth Circuit] has determined that a jury's verdict should not be overturned as being against the weight of the evidence unless that verdict was unreasonable.") (punctuation modified).

The jury's finding means that Absopure did not establish that its storage of Mountain Valley products amounted to only a short pause on a practical continuity of movement across state lines.  Absopure's failure to carry its burden in proving this fact weighs in Plaintiffs' favor.

### g.  Cost of Transportation

"A shipper who bears the cost of transportation, through the final destination, demonstrates a fixed and persisting intent to ship products interstate."  Horn v. Digital Cable & Commc'ns, Inc., No. 1:06-cv-325, 2008 WL 7137186, at *6 (N.D. Ohio June 12, 2008).  Where an intrastate shipper ultimately bears the cost of the interstate transportation of the products, the products' intrastate journey is more likely to reflect a continuation of that interstate transportation.  See Finn, 53 F. Supp. 3d at 1048, 1056 (finding that defendant's payment of all out-of-state shipping costs weighed in favor of the MCA's application to plaintiffs who drove intrastate routes).  Here, the jury found that it was "[n]ot established" as to whether Absopure ultimately bears the cost of transporting Mountain Valley products.  Verdict Form ¶ 9.

Absopure contends that the phrasing of the question posed to the jury, which asked whether "Absopure ultimately bear[s] the cost of transportation," was ambiguous.  Def. Br. on MCA at 9; Verdict Form ¶ 9.  It argues that the question could mean "a number of different questions such as who paid the carrier directly, who paid last in time, or who paid the full amount."  Def. Br. on MCA at 9.  Absopure's apparent challenge to the wording of the verdict form is not well taken.  In response to the Court's direction to the parties to supply it with proposed questions for the jury verdict form, Absopure submitted proposed questions regarding the MCA exemption.  See Def. Proposed Questions for Jury Questions on MCA Exemption (Dkt. 227).  Absopure's proposed question regarding the cost of transportation largely tracks the final verdict form.  See id. ¶ 12 (proposing that the verdict form include the question: "Does Absopure pay for the cost of shipping the products it orders from Mountain Valley?").  In conferences over the formulation of the jury verdict, Absopure raised no challenge that the question ultimately utilized by the Court on shipping was somehow ambiguous.  To the extent Absopure belatedly raises now any challenge to the validity of this factor or the wording of the verdict form, the Court rejects that challenge.

Plaintiffs submit that the jury's finding cuts against Absopure.  Pl. Br. on MCA at 6.  The Court agrees.  Absopure's failure to establish that it paid for the cost of transportation further indicates that the intrastate journey—which Absopure controlled—was not an extension of the Mountain Valley products' practical continuity of movement across state lines.  This factor weighs against Absopure.

### h.  Warehouse Ownership

Under the MC-207 test, a "shipment is more likely to be considered interstate if the warehouse used is owned by the shipper."  Musarra, 454 F. Supp. 2d at 719.  Absopure argues that this factor supports a finding of a practical continuity of interstate movement because it owns its warehouse.  Def. Br. on MCA at 9.  The Court disagrees.

As an initial matter, Absopure cites no evidence—and the jury made no findings—to support its assertion that Absopure "owns its warehouse." <u>See</u> Verdict Form; Def. Br. on MCA. And the evidence undercuts that assertion.  Byrne testified that Absopure owns the warehouse located in Plymouth, Michigan and leases the Grand Rapids warehouse.  12/11/23 Byrne Trial Test. at 8.

In any event, even if Absopure were to own both warehouses, the Court does not see how that fact has any bearing on the inter or intra-state nature of the shipment of Mountain Valley products.  This factor is simply not relevant to determining whether a transaction is part of the practical continuity of movement across state lines. <u>See</u> <u>Collins</u>, 589 F.3d at 899 ("[W]e can't see the relevance of whether the warehouse is owned, leased, shared, or for that matter stolen, given that the object of the statutory exemption is to shift regulation of truckers' hours from the Labor Department to the Department of Transportation if the truckers participate in interstate transportation, and what has that to do with where title to the warehouse resides[.]").  The Court concurs in this reasoning and finds that this factor favors neither party.

### i.  Modification and Control of Products

When applying MC-207, Courts have found that a lack of processing or product modification while the products are stored at the warehouse is reflective of a practical continuity of movement across state lines under the MCA. <u>Musarra</u>, 454 F. Supp. 2d at 715.  This is because the "manufacture of an item interrupts the stream of commerce so that after manufacture, there is a new commercial journey, either inter–or intrastate." <u>Id.</u> at 715–716.  However, "a modification that does not change the nature of the product is insufficient to create a break in that product's interstate journey." <u>Id.</u> (punctuation modified).

Absopure submits that this factor weighs in its favor.  Def. Br. on MCA at 10.  The Court agrees.  The parties do not dispute that Absopure did not modify the Mountain Valley products

that it received in its Warehouse.  See Joint Final Pretrial Order at 25.  The fact that Absopure did not alter the products lends support to its position that its intrastate deliveries were a continuation of the interstate journey beginning in Mountain Valley's facility in Arkansas.  This factor weighs in Absopure's favor.

Relatedly, courts applying MC-207 also "consider whether, while in the warehouse, the merchandise is subject to the shipper's control and direction to the subsequent transportation." Musarra, 454 F. Supp. 2d at 717 (punctuation modified).

Absopure argues that this factor supports a finding of a practical continuity of interstate movement.  Def. Br. on MCA at 9.  It points out that it retains control over the Mountain Valley products received in its warehouses.  Id.; see also Joint Final Pretrial Order at 25 (indicating that the parties do not contest the fact that Absopure "controls what happens with the products once they are delivered to the warehouse").  On this count, the Court disagrees.

While Absopure is correct that MC-207 directs that a shipper's control of products while they remain in the warehouse is reflective of a continuity of movement in interstate commerce, the Court is not convinced that this fact has any bearing here.  Courts find that this factor reflects a practical continuity of interstate movement when the out-of-state supplier retains control of the product while it is stored in the in-state distributor's warehouse.  See, e.g., Musarra, 454 F. Supp. 2d at 717 (finding that out-of-state supplier and manufacturer's retention of control of products while stored in the  defendant's warehouse weighed in favor of applying the MCA exemption); Horn, 2008 WL 7137186, at *5 (concluding that an out-of-state supplier and manufacturer of satellite product's retention of control and direction of products while the products are in the defendant's warehouse reflected that the transportation was interstate in character); Ehrlich, 2018 WL 2017532, at *6 (finding that an out-of-state ice cream cake manufacturer's control over the "handling, release[,] and transfer" of its products while stored in the defendant's warehouse

reflected a continuity of movement across state lines).  Here, by contrast, Absopure's asserted control began only after Absopure received the product into its warehouses.  To be sure, Absopure maintained that control as it delivered the products to its intrastate customers.  But the control Absopure exercised over the products was entirely intrastate in nature.  This factor lends no support to Absopure's position.

### j.  Interstate Intent of the "Shipper"

As explained above, an evaluation of intent may not be the best formulation of the proper analysis for the MCA exemption.  Nonetheless, if intent is to be utilized, the question arises: whose intent is relevant?  The parties disagree about whether Absopure or Mountain Valley is the "shipper" for purposes of assessing intent.  Plaintiffs submit that Mountain Valley is the shipper. Pl. Br. on MCA at 3 (citing Pl. Mot. for Recons. at 2 (Dkt. 214)).  They point to testimony from Byrne who answered in the affirmative when asked questions like: "And it's your position that Mountain Valley did . . . ship these [Mountain Valley products] from their Hot Springs facility to Absopure's Plymouth, Michigan facility; correct?"  Pl. Mot. for Recons. at 2–3 (citing Absopure Dep. at 175, 187 (Dkt. 56-2)).  They also point to testimony from the corporate representative of J.B. Hunt—a third-party carrier that shipped the products from Arkansas to Absopure's warehouses in Michigan—indicating that Mountain Valley largely directs J.B. Hunt's transportation of Mountain Valley products.  Pl. Mot. for Recons. at 6–10 (citing J.B. Hunt Dep at 52 (Dkt. 203-1)).

Absopure disagrees and contends that it is the shipper.  Def. Br. on MCA at 8–9.  It too cites Byrne's testimony, who at trial stated that Absopure determined the amount and type of products to be shipped to Absopure's warehouses from Mountain Valley and the timeframe for when those shipments arrive.  Id. at 8–9 (citing 12/12/23 Byrne Trial Test. at 140–142).  Absopure further points out that Byrne testified that Absopure had final control over selecting the third-party

carrier entity used to ship the product. Id. at 9 (citing 12/12/23 Byrne Trial Test. at 147, 192–194) (testifying that "we select our carrier").

The Court's review of case law applying the MCA reveals little clarity on the precise definition of the "shipper."  While they do not explicitly define the role of the "shipper," courts often implicitly characterize the employer as the "shipper" by centering their analysis on whether the employer invoking the FLSA maintained the requisite interstate intent.  See, e.g., Collins, 589 F.3d at 896–898 (referring to the employer, an importer and distributor of wine, as "the shipper," and assessing the employer's intent where the employer purchased wine from out-of-state, and "control[led] the wine and direct[ed] its movements on the entire journey from the state . . . of origin . . . to the [in-state] retail stores"); Mazzarella, 823 F.3d at 791 (assessing whether the employer's intent—as reflected by its employees' activities—revealed a "fixed and persisting intent" to ship in interstate commerce).  Moreover, several courts have indicated that there may be multiple shippers in a given transaction.  See Musarra, 454 F. Supp. 2d at 706 (explaining that a "crucial factor in determining the character of a particular shipment is the 'original and persisting intention of the shippers'") (quoting Baltimore & O.S.W.R.R. v. Settle, 260 U.S. 166, 174 (1922)); Horn, 2008 WL 7137186, at *3 (noting that whether intrastate activities are an extension of interstate commerce depends on the "fixed and persisting transportation intent of the shippers") (punctuation modified).

Given the law's lack of clarity regarding the role of the shipper and the competing evidence regarding Mountain Valley and Absopure's respective roles in transporting the products from Mountain Valley's location in Arkansas to Absopure's customers in Michigan, the Court finds it appropriate to examine whether Mountain Valley or Absopure maintained a fixed and persisting interstate intent beyond Absopure's warehouses.  An evaluation of either entity's intent yields the

same result: neither Absopure nor Mountain Valley had a fixed and persisting intent that Plaintiffs'

intrastate deliveries were part of a practical continuity of product across state lines.

Regarding Mountain Valley, it is undisputed that Mountain Valley lacked any role in the

intrastate delivery of products from Absopure's warehouses to the ultimate customers.  See Def.

Resp. to Pl. Mot. for Summ. J. at 5 (Dkt. 61) (stating that "Mountain Valley's intent is to sell its

products to Absopure[,] [o]nce Mountain Valley sells its products, it has no further intent").  In

other words, Mountain Valley's intent to ship interstate does not persist beyond delivering its

product to Absopure's warehouses.

As to Absopure, the Court finds that Absopure also lacked a fixed and persisting intent for

continuous shipment of Mountain Valley products in interstate commerce.  To be sure, Absopure

intends to purchase Mountain Valley products from Arkansas and have those products transported

across state lines to Michigan.[10]  However, the Court's application above of MCA factors shows

that the intrastate journey was fundamentally disconnected from the interstate journey.  Orders of

products were completed upon delivery to customers.  Absopure's orders from Mountain Valley

were not based on orders from particular customers; rather, they were based on Absopure's stock

levels coupled with a view of its overall customer demand.  Absopure did not track its products

---

[10] Absopure has repeatedly argued that its interstate procurement of Mountain Valley products is
similar to the defendant's importation and delivery of produce in Smith, 2021 WL 1026910, at *4.
See Def. Br. on MCA at 8; Def. Br. in Supp. Mot. for Summ. J.  In that case, the court found that
the MCA applied to a plaintiff who made intrastate deliveries of produce and dairy products.
Smith, 2021 WL 1026910, at *4.  The court reasoned that the intrastate delivery of product to the
defendant's customers did not break the continuity of movement in interstate commerce in part
because the undisputed evidence at summary judgment showed that the defendants themselves
procured and made all arrangements for shipping the product (via "third-party shippers") from out-
of-state vendors to its own warehouses, and eventually to their customers in Michigan.  Id. at *4–
*5.  Here, by contrast, there is competing evidence regarding which entity controlled the interstate
transportation of products to Absopure's warehouses.  And as the Court explains above, the MCA
factors do not reflect a practical continuity of movement across state lines.

during the interstate journey, and the length of time those products remained in its warehouses is unclear.

### k. Conclusion Regarding Application of MCA Factors

At bottom, the manner in which Absopure warehoused and delivered its products to customers reflects a clear break in the products' interstate journey to Absopure's warehouses. The absence of such a continuous interstate movement compels the conclusion that Plaintiffs' work activities do not fall within the MCA's scope. See, e.g., Timberline, 925 F.3d at 850 (affirming district court's grant of summary judgment in favor of Secretary of Labor who brought action on behalf of employees who drove intrastate routes to deliver timber to mills); Mazzarella, 823 F.3d 791 (finding that the MCA did not apply to truck drivers who transported water to hydraulic fracking sites exclusively within Pennsylvania); Sedrick v. All Pro Logistics, LLC, No. 07-cv-5811, 2009 WL 1607556, at *1 (N.D. Ill. June 8, 2009) (granting summary judgment to employee who made intrastate deliveries of packaging material from manufacturer facility to warehouse, both of which located in Illinois).

### 3. "Firm Orders" and Walling v. Jacksonville Paper Co.

Aside from the Court's application of the above factors, Absopure also argues in its post-trial submissions—for the first time—that the MCA exemption applies solely because a "substantial part" of the products Absopure delivers derive from "firm orders," which it defines as pre-orders from customers. Def. Br. on MCA at 4–5. According to Absopure, firm orders account for eleven percent of its Mountain Valley deliveries. Id. at 5 (citing 12/12/23 Byrne Trial Test. at 15 (stating that "like [eleven] percent" orders are "firm orders")). To support this argument, Absopure cites an excerpt from Walling v. Jacksonville Paper Co., 317 U.S. 564, 569 (1943), in which the United States Supreme Court explains:

> The fact that all of respondent's business is not shown to have an interstate character is not important . . . . If a substantial part of an employee's activities

24

> related to goods whose movement in the channels of interstate commerce was
> established by the test we have described, he is covered by the Act.

Def. Br. on MCA at 4–5 (quoting Walling, 317 U.S. at 571–572) (emphasis by Absopure).  As far

as the Court can gather, Absopure's position is that, because eleven percent of its product deliveries

stem from firm orders—i.e., requests for products as of the time the products are still in Mountain

Valley's possession in Arkansas—a "substantial part" of Plaintiffs' "activities relate[] to goods

whose movements" are in "channels of interstate commerce."

This argument is without merit.  Even accepting Absopure's factual assertion that eleven

percent of its orders are firm orders, Absopure provides no support for the proposition that this

figure amounts to a "substantial part" of Plaintiffs' activities under Walling.  Further, Absopure

has not established that these firm orders reflect a practical continuity of movement of products

across state lines.  In fact, Byrne's testimony suggests that the opposite is true: Absopure's

fulfilment of firm orders is entirely intrastate in nature.  Byrne explained that "firm orders" are

those by which a customer has made a request for a specific product.  12/12/23 Byrne Trial Test.

at 22.  Absopure fulfills these orders within one or two days using the stock it has on hand at its

warehouses.  Id. at 23.  However, the deliveries Absopure receives from Mountain Valley are not

based on specific customer orders, but rather reflect an "accumulation" of customer orders.  Id. at

24.  This means that, contrary to Absopure's assertion, firm orders represent requests for products

that are already located in Absopure's warehouses in Michigan.  As a result, Absopure's firm-

order deliveries are no more continuously interstate in character than its deliveries of non-firm

orders.  Absopure's appeal to Walling based on Plaintiffs' deliveries stemming from firm orders

is misplaced.[11]

---

[11] Even if Absopure's firm orders did reflect the practical continuity of movement in interstate
commerce, Absopure cites no evidence that these particular Plaintiffs made any deliveries of firm
orders.  See Def. Br. on MCA.  For all the Court is aware, firm orders may have been delivered by
none, some, or all of the Plaintiffs.

In sum, taking into account all of the relevant factors regarding the applicability of the MCA, the Court finds that Absopure's intrastate deliveries of Mountain Valley products were not part of a continuous movement of interstate commerce. Accordingly, the Court concludes that Plaintiffs are not subject to the MCA's exemption to the FLSA's overtime requirements.

### B. Application of the Small Vehicle Exception to the MCA to Plaintiffs Who Drove Small Vehicles Less Than Two Times Per Month

Because the Court finds that the MCA exemption does not apply to Plaintiffs, it need not reach the small vehicle exception to the MCA exemption. However, in the interest of presenting a complete record should an appellate decision make this issue material, the Court addresses the issue now.

The Technical Corrections Act (TCA) provides an exception to the MCA exemption to the FLSA's requirements for "covered employees." See SAFETEA–LU Technical Corrections Act of 2008 § 306, Pub. L. No. 110–244, June 6, 2008, 122 Stat 1572. The statute defines "covered employee" as an individual:

> (1) who is employed by a motor carrier or motor private carrier . . .
> (2) whose work, in whole or in part, is defined—
>> (A) as that of a driver, driver's helper, loader, or mechanic; and
>> (B) as affecting the safety of operation of motor vehicles weighing 10,000 pounds or less in transportation on public highways in interstate or foreign commerce, except vehicles—
>>> (i) designed or used to transport more than 8 passengers (including the driver) for compensation;
>>> (ii) designed or used to transport more than 15 passengers (including the driver) and not used to transport passengers for compensation; or
>>> (iii) used in transporting material found by the Secretary of Transportation to be hazardous under section 5103 of title 49, United States Code, and transported in a quantity requiring placarding under regulations prescribed by the Secretary under section 5103 of title 49, United States Code; and
> (3) who performs duties on motor vehicles weighing 10,000 pounds or less.

26

Id. § 306(c) (emphasis added).  Plaintiffs bear the ultimate burden in showing that the small vehicle exception applies.[12]  Carley v. Crest Pumping Techs., L.L.C., 890 F.3d 575, 580 (5th Cir. 2018).

In its May 10, 2023 summary judgment ruling (Dkt. 109), the Court concluded that named-plaintiff Justin Guy was a "covered employee" under the small vehicle exception because he demonstrated that he drove small vehicles at least twice per month.  Following entry of that order, the parties stipulated as follows:

> The Parties agree that [this Court's May 10, 2023] Order applies to the Opt-in Plaintiffs who drove a vehicle that weighs less than 10,001 pounds at least two times per month during their employment with Defendant and renders the Motor Carrier Act Exemption inapplicable to these Opt-in Plain[tiffs]."

See 5/15/23 Joint Statement at 1–2 (Dkt. 111).  However, they disagree about the extent to which Plaintiffs whom the jury found drove small vehicles less than two times per month fall within the scope of the exception.

As this Court has previously explained, see 5/10/23 Op. & Order at 4, courts in this circuit addressing the application of the small vehicle exception have applied what has become known as the "de minimis" standard, i.e., if the employee's work with small vehicles is more than de minimis, the exception applies, and those employees are entitled to overtime pay under the FLSA. See Byers v. Care Transp. Inc., No. 13-cv-15174, 2015 WL 5608287, at *8 (E.D. Mich. Sept. 24, 2015); Gowey v. True Grip & Lighting, Inc., 520 F. Supp. 3d 1013, 1017 (E.D. Tenn. 2021). While the Sixth Circuit has not defined the meaning of "de minimis" in the context of the TCA, courts applying this term typically consider whether the employee's work with small vehicles is

---

[12] The Sixth Circuit has not yet addressed the issue of who bears the burden with respect to the small vehicle exception.  In Carley, the Fifth Circuit held that plaintiffs bear the burden of proving that they are entitled to the small vehicle exception.  As that court explained, although employers "logically . . . bear the burden of proving an exemption from FLSA," the TCA is "not codified as an exemption [under 29 U.S.C § 207] but, rather, under the provision defining when FLSA mandates overtime pay," therefore, "the burden . . . is more appropriately placed on [p]laintiffs . . . as compliance with the [TCA] is of a piece of compliance with §207(a) . . . ."  Carley, 890 F.3d at 580.

"trivial, casual, or insignificant." <u>Gowey</u>, F. Supp. 3d at 1021; <u>see also</u> <u>Byers</u>, 2015 WL 5608287, at *8 n.11 (interpreting de minimis to mean conduct that is "'limited', 'trivial', 'casual', or 'occasional'") (quoting <u>Linnville v. RW Properties</u>, No. 6:13-cv-00542, 2015 WL 196372, at *4–*5 (D.S.C. Jan. 15, 2015)).

Courts have attempted to quantify the de minimis concept by analyzing the percentage of time a plaintiff worked with small vehicles.  <u>See, e.g.</u>, <u>Hinds v. FedEx Ground Package Sys., Inc.</u>, No. 18-cv-01431, 2020 WL 12048882, at *7–*8 (N.D. Cal. June 1, 2020) (finding that the plaintiff met the de minimis threshold by working on such vehicles during "5.41% of her workweeks (2/37 × 100) and on approximately 1.31% (2/153 × 100) of her workdays").

Plaintiffs urge the Court to adopt a 1% threshold—i.e., to qualify for the small vehicle exception, Plaintiffs' engagement with small vehicles must comprise 1% or more of their work. Pl. Br. on Small Vehicle Exception at 3.  As Plaintiffs point out, the 1% de minimis threshold has been recognized in the context of the small vehicle exception.  <u>See</u> <u>id.</u> citing (<u>Oddo v. Bimbo Bakeries U.S.A., Inc.</u>, 391 F. Supp. 3d 466, 474 (E.D. Pa. 2019)).  In <u>Oddo</u>, the court held that the plaintiffs satisfied the de minimis threshold where the plaintiffs drove small vehicles on 1% or more of their trips.  <u>Oddo</u>, 391 F. Supp. 3d at 474.  And Plaintiffs cite other cases where courts have utilized the 1% figure in addressing whether conduct exceeds a de minimis level for purposes of applying other aspects of the MCA exemption.  Pl. Br. on Small Vehicle Exception at 4 (citing <u>Turk v. Buffets, Inc.</u>, 940 F. Supp. 1255, 1262 (N.D. Ill. 1996) (finding that plaintiffs who spent more than 1% of their work on safety-affecting activities met the de minimis threshold) and <u>Walters v. Am. Coach Lines Of Miami, Inc.</u>, 575 F.3d 1221, 1228 (11th Cir. 2009) (explaining that, in the context of determining whether a motor carrier sufficiently engages in interstate commerce such that it falls within the scope of the MCA's jurisdiction, "a company's interstate

business is de minim[i]s if it constitutes less than one percent of the overall trips taken by the company")).

Relying on this line of cases, Plaintiffs argue that the small vehicle exception applies to those whose engagement with small vehicles was 1% or more of their work.  Pl. Br. on Small Vehicle Exception at 4–5.  Under Plaintiffs' view, of the eleven Plaintiffs whom the jury found drove small vehicles on average less than two times per month, three Plaintiffs—Keith Brown, Gary Johnson Jr., and Nathan Redmer—do not meet the de minimis threshold because the jury determined that each drove small vehicles "zero" times per month. Pl. Br. on Small Vehicle Exception at 4–5 (citing Verdict Form at 4, 7, 11).  According to Plaintiffs, this means that the remaining eight Plaintiffs—i.e., those whom the jury found drove small vehicles but did so less than two times per month[13]—all clear the de minimis threshold because they drove small vehicles for at least 2.31% of the time.[14]

The Court agrees with Plaintiffs that the individual plaintiffs who engaged with small vehicles for more than 1% of their work satisfy the de minimis threshold.  To determine whether individual plaintiffs meet this threshold, Plaintiffs translate the jury's findings on the number of

---

[13] These eight Plaintiffs include: (i) John Aniol, Lucas Belonga, Ryan Clendennin, and Charles Perry, whom the jury found drove small vehicles at least 0.5 times per month; (ii) Paul Okimoto and Ryan Rhodes, whom the jury found drove small vehicles 1 time per month; and (iii) Antony Newkirk and Terry Pemberton, whom the jury fund drove small vehicles 1.5 times per month.  See Verdict Form.

[14] The 2.31% figure is derived from Plaintiffs' method of calculating the percentage of time Plaintiffs spent driving small vehicles per month.  See Pl. Br. on Small Vehicle Exception at 4–5.  Plaintiffs' math assumes the following variables: (i) Plaintiffs drove a small vehicle 8 hours in each instance and (ii) there are 173.2 work hours in a month (52 workweeks per year consisting of 40 hours-worked ÷ 12 months).  Id.  This would mean that a plaintiff's driving of a small vehicle 1 time per month equates to 4.62% of that plaintiff's working hours (8 hours-driving ÷ 173.2 work hours per month = 4.62%); driving a small vehicle 0.5 times per month equates to 2.31% (4 hours-driving ÷ 173.2 work hours per month = 2.31%); and driving a small vehicle 1.5 times per month equates to 6.92% (12 hours-driving ÷ 173.2 work hours per month = 6.92%).  See id.  Plaintiffs ultimately conclude that a plaintiff meets the de minimis threshold if he drove small vehicles for 1.732 hours per month (1.732 hours-driving ÷ 173.2 work hours per month = 1%).  Id.

times per month that Plaintiffs' drove small vehicles into percentages by determining the number of hours Plaintiffs spent driving small vehicles.  Id. at 4–5; see also note 14 above.

While Plaintiffs' analysis focuses on the amount of time spent per month driving small vehicles, another way is to determine whether Plaintiffs drove small vehicles for an average of 1% or more of their trips per month.  Assuming that a plaintiff's duties consisted of driving 20 routes per month (one route for each workday and excluding weekends), the 1% threshold would be reached if a plaintiff drove a small vehicle at least 0.2 times per month.[15]  Thus, those Plaintiffs whom the jury found drove small vehicles "0.5 times per month," exceed the 1% de minimis threshold.  Regardless of whether the Court views Plaintiffs' work with small vehicles in terms of the amount of time or number of trips, the eight Plaintiffs who drove small vehicles at least 0.5 times per month meet the 1% de minimis threshold.  These Plaintiffs are subject to the small vehicle exception under the TCA.

Resisting this conclusion, Absopure argues that the Court should apply the de minimis standard as it is used in cases involving the Portal-to-Portal Act, 29 U.S.C § 254(a), which clarifies employers' obligations for compensating employees for certain activities during the workday.[16] Def. Br. on Small Vehicle Exception at 3–4; De Asencio, 500 F.3d at 374 (explaining that courts

---

[15] Trial testimony established that Plaintiffs typically worked five days a week and occasionally on weekends.  See e.g., Trial Tr. Vol. 2 at 89–91 (Dkt. 261) (testimony of Kevin Phipps explaining that he worked Monday through Friday and occasionally on Saturdays); Trial Tr. Vol. 3 at 150–151 (Dkt. 262) (testimony of Belonga stating that he worked "[s]ome Saturdays); id. at 296 (testimony of Clendennin stating that he occasionally worked on Saturdays).  Even assuming Plaintiffs worked six days a week and drove approximately 26 routes per month (to account for four Saturdays in some months and five Saturdays in other months), Plaintiffs who drove a small vehicle at least 0.26 times per month meet the 1% threshold.

[16] The Portal-to-Portal Act characterizes the following activities as not subject to the FLSA's compensation requirements: "(1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and (2) activities which are preliminary to or postliminary to said principal activity or activities." De Asencio v. Tyson Foods, Inc., 500 F.3d 361, 367 (3d Cir. 2007) (punctuation modified).

determine whether compensable time is de minimis for purposes of the Portal-to-Portal Act by examining "(1) the practical administrative difficulty of recording the additional time; (2) the aggregate amount of compensable time; and (3) the regularity of the additional work") (punctuation modified)).

The Court declines to adopt the de minimis standard as it is defined by courts interpreting the Portal-to-Portal Act. For one thing, the Court has already determined that it will apply the de minimis standard applied by other district courts in the context of the small vehicle exception, and that standard that does not stem from the Portal-to-Portal Act. See 5/10/23 Op. & Order at 4.

In addition, courts applying the de minimis standard in the Portal-to-Portal context are concerned about "provid[ing] a limiting principle to compensation for trivial calculable quantities of work" for purposes of calculating overtime under the FLSA. De Asencio, 500 F.3d at 374 (utilizing Portal-to-Portal Act to determine whether time spent donning, doffing, and washing work gear was "work" under FLSA for purposes of computing hours worked). Here, the Court's task is different; it must determine whether the proportion of Plaintiffs' work with small vehicles is sufficient for them to qualify for the small vehicle exception.

Tellingly, Absopure does not explain how the three de minimis factors in the context of the Portal-to-Portal Act would apply to the facts at issue here. Def. Br. on Small Vehicle Exception at 4–5. Nor does it cite any authority to support the proposition that the Portal-to-Portal standard should also be applied in cases involving the small vehicle exception. Id. at 4. Indeed, at least one court addressing the small vehicle exception has rejected this same position. See Oddo, 391 F. Supp. 3d at 471 (rejecting defendant-employer's request to apply de minimis standard derived from Portal-to-Portal Act jurisprudence). The Court will not revisit its prior conclusion that, for purposes of the small vehicle exception, de minimis means work with small vehicles that is trivial, casual, or insignificant.

Absopure also argues that the standard adopted by this Court must be applied on a week-by-week basis—i.e., to qualify for the exception, Plaintiffs must demonstrate that they have met the de minimis threshold in a given workweek. Def. Br. on Small Vehicle Exception at 2–3. Plaintiffs reply that Absopure waived any argument that the de minimis standard must be applied on a weekly basis by stipulating that the exception applies to Plaintiffs who drove small vehicles at least two times per month. Pl. Br. on Small Vehicle Exception at 2. The Court agrees. Because Absopure previously agreed that Plaintiffs can demonstrate that they meet the de minimis threshold based on the number of times they drove small vehicles per month, see 5/15/23 Joint Statement at 1–2, it cannot now insist upon a week-by-week analysis.

Even if it had not waived the argument, Absopure's cited cases do not support its position. See Def. Br. on Small Vehicle Exception at 2–3. Whether courts must apply the small vehicle exception on week-by-week basis was not a contested issue in these cases. In Oddo, the plaintiffs—who were drivers of both small and large vehicles—advocated for a week-by-week analysis. The dispute in the case was whether the court should not require them to make an initial showing that they had met the de minimis standard of small vehicle usage on an overall basis during the period of employment before proceeding to a week-by-week analysis. Id. at 470–472. The court rejected plaintiffs' argument that no threshold showing was required, but it did agree that the 1% usage was sufficient to meet that threshold. Thus, the parties did not dispute, nor was the court required to address, whether the small vehicle exception must be applied on a week-by-week basis.

The same is true in in Byers, 2015 WL 5608287, at *8. There, the central dispute was whether the exception applied to plaintiffs whose duties included any work on large vehicles. Id. Siding with the plaintiffs' view, the court held that the plaintiffs who performed more than a de minimis amount of work on small vehicles could properly invoke the small vehicle exception. Id.

32

There was no defense argument or court ruling that the analysis must be week-by-week.[17]  Byers and Oddo provide no support for the proposition that Plaintiffs must satisfy the de minimis standard based on a week-by-week metric.

Absoupre cites C.F.R § 782.2, which contains a de minimis standard for one aspect of the MCA—i.e., whether safety-affecting operations are involved—and applies that standard on a week-by-week basis under certain circumstances.  Def. Br. on Small Vehicle Exception at 4.[18]  Notably, it does not apply to the small vehicle exception.  Further, it utilizes the week-by-week analysis in a limited case: only when a driver's general duties do not impact safety or do so in a de minimis way and there are additional duties assigned that impact safety during particular weeks.  Only in that limited circumstance does the regulation call for a week-by-week basis.  The regulation is hardly a broad endorsement of a week-by-week analysis in all circumstances and certainly not in the small vehicle context, to which it does not purport to apply.

Nor does this regulation appear consistent with the plain text of the TCA.  As noted above, the term "covered employee" is one whose job "in whole or in part," affects the safe operation of vehicles lighter than 10,000 pounds.  TCA § 306(c).  The natural reading of that text does not

---

[17] The court did state that the exception was available "at least during weeks where there is such combined work [on small and large vehicles]."  Byers, 2015 WL 5608287, at *8.  But this statement was not made in the context of any discussion that made a week-by-week analysis a requirement.  And the court's use of the phrase "at least" shows the court was not making that a required analysis.

[18] Section 782.2(b)(3) provides in part:
> [W]here the continuing duties of the employee's job have no substantial direct effect on such safety of operation or where such safety-affecting activities are so trivial, casual, and insignificant as to be de minimis, the exemption will not apply to him in any workweek so long as there is no change in his duties. If in particular workweeks other duties are assigned to him which result, in those workweeks, in his performance of activities directly affecting the safety of operation of motor vehicles in interstate commerce on the public highways, the exemption will be applicable to him those workweeks, but not in the workweeks when he continues to perform the duties of the non-safety-affecting job.

(punctuation modified).

suggest any week-by-week analysis: so long as a plaintiff's work duties with small vehicles are sufficient to meet the de minimis threshold, that plaintiff is a "covered employee" under TCA, and therefore, entitled to overtime under the FLSA.  Absopure's reliance on 29 C.F.R. § 782.2 lacks merit.[19]

In addition, the Court's review of the caselaw does not compel the conclusion that the de minimis standard requires a week-by-week application.  Indeed, a number of courts have adopted interpretations of the TCA that reject the week-by-week approach and interpret the TCA to count as "covered employees" individuals whose duties, on the whole, include more than a de minimis amount of work involving small vehicles.  Courts adopting this view reason that the plain text of the TCA compels such an interpretation.  See, e.g., Schilling v. Schmidt Baking Co., Inc., No. 16-cv-2498, 2018 WL 3520432, at *5 (D. Md. July 20, 2018) ("[B]y its plain text, the TCA exception applies to employees based on their job duties, not based on their actual work performed each week."); Childress v. Ozark Delivery of Missouri L.L.C., 95 F. Supp. 3d 1130, 1137 n.6 (W.D.

---

[19] Absopure also points to a DOL "Field Assistance Bulletin," which states that the FLSA's "overtime pay requirements apply to an employee of a motor carrier or motor private carrier in any workweek in which the employee works, 'in whole or in part', as a driver, driver's helper, loader or mechanic affecting the safety of operation of small vehicles on public highways in interstate or foreign commerce."  U.S. Dept. of Labor, Wage and Hour Div., Field Assistance Bulletin No. 2010-2 (Nov. 4, 2010); Def. Memo on Small Vehicle Exception at 1–2 (Dkt. 222).

However, Absopure has not established that the bulletin is entitled to interpretive deference.  See Parker v. Battle Creek Pizza, Inc., No. 22-2119, 2024 WL 1068871, at *6 (6th Cir. Mar. 12, 2024) ("[C]ourts should defer to an agency's 'authoritative' interpretation of a genuinely ambiguous regulation") (quoting Kisor v. Wilkie, 139 S. Ct. 2400, 2414 (2019) (plurality opinion).  The bulletin provides no explanation about the meaning of the TCA or why the small vehicle exception would be applied on a week-by-week basis.  Parker, 2024 WL 1068871, at *6 (declining to grant interpretive deference to a DOL "Field Operations Handbook" in part because the handbook "offers no interpretation at all" and explaining that "'[e]nforcement policies'" guide the exercise of prosecutorial discretion; interpretations of legal texts, by contrast, explain not only what the words mean but why").  Moreover, the bulletin offers no guidance on how to apply the small vehicle exception in the context of the present case—i.e., where the particular weeks in which Plaintiffs drove small vehicles are not known.

Mo. 2015) (rejecting interpretation that plaintiffs were only "covered employees" during the weeks they drove exclusively small vehicles).

Absopure's position is also not consistent with how the law allocates the burden of proof between employers and employees in cases involving the FLSA and its exemptions. In FLSA cases, if Plaintiffs provide "reasonable estimate[s] of damages, then the burden shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the plaintiff's evidence." Walsh v. Timberline S., LLC, 658 F. Supp. 3d 484, 489 (E.D. Mich. 2023) (punctuation modified). And while Plaintiffs have the burden of showing that they fall within the scope of the small vehicle exception, Carley, 890 F.3d at 580, that burden does not permit Absopure to shirk its obligation to maintain records under the FLSA. Essentially, Absopure's position flips FLSA's recordkeeping regime on its head—requiring that Plaintiffs provide precise evidence that they drove small vehicles in a particular workweek to establish that the MCA does not apply. The law does not require Plaintiffs to shoulder such a burden. See Parker, 2024 WL 1068871, at *6 (cautioning that, in the FLSA context, the Supreme Court has "chosen to lighten somewhat the plaintiffs' burden of proof" where the employer has "fail[ed] to keep certain records").

As an alternative to requiring a week-by-week approach, Absopure submits that the Court should "translate[]" the jury's findings on the number of times Absopure drove small vehicles per month into a weekly finding. Def. Br. on Small Vehicle Exception at 5.[20] Absopure cites no authorities to support this position. And such an approach would require that the Court infer facts not supported by the jury's findings. The Court declines to adopt Absopure's approach.

---

[20] Per Absopure's example, the jury's finding that a plaintiff drove small vehicles "'twice per month' could only mean two weeks per month that the small vehicle exception applied; '1.5 times per month' would mean only three weeks out of two months; '0.5 times per month' would only mean one week out of two months, and so on." Def. Br. on Small Vehicle Exception at 5.

Because the Court concludes that Plaintiffs who drove small vehicles for 1% or more of their average monthly work meet the de minimis threshold, these Plaintiffs fall within the TCA's small vehicle exception to the MCA exemption to the FLSA's overtime requirements.[21]

### III. CONCLUSION

For the foregoing reasons, the Court concludes that (i) Plaintiffs are not subject to the MCA exemption to the FLSA, and (ii) even if the MCA exemption were to apply, Plaintiffs whom the jury found drove small vehicles for an average of 1% or more of their trips per month are subject to the TCA's small vehicle exception to the MCA exemption.  The Court will separately enter a judgment consistent with this opinion and order.

SO ORDERED.

Dated:  March 29, 2024                                    s/Mark A. Goldsmith
       Detroit, Michigan                              MARK A. GOLDSMITH
                                       United States District Judge

---

[21] The following Plaintiffs qualify for the small vehicle exception: Justin Guy, John Aniol, Aaron Armstead, Lucas Belonga, Dannielle Childs, Ryan Clendennin, Caleb Fish, Shawn Jacek, Antony Newkirk, Paul Okimoto, Terry Pemberton, Charles Perry, Kevin Phipps, Ryan Rhodes, David Sujkowski, Jordan Tampa, Kyle Winconek, and George Woldt.  See Verdict Form.